```
4/05/21                OREGON DEPARTMENT OF CORRECTIONS            PAGE: 001
7:43:04                 Institution Division FACESHEET             OPS532B
                                                                   MOSSM

Location: EOCI                    SID#: 19524416
                                                        Orig Adm Date: 10/25/2016
Court/Legal Name: HOLLINGSWORTH, JORDEN TIMOTHY         Curr Adm Date: 10/25/2016
True Name:                                              Proj Rele Date: 06/03/2022
       Birth Date:  08/01/1993                          Phys Rele Date:
        Sex/Race:   M/W                                  Maximum Date: 06/03/2022
        Hair/Eyes:  BROWN/BROWN                         Parole Release:
    Height/Weight:  5'08"/165 lbs                       Good Time Date:


                                                        SG Earned Date: 06/03/2022
Not eligible for Transitional Leave                     SG Proj Date: 06/03/2022

                            01      *SG      02     *SG
Offense (abbrev)      SEXAB1 N          SEXAB1 N
137.635/137.700       N/Y               N/Y
Sent Reduct/Ovrd      R-00/N            R-00/N
TL/AIP1/AIP2/WR       R/R/R/R           R/R/R/R
Sentence yy-mm-dd     000-075-000       000-075-000
Court docket#         CR1501848         CR1501848
Dockt county/count    CLAC/01           CLAC/02
Name of judge         WEBER             WEBER
Date convicted        10/24/2016        10/24/2016
Sentence begin dt.    10/25/2016        10/25/2016
Time served credit    00235 N           00235 N
Minimum 137.700       000-075-000       000-075-000
Minimum 137 date      06/03/2022        06/03/2022
GT-ET credit/Lost
Inop/Merit GT
MAX sent date         06/03/2022        06/03/2022
SG earned date        06/03/2022        06/03/2022
Proj rele/GT date     06/03/2022        06/03/2022
Termination date
Termination code
PPS sent length       000-036-000       000-036-000
```

```
* * * * * * * * * * * E N D   O F   F A C E S H E E T * * * * * * * * * * * *
```

*State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

# IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR THE COUNTY OF CLACKAMAS

| | | |
|---|---|---|
| State of Oregon, | ) | |
| Plaintiff | ) | |
| | ) | Case No.: CR1501848 |
| vs. | ) | |
| | ) | **JUDGMENT** |
| | ) | |
| JORDEN TIMOTHY HOLLINGSWORTH, | ) | Case File Date: 10/23/2015 |
| Defendant | ) | District Attorney File #: 005270149 |

## DEFENDANT

True Name: JORDEN TIMOTHY HOLLINGSWORTH
Date Of Birth: 08/01/1993            State Identification No (SID): 19524416OR
Fingerprint Control No (FPN): 00000000

## HEARING

Proceeding Date: 10/24/2016
Judge: Katherine E Weber
Court Reporter: FTR, Courtroom 2

Defendant appeared in person and was in custody. The court determined that the defendant was indigent for purposes of court-appointed counsel, and the court appointed counsel for the defendant. The defendant was represented by Attorney(s) ARTHUR B KNAUSS, OSB Number 731700. Plaintiff appeared by and through Attorney(s) SARAH J DUMONT, OSB Number 035419.

## COUNT(S)

It is adjudged that the defendant has been convicted on the following count(s):

### Count 1 : Sexual Abuse in the First Degree

Count number 1, Sexual Abuse in the First Degree, 163.427, Felony Class B, committed on or about 02/13/2015. Conviction is based upon a Court Verdict of Guilty on 08/11/2016.

**Sentencing Guidelines**

The Crime Severity Classification (CSC) on Count Number 1 is 8 and the Criminal History Classification (CHC) is B.

This sentence is pursuant to the following special factors:
- Sentence per ORS 137.700

EXHIBIT 101, Page 2 of 5
Case No. 3:20-cv-01567-MC

*State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

**Sentence Instructions**

Defendant shall:
- Report as a sex offender under ORS 181.596, report with the Department of State Police, a city police department, a county sheriff's office or the supervising agency:  (A) When supervision begins; (B) Within 10 days of a change in residence; (C) Once each year within 10 days of the probationer's date of birth; (D) Within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; and (E) Within 10 days of a change in work, vocation or attendance status at an institution of higher education.

**Incarceration**

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 75 month(s). Defendant is remanded to the custody of the Clackamas Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The defendant is not eligible for earned time/good time credit. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

**Post-Prison Supervision**

The term of Post-Prison Supervision is 36 month(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

## Count 2 : Sexual Abuse in the First Degree

Count number 2, Sexual Abuse in the First Degree, 163.427, Felony Class B, committed on or about 08/24/2009. Conviction is based upon a Court Verdict of Guilty on 08/11/2016.

**Sentencing Guidelines**

The Crime Severity Classification (CSC) on Count Number 2 is 8 and the Criminal History Classification (CHC) is A.

This sentence is pursuant to the following special factors:
- Sentence per ORS 137.700

*Document Type: Judgment*          *Page 2 of 4*          *Printed on 10/24/2016 at 9:50 AM*

*State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

**Sentence Instructions**

Defendant shall:

- Report as a sex offender under ORS 181.596, report with the Department of State Police, a city police department, a county sheriff's office or the supervising agency:  (A) When supervision begins; (B) Within 10 days of a change in residence; (C) Once each year within 10 days of the probationer's date of birth; (D) Within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; and (E) Within 10 days of a change in work, vocation or attendance status at an institution of higher education.

**Incarceration**

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 75 month(s). Defendant is remanded to the custody of the Clackamas Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The defendant is not eligible for earned time/good time credit. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

This sentence shall be concurrent with the following cases Count number 1.

**Post-Prison Supervision**

The term of Post-Prison Supervision is 36 month(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

If convicted of a felony or a crime involving domestic violence, you may lose the right to buy, sell, transport, receive, or possess a firearm, ammunition, or other weapons in both personal and professional endeavors pursuant to ORS 166.250, ORS 166.291, ORS 166.300, and/or 18 USC 922(g).

*State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

**Payment Schedule**

Payment of the fines, fees, assessments, and/or attorney's fees noted in this and any subsequent Money Award shall be scheduled by the clerk of the court pursuant to ORS 161.675.

Payable to:

**Clackamas County Circuit Court**
**807 Main St**
**Oregon City, Oregon 97045**
**P: 503.655.8447**
**F: http://courts.oregon.gov/Clackamas**

Dated the _____24ᵗʰ_____ day of _____October_____, 20 _16_

Signed: /S/ KATHERINE E. WEBER
_____
Katherine E Weber

CLACKAMAS COUNTY COURT
Filed/Entered

OCT 23 2015 11: 40

By: DOCKET TAE

1

2

3                IN THE CIRCUIT COURT OF THE STATE OF OREGON

4                     FOR THE COUNTY OF CLACKAMAS

5   STATE OF OREGON,                    )
                    Plaintiff,          )    Court No. CR1501848
6                                       )
                                        )
        vs.                             )
7                                       )    INDICTMENT
    JORDEN TIMOTHY HOLLINGSWORTH,       )
8   DOB: 08/01/1993                     )
    DL: OR 2735840                      )    DA No. 005270149
9                   Defendant.          )
    _____)

10          The above-named defendant is accused by the Grand Jury of the County of Clackamas,
    State of Oregon, by this Indictment as follows:
11

                          SEXUAL ABUSE IN THE FIRST DEGREE
12                               COUNT 1 (ORS 163.427)
                                     Class B Felony
13          The defendant, on or about February 13, 2015, in Clackamas County, Oregon, did
    unlawfully and knowingly subject Jasmine Jewell Shafer a person under the age of 14 years, to
14  sexual contact by touching her breast, a sexual or intimate part of Jasmine Jewell Shafer.

15                        SEXUAL ABUSE IN THE FIRST DEGREE
                                 COUNT 2 (ORS 163.427)
16                                   Class B Felony
            The defendant, on or between August 24, 2009 and August 23, 2012, in Clackamas
17  County, Oregon, did unlawfully and knowingly subject Jasmine Jewell Shafer a person under the
    age of 14 years, to sexual contact by touching her genitals, a sexual or intimate part of Jasmine
18  Jewell Shafer.

19  /////

20  /////

21  /////

22  /////

23  /////

24  /////

CR1501848
SI
Secret Indictment
4101163

25  Page 1 of 2 – INDICTMENT / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 / CR1501848
                            Clackamas County District Attorney
                    807 Main Street, Room 7, Oregon City, OR 97045
                    Phone: (503) 655-8431  Fax (503) 650-8943

Verified Correct Copy of Original 1/11/2016.

1 //////

    Said act(s) contrary to statutes in such cases made and provided, and against the peace

2 and dignity of the State of Oregon.

3 Dated this 19th day of October, 2015.

4                 A TRUE BILL

5 _____

   Foreman of the Grand Jury

6

7

Witnesses examined before the Grand Jury
(unless otherwise specified, witness gave
testimony in person):
Sean Ellis
Kenneth Jewell
Jasmine Jewell Shafer
Trisha Miller

8 JOHN S. FOOTE

   District Attorney

9

   By _____

10     Bryan J. Brock, OSB# 962335

     BryanBro@co.clackamas.or.us

11    Deputy District Attorney

12 NOTICE:    Where this accusatory instrument charges one or more misdemeanor crimes, the district

   attorney hereby declares that the state intends that said offense(s) proceed as a misdemeanor(s).

13

   CONTROL #:    / SID #OR19524416

14 Agency:       Oregon City Police Department/15-0539

15

16

17

18

19

20

21

22

23

24

25 Page 2 of 2 – INDICTMENT / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 / CR1501848

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone (503) 655-8431 Fax: (503) 650-8943

EXHIBIT 102, Page 2 of 2
Case No. 3:20-cv-01567-MC

Verified Correct Copy of Original 1/11/2016.

1              IN THE CIRCUIT COURT OF THE STATE OF OREGON

2                     FOR THE COUNTY OF CLACKAMAS

3

4     STATE OF OREGON,                )
                                      )
5                   Plaintiff,        )   Case No. CR1501848
                                      )
6         v.                          )   Appellate No. A163680
                                      )
7     JORDEN TIMOTHY HOLLINGSWORTH,   )
                                      )
8                   Defendant.        )

9

10

11

12

13

14              <u>TRANSCRIPT OF PROCEEDINGS</u>

15                   August 9, 2016

16                   August 10, 2016

17                   August 11, 2016

18                   October 24, 2016

19

20

21

22

23

24

25

```
 1                         INDEX

 2                                                  Page

 3   August 9, 2016                                    6

 4     Waiver of jury trial                            8

 5     State's opening statement                      13
       Defendant's opening statement                  16
 6

 7   August 10, 2016                                 150

 8     State rests case in chief                      311

 9

10   August 11, 2016                                 453

11     Defendant rests case in chief                 553

12     State's closing argument                      554
       Defendant's closing argument                  565
13     State's rebuttal argument                     576

14     Verdict                                        578

15

16   October 24, 2016                                583

17     Imposition of sentence                        597

18

19

20

21

22

23

24

25
```

EXHIBIT 103, Page 2 of 601
Case No. 3:20-cv-01567-MC

:

1                          <u>WITNESS INDEX</u>

2    <u>FOR THE STATE</u>:                                              <u>Page</u>

3    JASMINE JEWELL SHAFER
     Direct examination by Ms. Dumont                          23
4    Cross-examination by Mr. Knauss                           45
     Redirect examination by Ms. Dumont                        68
5
     KENNETH JEWELL
6    Direct examination by Ms. Dumont                          76
     Cross-examination by Mr. Knauss                          102
7    Redirect examination by Ms. Dumont                       118

8    JOHN BEHAN
     Direct examination by Ms. Dumont                         121
9    Cross-examination by Mr. Knauss                          129
     Redirect examination by Ms. Dumont                       131
10
     SEAN ELLIS
11   Direct examination by Ms. Dumont                         132
     Cross-examination by Mr. Knauss                          144
12   Redirect examination by Ms. Dumont                       145

13   AMANDA MCVAY
     Direct examination by Ms. Dumont                         152
14   Cross-examination by Mr. Knauss                          271

15   SUSAN SKINNER
     Direct examination by Ms. Dumont                         296
16   Cross-examination by Mr. Knauss                          306

17

18

19

20

21

22

23

24

25

1                          WITNESS INDEX

2    FOR THE DEFENDANT:                                    Page

3    TRISHA MILLER
     Direct examination by Mr. Knauss                     322
4    Questions in aid of objection by Ms. Dumont          334
     Direct examination by Mr. Knauss resumed             335
5    Cross-examination by Ms. Dumont                      355
     Redirect examination by Mr. Knauss                   381
6
     DEBORAH MILLER
7    Direct examination by Mr. Knauss                     384
     Cross-examination by Ms. Dumont                      394
8    Redirect examination by Mr. Knauss                   397

9    TANAE'A HOLLINGSWORTH
     Direct examination by Mr. Knauss                     399
10   Cross-examination by Ms. Dumont                      410

11   MINDY SOLOMON
     Direct examination by Mr. Knauss                     414
12   Cross-examination by Ms. Dumont                      427

13   TRISTA TOBIN
     Direct examination by Mr. Knauss                     443
14   Cross-examination by Ms. Dumont                      446

15   WENDY BOURG
     Direct examination by Mr. Knauss                     455
16   Questions in aid of objection by Ms. Dumont          464
     Direct examination by Mr. Knauss resumed             466
17   Cross-examination by Ms. Dumont                      488

18   JORDEN TIMOTHY HOLLINGSWORTH
     Direct examination by Mr. Knauss                     504
19   Cross-examination by Ms. Dumont                      533
     Redirect examination by Mr. Knauss                   549

20

21

22

23

24

25

1                          EXHIBIT INDEX

2    FOR THE STATE:                          Offered   Received

3     1 - Photograph of text messages          139        139

4     2 - CD of Children's Center interview     163        163

5     3 - Copies of drawings                    259        259

6

7    FOR THE DEFENDANT:

8    101 - Wendy Bourg's curriculum vitae       456        456

9    102 - Diagram                              551        552

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              BE IT REMEMBERED That the above-entitled

 2   matter came on regularly for trial before the HONORABLE

 3   KATHERINE E. WEBER, Judge of the Circuit Court of the

 4   State of Oregon, for the County of Clackamas, commencing

 5   the 9th day of August, 2016.

 6

 7

 8   APPEARANCES:

 9   Sarah J. Dumont
     Deputy District Attorney
10   Clackamas County District Attorney's Office
     Clackamas County Courthouse
11   807 Main Street
     Room 7
12   Oregon, City OR  97045
     Appearing on behalf of the State of Oregon
13
     Arthur B. Knauss
14   Attorney at Law
     294 Warner Milne Road
15   Oregon City, OR  97045
     Appearing on behalf of the Defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2                    (August 9, 2016; 9:15 a.m.)
 3              [Transcriber's note:  Ms. Dumont's voice
 4    is not being amplified by a microphone, resulting in
 5    indiscernible passages.]
 6              MS. DUMONT:  State vs. Hollingsworth;
 7    1501848.  Sarah Dumont on behalf of the State.
 8    Defendant is present, out of custody, represented by
 9    Mr. Knauss.  The parties are prepared to proceed.  I
10    believe counsel has -- and defendant has executed a
11    waiver of jury trial.
12              MR. KNAUSS:  That's true.
13              THE COURT:  Mr. Knauss, I think I can see
14    it right there in front of Mr. Ward's chair.  If you
15    could hand it to me.
16              And I also understand that this case,
17    although it is a little bit newer in age, that two of
18    the State's witnesses were flown in from out of state,
19    so collectively the four of you, meaning the attorneys,
20    had a conversation and the understanding was that if
21    there's only one courtroom available, this case would
22    proceed first.
23              MR. KNAUSS:  Right.
24              MS. DUMONT:  Yes, Your Honor.  We have two
25    out-of-state witnesses (indiscernible) the trial.
```

1                    THE COURT:  Mr. Knauss, is that your
2      understanding as well?
3                    MR. KNAUSS:  Yeah.  We have three extra
4      witnesses too, between the two of us, so --
5                    THE COURT:  And all of those witnesses are
6      all lined up --
7                    MR. KNAUSS:  They are.
8                    THE COURT:  -- anticipating a three-day
9      trial today.
10                    MR. KNAUSS:  Yes.
11                    THE COURT:  Okay.
12                    Do you have an answer for us, Mr. Ward?
13                    THE CLERK:  She's taking (indiscernible).
14                    THE COURT:  Thank you very much.
15                    Sir, I'd like to begin, Mr. Hollingsworth,
16      with a document in front of me.  It's entitled Waiver of
17      Jury Trial.  Towards the bottom and the middle is a
18      signature.  Is that your signature?
19                    THE DEFENDANT:  Yes, it is.
20                    THE COURT:  Sir, before you signed that
21      document, did you read it carefully or have it read to
22      you?
23                    THE DEFENDANT:  Yes.
24                    THE COURT:  Did you understand it?
25                    THE DEFENDANT:  Correct.

1                    THE COURT:  Sir, you understand that under

2    the law you have the right to a 12-person jury.  We

3    actually have jurors waiting right now across the

4    courtyard to come over and be jurors on at least one

5    other case.

6                    Your attorney and the State would ask

7    those individuals questions.  Decisions would be made,

8    tactical decisions by you and your attorney about which

9    of those potential jurors you would remove from the

10   panel.  And the State would have the opportunity to do

11   that as well.  We call that peremptory challenges.  Of

12   course, anyone would be removed from the panel that

13   simply couldn't hear this kind of a case for personal

14   reasons of bias, of course.

15                   And then the end result would be a

16   12-person jury.  Those members of our community would --

17   would listen to the facts presented by the State, any

18   defense presented by your -- you and your attorney, and

19   those 12 people would make a decision about whether the

20   State can prove you guilty beyond a reasonable doubt.

21                   Do you understand that process, sir?

22                   THE DEFENDANT:  Yes, I do.

23                   THE COURT:  And you understand, sir, that

24   by providing me with this document and by having this

25   conversation with me, what you're doing is you're

1    saying, "Judge, I don't want a 12-person jury.  I want

2    to leave the decision entirely in your hands, Judge

3    Weber, as to whether or not the State can prove the case

4    beyond a reasonable doubt."

5               THE DEFENDANT:  That is correct.

6               THE COURT:  Do you have any questions at

7    all about your right to a jury trial?

8               THE DEFENDANT:  No.

9               THE COURT:  Okay.  I'm going to go ahead

10   and accept your waiver at this time.  I'm going to make

11   a finding that it's knowingly, voluntarily, and

12   intelligently made.

13               You can go ahead and have a seat, sir.

14               Any pre- -- assuming for a moment that

15   we're going to head -- go ahead this morning, any

16   pretrial issues other than the flexibility in

17   scheduling, which I've already committed to, that you

18   all want to bring to my attention?

19               MS. DUMONT:  Counsel provided or filed a

20   notice of intent to offer statement made by a child.

21   And it's a deficient notice, so I wanted to raise that

22   to the Court's attention.  It doesn't comply with the

23   particularly requirements.

24               The State also filed a notice of intent.

25   Of course, I'm not (indiscernible).  If that makes

1   sense.

2                    THE COURT:  It does.

3                    MS. DUMONT:  Okay.  And maybe the perfect

4   time would be prior to that witness testifying, we can

5   take that up with the Court.  I just wanted to put the

6   Court on notice that I do intend to -- or I will be

7   raising that issue.  And that witness is the one that's

8   required a sign language person.  And that won't be

9   until Wednesday afternoon.

10                   THE COURT:  Mr. Knauss.

11                   MR. KNAUSS:  Yes.  Actually, what's going

12  to happen is this witness actually didn't hear anything

13  from the alleged victim.  So I filed that for cautionary

14  reasons, but don't see --

15                   THE COURT:  So you're -- it's not a notice

16  of a statement, it's a notice of a nonstatement.

17                   MR. KNAUSS:  Well, I was doing it to, you

18  know, comply with the statute.  But the witness name is

19  Trisha Miller.  And during the trial, you'll see what I

20  mean about the statements.

21                   THE COURT:  Is there a reason, given that

22  this isn't a jury trial, that I need to make a decision

23  about this issue at this time?

24                   MR. KNAUSS:  No.

25                   MS. DUMONT:  I don't believe so.  I just

1    wanted to raise it to the Court's attention.

2              THE COURT:  I know nothing about the case

3    whatsoever --

4              MS. DUMONT:  That's fine.

5              THE COURT:  -- other than what I read in

6    the indictment.  So it would be more helpful, as long as

7    I have a stipulation to deal with it when it arises.

8              MS. DUMONT:  Thank you.

9              THE COURT:  Any other pretrial issues from

10   the State?

11             MS. DUMONT:  No, Your Honor.

12             THE COURT:  Mr. Knauss?

13             MR. KNAUSS:  No.

14             THE COURT:  All right.  Before we actually

15   start, then, with the trial, let me find out, so I don't

16   keep Mr. Berzins and Mr. Moore waiting.  I'll speak with

17   Ms. Tegman and be right back.

18             (Recess; 9:20 a.m. to 9:34 a.m.)

19             MS. DUMONT:  May I call the case

20   (indiscernible)?

21             THE COURT:  Please.

22             MS. DUMONT:  State vs. Hollingsworth;

23   1501848.  Sarah Dumont for the State.  Defendant is

24   present, out of custody, represented by Mr. Knauss.  The

25   jury waiver was done on the record previous to the Court

1    coming out.

2                    THE COURT:  It --

3                    MS. DUMONT:  It was done on the record

4    when the Court was here.

5                    THE COURT:  Correct.

6                    MS. DUMONT:  (Indiscernible.)

7                    THE COURT:  I think we are now, then,

8    ready to go ahead with opening statements.  Both of the

9    parties have indicated there aren't any additional

10   issues for the Court before we start.  So if you'll go

11   ahead.

12                   MS. DUMONT:  Thank you, Your Honor.

13                   Also, I asked your clerk about hanging a

14   sign that witnesses be excluded.

15                   THE COURT:  Yes.

16                   MS. DUMONT:  Counsel did not have a

17   problem with that.

18                   MR. KNAUSS:  No.  Join in the motion.

19                   THE COURT:  Witnesses will be excluded and

20   sequestered.  I will anticipate that you'll police the

21   back of the courtroom and make sure that folks that are

22   coming in know about the rules.

23                   Go ahead.

24                   MS. DUMONT:  The evidence will show that

25   on February 13th, 2015, ten-year-old Jasmine Jewell

State's Opening Statement                                    14

1    Shafer was with her father, who's Kenneth Jewell, and

2    they had gone to Kenneth Jewell's girlfriend's house,

3    Trisha Miller.  Trisha Miller lived in Oregon City.  And

4    Mr. Jewell and Ms. Miller had been having relationship

5    problems.  They were trying to work it out.  And

6    Mr. Jewell and his daughter, ten-year-old Jasmine, went

7    to the house in Oregon City.

8                     Defendant, who was Trisha Miller's nephew,

9    was there.  He had been -- he was staying there.  He was

10   couch surfing at the time.  His sister -- I'm sorry.

11   Trisha Miller's sister, who is defendant's mother, was

12   living at the house.

13                    And Jasmine went to sleep on the couch

14   downstairs.  Defendant went to sleep on a different

15   couch downstairs.  Jasmine woke up to find defendant

16   touching her breasts with his finger.

17                    She reacted.  And when she reacted,

18   defendant jumped behind the couch and pretended to be

19   asleep.  Then he asked her repeatedly if he could touch

20   her, and she said no.  He asked her this several times.

21   He then tried to bribe her not to tell by offering her

22   money and to let her watch a movie.  And she agreed not

23   to tell.

24                    That morning, after everyone woke up, the

25   victim, Jasmine, went out to brunch/lunch type of

1    situation with the father, Kenneth Jewell, as well as

2    Trisha Miller and her younger sister.  At that

3    brunch/lunch situation, she told her father that Jorden

4    had touched her.  And her father, Kenneth Jewell, and

5    Trisha Miller, were both very upset.  They went to the

6    police station and reported this to the police in

7    person.

8              Trisha Miller was interviewed at the

9    police station.  Kenneth Jewell was interviewed at the

10   police station that very day.  And a safety plan was put

11   into place for Jasmine, as well as her younger sister,

12   so that the two could be protected from the defendant.

13   At that time, a Children's Center interview was

14   scheduled as well for the 19th.

15             On the 19th, which was around six days

16   later, Kenneth Jewell, the father, and Trisha Miller,

17   brought Jasmine Shafer to the Children's Center, where

18   she disclosed the defendant had touched her breasts that

19   morning with his finger on her bare skin.  And that he

20   had previously, when she was younger and living at a

21   different address, exposed himself to her, put his hands

22   down her pants, and touched her vagina.  And that she

23   pushed him away.

24             Jasmine expressed concern that this was

25   the second time that he had touched her and that she was

State's Opening Statement                              16

1   worried that he would hurt her.  And she was worried

2   also about her little sister, because her little sister

3   could not talk.  You will see the video and will review

4   her demeanor in her statement.

5                Trisha Miller went back to the police

6   station and brought the police her telephone, which

7   contained text messages from the defendant.

8                You will hear from the police officers

9   about their investigation; the victim, Jasmine Jewell

10  Shafer, about what happened; view the Children's

11  Center -- hear from the Children's Center personnel and

12  from Kenneth Jewell.

13                Unfortunately, Kenneth Jewell and Trisha

14  Miller's relationship did not work out.  They had been

15  attempting to patch things up and it didn't work out and

16  they ended up breaking up for good later that year.

17  Kenneth Jewell moved his daughter to live with his

18  mother in Oklahoma, where he now resides as well.

19                And after you've heard the evidence, we

20  ask that you find the defendant guilty of both counts.

21  Thank you.

22                THE COURT:  Thank you.

23                Mr. Knauss.

24                MR. KNAUSS:  Thank you, Your Honor.

25                The family dynamic, just to give you a

Defendant's Opening Statement                    17

1  road map there, this is kind of -- sometimes I think we
2  should give you a family tree here so you can get the
3  playbill here, as far as who's coming.  But Trisha
4  Miller and Ken Jewell have a child together.  And I
5  believe at the time in 2015, she was three?
6              THE DEFENDANT:  Three or four.
7              MR. KNAUSS:  Okay.
8              And -- and they had been having -- they'd
9  been separated for a while and they were trying to see
10 if they can make a go of it.  So Mr. Jewell, Jasmine,
11 stayed basically two or three days there while this was
12 going on.
13             They had previously lived together when
14 Jasmine was three, in Milwaukie.  And later on, they
15 moved to Trisha Miller's -- she changed her address and
16 she moved to Oregon City.  And that's where this 2015
17 incident happened.
18             The allegation is that there's another
19 incident that occurred, and it's alleged between August
20 of 2009 and August of 2012.  Presumably the State's
21 claim is that's when Trisha Miller was living in
22 Milwaukie and that Kenneth Jewell and Jasmine lived
23 there for some period of time.
24             Now, Trisha Miller's sister is my client's
25 mother.  His mother's name is Mindy Solomon.  And she's

Defendant's Opening Statement                                18

1   very close to her sister, Trisha, who's profoundly deaf.

2   She has the cochlear implants now, but she'll need a

3   signer.  So the signer's coming tomorrow afternoon, so

4   she'll be a witness tomorrow afternoon.  And she didn't

5   get the implants till much after this early incident.

6               The situation for my client, when they

7   were living -- when Trisha Miller and Kenneth Jewell

8   were living in Milwaukie, he would -- he lived there for

9   a while.  He would be around Jasmine.  And there wasn't

10  like a tight bond, but he helped her with her homework.

11  And my client had a girlfriend at the time, Trista

12  Tobin, and they interacted with Jasmine.

13              And at the time of this incident in 2015,

14  my client was coming over, sometimes staying the night

15  there at his aunt's house, Trisha Miller.

16              His mother had a bedroom in that house.

17  She has a bad back and she sleeps on the floor.  So my

18  client would sleep in that bed when he was there.

19  Basically couch surfing.

20              Now, what's the situation in this case,

21  it's an unusual case.  The facts of this are unusual.

22              Jasmine is a self-admitted liar.  She's

23  going to acknowledge that.  It's on the -- on the video.

24  She acknowledged that and you'll see that during the

25  video.  At the time, she was ten years and five months

Defendant's Opening Statement                    19

1    old, in 2015.  And during the video she acknowledges

2    that she did not tell anybody about the first incident

3    because they think she's lying anyway.  And she talked

4    about her problems with lying.  I have several witnesses

5    that are prepared to testify as to her character and

6    reputation for veracity and truthfulness as well.

7                    Now, during the physical examination by

8    the Children's Center, she was asked -- other than this

9    recent thing that just happened a few days ago, she was

10   asked if there had been any other inappropriate

11   touching, and she said no.

12                   During the video there's a brief colloquy

13   about halfway through the video where she describes a

14   second touching back when they lived in Milwaukie.

15                   Now, prior to the interview, Ms. McVay

16   gave what we would characterize as the usual warnings

17   about truthfulness or whatnot.  But the evidence will

18   be, and you'll see it on video, that she went through a

19   very complex statement with Jasmine, including "Only

20   talk about true things, not pretend or make-believe

21   things.  Just stuff we know.  If I ask you something

22   that doesn't make sense, tell me.  If I make a mistake,

23   tell me."

24                   And she went through this just bang, bang,

25   bang, bang, bang, to this ten-year-old, who you'll find

1    suffers from ADHD.  And there was no care taken to make

2    sure that she understand these principles, even though

3    they were aware that there was some lying issues in the

4    past.  And when Jasmine brought this up during the

5    interview, there's no making sure that she knows --

6    making sure she's making truthful statements, when she

7    acknowledges she lied.

8             Now, these concepts, it will be apparent

9    that these concepts are not simple concepts, and

10   certainly not simple concepts from -- for a

11   ten-year-old.  And Dr. Wendy Bourg is my expert witness.

12   She actually was involved in writing the initial

13   guidelines for interviews for the CARES people.  She's

14   involved in that.  She's been involved in this and I'm

15   sure the Court is aware of her as a witness in prior

16   proceedings.  But she'll be called Thursday morning.

17            The second major issue here that the

18   evidence will show is that Jasmine was being treated for

19   ADHD and had recently been prescribed, not two weeks

20   before this incident, the drug Dexedrine.  And the

21   family witnesses that were around Jasmine that night

22   that this incident occurred will tell you that they

23   thought that she was dopey, or adversely affected by the

24   Dexedrine.

25            Then we have a third piece of evidence

1    here that you'll hear about.  And Jasmine's

2    self-admission that she was sleeping, dreaming, and in

3    her dream state she believes that she was touched.  In

4    the interview you'll see that they don't clarify, "Well,

5    when did you actually wake up?"

6               And Dr. Bourg will address those issues as

7    well, as far as how we wake up, particularly when we

8    have drugs in our system and -- and when do we become

9    consciously aware of what's going on?

10              Another factor you'll hear about is

11   Jasmine had been in counseling at Western Psychological

12   in January, about a month before these allegations were

13   made.  And she had been in counseling there for several

14   sessions and made no disclosure about any prior

15   touching.

16              You'll also have evidence that her

17   statements were inconsistent to others.  And there will

18   also be some testimony she claimed she had a bra on, and

19   I have a witness that will be testifying that she did

20   not have a bra on at the time.

21              And lastly, we'll get into the text

22   messages during the trial.  You'll have those.  And

23   you'll be provided evidence as to the context of that;

24   that this was a period of time when Trisha Miller was --

25   was very involved in a very emotional situation with

1   Mr. Jewell coming back and interacting with their

2   daughter, having Jasmine there.  It was pretty intense

3   emotionally for Trista [sic].  And there will be other

4   context issues as far as the texts there.

5                   So that's what the evidence will be, even

6   in the State's case.  And I appreciate the opportunity

7   to address the Court.  Thank you.

8                   THE COURT:  Ms. Dumont, your first

9   witness.

10                  MS. DUMONT:  Thank you.  The State calls

11  Jasmine Jewell Shafer.

12                  (Witness summoned.)

13                  THE COURT:  If you'll come all the way to

14  the front of the courtroom.  When you arrive at the

15  witness stand, I need you to remain standing.  Raise

16  your right hand.  Other right hand.

17                      JASMINE JEWELL SHAFER,

18  called as a witness on behalf of the State, having been

19  first duly sworn, was examined and testified under oath

20  as follows:

21                  THE COURT:  Go ahead and have a seat.  And

22  if you'll state your whole name, spelling your last name

23  for the record.

24                  THE WITNESS:  Jasmine Jewell Shafer.

25  J-E-W-E-L-L, Marie Shafer.

Jasmine Jewell Shafer - D                    23

```
 1                    THE COURT:  And how do you spell your last
 2   name?
 3                    THE WITNESS:  S-H-A-F-E-R.
 4                    THE COURT:  Go ahead.
 5                    MS. DUMONT:  Thank you.
 6                    DIRECT EXAMINATION
 7   BY MS. DUMONT:
 8        Q.   Are you feeling a little nervous, Jasmine?
 9        A.   Yes.
10        Q.   Okay.  Well, I'm going to try and ask questions
11   slowly.  So if you don't understand, you let me know,
12   okay?
13        A.   (No audible response.)
14        Q.   How old are you right now?
15        A.   Eleven.
16        Q.   Eleven?
17             And when's your birthday?
18        A.   August 24th, 2004.
19        Q.   Okay.  So does that mean you have a birthday
20   coming up this month?
21        A.   Yes.
22        Q.   Okay.  What grade are you in?
23        A.   Going into sixth.
24        Q.   What's your favorite class?
25        A.   Reading and writing.
```

Jasmine Jewell Shafer - D                          24

1      Q.    Have you been reading or writing anything
2  interesting lately?
3      A.    No, not much.
4      Q.    Is there a book that you liked reading this
5  summer?
6      A.    Yeah.  Harry Potter and the Cursed Child.
7      Q.    Neat.
8            And what's the name of your school that
9  you're going to be going to?
10     A.    Central.
11     Q.    Central?  And where is that?
12     A.    In Lawton, Oklahoma.
13     Q.    Okay.  Who are you living with in Lawton?
14     A.    My nana, my grandma, and my papa.
15     Q.    And nana is different from grandma how?
16     A.    She is my great-grandmother.
17     Q.    Okay.  So your nana is your great-grandma and
18  your grandma is your --
19     A.    Just my grandma.
20     Q.    Okay.  And before you moved to Lawton,
21  Oklahoma, where did you live before that?
22     A.    With my grandma and my grandpa and my auntie.
23     Q.    Okay.  And where was that?
24     A.    In -- well, Vancouver.
25     Q.    Okay.  Is that Vancouver, Washington?

Jasmine Jewell Shafer - D                                    25

1        A.    Yes.

2        Q.    Okay.  And when you lived with -- you know, you

3    said your -- who was it again that lived with you in

4    Vancouver?  Your --

5        A.    My -- my grandpa and my grandma.  And I almost

6    forgot my dad.  So with my dad, too.

7        Q.    Okay.  And when did you -- do you remember when

8    you moved from Vancouver to Lawton?

9        A.    No.  It was in the middle of the school year is

10   all I know.

11       Q.    Okay.  The middle of school.

12             Was that hard to do?

13       A.    Yes.

14       Q.    Why was that hard?

15       A.    Because I was going to miss all my friends and

16   my family in Vancouver, Washington.

17       Q.    Okay.  And you left in the middle of the year?

18       A.    Yeah.

19       Q.    When you were living in Vancouver, where were

20   you going to school?

21       A.    Orchards Elementary.

22       Q.    Do you remember a teacher that you had?

23       A.    Ms. Humphrey.

24       Q.    I'm going to talk to you a little bit about

25   ADHD.  Are you -- do you have ADHD?

1     A.   Yes.

2     Q.   What does that mean?  How does that impact you?

3     A.   I'm hyper all the time and I can't focus much.

4     Q.   Okay.  And do you take any medication for that?

5     A.   Yes.

6     Q.   Okay.  Do you know what that -- what type of

7  medication?

8     A.   No.

9     Q.   Okay.  What does it look like?

10     A.   It's small and it's blue.

11     Q.   Okay.  And is it a drop, a blue drop, or the

12  shot, or what -- how do you take it?

13     A.   I -- it's a pill.

14     Q.   Okay.  Okay.  And how many do you take?

15     A.   Two a day.

16     Q.   And do you -- do you take some in the morning

17  and some in the evening or how do you -- how do you get

18  that?

19     A.   One in the morning, two in the afternoon,

20  evening.

21     Q.   Okay.  And you said that they were blue.  Have

22  you always taken a blue one or have they been different

23  colors?

24     A.   They've been different colors.  Each dose I go

25  higher.

Jasmine Jewell Shafer - D                                27

1        Q.    Okay.  So what were some of the other colors

2   you took?

3        A.    White --

4        Q.    Okay.

5        A.    -- and green.

6        Q.    Okay.  And when you take your medication, how

7   does that make you feel?

8        A.    Like I can focus more and I'm a bit calmer.

9        Q.    Okay.  And does it -- how does it impact your

10  sleep?

11       A.    It makes me stay up a little bit.

12       Q.    Okay.  I want to talk to you a little bit about

13  when you were living in Vancouver, Washington, did

14  you -- did you know someone named Trisha Miller?

15       A.    Yes.

16       Q.    Who's Trisha Miller?

17       A.    My dad's ex-fiancée.

18       Q.    Okay.  And where did Trisha live?  Do you

19  remember?

20       A.    In a apartment.

21       Q.    Okay.  Did you live with her in that apartment

22  at some point?

23       A.    Yes.

24       Q.    Okay.  When was that?  Or do you remember when

25  that was?

1          A.     When I was nine.

2          Q.     Nine?  Okay.

3                 And when you lived with her in that

4     apartment, can you describe -- what does the apartment

5     look like when you come in?

6          A.     There's a couch right by the left side of the

7     door.  And then Kaeli's play area in between, by the

8     other side of the small couch.  And then on this side of

9     Kaeli's area is a long couch.

10         Q.     Okay.  So there's a small couch, a long couch.

11    And who's Kaeli?

12         A.     My baby sister.

13         Q.     Okay.  And so where was Kaeli's play area in

14    relation to the two couches?

15         A.     In a square, but by each end.

16         Q.     Okay.  And when you went to visit -- now, I'm

17    not talking about when you -- because at a certain point

18    did you leave?  Did you stop living there with Trisha

19    Miller?

20         A.     (No audible response.)

21         Q.     Okay.  When you did live with her, did you have

22    a place to stay?  Did you have a room?

23         A.     Yeah.

24         Q.     Where was that room?

25         A.     Upstairs.

Jasmine Jewell Shafer - D

29

1    Q.   Okay.  So you lived upstairs and had your own
2    bedroom.  And where -- where did your dad and Trisha
3    Miller stay?
4    A.   Right beside it.
5    Q.   Okay.  Did they have -- was it in the same room
6    or was it a different room?
7    A.   Well, it was a different room.
8    Q.   Okay.  So there were how many bed- -- two
9    bedrooms upstairs?
10   A.   Yes.
11   Q.   Okay.  Did you -- I want to talk to you about
12   when you and your dad came to visit from Vancouver and
13   you went to visit Trisha Miller, okay?  And this is
14   before you moved to Lawton, okay?  I want to talk about
15   what happened when you were there.
16        First I want to ask you:  Do you remember if
17   anyone else was at the house that evening?
18   A.   My dad and Trisha I know were at the house.  I
19   don't know if anybody else was there besides -- besides
20   Jorden.
21   Q.   Okay.  Besides Jorden.  Okay.  And who --
22   who -- how do you know Jorden?
23   A.   He's Trisha's nephew.
24   Q.   Okay.  Had you met him before?
25   A.   Yes.

1        Q.    And how -- how long had you known him for?

2        A.    A few years.

3        Q.    Okay.  So -- and do you see him here in the

4    courtroom?

5        A.    Yes.

6        Q.    Okay.  What color hair does he have?

7        A.    Blackish brown.

8        Q.    Okay.  And what is he wearing?

9        A.    A suit.

10       Q.    Okay.  Okay.

11              And so you said that your dad, Trisha, you

12   don't know if anyone else was there, and Jorden was

13   there.  Okay.  So what were you -- where were you

14   staying when you were at the house that time, when you

15   were visiting?

16       A.    I was staying on the small couch.

17       Q.    Do you remember what color the small couch was?

18       A.    I think it was either black or brown leather.

19       Q.    Okay.  And -- and you said that Jorden was

20   there.  Where was Jorden?

21       A.    On the big couch.

22       Q.    Do you remember anything about the big couch?

23       A.    It was the same color as the small couch, I'm

24   pretty sure.

25       Q.    Okay.  So it was like black or brown leather.

Jasmine Jewell Shafer - D                          31

1      Is that right?

2          A.   (No audible response.)

3          Q.   Okay.  Okay.

4               So you were staying on the small couch and

5      Jorden was staying on the big couch.  And then what

6      happened?

7          A.   I felt his finger go down the shirt and then

8      under the bra.

9          Q.   Okay.  And went -- and you said down the shirt

10     and under the bra.  When -- what were you wearing that

11     evening?

12         A.   Two-piece pajamas.

13         Q.   Okay.  Were you wearing a bra also?

14         A.   Yes.

15         Q.   Okay.  When did you first get a bra?

16         A.   I think I was nine.

17         Q.   Okay.  And who'd you get it with?

18         A.   My Grandma Rachel.

19         Q.   Do you remember what store you got it at?

20         A.   Walmart.

21         Q.   Okay.  And where does Grandma Rachel work?

22         A.   Walmart.

23         Q.   Okay.

24              THE COURT:  I need for you to move the

25     microphone a little bit closer to your mouth.  About

Jasmine Jewell Shafer - D                          32

1    there, so we can make sure that your voice is getting

2    picked up.  Okay.

3                    THE WITNESS:  Okay.

4                    THE COURT:  Thank you.

5                    Go ahead.

6                    MS. DUMONT:  Thank you.

7    BY MS. DUMONT:

8        Q.    So you were wearing two-piece pajamas and a bra

9    and you said you felt a finger on -- and when you felt

10   the finger, where was it going?

11       A.    On the breast.

12       Q.    On your breast?

13       A.    (No audible response.)

14       Q.    Is that what you said?  I couldn't hear you.

15       A.    Yeah.  That's what I said.

16       Q.    Okay.  And when you felt it go on your breast,

17   was that one breast or two breasts?

18       A.    One.

19       Q.    Okay.  And what did you do?

20       A.    I said, "Huh?  What?"  And I heard him gasp.

21   And then he pretended to be asleep on Kaeli's play area.

22       Q.    Okay.  You said, "Huh?  What?" and then you

23   heard a gasp.  What did the gasp sound like?

24       A.    (Demonstrative sound.)

25       Q.    Okay.  And so you -- when you heard the gasp,

Jasmine Jewell Shafer - D                              33

1    what did you do?

2         A.   I looked behind -- at the end of the couch onto

3    play -- Kaeli's play area.

4         Q.   Okay.  And what did you see?

5         A.   Jorden pretending to be asleep on Kaeli's

6    play -- play area.

7         Q.   Why do you say he's pretending to be asleep?

8         A.   Because I heard him gasp.  And I know I felt

9    something.

10        Q.   Okay.  And when you say you know you felt

11   something, where were you feeling it?

12        A.   On the breast.

13        Q.   On the breast?

14        A.   Yeah.

15        Q.   Okay.  And when you felt that, how did that

16   make you feel?

17        A.   Uncomfortable.

18        Q.   And what kind of movement were you feeling?

19        A.   Back and forth.

20        Q.   Back and forth.  And was it on your -- was it

21   over your shirt or on your bare skin?

22        A.   On the bare skin.

23        Q.   And what made you think -- you said he was

24   pretending to be asleep and -- and you heard a -- and

25   you -- why did you think he was pretending to be asleep?

Jasmine Jewell Shafer - D                    34

1        A.    Because I heard him gasp and --

2        Q.    Okay.  And what did -- what happened next?

3        A.    I -- I turned around and just sat on the couch.

4   And then later on, he said, "Jasmine."

5               And I said, "What?"

6               He's like, "Can I touch you?"

7               And I said, "No."

8        Q.    Okay.  And what did he -- what happened next?

9   And when you said -- when you said "he," who was that

10  that was saying this?

11       A.    Jorden.

12       Q.    Okay.  So he's saying, "Can I touch you?"  And

13  you say, "No."  What happened next?

14       A.    He said it a few more times and I just kept

15  saying no.

16       Q.    Okay.

17       A.    And then he started off with something random

18  and said, "I don't want to take out the trash.  You do

19  it."

20       Q.    Okay.  And then what happened?

21       A.    He just kept saying that a couple times.  I

22  kept ignoring it.  And then he went onto the floor with

23  his blanket and pillow.

24       Q.    Okay.  What else did he say then?

25       A.    Nothing else.

1        Q.    Did he talk to you about not telling?

2        A.    Yes.

3        Q.    What did he say?

4        A.    He said he would give me $20 and take me to the

5    old Sponge Bob movie when it -- it was new at the time.

6        Q.    Okay.  Was that a movie that you were

7    interested in?

8        A.    Yes.

9        Q.    And when you -- when he asked you not to tell,

10   what did you say?

11       A.    I said I wouldn't tell, but I didn't mean it.

12       Q.    Okay.  And why did you want to tell?

13       A.    Because I knew what he did was wrong.

14       Q.    Okay.  And did you smell anything?

15       A.    I think I might have smelled a bit of alcohol,

16   but I'm not sure if that's what it was.

17       Q.    Okay.  And he -- where would the alcohol be

18   coming from?

19       A.    I think his breath.

20       Q.    Okay.  When you -- was there anyone else in the

21   living room when -- when you felt that --

22       A.    No.

23       Q.    -- finger on your -- what?

24       A.    (No audible response.)

25       Q.    When you felt -- I didn't hear.  When you felt

Jasmine Jewell Shafer - D                    36

```
 1    that finger on your breast, was there anyone else, other

 2    than defendant -- Jorden in the room?

 3         A.    Huh-uh.

 4         Q.    Okay.  And are you certain that it was Jorden

 5    that touched your breast?

 6         A.    Yes.

 7         Q.    And why do you think that?

 8         A.    Because he was the only one in the room.

 9         Q.    Okay.

10               Prior -- when you were younger, did you live

11    at another -- did you live with the defendant,

12    Mr. Hollingsworth?

13         A.    Uh . . .

14         Q.    Did you live with Trisha in Milwaukie?

15         A.    Yes.

16         Q.    Yeah?  Okay.

17               When -- around how old were you?

18         A.    I was about six or seven.

19         Q.    Okay.  And were you in school at that time?

20         A.    I don't know.

21         Q.    Okay.  That apartment that -- or that place

22    that you lived in, was -- what kind of -- what kind of

23    place was it?

24         A.    It was a apartment, one bedroom, one bathroom.

25         Q.    And what was the setup like?
```

Jasmine Jewell Shafer - D                    37

1        A.    There was one small couch, cloth, and then one

2    big couch, cloth.

3        Q.    Okay.  And then was there -- where was the

4    bedroom?

5        A.    It was by the bathroom, which was -- the living

6    room was a big old rectangle, and there was a small

7    hallway, and then there was the bathroom right here and

8    the bedroom right there.

9        Q.    Okay.  And where would you stay?

10       A.    I stayed in the living room.

11       Q.    Okay.  Where would you sleep?

12       A.    On a pink princess bed I had.

13       Q.    Okay.  What did that -- you said "pink."  So

14   what did -- what did that look like, when you say

15   "princess bed"?

16       A.    It had princess stickers on the -- on the head

17   of the bed.

18       Q.    Okay.

19       A.    And then it was pink.

20       Q.    Okay.  And what was the setup?  So you have

21   your pink princess bed, and then where is that in

22   relation to the couch?

23       A.    It's almost by the couch.  And then my squared

24   play area was at the -- the end of the couch.

25       Q.    Okay.  And was defendant, Jorden

```
 1    Hollingsworth -- did he sometimes stay there often?

 2         A.    Yes.

 3         Q.    Okay.  And where would he sleep?

 4         A.    On the big couch.

 5         Q.    Okay.  And let me -- did you have -- was there

 6    a friend that lived nearby that you remember?

 7         A.    Yes.  Cody [phonetic].

 8         Q.    Cody?

 9         A.    And then -- and then Katie, but we all called

10    her Katie Bug.

11         Q.    Katie Bug.

12               And where did Cody live in relation to your

13    place?

14         A.    Cody lived right next to our place.

15         Q.    Okay.

16         A.    Or our apartment.

17         Q.    And -- and how would you guys hang out?  Would

18    there be a time?  Or would you guys hang out sometimes?

19         A.    I'd go over to his house.  His dad was my

20    babysitter.  And we'd play outside all the time.

21         Q.    Okay.  And I want to ask you about what

22    happened.  Was there -- was there a time when Mr. --

23    defendant had an interaction with you?

24         A.    Yes.

25         Q.    Okay.  What was it -- what time of day was it?
```

1        A.    It was morning.

2        Q.    Okay.  And what happened?

3        A.    He said, "Come here" a couple times.  I ignored

4    it.

5        Q.    Who's "he"?

6        A.    Jorden.

7        Q.    Okay.

8        A.    Motioned me over -- or said, "Come here" a

9    couple times.  I ignored it until he motioned me over.

10   And so I --

11       Q.    How did he motion you?  What does that mean?

12       A.    (No audible response.)

13       Q.    Okay.

14       A.    So I came over.  He led me into the kitchen,

15   near the stove.  And he pulled out his down-there part.

16       Q.    Okay.  When you say "down there," what part is

17   that?

18       A.    The long stick thingy (indiscernible).

19       Q.    Okay.  So he pulled out that.  And -- and when

20   he did that, had you seen that part before?

21       A.    No.

22       Q.    No?

23             And when -- when he did that, what happened

24   next?

25       A.    He kinda pointed to it.  And he stuck his hand

1    down my underpants and placed his hand on the bottom of

2    my -- the -- the underpart.

3        Q.    Okay.  You're talking -- are you talking --

4    what part of the body are you talking about?  You said

5    "the underpart."  What's the underpart?

6        A.    Vagi- --

7        Q.    If there's a different word you use, that's

8    fine.

9        A.    Dandelion.

10       Q.    Dandelion?  Okay.

11              And is that the part where -- what part of

12   your body is that?  Where is that at?

13       A.    The underpants.  I don't . . .

14       Q.    Okay.  The -- the front underpart.  Is it --

15   are you talking about in -- on the front of the body or

16   the back of the body?

17       A.    Um . . .

18       Q.    Are you talking about the vagina or are we

19   talking about the butt?

20       A.    The vagina.  Yeah.

21       Q.    Okay.  And the term you use for vagina is

22   "dandelion"?

23       A.    (No audible response.)

24       Q.    Is that a "yes"?

25       A.    Yeah.

Jasmine Jewell Shafer - D                                41

1      Q.    Okay.  And so he put it on -- he put what on --

2      A.    His hand.

3      Q.    His hand?  And what did you do?

4      A.    I jumped and held that spot and he pulled his

5   hand out.

6      Q.    Okay.  And then what did you do?

7      A.    He -- I looked at him confused.  And then he

8   just did this.  And -- and so I kept quiet about it

9   because I didn't know what to do.  I was confused.

10      Q.    Okay.  And I'm going to ask you -- so you said

11   this happened in the kitchen.  What is the kitchen like?

12      A.    It was like an L.  A boxed letter L.

13      Q.    A boxed letter L?

14            And you said it happened near the stove?

15      A.    (No audible response.)

16      Q.    Where was the stove in the boxed letter L?

17      A.    By the -- across from the washing machine.

18   Well, dishwasher.

19      Q.    There's a dishwasher?  Okay.  And was there

20   anything around -- around the stove that you remember?

21      A.    No.  I don't know.

22      Q.    Okay.  And was anyone else there when this

23   happened?

24      A.    Dad and Trisha were sleeping.

25      Q.    Okay.  Do you remember what you were wearing?

Jasmine Jewell Shafer - D                          42

1        A.    Two-piece PJs.

2        Q.    Okay.  And so going back to what happened on

3   the -- the brown leather couch, after that happened,

4   where did -- do you remember where you went that

5   morning?

6        A.    I --

7        Q.    This is after -- not after the one with the

8   pink princess bed, but the one where you were at

9   Trisha's house in Oregon City and there were brown and

10  black leather couch.  Where did you go that morning?

11       A.    We went for breakfast in the morning.  I don't

12  know exactly where we went.

13       Q.    Okay.  And when you went to breakfast, who went

14  with you?

15       A.    Kaeli, my dad, and Trisha.

16       Q.    Okay.  And when you went to breakfast, what

17  happened?  Or what did you do?

18       A.    After -- I said, "Dad, there's something you

19  might want to know."  And then I told him what happened.

20       Q.    Okay.  And when you were telling him, what --

21  where were you at?  And you said that you were in a

22  restaurant having some sort of breakfast.  Do you

23  remember, was there a table that you were sitting at?

24       A.    Yes.

25       Q.    Okay.  What kind of table was it?

Jasmine Jewell Shafer - D                                43

1        A.    A rectangle.

2        Q.    Okay.  And where were you in relation to your

3   dad?

4        A.    I was a -- across from him.

5        Q.    Okay.

6        A.    I don't know if Trisha was beside me or across

7   from me.

8        Q.    Okay.

9        A.    And --

10       Q.    Where was Kaeli?

11       A.    At the side of the table, up in her highchair.

12       Q.    Okay.  So Kaeli's in a highchair.

13             And after you told your dad, you told him

14   about what happened that morning?  Is that what you

15   talked to him about?

16       A.    Uh-huh.

17       Q.    Is that a "yes"?

18       A.    Yeah.

19       Q.    Okay.  What -- what did you do after that?

20   What happened after that?

21       A.    They went -- they told me to go to the car

22   after we ate.  And then I stayed in the car.  And I

23   think they were calling the cops.  Not sure.

24       Q.    Okay.  Did you, after that -- when you were in

25   the car, where did you go in the car?

Jasmine Jewell Shafer - D                                    44

1          A.    To the police station.

2          Q.    Okay.  And when you went to the police station,

3     did you -- do you remember if you went inside or did you

4     stay in the car?

5          A.    I went inside.

6          Q.    Okay.  And you went inside the police station.

7     And did -- did anyone -- did you get interviewed at the

8     police station?

9          A.    No.

10         Q.    Okay.  You didn't get interviewed at the police

11    station.  Do you remember going after that, a few days

12    later, somewhere else?

13         A.    Yeah.

14         Q.    Where -- where was that; do you remember?

15         A.    The children's place.

16         Q.    Okay.  And as -- at the children's place, did

17    you talk to them about what happened?

18         A.    Yes.

19         Q.    Okay.  In between telling your dad and Trisha

20    what happened and going to the children's place, did you

21    talk to anyone else about it?

22         A.    My -- my grandpa, and that's about it.

23         Q.    Okay.  And when you went to the children's

24    place, after you went to the children's place, do you

25    remember talking about it with anyone else?

```
 1        A.    No.

 2        Q.    No?   Okay.

 3                    (Pause in the proceedings.)

 4                    MS. DUMONT:   Nothing further.

 5                    THE COURT:   Mr. Knauss.

 6                    MR. KNAUSS:   Thank you.

 7                         CROSS-EXAMINATION

 8   BY MR. KNAUSS:

 9        Q.    Jasmine, is it okay if I ask you some

10   questions?

11        A.    Yes.

12        Q.    And did Ms. Dumont tell you that that would

13   happen?

14        A.    Yes.

15        Q.    Okay.

16              Now, have you talked to anybody about what

17   you're going to say in court today --

18        A.    No.

19        Q.    -- recently?   Okay.

20              When did you and your dad come back from

21   Oklahoma?

22        A.    Did you say when?

23        Q.    When.

24        A.    The -- just yesterday.

25        Q.    Okay.   And did you talk to Ms. Dumont yesterday
```

Jasmine Jewell Shafer - X                    46

1    or today about what you're going to say?

2         A.   Not about what I was -- well, don't understand

3    the question.

4         Q.   Okay.  What you just told us here this morning,

5    did you go over that with Ms. Dumont either this morning

6    or yesterday?

7         A.   Yesterday.

8         Q.   Okay.  Who was there when you did that?

9         A.   The one in the blue over there and the thing.

10   And that's about it.

11        Q.   Okay.  Was your dad there?

12        A.   No.

13        Q.   Okay.  Now, when is the last time you talked

14   about this?

15        A.   Last night, talked about the -- the court or --

16        Q.   Yeah.  What you just said to us today, when's

17   the last time you talked about that to somebody?

18        A.   A while.  When I was in Oregon.

19        Q.   Last time you were in Oregon?  Is that right?

20        A.   (No audible response.)

21        Q.   Okay.  Have you talked about this in Oklahoma?

22        A.   No.

23        Q.   Okay.  You haven't talked to your dad about

24   this?

25        A.   Well, I told my dad about it.  That's about it.

Jasmine Jewell Shafer - X                                    47

1          Q.    Okay.  What did you guys talk about?

2          A.    What he -- what Jorden did to me.  And Dad

3    didn't really ask me any questions.

4          Q.    Okay.  Have you been in counseling?

5          A.    Yes.

6          Q.    Okay.  Is that in Oklahoma?

7          A.    No.

8          Q.    Before you left to go to Oklahoma, were you in

9    counseling?

10         A.    Yes.

11         Q.    Where were you in counseling?

12         A.    Don't know.

13         Q.    What part of town was it in?  Do you know?

14         A.    No.

15         Q.    Could it have been in Gladstone?

16         A.    I don't know, sir.

17         Q.    Okay.  Was it near where you lived in

18   Vancouver?

19         A.    Yeah.

20         Q.    Okay.  So you -- you had counseling in

21   Vancouver?

22         A.    Yes.

23         Q.    Before you went to Oklahoma?

24         A.    (No audible response.)

25         Q.    Okay.  How many times did you go to counseling?

Jasmine Jewell Shafer - X

1       A.   Twice.

2       Q.   Have you been in -- had any other counselor?

3       A.   No.

4       Q.   Did you go to counseling before or after the

5   thing about what happened when you were on the couch and

6   you claim Jorden touched you?  Was it before or after?

7       A.   I think after.

8       Q.   Okay.  Is there any chance you had a -- three

9   or four counseling appointments before this happened?

10       A.   No.

11       Q.   Okay.  What did you talk about after -- to the

12   counselor?

13               MS. DUMONT:  This is outside the scope of

14   direct.

15               THE COURT:  Mr. Knauss?

16               THE WITNESS:  Um --

17               THE COURT:  Hold on just a moment.

18               Mr. Knauss?

19               MR. KNAUSS:  Well, I guess I'll have to

20   call her in my case, unless --

21               THE COURT:  Ms. Dumont?

22               It is outside of the scope of direct.  I

23   think we can proceed in one of two fashions.  Either I

24   can expand the scope of cross-examination or we can

25   retain the witness for re-calling as a direct witness in

1    Mr. Knauss's case.  Do you have a preference?

2                    MS. DUMONT:  Expand the scope.

3                    THE COURT:  Okay.

4                    Do you remember what the question was?

5                    THE WITNESS:  Just now?

6                    THE COURT:  Just now.

7                    THE WITNESS:  What was I talking about in

8    counseling?

9                    THE COURT:  Okay.  You do remember.  That

10   was the question, as I recall it.  So go ahead and

11   answer that question.

12                   THE WITNESS:  About my past.  And -- yeah.

13   About my past.

14   BY MR. KNAUSS:

15       Q.    What about your past?

16       A.    I was abused as a child.  Lost my sister, which

17   I basically raised myself.

18       Q.    And you say "abused."  Was that like somebody

19   hurt you?

20       A.    Yes.

21       Q.    Okay.  Did you talk about this incident about

22   the touching?

23       A.    No.

24       Q.    The place in Milwaukie, what kind of a -- was

25   it a house or an apartment?

Jasmine Jewell Shafer - X                    50

```
1         A.    An apartment.

2         Q.    Do you know what street it was on?

3         A.    No.

4         Q.    Now, do you know if you were in school?

5         A.    I think I was in my summer.

6         Q.    Pardon me?

7         A.    I think it was in my summer.

8         Q.    Okay.  I didn't quite hear you.  You think this

9    happened during the summer?  Is that what you said?

10        A.    Yeah.

11        Q.    Okay.  Do you know if you'd already started

12   school?

13        A.    No.

14        Q.    Okay.  Do you know when -- did you -- did you

15   go to kindergarten?

16        A.    Yes, I have went to kindergarten.

17        Q.    Do you know what the name of the school was?

18        A.    No, because I've switched kindergarten --

19   school from kindergarten and school.

20        Q.    Okay.  Was the school in Vancouver or in

21   Milwaukie, your first school?

22        A.    In Milwaukie.  No, my very first school?

23        Q.    Yeah.

24        A.    It was in Lawton.

25        Q.    Where?
```

1        A.    In Lawton.

2        Q.    In Lawton?   Okay.   Where was your next school?

3        A.    In Lawton.

4        Q.    Okay.   Your next school?

5        A.    Or- -- or Milwaukie.

6        Q.    Okay.   Your next school?

7        A.    Milwaukie.

8        Q.    Okay.   Your next school?

9        A.    Oregon City.

10       Q.    Okay.   You ever go to school in Vancouver?

11       A.    Yeah.

12       Q.    Okay.   So now, did you tell anybody about this

13    incident in Milwaukie in the kitchen?

14       A.    No, sir.

15       Q.    Why not?

16       A.    Because I was at a young age.   Didn't really

17    quite understand what was going on.   I was confused.

18       Q.    Was one of the reasons you didn't talk about

19    this is that they think you were lying anyway?

20       A.    No.

21       Q.    Okay.   Do you remember telling the people at

22    Children's Center that -- that people thought you lied?

23       A.    No.

24       Q.    Have you ever felt that people think you lie?

25       A.    Yes.

Jasmine Jewell Shafer - X                              52

1        Q.   Okay.  How old were you when people thought you

2   lied?

3        A.   Nine.

4        Q.   Nine?

5        A.   Yes.

6        Q.   Okay.  So did you ever lie before you were

7   nine?

8        A.   Yes.

9        Q.   When did -- when do you think you started

10  lying?

11       A.   I started lying at the age of six.

12       Q.   Okay.  Why would you lie?

13       A.   To keep me out of trouble.

14       Q.   Did you lie often or just once in a while?

15       A.   Once in a while, until it became a habit.

16       Q.   Okay.  What do you mean by that?

17       A.   Like, I would lie about me not doing something

18  or about what really happened and what not.

19       Q.   Okay.  So it became a habit.  How often would

20  you lie when it became a habit?

21       A.   Couple times a week.

22       Q.   Okay.  Do you remember how old you were then?

23       A.   Eight or nine.

24       Q.   All right.

25       A.   I don't know.

Jasmine Jewell Shafer - X                          53

1        Q.    Would you lie to your dad?

2        A.    Yes.

3        Q.    Okay.  Did you lie to Trisha?

4        A.    Yes, I did.

5        Q.    So did it seem to you like it was just sort of

6    like a habit of yours?

7        A.    A little bit, yeah.

8        Q.    Okay.  Have you worked on that since?

9        A.    Yes, I have.

10       Q.    When did you start working on it?

11       A.    When I realized that it could get me into big

12   trouble one day.

13       Q.    Okay.  When was that?  When did you start

14   working on it?

15       A.    At eight.

16       Q.    Eight?  But you still lied when you were nine?

17       A.    Yes.

18       Q.    Okay.  And you've lied even after then, haven't

19   you?

20       A.    Yeah.

21       Q.    Do you remember when your -- that the people at

22   the Children's Center were checking you out, looking at

23   your scalp, your face, all that?

24       A.    Yes.

25       Q.    Do you remember them asking you why you were

1    there?

2        A.    No.

3        Q.    Do you -- do you remember saying, "I'm here

4    because of Jorden touching me"?

5        A.    I think so.

6        Q.    Okay.  Did -- do you remember them asking you,

7    when they were examining you, if anybody else touched

8    you?

9        A.    No.

10       Q.    You don't remember that?

11       A.    (No audible response.)

12       Q.    Okay.

13             Now, when -- how old were you when you

14    started taking the -- any of the pills, whatever the

15    color was?

16       A.    I don't know, sir.

17       Q.    Okay.  Was it when you were in school?

18       A.    Yes.

19       Q.    Okay.  Were you living -- where were you living

20    when you started taking the pills?

21       A.    With Trisha.

22       Q.    Okay.  Was it in Milwaukie or Oregon City?

23       A.    Oregon City.

24       Q.    Okay.  Now, do you remember when you started

25    the pills, was it before this thing where you claim

Jasmine Jewell Shafer - X                          55

1    Jorden touched you in --

2         A.   Yes, it was before it.

3         Q.   Okay.  You don't have any idea when you started

4    them was it -- before that?  How old you were?

5         A.   No.

6         Q.   Okay.  Do you know the name of the pill?

7         A.   No, sir.

8         Q.   Okay.  Does Dexedrine sound like the name?

9         A.   (No audible response.)

10        Q.   Okay.  Would you take the pills yourself or

11   would somebody else give them to you?

12        A.   Somebody else would give them to me.

13        Q.   Who was the one that would give them to you?

14        A.   Huh?

15        Q.   Who gave them to you?

16        A.   My dad.

17        Q.   Okay.  Did he ever give you more pills than

18   usual?

19        A.   No.

20        Q.   Do you know if you had pills the night of this

21   incident in Oregon City?

22        A.   Yes, I did.  But at the time, I only took one a

23   day.

24        Q.   Okay.  How do you know that?

25        A.   Because I remember I only took one a day at the

Jasmine Jewell Shafer - X                                    56

1    time.

2         Q.   Okay.  Did somebody ask you about that

3    yesterday?

4         A.   No.

5         Q.   Okay.  So you never took more pills?  Once in a

6    while, take a little bit more?

7         A.   No.

8         Q.   Okay.  Okay.

9              So let's talk about what happened in Oregon

10   City.  You were sleeping on the big couch or the little

11   couch?

12        A.   Little couch.

13        Q.   And when you went to sleep, was there anybody

14   else in the room?

15        A.   Yes.  Jorden was.

16        Q.   So when you first went to sleep that night,

17   Jorden was there?

18        A.   Yeah.

19        Q.   Okay.  Where was he?

20        A.   On the big couch.

21        Q.   Do you have an idea what time you went to

22   sleep?

23        A.   No.

24        Q.   Okay.  Do you know where Jorden had been?  If

25   he'd been -- gone somewhere else that night?

1      A.    Maybe to a friend's house, a -- a girl's house.

2   I don't know.

3      Q.    Are you making that up or is that something

4   that you actually remember?

5      A.    It's just an idea of where he would have been.

6      Q.    Okay.  Okay.

7            So do you have any idea what time of night

8   it was that you went to sleep?

9      A.    No.

10     Q.    And what was Jorden doing on the big couch when

11  you went to sleep?  What's the last thing you remember?

12     A.    Watching movies is the last thing I remember.

13     Q.    Okay.  Were you watching the movie with him?

14     A.    Everybody was.

15     Q.    Okay.  So around the time you went to sleep,

16  was there other people watching the movie, too?

17     A.    I think so.  Yeah.

18     Q.    Okay.  Who -- who else was watching the movie?

19     A.    Dad and Trisha.

20     Q.    Okay.  So I don't want to confuse you here, so

21  try to remember, like, when you're -- you're -- last

22  thing you remember before you fell asleep, who was in

23  the room?

24     A.    Dad, Trisha, and then Jorden.

25     Q.    Okay.  Now, you say you felt some -- somebody

Jasmine Jewell Shafer - X        58

1    touching your -- your breast; is that right?

2    A.    Yes.

3    Q.    Okay.  Were you asleep or awake when -- the

4    first thing that you felt the touch?

5    A.    I -- I had my eyes closed, but I was awake.

6    Q.    You had what?

7    A.    My eyes closed, but I was awake.

8    Q.    Okay.  Do you think at the time of this touch

9    that you were dreaming?

10    A.    No, sir.

11    Q.    Okay.  Did you tell somebody before that you

12    were dreaming?

13    A.    No, sir.

14    Q.    Okay.  So had -- had you woken up before you

15    were touched and were wide awake?

16    A.    I woke up during it.

17    Q.    Okay.  Did you -- while you were being touched,

18    did you open your eyes?

19    A.    Yes, sir.

20    Q.    Okay.  And when you opened your eyes, what did

21    you see?

22    A.    I saw -- I think a arm, but I'm not sure if

23    that's what I saw.

24    Q.    Okay.  So you woke up during the touch, you

25    opened your eyes and you saw an arm?

1      A.    Uh-huh.

2      Q.    Okay.  Was that -- was the hand or that arm

3  touching you at the time?

4      A.    Yes.

5      Q.    Okay.  But you didn't see a face?

6      A.    No.

7      Q.    And then you say you -- you looked over the end

8  of the couch and saw Jorden pretending to sleep in the

9  play -- in the toy area?

10      A.    Yes.

11      Q.    Okay.  And then you say he kept saying, "Can I

12  touch you?"  Where -- where was he then?

13      A.    He was at the couch.

14      Q.    Okay.  Was he sitting on the couch?

15      A.    He was lying down.

16      Q.    Pardon?

17      A.    He was lying down.

18      Q.    Okay.  How many times did he ask you to touch

19  you?

20      A.    About three times.

21      Q.    Three?

22      A.    (No audible response.)

23      Q.    Okay.  Did he go like that with his finger?

24  "Come over here," or something like that?

25      A.    That was the -- the one in McLoughlin.

Jasmine Jewell Shafer - X                    60

```
 1        Q.    Okay.

 2        A.    (Indiscernible.)

 3        Q.    Didn't do that this time, right?

 4        A.    Right.

 5        Q.    Okay.

 6              Now, did he say something about taking the

 7  garbage out?

 8        A.    Yes.

 9        Q.    Did that make any sense?

10        A.    No.

11        Q.    Okay.  What did he say?

12        A.    He said, "I don't want to take out the trash.

13  You do it."

14        Q.    And at the time, that made no sense to you,

15  right?

16        A.    Right.

17        Q.    Okay.  You say he offered you money to not

18  tell?

19        A.    Yes.

20        Q.    Okay.  And something about a movie?

21        A.    Uh-huh.

22        Q.    Okay.  Do you know what movie it was?

23        A.    The new Sponge Bob movie.

24        Q.    Okay.  How do you remember that?

25        A.    I just remember him saying it.
```

Jasmine Jewell Shafer - X                                            61

1          Q.    All right.

2          A.    Coming over to me and saying, "If you do not

3     tell, I will give you $20 and take you to the movies to

4     see that new Sponge Bob movie."

5          Q.    Okay.  Now, where was he when he talked about

6     that?

7          A.    He was right by the little couch.

8          Q.    That you were on?

9          A.    Yes.

10         Q.    Okay.  So was he, like, standing or sitting or

11    what?

12         A.    He was squatting.

13         Q.    Okay.  How far apart is -- are the two couches?

14    Are they farther apart than you and me?

15         A.    No.  They're a little closer.

16         Q.    Okay.  Did you promise him you wouldn't tell?

17         A.    Yes.  But I never meant it.

18         Q.    Okay.

19               Now, what's the closest he got to you after

20    you woke up?

21         A.    When he -- when he tried to bribe me.

22         Q.    Okay.  How close was he then?

23         A.    Just, like, two inches away.

24         Q.    So he got right in your face, two inches away,

25    and said that?

Jasmine Jewell Shafer - X                          62

1        A.   Or not like in the face.   A little apart.

2        Q.   Like this close?

3        A.   Yeah.

4        Q.   Okay.   So that's when he said about the Sponge

5   Bob and the $20?

6        A.   Yes.

7        Q.   So could you -- could you hold your hands up

8   and show the judge that, how close he was?   Just go like

9   this, however close he was.

10            Could you turn -- okay.   So could you turn

11   back?

12            So it would be about the size of putting

13   your hands around my head?   About that big?

14        A.   Um . . .

15        Q.   About this big?

16        A.   Yes.

17        Q.   Okay.   And that's the closest he got to you?

18        A.   Yeah.

19        Q.   Okay.   Was he squatted or standing?

20        A.   He was squatted.

21        Q.   Was he being nice or mean?

22        A.   Nice about it.

23        Q.   But that's the closest he got to you; is that

24   right?

25        A.   Yes.

    1        Q.    Okay.

    2              Now, do you remember the ladies talking to

    3    you at the Children's Center about your body parts?

    4        A.    (No audible response.)

    5        Q.    Remember that part?

    6        A.    Yes.

    7        Q.    Okay.  Do you remember them asking you about

    8    the parts of your body, what you called them?

    9        A.    No.

   10        Q.    Okay.

   11        A.    A --

   12        Q.    Pardon?

   13        A.    -- little bit, yes.

   14        Q.    Okay.  Did you tell them about the dandelion?

   15        A.    I -- yeah.

   16        Q.    Okay.  So what part of your body do you think

   17    the dandelion is?

   18        A.    The vagina.

   19        Q.    Okay.  Was that your word for vagina at the

   20    time, was dandelion?

   21        A.    Yes.

   22        Q.    Okay.  And they wanted to know what you called

   23    the body parts, right?  So you -- you told them that

   24    part's the dandelion; is that right?

   25        A.    Right.  Yeah.

Jasmine Jewell Shafer - X                    64

 1        Q.   Okay.  Now, when -- when you -- remember when
 2   you talked to the policeman at the very first?  Well,
 3   let me start over.
 4             You went to the restaurant, you told your
 5   dad what happened, right?  And you ended up at the
 6   police station?
 7        A.   (No audible response.)
 8        Q.   Do you remember telling the policeman anything?
 9        A.   No, sir.
10        Q.   Okay.  Did the -- did the policeman say
11   anything about your telling your dad about what
12   happened?  Did he make any comment about that?
13        A.   No, sir.
14        Q.   Did he say anything like you were very brave to
15   tell your dad?
16        A.   I think he did.
17        Q.   Okay.  So did you tell the policeman about
18   going to a movie or getting money?
19        A.   Not sure.
20        Q.   Okay.  Now, when -- when you were in Oregon
21   City, when you say this happened, you and your dad were
22   staying at Trisha's house?
23        A.   Spending the night.
24        Q.   Okay.  Do you know if your dad and Trisha were
25   talking about trying to get back together?

Jasmine Jewell Shafer - X                    65

1        A.    Yes.

2        Q.    So they were talking about that?

3        A.    Yeah.

4        Q.    Okay.  Did you hear them talking about it?

5        A.    No.  He told me.

6        Q.    Okay.  Had any decision been made that night

7   when you feel asleep?

8        A.    I'm not sure.

9        Q.    Okay.  Now, you -- you were living in Vancouver

10  at the time?

11       A.    Yeah.

12       Q.    With your grandmother?

13       A.    My grandma and my grandpa and my dad.

14       Q.    And -- and your nana?

15       A.    No.  That's in Lawton.

16       Q.    Okay.  So you were living with your grandmother

17  and your grandfather and your dad in Vancouver at the

18  time; is that correct?

19       A.    Yes.

20       Q.    Did you like living there?

21       A.    Yes.

22       Q.    Are you close to your grandpa or grandma?

23       A.    Yes.

24       Q.    Okay.  And is that the grandpa you -- you

25  talked on the phone about what happened?

1        A.    No.  I told him face-to-face.

2        Q.    I'm sorry.  I didn't hear that.

3        A.    I told him face-to-face.

4        Q.    Oh, okay.  So was that before you went to the

5    Children's Center?

6        A.    Yes.

7        Q.    You told -- okay.  You told your grandpa

8    face-to-face, right?

9        A.    (No audible response.)

10       Q.    Okay.  Did you tell anybody else face-to-face?

11       A.    My grandma.

12       Q.    Okay.

13       A.    And she heard.

14       Q.    Were they both there at the same time?

15       A.    Yes.

16       Q.    Okay.  Did you tell them what happened, about

17   the touching and all that?

18       A.    Yes.

19       Q.    Did you tell them that it happened before?

20       A.    Yes.

21       Q.    Did you tell your dad before you went to the

22   Children's Center that it happened before?

23       A.    Yes.

24       Q.    Did you tell them what happened in the kitchen

25   in Milwaukie?

1        A.    Yes.

2        Q.    Okay.  I want to be real clear here.  Before

3  you went to the Children's Center and talked to the

4  ladies and had -- had the video and all that, you told

5  your dad what had happened in Milwaukie about the first

6  touching; is that right?

7        A.    Yes.

8        Q.    Okay.  And did you tell him where you got

9  touched?

10       A.    Yes, I did.

11       Q.    Okay.  Did you tell Grandma and Grandpa where

12  you got touched?

13       A.    Yes.  They --

14       Q.    Did you --

15       A.    They were all there.

16       Q.    Pardon?

17       A.    They were all in the same room when I said it.

18       Q.    Okay.  So you told all three of them together?

19       A.    Yes.

20       Q.    Okay.  And that was at your place in Vancouver?

21       A.    Yes.

22       Q.    Did you mention the dandelion or --

23       A.    Yes.

24       Q.    Do you think you used that word?

25       A.    Yes.

Jasmine Jewell Shafer - X                                    68

1        Q.    Okay.  Did you tell anybody else before you
2    went to the Children's Center?
3        A.    Anyone else besides my grandma and my grandpa
4    and my dad?
5        Q.    Yeah.
6        A.    No.
7        Q.    Do you know what the boy part is called?
8        A.    Yes.
9        Q.    What's that called?
10       A.    The penis.
11       Q.    Did you know that word back when you were at
12   the Children's Center?
13       A.    Yes.
14       Q.    Okay.
15                 MR. KNAUSS:  Nothing further.  Thank you.
16                 THE COURT:  Ms. Dumont.
17                 MS. DUMONT:  Thank you.
18                        REDIRECT EXAMINATION
19   BY MS. DUMONT:
20       Q.    You talked about going to counseling a few
21   times.  And you said that you were abused as a child.
22   Was that physical abuse?
23       A.    (No audible response.)
24       Q.    Do you know what I'm asking about?
25       A.    Uh.

Jasmine Jewell Shafer - ReD                    69

1        Q.    No?   Okay.

2              What kind of abuse were you talking to your

3    counselor about that had happened with you when you were

4    younger?

5        A.    I was pulled by the hair and kicked in the

6    stomach to the ground.

7        Q.    Okay.  And so that was the abuse that you were

8    talking about with your counselor?

9        A.    Yes.

10       Q.    Okay.

11             And you talked a little bit about you lost

12   your sister, who you raised by yourself.  Was that one

13   of the other things you were talking to the counselor

14   about?

15       A.    Yeah.

16       Q.    Okay.  And then could that have been counseling

17   that you were going to before this incident with Jorden

18   at -- on the -- the brown and black couch?

19       A.    Yeah.

20       Q.    Okay.  And so is it fair to say that you

21   don't -- you aren't quite sure about when you were going

22   to counseling, but you just remember going a few times?

23       A.    Yeah.

24       Q.    Okay.

25             You talked a little bit about how you --

1    when you were eight years old, you started to try and

2    work on telling the truth.  Do you remember talking

3    about that with Mr. Knauss just now?

4        A.   Yes.

5        Q.   Okay.  And, you know, when -- when you're

6    talking about what happened with -- with feeling

7    defendant touching your breast, is that something that

8    you were dreaming?

9        A.   No, ma'am.

10       Q.   Is that something that you were saying -- did

11   that really happen to you?

12       A.   Yes.

13       Q.   Okay.  Why do you think that really happened to

14   you versus it being -- you know it's not a dream and you

15   know you weren't just saying it?

16       A.   I know it wasn't a dream because I know I felt

17   it and I wouldn't just make something up like that.

18       Q.   Okay.  And you felt it and you wouldn't make

19   something up like that.  And did your conversation with

20   the defendant afterwards, did that -- what did you --

21   what did you make of that?

22       A.   I'm not sure I understand the question.

23       Q.   Okay.  That's fair enough.

24            When you were -- when you were talking

25   about -- about defendant, Jorden Hollingsworth, being

1    very close to you after -- after he touched you, okay,

2    and then he came up to you afterwards, when you were on

3    the couch and he was crouching down -- do you remember

4    talking about that?

5         A.   Yes.

6         Q.   Okay.  And did he -- at that time, what were --

7    what was he asking you about?  What were you guys

8    talking about?

9         A.   About me not telling.

10        Q.   Okay.  And so -- and he was really close to you

11   when you were -- when you were talking about that.  And

12   after -- after -- I think you said you told him you

13   wouldn't tell, what he do?  Did he do anything?

14        A.   He hugged me.

15        Q.   He hugged you.  And when he hugged you, where

16   did he hug you?

17        A.   Just like a normal hug.

18        Q.   Okay.  And -- and how did that make you feel?

19        A.   I'm not sure how I felt at the time.

20        Q.   Okay.  When he was talking to you and you guys

21   were -- were you guys face-to-face when he was asking

22   you not to tell?

23        A.   Yes.

24        Q.   Okay.  Is that when you were -- you talked

25   about smelling some alcohol smell.  Was that when you

1     could smell the alcohol smell?

2          A.    I'm not sure.

3          Q.    You aren't sure?  Okay.  So you don't know when

4     in the conversation you could smell the alcohol smell?

5     Is that what you're saying?

6          A.    Yeah.

7          Q.    Okay.  That's fair.  And that's all I want.  If

8     you -- if you don't -- if you're not sure, just say.

9                So when you -- you said that you didn't know

10    if your dad and Trisha were going to get back together

11    when you went to bed that night.  And were you saying

12    this, that happened with defendant, to try and break

13    them up?  Just --

14         A.    No.

15         Q.    No.  Okay.

16               And so when you -- when you were talking

17    about this, this wasn't an attempt to break up your dad

18    and Trisha?

19         A.    No.

20         Q.    And, in fact, them breaking up resulted in you

21    having to move where?

22         A.    With my grandma and grandpa.

23         Q.    In -- and where?  Which state?

24         A.    In Vancouver, Washington.

25         Q.    And then where did you have to move?

Jasmine Jewell Shafer - ReD                                    73

 1        A.    And then I moved to Oklahoma.

 2        Q.    Okay.  And was that a good thing for you or

 3   just sort of -- was that sort of not something that you

 4   liked so much?

 5        A.    I'm not sure I wanted to go.

 6        Q.    Okay.

 7              When you -- when we've been talking about

 8   some of the phrases and the terms for body parts, did --

 9   is it -- is it a little uncomfortable for you?

10        A.    Did you say comfortable or uncomfortable?

11        Q.    Uncomfortable to talk about body parts?

12        A.    Yes.

13        Q.    Okay.  And when you're referring to -- just

14   when I was asking questions, you kept saying "the, the."

15   Is that because -- why were you having a hard time

16   saying that word?

17        A.    Because it's me -- it's just weird saying body

18   parts.

19        Q.    Okay.  At the Children's Center, do you

20   remember using the -- the "vagina" word?

21        A.    No.  I said "dandelion."

22        Q.    Okay.  And do you remember using the -- the

23   "penis" word?

24        A.    No.  They gave me a sheet of paper and then had

25   me circle the part.

Jasmine Jewell Shafer - ReD                                    74

1          Q.    Okay.  And you circled the part that defendant

2     had showed you?

3          A.    Yes.

4          Q.    Okay.  And what was that part?

5          A.    The penis.

6          Q.    Okay.  And -- (pause).

7                     MS. DUMONT:  Nothing further.

8                     THE COURT:  May this witness be excused?

9                     MS. DUMONT:  Yes, Your Honor.

10                    THE COURT:  Any objection, Mr. Knauss?

11                    MR. KNAUSS:  No.

12                    THE COURT:  You're excused.  That means

13    you can leave.  Thank you.

14                    Witness scheduling for the rest of the

15    morning?

16                    MS. DUMONT:  I do have another witness.

17    Can we take a short recess, though?

18                    THE COURT:  Yes.  That -- that was --

19                    MS. DUMONT:  Because I have to --

20                    THE COURT:  My question was whether we

21    would take a short recess or a long recess and start

22    after the noon hour.  But if you have another witness --

23                    MS. DUMONT:  We can do that.  Let's -- we

24    could do --

25                    THE COURT:  You all know your scheduling

```
1    of your other witnesses better than I do.
2              MS. DUMONT:  Okay.  Let's take a long
3    recess and then come back after lunch.  What time does
4    Your Honor want us back?
5              THE COURT:  I have a judges' meeting
6    during the noon hour.  1:15?
7              MR. KNAUSS:  Sure.
8              MS. DUMONT:  Yes, Your Honor.
9              THE COURT:  1:15.  All right.  I'll see
10   you back at 1:15.
11             (Recess; 11:05 a.m. to 1:16 p.m.)
12             THE COURT:  We're on the record.
13             MS. DUMONT:  Does Your Honor want me to
14   call the case again?
15             THE COURT:  Yes, please.
16             MS. DUMONT:  State vs. Hollingworth --
17   Hollingsworth; 1501848.  Sarah Dumont on behalf of the
18   State.  Defendant is present, out of custody,
19   represented by Mr. Knauss.  We are prepared to proceed,
20   Your Honor.
21             THE COURT:  And the next State's witness,
22   then?
23             MS. DUMONT:  Thank you, Your Honor.  State
24   calls Kenneth Jewell.
25             (Witness summoned.)
```

 1                    THE COURT:  Sir, if you'll come all the

 2      way to the front of the courtroom.  When you arrive at

 3      the witness stand, please do remain standing, face my

 4      clerk, and raise your right hand to be sworn.

 5                          KENNETH JEWELL,

 6      called as a witness on behalf of the State, having been

 7      first duly sworn, was examined and testified under oath

 8      as follows:

 9                    THE CLERK:  Be seated.

10                    Please state your full name and spell your

11      last for the record.

12                    THE WITNESS:  My name is Kenneth Jewell.

13      And my last name is J-E-W-E-L-L.

14                    THE COURT:  Go ahead.

15                        DIRECT EXAMINATION

16      BY MS. DUMONT:

17          Q.   Sir, where do you live?

18          A.   I -- I currently reside in Lawton, Oklahoma.

19          Q.   Okay.  And how long have you lived there?

20          A.   I've lived there for about six months now.

21          Q.   Okay.  And before that, where did you live?

22          A.   I lived in -- in Washington.

23          Q.   Okay.

24          A.   Vancouver.

25          Q.   And you said that you moved to Lawton around

Kenneth Jewell - D                          77

1     six months ago.  What -- what kind of work do you do?

2          A.    I do construction.

3          Q.    Okay.  And when you lived in Vancouver,

4     Washington, what kind of work did you do?

5          A.    I made artist oil paint.

6          Q.    And prior to Vancouver, Washington -- well,

7     first of all, who -- who was living with you in

8     Vancouver, Washington?

9          A.    It was me, my sister, Jasmine, my dad, and my

10    stepmother.

11         Q.    And before that, where -- where were you

12    living?

13         A.    I was living in Oregon City, Oregon, with

14    Trisha Miller.

15         Q.    Okay.  And what was your relationship with

16    Trisha Miller?

17         A.    We were fiancé and -- so . . .

18         Q.    And how long had you been dating?

19         A.    We had been dating on and off for about seven

20    years.

21         Q.    Okay.  And what is your relationship to

22    Jasmine?

23         A.    My relationship?

24         Q.    Yeah.

25         A.    I'm her father.

Kenneth Jewell - D                                      78

1       Q.    Okay.  And is -- who's Jasmine's mother?

2       A.    Is Denise Shafer.

3       Q.    Okay.

4       A.    She has no contact with the mother.

5       Q.    Okay.

6             I want to talk to you a little bit about

7    when you were living in Vancouver.  Did there come a

8    time when you and Jasmine went to Mrs. Miller's house?

9       A.    Yes.

10      Q.    Okay.  And I'm going to situate you sort of in

11   the time frame of February 2015, when this happened.

12      A.    Okay.

13      Q.    At that point in your relationship with

14   Ms. Miller, what was going on?

15      A.    We had some issues that we were trying to

16   resolve concerning my -- my youngest daughter and the

17   dog at the time.

18      Q.    Okay.  What's your youngest daughter's name?

19      A.    Kaeli.  Kaeli Jewell.

20      Q.    Okay.  And so you went to Ms. Miller's house.

21   Do you remember where her house was at?

22      A.    Yes.  It was off of Mount Pleasant.

23      Q.    Okay.

24      A.    Right there on Main Street.

25      Q.    And you said it was in Oregon City; is that

1    right?

2         A.    Yes.  It was in Oregon City.

3         Q.    Okay.  So you went there and you -- did Jasmine

4    come with you?

5         A.    Yes.  Yes.

6         Q.    Okay.

7         A.    She came with me.

8         Q.    And was that a house that was familiar to you?

9         A.    Yes.  Yes.  We both used to live there.

10        Q.    Okay.  When you say "both," who is that?

11        A.    Me and Jasmine.

12        Q.    Okay.  So you used to live there.  And when was

13   it that you lived there?

14        A.    We lived there from -- well, we -- me, Jasmine,

15   and Trisha all moved in there together once -- right --

16   just before Kaeli was born.

17        Q.    Okay.  And where -- how old is Kaeli now?

18        A.    Kaeli is two years old.  She was born on May --

19   May 3rd -- May 4th.

20        Q.    She was born May 4, and it's 2016, so would it

21   be correct that she was born in 2014?

22        A.    Yes.

23        Q.    So she was -- she's two years old.  So you guys

24   moved into that address in Oregon City.  And what is the

25   layout of the house like, or the apartment?

1      A.    It's a -- it's a townhouse.

2      Q.    Okay.

3      A.    So when you first walk into the -- the house,

4   in front of you is the stairs up to the bathroom and the

5   two bedrooms upstairs.

6            Downstairs, as soon as you come into the

7   house is the living room and the -- the kitchen area.

8      Q.    Okay.  And the living room, were there -- what

9   kind of seating was there in the living room?

10     A.    There was two leather couches.  One was a

11  bigger one, one was a smaller one.  And there was a

12  recliner as well.

13     Q.    Okay.  Was there anything in that room for

14  Kaeli?

15     A.    Yes, there was.  In the corner there was a

16  little play area that was set up for her with some foam

17  in there and all of her little toys and a gated kinda

18  enclosure for her.

19     Q.    Okay.  And do you remember -- you said there

20  were two leather couches; one smaller, one bigger.  Do

21  you remember what color they were?

22     A.    They were black.

23     Q.    Okay.  And you mentioned that there were two

24  bedrooms up -- you walk in and there was stairs up and

25  there were two bedrooms upstairs.

 1        A.    Uh-huh.

 2        Q.    Who -- when you were living there, so back when

 3   you first moved in --

 4        A.    Uh-huh.

 5        Q.    -- where would you -- where was your bedroom?

 6        A.    My bedroom is when you come up to the stairs,

 7   there's -- my bedroom is off to the right.   And

 8   Jasmine's room, she was staying up to the left.

 9        Q.    Okay.  Okay.

10              And then -- okay.  So that was when you

11   first moved in and the setup of the house.  And then you

12   guys -- you and Jasmine then, I understand -- if I'm

13   understanding correctly, you guys left and moved to

14   Vancouver?

15        A.    Yes.

16        Q.    Okay.  And so when you came back in February of

17   2015, where -- who was living upstairs at that time?

18        A.    It was Mindy.  That is --

19        Q.    And who is Mindy?

20        A.    She is Trisha's sister, Jorden's mother.

21        Q.    Okay.  And she was living in which room?  The

22   room that you had been in or --

23        A.    Jasmine's old room.

24        Q.    Okay.  Okay.

25              So -- and she was there.  Was anyone else

Kenneth Jewell - D                    82

1    there?

2         A.   No.  Just me and Trisha, Jasmine, and Mindy at

3    the time when we first got there.

4         Q.   Okay.  And then -- you said when you first got

5    there.  Did there come a time when someone else came

6    there?

7         A.   Yes.  Jorden came over later that night.

8         Q.   Okay.  And just so we're clear, who is Jorden

9    in relationship to the people who were at the house?

10        A.   He's Trisha's nephew.

11        Q.   Okay.  And do you see him in the courtroom

12   today?

13        A.   Yes, ma'am.

14        Q.   Okay.  Can you describe him by his hair color?

15        A.   Yes.  It's -- it's dark brown.

16        Q.   Okay.  And what is he wearing?

17        A.   A suit.

18        Q.   Okay.

19             So he came, I think you said later that

20   evening.  Do you remember what time?  And if you don't

21   remember, that's fine.

22        A.   It was probably around 10:30, 11 o'clock, I

23   believe.

24        Q.   Okay.  So 10:30 or 11:00.  And where was

25   Jasmine going to sleep that night?

Kenneth Jewell - D                                    83

1          A.    Oh, she was just going to sleep on the -- on

2     the couch because her room was occupied at the time.

3          Q.    Okay.  So -- and are you talking about the

4     couches, the leather -- black leather couches that you

5     described before?

6          A.    Yes.  On the smaller one.

7          Q.    Okay.  So she was going to stay there.  And

8     then defendant came home and what, if anything, did you

9     notice about him?

10         A.    What's that?  Can you repeat?

11         Q.    What did you notice about him?  Was there

12    anything that you noticed about him?

13         A.    Not really.  And I know he had had a couple

14    drinks, but he wasn't visibly intoxicated.

15         Q.    Okay.  He'd had a couple drinks.  And did

16    you -- what did you do then?

17         A.    We stayed up, we watched some TV, and later we

18    went to bed.

19         Q.    Okay.

20         A.    Probably about --

21         Q.    When you say --

22         A.    I don't know.  Probably about 45 minutes to an

23    hour later.

24         Q.    Okay.  You said stayed up and watched TV.  And

25    who were -- who were the -- who was it (indiscernible)?

Kenneth Jewell - D                    84

1    Sorry I just got (indiscernible).

2        A.   It was -- it was just me, Trisha, and Jasmine.

3    And Jorden was down there as well.  I think Mindy was

4    still up in her room.

5        Q.   Okay.  And so when you say, "We went to sleep

6    45 minutes to an hour later," who was that that went to

7    bed?

8        A.   Myself and Trisha and Kaeli.

9        Q.   Okay.  And where did you go to bed?

10       A.   In our old bedroom.

11       Q.   Okay.  And so is that the one that's upstairs

12   you described as on the right-hand side?

13       A.   Yes.

14       Q.   Okay.

15            And then -- do you smoke cigarettes?

16       A.   Yes, I do.

17       Q.   Okay.  Does Trisha smoke cigarettes?

18       A.   Yes.

19       Q.   Okay.  What kind of cigarettes?

20       A.   Marlboro.

21       Q.   Okay.  And when you were at the house, would

22   you smoke inside the house?

23       A.   No.  We would not smoke inside the house.

24       Q.   Okay.  Would Trisha smoke inside the house?

25       A.   No.  We would not smoke inside the house.

Kenneth Jewell - D                          85

1        Q.    Okay.  And so when you would want to smoke,

2   where would you go?

3        A.    Outside.  In the backyard.

4        Q.    Okay.  All right.

5              And then what time, if you recall, do you

6   think that you woke up the next morning?

7        A.    Probably 10:30 or 11 o'clock in the morning.

8        Q.    Okay.  And what was your plan for the day?

9        A.    We were -- me, Jasmine, Trisha, and Kaeli, were

10  all going to go have -- have lunch and then we were

11  going to go to the zoo.

12       Q.    Okay.  And when you got up, did you -- did you

13  put that plan into effect?

14       A.    Yes.

15       Q.    Okay.  When --

16       A.    We left shortly after we woke up, to go get

17  something to eat.

18       Q.    So do you remember where you went?

19       A.    We went to the Coffee Barn.

20       Q.    Okay.

21       A.    To get some chicken teriyaki.

22       Q.    The Coffee Barn has chicken teriyaki?

23       A.    Yeah.

24       Q.    Okay.

25       A.    I believe that's what it was called.

Kenneth Jewell - D                    86

 1      Q.    Okay.

 2            And so you go -- you go there.  And -- and

 3   do you eat?

 4      A.    Yeah, we ate.

 5      Q.    Okay.  And did something happen when you were

 6   there and were eating?

 7      A.    Halfway into the meal, Jasmine told me that she

 8   needed to tell me something.  And that's when she told

 9   me that she was touched.

10      Q.    Okay.  Let's -- I want to focus in a little

11   bit.

12            So you're saying you're -- you're in the --

13   eating your meal.

14      A.    Uh-huh.

15      Q.    What kind of -- what kind of table was it?

16      A.    Just a regular rectangular table.

17      Q.    Okay.

18      A.    I was sitting on the side by -- with Trisha.

19   And I was on the -- the outside of the table and Jasmine

20   was sitting straight across from me.

21      Q.    Okay.  So you're sitting in -- and the --

22   Trisha's, I think you said, sitting next to you?

23      A.    Yes.

24      Q.    Okay.  And so -- and then Jasmine is across

25   from you.  So is Jasmine also across from Trisha?

Kenneth Jewell - D

1      A.   Yes.

2      Q.   Okay.  And then where is Kaeli in relation to

3  you and -- and Trisha?

4      A.   She was off to the end of the table, right to

5  the side of us, in a highchair.

6      Q.   Okay.  So Kaeli is sitting next to you --

7      A.   Yes.

8      Q.   -- in a highchair.  Okay.

9           And so you said that Jasmine said she needed

10  to tell you something.

11     A.   Yes.

12     Q.   And what did you say?

13     A.   I -- I asked her what it was.

14     Q.   You said, "What is it?"

15     A.   I said, "What would you like to tell me?"

16     Q.   Okay.  And what did she say?

17     A.   She said that "Something happened last night.

18  Jorden touched me."

19     Q.   Okay.  And what did you say?

20     A.   I immediately looked over at Trisha and asked

21  if she had heard what I said.  And she was like, "I

22  heard some of it."

23           And I said, "Okay."

24           So we got our stuff to -- our meal to go and

25  we left.  We were out in the parking lot.  And that's

Kenneth Jewell - D                                    88

1    when I told Trisha exactly what Jasmine had said.  And
2    we made the decision to call the Oregon City sheriff's
3    department.
4         Q.    Okay.  So --
5         A.    Together.
6         Q.    -- let me just back up a little bit.
7              You said -- you asked her, "What would you
8    like to tell me?"  This is when you're talking to
9    Jasmine.
10        A.    Yes.
11        Q.    And she said, "Something happened last night.
12   Jorden touched me."
13        A.    Yes.
14        Q.    And then what did you ask her, if anything?
15        A.    I -- what's that?
16        Q.    And then what did you ask Jasmine, if anything?
17        A.    I -- I -- I just -- I -- I just -- I just asked
18   her, I said, "Are you sure that happened?"
19              And she says, "Yes."
20              So I said, "Okay."  I said, "Because this is
21   really serious."  I said, "We're going to have to call
22   the police or something."
23              And that's when we went outside.  We got our
24   stuff all -- all to go and everything.  We sat out in
25   the car and I talked with -- with Trisha Miller.  And

Kenneth Jewell - D                89

```
 1   then we decided to call the sheriff's department.

 2        Q.   Okay.  And did you actually go to the police

 3   station?

 4        A.   Yes, together.  We both went there and made a

 5   statement.

 6        Q.   Okay.

 7        A.   We both talked to Officer Ellis.

 8        Q.   Okay.  Hold on.

 9             So you both went to the police station.  And

10   when you say "both," who all went?

11        A.   Trisha, myself, and Jasmine went.

12        Q.   Was Kaeli still there?

13        A.   Kaeli was with us.

14        Q.   Okay.  So all of you.  Do you leave from the

15   Coffee Barn and go directly to the police station?

16        A.   Yes.

17        Q.   Okay.  So you go to the police station and when

18   you get to the police station, you said, I think, that

19   you -- who did -- did you give a statement?

20        A.   Yes, we did.

21        Q.   Okay.  And when you gave your statement -- I'm

22   not going to ask you what you said, but was anyone else

23   in the room?

24        A.   Yes.

25        Q.   The -- other than a police officer.
```

```
1        A.   Well -- well, I talked to -- I talked to him

2   alone.

3        Q.   Okay.

4        A.   And he spoke with Trisha as well, and he spoke

5   with Jasmine.  We all had a turn to speak with him.

6        Q.   Okay.  I'm --

7        A.   But it was all by ourself.

8        Q.   Let me -- I know.  Let me go back.

9             So you met with the police officer

10  individually?

11       A.   Yes.

12       Q.   Okay.  And when Trisha talked to the police

13  officer, were you there?

14       A.   Not the first time.

15       Q.   Okay.  So they -- they had a private

16  conversation also?

17       A.   Yes.

18       Q.   Okay.  And then when -- when you -- when

19  Jasmine told you what had happened, what -- what was

20  your -- how did you feel?

21       A.   I was in a state of shock.

22       Q.   Okay.  And when Jasmine told you and Trisha,

23  how did Trisha appear?

24       A.   Very worried and concerned.

25       Q.   Okay.  And at that time in February, you and
```

1   Trisha, were you guys together or apart?  You were --

2        A.   When -- oh, we were -- we were apart.

3        Q.   Okay.

4        A.   But we were trying to fix what was going on.

5   We were pretty much in the process of getting back

6   together.

7        Q.   Okay.  And after this happened, did you and

8   Trisha stay together for a while longer?

9        A.   It was about -- yes, we did.  We were just

10  visiting.  I was -- still resided in Washington, but I'd

11  come for visits.

12       Q.   Okay.  And this incident that happened, it --

13  what was the reason you guys broke up?  Let me start

14  there.

15       A.   The reason that me and Trisha broke up was

16  because the dog bit our little girl twice.  And we had

17  numerous conversations about getting rid of the dog for

18  Kaeli.  That way, that no one else would get bit.

19       Q.   Okay.

20       A.   And when it happened the second time, we just

21  decided to call it off.

22       Q.   Okay.  Now, Jasmine has been diagnosed with

23  ADHD; is that right?

24       A.   Yes.

25       Q.   Okay.  And I want to talk to you a little bit

```
 1    about that.

 2              Do you -- does she have some medication that

 3    she takes?

 4         A.    Yes, she does.

 5         Q.    Okay.  And who -- at the time back in February

 6    of 2015, was she taking medication?

 7         A.    Yes.  She had --

 8         Q.    Okay.

 9         A.    -- just began to take medication.

10         Q.    Okay.  So she's taking medication.  And do you

11    give her the medication?

12         A.    I do, yes.

13         Q.    Okay.  And would you ever give her more

14    medication than was prescribed?

15         A.    No, ma'am.  She only got one pill a day.

16         Q.    Now, I want to ask you about -- you talked a

17    little bit about some of the places that you lived.  And

18    you said that when you moved into this place in Oregon

19    City right before Kaeli was born -- where did you live

20    before that?

21         A.    It was at -- it was right off Boardman.

22    Boardman.

23         Q.    Okay.

24         A.    Boardman Avenue.

25         Q.    And in that --
```

Kenneth Jewell - D                          93

1          A.    In some apartments.

2          Q.    An apartment on Boardman Avenue.  And what city

3     is that in?

4          A.    That's in Gladstone.

5          Q.    Okay.  And at that time, where were you

6     working?

7          A.    I was -- I was still working at Gamblin Artists

8     Colors, making artist oil paint.

9          Q.    Okay.  Did -- was there a time when you worked

10    at Safeway?

11         A.    Yes, there was.

12         Q.    When was that?

13         A.    That was right before Kaeli was conceived.

14    After I found out that we were going to have a baby,

15    I -- I started looking for a better job.

16         Q.    Okay.  And that's when you worked at Safeway?

17         A.    Yes.

18         Q.    Okay.  And so I want to ask you a little bit

19    about this Gladstone apartment that you described off

20    Boardman.

21               What was your setup of that apartment?

22         A.    It was a one-bedroom apartment.  It had a big

23    living room that Jasmine was staying in.  She was

24    staying in the left corner of the living room.  We had

25    her a -- a bed put up there.

1      Q.    What kind of bed was it?

2      A.    It was a little princess bed, a Barbie one,

3   with the little lace curtains and stuff.

4      Q.    Okay.  And that was in one corner.  What --

5   what else was in that room?

6      A.    Just the -- the TV.  And there was -- there was

7   a couch in there as well.

8      Q.    Okay.  You said there was one bedroom.  Where

9   was that bedroom at?

10      A.    That bedroom was located towards the left of

11   the house.

12      Q.    Okay.

13      A.    And you would take another left to go into the

14   bedroom.

15      Q.    Okay.  And where was the kitchen at?

16      A.    The kitchen was straight forward from the

17   entryway.

18      Q.    And describe the kitchen, the setup of the

19   kitchen.

20      A.    The kitchen had a little -- little dining area

21   off to the right.  And at the -- what separated the

22   dining room from the kitchen was a little wall with an

23   oven on the other side and a fridge and a sink.

24      Q.    Okay.  And so when you were on the other

25   side -- so there was a little wall, and then the oven is

1    here.  What was -- would you be able -- would it

2    basically then dead-end to the wall or how would --

3        A.   It was a window.  It dead-end into the wall.

4    There was a window there.

5        Q.   Okay.  So there's a dead end into a window.

6    And then the oven was on this other side.  What was at

7    the -- what else was on that same area that the wall was

8    on?

9        A.   It was a --

10       Q.   Or I'm sorry, the dish- --

11       A.   There was just a window ledge and then wall --

12       Q.   Okay.

13       A.   -- all the way down.  And then there was a

14   counter to the left.  And there was a stove to the

15   right.

16       Q.   Was there anything around the stove?

17       A.   There was just cooking utensils and little

18   containers that Trisha used to put sugar and flour in.

19       Q.   Okay.  And at that time when you were living in

20   that Boardman apartment, was there an apartment nearby?

21       A.   Yes.  There was two -- two apartments on the --

22   on the lower level.  What separated the two units was a

23   flight of stairs that were two more units upstairs.

24       Q.   And was there anyone that lived in those

25   apartments?

Kenneth Jewell - D                                    96

1          A.    All were occupied.

2          Q.    Okay.  Did Jasmine have any friends that lived

3     in those apartments?

4          A.    Yes, she did.

5          Q.    Who was it?

6          A.    It was a -- a Cody, Cody Nunes [phonetic], with

7     Patty and Chris, was his parents.  They lived in the

8     unit right next to us, on the lower level.

9          Q.    Okay.  And you're saying "right next."  Would

10    you be able to access -- like, was there a shared space

11    outside or how did that happen?

12         A.    Yeah.  It was a patio.  There was a patio out

13    front that we would all go and have -- have a cigarette

14    and . . .

15         Q.    Okay.  And at that time, at any time when you

16    were living at that Boardman Avenue apartment, did

17    defendant live there also?

18         A.    Yes.  He lived with us.

19         Q.    Okay.  When was that?

20         A.    I -- I'm not sure exactly on the dates, but I

21    know that he lived with us for quite some time.

22         Q.    Okay.  And when he was living there, do you

23    recall if that was -- so that was -- I'm just trying to

24    get a gauge here.  Would that -- that was before Kaeli

25    was born --

Kenneth Jewell - D                                97

```
 1        A.    Yes.

 2        Q.    -- obviously?

 3        A.    Yes.  Yes.  That was before Kaeli was born.

 4        Q.    And was that the time frame that you were

 5   working at Safeway?

 6        A.    Yes.  I working at Safeway.

 7        Q.    Okay.  And when you say he lived there for

 8   quite some time, what does that mean?  How much time

 9   does that mean?

10        A.    Well, probably --

11        Q.    And --

12        A.    -- probably four months.

13        Q.    Okay.  And you mentioned there was one bedroom

14   in that apartment.

15        A.    Yes.

16        Q.    And -- and I'm assuming, but maybe I shouldn't,

17   whose bedroom was that?

18        A.    Mine and Trisha's.

19        Q.    Okay.  So you and Trisha are in the bedroom,

20   and then I think you testified that Jasmine had a -- a

21   princess bed.

22        A.    Yeah.

23        Q.    Where was Jorden, the defendant, staying?

24        A.    He was sleeping on the couch, on the opposite

25   side of the living room.
```

Kenneth Jewell - D                                    98

1      Q.    Okay.  And would Jorden sometimes watch the --
2    would defendant sometimes watch Jasmine?
3      A.    Yeah.  He would watch us -- he would watch her
4    for us.
5      Q.    Around the time -- you agreed, I think -- or
6    let me rephrase that.
7            When you went to the police station, I'm --
8    in February, and you met with the police, was there a
9    safety plan that was put in place?
10     A.    Yes.  They said not to have -- not to let
11   Jasmine and Jorden have any contact.
12     Q.    Okay.  And did you -- did you agree with that?
13     A.    Yes, ma'am, I did.
14     Q.    Okay.  And was there also a safety plan put in
15   place for Kaeli not to have contact with Jorden?
16     A.    Um . . .
17     Q.    It's fine if you don't --
18     A.    That was -- that was -- I believe I had said
19   something about it.
20     Q.    All right.
21     A.    But I don't know if that was said by anyone
22   else.
23     Q.    Okay.  And when you -- do you remember there
24   being a Children's Center appointment made?
25     A.    Yes, there was.

1      Q.    Okay.  And did you -- did you take Jasmine to

2   that Children's Center appointment?

3      A.    Me and Trisha took Jasmine.

4      Q.    Okay.

5      A.    And Kaeli went.  At one point, Ms. --

6   Ms. Miller, Trisha, took Kaeli back to the apartment, so

7   that some -- I think it was her sister was going to

8   watch her.

9      Q.    Okay.  But Trisha Miller and you took Jasmine

10  to the Children's Center?

11     A.    Yes, we did.

12     Q.    Okay.  And when you went to the Children's

13  Center, you -- you know, around that time was there some

14  sort of conversation that you had with your father and

15  Jasmine?

16     A.    Yes.  We had a conversation.  It was just

17  pretty much saying that we -- we -- we were there to

18  support her and we were going to be there for her.  And

19  that was pretty much, you know, the -- the extent of the

20  conversation.

21     Q.    Okay.  And after the Children's Center, did you

22  have a conversation with Ms. Miller about some text

23  messages?

24     A.    Yes, I did.

25     Q.    Okay.  And what -- what did you -- what did you

EXHIBIT 103, Page 99 of 601
Case No. 3:20-cv-01567-MC

Kenneth Jewell - D                    100

1    say?  I don't want you to say what she said, but what
2    did you say?
3        A.   I said that we needed to tell -- take those to
4    the police.
5        Q.   Okay.  And did you take any steps to -- to make
6    sure that those text messages got to the police?
7        A.   Yes.  I guess I did.
8        Q.   Okay.  What were those steps?
9        A.   I asked Trisha to save -- save those because
10   they came -- we found the texts after we had left the
11   police station.
12       Q.   Okay.  So you asked Trisha to save the text
13   messages?
14       A.   Yes, I did.
15       Q.   And did you ask her -- what else did you ask
16   her?
17       A.   I -- I'm not sure what you mean.  I --
18       Q.   Okay.
19       A.   I think that was pretty much it.
20       Q.   That was it?
21       A.   Yeah.
22       Q.   And did you -- did Trisha end up -- to your
23   knowledge, did Trisha end up taking those to the police
24   station?
25       A.   She said that they were destroyed.

Kenneth Jewell - D                     101

```
1          Q.    Okay.  Are you aware that Trisha went to the

2    police station?

3          A.    Am I aware that she went to the police station?

4          Q.    Yeah.

5          A.    By herself?

6          Q.    Yeah.

7          A.    No.

8          Q.    Okay.

9                When did you move Jasmine to Oklahoma?

10         A.    It was probably about -- it was right after she

11   got out of school.  It was, oh, probably

12   (indiscernible).

13         Q.    If you don't remember, just say you don't

14   remember.

15         A.    I'm not sure.  I don't really remember.

16         Q.    Okay.  Would it be fair to say it was sometime

17   last year?

18         A.    Oh, yes, it was.

19         Q.    Okay.  So at some point last year.  All right.

20         A.    It was right --

21               MS. DUMONT:  Nothing further.

22               THE WITNESS:  Right before summer started.

23               MS. DUMONT:  Okay.

24               Nothing further.

25               THE COURT:  Mr. Knauss.
```

 1          MR. KNAUSS:  Thank you.

 2                   CROSS-EXAMINATION

 3    BY MR. KNAUSS:

 4          Q.    What was your relationship with

 5    Mr. Hollingsworth?

 6          A.    Well, he was -- he was a friend.

 7          Q.    Got along well with him?

 8          A.    What's that?

 9          Q.    Got along well with him?

10          A.    Yes, I did.

11          Q.    Did you socialize with him?

12          A.    Yes, I would.

13          Q.    Was he -- would be -- he'd count as a friend or

14    where would -- in a scale of closeness, where would you

15    say he was?

16          A.    I -- I liked -- I liked Mr. Hollingsworth.

17          Q.    Did you ever witness Jasmine to be hesitant

18    around him?

19          A.    No.  Not at first.

20          Q.    Okay.  So when -- when you first lived on

21    Boardman, that's when you first got together with Trisha

22    Miller?

23          A.    Uh-huh.

24          Q.    And Jasmine was around three?

25          A.    Yes.

 1      Q.    So do you remember what year you moved to --
 2  well, what year you moved out of there with Jasmine?
 3      A.    Well, when we -- when I first met Trisha, I
 4  didn't have custody of Jasmine.  She came for a visit
 5  once.
 6      Q.    Okay.  All right.  So how old was she when --
 7  when you got custody?
 8      A.    She was -- she was five.
 9      Q.    Okay.  Had you been staying at the place on
10  Boardman all that time, for that two years?
11      A.    No.  No.  I'd been staying in Vancouver,
12  Washington --
13      Q.    Okay.
14      A.    -- with my father before we got back together.
15      Q.    Okay.  So when was the next time you actually
16  lived there?  How old was Jasmine?
17      A.    She was -- it was in 2010.  She was -- she was
18  around five or six.
19      Q.    How long did you live there straight through,
20  from 2010?
21      A.    We -- we stayed together -- when I had custody
22  of Jasmine, we stayed together the entire time --
23      Q.    Okay.
24      A.    -- until we broke up.
25      Q.    And the -- I think we clarified, but let me

Kenneth Jewell - X                                    104

1    make sure.

2              When did you move to Oregon City?

3         A.   I moved to Oregon City, it was just before

4    Kaeli was born.  It was probably around November of that

5    year, I think.  It was just before Kaeli was born.  Just

6    a couple months.

7         Q.   I -- was that 2014?

8         A.   Yes.

9         Q.   So November of 2014 or '13?

10        A.   I think it was '14.  It was probably closer to

11   May, though, because Jas- -- Kaeli was born on May.  So

12   it was only a couple months before that.

13        Q.   Okay.  So we're going to get rid of the idea of

14   November.  So --

15        A.   Yeah.

16        Q.   So 2014, what month would you estimate that you

17   moved to Oregon City?

18        A.   Probably -- probably closer to March.

19        Q.   Okay.  Did you continually live at the Boardman

20   address from 2010 to March of 2014?

21        A.   It wasn't -- I don't think it was -- I don't

22   think it was that long.  I stayed there for -- it was

23   probably about -- I'm not sure.

24        Q.   Okay.  But it wasn't four years?

25        A.   It wasn't four years, no.

Kenneth Jewell - X

1        Q.    Okay.  When did you stop working at Safeway?

2        A.    It was -- it was shortly after Kaeli was

3    conceived.  I decided I needed to get a better job so

4    that I could support my family.

5        Q.    So maybe July of '13?  If I'm doing nine months

6    right.  Let's see.  She was born in May.  That's five

7    months.  So four months.  So maybe August of 2013?

8        A.    Possibility.

9        Q.    Okay.  And have you worked -- did you work at

10   the art place until you went to Oklahoma?

11       A.    I worked there until I went to Oklahoma, yes.

12       Q.    Okay.  All right.

13            When did you -- well, let's see.  In -- in

14   looking at the CARES -- or the Children's Center report,

15   sounds like you got the prescription for the medication

16   not too long before this incident.  Does that sound

17   right?

18       A.    She had been taking medication for probably

19   about, oh, a good five months before then.

20       Q.    Okay.  Did she start out on Dexedrine?

21       A.    I'm not sure what the medication was, but it

22   was a long-acting pill.  She only took one a day.

23       Q.    Okay.  Did you ever change to Dexedrine?

24       A.    I -- like I said, I'm not sure on what the drug

25   was called, but we did make a change on the prescription

Kenneth Jewell - X                                106

 1    later because her -- she wasn't able to focus too much

 2    when she got home from school.  The medication was

 3    wearing off.

 4        Q.   Okay.

 5        A.   And she needed the extra pill so that she could

 6    do some homework and have that attentiveness.

 7        Q.   All right.  So it could have been in late

 8    January that you -- they changed medication, right

 9    before this incident?

10        A.   No.  I'm not -- I'm not -- I'm not too sure.

11        Q.   Okay.

12        A.   It wasn't -- we didn't change the medication

13    right before the incident.

14        Q.   Okay.

15        A.   She was -- we didn't change the medication

16    until after.

17        Q.   When you were at the Children's Center, did you

18    provide any prescriptions?

19        A.   What do you mean?

20        Q.   Did you provide them any prescriptions for

21    Jasmine when you were at the Children's Center?

22        A.   No.  She took her medication before she went.

23        Q.   But what I mean is did you bring any pill

24    bottles or --

25        A.   No.  There was --

Kenneth Jewell - X                    107

1      Q.    -- paper prescription?

2      A.    There was -- no.  We left that at home.

3      Q.    Okay.

4      A.    Because she was only taking one pill a day, so

5   we left it at home.

6      Q.    Did you tell the Children's Center what you

7   were giving her?

8      A.    I don't think that ever came up, that she was

9   on medication.  That wasn't what we were there for.

10     Q.    Has Jasmine -- before this incident, had

11  Jasmine been in counseling?

12     A.    Yes.

13     Q.    Where has she gone?

14     A.    Western Psychological.

15     Q.    When did she go there?

16     A.    I'm not too sure on the exact dates.

17     Q.    Okay.

18     A.    But she -- she did go there.

19     Q.    Could it have been in January of 2015?

20     A.    I'm not --

21     Q.    Over a month --

22     A.    I'm not sure when it was.

23     Q.    Did you tell them where she had gone?

24     A.    What's that?

25     Q.    Did you tell the Children's Center people where

1    she'd been going?

2         A.    What do you mean "where she's been going"?

3         Q.    For counseling.

4         A.    Well, yeah.  They -- they -- yeah.  I told them

5    he was going to Western --

6         Q.    Okay.

7         A.    -- Psychological.

8         Q.    I'm not trying to trick.  I mean, in -- in the

9    Children's Center report it talks about Western

10   Psychological and --

11        A.    Yeah.

12        Q.    -- some dates in there.  So I'm just trying

13   to --

14        A.    Yeah.  I --

15        Q.    -- find out.

16        A.    I believe that that was mentioned, that she

17   was -- she was getting some counseling.

18        Q.    Okay.  Has she seen any other counselor, other

19   than Western Psychological?

20        A.    No.  That was the first time we had done

21   counseling.

22        Q.    Okay.

23              On the medication issue, on -- on the night

24   of this incident, when you found about it the next day,

25   did anybody say -- suggest to you that she had taken --

```
1    or had been given too much medication?

2         A.    No.

3         Q.    Had Trisha Miller ever suggested that to you?

4         A.    No.  Because at that time, Trisha Miller wasn't

5    in possession of the medication.  I was.  It was in my

6    bag.

7         Q.    Uh-huh.

8         A.    I had a backpack, because I was not staying

9    there.

10        Q.    Okay.

11              When this happened, how long had you been

12   there, if you remember, on this --

13        A.    That -- that day, I believe that we had shown

14   up around midafternoon, I -- I -- probably.

15        Q.    Okay.  And when did you leave what -- if you

16   were told the next day, when did you leave to go back

17   to --

18        A.    Well, we left to go have lunch at around 10:30,

19   11 o'clock.

20        Q.    So what I meant is when did you -- did you stop

21   staying at Trisha's?

22        A.    I did.  It was after the -- after the sheriff's

23   office.  It was probably around -- it was starting to

24   turn evening time when we --

25        Q.    Okay.
```

1       A.    -- returned to the house.  And we decided that

2   I wasn't going to stay there with Jasmine and we left.

3       Q.    Okay.  Did you go back to Vancouver then?

4       A.    Yes, I did.

5       Q.    And you were living in Vancouver at the time of

6   the Children's Center interview?

7       A.    Yes, I was.

8       Q.    Okay.  Okay.

9             When you went to the Oregon City police

10  station, do you know if you spoke to an Officer Gates

11  there?

12      A.    Officer Gates?

13      Q.    Yeah.

14      A.    I know I spoke to a Officer Ellis.

15      Q.    Okay.  Did you talk to an Officer Behan?

16      A.    I'm not sure, sir.

17      Q.    Okay.  That's all right.

18            Were -- were you present on the first visit

19  to the police station when a policeman interviewed

20  Jasmine?

21      A.    Yeah.  Yes.

22      Q.    Okay.  And did she say anything about what

23  happened, to that policeman?

24      A.    Like I said, I wasn't in the room with them.

25  But she -- she had interview with the -- with -- with

1   the --

2        Q.   Okay.

3        A.   -- sheriff.

4        Q.   Okay.  I guess I misunderstood.  You weren't in

5   the room with her when she was interviewed by the

6   policeman on the very first police contact?

7        A.   Yeah.  I guess I was -- I -- I can't -- I can't

8   really remember.  I know that we spoke to Sergeant

9   Ellis.

10       Q.   Okay.  All right.

11            Now, did you talk to a second policeman

12   later that afternoon?

13       A.   I was in contact with only one policeman.

14       Q.   Okay.  Now, during the evening, you -- you went

15   to bed, what, about 11:00, does that sound --

16       A.   Or so.

17       Q.   Okay.

18       A.   Yes.

19       Q.   Did you wake up during the evening?

20       A.   No.  I did not come downstairs.

21       Q.   Okay.  Did you tell the officer -- or did you

22   tell a officer that you were awake at 11:00, when you

23   saw Jorden return from the bar?

24       A.   Yeah.  I was -- I was awake when -- when Jorden

25   came in.

1        Q.    All right.  And did you tell the officer you

2    went to bed about 1:00 in the morning?

3        A.    Somewhere around there.  We went to bed late.

4        Q.    Okay.  Okay.

5              So bed at 1:00.  Okay.  And was Jasmine

6    still asleep when you went to bed at 1:00?

7        A.    She was awake when we went to bed.  We were --

8    I think we had the understanding we were all going to go

9    to sleep together because we were going to go do some

10   stuff the next day.

11       Q.    Okay.  And that was 1:00 in the morning?

12       A.    Yeah.

13       Q.    Okay.

14             And the police arranged for an interview at

15   the Children's Center?

16       A.    Yes, they did.

17       Q.    Okay.  And that was for -- does February 19th

18   sound right?

19       A.    I'm -- I'm not sure on the date, sir.

20       Q.    Okay.  But it was about six days later?

21       A.    It was -- it was -- it was a couple days after

22   the incident.

23       Q.    Okay.  And were you instructed by the policeman

24   not to question Jasmine regarding the incident?

25       A.    Yes.  Yes, I was.

1        Q.    Okay.  So between the time you got interviewed

2    by the police and Jasmine talked to him, you talked to

3    him, Trisha talked to him, and when you went to the

4    CARES Center, did you talk to Jasmine about any -- any

5    incident?

6        A.    Not that -- what happened.  Not about what

7    happened, no.

8        Q.    Okay.  And were you present in the room when

9    Jasmine may have been talking to your mother -- or your

10   stepmother or your father in Vancouver about anything

11   about touching?

12       A.    She never -- to my knowledge, she never talked

13   to them about it.  Wasn't aware of any conversation that

14   they may have had.  But I know that they were aware that

15   they were not to talk to Jasmine as well.

16       Q.    Okay.  But they didn't tell you anything about

17   any disclosures of Jasmine; is that --

18             MS. DUMONT:  Objection (indiscernible).

19             THE COURT:  I didn't --

20             MS. DUMONT:  Hearsay.

21             THE COURT:  "But they didn't tell you

22   anything."  I don't think it's asking for hearsay.  I

23   think it's asking for a "yes" or "no" answer.  "They

24   didn't tell you."  I'm going to allow it.

25             Do you recall what the question was?

1          THE WITNESS:  Can you repeat the question,

2     please?

3     BY MR. KNAUSS:

4          Q.   Did -- did your stepmother or father tell you

5     about just any disclosure -- not what was disclosed, but

6     any disclosure by Jasmine to them?

7          A.   No.  They never told me anything like that.

8          Q.   Okay.

9          A.   It wasn't -- to my -- nothing was said to me

10    about them having a conversation --

11         Q.   Okay.

12         A.   -- about what had happened.

13         Q.   And -- and they -- and you had told them not to

14    talk to her, too?

15         A.   Yes, because I -- I -- I told them what

16    happened at the Children's Center and what was said.

17         Q.   Okay.  All right.

18              Now, you took your daughter to the

19    Children's Center; is that right?

20         A.   Yes.  Me and Trisha.

21         Q.   Yeah.  Okay.

22              And did you tell them that Jasmine hadn't

23    said anything about what happened to her and that you

24    haven't asked her anything about it?

25         A.   Yeah.  That was correct.

Kenneth Jewell - X                                    115

 1      Q.   May -- did you tell them that?
 2      A.   Well, we really hadn't had any conversa- --
 3   the -- even the police said, when we had the interview,
 4   not to really talk about it.
 5      Q.   Yeah.
 6      A.   It was, you know, kind of from --
 7      Q.   No, I'm asking you, do you -- and "no" is a
 8   perfectly fine answer, but did you tell the Children's
 9   Center staff that Jasmine hadn't said anything about
10   what happened to her and that you hadn't asked Jasmine
11   to talk about it?
12      A.   I don't -- I don't think that I just said
13   something like that, no.
14      Q.   Okay.
15           When did you find out about the second
16   incident?
17      A.   After the interview, the Children's -- the
18   Children's Center staff told me, with Trisha in the
19   room.
20           (Pause in the proceedings.)
21   BY MR. KNAUSS:
22      Q.   Did Jasmine have a problem with lying?
23      A.   Not really, no.
24      Q.   Okay.  Did she think she had a problem about
25   lying?  She ever say that to you?

Kenneth Jewell - X                          116

1        A.   No.

2        Q.   And speaking about before the incident here,

3   not since.

4        A.   No.

5             (Pause in the proceedings.)

6   BY MR. KNAUSS:

7        Q.   What was Jasmine's relationship with Trisha?

8        A.   Stepmother.

9        Q.   Okay.  Who -- between you and Trisha, who do

10  you think did more of the disciplining?

11       A.   Well, we both kind of did it together.  Trisha

12  was with Jasmine more because I was -- I was working.

13  But all the discipline was talked about and done between

14  us.  Everything was talked about.

15       Q.   Okay.

16            Now, your daughter was diagnosed with ADHD?

17       A.   Yes.

18       Q.   Okay.  What did you -- what symptoms did you

19  personally see that seem to match ADHD with your

20  daughter?

21       A.   Well, she was having a hard time focusing on

22  her homework.  It was a lot of -- you know, she -- it

23  was -- she was just having -- she was struggling.  You

24  could tell she was struggling a little bit.

25       Q.   Was it just about homework or was there other

Kenneth Jewell - X                                117

1    issues that she had?

2         A.    It was mainly about school and she was not able

3    to focus very well.  You had to tell her to do things

4    probably more than the normal child.  She would forget

5    to do some things.  If we gave her a list of things to

6    do, she'd probably get most of one thing done in that

7    list.

8         Q.    Okay.

9               Since -- since February of 2015, has Jasmine

10   been in counseling?

11        A.    She was -- she hasn't been in any type of

12   counseling.  We have the -- she talks with the Father at

13   her church.  But I don't know what they talk about.

14        Q.    Okay.  The priest?

15        A.    Yes.

16        Q.    Okay.

17        A.    His name is Father Phil.

18        Q.    Okay.

19               (Pause in the proceedings.)

20               MR. KNAUSS:  All right.  Nothing further.

21   Thank you.

22               THE COURT:  Ms. Dumont.

23               MS. DUMONT:  Thank you.

24

25

1                    <u>REDIRECT EXAMINATION</u>

2    BY MS. DUMONT:

3        Q.    You talked about the police telling you not to

4    question Jasmine about this incident.  Do you remember

5    that?

6        A.    Yes.

7        Q.    Okay.  And is it fair to say that you didn't

8    question her after that conversation with the police?

9        A.    That is correct.

10       Q.    Okay.  But there was a conversation that

11   happened with you, your father, your stepmother, and

12   your aunt, about the Children's Center and about that --

13       A.    It was a --

14       Q.    -- with Jasmine; is that -- is that correct?

15       A.    Yes.

16       Q.    Okay.  And so there has been some conversation

17   about Trisha Miller, and I want to ask you about her

18   abilities.

19             When you would -- when you were with her, do

20   you -- do you sign?

21       A.    I don't know a lot of sign language, no.

22       Q.    Okay.

23       A.    She --

24       Q.    So how were you able to communicate with --

25   with Ms. Miller, if you don't sign?

1        A.    Well, she could hear.  She could hear me talk,

2    as long as I pronounced my words and spoke cloley [sic].

3    Or, you know, loudly, she -- she could understand me.

4    She had no problem understanding what I said.

5        Q.    Okay.  So you would -- and is -- is Ms. Miller

6    able to talk?

7        A.    Yes, she is.

8        Q.    Okay.  And so -- so she could hear you, you

9    would talk loudly, or you would enunciate --

10       A.    Yes.

11       Q.    -- and she would understand you?

12       A.    No communication problems.

13       Q.    Okay.  And you talked a little bit about --

14   have you noticed any -- counsel asked you about Jasmine

15   after this incident, and I want to follow up on that.

16            Did you notice any change in -- in Jasmine

17   after this incident happened?

18       A.    She -- she was just -- um -- um -- um -- she

19   didn't really --

20            MR. KNAUSS:  Your Honor, I object.  This

21   is -- I didn't cover that in direct -- or in cross.

22            THE COURT:  Ms. Dumont?

23            MS. DUMONT:  He asked about if she was in

24   therapy after this happened, who she's been seeing.  He

25   also talked about her being in Western Psychological.  I

1     think (indiscernible) cross-examination.

2                    THE COURT:  Mr. Knauss?

3                    MR. KNAUSS:  Well, we established the

4     Western Psychological was before the incident, not

5     after.  I didn't go into anything about her demeanor or

6     what was going on after, other than did she go to

7     counseling.  That was it.

8                    THE COURT:  Not going to allow the

9     question.  Go ahead with your next question, please.

10                    MS. DUMONT:  Nothing further.

11                    THE COURT:  May this witness be excused?

12                    MS. DUMONT:  Yes, Your Honor.

13                    THE COURT:  Any objection?

14                    MR. KNAUSS:  No.

15                    THE COURT:  You may be excused.  Thank

16    you.

17                    THE WITNESS:  Thank you.

18                    MS. DUMONT:  The State calls Officer

19    Behan.

20                    (Witness summoned.)

21                    THE COURT:  If you'll please come all the

22    way to the front of the courtroom.  When you arrive at

23    the witness stand, please do remain standing, face my

24    clerk, and raise your right hand to be sworn.

25

1                            <u>JOHN BEHAN</u>,

2     called as a witness on behalf of the State, having been

3     first duly sworn, was examined and testified under oath

4     as follows:

5                   THE CLERK:  Be seated.

6                   Please state your full name and spell your

7     last for the record.

8                   THE WITNESS:  My name is John R. Behan.

9     My first name is John, J-O-H-N.  My second -- my last

10    name is Behan, B-E-H-A-N.

11                       <u>DIRECT EXAMINATION</u>

12    BY MS. DUMONT:

13        Q.    Officer, where do you work?

14        A.    I'm employed at the Oregon City Police

15    Department.

16        Q.    What's your position there?

17        A.    I'm a patrol officer.

18        Q.    Okay.  And how long have you been so employed?

19        A.    Since February of the year 2000.

20        Q.    And what is your training to be a police

21    officer?

22        A.    I attended the -- the police academy and I've

23    had a variety of other training since then.

24        Q.    Okay.

25                   And I'm going to turn your attention to this

John Behan - D                              122

1    case in particular.  Were you working on February 13,

2    2015?

3        A.   Yes, I was.

4        Q.   Okay.  And in that date -- on that date, who

5    came to the Oregon City Police Department?

6        A.   Kenneth Jewell, Trisha Miller, Jasmine Jewell

7    Shafer, and Kaeli Jewell.

8        Q.   Okay.  And what time, about, did they arrive at

9    the station?

10       A.   I met them -- with them about 3:00 p.m.

11       Q.   Okay.  And through your investigation did you

12   determine where this event occurred?

13       A.   Yes, I did.

14       Q.   Where was that?

15       A.   1208 Linn Avenue, Number 32, here in Oregon

16   City.

17       Q.   Okay.  Is that in Clackamas County, state of

18   Oregon?

19       A.   Yes, it is.

20       Q.   Okay.  And through your investigation were you

21   able to determine where -- when the event occurred?

22       A.   At about 1:30 in the morning.

23       Q.   Okay.  On what day?

24       A.   I believe it was the day that they met with me.

25       Q.   And what day was that?

John Behan - D                                    123

1       A.    February 13th, 2015.

2       Q.    Okay.  And, you know, I'm not going to ask you

3   what was said.  I'm just going to make that really clear

4   upfront.  But I want to talk about who you met with that

5   day.

6             Who was the first person that you met with?

7       A.    I met with -- with Trisha Miller.

8       Q.    Okay.  And where did you meet with her?

9       A.    Initially, Sergeant Gates and I met with the --

10  the people I stated before that were in the lobby of the

11  Oregon City Police Department.  When I actually spoke to

12  Trisha Miller, it was in an interview room in the Oregon

13  City Police Department.

14      Q.    Okay.  Let me see if I understand.

15            So Trisha Miller, Kenneth, Jasmine, and

16  Kaeli all come into the police station.  You and

17  Sergeant Gates are there?

18      A.    Correct.

19      Q.    Okay.  And -- and then you then take

20  individuals and have individual interviews with them?

21      A.    Correct.

22      Q.    Is that what happened?

23      A.    Yes.

24      Q.    Okay.  And so you met first with, I think you

25  testified, Trisha Miller; is that right?

John Behan - D                                    124

1          A.    That's correct.

2          Q.    Okay.  And you met in a -- in a room?

3          A.    Yes.

4          Q.    And was anyone else there or was it you and

5    Trisha Miller?

6          A.    I believe it was just Trisha Miller and I.

7          Q.    Okay.  Did you have a sign language person

8    there?

9          A.    I did not.

10         Q.    Okay.  Were you able to communicate with

11   Ms. Miller?

12         A.    Yes.

13         Q.    Okay.  And how was that?

14         A.    Ms. Miller's hearing impaired.

15         Q.    Yeah.

16         A.    And -- and if my recollection's accurate, she's

17   able to read lips, to some extent.  And then she's able

18   to speak.

19         Q.    Okay.

20         A.    And so I just basically faced her and -- and

21   spoke slowly, so she would understand what I was saying.

22         Q.    Okay.  And so -- and I'm not asking -- again, I

23   don't want you to say what she said, but when you asked

24   her a question, was she able to respond?

25         A.    Yes.

1       Q.    Okay.  And did her response answer the question

2    you were asking?  Again, I don't want you to say what

3    she said, but was she responding to the question you

4    were asked -- asking her?

5       A.    Yes.

6       Q.    Okay.  And -- and did you take notes of the

7    conversation and put those in a report?

8       A.    I did.

9       Q.    Okay.  And is that what you're holding in front

10   of you?

11      A.    It is.

12      Q.    Okay.  And generally speaking, if you don't

13   understand something, do you ask for clarification?

14      A.    Yes.

15      Q.    Okay.  And if you clarify something, would you

16   then document that in your report?

17      A.    I would.

18      Q.    Okay.  And in reviewing your report, did you

19   have to clarify your questions or Ms. Miller's

20   responses?

21      A.    No.

22      Q.    Okay.  Now, again, I don't want you to say what

23   she said, but what was the question that you asked her?

24      A.    I asked Trisha to tell me what was disclosed to

25   her by Jasmine and the circumstances surrounding what

John Behan - D                                    126

1    occurred.

2         Q.    Okay.  And did there come a time in the

3    conversation when you asked her another question?

4         A.    Yes, there was.

5         Q.    Okay.  And what was that other question that

6    you asked Ms. Miller?

7         A.    I asked Trisha if Jasmine was specific about

8    where Jorden was touching her.

9         Q.    Okay.  And during your interview with

10   Ms. Miller, what was her demeanor about this incident?

11        A.    As best as I can remember, they -- they showed

12   up at the police department, I didn't -- you know, they

13   weren't coerced into making any statements.  She was

14   voluntarily talking to me.

15        Q.    Okay.  So she came to the police station, she

16   seemed -- she was voluntarily talking to you.

17              And who was the next person that you

18   interviewed?

19        A.    I interviewed Kenneth.  And I've got -- Kenneth

20   Jewell.

21        Q.    Okay.  And what was his demeanor?

22        A.    The same.  Just, again, he appeared cooperative

23   and basically wanting to talk to us, the police.

24        Q.    Okay.

25              Now, did you interview Jasmine?

John Behan - D                              127

1        A.    No.

2        Q.    Okay.  Was an interview done of Jasmine?

3        A.    It was.  There was an interview after I was

4   not -- I was -- after I talked to the -- the people,

5   later, by I believe it was the Children's Center.

6        Q.    Okay.  So to your knowledge, no interview was

7   made of Jasmine at the police station, but an interview

8   was set up later for the Children's Center, correct?

9        A.    That's correct.

10       Q.    Okay.  And do you know what date that

11   Children's Center interview was?

12       A.    On February 19th, 2015, at about 9:00 a.m.

13       Q.    Okay.  Okay.

14             And was that an appointment that was made

15   that day?

16       A.    Yes.

17       Q.    Okay.  So when you saw them, after you talked

18   to Trisha Miller and Kenneth Jewell, an appointment was

19   made for the Children's Center.  But Jasmine was there

20   that day.  Did you notice anything about her demeanor?

21       A.    No.  She appeared to be a normal child.  I

22   mean, nothing --

23       Q.    Okay.

24       A.    I didn't -- I didn't notice any -- anything

25   that stood out in my memory.

John Behan - D                                                    128

1      Q.    Okay.  And did you put into place a safety

2   plan?

3      A.    Yes, I did.

4      Q.    Okay.  Now, what -- what is a safety plan?

5   What is that for?

6      A.    Basically it's to protect any children that are

7   likely to be victimized or who have been victimized,

8   from the -- from the suspect.

9      Q.    Okay.  And what was Trisha Miller, Ms. Miller,

10  going to do to protect Kaeli?

11     A.    Specifically with regard to Kaeli, we

12  instituted a line of line of sight safety plan, where

13  while the suspect was at the residence, Kaeli was not to

14  be out of her sight.

15     Q.    Okay.  And what was Mr. Jewell going to do to

16  protect Jasmine?

17     A.    Jasmine was going to stay with Mr. Jewell and

18  not go to the apartment at all.  They -- it was my

19  understanding Mr. Jewell lived in Vancouver at the time.

20     Q.    Okay.

21           MS. DUMONT:  Nothing further.

22           THE COURT:  Mr. Knauss.

23           MR. KNAUSS:  Thank you.

24

25

John Behan - X                                      129

                        CROSS-EXAMINATION

1                       CROSS-EXAMINATION

2   BY MR. KNAUSS:

3       Q.    Did you and Officer Gates interview the people

4   or just you?

5       A.    Just me, sir.

6       Q.    Okay.  Was --

7       A.    It's my memory that Sergeant Gates stayed out

8   in the lobby where the other half and -- or, you know,

9   the other folks were.

10      Q.    Okay.  Great.

11             And you didn't -- you didn't witness Gates

12  talking to Jasmine in the inter- -- oh, excuse me.

13  Either in the lobby or the interview room?

14      A.    No.  I don't remember that.

15      Q.    Okay.  All right.

16             (Pause in the proceedings.)

17  BY MR. KNAUSS:

18      Q.    Okay.  And did you instruct Trisha Miller and

19  Kenneth Jewell not to question Jasmine regarding the

20  incident before -- after -- at the time you were

21  interviewing them and before the Children's Center?

22      A.    Yes, I did.

23      Q.    Okay.  And that's standard police practice?

24      A.    Yes, sir.

25      Q.    Okay.  And you indicated if she volunteered

John Behan - X                                    130

1    something, be a good listener?

2         A.   Correct.

3         Q.   Okay.

4              Now, was -- is Sean Ellis a Oregon City

5    police officer?

6         A.   Yes, sir, he is.

7         Q.   Was he there at the -- at the police station

8    when you were interviewing the people and giving them

9    the instructions?

10        A.   He was not involved in this case.  Whether he

11   was in the building or not, I don't -- I don't know.

12        Q.   Okay.  Did he take -- or did he go to the

13   Children's Center interview?

14        A.   I don't know.

15        Q.   Okay.  You didn't?

16        A.   No, sir, I did not.

17        Q.   Would it be likely he would have taken over the

18   case?

19        A.   That's typically what -- what happens --

20        Q.   Uh-huh.

21        A.   -- is when we investigate a case of this

22   nature, we get a quick initial statement from a witness

23   to the child's disclosing, and then we pass that off to

24   detectives.

25        Q.   Okay.  Did you say anything to Trisha or

John Behan - X                                      131

1    Kenneth about, "If Jasmine tells you anything or

2    volunteers anything, be sure to tell the Children's

3    Center"?

4         A.   I don't remember.

5         Q.   Okay.

6              MR. KNAUSS:  All right.  No further

7    questions.

8              THE COURT:  Ms. Dumont.

9                   REDIRECT EXAMINATION

10   BY MS. DUMONT:

11        Q.   Counsel asked you about what you typically do

12   in these cases and you said you interview a witness.  Is

13   it typical, in your experience, not to interview the

14   child until the Children's Center?

15        A.   Absolutely.

16        Q.   Okay.

17             MS. DUMONT:  Nothing further.

18             THE COURT:  May this witness be excused?

19             MS. DUMONT:  Yes, Your Honor.

20             THE COURT:  Any objection, Mr. Knauss?

21        MR. KNAUSS:  No.

22             THE COURT:  You're excused.  Thank you.

23             THE WITNESS:  Thank you.

24             MS. DUMONT:  The State calls Detective

25   Ellis.

Sean Ellis - D                                    132

 1                  (Witness summoned.)

 2                  THE COURT:  If you'll come all the way to

 3       the front of the courtroom.  When you arrive at the

 4       witness stand, please do remain standing, face my clerk,

 5       and raise your right hand to be sworn.

 6                          SEAN ELLIS,

 7       called as a witness on behalf of the State, having been

 8       first duly sworn, was examined and testified under oath

 9       as follows:

10                  THE CLERK:  Be seated.

11                  Will you please state your full name and

12       spell your last for the record.

13                  THE WITNESS:  My name is Sean Ellis.  And

14       my last name is spelled E-L-L-I-S.

15                  THE COURT:  Go ahead.

16                  MS. DUMONT:  Thank you.

17                       DIRECT EXAMINATION

18       BY MS. DUMONT:

19           Q.   Where do you work?

20           A.   I work for the City of Oregon City.  I am

21       currently assigned to the detective unit there.

22           Q.   Okay.  And how long have you been so assigned?

23           A.   Almost two and a half years.

24           Q.   And how long have you worked for the Oregon

25       City Police Department?

Sean Ellis - D                    133

1        A.    It will be seven years this October.

2        Q.    Okay.  And did you have law enforcement

3  experience before that?

4        A.    Yes.  I worked for the City of Scappoose for

5  just under three years prior to that.

6        Q.    Okay.  And can you briefly describe your

7  training?

8        A.    Sure.

9              I attended the police academy in Salem in

10  2007.  Graduated from there.  In addition to that, I've

11  attended two separate detectives academies; one put on

12  by the Portland Police Bureau and one put on by the

13  Clackamas County Sheriff's Office.

14             I've also attended several of the child

15  abuse summits put on by the sheriff's office in Jantzen

16  Beach, as well as the National Child Abuse conference in

17  Dallas, Texas.

18       Q.    Okay.  And I want to talk to you a little

19  bit -- just turn your attention to this case.

20             How did you become involved in this case?

21       A.    My involvement began when I was assigned the

22  case, the -- the follow-up to the case after the initial

23  officer, Officer Behan, and then Sergeant Gates respond

24  initially.

25             So I received -- I believe I received the

Sean Ellis - D                                    134

1    reports that they had written and then was assigned the
2    follow-up portion of the case.
3         Q.    Okay.  And did you go to the Children's Center
4    interview?
5         A.    Yes, I did.  I attended the Children's Center.
6         Q.    And when was that?
7         A.    February 19th of 2015.
8         Q.    Okay.  And who was there?  I -- I'm talking
9    about from -- not from who was doing the interview from
10   the Children's Center --
11        A.    Okay.
12        Q.    -- side, but who was there with respect to the
13   victim?
14        A.    Okay.  Jasmine Jewell was present.  Her father,
15   Kenneth Jewell, was present.  And Kenneth -- Kenneth's
16   at-the-time-fiancée Trisha Miller was present there.
17        Q.    Okay.  And there's been some mention of a
18   Sponge Bob movie.
19        A.    Yes.
20        Q.    In -- in your review of -- of this case, did
21   you follow up and see if there had been a Sponge Bob --
22   Sponge Bob movie that was released around the same time?
23        A.    I did.
24        Q.    Okay.  What was that?
25        A.    I saw that it was -- it was a Sponge Bob movie

Sean Ellis - D                                    135

1    that had to do with water.  I don't remember the exact

2    title.  But it came out the first week of February 2015.

3         Q.    Okay.  Okay.

4               And in your investigation, this incident

5    happened on what day?

6         A.    That was the 13th of February.

7         Q.    Okay.  So the movie would have been sort of a

8    new release at that time?

9         A.    Yes.

10        Q.    Okay.

11              So after attending the Children's Center,

12   did you then receive a call from Mr. Jewell later that

13   same day?

14        A.    Yes, I did.

15        Q.    Okay.  And what was that call regarding?

16        A.    Mr. Jewell wanted to follow up with me.  He

17   told me that his fiancée, Ms. Miller, had some text

18   messages on her cell phone.  He said that -- that the

19   information in those text messages was important to the

20   case and he would like for me to see those messages and

21   what they said.

22        Q.    Okay.  And after you had that conversation with

23   Mr. Jewell, did you have an opportunity to meet with

24   Trisha Miller?

25        A.    I did.

Sean Ellis - D                    136

1        Q.    Okay.  And how did that meeting take place?

2        A.    Ms. Miller arrived at the Oregon City Police

3   Department.  She -- I met her in the front lobby.  We

4   had just seen each other, so I knew who she was and she

5   knew who I was.

6        Q.    Okay.

7        A.    And so we just spoke briefly right there in

8   the -- the front lobby at the police department.

9        Q.    Okay.  And did she have something with her?

10       A.    Yes.  She brought her cell phone with her.

11       Q.    Okay.  And when you were communicating with

12   Ms. Miller, did you have any problems making yourself

13   understood or understanding her?

14       A.    I can say I didn't have any problems

15   understanding her.

16       Q.    Okay.

17       A.    And I -- I don't believe she had any problem

18   understanding me.

19       Q.    Okay.  And when you were having -- and I don't

20   want you to say what she told you, but when you were

21   having your communication with her, was she responding

22   to what you were saying?

23       A.    Yes.

24       Q.    Okay.  And did she provide you with those text

25   messages?

Sean Ellis - D                                    137

1        A.    She did.

2        Q.    Okay.  And I'm showing you what's been

3   previously marked as State's Exhibit 1.

4                  MR. KNAUSS:  Oh, sorry.

5                  MS. DUMONT:  That's okay.  I -- I don't

6   want to get --

7                  MR. KNAUSS:  Okay.

8                  MS. DUMONT:  I'm not trying to hide behind

9   you.

10                 MR. KNAUSS:  Okay.

11  BY MS. DUMONT:

12       Q.    Do you recognize that?

13       A.    I do.

14       Q.    Okay.  What -- what is that?

15       A.    The -- this is a -- a copy, it looks like, of a

16  photo that I took of Ms. Miller's cell phone with some

17  text messages on -- on the screen.

18       Q.    Okay.  And there's a name that is at the top.

19       A.    Uh-huh.

20       Q.    What is that name?

21       A.    It's -- it's hyphenated, but it says, "Jorden."

22  It's spelled J-O-R-D-E, and then -- I'm sorry,

23  "hyphen" -- apostrophe N.  And then "Hollings," with

24  some dots after the S, because the full name wouldn't

25  fit.

Sean Ellis - D                                              138

1        Q.    Okay.  And is it -- is there also a phone

2    number?

3        A.    There is.  Just underneath the name, the phone

4    number 503-967-8700 is on the screen.

5        Q.    Okay.  And this is -- you took these

6    photographs on the day in question?

7        A.    On the day --

8        Q.    That Trisha Miller brought them to you?

9        A.    Yeah.  On the 19th, yes.

10       Q.    Okay.  And you keep those in the regular course

11   of business?

12       A.    Yes.  Uh-huh.

13       Q.    And are a fair and accurate depiction of the

14   cell phone messages that she brought you?

15       A.    Yes.

16       Q.    And after -- when you were attempting -- did

17   you attempt to get in touch with defendant,

18   Mr. Hollingsworth?

19       A.    Yes, I did.

20       Q.    Okay.  And did you use that phone number to

21   contact him?

22       A.    That's the number that I used is -- yes.

23       Q.    Okay.  And is that -- did Mr. Hollingsworth

24   call you back on that -- call you back?  You don't know

25   what number he called you back, but after you called

Sean Ellis - D

139

1    that number, did he call you back?

2        A.    Yes.

3        Q.    Okay.

4             MS. DUMONT:  Your Honor, State moves to

5    admit into evidence State's Exhibit 1.

6             THE COURT:  Any objection to 1?

7             MR. KNAUSS:  No.

8             THE COURT:  1 will be received.

9             (State's Exhibit 1 received.)

10            MS. DUMONT:  Okay.

11   BY MS. DUMONT:

12       Q.    And on page 1 of 5 on State's Exhibit 1 --

13   I've -- I've numbered them all by --

14       A.    Okay.

15       Q.    Just so we're very clear here.

16       A.    Okay.

17       Q.    The top, what -- what does that say?

18       A.    It says what looks to me like it says 2 of 2,

19   message 2 of 2.

20       Q.    Uh-huh.

21       A.    And it says, "She woke up and was gonna go

22   upstairs and tell.  I just freaked out and didn't want

23   her" -- "I didn't want her to.  I didn't know what the

24   fuck I was thinking.  I'm so sorry."

25       Q.    Okay.  And what's the date on that one?

Sean Ellis - D

140

1          A.    It is February 13th.

2          Q.    Okay.  And -- and then is there a response?

3                Oh, sorry.

4          A.    That's okay.

5                It says -- it's abbreviated, but it says,

6    "Please," P-L-S, "don't come to my house tonight."  Some

7    dots.  "Go to Kip's or somebody," and then again the

8    shortened "please."

9          Q.    And what's the date on that one?

10         A.    February 13th.

11         Q.    Okay.  And then is there another response from

12   that same --

13         A.    Yeah.

14         Q.    -- (indiscernible)?

15         A.    Yes.  It says, "Never mind.  Ken," and it's --

16   I think it's a -- a misspelled word.  It's "Jas," I

17   believe it's supposed to be "was" -- or "Jas."  I'm

18   sorry.  Jas, short for Jasmine -- "are leaving.  And if

19   I" -- "And if I start shit with me, then you need to

20   leave."

21               Then underneath that there's another

22   message.  It says, "You," and then a star, which to me

23   says to replace the I with the U.  "If you start shit."

24         Q.    Okay.  And then on -- and that was -- what date

25   was that?

Sean Ellis - D                                     141

1        A.    Again, February 13th.

2        Q.    Okay.  And so February 13th was -- was the date

3   that this occurred?

4        A.    Correct.

5        Q.    Okay.  So this is from -- to --

6   Mr. Hollingsworth, defendant, interacting with Trisha

7   Miller?

8        A.    Correct.

9        Q.    On the day that this occurred?

10       A.    Correct.

11       Q.    Okay.  And then page 2 of 5.  Again, what's the

12   name at the top of this?

13       A.    It's the same name, Jorden, and then the

14   shortened "Hollings," Hollingsworth.

15       Q.    Okay.  And what does it indicate here?

16       A.    Message number 1/4, "I was heading upstairs and

17   I noticed her shirt was pulled up.  I leaned over her,

18   looked.  I don't know why.  And went to pull her shirt

19   down and she woke."

20       Q.    Okay.  Now, State's -- page 3 of 5.

21       A.    Uh-huh.

22       Q.    And we're going to go -- you just this 1 of

23   4 --

24       A.    Okay.

25       Q.    -- so we're going to go to 2 of 4.  What does

Sean Ellis - D                                    142

1    that say?

2        A.    It says, "up and said she was gonna wake you

3    guys up and tell you I was looking at her or touching

4    her.  I freaked out and just asked her not to.

5    Honestly, it was."

6        Q.    Okay.  And what's the date on this?

7        A.    That says February 14th.

8        Q.    Okay.  So this is the day after --

9        A.    Uh-huh.

10       Q.    -- (indiscernible)?

11       A.    Yes.

12       Q.    Okay.  And we're going to refer to?

13       A.    Number 3 of 4.

14       Q.    Right.

15       A.    Says, "So quick.  All this happened within,

16   like, five seconds.  I knew what it looked like, so I

17   didn't want her to tell.  I was just gonna tell you

18   first.  I just didn't know."

19       Q.    Okay.  And then finally, on page 5 of 5 on

20   State's Exhibit 1.

21       A.    4 of 4.  "How to put it.  I still don't, but

22   I'm trying."

23       Q.    And again, what day is this?

24       A.    February 14th is what it's dated.

25       Q.    In the course of doing this investigation, did

Sean Ellis - D                                    143

1    you attempt to contact the defendant's mother?

2        A.    Yes.

3        Q.    Okay.  And what is her name?

4        A.    Mindy Hollingsworth.

5        Q.    And were you able to take a statement from her?

6        A.    No.

7        Q.    Okay.  And in the course of your investigation

8    did you attempt to contact defendant's sister?

9        A.    Yes.

10       Q.    And what's her name?

11       A.    Tanae'a Hollingsworth.

12       Q.    Okay.  Were you able to take a statement from

13   her?

14       A.    Not anything related to the case, no.

15       Q.    Okay.  Through your investigation, were you

16   able to determine where the second incident occurred?

17       A.    Yes.

18       Q.    Where was that?

19       A.    The address was 4800 Southeast Boardman, in

20   Milwaukie, Oregon.

21       Q.    Okay.  Is that in Clackamas County and state of

22   Oregon?

23       A.    Yes.

24       Q.    Okay.  And did you determine that the victim,

25   Jasmine, had been residing at that Boardman address

1    between 2009 and 2012?

2        A.    The dates that I determined that she lived

3    there were August of 2007 until June of 2009.  And then

4    again from an unknown month in 2011 until December of

5    2013.

6        Q.    Okay.

7              MS. DUMONT:  Nothing further.

8              THE COURT:  Mr. Knauss.

9                    CROSS-EXAMINATION

10   BY MR. KNAUSS:

11       Q.    Who provided those dates?

12       A.    Who did?

13       Q.    Yeah.

14       A.    Kenneth Jewell.

15       Q.    When you went to the Children's Center, did you

16   get a statement from Kenneth Jewell?  Bottom of your

17   report, the first page.

18       A.    Yes.  I met with him after Jasmine's interview.

19       Q.    Okay.  Was there any disclosure by him of a

20   second incident?

21       A.    By Mr. Jewell?

22       Q.    Yeah.

23       A.    No.

24       Q.    After the Children's Center interview, did

25   you -- did you watch the interview through the window?

Sean Ellis - X

1     A.    Yes, I did.

2     Q.    Heard it?

3     A.    Yes.

4     Q.    Okay.  And did you advise Mr. Jewell that there

5  was a second incident alleged?

6     A.    Yes.

7     Q.    Okay.

8           Did you go to the Linn Avenue address of

9  Ms. Miller's?

10    A.    Yes, I did.

11    Q.    Did you take any photographs?

12    A.    No, I did not.

13    Q.    Do you usually take photographs of a Measure 11

14  case?

15    A.    It depends.

16    Q.    Did you ever personally speak to Jasmine?

17    A.    No.

18          MR. KNAUSS:  No further questions.

19          THE COURT:  Ms. Dumont.

20                    REDIRECT EXAMINATION

21  BY MS. DUMONT:

22    Q.    In this case, why didn't you take photographs?

23    A.    In this case, we were -- by the time I had

24  received the case, we were a week or so out from when it

25  took place.  And I had a drawing from Jasmine that she

1    drew at the Children's Center, which depicted the -- the

2    layout in her mind.  And to me, that drew a better

3    picture, because it was from Jasmine, than I could have

4    gotten with a -- with a camera.

5        Q.    Okay.

6              MS. DUMONT:  Nothing further.

7              THE COURT:  May this witness be excused?

8              MS. DUMONT:  Yes, Your Honor.

9              THE COURT:  Any objection?

10             MR. KNAUSS:  No.

11             THE COURT:  You're excused.  Thank you.

12             THE WITNESS:  Thank you, Your Honor.

13             MS. DUMONT:  Given scheduling, this is the

14   last witness that I have for today, Your Honor.  So if

15   we can start tomorrow morning.

16             THE COURT:  It came to my attention a few

17   moments ago that I am scheduled to be on a judge swap in

18   Multnomah County on Thursday.  I don't think that was

19   taken into consideration when I was sent this case.  And

20   I'd like to proactively have a conversation with the two

21   of you about Thursday.

22             I'm hopeful that they may be able to find

23   a judge that can go on that one-day judge swap to

24   Multnomah County, so I might be able to stay here.  But

25   in the event that I still need to be in Multnomah County

1   on Thursday, would you all be willing to take a one-day

2   break from this trial and return on Friday?

3              And what I can do is I can take a recess

4   while you think about that, and I can go upstairs and

5   have a conversation with calendaring and find out

6   whether there will be a judge that can take my place in

7   Multnomah County, and this may not then be an issue.

8              MS. DUMONT:  My -- my only hesitation from

9   obviously saying immediately "yes" is that my victim and

10  her father were planning on leaving Thursday after the

11  close of this case.  They have tickets to leave early

12  afternoon.  And so I was anticipating -- Mr. Knauss had

13  told me that his witness was going to be an hour in the

14  morning.

15             And so I -- I will go downstairs and talk

16  to my people about rescheduling.  So maybe we see about

17  rescheduling their flight to be on Friday.

18             THE COURT:  Before --

19             MS. DUMONT:  So that --

20             THE COURT:  Before anybody takes any

21  action --

22             MS. DUMONT:  Okay.

23             THE COURT:  -- I want to find out, A, can

24  a judge go in my place, and B, what logistically would

25  need to happen with your witnesses' flights, et cetera.

1          Mr. Knauss?

2          MR. KNAUSS:  I'm fine.

3          THE COURT:  You're fine either way?

4          MR. KNAUSS:  Yeah.

5          THE COURT:  All right.  Let's get that

6  information before any decisions are made.  And I may --

7  someone may be able to go in my stead very easily.

8          Let's be back ten minutes?  Or 2 o'clock.

9  Let's do 3 o'clock --

10          MR. KNAUSS:  Okay.

11          MS. DUMONT:  Yes, Your Honor.

12          THE COURT:  -- on that -- on that clock.

13          (Recess; 2:46 p.m. to 3:00 p.m.)

14          THE COURT:  We're back on the record.

15  Let's call the case.

16          MS. DUMONT:  Call State vs. Hollingsworth;

17  1501848.  Sarah Dumont on behalf of the State.

18  Defendant is present, out of custody, represented by

19  Mr. Knauss.

20          THE COURT:  I was able to speak with the

21  folks in calendaring and the judicial swap that I was

22  going to be engaging in on Thursday was taken off my

23  calendar, but no one notified me.  So my apologies for

24  causing some concern about whether we could continue on

25  Thursday.  That was completely my error that now is

1    gone.  So we will continue tomorrow morning and then

2    into Thursday.

3                    MR. KNAUSS:  Okay.

4                    THE COURT:  Any additional issues from the

5    State at this point?

6                    MS. DUMONT:  No, Your Honor.

7                    THE COURT:  Mr. Knauss?

8                    MR. KNAUSS:  No.  We're fine.

9                    THE COURT:  All right.  We'll see you

10   tomorrow morning, 9 o'clock?

11                   MR. KNAUSS:  Sure.

12                   THE COURT:  9 o'clock?

13                   MS. DUMONT:  Yes, Your Honor.

14                   THE COURT:  All right.  Thank you.

15                   (Recess at 3:00 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1              BE IT REMEMBERED That the above-entitled

 2  matter came on regularly for trial before the HONORABLE

 3  KATHERINE E. WEBER, Judge of the Circuit Court of the

 4  State of Oregon, for the County of Clackamas, commencing

 5  the 10th day of August, 2016.

 6

 7

 8  APPEARANCES:

 9  Sarah J. Dumont
    Deputy District Attorney
10  Clackamas County District Attorney's Office
    Clackamas County Courthouse
11  807 Main Street
    Room 7
12  Oregon, City OR  97045
    Appearing on behalf of the State of Oregon
13
    Arthur B. Knauss
14  Attorney at Law
    294 Warner Milne Road
15  Oregon City, OR  97045
    Appearing on behalf of the Defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2                         (August 10, 2016; 9:06 a.m.)

 3              MS. DUMONT:  Good morning, Your Honor.

 4              THE COURT:  Good morning.

 5              MS. DUMONT:  State vs. Hollingsworth;

 6   1501848.  Sarah Dumont on behalf of the State.

 7   Defendant is present with counsel.  And we were just

 8   going to make sure the video is --

 9              THE COURT:  Functions.

10              MS. DUMONT:  Functions.  So --

11              THE COURT:  Go ahead.

12              MS. DUMONT:  Okay.

13              (Pause in the proceedings.)

14              MS. DUMONT:  The State calls Amanda McVay.

15              (Witness summoned.)

16              THE COURT:  If you'll come all the way to

17   the front of the courtroom.  When you arrive at the

18   witness stand, do remain standing, face my clerk, and

19   raise your right hand to be sworn.

20                    AMANDA MCVAY,

21   called as a witness on behalf of the State, having been

22   first duly sworn, was examined and testified under oath

23   as follows:

24              THE CLERK:  Be seated.

25              Will you please state your full name and
```

Amanda McVay - D                                        152

1    spell your last for the record.

2                THE WITNESS:  My name's Amanda Lee

3    [phonetic] McVay.  M-C-V-A-Y.

4                THE COURT:  Go ahead.

5                     DIRECT EXAMINATION

6    BY MS. DUMONT:

7        Q.  Ms. McVay, where do you work?

8        A.  I work at the Children's Center.

9        Q.  Okay.  And what is your position there?

10       A.  I'm a child interviewer.

11       Q.  Okay.  What is a child interviewer?

12       A.  So my role at the Children's Center is I work

13   as part of a team with a medical examiner and a family

14   support specialist.  We see kids when there are concerns

15   for possible abuse or neglect.

16           And my role there is to -- if a child is

17   making statements concerning for possible abuse and is

18   willing to transition to a formal interview with me,

19   which is recorded, I would do that.  And I would gather

20   as much information in a mutual nonleading way from that

21   child regarding experiences they may have had, so that

22   they can provide information in their own words.

23       Q.  Okay.  And what is your education?

24       A.  So my background in education includes I have a

25   bachelor's degree in psychology from the University of

Amanda McVay - D

153

1    Montana.

2              Do you want me to continue on my experience?

3    Q.    Sure.   What are your experiences?

4    A.    Sorry.

5    Q.    It's okay.

6    A.    I began working in the field of child abuse in

7    1998, in the state of Wyoming, as -- a social service

8    specialist is what it's called here in the state of

9    Oregon.  But I conducted child abuse investigations,

10   adult abuse investigations, and other child abuse

11   concerns for the state of Wyoming.

12             I had some experience with the Head Start

13   program as a family support before coming to the state

14   of Oregon as a Child Welfare worker for the state in

15   2004, where I was a child protection worker and

16   completed child abuse assessments at that time, until

17   2007, where I came to the Children's Center as a child

18   interviewer and have been there since.

19   Q.    Okay.   And what are -- do you have some

20   specific training for your position?

21   A.    Yes.   So my training goes back to 2000, when I

22   was in the state of Wyoming and I went to the National

23   Children's Advocacy Center for child forensic

24   interviewer training.   At that time, the state of

25   Wyoming did not have centers, like we do here that I

Amanda McVay - D

154

1    work for at the Children's Center.  So the caseworkers

2    did those interviews themselves.

3              Since being with the Children's Center, I

4    have attended the American Professional Society on the

5    Abuse of Children for their forensic interviewer

6    training, as well as their advanced interviewer

7    training.  And then when the Oregon Interview Guide- --

8    Interviewing Guidelines came to place, I think roughly

9    2013, I attended that training as well.

10             In addition to that, I've attended multiple

11   child abuse conferences, trainings.  We do regular peer

12   review internally with the other interviewers at the

13   center, as where -- as well as with our regional

14   trainer, through CARES Northwest.  We attend peer review

15   not only to play our videos and review them and learn

16   where we could, you know, increase our skills or what we

17   could change or do, but also to look at, you know,

18   what's currently out there as far as research and

19   concerns in the field of child abuse.

20       Q.   Okay.  And you mentioned Oregon Interviewing

21   Guidelines.  What -- what are those?

22       A.   So the guidelines were put together and

23   included multiple national ways that interviews are

24   conducted, which also includes what I mentioned

25   previously, that I had training for through APSAC and

Amanda McVay - D                                                    155

1    NCAC.  And a group of people put together for the

2    guidelines to update them.  They've been in place much

3    previously to the most recent one in 2012.  And it's a

4    way to train individuals, not just child interviewers

5    like myself in a center, but first responders, Child

6    Welfare workers, police officers, on how to go about

7    interviewing children to help increase consistency in

8    the field of child abuse so that there's more

9    consistency on how children are questioned when there

10   are concerns.

11        Q.  Okay.  And it sounds like you've been in this

12   area since 1998.  And how many, roughly -- I know it's a

13   hard question.  How many, roughly, interviews have you

14   done so far?

15        A.  At the Children's Center, I have completed

16   around 900 interviews and seen over 1500 children.  Not

17   all children go to an interview, based on age,

18   development, as well as sometimes they don't feel like

19   talking about something and we don't ever force a child

20   to do anything they don't want to do at our center.

21        Q.  Okay.  And you mentioned a little bit initially

22   about your role at the Children's Center.  And I want

23   you to take us step-by-step through what exactly you do

24   when a child comes in.

25        A.  Okay.

1          So as I mentioned before, we work together
2     as a team, myself, a medical examiner, and a family
3     support specialist.  When a caregiver or family member
4     brings a child into the center, we have paperwork that's
5     completed that includes a medical and social history
6     form that we've typically sent to the parent or
7     caregiver ahead of time to complete.
8          We meet the family and the child.  And when
9     I say "we," I mean myself and the medical examiner.  And
10    we greet them, examiner typically tells the child
11    briefly, you know:  We're not going to do anything that
12    is not okay with you.  We're going to do, like, a
13    head-to-toe checkup, but first we want to talk to your
14    parents, because they filled out the paperwork.
15         So we'll bring the parents back.  And the
16    examiner and myself will go into the interview room and
17    review the paperwork with the parents.  Again, my
18    portion is more the social than the medical, because
19    that's not my field.  And so we split the paperwork and
20    ask questions.
21         Mine is more about family, caregivers,
22    education, concerning behaviors, what they may have been
23    exposed to with regards to multiple concerns for child
24    abuse, not just why a child may have been coming to us.
25    So that includes exposure to violence, sexualized

Amanda McVay - D                    157

1    material, and other questions like that.  We review

2    that.

3                   The -- if there's a police officer or a

4    Child Welfare worker involved with the family for the

5    concerns, they're invited and they can observe in the

6    observation room.  And they're allowed to observe when

7    we meet with the parents.  And then of course as well

8    when the child is in the interview room.  And they can

9    hear and see in the observation room, but only hear in

10   the examination room when a child goes back.

11                  So when we complete that and the consent

12   forms are signed and we answer any questions the parents

13   may have, we return them to the family waiting area.

14                  Our family support specialist is also

15   observing that.  The parents know who's listening.  That

16   way, the family support specialist can check in with the

17   parents or caregivers to see if there's any support that

18   can be provided to them.

19                  And then we transition back out to the

20   waiting room.  And then usually a brief moment before we

21   bring the child back alone, if they're able and willing

22   to, and transition to the exam room first.  And that is

23   more the medical examiner's piece, but I am in the room

24   and involved and do try to engage with the child,

25   because I am the one that's going to be talking to them

Amanda McVay - D                                    158

1   further if they're willing to transition and answer any

2   questions.  But that's -- it's still led by the

3   examiner, because it's their exam room.

4           So they're introduce the exam room, go over

5   the ground rules, answer any questions, and then

6   typically begin the examination.

7           Some older children decide they want to do

8   talking first and would transition with me to the

9   interview room, and then we would go back later.  So

10  again, it varies on what the child wants and what

11  they're willing to do.  And we don't force them to do

12  anything.

13          So then I'm present with them in the exam

14  room.  If they're making statements warranting further

15  exploration and there's a concern, then we transition to

16  the interview room, where I'd complete the interview,

17  where it's recorded on video.  And again, everything's

18  explained to the child about the room.

19          Again, review the ground rules that were

20  already reviewed with the examiner.  You know, we're

21  only going to talk about things we know.  If I ask

22  something that doesn't make any sense, you can, you

23  know, ask me what -- you know, if you didn't understand,

24  tell me, correct me, say, "I don't know," if that's, you

25  know, true.

Amanda McVay - D

159

1          Kinda settle them into the room and explain

2     the video recording and who's listening.  And then do

3     some rapport building and move into or transition to

4     statements they may have made in the exam room to

5     explore that further in a neutral, nonleading way.

6          So I try to obtain answers from the child in

7     an open-ended fashion, with not leading or suggestive or

8     coercive questions.  Sometimes more focused questions

9     are direct.  That does happen in interviews to gather

10    additional information.  And then complete the interview

11    when the child is done or there are no further

12    questions.

13         I typically take a break before the end of

14    the interview to check with the medical examiner to see

15    if there's other questions, since the child is there.

16    And again, we work as a team for many reasons.  Not only

17    for that piece, but also in working with these cases, we

18    need to look at all the alternative hypothesis that we

19    address.  Before we look at that, we think about that,

20    we work as a team to try to address those, as well as

21    balance out some -- you know, if there's, you know,

22    evaluator bias or interviewer bias.  We're there to help

23    check that we're not doing that throughout the

24    evaluation.

25         And then I would conclude the interview and

Amanda McVay - D                    160

1    transition the child to the waiting room.  And then the

2    team, including the family support specialist, myself,

3    and examiner, will write some recommendations for the

4    family, based on the information we received that day,

5    and go over the statements the child had made.  And then

6    conclude our evaluation and allow -- if Child Welfare

7    and law enforcement are there, they can meet with the

8    parents on their own, separate from us, to answer any

9    questions the family might have.

10        Q.    In your training and experience, what is the

11   process of disclosure that a child goes through?

12        A.    It varies by child, of course.  Every child and

13   person is individual.  But a lot of times children will

14   initially disclose to someone, which most often actually

15   is not always a parent.  A lot of children are worried

16   how parents and caregivers will respond or react and

17   they're very protective of parents.

18             So it's more common that children have

19   disclosed to someone separate from a parent or caregiver

20   first and initially disclose something and see how

21   everyone reacts or responds or what happens from that.

22             So most frequently it's a small disclosure,

23   a little bit of information.  And they may see how

24   people respond and react based on that.  Some children,

25   if they're supported, will continue to make statements.

Amanda McVay - D                              161

1    Some children who are not supported and not believed

2    will actually take back what they said because nobody's

3    believing them and they're not supporting them.  And

4    that's called recantation.  And we look for concerns of

5    that as well.  Children who are not supported or

6    believed will often take back statements.

7            So sometimes they come into the center and

8    make additional statements.  And other times --

9    sometimes children again recant and don't say anything

10   when they come to our center.

11           And then even further, depending on again

12   how everything -- what happens at that time, how the

13   people in their life respond, if children are able to

14   get into counseling and have a supportive therapist

15   who's working with them ongoing that they can build a

16   relationship with, sometimes children even further will

17   disclose things later that they did not initially

18   respond to throughout the process.

19       Q.   Okay.  What is the -- what is coaching?

20       A.   So coaching is something that is included in

21   that alternative hypothesis.  We look at for each case

22   what the possible alternative hypothesis are, which

23   include no abuse happened.  Or it was a

24   misinterpretation or a misunderstanding.

25           Coaching is very concerning in young

Amanda McVay - D

1    children, preschool-age children, who are suggestible

2    and more suggestible than older children, in that

3    coaching is when an adult in their lives has told a

4    child to say something that, "You will say Johnny did

5    this to you," or they will ask leading and coercive

6    questions that elicit a response because a young

7    preschool child knows that adults need an answer, so

8    they will answer a question.

9         So they will say, "Johnny touched you,

10   didn't he?"  Which is a coercive and leading question.

11        And then a child could respond with, "Yes,"

12   because that's what they're supposed to say.  They know

13   they're supposed to answer an adult.  It's very

14   concerning in younger children.  Not that it can't come

15   up with older children.  But less [sic] suggestible

16   children can be coached easily.

17   Q.   And you're --

18   A.   Or easier.

19   Q.   -- you're drawing a distinction between

20   preschool-age children and older children.  Why is it

21   not as concerning for older children?

22   A.   Older children, as far as developmentally, as

23   they age and get older, they have learned in school, and

24   by age ten children are just as suggestible as adults

25   are.

Amanda McVay - D                                    163

1        Q.    And are you saying I guess the converse of that
2    is they're less suggestible than preschool kids?  Is
3    that what you're saying?
4        A.    Yes.
5        Q.    Okay.  And in this case, did you see Jasmine?
6        A.    Yes.
7        Q.    Okay.  And when was that?
8        A.    Without reviewing my report, it was in February
9    2015.  I don't remember the exact date.
10        Q.    Okay.  And we're going to watch a video of that
11    if I can get this to work.
12            MS. DUMONT:  I had previously marked as
13    State's Exhibit 2 a CD of the Children's Center
14    interview.  Do you -- is there -- I'm going to ask to
15    admit it.
16            Mr. Knauss (indiscernible)?
17            MR. KNAUSS:  I'm sorry?
18            MS. DUMONT:  I'm going to ask to admit the
19    CD of the --
20            MR. KNAUSS:  No objection.
21            MS. DUMONT:  Okay.
22            THE COURT:  And it's Exhibit 2?
23            MS. DUMONT:  Yes, Your Honor.
24            THE COURT:  State's 2 will be received.
25            (State's Exhibit 2 received.)

Amanda McVay - D                    164

1              THE COURT:  Ms. Dumont, I'm going to need

2      that slanted about five more degrees.

3              MS. DUMONT:  Yes, Your Honor.

4              THE COURT:  Thank you.  That's fine.

5              Mr. Knauss, can you and your client see

6      that?

7              MR. KNAUSS:  (No audible response.)

8              MS. DUMONT:  Okay.  Is it permissible for

9      me to maybe turn down the lights so we can see a little

10     better?

11             THE COURT:  Yes.

12             Mr. Ward.

13             Are you still able to see the notes that

14     you need to?

15             MR. KNAUSS:  No, that's great.

16             MS. DUMONT:  Can --

17             THE COURT:  Is that a challenge for you,

18     ma'am, to have the lights dimmed like that?

19             THE WITNESS:  No, it's fine.

20             THE COURT:  Okay.

21             THE WITNESS:  Thank you, Your Honor.

22     BY MS. DUMONT:

23        Q.   And can you describe briefly where this is?

24        A.   So this is one of our two interview rooms at

25     the Children's Center.  And this is, like I mentioned

Amanda McVay - D                           165

1    earlier, where we meet with parents.  And then is also

2    the room where we meet and interview children when

3    they're willing to transition.

4        Q.   Okay.  And I see a date up here.  Is that --

5    would that be consistent with the date that you saw

6    Jasmine?

7        A.   Yes, it is.

8        Q.   Okay.  And is that -- what date is that?

9        A.   February 19th, 2015.

10       Q.   (Indiscernible) play here.

11              MS. DUMONT:  I'm just going to stand here

12   until we get the sound.

13              (Pause in the proceedings.)

14              (State's Exhibit 2 played as follows:)

15              MEDICAL EXAMINER:  All right.  This is

16   Amanda's room, okay?  And this is the second part of

17   your checkup.  So I'll have you sit here, okay?  And I'm

18   just going to be on the other side of the mirror.

19              (State's Exhibit 2 interrupted as

20   follows:)

21              THE COURT:  I think the volume is good.

22              Mr. Knauss, is the volume acceptable for

23   you?

24              MR. KNAUSS:  It's all right.

25              THE COURT:  Okay.

```
 1                    (State's Exhibit 2 played as follows:)
 2                    MS. MCVAY:  Let me tell you about this
 3      room.  What do you see in front of us?
 4                    JASMINE JEWELL SHAFER:  A mirror.
 5                    MS. MCVAY:  A mirror.  But it's a
 6      different mirror.
 7                    JASMINE JEWELL SHAFER:  I know.  The cop
 8      told me about it.  And he said to ask somebody who's
 9      (indiscernible).
10                    MS. MCVAY:  Oh, okay.  Who -- what cop
11      told you that?
12                    JASMINE JEWELL SHAFER:  I forget.
13                    MS. MCVAY:  You forget.  Okay.  And that's
14      okay.  If you forget something, you just tell me that.
15      But this is -- yes.  If you want to see behind the
16      mirror, when we're done we can go back there, okay?
17                    So Ms. Gabby, who did your checkup, she's
18      (indiscernible) out there.  And then there's the
19      detective named Sean.  He's back there, too.  So just
20      (indiscernible) and Sean.  And they can hear us because
21      there's a microphone in here, just like the other room.
22      And they can see us because they can see us through,
23      like a window.
24                    And you can color, if you want, while
25      we're talking, too.
```

1          I know.  It looks like a window to them.

2    This big mirror is a big window.  But we can't see them.

3                 JASMINE JEWELL SHAFER:  (Indiscernible.)

4                 MS. MCVAY:  I know.  It's kinda funny,

5    huh?

6                 JASMINE JEWELL SHAFER:  Yeah.

7                 MS. MCVAY:  If you want to color while

8    we're talking, it's okay.

9          And the other thing about this room is I

10   started a video camera recording us.  Do you know what a

11   video camera is?

12                JASMINE JEWELL SHAFER:  Yeah.

13                MS. MCVAY:  Yeah.  What's a video camera?

14                JASMINE JEWELL SHAFER:  It records you.

15                MS. MCVAY:  It does.

16                JASMINE JEWELL SHAFER:  (Indiscernible.)

17                MS. MCVAY:  Yeah.

18                JASMINE JEWELL SHAFER:  I have one on my

19   tablet.

20                MS. MCVAY:  Oh, you do?  You know all

21   about it.

22                JASMINE JEWELL SHAFER:  Yeah.

23                MS. MCVAY:  Yeah.  So that's recording us.

24   Then it helps me do my job better and I don't have to

25   take a bunch of notes while we're talking.  We can just

1    talk and color, okay?

2                    JASMINE JEWELL SHAFER:  The cool thing

3    is -- about my tablet is because we can make movies,

4    too, on there.

5                    MS. MCVAY:  Oh, okay.  So do you make

6    movies on there?

7                    JASMINE JEWELL SHAFER:  (Indiscernible.)

8                    MS. MCVAY:  Yeah.  Does somebody use your

9    tablet to make movies?

10                   JASMINE JEWELL SHAFER:  No.

11                   MS. MCVAY:  No.

12                   JASMINE JEWELL SHAFER:  I was thinking of

13   putting a lock on it until my dad busted me.

14                   MS. MCVAY:  Oh.

15                   JASMINE JEWELL SHAFER:  He caught me

16   looking (indiscernible).  But I told him that I put a

17   password on it.

18                   MS. MCVAY:  Uh-huh.

19                   JASMINE JEWELL SHAFER:  And he's like,

20   "You open up that tablet and get that password off."

21                   And I didn't know how to get the password

22   off.  I undownloaded that --

23                   MS. MCVAY:  Yeah.

24                   JASMINE JEWELL SHAFER:  -- but the app was

25   still there.

1          MS. MCVAY:  Uh-oh.  So how'd you fix it?

2          JASMINE JEWELL SHAFER:  We went onto my

3    settings and went onto the security.

4          MS. MCVAY:  Oh, okay.

5          JASMINE JEWELL SHAFER:  I couldn't even

6    have a swipe open log.

7          MS. MCVAY:  Oh, he didn't want that

8    either.  Yeah.

9          JASMINE JEWELL SHAFER:  All's you do is

10   have to swipe and you're in.

11         MS. MCVAY:  Oh, gotcha.

12         So why did you want a lock on there?

13         JASMINE JEWELL SHAFER:  I don't know.  I

14   just picked a lock.  Okay.

15         MS. MCVAY:  Dad said, "Nope.  Not gonna

16   happen."

17         JASMINE JEWELL SHAFER:  Yep.

18         MS. MCVAY:  Yeah.

19         So there's markers and then there's a

20   kinda twisty crayon.  So you can use whatever you want.

21   Do you care if I color the wolf or the flower?  Is there

22   one you wanted to color if you get done?

23         JASMINE JEWELL SHAFER:  Just that.

24         MS. MCVAY:  You want to color that one

25   (indiscernible)?

```
 1                    JASMINE JEWELL SHAFER:  Yeah.

 2                    MS. MCVAY:  Can I color the flower?

 3                    JASMINE JEWELL SHAFER:  Yeah.

 4                    MS. MCVAY:  All right.  Thank you.

 5              All right.  So in this room, just like the

 6       other room, we only talk about true stuff.  No pretend

 7       and no make believe.  Just stuff we know.  Okay?

 8                    And if I ask you a question and it doesn't

 9       make any sense, you can say, "Amanda, I don't know what

10       you're asking me."  You just tell me, okay?

11                    And sometimes I repeat stuff.  And if I

12       get something wrong, just correct me.

13                    JASMINE JEWELL SHAFER:  Okay.

14                    MS. MCVAY:  You won't be in trouble with

15       me for correcting me, okay?  Sound like a deal?

16                    JASMINE JEWELL SHAFER:  Yeah.

17                    MS. MCVAY:  Do you think you can do all

18       that while we're talking?

19                    JASMINE JEWELL SHAFER:  Yeah.

20                    MS. MCVAY:  Yeah?

21                    JASMINE JEWELL SHAFER:  I just

22       (indiscernible) some of my schoolwork.

23                    MS. MCVAY:  Why do you have to use some of

24       your schoolwork?

25                    JASMINE JEWELL SHAFER:  Because I missed
```

1  math.

2                    MS. MCVAY:  Oh.

3                    JASMINE JEWELL SHAFER:  My least favorite.

4                    MS. MCVAY:  That's right.  You said that.

5  You don't really like math, huh?

6                    JASMINE JEWELL SHAFER:  No.

7                    MS. MCVAY:  Okay.

8                    So it's my job to come in here and talk

9  with kids and get to know them a little bit.  I learned

10  a little bit about you in the other room.  But I was

11  wondering -- so tell me, Jasmine, who do you live with?

12                    JASMINE JEWELL SHAFER:  I live with my

13  dad, my aunt, my grandma, and grandpa.

14                    MS. MCVAY:  Oh, okay.  Dad and aunt and

15  grandma and grandpa.

16                    JASMINE JEWELL SHAFER:  Yeah.

17                    MS. MCVAY:  So what is your aunt's name?

18                    JASMINE JEWELL SHAFER:  Ashley.

19                    MS. MCVAY:  Ashley.  And is your aunt a

20  kid or a grownup or --

21                    JASMINE JEWELL SHAFER:  She's a teenager.

22                    MS. MCVAY:  Oh, a teenager.  Gotcha.

23                    JASMINE JEWELL SHAFER:  (Indiscernible.)

24                    MS. MCVAY:  You do?

25                    JASMINE JEWELL SHAFER:  (Indiscernible.)

1           MS. MCVAY:  With your hand?

2           JASMINE JEWELL SHAFER:  Yeah.

3           MS. MCVAY:  Uh-oh.

4           JASMINE JEWELL SHAFER:  And I just hate

5    homework.

6           MS. MCVAY:  Oh, okay.

7           JASMINE JEWELL SHAFER:  (Indiscernible.)

8           MS. MCVAY:  Gotcha.  And so how do you go

9    to the Dollar -- Dollar Tree?

10           JASMINE JEWELL SHAFER:  Three blocks.

11           MS. MCVAY:  Yeah?  And who do you walk

12    with?

13           JASMINE JEWELL SHAFER:  My aunt.

14           MS. MCVAY:  Your Aunt Ashley?

15           JASMINE JEWELL SHAFER:  Yeah.

16           MS. MCVAY:  Oh, okay.  Very cool.

17           And then what's Grandma and Grandpa's

18    names?

19           JASMINE JEWELL SHAFER:  Grandma Rachel,

20    Grandpa Ken.

21           MS. MCVAY:  Oh, okay.

22           JASMINE JEWELL SHAFER:  Great, Ken.

23           MS. MCVAY:  Oh.

24           JASMINE JEWELL SHAFER:  They're both Ken.

25           MS. MCVAY:  Okay.  So do you -- does your

1   great grandpa live with you too or just --

2               JASMINE JEWELL SHAFER:  Nope.

3               MS. MCVAY:  -- your grandpa?

4               JASMINE JEWELL SHAFER:  Grandpa.

5               MS. MCVAY:  Oh, okay.  All right.

6               And so where do you guys live?

7               JASMINE JEWELL SHAFER:  A trailer park.

8               MS. MCVAY:  Okay.  And where is that at?

9   Do you know?

10              JASMINE JEWELL SHAFER:  No.  But I know

11  it's by the Safeway by (indiscernible).

12              MS. MCVAY:  Oh, okay.  So that's

13  (indiscernible).

14              JASMINE JEWELL SHAFER:  Yeah.

15              MS. MCVAY:  Yeah.  Especially

16  (indiscernible).

17              JASMINE JEWELL SHAFER:  Yeah.

18              MS. MCVAY:  Yeah?

19              JASMINE JEWELL SHAFER:  And something with

20  (indiscernible) pens.  They really suck.

21              MS. MCVAY:  They do?

22              JASMINE JEWELL SHAFER:  I have one, so,

23  like they (indiscernible).

24              MS. MCVAY:  Uh-huh.  Uh-huh.

25              JASMINE JEWELL SHAFER:  I was writing with

```
1   the pen side.
2               MS. MCVAY:  Yeah.
3               JASMINE JEWELL SHAFER:  And all of a
4   sudden it broke.  I'm like, "I hate you"
5   (indiscernible).
6               MS. MCVAY:  That happens sometimes,
7   doesn't it?
8               So -- okay.  So who brought you here today
9   for your appointment?
10              JASMINE JEWELL SHAFER:  My dad.
11              MS. MCVAY:  Yeah?  And then who's the lady
12  who's here with you and your dad?
13              JASMINE JEWELL SHAFER:  Trisha.
14              MS. MCVAY:  Okay.  So who's Trisha?
15              JASMINE JEWELL SHAFER:  My stepmom.
16              MS. MCVAY:  Oh, okay.
17              And then you had said something about
18  having a sister?
19              JASMINE JEWELL SHAFER:  Yeah.
20              MS. MCVAY:  You said -- was one Olivia?
21              JASMINE JEWELL SHAFER:  Yeah.
22              MS. MCVAY:  And the other one, I thought
23  you said Kaeli.  Did I get that right?
24              JASMINE JEWELL SHAFER:  Yeah.  And
25  Jennifer.
```

1              MS. MCVAY:  And Jennifer.

2              JASMINE JEWELL SHAFER:  (Indiscernible.)

3              MS. MCVAY:  (Indiscernible.)  Okay.

4         And so whose mom is the mom to Kaeli?

5              JASMINE JEWELL SHAFER:  Trisha.

6              MS. MCVAY:  Okay.  So Trisha

7    (indiscernible).  Okay.

8              And who is the mom to Jennifer and Olivia?

9              JASMINE JEWELL SHAFER:  Well, they both

10   have the same mom.  It's just she (indiscernible).

11             MS. MCVAY:  Okay.  And is that -- did you

12   say that was your mom?  (Indiscernible.)

13             JASMINE JEWELL SHAFER:  Yeah.

14             MS. MCVAY:  Oh.

15             JASMINE JEWELL SHAFER:  Slash

16   (indiscernible).

17             MS. MCVAY:  Slash (indiscernible).  Okay.

18             And how old is Kaeli?

19             JASMINE JEWELL SHAFER:  She's one years

20   old.

21             MS. MCVAY:  Oh, okay.  And so where do

22   Kaeli and Trisha live?

23             JASMINE JEWELL SHAFER:  In apartments.

24             MS. MCVAY:  Oh.  And -- but they don't

25   live with you?

1                    JASMINE JEWELL SHAFER:  No.

2                    MS. MCVAY:  Oh.  How come?

3                    JASMINE JEWELL SHAFER:  They split up.

4     They're trying to get back together.  Then we're moving

5     back this summer.

6                    MS. MCVAY:  Oh, okay.  Back in with

7     Trisha?

8                    JASMINE JEWELL SHAFER:  Yeah.

9                    MS. MCVAY:  And Kaeli?  Okay.  Does that

10    mean you and your dad or --

11                   JASMINE JEWELL SHAFER:  Yeah.

12                   MS. MCVAY:  Okay.  And so who lives at

13    Trisha's house?

14                   JASMINE JEWELL SHAFER:  Used to be Jorden.

15                   MS. MCVAY:  Oh.

16                   JASMINE JEWELL SHAFER:  And I am not sure

17    about Mindy no more because Mindy is (indiscernible) and

18    she's trying to protect him.

19                   MS. MCVAY:  Oh.  Trying to protect who?

20                   JASMINE JEWELL SHAFER:  Because they think

21    I'm a liar.

22                   MS. MCVAY:  Oh.  Who thinks you're a liar?

23                   JASMINE JEWELL SHAFER:  Deborah, Mindy.

24    They weren't even there.

25                   MS. MCVAY:  Okay.

1              JASMINE JEWELL SHAFER:  Jorden's awake and
2    Mindy was sleeping.
3              MS. MCVAY:  Okay.  So tell me -- what were
4    you going to say?  Sorry.
5              JASMINE JEWELL SHAFER:  I was going to say
6    the thing is, when I (indiscernible) to go up to Trisha
7    and Dad's room --
8              MS. MCVAY:  Uh-huh.
9              JASMINE JEWELL SHAFER:  -- (indiscernible)
10   because he was (indiscernible) why I should tell anyone,
11   I smelled alcohol on his breath.  I'm like
12   (indiscernible).  So he's not (indiscernible).
13             MS. MCVAY:  Okay.  So let's back up a
14   little bit and tell me what people think you're lying
15   about.  Tell me everything about what people think
16   you're lying about.
17             JASMINE JEWELL SHAFER:  Well, I don't
18   really exactly know, but I know they have conversations
19   where they think I'm lying, that Jorden didn't do it.
20   It just frustrates me.
21             MS. MCVAY:  Sure.
22             So tell me what Jorden did.
23             JASMINE JEWELL SHAFER:  He touched right
24   here.
25             MS. MCVAY:  Okay.

1           JASMINE JEWELL SHAFER:  He went -- he

2   actually went under my shirt and (indiscernible).  I

3   woke up and said, "What?"

4           MS. MCVAY:  Uh-huh.

5           JASMINE JEWELL SHAFER:  Because I knew

6   someone was touching me.  And then Jorden goes

7   (demonstrative sound).  I heard a gasp and he went

8   behind the -- on the couch where Kaeli's toy -- toy area

9   is.

10          MS. MCVAY:  Okay.

11          JASMINE JEWELL SHAFER:  (Indiscernible.)

12          MS. MCVAY:  Sometimes (indiscernible)

13  stuff, but let's just talk.

14          Okay.  So why don't you -- where -- where

15  did this happen?

16          JASMINE JEWELL SHAFER:  On the couch, at

17  night.

18          MS. MCVAY:  Okay.  At whose house?

19          JASMINE JEWELL SHAFER:  Trisha's.

20          MS. MCVAY:  Oh, okay.  So you were at

21  Trisha's house?

22          JASMINE JEWELL SHAFER:  I was sleeping.

23          MS. MCVAY:  Oh, okay.

24          So tell me what happened -- well, let me

25  see.  What -- how come you were at Trisha's house

```
 1    sleeping?
 2                   JASMINE JEWELL SHAFER:  Because they're
 3    trying to get back together.  And we were visiting
 4    because they split up because of unhappiness.  My dad
 5    couldn't deal with it.
 6                   MS. MCVAY:  Uh-huh.
 7                   JASMINE JEWELL SHAFER:  And they were
 8    trying to see if me and Trisha could get along.
 9                   MS. MCVAY:  Uh-huh.
10                   JASMINE JEWELL SHAFER:  And see if she's
11    changed.
12                   MS. MCVAY:  Okay.
13                   JASMINE JEWELL SHAFER:  And I'm sleeping.
14                   MS. MCVAY:  Okay.
15                   JASMINE JEWELL SHAFER:  That's very
16    disturbing.
17                   MS. MCVAY:  Okay.
18                   JASMINE JEWELL SHAFER:  And I was
19    (indiscernible) Jorden, which is my cousin.
20                   MS. MCVAY:  Oh, okay.
21                   JASMINE JEWELL SHAFER:  In my head, like,
22    when I saw Jorden, I'm like, okay, that's it.
23    (Indiscernible.)  I almost got off that couch.
24                   MS. MCVAY:  Okay.  He's (indiscernible) in
25    the other room.
```

 1                    JASMINE JEWELL SHAFER:  Yeah.

 2                    MS. MCVAY:  So what -- tell me who was at

 3      Trisha's house when you first got to her house to stay

 4      there.

 5                    JASMINE JEWELL SHAFER:  When --

 6                    MS. MCVAY:  When the (indiscernible).

 7                    JASMINE JEWELL SHAFER:  (Indiscernible.)

 8      Well, no one was really (indiscernible).

 9                    MS. MCVAY:  Okay.

10                    JASMINE JEWELL SHAFER:  It was like the

11      middle of the night.

12                    MS. MCVAY:  Oh, okay.

13                    JASMINE JEWELL SHAFER:  With Jorden, I

14      lied to Jorden, said, "Okay.  I won't tell anyone."

15                    MS. MCVAY:  Uh-huh.

16                    JASMINE JEWELL SHAFER:  That's

17      (indiscernible) actually got (indiscernible).

18                    MS. MCVAY:  Oh, okay.

19                    JASMINE JEWELL SHAFER:  So that actually

20      helped me for once.

21                    MS. MCVAY:  That helped you?  How did that

22      help you?

23                    JASMINE JEWELL SHAFER:  Because I didn't

24      keep it (indiscernible) telling.

25                    MS. MCVAY:  Okay.

1              JASMINE JEWELL SHAFER:  Can't do that to a
2     kid.
3              MS. MCVAY:  Sure.
4              JASMINE JEWELL SHAFER:  Adults.  And he's,
5     like, begging me, and like, say one more thing about it.
6     And I (indiscernible) pulled my backpack and throw it at
7     her head.
8              MS. MCVAY:  You were thinking that or
9     saying that?
10             JASMINE JEWELL SHAFER:  I said that.
11             MS. MCVAY:  Oh.
12             JASMINE JEWELL SHAFER:  Because he's like,
13    "Please don't tell on me."
14             MS. MCVAY:  He saying that --
15             JASMINE JEWELL SHAFER:  He's saying it
16    over and over and over --
17             MS. MCVAY:  -- over and over?  Okay.
18             JASMINE JEWELL SHAFER:  -- again.
19             MS. MCVAY:  Okay.
20             So let's go back to -- tell me what you
21    were doing right before you went to bed that night.
22             JASMINE JEWELL SHAFER:  Watching TV.
23             MS. MCVAY:  Okay.  And where were other
24    people?
25             JASMINE JEWELL SHAFER:  On the couch.

1          MS. MCVAY:  Okay.  Who was on the couch?

2          JASMINE JEWELL SHAFER:  My dad and Jorden.

3          MS. MCVAY:  Okay.  And you were on the

4     couch or you were somewhere else?

5          JASMINE JEWELL SHAFER:  I was on the other

6     short couch.

7          MS. MCVAY:  The other shorter couch.

8     Okay.  So is there more than one couch?

9          JASMINE JEWELL SHAFER:  Yes.  There's --

10          MS. MCVAY:  Yeah?

11          JASMINE JEWELL SHAFER:  -- two.

12          MS. MCVAY:  Okay.

13          JASMINE JEWELL SHAFER:  But Jorden has no

14     real space (indiscernible).

15          MS. MCVAY:  Uh-huh.

16          JASMINE JEWELL SHAFER:  Because there

17     would be new furniture.

18          MS. MCVAY:  Oh, okay.

19          So do you think -- because sometimes kids

20     draw the room where something happened.  Do you think

21     you could draw the room for me so I know where these

22     couches are?

23          JASMINE JEWELL SHAFER:  Is there, like,

24     paper?

25          MS. MCVAY:  Right here.  And I have more,

1    if you need more.  That way, then I kinda know where you

2    were and what happened.

3                    So what were you guys watching?

4                    JASMINE JEWELL SHAFER:  I forget.

5                    MS. MCVAY:  Okay.  And it was you and your

6    dad and Jorden?

7                    JASMINE JEWELL SHAFER:  And Jorden.

8    Trisha went up to get Kaeli a bottle of milk.

9                    MS. MCVAY:  Okay.  So she wasn't there?

10                   JASMINE JEWELL SHAFER:  (Indiscernible.)

11                   MS. MCVAY:  And what about Mindy?  You

12   said something about Mindy.  Where was Mindy?

13                   JASMINE JEWELL SHAFER:  She was upstairs.

14                   MS. MCVAY:  Okay.  What was she doing

15   upstairs?

16                   JASMINE JEWELL SHAFER:  Watching TV or

17   sleeping.

18                   MS. MCVAY:  Okay.

19                   JASMINE JEWELL SHAFER:  Aunt Mindy doesn't

20   like me very much.

21                   MS. MCVAY:  Huh.  Why does Aunt Mindy not

22   like you very much?

23                   JASMINE JEWELL SHAFER:  I don't know.  She

24   just never liked me because -- I don't know.

25                   MS. MCVAY:  Oh.

1                    JASMINE JEWELL SHAFER:  (Indiscernible)
2      had to get used to her.
3                    MS. MCVAY:  Okay.
4                    What have you drawn?
5                    JASMINE JEWELL SHAFER:  This is
6      (indiscernible).
7                    (Pause.)
8                    JASMINE JEWELL SHAFER:  (Indiscernible.)
9                    MS. MCVAY:  Okay.  TV's on the TV stand.
10     Right?
11                   JASMINE JEWELL SHAFER:  (No audible
12     response.)
13                   MS. MCVAY:  Okay.  So there's the TV.
14     (Indiscernible) yellow (indiscernible).
15                   JASMINE JEWELL SHAFER:  Then I did
16     different colors for each one (indiscernible).
17                   MS. MCVAY:  Okay.  And this is the play
18     area?
19                   JASMINE JEWELL SHAFER:  (No audible
20     response.)
21                   MS. MCVAY:  You know what?  I think
22     (indiscernible).
23                   (Recording stopped.)
24                   (State's Exhibit 2 played as follows:)
25                   MS. MCVAY:  Either dark purple or --

 1                    (Recording stopped.)

 2                    (State's Exhibit 2 played as follows:)

 3                    MS. MCVAY:  You can use this black.  Give

 4     you a little marker.

 5                    JASMINE JEWELL SHAFER:  (Indiscernible.)

 6                    (Recording stopped.)

 7                    MS. DUMONT:  I would like -- Your Honor, I

 8     apologize.  It looks like the CD is having some problem.

 9     I'm going to pause it for a second and hope it buffers.

10     Although it shouldn't need to buffer.

11                    (Pause in the proceedings.)

12                    THE COURT:  Do you want a brief recess to

13     contact your tech people?

14                    MS. DUMONT:  Yes.  Thank you, Your Honor.

15                    THE COURT:  Okay.  We'll be in recess.

16     Let's make sure we all take a comfort break as we can.

17     Thank you.

18                    MR. KNAUSS:  Thank you.

19                    (Recess; 9:43 a.m. to 9:57 a.m.)

20                    THE COURT:  We're back on the record.

21                    MS. DUMONT:  State vs. Hollingsworth;

22     1501848.  I will press "play."  I got to what I believe

23     was (indiscernible).

24                    THE COURT:  I think the volume has been

25     turned down.

```
1                    MS. DUMONT:  This is a different player,
2      so it may be.
3                    (State's Exhibit 2 played as follows:)
4                    MS. MCVAY:  Okay.  TV on the TV stand.
5      Okay.
6                    Okay.  So there's the TV.
7                    (State's Exhibit 2 interrupted as
8      follows:)
9                    THE COURT:  Would you turn it up a little
10     bit more?
11                   Mr. Knauss, I want to do a test with you
12     and your client.
13                   MR. KNAUSS:  It could be louder, please.
14                   (State's Exhibit 2 played as follows:)
15                   MS. MCVAY:  Play area.
16                   You know what?  I think the black is
17     missing from that.
18                   (State's Exhibit 2 interrupted as
19     follows:)
20                   THE COURT:  That's much better.
21                   Mr. Knauss?
22                   MR. KNAUSS:  (No audible response.)
23                   THE COURT:  Thank you.
24                   (State's Exhibit 2 played as follows:)
25                   MS. MCVAY:  Dark purple or -- or maybe
```

1    there's black.  Give you a little marker.

2                    JASMINE JEWELL SHAFER:  (Indiscernible.)

3                    MS. MCVAY:  Okay.  The arm of the leather

4    couch?  Okay.  Black.  (Indiscernible.)  And that's one

5    couch?

6                    JASMINE JEWELL SHAFER:  Yeah.  I was

7    (indiscernible) black.

8                    MS. MCVAY:  Oh, okay.  Use a better

9    marker.  So a leather black couch?

10                   JASMINE JEWELL SHAFER:  Yeah.

11                   MS. MCVAY:  Okay.

12                   JASMINE JEWELL SHAFER:  (Indiscernible.)

13                   MS. MCVAY:  Okay.

14                   JASMINE JEWELL SHAFER:  (Indiscernible.)

15                   MS. MCVAY:  Okay.  You had a blanket?

16                   JASMINE JEWELL SHAFER:  Yeah.

17                   MS. MCVAY:  Okay.

18                   JASMINE JEWELL SHAFER:  (Indiscernible.)

19                   MS. MCVAY:  So where were you when you

20   were watching the TV?

21                   JASMINE JEWELL SHAFER:  (Indiscernible.)

22                   MS. MCVAY:  On the couch you slept on?

23                   JASMINE JEWELL SHAFER:  Yeah.

24                   MS. MCVAY:  Yeah?  And so who was on the

25   other couch before you fell asleep?

1                    JASMINE JEWELL SHAFER:  Dad and Jorden.

2                    MS. MCVAY:  Dad and Jorden?

3                    JASMINE JEWELL SHAFER:  And this is

4        Jorden.

5                    MS. MCVAY:  So you fell asleep?

6                    JASMINE JEWELL SHAFER:  This is -- it was

7        at night.

8                    MS. MCVAY:  It was at night?

9                    JASMINE JEWELL SHAFER:  Uh-huh.  Yeah.

10                    MS. MCVAY:  Okay.

11                    And so does Jorden live there?

12                    JASMINE JEWELL SHAFER:  Yeah.  But not

13       anymore.

14                    MS. MCVAY:  Not anymore?  Okay.  So where

15       does he sleep when he lives there?

16                    JASMINE JEWELL SHAFER:  (No audible

17       response.)

18                    MS. MCVAY:  Oh, on the other couch?  Is

19       that what you're pointing to?  Okay.

20                    JASMINE JEWELL SHAFER:  This is his arm.

21                    MS. MCVAY:  Okay.

22                    So how about, Jasmine, tell me -- you were

23       asleep.  What was the first thing that happened?  You

24       were asleep and then what happened?

25                    JASMINE JEWELL SHAFER:  I was sleeping and

1    then I felt (indiscernible) here and then

2    (indiscernible) automatically changed.

3                    MS. MCVAY:  Uh-huh.

4                    JASMINE JEWELL SHAFER:  (Indiscernible.)

5                    MS. MCVAY:  Okay.

6                    JASMINE JEWELL SHAFER:  And

7    (indiscernible).

8                    MS. MCVAY:  Okay.

9                    JASMINE JEWELL SHAFER:  So (indiscernible)

10   someone doing -- doing to me in my sleep.  The other

11   character was (indiscernible) character on

12   (indiscernible).

13                   MS. MCVAY:  Oh, okay.

14                   JASMINE JEWELL SHAFER:  When I wake up,

15   (indiscernible) and he's like (demonstrative sound).

16   And then he jumped behind Kaeli's toy -- toy area.

17                   MS. MCVAY:  Okay.  So that's the toy

18   area --

19                   JASMINE JEWELL SHAFER:  Yeah.

20                   MS. MCVAY:  -- right behind the couch?

21                   JASMINE JEWELL SHAFER:  Uh-huh.

22                   MS. MCVAY:  So when you're talking about

23   dreaming and someone touches you, has someone touched

24   you when you were dreaming before Jorden did?

25                   JASMINE JEWELL SHAFER:  Well,

1  (indiscernible) my mom.  I dreamed where my little

2  sister, Jennifer, and my dog were trying to wake me up.

3               MS. MCVAY:  Yeah?

4               JASMINE JEWELL SHAFER:  (Indiscernible.)

5               MS. MCVAY:  Yeah?  So when you woke up

6  that time, what was going on?

7               JASMINE JEWELL SHAFER:  They were trying

8  to wake me up.

9               MS. MCVAY:  Okay.  So you were dreaming

10  that, then when you woke up, they were?

11               JASMINE JEWELL SHAFER:  And Jennifer's

12  like, "Get up.  Breakfast.  Get up."

13               MS. MCVAY:  Okay.  All right.

14               JASMINE JEWELL SHAFER:  I'm like, "I'm up.

15  All right."

16               MS. MCVAY:  Okay.

17               JASMINE JEWELL SHAFER:  (Indiscernible.)

18               MS. MCVAY:  Yeah.

19               JASMINE JEWELL SHAFER:  So, "Get up.  Get

20  up."

21               MS. MCVAY:  Yeah.

22               JASMINE JEWELL SHAFER:  "I got it.  I'm

23  up."

24               MS. MCVAY:  Okay.  So this time, with

25  Jorden, what was touching you right there and what part

1    of that -- what part of your body do you call that?

2                    JASMINE JEWELL SHAFER:  Boob.

3                    MS. MCVAY:  Okay.  So your boob?  And what

4    was he touching with?

5                    JASMINE JEWELL SHAFER:  A finger.

6                    MS. MCVAY:  Okay.  What was his finger

7    doing when it touched you?

8                    JASMINE JEWELL SHAFER:  Like . . .

9                    MS. MCVAY:  Okay.  Okay.

10                   And was that on top of your clothes?  On

11   your skin?  Or --

12                   JASMINE JEWELL SHAFER:  Under my bra.

13                   MS. MCVAY:  Under your bra?  Okay.  So you

14   were wearing a bra?

15                   JASMINE JEWELL SHAFER:  Yes.

16                   MS. MCVAY:  Okay.

17                   JASMINE JEWELL SHAFER:  Because I know

18   Jorden goes to the bar and is in the bathroom, like,

19   okay, (indiscernible).

20                   MS. MCVAY:  Okay.  What would you have to

21   wear a bra for?

22                   JASMINE JEWELL SHAFER:  Because Jorden --

23   he looks (indiscernible) girl.

24                   MS. MCVAY:  Uh-huh.

25                   JASMINE JEWELL SHAFER:  I don't know what

1    he's doing with them -- with her, but he didn't need to

2    ask.

3                    MS. MCVAY:  Okay.  All right.  But that

4    was a different time than this night you were telling me

5    about?

6                    JASMINE JEWELL SHAFER:  Yeah.

7                    MS. MCVAY:  Okay.  So Jorden's finger was

8    touching on your boob?

9                    JASMINE JEWELL SHAFER:  Yeah.

10                   MS. MCVAY:  Was it one boob or both boobs

11   or --

12                   JASMINE JEWELL SHAFER:  One.  One.

13                   MS. MCVAY:  One?  Okay.

14                   And then before Jorden gasped, like you

15   said, what did you do?

16                   JASMINE JEWELL SHAFER:  I, like, "What?"

17                   MS. MCVAY:  Okay.

18                   JASMINE JEWELL SHAFER:  I still had my

19   eyes closed --

20                   MS. MCVAY:  Okay.

21                   JASMINE JEWELL SHAFER:  -- because I was

22   sleepy.

23                   MS. MCVAY:  Okay.

24                   JASMINE JEWELL SHAFER:  And, "What?"  He's

25   like (demonstrative sound).

1              MS. MCVAY:  So you heard him do that?

2              JASMINE JEWELL SHAFER:  Yes.

3              MS. MCVAY:  And then what happened?

4              JASMINE JEWELL SHAFER:  I, like, "Okay.

5    I've got to wake up."

6              MS. MCVAY:  Uh-huh.

7              JASMINE JEWELL SHAFER:  So my

8    (indiscernible) eyes.  Open them up.

9              MS. MCVAY:  Okay.

10             JASMINE JEWELL SHAFER:  And so I opened my

11   eyes and looked over the couch because I heard somebody

12   gasp --

13             MS. MCVAY:  Uh-huh.

14             JASMINE JEWELL SHAFER:  -- right by me.

15             MS. MCVAY:  Okay.

16             JASMINE JEWELL SHAFER:  It's like it

17   sounded like Jorden.

18             MS. MCVAY:  Uh-huh.

19             JASMINE JEWELL SHAFER:  My own cousin.

20             MS. MCVAY:  Okay.

21             JASMINE JEWELL SHAFER:  And I almost

22   marched off that couch and stomped and kicked

23   (indiscernible).

24             MS. MCVAY:  Okay.  But you didn't.

25             JASMINE JEWELL SHAFER:  No.

1               MS. MCVAY:  You didn't kick him?

2               JASMINE JEWELL SHAFER:  I'm not violent.

3               MS. MCVAY:  And you were thinking Jorden

4       in your head.  And then what happened?

5               JASMINE JEWELL SHAFER:  I just didn't say

6       anything because I'm, like, thinking why would he do

7       that?  He's my cousin.

8               MS. MCVAY:  Uh-huh.  So did you see

9       Jorden?

10              JASMINE JEWELL SHAFER:  Yes.  I saw him

11      right by there, acting like he's sleeping.

12              MS. MCVAY:  Okay.

13              JASMINE JEWELL SHAFER:  There's like

14      cushions on the -- the -- the carpet.

15              MS. MCVAY:  Uh-huh.

16              JASMINE JEWELL SHAFER:  It's, like, really

17      soft.

18              MS. MCVAY:  Okay.  Like --

19              JASMINE JEWELL SHAFER:  He took one of

20      those little play area board things.

21              MS. MCVAY:  Oh, okay.

22              JASMINE JEWELL SHAFER:  Like, you know

23      those little puzzles, or ABCs and --

24              MS. MCVAY:  Uh-huh.

25              JASMINE JEWELL SHAFER:  -- others?

1                    MS. MCVAY:  Uh-huh.

2                    JASMINE JEWELL SHAFER:  Yeah.  It was one

3     of those.

4                    MS. MCVAY:  Okay.  And that was in

5     Kaeli's --

6                    JASMINE JEWELL SHAFER:  Yes.

7                    MS. MCVAY:  -- play space?  That's where

8     he was?

9                    JASMINE JEWELL SHAFER:  It has different

10    colors, so that's what I put.

11                   MS. MCVAY:  Okay.

12                   So how was he pretending to be asleep?

13                   JASMINE JEWELL SHAFER:  He's like . . .

14                   MS. MCVAY:  Okay.

15                   JASMINE JEWELL SHAFER:  (Indiscernible.)

16                   MS. MCVAY:  Okay.  So you saw him there,

17    and then what happened?

18                   JASMINE JEWELL SHAFER:  Just -- I just

19    turned around, thinking, okay, maybe I was just

20    (indiscernible) something.

21                   MS. MCVAY:  Okay.

22                   JASMINE JEWELL SHAFER:  But I know that

23    wasn't me who gasped.

24                   MS. MCVAY:  Okay.  So then what happened

25    next?

1          JASMINE JEWELL SHAFER:  Then Jorden -- I'm

2     usually not a very heavy sleeper, but he can make it

3     past me --

4          MS. MCVAY:  Uh-huh.

5          JASMINE JEWELL SHAFER:  -- when I'm still

6     awake.

7          MS. MCVAY:  Uh-huh.

8          JASMINE JEWELL SHAFER:  How can he get

9     past (indiscernible).

10          MS. MCVAY:  Okay.  So what happened?

11          JASMINE JEWELL SHAFER:  And he -- really,

12     he's like, "Hey."

13          I sat up, was like, "What?" in like a very

14     grumpy voice.

15          MS. MCVAY:  Uh-huh.

16          JASMINE JEWELL SHAFER:  "Can I touch you?"

17          MS. MCVAY:  Okay.

18          JASMINE JEWELL SHAFER:  I'm like -- I sat

19     up.

20          MS. MCVAY:  Uh-huh.

21          JASMINE JEWELL SHAFER:  I was

22     (indiscernible) like, "No."

23          MS. MCVAY:  Uh-huh.

24          JASMINE JEWELL SHAFER:  And then

25     (indiscernible), I'd be like (indiscernible).  He's

1    like, "I took out the garbage."

2              I'm like, "Yeah.  (Indiscernible) take out

3    the garbage."

4              MS. MCVAY:  Okay.

5              JASMINE JEWELL SHAFER:  And then sooner or

6    later, after hearing (indiscernible), he went

7    (indiscernible).  "I don't want to take out the garbage.

8    Leave me alone."

9              MS. MCVAY:  Okay.  And then --

10             JASMINE JEWELL SHAFER:  And then he kept

11   asking me the same exact question.  "Can I touch you?

12   Can I touch you?"

13             MS. MCVAY:  Okay.  So where was he when he

14   was asking you, "Can I touch you?"

15             JASMINE JEWELL SHAFER:  First time on the

16   couch, except the very last one, he's like, "I know I'm

17   gay, but" --

18             MS. MCVAY:  Uh-huh.

19             JASMINE JEWELL SHAFER:  He just

20   (indiscernible).

21             MS. MCVAY:  Okay.  So he asked to touch

22   you more than one time.

23             JASMINE JEWELL SHAFER:  Yes.

24             MS. MCVAY:  And you told him no?

25             JASMINE JEWELL SHAFER:  Yes.

1            MS. MCVAY:  Okay.  And he asked to take

2    out the garbage?

3            JASMINE JEWELL SHAFER:  Yes.

4            MS. MCVAY:  And so was he laying down here

5    or was he somewhere else when he was asking you to

6    touch?

7            JASMINE JEWELL SHAFER:  He was on the

8    couch.

9            MS. MCVAY:  Oh, he was on this other

10   couch?

11           JASMINE JEWELL SHAFER:  No.

12           MS. MCVAY:  Okay.

13           JASMINE JEWELL SHAFER:  (Indiscernible.)

14           MS. MCVAY:  Okay.

15           JASMINE JEWELL SHAFER:  But really the

16   couch isn't that far from it.

17           MS. MCVAY:  Okay.  And you said no.  And

18   then he asked to take out the garbage, and then you

19   didn't want to.  And then he said, "I know I'm gay,

20   but," and he didn't say anything.

21           JASMINE JEWELL SHAFER:  Yeah.

22   (Indiscernible.)

23           MS. MCVAY:  Uh-huh.  (Indiscernible.)

24           JASMINE JEWELL SHAFER:  And then my

25   conscience saying, "I probably don't want to know the

1    last word."

2              MS. MCVAY:  Yeah.

3              JASMINE JEWELL SHAFER:  And I

4    (indiscernible) back probably (indiscernible).

5              MS. MCVAY:  Yeah.  And then what happened

6    next?

7              JASMINE JEWELL SHAFER:  Then -- then he,

8    like (indiscernible) no but asked to touch me and he

9    touched me in my sleep.

10             MS. MCVAY:  Uh-huh.  And what did he say

11   to that?

12             JASMINE JEWELL SHAFER:  (Indiscernible.)

13   I'm like, "No, you weren't sleeping."

14             MS. MCVAY:  Okay.

15             JASMINE JEWELL SHAFER:  But later on

16   (indiscernible) somewhere.  (Indiscernible.)  Offering

17   to take me to the movies.

18             MS. MCVAY:  Huh.  Tell me about that.

19   What was he saying?

20             JASMINE JEWELL SHAFER:  He said, "I'll

21   give you $20 if you don't tell anybody."

22             MS. MCVAY:  Okay.

23             JASMINE JEWELL SHAFER:  I'm like, "Jorden,

24   I'm not going to take your stupid money."

25             MS. MCVAY:  Okay.

1              JASMINE JEWELL SHAFER:  And, like, I -- I

2    finally got frustrated because he kept asking, "Please

3    don't tell" (indiscernible).

4              MS. MCVAY:  Okay.

5              JASMINE JEWELL SHAFER:  And when he told

6    me (indiscernible).

7              MS. MCVAY:  Uh-huh.

8              JASMINE JEWELL SHAFER:  Well, I said it in

9    my head.

10             MS. MCVAY:  Uh-huh.

11             JASMINE JEWELL SHAFER:  "You touched me

12   and you're going to get a big slap."

13             MS. MCVAY:  Okay.  And then -- so he

14   offered you $20 to not say something about what?

15             JASMINE JEWELL SHAFER:  Yeah.  It was

16   like -- about him touching me.

17             MS. MCVAY:  Okay.

18             JASMINE JEWELL SHAFER:  And then he's

19   offering me to take me to see the new Sponge Bob movie.

20   I want to see it, but --

21             MS. MCVAY:  Uh-huh.

22             JASMINE JEWELL SHAFER:  (Indiscernible.)

23             MS. MCVAY:  Okay.

24             JASMINE JEWELL SHAFER:  And so the next

25   day -- well, (indiscernible).  I couldn't go back to

```
 1   sleep.
 2              MS. MCVAY:  Oh, that night, after --
 3              JASMINE JEWELL SHAFER:  Yeah.
 4              MS. MCVAY:  Okay.
 5              JASMINE JEWELL SHAFER:  He said he didn't
 6   fall asleep, but I doubted that.
 7              (Recording stopped.)
 8              (Pause in the proceedings.)
 9              MS. DUMONT:  Your Honor, Counsel and I
10   discussed potentially playing it off my server from the
11   DA's office.  It is a nonredacted copy.  Counsel and I
12   discussed that and he was, I believe, amicable to
13   playing it off the -- the nonredacted copy off the
14   server.  Is that --
15              MR. KNAUSS:  Yes.
16              MS. DUMONT:  I don't want to misstate.
17              I'm going to now attempt to do that,
18   because I don't want to --
19              THE COURT:  (Indiscernible) stopping and
20   starting at the portions that are redacted or just
21   having me disregard them?
22              MR. KNAUSS:  Well, it's just talking about
23   other legal matters that he had.  And he's going to
24   testify anyway and that's going to come out, so it's
25   fine.
```

```
 1                     THE COURT:  All right.  Go ahead.

 2                     MS. DUMONT:  Thank you.

 3                     THE COURT:  How much time do you need to

 4   accomplish this?

 5                     MS. DUMONT:  Oh, less than one minute.

 6                     (Pause in the proceedings.)

 7                     MS. DUMONT:  I lied.  I need another

 8   minute to get up and running.  I apologize, Your Honor.

 9                     THE COURT:  Let's be in recess again until

10   this is ready.

11                     (Recess; 10:12 a.m to 10:16 a.m.)

12                     MS. DUMONT:  Back on the record.

13                     (State's Exhibit 2 played as follows:)

14                     MS. MCVAY:  Let's just start --

15                     JASMINE JEWELL SHAFER:  I couldn't go back

16   to sleep.

17                     MS. MCVAY:  Oh, that night, after --

18                     JASMINE JEWELL SHAFER:  Yeah.

19                     MS. MCVAY:  Okay.

20                     JASMINE JEWELL SHAFER:  He said he didn't

21   fall asleep, but I doubted that.

22                     MS. MCVAY:  Uh-huh.

23                     JASMINE JEWELL SHAFER:  Because later on I

24   heard him sleeping.

25                     MS. MCVAY:  Okay.  But you couldn't fall
```

1    asleep?

2                    JASMINE JEWELL SHAFER:  No.

3                    MS. MCVAY:  What's the reason you couldn't

4    fall asleep?

5                    JASMINE JEWELL SHAFER:  It was because I

6    was scared.  Because I smelled alcohol on Jorden's

7    breath.  And I knew I don't want to be (indiscernible).

8    I'm like, okay, I'm going to keep (indiscernible).

9                    MS. MCVAY:  Uh-huh.  Okay.

10                   So you said something about lying about

11   you somewhere.  What was it that --

12                   JASMINE JEWELL SHAFER:  I said, "Fine.  I

13   won't tell anybody."

14                   MS. MCVAY:  Oh, okay.  You told Jorden --

15                   JASMINE JEWELL SHAFER:  Yeah.

16                   MS. MCVAY:  -- "I won't tell anybody"?

17   Okay.  And then what did he do after you said that?

18                   JASMINE JEWELL SHAFER:  He said, "Thank

19   you," and started hugging me.

20                   I'm like, "Get off me.  Get off me."

21                   MS. MCVAY:  Okay.  So when did you smell

22   alcohol on his breath?

23                   JASMINE JEWELL SHAFER:  When he was

24   talking to me.  And when I said I -- when he told me

25   (indiscernible) when I got up and looked.

1                    MS. MCVAY:  So he said (indiscernible) to

2    him?

3                    JASMINE JEWELL SHAFER:  Yeah.

4                    MS. MCVAY:  Did I get that right?

5                    JASMINE JEWELL SHAFER:  Yeah.

6                    MS. MCVAY:  Oh.  When did he say that?

7                    JASMINE JEWELL SHAFER:  A little after

8    he's, like -- he -- I -- "Please don't tell anybody."

9                    MS. MCVAY:  All right.  Okay.

10                   And when he hugged you, where did he touch

11   on your body when he hugged you?

12                   JASMINE JEWELL SHAFER:  Just like . . .

13                   MS. MCVAY:  Okay.

14                   JASMINE JEWELL SHAFER:  Or like that.

15   (Indiscernible.)

16                   MS. MCVAY:  Okay.

17                   JASMINE JEWELL SHAFER:  Rage.

18                   MS. MCVAY:  Okay.  And had he hugged you

19   before this night?  Had he given you hugs before?

20                   JASMINE JEWELL SHAFER:  When I say goodbye

21   to him.

22                   MS. MCVAY:  Yeah?  Okay.

23                   And had he ever offered you money or to

24   take you to a movie before this?

25                   JASMINE JEWELL SHAFER:  No.

1                 MS. MCVAY:  Had he ever given you any
2   gifts before?
3                 JASMINE JEWELL SHAFER:  (Indiscernible.)
4                 MS. MCVAY:  Did you see him very much
5   before the second?
6                 JASMINE JEWELL SHAFER:  Yeah.  We
7   (indiscernible) there a lot.
8                 MS. MCVAY:  Oh, okay.  So he was living at
9   the house when you were there?
10                 JASMINE JEWELL SHAFER:  Yeah.
11                 MS. MCVAY:  So was it the same apartment
12   that you lived at?
13                 (State's Exhibit 2 interrupted as
14   follows:)
15                 THE COURT:  I just missed obviously about
16   20 seconds conversation.
17                 MS. DUMONT:  That was the redacted.
18                 (State's Exhibit 2 played as follow:)
19                 MS. MCVAY:  And where did Jorden sleep
20   when he lived with you?  On the couch?
21                 JASMINE JEWELL SHAFER:  Uh-huh.
22                 MS. MCVAY:  Had Jorden ever touched you
23   any times before this?
24                 JASMINE JEWELL SHAFER:  Well, when I was
25   really little, I was kinda scared and (indiscernible).

```
1                    (State's Exhibit 2 interrupted as

2       follows:)

3                    THE COURT:  Is this also redacted, then?

4                    MS. DUMONT:  Yes.

5                    (State's Exhibit 2 played as follows:)

6                    JASMINE JEWELL SHAFER:  And he took his

7       (indiscernible) out of his penis and he reached into my

8       pants.

9                    MS. MCVAY:  Okay.

10                   JASMINE JEWELL SHAFER:  And I jumped.  I

11      went like this, grabbed out.

12                   MS. MCVAY:  Okay.  And what part on your

13      body did he touch (indiscernible)?

14                   JASMINE JEWELL SHAFER:  (Indiscernible.)

15                   MS. MCVAY:  Okay.  And was -- what did he

16      touch it with?

17                   JASMINE JEWELL SHAFER:  His hand.

18                   MS. MCVAY:  Okay.  And what did his hand

19      do when it touched your (indiscernible)?

20                   JASMINE JEWELL SHAFER:  I -- it really

21      wouldn't do anything.  (Indiscernible) trying to do

22      happened.

23                   MS. MCVAY:  What --

24                   JASMINE JEWELL SHAFER:  I was little, so

25      it kinda took a little bit.
```

1                    MS. MCVAY:  Okay.

2                    JASMINE JEWELL SHAFER:  Get it out.

3                    MS. MCVAY:  Okay.

4                    (Pause in the proceedings.)

5                    MS. MCVAY:  But you said you moved back

6      and went like this?

7                    JASMINE JEWELL SHAFER:  I jumped.

8                    MS. MCVAY:  Jumped.

9                    JASMINE JEWELL SHAFER:  And I went like

10     this.

11                    MS. MCVAY:  Okay.

12                    JASMINE JEWELL SHAFER:  And he struggled.

13     He didn't really struggle, but he went (demonstrative

14     sound).

15                    MS. MCVAY:  Okay.  And then he pulled his

16     hand out?

17                    JASMINE JEWELL SHAFER:  Yeah.

18                    MS. MCVAY:  Okay.  And then what happened?

19                    JASMINE JEWELL SHAFER:  And then he just

20     went out of the kitchen.  Really just -- he told me

21     "Come here" in the morning.

22                    MS. MCVAY:  Okay.

23                    JASMINE JEWELL SHAFER:  And then I -- he

24     went in the kitchen.  I was right (indiscernible) so I

25     couldn't go anywhere.

1          MS. MCVAY:  Okay.

2          JASMINE JEWELL SHAFER:  And after that

3    (indiscernible).  Which disgustes [sic] me.

4          MS. MCVAY:  Okay.  Because he showed you

5    his crotch?  Did I hear that right?

6          JASMINE JEWELL SHAFER:  Yes.

7          MS. MCVAY:  Okay.

8          JASMINE JEWELL SHAFER:  Even

9    (indiscernible) it was still disgusting, like seeing, my

10   vision.

11         MS. MCVAY:  Okay.  So what house did this

12   happen at that you just told me about?

13         JASMINE JEWELL SHAFER:  That was -- it was

14   at this little apartment.

15         MS. MCVAY:  It wasn't this --

16         JASMINE JEWELL SHAFER:  No.

17         MS. MCVAY:  No.

18         JASMINE JEWELL SHAFER:  It was at a

19   different apartment.

20         MS. MCVAY:  A different apartment?

21         JASMINE JEWELL SHAFER:  And there was a

22   smaller kitchen.

23         MS. MCVAY:  Okay.

24         JASMINE JEWELL SHAFER:  He took me by the

25   stove area, where all the sugar was at.

1          MS. MCVAY:  Okay.

2          JASMINE JEWELL SHAFER:  And then it was

3     like a dead end.

4          MS. MCVAY:  Okay.

5          JASMINE JEWELL SHAFER:  So I couldn't go

6     anywhere.

7          MS. MCVAY:  Okay.

8          JASMINE JEWELL SHAFER:  So (indiscernible)

9     I was, like, trapped there.

10         MS. MCVAY:  Oh, okay.

11         So where was -- where were other people

12    when this --

13         JASMINE JEWELL SHAFER:  They were

14    sleeping.

15         MS. MCVAY:  They were sleeping.  Okay.

16         JASMINE JEWELL SHAFER:  Yes.

17         MS. MCVAY:  Did I hear you say it was in

18    the morning?

19         JASMINE JEWELL SHAFER:  Yes.

20         MS. MCVAY:  Okay.  And so who was sleeping

21    and where?

22         JASMINE JEWELL SHAFER:  My dad and Trisha.

23         MS. MCVAY:  Okay.

24         JASMINE JEWELL SHAFER:  They slept in a

25    room.  It was, like, a one-bedroom apartment.

 1                    MS. MCVAY:  Okay.  And so where did you

 2      sleep?

 3                    JASMINE JEWELL SHAFER:  I slept in a

 4      little corner by my toy area.

 5                    MS. MCVAY:  Okay.

 6                    JASMINE JEWELL SHAFER:  (Indiscernible.)

 7      You know those little kids -- have you ever went to

 8      Oklahoma?

 9                    MS. MCVAY:  I have not been to Oklahoma.

10                    JASMINE JEWELL SHAFER:  Well, you know,

11      there's this little kid beds in Oklahoma.

12                    MS. MCVAY:  Okay.

13                    JASMINE JEWELL SHAFER:  They're, like,

14      pink and other kinds of colors.

15                    MS. MCVAY:  Uh-huh.

16                    JASMINE JEWELL SHAFER:  But, like, they

17      have stickers, like princess stickers --

18                    MS. MCVAY:  Uh-huh.

19                    JASMINE JEWELL SHAFER:  -- and Minnie

20      Mouse stickers and stuff like that.

21                    MS. MCVAY:  I've seen those before.

22      Uh-huh.

23                    JASMINE JEWELL SHAFER:  You can decorate

24      them.

25                    MS. MCVAY:  Uh-huh.

1           JASMINE JEWELL SHAFER:  You, like, have a
2    little place on the top where your head is.
3           MS. MCVAY:  Okay.
4           JASMINE JEWELL SHAFER:  And you have a
5    little place to sleep.  They were for, like, little
6    kids.
7           MS. MCVAY:  Uh-huh.
8           JASMINE JEWELL SHAFER:  So we --
9           MS. MCVAY:  Okay.
10          JASMINE JEWELL SHAFER:  -- had those
11   little side things.
12          MS. MCVAY:  Yeah.
13          JASMINE JEWELL SHAFER:  Where the
14   (indiscernible) were at, so you didn't fall out.
15          MS. MCVAY:  Okay.
16          JASMINE JEWELL SHAFER:  And all, like,
17   (indiscernible).
18          MS. MCVAY:  Okay.
19          JASMINE JEWELL SHAFER:  It was kinda like
20   (indiscernible).  Yeah.  Only it wasn't (indiscernible).
21          MS. MCVAY:  Okay.  How old were you when
22   that happened?
23          JASMINE JEWELL SHAFER:  I don't remember.
24          MS. MCVAY:  Okay.
25          JASMINE JEWELL SHAFER:  It was a few years

```
 1  back.
 2              MS. MCVAY:  Okay.  But you were in a
 3  one-bedroom apartment --
 4              JASMINE JEWELL SHAFER:  Yes.
 5              MS. MCVAY:  -- with your dad and Trisha?
 6              JASMINE JEWELL SHAFER:  Yes.
 7              MS. MCVAY:  And what about --
 8              JASMINE JEWELL SHAFER:  Jorden was --
 9  Jorden lived with us.
10              MS. MCVAY:  Okay.
11              JASMINE JEWELL SHAFER:  And then when he
12  did this, "Come over," I came over.
13              MS. MCVAY:  Uh-huh.
14              JASMINE JEWELL SHAFER:  And then something
15  really unexpected happened.
16              MS. MCVAY:  Uh-huh.  Is that when he
17  showed you his crotch?
18              JASMINE JEWELL SHAFER:  Yes.
19              MS. MCVAY:  So how did he do that?  Tell
20  me about --
21              JASMINE JEWELL SHAFER:  Like, his thing
22  out of his pants.
23              MS. MCVAY:  Okay.
24              JASMINE JEWELL SHAFER:  And then he
25  reached in my pants.
```

1              MS. MCVAY:  Okay.  Did he --

2              JASMINE JEWELL SHAFER:  I think he sort of

3    laughed.  I can't remember.

4              MS. MCVAY:  Okay.

5              JASMINE JEWELL SHAFER:  (Indiscernible.)

6              MS. MCVAY:  Okay.  Grabbed what?

7              JASMINE JEWELL SHAFER:  Over my vagina.

8              MS. MCVAY:  Over your vagina?  Okay.

9              What did he do to his thing when that

10   happened?

11             JASMINE JEWELL SHAFER:  He just stuck it

12   and left it out of his pants, like, what's going on?

13             MS. MCVAY:  Okay.  Did he say something

14   when he did that?

15             JASMINE JEWELL SHAFER:  Nope.

16             MS. MCVAY:  Okay.  And then he put his

17   hand in your pants on your vagina?

18             JASMINE JEWELL SHAFER:  Yes.

19             MS. MCVAY:  Was that on the skin or on

20   clothes?

21             JASMINE JEWELL SHAFER:  Skin.

22             MS. MCVAY:  Okay.  How did he get it to

23   your skin?

24             JASMINE JEWELL SHAFER:  He stuck his hands

25   under my underwear.

1              MS. MCVAY:  Oh, okay.  So he put his

2     hands -- you're showing your hands?

3              JASMINE JEWELL SHAFER:  Yes.

4              MS. MCVAY:  Okay.  And what did you do

5     when -- you said you jumped back.  Did you say anything

6     to Jorden when he did that?

7              JASMINE JEWELL SHAFER:  No.  I was just

8     scared.

9              MS. MCVAY:  Okay.  And then what happened

10    after you jumped back?  He pulled his hand?

11             JASMINE JEWELL SHAFER:  He pulled his hand

12    out.

13             MS. MCVAY:  Okay.  And then what happened?

14             JASMINE JEWELL SHAFER:  He just walked

15    back to the living room and I walked back into the

16    living room and (indiscernible) he was on the couch.

17             MS. MCVAY:  Okay.  And where did you go

18    when he was on the couch?

19             JASMINE JEWELL SHAFER:  I went in my bed.

20             MS. MCVAY:  Okay.

21             JASMINE JEWELL SHAFER:  And stayed there.

22             MS. MCVAY:  Yeah?

23             JASMINE JEWELL SHAFER:  Until my parents

24    got up.

25             MS. MCVAY:  Okay.

1                    JASMINE JEWELL SHAFER:  Usually I get

2     up --

3                    MS. MCVAY:  Uh-huh.

4                    JASMINE JEWELL SHAFER:  -- when they're

5     sleeping.  And -- but after that, I just waited.

6                    MS. MCVAY:  Okay.

7                    JASMINE JEWELL SHAFER:  I stood there

8     quietly.

9                    MS. MCVAY:  Yeah?  What were you waiting

10    for?

11                   JASMINE JEWELL SHAFER:  Parents to get up.

12    (Indiscernible) got up at noon, so --

13                   MS. MCVAY:  Oh, okay.

14                   JASMINE JEWELL SHAFER:  But Cody gets up

15    not too early, but still early.

16                   MS. MCVAY:  Uh-huh.

17                   JASMINE JEWELL SHAFER:  And we usually

18    speak to each other by the glass sliding window.

19                   MS. MCVAY:  Okay.

20                   JASMINE JEWELL SHAFER:  I heard him

21    knocking on the door.

22                   MS. MCVAY:  Uh-huh.

23                   JASMINE JEWELL SHAFER:  Because he knew

24    I'd be up.

25                   MS. MCVAY:  Who's Cody?

1                    JASMINE JEWELL SHAFER:  My best friend.

2                    MS. MCVAY:  Oh, okay.  So did he live near

3      you?

4                    JASMINE JEWELL SHAFER:  Yes.  He lived

5      right next door.

6                    MS. MCVAY:  Oh, okay.

7                    JASMINE JEWELL SHAFER:  And so he'd speak

8      to me (indiscernible).

9                    MS. MCVAY:  Uh-huh.

10                    JASMINE JEWELL SHAFER:  But I knew for

11     sure I wasn't allowed to go over the deck.

12                    MS. MCVAY:  Okay.  (Indiscernible.)

13                    JASMINE JEWELL SHAFER:  We would -- I

14     would crack it a little.

15                    MS. MCVAY:  Uh-huh.

16                    JASMINE JEWELL SHAFER:  And then he'd

17     speak to me.

18                    MS. MCVAY:  Oh, okay.  So let's see.

19                    JASMINE JEWELL SHAFER:  But we're kind of

20     whispering.

21                    MS. MCVAY:  You whispered when you were

22     talking to him?  Yeah?

23                    JASMINE JEWELL SHAFER:  I didn't tell him

24     what was going on, though.

25                    MS. MCVAY:  Yeah?

1                    Do you know Cody's last name?

2                    JASMINE JEWELL SHAFER:  Nunes.

3                    MS. MCVAY:  Nunes?  Okay.

4                    And so where was Kaeli when the kitchen --

5                    JASMINE JEWELL SHAFER:  She wasn't born.

6                    MS. MCVAY:  She wasn't born?  Okay.

7                    And were you in school?

8                    JASMINE JEWELL SHAFER:  Yes.  I was in

9    school.

10                   MS. MCVAY:  When that happened?  Yeah?

11                   JASMINE JEWELL SHAFER:  Not at school,

12   but --

13                   MS. MCVAY:  Right.

14                   JASMINE JEWELL SHAFER:  -- I was in

15   school.

16                   MS. MCVAY:  Okay.  Do you know what grade

17   you were in?

18                   JASMINE JEWELL SHAFER:  Kindergarten.

19                   MS. MCVAY:  Oh, okay.  What makes you

20   think you were in kindergarten when that happened?

21                   JASMINE JEWELL SHAFER:  Wait.  Not

22   kindergarten.  It was -- yeah, in kindergarten for the

23   school year.  It was (indiscernible).

24                   MS. MCVAY:  Oh, okay.  So what makes you

25   think you were in kindergarten and it was during the

1    school year?

2                    JASMINE JEWELL SHAFER:  Because -- because

3    it was the (indiscernible).

4                    MS. MCVAY:  Okay.  All right.

5                    Did Jorden say anything to you about not

6    telling about that touching?

7                    JASMINE JEWELL SHAFER:  No.

8                    MS. MCVAY:  Okay.  Or try to give you

9    money?

10                   JASMINE JEWELL SHAFER:  (No audible

11   response.)

12                   MS. MCVAY:  Okay.  And what about did you

13   smell any alcohol that time?

14                   JASMINE JEWELL SHAFER:  No.  I -- before I

15   had really bad allergies, and really, really bad, so I

16   couldn't (indiscernible).

17                   MS. MCVAY:  Okay.

18                   JASMINE JEWELL SHAFER:  But this smell was

19   just strong enough, I breathed -- I could smell it

20   through my mouth.  (Indiscernible.)  Breathe it.

21                   MS. MCVAY:  And what -- are you talking

22   about this time, when this happened, you could smell it?

23                   JASMINE JEWELL SHAFER:  Yeah.

24                   MS. MCVAY:  Okay.

25                   When the time happened in the kitchen,

1    what's -- what do you call the boy's thing?  Do you have

2    another name for the boy's thing you saw?

3                    JASMINE JEWELL SHAFER:  Crotch.

4                    MS. MCVAY:  Crotch?  Okay.

5                    And sometimes when you see the boy's

6    crotch or his thing -- what should we call it while

7    we're talking?

8                    JASMINE JEWELL SHAFER:  Crotch.

9                    MS. MCVAY:  Crotch.  Okay.

10                   When you see that, sometimes it can be

11   hanging down or standing up.

12                   (Recording stopped.)

13                   MS. DUMONT:  Your Honor, I'm -- I have

14   tech support and we're going to run a --

15                   (State's Exhibit 2 played as follows:)

16                   MS. MCVAY:  How did that look when Jorden

17   showed you his crotch?

18                   JASMINE JEWELL SHAFER:  Well, it was

19   like -- like hanging over his pants, so it was a little

20   sticking up.

21                   MS. MCVAY:  Okay.  And what pants did he

22   have?  Like, did he have pants with a zipper or no

23   zipper or something else?

24                   JASMINE JEWELL SHAFER:  I don't know.

25                   MS. MCVAY:  Okay.  You just tell me what

1    you know.

2                    So have you told someone besides me about

3    the kitchen and Jorden touching your vagina?

4                    JASMINE JEWELL SHAFER:  (No audible

5    response.)

6                    MS. MCVAY:  No?  What's the reason you

7    haven't told someone?

8                    JASMINE JEWELL SHAFER:  It's because

9    everyone's thinking I'm lying already.  I don't want no

10   drama.

11                   MS. MCVAY:  Yeah?

12                   JASMINE JEWELL SHAFER:  I don't want no

13   drama queens (indiscernible).

14                   MS. MCVAY:  Okay.  Has someone talked

15   about the drama?

16                   JASMINE JEWELL SHAFER:  They were just

17   arguing (indiscernible).

18                   MS. MCVAY:  Oh, okay.  Who have you heard

19   arguing?

20                   JASMINE JEWELL SHAFER:  Mindy and -- no,

21   wait, not Mindy.  Tanae'a.  That's the only person I

22   have.  I (indiscernible) Trisha had told Deborah and

23   then all of a sudden the word's out.  It's all kinda --

24                   MS. MCVAY:  So they all know?

25                   JASMINE JEWELL SHAFER:  Yep.

```
 1                    MS. MCVAY:  Okay.  What do you think about
 2    that, when they say you're lying or argue about your
 3    lying?
 4                    JASMINE JEWELL SHAFER:  I had -- I'm like,
 5    okay, I may still be a liar, but I'm working on it.
 6                    MS. MCVAY:  Yeah.
 7                    JASMINE JEWELL SHAFER:  I wouldn't lie,
 8    though, about this.
 9                    MS. MCVAY:  Okay.  What do you mean you
10    may have been a liar and you used to?  What --
11                    JASMINE JEWELL SHAFER:  Like, I -- I
12    always liked because I --I was -- I was (indiscernible)
13    trouble.
14                    MS. MCVAY:  Oh.  So what kinds of things
15    did you lie about?
16                    JASMINE JEWELL SHAFER:  I forget.
17                    MS. MCVAY:  Okay.  All right.
18                    Are you worried about anything now?
19                    (State's Exhibit 2 interrupted as
20    follows:)
21                    MR. KNAUSS:  Could we -- could we play
22    that -- that part over?  There was some skipping.
23                    MS. DUMONT:  Okay.
24                    MS. MCVAY:  Do you want some time to work
25    on the tech (indiscernible) opportunity, Ms. Dumont?
```

```
 1                    MS. DUMONT:  Yes.

 2                    (Recess; 10:31 a.m. to 10:39 a.m.)

 3                    (State's Exhibit 2 played as follows:)

 4                    MS. MCVAY:  What kinds of things would you

 5    lie about?

 6                    JASMINE JEWELL SHAFER:  (Indiscernible.)

 7                    MS. MCVAY:  Okay.  Are you worried about

 8    anything now?

 9                    JASMINE JEWELL SHAFER:  I'm worried

10    that -- I've been having some nightmares about Jorden

11    raping me.

12                    MS. MCVAY:  Okay.

13                    JASMINE JEWELL SHAFER:  And I -- he knows

14    where I lived, so that kinda scares me.  He's gonna --

15    if he can make it happen, he --

16                    MS. MCVAY:  Uh-huh.

17                    JASMINE JEWELL SHAFER:  (Indiscernible.)

18    If he can make it out that door.

19                    MS. MCVAY:  Okay.

20                    JASMINE JEWELL SHAFER:  I'm pretty sure my

21    dad (indiscernible), though.

22                    MS. MCVAY:  Okay.  Are you worried about

23    Jorden coming to your house?

24                    JASMINE JEWELL SHAFER:  I am.  It's like

25    (indiscernible).  Like, the door's right by the kitchen,
```

1   so he could just look and see that, okay -- it would be

2   like, "Okay, she's there.  I can do that."  I'm just

3   scared of him coming to my house in the middle of the

4   night.

5                   MS. MCVAY:  Uh-huh.  Okay.

6                   So who did you tell about this?

7                   JASMINE JEWELL SHAFER:  My dad and Trisha.

8                   MS. MCVAY:  Okay.

9                   JASMINE JEWELL SHAFER:  We would

10  (indiscernible) to have Jorden.

11                  MS. MCVAY:  Okay.

12                  JASMINE JEWELL SHAFER:  (Indiscernible.)

13                  MS. MCVAY:  Okay.  So what's the reason

14  you decided to tell them about this thing?

15                  JASMINE JEWELL SHAFER:  Because it's the

16  second time he touched me and I don't feel comfortable

17  about that.

18                  MS. MCVAY:  Okay.  All right.

19                  Have you talked to someone else about what

20  Jorden's done to you?

21                  JASMINE JEWELL SHAFER:  Yeah.  Trisha.

22  Trisha (indiscernible).

23                  MS. MCVAY:  Okay.  All right.

24                  And how did you feel about Jorden before

25  the touching happened both times?  How did you feel

1   about Jorden before?

2                 JASMINE JEWELL SHAFER:  I felt safe with

3   safe Jorden too.

4                 MS. MCVAY:  Okay.

5                 JASMINE JEWELL SHAFER:  I feel like he's

6   going to be a good cousin.

7                 MS. MCVAY:  Okay.

8                 JASMINE JEWELL SHAFER:  Now I'm like:

9   Keep my cousin away from me.  I don't want to see him.

10  I don't want to hear him.  I don't want to talk him.  I

11  don't want nothing to do with him.

12                MS. MCVAY:  Okay.  Do you have any worries

13  about Jorden doing something to someone else?

14                JASMINE JEWELL SHAFER:  I feel like he's

15  gonna hurt people doing this again.

16                (State's Exhibit 2 interrupted as

17  follows:)

18                MR. KNAUSS:  Your Honor, we -- we missed

19  the whole part about the lying subject here.  We're

20  onto -- I would ask that we rewind it to where we left

21  off the first time.

22                THE COURT:  I didn't note where we left

23  off.  We've left off so many times now.  I thought it

24  actually went back and replayed a portion of what I had

25  already heard.

1          MS. DUMONT:  It did, Your Honor.  I

2     actually noted the time and I went back and played

3     before that time.  And I have a transcript here that I

4     did myself, and it played according to the transcript.

5          MR. KNAUSS:  Well --

6          MS. DUMONT:  So I don't know what

7     Mr. Knauss is talking about.

8          THE COURT:  I don't remember what the

9     duplication was, but I thought I heard about two

10    sentences when it started that I had already heard.

11         MR. KNAUSS:  It just --

12         THE COURT:  If you want to rewind it and

13    replay something, that's fine.

14         MR. KNAUSS:  Well, I would ask that we go

15    back to where she finished the drawing.  And then she

16    asked her about, "Has anybody" -- excuse me, not -- no,

17    past that.  After -- after the drawing is where the

18    lying subject came in.  And it didn't all get played.

19         MS. DUMONT:  And, Your Honor, actually it

20    did all get played.  If Mr. Knauss has a certain

21    timestamp, then maybe he could do that on

22    cross-examination.  I'd be more than happy to

23    (indiscernible).

24         MR. KNAUSS:  Well, it got all -- it got

25    all garbled there in an important part.  I'd ask that we

1    go back to where she finished the drawing and --

2              MS. DUMONT:  Is there a time -- is there a

3    time that you want me to go back to?  I'm happy to go

4    back to the time.  I want to (indiscernible).

5              MR. KNAUSS:  Well, where she's finished

6    doing the drawing.  That's where they switched subjects

7    to the lying issue.

8              THE COURT:  What I'm going to do is,

9    Mr. Knauss, if you want to approach and if you want to

10   rewind the tape to the point that you think something

11   has not been played, I'm going to allow that.

12             I'm confident, though, unless these two

13   individuals used the exact same words to have an

14   exchange of about 20 seconds, 15 or 20, when it started

15   again when Ms. Dumont started playing it, that I heard

16   that 15 to 20 seconds of wording when I had been in the

17   courtroom previously.  And I didn't see a snippet that

18   it jumped.

19             But I don't want for you or your client to

20   believe that I've missed a portion of the video.  So if

21   you want to back it back to a specific point, then we'll

22   start there.

23             MR. KNAUSS:  To -- to where the --

24             THE COURT:  Go ahead.

25             MR. KNAUSS:  She finished with the

1    drawing.

2                THE COURT:  If you want to use the State's

3    computer and take it back.

4                MR. KNAUSS:  I don't know if anybody's

5    going to trust me with that, but -- because I don't -- I

6    don't know how to find that.  If somebody can help me go

7    back, we can see her.

8                THE COURT:  Well, if you -- if you --

9                MR. KNAUSS:  We can visually see it while

10   I rewind.

11               THE COURT:  Drag the little -- the little

12   circle that's on the yellow line.  If you drag that

13   back, you should see screenshots of exactly what's

14   happening.

15               MR. KNAUSS:  Well, I'm not --

16               THE COURT:  Ms. Dumont, if you'll assist

17   with the moving of the cursor.

18               (Pause in the proceedings.)

19               MS. DUMONT:  Okay.  Why don't you watch

20   here and I will assist you.

21               MR. KNAUSS:  Okay.  Okay.

22               MS. DUMONT:  And then you tell me where --

23               MR. KNAUSS:  Okay.  That's --

24               MS. DUMONT:  Yeah.  Where you think that's

25   at.

1                    This -- this is way before.  This is way

2      before here.  You want -- you're wanting to go --

3                    MR. KNAUSS:  Oh, I see.  (Indiscernible.)

4                    MS. DUMONT:  What?

5                    MR. KNAUSS:  Let's go back

6      (indiscernible).

7                    MS. DUMONT:  Okay.

8                    MR. KNAUSS:  Let's see what she's saying.

9                    MS. DUMONT:  Okay.  So you want to listen

10     to it now?

11                   MR. KNAUSS:  Yeah.

12                   MS. DUMONT:  Okay.

13                   (State's Exhibit 2 played as follows:)

14                   MS. MCVAY:  Talk to someone else about

15     what Jorden's done to you?

16                   JASMINE JEWELL SHAFER:  And Trisha.

17     Trisha (indiscernible).

18                   MS. MCVAY:  Okay.  All right.

19                   And how did you feel about Jorden before

20     the touching happened both times?  How did you feel

21     about Jorden before?

22                   JASMINE JEWELL SHAFER:  I felt safe with

23     Jorden.

24                   MS. MCVAY:  Yeah.

25                   JASMINE JEWELL SHAFER:  I felt like he's

1   going to be a good cousin.

2               MS. MCVAY:  Okay.

3               JASMINE JEWELL SHAFER:  Now I'm like, Keep

4   (indiscernible).  I don't want to see him.  I don't want

5   to see him.  I don't want to talk to him.  I don't want

6   nothing to do with him.

7               MS. MCVAY:  Do you have any worries about

8   Jorden doing something to someone else?

9               JASMINE JEWELL SHAFER:  I feel like --

10              (State's Exhibit 2 interrupted as

11  follows:)

12              MR. KNAUSS:  It's -- it was before that.

13              THE COURT:  I'll be in another recess,

14  then.  Just cue it up to wherever you want me to listen.

15  I'm -- I'm confident, though, again, that when I came

16  back in the courtroom this most recent time, at least 10

17  to 15, maybe 20 seconds, I'd already heard the exact

18  exchanged between the two individuals.

19              MS. DUMONT:  I also noted the time it went

20  to before the time (indiscernible).

21              THE COURT:  I'll be back.

22              (Recess; 10:47 a.m. to 10:50 a.m.)

23              (State's Exhibit 2 played as follows:)

24              MS. MCVAY:  Okay.  What do you think about

25  that, when they say you're lying or argue about you're

1    lying?

2                    JASMINE JEWELL SHAFER:  In my head, I'm

3    like, okay, I may used to be a liar, but I'm working on

4    it.

5                    MS. MCVAY:  Yeah.

6                    JASMINE JEWELL SHAFER:  I wasn't lying

7    about this.

8                    (State's Exhibit 2 interrupted as

9    follows:)

10                    THE COURT:  Has this been rewound?

11    Because I've heard this twice.

12                    MS. DUMONT:  This is what Mr. Knauss was

13    concerned about.

14                    (State's Exhibit 2 played as follows:)

15                    JASMINE JEWELL SHAFER:  Well, I -- I only

16    used to lie because I -- I -- I was scared of getting in

17    trouble.

18                    MS. MCVAY:  Oh.  So what kinds of things

19    did you lie about?

20                    JASMINE JEWELL SHAFER:  (Indiscernible.)

21                    MS. MCVAY:  Okay.  All right.

22                    Are you worried about anything now?

23                    JASMINE JEWELL SHAFER:  I'm worried

24    that -- I've been having some nightmares about Jorden

25    raping me.

```
 1                    MS. MCVAY:  Okay.

 2                    JASMINE JEWELL SHAFER:  And I -- he knows

 3      where I live.

 4                    MS. MCVAY:  Okay.

 5                    JASMINE JEWELL SHAFER:  So that kind of

 6      scares me he's going to -- if he can make it past me --

 7                    MS. MCVAY:  Uh-huh.

 8                    JASMINE JEWELL SHAFER:  -- and I'm not a

 9      heavy sleeper, he could make it past that door.

10                    MS. MCVAY:  Okay.

11                    JASMINE JEWELL SHAFER:  I'm pretty sure my

12      dad shut off the alarm.

13                    MS. MCVAY:  Okay.  So you're worried about

14      Jorden coming to your house?

15                    JASMINE JEWELL SHAFER:  I am.  It's, like,

16      I can see in the kitchen.  So, like, the door's right by

17      the kitchen.  So he could just look and see me.  It's

18      like, okay.  It would be, like, "Okay.  She's there.  I

19      can do that."  I'm just scared of him coming to my house

20      in the middle of the night.

21                    MS. MCVAY:  Okay.  Okay.

22                    So who did you tell about this?

23                    JASMINE JEWELL SHAFER:  My dad and Trisha.

24      We went to eat without Jorden.

25                    MS. MCVAY:  Uh-huh.  Okay.
```

1              JASMINE JEWELL SHAFER:  And -- and my

2     (indiscernible).

3              MS. MCVAY:  Okay.  So what's the reason

4     you decided to tell them about this thing?

5              JASMINE JEWELL SHAFER:  Because it's the

6     second time he touched me and I don't feel comfortable

7     about that.

8              MS. MCVAY:  Okay.  All right.

9              So did you talk to someone else about what

10    Jorden's done to you?

11             JASMINE JEWELL SHAFER:  Yeah.  And Trisha.

12    Trisha told someone (indiscernible).

13             MS. MCVAY:  Okay.  All right.

14             And how did you feel about Jorden before

15    the touching happened both times?  How did you feel

16    about Jorden before?

17             JASMINE JEWELL SHAFER:  I felt safer

18    around him.

19             MS. MCVAY:  Yeah?

20             JASMINE JEWELL SHAFER:  I felt like he's

21    going to be a good cousin.

22             MS. MCVAY:  Okay.

23             JASMINE JEWELL SHAFER:  Now I'm like:

24    Keep my cousin away from me.  I don't want to see him.

25    I don't want to hear him.  I don't want to talk to him.

1    I don't want nothing to do with him.

2              MS. MCVAY:  Okay.  Do you have any worries

3    about Jorden doing something to someone else?

4              JASMINE JEWELL SHAFER:  I feel like he's

5    going to hurt Kaeli and do what he did to me.

6    (Indiscernible.)  Yeah.  Because Kaeli can't speak for

7    herself much.

8              MS. MCVAY:  Uh-huh.

9              JASMINE JEWELL SHAFER:  And Jorden

10   sometimes watches her.  (Indiscernible.)

11             MS. MCVAY:  Oh, Jorden sometimes watches

12   Kaeli?

13             JASMINE JEWELL SHAFER:  Yes.

14             MS. MCVAY:  Okay.  When would he watch

15   Kaeli?

16             JASMINE JEWELL SHAFER:  I don't know, but

17   I know he used to watch me.  So just me and Kaeli

18   (indiscernible) did watch Kaeli.  You know what I'm

19   saying?

20             MS. MCVAY:  Uh-huh.  Yep.  I understand.

21             So you talked about a couple other things

22   that I want to check in with you about.

23             One I'm just wondering, how do you know

24   what the word "rape" means?  Or what does the word

25   "rape" mean to you?  Let me say that.  What does "rape"

```
 1    mean?
 2                    JASMINE JEWELL SHAFER:  Like, kill and
 3    sexual assault.
 4                    MS. MCVAY:  Okay.  And what's sexual
 5    assault?
 6                    JASMINE JEWELL SHAFER:  I think -- I
 7    really don't know how to explain it.
 8                    MS. MCVAY:  Okay.
 9                    JASMINE JEWELL SHAFER:  But I know that I
10    watched this show where it shows a lot of people
11    (indiscernible) sexual assault and stuff.
12                    MS. MCVAY:  Okay.
13                    JASMINE JEWELL SHAFER:  It's about crimes.
14                    MS. MCVAY:  Okay.  Do you know the name of
15    that show?
16                    JASMINE JEWELL SHAFER:  No.
17                    MS. MCVAY:  Okay.  When do you watch it?
18                    JASMINE JEWELL SHAFER:  Sometimes when --
19    I just watch whatever (indiscernible).
20                    MS. MCVAY:  Okay.  All right.
21    (Indiscernible.)  So that's how you know about that.
22                    And do you -- you said you could smell
23    alcohol.  How do you know what alcohol smells like?
24                    JASMINE JEWELL SHAFER:  Well, I -- I don't
25    know.  It just smelled like alcohol.
```

1          MS. MCVAY:  Have you smelled alcohol

2    before?

3          JASMINE JEWELL SHAFER:  I smelled the

4    cleaning alcohol, but -- I don't know how it smells, but

5    it just smelled like alcohol or something.  Because

6    Jorden does go to the bar at night and gets drunk.

7          MS. MCVAY:  Okay.  So what does it mean to

8    get drunk?

9          JASMINE JEWELL SHAFER:  Like, having too

10   many beers, and then, like, they can't control

11   theirselves.

12         MS. MCVAY:  Okay.

13         JASMINE JEWELL SHAFER:  And they do a lot

14   of crazy stuff.

15         MS. MCVAY:  Okay.

16         JASMINE JEWELL SHAFER:  (Indiscernible.)

17         MS. MCVAY:  Okay.  Who talks about that?

18         JASMINE JEWELL SHAFER:  I just learned it

19   from the show I watch.

20         MS. MCVAY:  Okay.  You've learned a lot,

21   haven't you?

22         So has someone talked about Jorden being

23   drunk that night when this happened?

24         JASMINE JEWELL SHAFER:  No.  I just know

25   he goes in bars because he said he stole a cup from the

1  bar.

2              MS. MCVAY:  He said he stole a cup from

3  the bar?

4              JASMINE JEWELL SHAFER:  Yeah.  The -- the

5  bar was (indiscernible).

6              MS. MCVAY:  Okay.

7              JASMINE JEWELL SHAFER:  At the counter.

8              He said, "Hey, I'm just going to take this

9  cup."

10             And then the guy said -- he even said that

11 he said, "Dude, don't tell me that you're going to take

12 the cup.  (Indiscernible) the worst (indiscernible).

13 Just put it into your coat."  So he actually let him

14 steal it.

15             MS. MCVAY:  Oh, okay.  How do you know

16 about that?

17             JASMINE JEWELL SHAFER:  Jorden said.

18             MS. MCVAY:  Okay.  Jorden told you about

19 that?

20             JASMINE JEWELL SHAFER:  (No audible

21 response.)

22             MS. MCVAY:  Okay.  All right.

23             Has Jorden done something else to you that

24 wasn't okay?

25             JASMINE JEWELL SHAFER:  It -- it includes

1    showing, like, a video of people being naked in the

2    shower together.

3                MS. MCVAY:  That -- tell me about that.

4                JASMINE JEWELL SHAFER:  He showed me the

5    video (indiscernible).

6                MS. MCVAY:  Okay.

7                JASMINE JEWELL SHAFER:  And then

8    (indiscernible) being in the shower together.

9                MS. MCVAY:  Okay.  Were they grownups or

10   kids or --

11               JASMINE JEWELL SHAFER:  Grownups.

12               MS. MCVAY:  Okay.  Where -- when did this

13   happen?  When did Jorden show you that?

14               JASMINE JEWELL SHAFER:  Oh, a couple days

15   before the kitchen.

16               MS. MCVAY:  Oh, so before the kitchen

17   touching happened, he had showed you a video?

18               JASMINE JEWELL SHAFER:  (No audible

19   response.)

20               MS. MCVAY:  Where -- where were you when

21   he showed you the video?

22               JASMINE JEWELL SHAFER:  A car.

23               MS. MCVAY:  A car?

24               JASMINE JEWELL SHAFER:  Uh-huh.

25               MS. MCVAY:  What were you doing in the

1    car?

2              JASMINE JEWELL SHAFER:  We were listening

3    to (indiscernible).

4              MS. MCVAY:  Okay.

5              JASMINE JEWELL SHAFER:  I thought it was

6    just, you know, like, a kid video, but it wasn't.

7              MS. MCVAY:  Okay.

8              JASMINE JEWELL SHAFER:  He (indiscernible)

9    woke up watching the video.  He just puts his seat

10   (indiscernible).  I don't believe that.

11             MS. MCVAY:  What do you mean?  When did he

12   say that?

13             JASMINE JEWELL SHAFER:  The day it

14   (indiscernible).

15             MS. MCVAY:  Okay.  When this happened?

16             JASMINE JEWELL SHAFER:  Yeah.  He said

17   he's sleeping.  People don't do that if you're sleeping.

18             MS. MCVAY:  Okay.  So how do you know that

19   he said he was sleeping --

20             JASMINE JEWELL SHAFER:  He told me.

21             MS. MCVAY:  -- and watched the video?

22             JASMINE JEWELL SHAFER:  He told me.

23             MS. MCVAY:  When did he tell you that?

24             JASMINE JEWELL SHAFER:  (Indiscernible)

25   like to tell anybody.

1                    MS. MCVAY:  Oh, so when he was telling you

2     to not talk -- or trying to get you to not tell anybody

3     about what happened, he said he was sleeping and must

4     have been watching something?

5                    JASMINE JEWELL SHAFER:  Yeah.

6                    MS. MCVAY:  And touched you?  Did I get

7     that right?

8                    JASMINE JEWELL SHAFER:  I -- I think he

9     meant two different things.

10                    MS. MCVAY:  Okay.  What did he mean?  Tell

11     me again what he said about sleeping and the video.

12                    JASMINE JEWELL SHAFER:  He said he woke up

13     watching the video.  He went to sleep (indiscernible).

14     But I just don't believe him, because he's --

15                    MS. MCVAY:  Oh, okay.

16                    JASMINE JEWELL SHAFER:  -- he's lied

17     before in the past.

18                    MS. MCVAY:  Oh, okay.  So did you see a

19     video like that on the TV that night when this touching

20     happened?

21                    JASMINE JEWELL SHAFER:  (No audible

22     response.)

23                    MS. MCVAY:  So let's go back to the video

24     he showed you before the kitchen touching.

25                    So you were in the car and he -- what did

1    he show you the video on?  What was he showing you?

2                    JASMINE JEWELL SHAFER:  His phone.

3                    MS. MCVAY:  Oh, his phone.  Okay.

4                    JASMINE JEWELL SHAFER:  So he either

5    downloaded the video or --

6                    MS. MCVAY:  Uh-huh.

7                    JASMINE JEWELL SHAFER:  -- he took a video

8    of it.

9                    MS. MCVAY:  Oh, okay.  So you don't know

10   if it was real people you knew that he videoed or maybe

11   he downloaded it?

12                   JASMINE JEWELL SHAFER:  I don't know if he

13   put secret cameras.  I doubt he would do that, because

14   he's not (indiscernible).

15                   MS. MCVAY:  Yeah.

16                   JASMINE JEWELL SHAFER:  Technology person.

17                   MS. MCVAY:  Okay.  So what --

18                   JASMINE JEWELL SHAFER:  Or if -- or if his

19   friend videotaped it for him.

20                   MS. MCVAY:  Okay.  Did he say?

21                   JASMINE JEWELL SHAFER:  No.

22                   MS. MCVAY:  Okay.

23                   JASMINE JEWELL SHAFER:  He didn't say

24   anything about it.  He just said, "You want to see a

25   video?"

```
 1                    I'm like, "Okay."
 2                    MS. MCVAY:  Did he -- was it on the same
 3        phone he has now or is it -- was it a --
 4                    JASMINE JEWELL SHAFER:  I don't know.
 5                    MS. MCVAY:  -- different phone?
 6                    JASMINE JEWELL SHAFER:  I don't know.
 7                    MS. MCVAY:  So who --
 8                    JASMINE JEWELL SHAFER:  It's probably the
 9        same phone, if he woke up watching it.
10                    MS. MCVAY:  Okay.  What -- who was in the
11        video?
12                    JASMINE JEWELL SHAFER:  I don't know.
13        (Indiscernible.)
14                    MS. MCVAY:  And were they -- you said
15        adults.  And were they boys?  Girls?  Both?
16                    JASMINE JEWELL SHAFER:  Boys and girls.
17                    MS. MCVAY:  Boy and girl in the shower?
18                    JASMINE JEWELL SHAFER:  Yeah.
19                    MS. MCVAY:  And what were they doing?
20                    JASMINE JEWELL SHAFER:  They were just
21        taking a shower.  I don't know whether his friend did
22        take it for him or what.
23                    MS. MCVAY:  Uh-huh.
24                    So they were taking a shower?
25                    JASMINE JEWELL SHAFER:  Yes.
```

1              MS. MCVAY:  What does that mean?  They
2    were in the shower and what were they doing?
3              JASMINE JEWELL SHAFER:  They were naked.
4    They were taking a shower.
5              MS. MCVAY:  Okay.  All right.
6              Let's see.  Has he -- has Jorden shown you
7    other videos?
8              JASMINE JEWELL SHAFER:  No.
9              MS. MCVAY:  Has someone else shown you
10   videos besides Jorden?
11             JASMINE JEWELL SHAFER:  No.
12             MS. MCVAY:  Okay.  And when I say that, I
13   mean like videos of people naked.
14             JASMINE JEWELL SHAFER:  No.
15             MS. MCVAY:  Okay.
16             JASMINE JEWELL SHAFER:  But I remember
17   when -- when I was with my mom, my friend was
18   inappropriate.
19             MS. MCVAY:  Uh-huh.
20             JASMINE JEWELL SHAFER:  She'd talk a lot
21   about the S-E-X.
22             MS. MCVAY:  Uh-huh.  When you were with
23   your mom Denise?
24             JASMINE JEWELL SHAFER:  Yes.
25             MS. MCVAY:  You had a friend that talked

1    about S-E-X?

2              JASMINE JEWELL SHAFER:  Yeah.

3              MS. MCVAY:  Oh.  What did your friend say?

4              JASMINE JEWELL SHAFER:  She's like,

5    "Parents have S-E-X."  Only she said the whole word.

6              MS. MCVAY:  She said the word.  Okay.

7              Did she show you videos of people doing

8    S-E-X?

9              JASMINE JEWELL SHAFER:  No, but Mom had

10   this book of naked people.  And apparently she would put

11   in her- -- my mom's closet, out like, "Let's look at

12   this book."

13             MS. MCVAY:  Your friend did?

14             JASMINE JEWELL SHAFER:  Yeah.

15             MS. MCVAY:  Oh, okay.

16             JASMINE JEWELL SHAFER:  We were, "Okay."

17   We were really little.  But she knew a lot better

18   because she was older.

19             MS. MCVAY:  Okay.  Has someone ever wanted

20   to take your picture with clothes off?  Or try to take a

21   movie?

22             JASMINE JEWELL SHAFER:  Did they try to do

23   that?  (Indiscernible.)

24             MS. MCVAY:  Okay.  Did they try to do that

25   to you?

1          JASMINE JEWELL SHAFER:  Yeah.

2          MS. MCVAY:  Okay.

3          JASMINE JEWELL SHAFER:  I don't

4    (indiscernible).

5          MS. MCVAY:  Okay.

6          Has someone else done touching to you

7    besides Jorden?

8          JASMINE JEWELL SHAFER:  (No audible

9    response.)

10          MS. MCVAY:  Let's see.  Some -- has

11    someone ever wanted you to touch on their body?

12          JASMINE JEWELL SHAFER:  My friend did.

13          MS. MCVAY:  Tell me about that.

14          JASMINE JEWELL SHAFER:  She'd, like, get

15    naked, and like play around.

16          MS. MCVAY:  Uh-huh.

17          JASMINE JEWELL SHAFER:  And then she'd

18    have me look behind a blanket in my room and she's,

19    like, "Okay.  Take the blindfold off your head."  And I

20    would take it, I'm like (demonstrative sound).

21          MS. MCVAY:  And then what would happen?

22    Then what happened?

23          JASMINE JEWELL SHAFER:  And then she'd,

24    like, get on me.

25          MS. MCVAY:  Uh-huh.  Without her clothes

1   on?

2                    JASMINE JEWELL SHAFER:  Yeah.

3                    MS. MCVAY:  And then what did she do?

4                    JASMINE JEWELL SHAFER:  (No audible

5   response.)

6                    MS. MCVAY:  Okay.  How old were you when

7   that happened?

8                    JASMINE JEWELL SHAFER:  I was the same

9   age.

10                   MS. MCVAY:  As you are now?

11                   JASMINE JEWELL SHAFER:  No.

12                   MS. MCVAY:  Same age as what?

13                   JASMINE JEWELL SHAFER:  Three.

14  (Indiscernible.)

15                   MS. MCVAY:  Oh, is this the friend that

16  talked about the S-E-X?

17                   JASMINE JEWELL SHAFER:  Yeah.

18  (Indiscernible.)

19                   MS. MCVAY:  Okay.  When you were with your

20  mom?

21                   JASMINE JEWELL SHAFER:  Yes.

22                   MS. MCVAY:  Oh, okay.  I think I

23  understand.

24                   I think that was most of my questions.  I

25  think I've got another question about when Jorden

1    touched you in the kitchen.  You said Kaeli wasn't born

2    yet.

3                    JASMINE JEWELL SHAFER:  Yeah.

4                    MS. MCVAY:  And your mom -- or Trisha and

5    your dad were asleep.

6                    JASMINE JEWELL SHAFER:  Yeah.

7                    MS. MCVAY:  And Jorden was with you there?

8                    JASMINE JEWELL SHAFER:  Yeah.

9                    MS. MCVAY:  And did someone else live with

10   you at that apartment?

11                   JASMINE JEWELL SHAFER:  No.

12                   MS. MCVAY:  Okay.  Let's see.

13                   Did your dad work?

14                   JASMINE JEWELL SHAFER:  Yeah.  I think he

15   worked at Safeway.

16                   MS. MCVAY:  Oh, okay.

17                   JASMINE JEWELL SHAFER:  No, wait.  That

18   was when I was older.

19                   MS. MCVAY:  That was when you were older?

20                   JASMINE JEWELL SHAFER:  Yeah.

21                   MS. MCVAY:  So it was before your dad

22   worked at Safeway?

23                   JASMINE JEWELL SHAFER:  Yeah.

24                   MS. MCVAY:  What about Trisha?  Was Trisha

25   working --

```
1                    JASMINE JEWELL SHAFER:  Yes.
2                    MS. MCVAY:  -- when the kitchen touching
3      happened?
4                    Where was she working?
5                    JASMINE JEWELL SHAFER:  She works at --
6      she works, like, at a factory that makes, like,
7      (indiscernible) clothes and (indiscernible) stuff like
8      that.
9                    MS. MCVAY:  Okay.  Does she work at the
10     same place now?
11                   JASMINE JEWELL SHAFER:  Pretty -- she
12     (indiscernible).
13                   MS. MCVAY:  Oh.
14                   JASMINE JEWELL SHAFER:  She has
15     (indiscernible) to give Kaeli (indiscernible).  But she
16     still has to go (indiscernible).
17                   MS. MCVAY:  Oh, okay.  So she's
18     (indiscernible).  She doesn't work.
19                   JASMINE JEWELL SHAFER:  Yeah.
20     (Indiscernible.)
21                   MS. MCVAY:  I am sure I've probably missed
22     some questions, but you remember how Ms. Gabby and I
23     work together.
24                   JASMINE JEWELL SHAFER:  Yeah.
25                   MS. MCVAY:  But she's not in here.  So
```

1    what I'm going to do is I'm going to let you do some

2    coloring.  I'm going to go check with (indiscernible).

3    And I'll come back and we'll finish talking.

4                    JASMINE JEWELL SHAFER:  Okay.

5                    MS. MCVAY:  Sound good?

6                    JASMINE JEWELL SHAFER:  (No audible

7    response.)

8                    MS. MCVAY:  All right.  I'll be back.

9                    (State's Exhibit 2 interrupted as

10   follows:)

11                   MS. DUMONT:  Your Honor, unless there's an

12   objection, I'd like to just fast-forward through this

13   break, when no one else is in the room except for the

14   victim, if that's --

15                   THE COURT:  Mr. Knauss?

16                   MS. DUMONT:  -- okay.

17                   MR. KNAUSS:  That's fine.

18                   THE COURT:  I assume that she would be

19   shown just continuing to color the picture she's

20   coloring.

21                   MS. DUMONT:  Yes, Your Honor.  There's no

22   talking.  There's just her sitting there.

23                   MR. KNAUSS:  Right.

24                   THE COURT:  Go ahead.

25                   (Pause in the proceedings.)

```
 1                    (State's Exhibit 2 played as follows:)
 2                    MS. MCVAY:  Oh, very nice.  I like the
 3      colors you picked.  I'm glad you finally (indiscernible)
 4      colored picture to color.  (Indiscernible.)
 5                    Do you like to draw?
 6                    JASMINE JEWELL SHAFER:  Yeah.
 7                    MS. MCVAY:  Sometimes?
 8                    JASMINE JEWELL SHAFER:  Yeah.
 9                    MS. MCVAY:  So I had to have a few things
10      before we're done, okay?
11                    Did you think of anything while I was gone
12      that we should talk about?
13                    JASMINE JEWELL SHAFER:  No.
14                    MS. MCVAY:  Nope.  You were coloring your
15      picture.  All right.  I did not write anything down, so
16      hopefully I will remember them all.
17                    Okay.  I had a couple questions, about
18      this many, when the touching happened by Jorden.  And
19      then I had another question about the kitchen.  How
20      about we do the kitchen real quick?
21                    JASMINE JEWELL SHAFER:  Okay.
22                    MS. MCVAY:  So when you said Jorden showed
23      you his -- pulled out his crotch, and you called it his
24      thing, I'm pretty sure I know what you mean, but I don't
25      want to guess wrong.  So I have a drawing of a boy and
```

```
1    it shows all their body parts.  So their privates and
2    their eyes and their ears and everything.
3                Do you think you think you could circle
4    for me on this drawing which part it is?  I think
5    (indiscernible) probably, but that way I'm never
6    guessing what you mean.  Although that mark
7    (indiscernible), which part is the crotch you were
8    talking about?
9                Okay.  All right.  Thank you.  I will
10   write that so I remember later when I look at it.
11   "Crotch" and "thing," right?
12               JASMINE JEWELL SHAFER:  Uh-huh.
13               MS. MCVAY:  That's what you called it?
14               All right.  Has someone else ever shown
15   you their crotch or thing?
16               JASMINE JEWELL SHAFER:  (No audible
17   response.)
18               MS. MCVAY:  Okay.  Have you ever seen
19   someone's crotch on accident?
20               JASMINE JEWELL SHAFER:  No.
21               MS. MCVAY:  No.
22               JASMINE JEWELL SHAFER:  Once I
23   accidentally walked in the boys' bathroom.
24               MS. MCVAY:  Okay.
25               JASMINE JEWELL SHAFER:  But thankfully,
```

1  there's no one in there.

2                 MS. MCVAY:  No one was in there?  Good.

3                 JASMINE JEWELL SHAFER:  (Indiscernible.)

4                 MS. MCVAY:  Oh, okay.

5                 JASMINE JEWELL SHAFER:  Right next to each

6  other.  So you just (indiscernible).

7                 MS. MCVAY:  You were in the wrong

8  bathroom, but you couldn't see anything?

9                 JASMINE JEWELL SHAFER:  Yeah.

10                 MS. MCVAY:  Okay.

11                 JASMINE JEWELL SHAFER:  (Indiscernible) no

12  one was in there.

13                 MS. MCVAY:  Okay.  I gotcha.

14                 JASMINE JEWELL SHAFER:  And then the --

15  the teacher's helper was like, "What are you doing in

16  here?"

17                 I'm like, "I thought this was the girls'."

18                 And then he's like, "The one with the girl

19  with the dress at the top of the bathroom is the

20  girls'."

21                 MS. MCVAY:  The girls' room.

22                 JASMINE JEWELL SHAFER:  I'm like, "I don't

23  look."

24                 MS. MCVAY:  But then you did?

25                 JASMINE JEWELL SHAFER:  Yeah.

 1                    MS. MCVAY:  Good job.

 2                    When Jorden showed you the video of the --

 3     the man and the woman in the shower, with the girl and

 4     the boy in the shower, could you see his crotch in the

 5     picture?

 6                    JASMINE JEWELL SHAFER:  I think I could.

 7                    MS. MCVAY:  Okay.  All right.

 8                    Let's see.  Has someone ever wanted you to

 9     do something with your mouth on their body?

10                    JASMINE JEWELL SHAFER:  (No audible

11     response.)

12                    MS. MCVAY:  Okay.

13                    JASMINE JEWELL SHAFER:  They'd probably

14     get punched if they did.

15                    MS. MCVAY:  Has someone ever put a body

16     part in your mouth?

17                    JASMINE JEWELL SHAFER:  No.

18                    MS. MCVAY:  Okay.  All right.  Just

19     checking.

20                    And then let's see.  I didn't write down

21     (indiscernible).  I have a couple questions just to

22     check in with you about this time when you were

23     sleeping.

24                    Okay.  So you said you were sleeping and

25     you were dreaming --

```
1                    JASMINE JEWELL SHAFER:  Yes.
2                    MS. MCVAY:  -- when this happened by
3      Jorden, right?
4                    JASMINE JEWELL SHAFER:  Yeah.  But when I
5      wake up, sometimes dreams do (indiscernible).
6                    MS. MCVAY:  Okay.  So I was wondering how
7      do you know Jorden touched you and it wasn't just a
8      dream?
9                    JASMINE JEWELL SHAFER:  Because the --
10     well, it actually went in the shirt and it -- Jorden was
11     saying, "Please don't tell anyone that I did that.  I
12     was sleeping."
13                   MS. MCVAY:  Okay.
14                   JASMINE JEWELL SHAFER:  So he basically
15     admitted it.
16                   MS. MCVAY:  Okay.  So what did you feel on
17     your body --
18                   JASMINE JEWELL SHAFER:  I felt --
19                   MS. MCVAY:  -- this night?
20                   JASMINE JEWELL SHAFER:  I felt a finger --
21                   MS. MCVAY:  Okay.
22                   JASMINE JEWELL SHAFER:  -- moving.
23                   MS. MCVAY:  Moving on your boob?  Okay.
24                   And you felt a finger.  How did that feel?
25                   JASMINE JEWELL SHAFER:  It felt weird.
```

1              MS. MCVAY:  Okay.  And what were you

2     wearing that night when this touching happened?

3              JASMINE JEWELL SHAFER:  A shirt and bra.

4              MS. MCVAY:  Shirt and a bra.  Okay.

5              And is that what you usually wear to bed?

6              JASMINE JEWELL SHAFER:  Yes.

7              MS. MCVAY:  Okay.  And let's see.

8              And then you said you heard him gasp.

9              JASMINE JEWELL SHAFER:  Yes.  When I said,

10    "What?"

11             MS. MCVAY:  "What?"  And you -- was

12    that --

13             JASMINE JEWELL SHAFER:  And it sounded

14    like Jorden.

15             MS. MCVAY:  And it sounded like Jorden?

16    The gasp sounded like Jorden?

17             JASMINE JEWELL SHAFER:  Yes.

18             MS. MCVAY:  Okay.  And how come it didn't

19    sound like your dad?

20             JASMINE JEWELL SHAFER:  Because he was

21    upstairs and Jorden was right by the couch.

22             MS. MCVAY:  Okay.  So your dad wasn't in

23    the living room --

24             JASMINE JEWELL SHAFER:  No.

25             MS. MCVAY:  -- when that -- when you woke

1    up and that happened?

2                    JASMINE JEWELL SHAFER:  Yes.

3                    MS. MCVAY:  Okay.  I got that right.

4                    JASMINE JEWELL SHAFER:  Yeah.

5                    MS. MCVAY:  Your dad and Trisha were

6    asleep?

7                    JASMINE JEWELL SHAFER:  Yes.

8                    MS. MCVAY:  Okay.

9                    JASMINE JEWELL SHAFER:  But I know my dad

10   (indiscernible) because he called the cops.

11                   MS. MCVAY:  Oh, okay.  Uh-huh.  I gotcha.

12                   Let's see.  Was there anything else about

13   this night when this touching happened by Jorden?

14                   JASMINE JEWELL SHAFER:  No.

15                   MS. MCVAY:  No?  Okay.

16                   And I already -- I already asked you all

17   the questions about that.  And we talked about Jorden

18   telling you not to -- asking you not to talk about it.

19   All right.

20                   Let's see.  I think we've done a lot of

21   talking.  So unless there was anything more to talk

22   about, about Jorden, we could probably be done talking.

23                   You missed school today.  Do you miss the

24   whole day?

25                   JASMINE JEWELL SHAFER:  I'm pretty sure,

1  because it was a half day today.

2              MS. MCVAY:  Oh, it was?

3              JASMINE JEWELL SHAFER:  I probably missed

4  lunch.

5              MS. MCVAY:  Oh, okay.  So what are you

6  going to do for lunch?

7              JASMINE JEWELL SHAFER:  (Indiscernible.)

8              MS. MCVAY:  Something.  Get some food?

9  (Indiscernible.)  Do you guys have any other plans for

10  your day?

11              JASMINE JEWELL SHAFER:  I don't know.

12              MS. MCVAY:  You don't know?  Did you have

13  any homework you missed today at school?

14              JASMINE JEWELL SHAFER:  We don't have

15  homework (indiscernible).

16              MS. MCVAY:  You don't?

17              JASMINE JEWELL SHAFER:  Drills class, yes.

18              MS. MCVAY:  Okay.  Really?  Oh, wow.

19              JASMINE JEWELL SHAFER:  (Indiscernible.)

20  Last day of school.

21              MS. MCVAY:  Any school.  Well, that's

22  pretty cool.

23              JASMINE JEWELL SHAFER:  In third grade

24  (indiscernible) have homework.

25              MS. MCVAY:  Oh, really?

1                    JASMINE JEWELL SHAFER:  (Indiscernible.)

2    We don't have homework.  We -- what are you talking

3    about?

4                    MS. MCVAY:  Yeah.

5                    JASMINE JEWELL SHAFER:  And she's like,

6    "What?  I have homework every single day but you don't

7    have homework."

8                    MS. MCVAY:  That's funny.  You don't have

9    homework?  Oh, all right.  Well --

10                   JASMINE JEWELL SHAFER:  (Indiscernible.)

11                   MS. MCVAY:  (Indiscernible.)

12                   JASMINE JEWELL SHAFER:  Half days.

13                   MS. MCVAY:  Yeah?

14                   JASMINE JEWELL SHAFER:  (Indiscernible.)

15                   MS. MCVAY:  Nice.

16                   Well, let's be done talking, okay?

17                   JASMINE JEWELL SHAFER:  (Indiscernible.)

18                   MS. MCVAY:  Yeah.

19                   JASMINE JEWELL SHAFER:  Thank you.

20                   MS. MCVAY:  You're welcome.

21                   JASMINE JEWELL SHAFER:  (Indiscernible.)

22                   MS. MCVAY:  Oh, I -- probably cold now,

23    huh?

24                   JASMINE JEWELL SHAFER:  Yeah.

25

Amanda McVay - D                                  258

1                    (State's Exhibit 2 interrupted as

2      follows:)

3                    MS. DUMONT:  I'm going to turn off the

4      video now, because they're leaving.

5                    (Recording stopped.)

6                    THE COURT:  Mr. Knauss, do you object to

7      the video being turned off?

8                    MR. KNAUSS:  No.

9                    THE COURT:  Let's turn the light back on.

10                    DIRECT EXAMINATION RESUMED

11     BY MS. DUMONT:

12        Q.    During the video, there was a drawing that was

13     done as well as a circling of an anatomical part.  I'm

14     going to show you what's been previously marked as

15     State's Exhibit 3.  What is that?

16        A.    It's a copy of the drawing that Jasmine drew

17     while talking with me.

18        Q.    Okay.

19        A.    And the bottom one's the anatomical drawing

20     that we used during the interview.

21        Q.    Okay.  And with respect to the drawing that she

22     did, you said -- you noted that it was a copy.  Is --

23     was the -- is there a difference in terms of the color

24     between this and the one on the video?

25        A.    Yes.  She was using colored markers --

Amanda McVay - D

1       Q.    Okay.

2       A.    -- during the evaluation, so it's black and

3  white rather than color.

4       Q.    And which incident was this referring to that

5  she did the drawing of?

6       A.    So this drawing here was the night when she

7  woke up and said that Jorden had touched her.  So the

8  most recent incident.

9       Q.    Okay.  And then the second page has the

10 anatomical drawing.  And what does this show?

11      A.    She circled the penis on the drawing, which she

12 identified as a "crotch" or a "thing."  And that was

13 when she was talking about what happened in the kitchen

14 when she was younger.  So it was a prior incident.

15            MS. DUMONT:  And the State moves to admit

16 into evidence State's Exhibit 3.

17            MR. KNAUSS:  No objection.

18            THE COURT:  3 will be received.

19            (State's Exhibit 3 received.)

20 BY MS. DUMONT:

21      Q.    I want to talk to you just briefly about

22 several concepts.  And you touched on some of them

23 before, but I want to, having watched the video, go over

24 a few of them.

25            Now, what -- when you're doing these

Amanda McVay - D

1    interviews, what is -- what is recantation?

2        A.    So recantation can come up for children where

3    they have initially made a -- an outcry or a statement

4    regarding something that happened to them, and then

5    later take it back and say, "No, that wasn't true," or

6    "You -- you didn't get it right."

7             So that frequently happens when children do

8    not have a supportive caregiver or parent in their

9    lives.  So someone that brushes off what the disclosure

10   was, doesn't believe them, tells them they don't believe

11   them, tells them they're lying, or is just not

12   supportive of that child.  That's typically when

13   recantation can come up or things in their life have

14   changed.

15            Sometimes children have to move or the

16   person who did something to them may be in trouble or

17   they're out of the home.  There are just various reasons

18   that may influence or affect a child to then take back

19   their initial statements because things have happened in

20   their life that they don't want to see happen and

21   they'll take it back because it's easier and things can

22   just go back to normal.  So --

23       Q.    In this case, was there was a concern about

24   recantation?

25       A.    You know, Jasmine's statements remained

Amanda McVay - D                          261

1    consistent from the initial disclosure.  There was some

2    thought while I was doing the interview that she could

3    recant, just based on the fact that she had heard people

4    were calling her a liar and that people didn't believe

5    her.  Not her dad, or her father, who is primary

6    caretaker.

7              So with the piece of a primary caretaker

8    being supportive and saying, "I believe you and I'm

9    going to get some help," that weighed it more for me, in

10   the fact that I wasn't as concerned about recantation.

11   But not knowing what was going to happen after the eval

12   or what was going to follow up from her disclosure, I

13   was possibly concerned that there could be some pressure

14   from outside family members or caregivers that might

15   influence her, just based on her feelings.  Not that

16   they directly influenced her, but she may feel like --

17   that it's too much.

18       Q.   And you mentioned or you talked a little bit at

19   the beginning about suggestibility.  Was that a concern

20   for you in this particular case?

21       A.   No.

22       Q.   Why not?

23       A.   First of all, as you can see, developmentally

24   she's actually probably doing much better than the

25   average ten-year-old.  But she's not preschool-aged,

Amanda McVay - D                          262

1    which is when the concerns for suggestibility are the

2    highest.  And she provided narrative and free flowing,

3    without even much solicitation through the evaluation.

4        Q.   That last portion, where you talked about

5    providing free-flowing narrative, what -- why is that

6    important?  Or what does that mean exactly?

7        A.   So as part of my job as an interviewer, I ask

8    more open-ended questions initially to solicit that

9    free-flowing narrative, the children's own words, rather

10   than more focused questions, like who, what where.

11            So we say, "Tell me everything," or "What

12   happened next?"  I'll elicit that free-flowing

13   narrative.

14            However, as you could see by watching this,

15   even when I asked a more direct question, she not only

16   answered that direct question, but then gave additional

17   narrative openly on her own.  She started doing that in

18   the exam room even before transitioning to the interview

19   room.

20       Q.   You talked a little bit before about

21   alternative hypotheses and that's part of your job is to

22   sort of look at those.  Did you do that in this

23   interview with -- with her?

24       A.   Yes.

25       Q.   Okay.  And -- and how did you do that?

Amanda McVay - D

1     A.     So when she brought up the fact that she's

2     lied, that oftentimes can be an alternative hypothesis

3     anyway.   She had already disclosed that and talked about

4     that and, in fact, said and admitted, "I've lied in the

5     past, but I'm not -- I wouldn't lie about this," which

6     is also consistent with what my training and experience

7     is, that most children do not make up sexual -- sexual

8     abuse.   Not that they don't, but there -- there is that

9     percent chance, but it's like 1.8 percent chance.

10                But in exploring those lines --

11                THE COURT:  I -- I'm concerned about the

12     testimony that I just heard, in light of the recent line

13     of cases regarding the opinion of an expert witness

14     regarding the believability and veracity of a child in

15     this type of a situation.   And I -- I'm unsure whether

16     this is a case where the Court of Appeals and Supreme

17     Court have indicated that the Court has to interject and

18     strike that testimony.   And I'm positing that to both of

19     the attorneys.

20                MR. KNAUSS:  Well, Your Honor, I would

21     object to her rending that opinion.   I move to strike

22     that comment.

23                MS. DUMONT:  I have not attempted to

24     elicit her to comment on the veracity of this child.

25                THE COURT:  I --

Amanda McVay - D                                    264

1              MS. DUMONT:  And so if that was the end

2    result of the question, I would ask that that be

3    stricken.

4              THE COURT:  All right.  I'm concerned that

5    either that portion of the testimony is testimony that I

6    must strike or that that testimony is precariously close

7    to the line that the Court has to strike.

8              Given that this is a Court trial and not a

9    jury trial, and given what you've indicated, Ms. Dumont,

10   I'm going to strike the entire last response to the

11   entire last question for clarity.  So I'm going to need

12   you to reask the last question and I'm going to need you

13   to not answer the last portion that I've just spoken

14   about.

15             And, Ms. Dumont, if you need me to go in

16   my office and review the record to find your last

17   question, I will do that, given my interjection that no

18   one was expecting.

19             MS. DUMONT:  I think I'm confident in

20   proceeding right now.

21             THE COURT:  Go ahead.

22   BY MS. DUMONT:

23   Q.   I had asked, generally speaking, about you

24   exploring -- I'm just going to situate us -- you

25   exploring alternative hypotheses, and you said one of

Amanda McVay - D

1    the alternative hypotheses is that she -- about someone

2    lying.  And that Jasmine talked about lying on the past,

3    okay?

4              And then when you explored this with her,

5    what was her response?

6        A.   So when I explored that with her, she said, I

7    believe, that she had lied in the past about things, but

8    she's working on that, and she wouldn't lie about what

9    she had said happened by Jorden.

10       Q.   Okay.  And did you explore other alternative --

11   alternative hypotheses?

12       A.   Yes.  There was an alternative hypotheses that

13   it could have been someone else, as she had talked about

14   being in the room watching television and her father was

15   there and Jorden was there.  And then saying -- and then

16   I believe Misty [sic] was upstairs.

17       Q.   Okay.

18       A.   Or I apologize if I have the name wrong.

19             So I explored that further with her about,

20   well, how did she know it wasn't her father?  And I

21   believe she talked about that and said that he was

22   upstairs and it was just Jorden in the room.  And that

23   it sounded like Jorden.

24             She also, to kind of ex- -- I'm going to

25   stop there.

Amanda McVay - D

1      Q.    Okay.  So she said it sounded like Jorden and

2  her father was upstairs when Jorden was there.  Okay.

3            Did you explore a dream hypothesis?

4      A.    Yes.

5      Q.    Okay.  And how did you explore that?

6      A.    So in talking with her about that, I went back

7  to what did she feel?  What she heard.  She

8  spontaneously talked about what she smelled.  So all of

9  those other sensory details to elicit a more concrete

10 information about what happened to her at that time.

11     Q.    Okay.  And you talked about --

12            MR. KNAUSS:  I object to that last

13 response and move to strike.

14            THE COURT:  What's the basis of the

15 objection?

16            MR. KNAUSS:  That she's interjecting her

17 opinion or attempting to show that she -- that this

18 child responded so that the hypothesis wouldn't be true.

19 It's my belief that she can only -- we can talk about

20 other hypotheses.  "So what did you do about it?"  And

21 "What did the kid say?"

22            I mean, I -- it's got to be limited to

23 that because whenever she editorializes that, then it

24 goes to her attempts to support a position that she's

25 telling the truth.

Amanda McVay - D                                    267

1                    THE COURT:  Ms. Dumont.

2                    MS. DUMONT:  I think that she did exactly

3     what Mr. Knauss said.  She described the hypothesis and

4     she's told us, the Court, what questions she asked, and

5     then talked about the responses that elicited, and that

6     those responses are sensory responses.  And she talked

7     in specific about feeling, hearing, and smelling.  I

8     think that's completely exactly what Mr. Knauss said

9     would be an appropriate response.  So I don't understand

10    his objection.

11                   THE COURT:  Mr. Knauss, any additional

12    objection?

13                   MR. KNAUSS:  No.

14                   THE COURT:  I'm going to allow the answer

15    to remain.

16                   Go ahead with your next question, please.

17    BY MS. DUMONT:

18        Q.   And we talked about sensory details.  I want to

19    ask you a little bit, is it -- in your training and

20    experience, when you're doing interviews, is it

21    important or noteworthy when children recount events and

22    use different senses?

23        A.   Could you be more specific in your question,

24    please?

25        Q.   Sure.

Amanda McVay - D                                    268

1            When you talked about sensory details, as an

2    interviewer, when you're interviewing someone are those

3    sensory details important to your interview?

4        A.   Gathering as much information as we can from

5    the child about what may have happened to them is the

6    goal.  And that includes anything that's possibly

7    sensory.  So not just telling us what happened, but also

8    what was felt, what they smelled, what they heard, how

9    their body felt.

10       Q.   Okay.  And in this case, did you get some of

11   those sensory details from Jasmine?

12       A.   Yes.

13       Q.   And what kind of sensory detail did she relate

14   to you?

15       A.   She talked about smelling the alcohol on his

16   breath when he was having a conversation with her.  And

17   she talked about how it felt when the hand touched on

18   her -- or finger.  I think she demonstrated as well with

19   her finger the touching.

20            She talked about hearing the gasp, which

21   again was another sense, while she was laying there when

22   it happened.

23       Q.   Okay.

24            Are the circumstances under which a

25   disclosure occur sometimes important?

Amanda McVay - D                                      269

1        A.    What do you mean?

2        Q.    So when a child discloses, are the

3   circumstances surrounding that disclosure -- are those

4   important?

5        A.    Yes, they can be.

6        Q.    Okay.  What is a spontaneous disclosure?

7        A.    So a spontaneous disclosure is when the child

8   bring forth information on their own.  So nobody's asked

9   them a question or solicited information for them --

10  from them.  That they just say something or share

11  something on their own.

12       Q.    And is that -- is that an important

13  circumstance when you're doing these interviews, to

14  understand what the circumstances were surrounding the

15  initial disclosure?

16       A.    Yes.  We always try to gather as much

17  information as we can about how the initial disclosure

18  came out, so that we can assess any possible alternative

19  hypotheses as we evaluate and complete the assessment.

20       Q.    During your interview, did you have concerns

21  about her -- or how did she appear to you?

22       A.    As you saw, she was very engaging.  She was

23  bright.  She was articulate.  She provided lots of

24  information on her own without much soliciting of

25  questions.

Amanda McVay - D

1              Very attentive.  She could color and pay

2    attention and corrected me when I got something wrong.

3    She appeared to follow things very well throughout the

4    course of the evaluation, from the exam room to the

5    interview room.

6              MS. DUMONT:  Nothing further.

7              THE COURT:  Mr. Knauss.

8              MR. KNAUSS:  Thank you.

9              I conferred with Ms. Dumont that I was

10   going to go beyond the scope of the direct because

11   they're not calling the nurse practitioner, but that's

12   -- Ms. McVay was there during the medical exam.

13             THE COURT:  Is there a stipulation that --

14             MS. DUMONT:  Mr. Knauss indicated there

15   was one -- or a question that he wanted to ask about

16   the --

17             MR. KNAUSS:  Well, more than one question.

18             MS. DUMONT:  Oh.  Well, we talked about

19   one question.  I'm --

20             MR. KNAUSS:  Yeah.  Because otherwise,

21   I -- I would need her to stay and -- and in my -- when I

22   start my case, I have to get into these issues here.

23             MS. DUMONT:  My understanding is he wants

24   to ask her some questions about the medical portion.  To

25   the extent she's able to respond, as she was there, I

Amanda McVay - X                              271

1    indicated to him that that would be fine.

2                   THE COURT:  Mr. Knauss, is that sufficient

3    for your purposes?

4                   MR. KNAUSS:  Yes.

5                   THE COURT:  All right.  Go ahead, then.

6                   MR. KNAUSS:  All right.  I'm just trying

7    to avoid her having to come back, is what I'm doing

8    here.

9                   THE COURT:  So I'm taking that as a

10   stipulation, Ms. Dumont, that questions regarding the

11   medical examination, although they were outside of the

12   scope of direct, wouldn't be objected to, given that

13   Mr. Knauss could have her held and re-called in his

14   case.

15                  MS. DUMONT:  Yes, Your Honor.

16                  THE COURT:  All right.  Go ahead,

17   Mr. Knauss.

18                  MR. KNAUSS:  Thank you.

19                        CROSS-EXAMINATION

20   BY MR. KNAUSS:

21       Q.   Just to confirm, you were present during the

22   medical exam?

23       A.   Yes.

24       Q.   Okay.  And did you ever leave?

25       A.   No.

Amanda McVay - X                                   272

 1      Q.   Now -- and you have the full report in front of

 2   you?

 3      A.   I do.

 4      Q.   Okay.  And I'll try to refer to your page

 5   numbers on that, if we need to.

 6               Now, you had the Children's Center intake

 7   summary.  That was a document that you sent out probably

 8   to -- to the father to fill out before they came to the

 9   meeting?  Is that what that was?

10      A.   No.  It's actually the child history

11   questionnaire.  The intake summary is what our intake

12   specialists use to document the initial request for the

13   evaluation.

14      Q.   Okay.

15      A.   So that's a different document.

16      Q.   All right.  And then you had police report of

17   Officer Behan; is that correct?

18      A.   Yes.

19      Q.   And immunization records for the child?

20      A.   Yes.

21      Q.   And medical records from Kaiser; is that

22   correct?

23      A.   Yes.

24      Q.   And she was being seen by Dr. Black?  Does that

25   sound right?

Amanda McVay - X                            273

1          A.    I don't know.  I'd have to review --

2          Q.    Okay.

3          A.    -- since that wasn't my part.

4          Q.    But there -- there are references in the report

5     about psychological counseling, medications, that sort

6     of thing?

7          A.    Yes.  And I'm looking at the medical examiner's

8     part of the report, and she noted Dr. Jonathan at

9     Kaiser, as well as Dr. Black.

10         Q.    Okay.  We'll -- we'll get into some of that in

11    a minute.

12               Now, there was a brief meeting with

13    Detective Ellis and then you and Nurse Petersen met with

14    Mr. Jewell and Trisha Miller to review the child history

15    questionnairy -- questionnaire; is that right?

16         A.    I believe we just reviewed the information with

17    Mr. Jewell and not with Ms. Miller.

18         Q.    Okay.

19         A.    She remained in the waiting room with the

20    child.

21         Q.    All right.  And then at the bottom of page 2,

22    apparently Mr. Jewell was asked to state what Jasmine

23    had told him before?

24         A.    Yes.

25         Q.    Okay.  And in that conversation, was there any

Amanda McVay - X                                    274

1    mention of him having learned of a second incident?

2         A.   No.

3         Q.   Okay.  Did you have any information at all

4    about a second incident until she talked about it on the

5    video?

6         A.   No.

7         Q.   Now, in looking at the police reports, let me

8    ask you this:  In your experience and your training, is

9    it important that there be no praising of the child to

10   have made a disclosure?  "Atta girl," that kind of

11   stuff?

12        A.   I -- I think I understand your question.  We

13   get concerned about influence of any interviewer,

14   whether --

15        Q.   Yeah.

16        A.   -- it's a parent or a police officer --

17        Q.   Okay.

18        A.   -- or somebody else when they're asking a child

19   questions and prompting them --

20        Q.   Yeah.

21        A.   -- and encouraging them to give responses.

22        Q.   Right.

23        A.   So that's concerning that they may be

24   influencing the statements when they're asking questions

25   and encouraging them as they go.

1        Q.    All right.  Would it be appropriate for, say, a

2    police officer to tell Jasmine that "You were very brave

3    for having told your dad," or "disclosed this"?

4        A.    I'm sorry.  What was the -- the initial

5    question?  Sorry.  Would it be --

6        Q.    Would it be appropriate for a policeman who's

7    interviewing Jasmine to tell her that "You were very

8    brave to have disclosed this," or "told your dad"?

9        A.    Well, in the sense that he was not interviewing

10    her, it does not concern me.

11        Q.    Okay.  Well, are you aware that she disclosed

12    herself some of the information about the event?

13        A.    Yes.

14        Q.    Okay.  And in response to that, the officer

15    said, at least in the report, "You were very brave to

16    have told -- told us that."  Or "told your dad that."

17    Excuse me.

18        A.    I do recall that, yes.

19        Q.    Okay.  Is that appropriate reinforcement that a

20    police officer would make to a purported victim?

21        A.    In the context of reviewing the entire police

22    report with the -- what was there about the spontaneous

23    disclosure to the police officer, I wasn't concerned

24    about it influencing her, especially given her age and

25    developmental level as well.

Amanda McVay - X                                      276

1          Q.    Okay.  Well --

2          A.    It did not concern me when reviewing the police

3     report and the information.

4          Q.    Well, you -- you would never say to Jasmine at

5     the end of this, "Boy, you were very brave to have told

6     me about all this," would you?

7          A.    No, I would not.

8          Q.    Okay.  And certainly a policeman is trained --

9     or at least hopefully he gets the protocols for doing

10    the Oregon guidelines for interviewing a child?

11         A.    What's the question?

12         Q.    Okay.  You are -- are you personally aware that

13    police officers are -- go to -- or are trained or go to

14    training sessions for the interviewing of children?

15         A.    I don't know how many --

16         Q.    Okay.

17         A.    -- police officers actually go to training --

18         Q.    All right.

19         A.    -- specific to interviewing children.

20         Q.    Did you happen to ask Jasmine about the praise

21    that she got from the policeman?

22         A.    No.

23         Q.    Now, the early part of your testimony, you --

24    you talk about circumstances where typically your agency

25    will suggest continued -- or counseling for the child

1  when there's a disclosure?

2      A.   So oftentimes when children come to our center,

3  we do make recommendations --

4      Q.   Okay.

5      A.   -- for counseling.

6      Q.   And, in fact, in this --

7           MS. DUMONT:  Your Honor, I don't want to

8  get into recommendations that they made, given the case

9  law, about, you know, their findings, specific findings.

10 I -- I just -- I want us to be careful about where we're

11 going.

12          THE COURT:  Mr. Knauss, I'm going to take

13 that as an objection to the question.

14          MR. KNAUSS:  Okay.

15          THE COURT:  Did you want to respond?

16          MR. KNAUSS:  Well, let me ask it

17 differently.

18 BY MR. KNAUSS:

19     Q.   Have you learned of any further disclosures

20 since you did this report?

21     A.   I've heard no information up until --

22     Q.   Okay.

23     A.   -- this trial.

24     Q.   Now, when -- when you were engaged in the

25 medical exam, you -- on page 3, did you learn of her

Amanda McVay - X

278

1    last visit to Kaiser was on February 9th, some four
2    days -- three or four days before this -- this incident?
3        A.   So that information Ms. Petersen reviewed as
4    part of the information for the report.  And she
5    probab- -- spoke with the father about that during the
6    preevaluation, when we reviewed the paperwork.  But
7    my -- my role is to review the social history.
8        Q.   Okay.
9        A.   Hers is the medical history.  So I -- I don't
10   recollect exactly what questions she may have asked --
11       Q.   Okay.
12       A.   -- the father or what he said.
13       Q.   You were aware that she had been diagnosed
14   ADHD?
15       A.   Yes.
16       Q.   And that had been about a year before?
17       A.   I believe so.
18       Q.   And that she was recently changed to a new
19   medication?
20       A.   I do recall that, yes.
21       Q.   And that -- do you know what medication she was
22   on when you interviewed her?
23       A.   I'd have to look at the report to see what
24   Ms. Petersen put.
25       Q.   Page --

1          A.    But --

2          Q.    Page 3.

3          A.    But I don't know about that medication.  I knew

4    she was on a medication for ADHD when we saw her.

5          Q.    Okay.  And what medication was that?

6          A.    As I'm reading the report to review this, she

7    said, "Per Mr. Jewell, Jasmine recently changed to a new

8    medication, methyl sulfate, approximately one week ago.

9    And Mr. Jewell reported that he has noticed an

10   improvement in Jasmine's focus."

11         Q.    No, I just asked you what medication it was.

12         A.    I'm -- I'm trying to find it because that --

13         Q.    Okay.  Well, this is --

14         A.    -- not being my part and I don't deal with

15   medications.

16         Q.    I don't need you to read the body of it.  I'm

17   just asking you what medication.

18              MS. DUMONT:  And, Your Honor, if the

19   witness doesn't know, I think the answer is she doesn't

20   know.

21              THE COURT:  Mr. Knauss?

22   BY MR. KNAUSS:

23         Q.    Well, do you know what medication that your

24   agency learned that she was --

25         A.    In looking in this --

Amanda McVay - X

1    Q.    -- taking?

2    A.    -- I don't know.

3    Q.    Okay.  Well, look at page 3, under

4    "Medications," and please read that to yourself and see

5    if that discloses what she was on at the time.

6    A.    As I stated a moment ago, he said that he

7    changed it to a medication that he reported was methyl

8    sulfate.  Up above, the exit -- examiner said it was

9    unclear if he meant mental -- I don't know how to

10   pronounce it -- methylphenidate.

11   Q.    Okay.  But there's a --

12   A.    But he was uncertain of the medication.

13   Q.    But as that goes on, it says there's a

14   recent -- "Recent review of Jasmine's medical record

15   from her office visit of January 29, 2015, at Kaiser.

16   It documented that Jasmine was recently prescribed

17   Dexedrine."

18   A.    Yes.  That's what it says.

19   Q.    Okay.  All right.

20         Do you happen to know, in your expertise,

21   about the -- what Dexedrine is designed to -- to --

22   what -- what it's designed to do?

23   A.    No.  That's not my expertise.

24   Q.    Okay.  Now, in the medical exam, on page 5,

25   under "Counseling History," it was confirmed with your

Amanda McVay - X

1    agency that she had been attending counseling through

2    Western Psychological in January?

3        A.   That's what --

4        Q.   Okay.

5        A.   -- the father reported.

6        Q.   And there was three sessions in January?

7        A.   Yes.

8        Q.   Okay.  Did you get the Western Psych reports?

9        A.   No.

10       Q.   Okay.  Now, on page 4, you -- she was asked,

11   the girl was asked terms for body parts.  And buttocks,

12   bottom, was "butt."  Boy's front private, penis, was

13   "penis."  Girl's front private, vagina, was "vagina."

14   And breasts were "breasts."  Is that the words she used?

15       A.   No.  So what you're referring to on that

16   page --

17       Q.   Yeah.

18       A.   -- is we ask the parent or caregiver what terms

19   they think their child uses.

20       Q.   Okay.

21       A.   And that's what the father put.

22       Q.   Okay.

23       A.   So that's --

24       Q.   All right.  So --

25       A.   -- not what he --

Amanda McVay - X

1    Q.    So the father put --

2    A.    Correct.

3    Q.    -- responded to these?

4    A.    Yeah.  That's the father's.

5    Q.    Okay.  Did you, in your discussion with Jasmine

6  during the medical exam or at any time this date does

7  she ever refer to her vaginal area as her dandelion or

8  use the word "dandelion"?

9    A.    No.

10   Q.    When on page 6 you ask -- or someone asked

11 Mr. Jewell to confirm whether or not this child has seen

12 nudity or sexual activity on TV, video, computers, or

13 magazines; is that correct?

14   A.    So the paperwork asks that question and he

15 responded on the paperwork.

16   Q.    And there was a "no" response?

17   A.    Correct.

18   Q.    Okay.  That wasn't from Jasmine.  That was from

19 his dad -- her dad?

20   A.    Correct.  That's the father --

21   Q.    Okay.

22   A.    -- who's reading the paperwork.

23   Q.    All right.  Now, on page 8 there was a section,

24 "Additional history from child during" -- or "in the

25 examination room."  There were notes taken of what she

Amanda McVay - X                        283

1    happened to say during that exam?

2        A.   Yes.

3        Q.   Okay.  And she indicated that the kids in her

4    class are not very nice to her, say rude things, such as

5    her nose is growing?

6        A.   Yes.

7        Q.   Okay.  And later on, she stated that when

8    Jorden was touching her, her dream changed, and the main

9    character was sad.  Is that what she told you?

10       A.   Yes.

11       Q.   Okay.  And finally, during that medical exam

12   you -- or when asked if anyone had ever touched her

13   boobs, she replied, "Jorden."  Is that correct?

14       A.   Correct.

15       Q.   She was asked if anyone had ever touched her

16   vagina and she shook her head "no."  Is that correct?

17       A.   Yes.

18       Q.   So the vagina episode did not come up before

19   the video interview?

20       A.   Correct.

21       Q.   Was her demeanor during the medical exam the

22   same as it was on the video?

23       A.   Yes.  I mean, it's in a medical exam room, like

24   a normal doctor's visit.

25       Q.   Yeah.

Amanda McVay - X                              284

1        A.    So she's sitting on the exam table with the

2   equipment in the room.  I think her presentation was

3   very similar.

4        Q.    Okay.

5        A.    But it's definitely a different setting.

6        Q.    Okay.  All right.

7              Now, you -- you were aware she had been

8   diagnosed with ADHD and that she had been prescribed

9   Dexedrine at the time.  You knew that?

10       A.    Yes.

11       Q.    Okay.  And you also knew that -- from page 5,

12  under "Concerning Behaviors," that her father had

13  indicating [sic] and answer of "yes" to her

14  hyperactivity, difficulty concentrating?

15       A.    Yes.

16       Q.    Okay.  So when you started this out on the

17  video, is it not true that you covered these areas,

18  bang, bang, bang, bang:  We want to talk about true

19  stuff, not about pretend things, not about make-believe.

20  Just stuff we know.  And if my questions don't make

21  sense, you -- you tell me.  And if my question -- or my

22  responses to you are mistaken or I get it wrong, you

23  tell me.

24              You gave her that admonition at the very

25  start of the video?

Amanda McVay - X

1      A.    I did review those with her at the beginning.

2      Q.    Okay.  And you did not go through each one of

3  these to confirm, as you went through each one, if she

4  understood that; is that correct?

5      A.    No.  I -- you're right.  Correct.

6      Q.    Okay.  And when -- when she told you that she

7  had lied in the past, you didn't stop and say:  Well,

8  let's make sure you understand.  Let's go over this

9  again.  You need to tell us what is true and what's --

10  and not talk about lies.

11            You didn't do that, did you?

12      A.    No, I did not.

13      Q.    Okay.  Isn't it the preferred approach that you

14  go through each one of these individually and make sure

15  the child understands each principle here?

16      A.    So in reviewing those, what we're doing, as per

17  the Oregon Interview Guidelines, is reducing

18  suggestibility by reviewing those with the child.  Now,

19  that's more concerning for children six and under.  And

20  so sometimes there's practice done with those with the

21  very young children.  But no, I do not go one-by-one and

22  ask a child if they agree to each one when I do an

23  interview.

24      Q.    Even with a child who has difficulty

25  concentrating, who has ADHD?

Amanda McVay - X

1    A.   She did not appear, from my exposure to her

2   during the medical exam, to have a problem with

3   attending or concentrating even prior to the interview.

4   And then during the interview, as you could see, she

5   attended to the questions and colored with me, answered

6   questions.  I could redirect her after she provided an

7   open narrative.

8              I did not have a concern about this child

9   not being able to focus or concentrate on the questions

10  I asked.  I've had many other children who do have

11  difficulties that I adjust per child, based on what

12  they're presenting that day.

13   Q.   Now, let's talk about this dream issue.  She

14  told you that she was having a dream when she thought

15  this touching of her breast occurred.  And then she

16  relayed further information.  And then later on you took

17  a break, went out, and then came back and touched upon

18  that subject again.

19              Did you ever ask her:  Well, when was the

20  point where you were sure that you weren't dreaming

21  anymore?

22   A.   I'm sorry.  Ask the question again.  I lost you

23  in the middle.

24   Q.   Did you ever ask her a question:  I want to

25  make sure when you -- when you know you weren't dreaming

Amanda McVay - X

287

1    anymore.  What was going on at that exact moment when

2    you weren't dreaming anymore?

3              You didn't ask her that, did you?

4         A.   No, I didn't.

5         Q.   Okay.  And when you asked her to clarify the

6    second time, she didn't talk to you about anything other

7    that -- than she smelled something.  She went from you

8    were asking her about dreaming and she responded about

9    some sensory thing about smelling something.  Correct?

10        A.   I don't recall exactly which.

11        Q.   Okay.

12        A.   There were a few different instances.

13        Q.   Right.

14        A.   But I do know that she brought up the sense,

15   the smell.

16        Q.   Well, I said that wrong, and I'll withdraw that

17   question and answer because I said it wrong.  Let's --

18   let me go back to it.

19             So you went -- on the video, when you came

20   back the second time, you asked her about the sleeping

21   and the dreaming and "How do you know it wasn't a

22   dream?"

23             And she responded, "Because he said, 'Please

24   don't tell anyone.'"

25             That was her response to your asking her

Amanda McVay - X                              288

1    about "How do you know it wasn't a dream?"

2        A.   I know.

3        Q.   Is that correct?

4        A.   I know she said that.  I don't recall if she

5    said anything else with it.  So --

6        Q.   Okay.

7        A.   -- without reviewing it, I can't -- I'm not

8    going to misquote myself.

9        Q.   Okay.

10       A.   Or misquote the video or her response.

11       Q.   So do we have a definite point on this video or

12   during your conversations where you ask her, "When do

13   you know you stopped dreaming?"

14       A.   I think I answered that already.  I did not ask

15   that question --

16       Q.   Okay.

17       A.   -- that way.

18       Q.   So when she's initially telling you about she

19   was asleep and dreaming and she felt the touching, she

20   tells us that then the dream automatically changed,

21   correct?

22       A.   She did say that.

23       Q.   And that the boy character in her dream was

24   doing the touching to the other character.  Is that what

25   she told you?

Amanda McVay - X

1       A.    I remember her saying the boy touching.

2       Q.    Okay.  That appears that she's still relating a

3   dream.  Is that right?

4       A.    You know, I -- I can't guess what she's

5   thinking --

6       Q.    Okay.

7       A.    -- when she's telling me that.  I can relay

8   what she said.

9       Q.    Well, is she saying the boy character in her

10  dream was doing the touching to the other character?

11  Correct?

12      A.    Yes.

13      Q.    Okay.

14      A.    We went over that.

15      Q.    Now, we don't know -- you did not ask her what

16  was she dreaming about?

17      A.    No.

18      Q.    Okay.  So -- so as far as any touching that she

19  relates to you, what we have is her saying the touching

20  occurred during a dream.  There was no indication to you

21  that he touched her after she woke up?

22      A.    I'm kinda confused by the question.  But in

23  talking about dreams, what I asked to gather more

24  information about what actually happened was, "What did

25  you feel?  What did you hear?"

Amanda McVay - X                                    290

1              I don't go into the dream state.  I gather

2    as much information about what they felt and heard and

3    other senses to gather information about what happened

4    to them.

5         Q.    Okay.  Well, she -- she told you that she was

6    dreaming when she felt the touching, correct?

7         A.    Correct.  That's --

8         Q.    At no point, even in the medical exam, did she

9    say that he touched her on the breast when she was

10   awake?

11        A.    I just asked her to tell me what happened and

12   she talked about what happened.

13        Q.    Well, that's an easy question.  She never told

14   you that he touched her on the breast when she was

15   awake.  She only told you that it had occurred when she

16   was dreaming.  Isn't that correct?

17             THE WITNESS:  Your Honor, if possible, I'd

18   like a chance to review with this, so I can accurately

19   answer the question.

20             THE COURT:  Mr. Knauss?

21             MR. KNAUSS:  That's fine.

22             THE COURT:  Is there a transcript that she

23   can review?

24             Do you want her to review the video before

25   you -- she answers the question?

 1                    MR. KNAUSS:  Whatever she needs.  I

 2   mean --

 3                    THE WITNESS:  I -- I feel like I can

 4   review my report, Your Honor --

 5                    MS. DUMONT:  I also --

 6                    THE WITNESS:  -- to answer the question

 7   better.

 8                    MS. DUMONT:  I also have a transcript that

 9   I wrote that's right after the break.  (Indiscernible.)

10                    THE WITNESS:  Oh, okay.  Thank you.

11                    THE COURT:  And I've lost the question.

12   Mr. Knauss, if you could reask the question.

13                    MR. KNAUSS:  Sure.

14                    THE COURT:  And then let me know if you

15   need additional time, Ms. McVay, before answering it.

16                    THE WITNESS:  Thank you.

17   BY MR. KNAUSS:

18        Q.   She told you that when she was dreaming, that's

19   when she felt the touch of her -- on her breast,

20   correct?

21        A.   Correct.

22        Q.   And she never told you that she -- that there

23   was a touch on her breast when she was awake?

24        A.   That's not true.

25        Q.   Okay.  When did -- when did she tell you that

Amanda McVay - X                                    292

1    and what did she say?

2        A.   So after the break, when I went back into the

3    evaluation room, I asked her, "How do you know Jorden

4    touched you and it wasn't a dream?"

5             And she responded.  And she said, "Because

6    he actually went into my shirt.  And he said, 'Please

7    don't tell anyone.'"

8             And that's when then she continued to say he

9    basically admitted.  And she could feel a finger moving

10   on her breast, and that's when she demonstrated in the

11   video the movement of her one finger over her boob.

12       Q.   But you did not follow up and say, "Are you

13   sure you still weren't dreaming then?"

14       A.   No, I wouldn't ask a question that way.  Since

15   I had already asked her, "How do you know it wasn't a

16   dream?" I wouldn't then requestion her because then

17   she'd think I don't believe her, she might believe I'm,

18   you know, upset with her or I might influence her

19   response, so I would not ask again.

20       Q.   In her relating of the prior incident in the

21   kitchen, she confirmed with you that she was in

22   kindergarten and it was during the school year, correct?

23       A.   She said that, yes.

24       Q.   Okay.

25             THE COURT:  Folks, it's just about noon.

```
1    I think we should probably break at this time.  I do
2    have a 1 o'clock phone conference.  It should not be
3    lengthy.  So if you can all be here and ready to go at
4    quarter past 1:00, it might be a few moments after that,
5    but I would anticipate being ready by quarter past 1:00
6    or very soon thereafter.
7                    MS. DUMONT:  Yes, Your Honor.
8                    THE COURT:  All right.
9                    THE WITNESS:  I'm not available --
10                   MS. DUMONT:  Oh, oh.
11                   THE WITNESS:  -- after.  I have to see a
12   child, as our other interviewer is out sick and I have
13   to --
14                   MS. DUMONT:  Is there any way we can go
15   into the lunch hour for the short -- I don't have any --
16                   THE COURT:  We're in the middle of
17   testimony.
18                   MS. DUMONT:  Okay.
19                   MR. KNAUSS:  I'm actually almost done.
20                   THE COURT:  I'm --
21                   MR. KNAUSS:  Yeah.  But whatever.
22                   THE COURT:  I'm not available --
23                   MS. DUMONT:  Okay.
24                   THE COURT:  -- during the noon hour today.
25                   MS. DUMONT:  Okay.
```

1                    THE COURT:  So unless there's a

2       stipulation that we can break from the testimony and

3       return to the testimony at a later time this afternoon

4       or tomorrow morning, which I'm happy to do, again, given

5       this is a Court trial, she's a subpoenaed witness on a

6       trial.  So --

7                    MS. DUMONT:  Yes, Your Honor.

8                    THE COURT:  -- if you all want to

9       stipulate to something different scheduling-wise --

10                   MR. KNAUSS:  Okay.

11                   THE COURT:  -- that's fine.

12                   MR. KNAUSS:  I -- I may be done, so I'll

13      let Ms. Dumont know.

14                   MS. DUMONT:  Are you done-done?

15                   MR. KNAUSS:  I don't know.  I've got to

16      look at my notes here.

17                   THE COURT:  If you all want to --

18                   MS. DUMONT:  Okay.

19                   THE COURT:  -- stipulate to this witness

20      returning to the witness stand at a time other than

21      1:15 --

22                   MS. DUMONT:  Yes, Your Honor.

23                   THE COURT:  -- in the next two days,

24      that's fine.

25                   MS. DUMONT:  Thank you, Your Honor.

Susan Skinner

1          MR. KNAUSS:  Okay.

2          THE COURT:  Barring that stipulation,

3     we'll be back at 1:15.

4          MS. DUMONT:  Thank you.

5          MR. KNAUSS:  Okay.

6          (Recess; 12:01 p.m. to 1:18 p.m.)

7          THE COURT:  We're back on the record.  Go

8     ahead, Ms. -- I almost called you Ms. Borgman.

9     Ms. Dumont.

10          MS. DUMONT:  Thank you, Your Honor.

11          The State calls Sue Skinner.

12          (Witness summoned.)

13          THE COURT:  Ma'am, if you'll come all the

14     way to the front of the courtroom.  When you arrive at

15     the witness stand, please remain standing, face my

16     clerk, and raise your right hand to be sworn.

17                    SUSAN SKINNER,

18     called as a witness on behalf of the State, having been

19     first duly sworn, was examined and testified under oath

20     as follows:

21          THE CLERK:  Be seated.

22          Please state your full name and spell your

23     last for the record.

24          THE WITNESS:  Susan Skinner.

25     S-K-I-N-N-E-R.

Susan Skinner - D

296

```
1                      DIRECT EXAMINATION
2    BY MS. DUMONT:
3         Q.    Where do you work?
4         A.    I work at the Children's Center.
5         Q.    Okay.  What is your position there?
6         A.    Just going to pour a glass of water.
7         Q.    Okay.  Sorry.
8         A.    That's all right.
9         Q.    That's what I get for not making eye contact.
10   I didn't know what you were doing.
11        A.    I'm the medical director.
12        Q.    Okay.  And how long have you been so employed?
13        A.    I've been at the Children's Center almost six
14   years.
15        Q.    And before that, where did you work?
16        A.    I worked at CARES Northwest.
17        Q.    And what was your position there?
18        A.    Pediatrician.  Child abuse pediatrician.
19        Q.    Okay.  Are you still a child abuse
20   pediatrician?
21        A.    Yes, I am.
22        Q.    Okay.  And what kind of educational
23   requirements do you have for your position?
24        A.    I'm board certified in both general pediatrics
25   and child abuse pediatrics.  I've been board certified
```

Susan Skinner - D

297

1    in pediatrics since 1992.  And I've been board certified

2    in child abuse pediatrics since 2009.  That's the first

3    year you could be.

4        Q.   Okay.  And where did you go to school?  What

5    was your (indiscernible)?

6        A.   I went to Linfield College.  I did my medical

7    school at OHSU.  I did my pediatric residency training

8    at University of Arizona in Tucson.

9        Q.   Okay.  Are you licensed?

10       A.   Yes, I am.

11       Q.   Are you certified?

12       A.   I'm board certified in -- in both pediatrics

13   and child abuse pediatrics.

14       Q.   Okay.  And what is the licensing or

15   certification for child abuse pediatrics?

16       A.   It's the -- it's a board certification.  It's

17   through the American Board of Pediatrics.  It's a

18   subspeciality field through the American Board of

19   Pediatrics.  And in general, it's a three-year

20   fellowship training above and beyond your pediatrics

21   training.

22            A substitute for that is demonstration of

23   knowledge across the board.  And what I mean by that is

24   seeing a certain number of hospitalized patients,

25   outpatients, research, trainings, so it -- it was a

 1    large application to be able to sit for the exam.  And

 2    then I had to sit for the exam and pass it.

 3         Q.   And that was the one that happened in 2009?

 4         A.   Yes.

 5         Q.   Okay.  And you mentioned that that was the

 6    first time it was available.  Is that just for the state

 7    of Oregon that it was first made available or is it

 8    entirely throughout the United States?

 9         A.   Nationally.

10         Q.   Okay.  In your work as a -- as a pediatrician

11    and as a medical director, do you see children for child

12    abuse?

13         A.   Yes, I do.

14         Q.   Okay.  And about how many do you see a year or

15    do you have some sort of approximation?

16         A.   I've been working in the field for about 21

17    years and I've seen probably 2,000.

18         Q.   Okay.  And I want to talk to you a little bit

19    about the Children's Center briefly.

20              Is it -- is the Children's Center an

21    independent agency?

22         A.   Yes.  It's an independent nonprofit clinic.

23         Q.   Okay.  And who pays the bills?

24         A.   Well, I -- do you mean how does money come in

25    to --

Susan Skinner - D

299

1      Q.    Are you receiving money from the State to --
2  from the DA's office to testify today?
3      A.    No.
4      Q.    Okay.  Do you -- do you have -- how -- what is
5  the -- I don't want to get too in the weeds, but is the
6  DA's office paying for the Children's Center?
7      A.    I -- I can tell you a little bit of my
8  understanding about our funding.  We're nonprofit.
9  We're a medical clinic.  So first and foremost, we bill
10 medical insurance for medical visits.
11          In addition, child abuse assessments are
12 supported at a state level and money comes out to
13 counties -- to county MDTs.  So a portion of our funding
14 is for medical billing.  A portion of it comes to
15 Clackamas County, which then comes to our center.  And a
16 portion of it is simply through fundraising.
17     Q.    Okay.  And is there a procedure that you have
18 that you follow when children come to the Children's
19 Center in doing an evaluation with them?
20     A.    Yes.
21     Q.    Okay.  And briefly, what is that?
22     A.    Again, we're a medical clinic, so certainly
23 the -- the mainstay is the medical exam.  We're a little
24 unique in that we -- we're a child abuse assessment
25 center, so we work with an interview and with a family

1    support member.  So we have somebody meet with the

2    parent.  And the child is seen in a team fashion,

3    meaning an examiner and interviewer work together.

4        Q.   Okay.  When you have a child abuse case, do you

5    expect to have physical findings in each one?

6        A.   I -- I try to go into all evaluations

7    neutrally, without having expectations of what I'm going

8    to see.  Sometimes prior to seeing a child I may have

9    photographs that are sent to me.  So certainly if I have

10   a photograph of a bruise sent to me that was taken by a

11   detective, and I'm seeing a child six hours later, I

12   would anticipate it would be there.

13            But in general, we see kids for a lot of

14   worries of abuse and neglect.  And I try and keep an

15   open mind and not approach the exam with an expectation

16   for physical findings or lack thereof.

17       Q.   Okay.  And with sex abuse cases in particular,

18   is it always your expectation or your experience that

19   there are physical findings?

20       A.   It's not my expectation one way or the other,

21   but certainly the literature and my own experience is

22   that more often than not there are not physical

23   findings.  Physical findings are a little unusual.

24       Q.   Okay.  And in this case, was a medical

25   examination of Jasmine done?

Susan Skinner - D                                    301

1          A.    Yes.

2          Q.    Okay.  And do you have the date of that?

3          A.    February 19th, 2015.

4          Q.    Okay.  And you weren't the doctor who did the

5    medical exam; is that correct?

6          A.    Correct.

7          Q.    Who was the person who did that?

8          A.    Gabrielle Petersen.

9          Q.    And Gabrielle Petersen is not available today;

10   is that correct?

11         A.    She's out of state.

12         Q.    Okay.  And as part of your testimony here

13   today, I believe you have before you the Children's

14   Center report?

15         A.    Yes.

16         Q.    Okay.  And I want to talk to you about -- just

17   briefly about some discrete issues.

18                    What is ADHD?

19         A.    Attention deficit and hyperactivity disorder.

20         Q.    Okay.  When someone has that, what does that

21   mean?

22         A.    It's -- it's diverse.  So some kids that have

23   ADHD are more hyperactive.  Some are more inattentive or

24   spacy.  Some have a combination of both.

25         Q.    Okay.  And what -- are there some medications

Susan Skinner - D                                    302

1   that you can use to treat ADHD?

2       A.   Yes.  As -- as part of -- as part of treatment

3   of ADHD, medication can and sometimes is used as a part

4   of the treatment.

5       Q.   Okay.  And what are -- what is the type of

6   medication that's used?

7       A.   Most medications are stimulants.

8       Q.   Okay.  And what does that mean?

9       A.   Means they're not sedating.

10      Q.   Okay.  And --

11      A.   That's -- that's the medication category, is

12  that they're a stimulant.

13      Q.   Okay.  And so in this particular case, was

14  there some ADHD medication that was being used?

15      A.   Yes.

16      Q.   Okay.  And what was that ADHD medication?

17      A.   She was on Dexedrine.

18      Q.   Okay.  And is -- you mentioned that there were

19  some medications and you characterized them as a

20  stimulant.  What is Dexedrine?

21      A.   It's a stimulant.  It's -- dexamphetamine is

22  the generic name, but the brand name is Dexedrine.

23      Q.   Okay.  And what does -- what are the side

24  effects of Dexedrine?

25      A.   Do you mean at normal dose?  At high dose?

Susan Skinner - D

303

1      Q.   Normal dose.

2      A.   In general?

3      Q.   Yeah.

4      A.   I -- I would say generally with the stimulant

5  medications that are used for ADHD, for example, if I

6  was seeing a child at a pediatric visit and I was trying

7  to check in on how they were doing on their medication,

8  are they sleeping okay?  Are they eating okay?  Are they

9  gaining weight?  And -- and is the medication helping

10  them to manage their symptoms?

11      Q.   Okay.

12      A.   So -- so the most common side effect we see is

13  actually lack of appetite and poor weight gain.  There

14  can be other side effects as well, but that's the one

15  that we probably monitor the most.  Sometimes blood

16  pressure as well.

17      Q.   Okay.  And if -- hypothetically speaking, if

18  someone was taking their normal dosage and they said

19  that when they take their dosage it helps them focus and

20  concentrate, would that be a side effect or would that

21  be an impact of the medication that would be consistent

22  with the purpose of the medication?

23      A.   I think that would be the reason you have them

24  on it.

25      Q.   Okay.

Susan Skinner - D                                    304

1          A.     That's -- that's what it's supposed to do.

2          Q.     And hypothetically speaking, if someone were to

3     describe that sometimes it causes them to have a hard

4     time falling asleep, would that be consistent with your

5     understanding of some of the impacts of the impacts that

6     this medication may have?

7          A.     It -- it can have that side effect, if it's

8     taken too close to bedtime.  Typically that's when we

9     would see it.  Maybe adjusting timing of the doses is

10    the first thing you'd do.

11         Q.     Okay.  And if you were to take, hypothetically

12    speaking, a whole bunch of this medication, what would

13    the impact be of that?

14         A.     If you took, like, too much?

15         Q.     Sure.

16         A.     Increased heart rate, increased blood pressure,

17    seizures, restlessness, can have a coma.  So if you took

18    way too much, it can be bad.

19         Q.     Okay.  And so generally speaking, does the

20    medication make you slow and unable to concentrate or

21    does it have the -- does it have the opposite effect?

22         A.     I think those are two different questions.

23         Q.     Okay.

24         A.     The inability to concentrate is usually a

25    symptom of the ADHD.  And medication given for ADHD

Susan Skinner - D                                305

1    usually aids in concentration.  I don't know that really

2    the medication makes you slow or speedy.  I don't know

3    that ADHD is usually slow.

4         Q.    Sure.

5              And from your review, you mentioned that

6    Jasmine was taking Dexedrine.  And when -- how would you

7    characterize her dosage of Dexedrine?

8         A.    It's low normal.  Staring dose for Dexedrine

9    typically is maybe two and a half milligrams or five

10   milligrams once a day.  And then after a week or two,

11   usually you go up a little, to taking it twice a day.

12   Or sometimes even three times a day, depending.

13             I think the maximum for Dexedrine is 30

14   milligrams a day.  So her dose at 10 milligrams a day is

15   low normal.

16        Q.    Okay.  So 10 milligrams a day.  And when had

17   she started that dosage?

18        A.    I believe she had started it the end of

19   December.  She'd been on a different medication prior

20   and I believe she had switched to Dexedrine the end of

21   December.  And then we have the Kaiser visit from the

22   end of January was -- which was her one-month follow-up

23   on the new medication.

24        Q.    And how was she doing on the new medication?

25        A.    Great.

Susan Skinner - X                          306

1              MS. DUMONT:  Nothing further.

2              THE COURT:  Mr. Knauss.

3                   <u>CROSS-EXAMINATION</u>

4    BY MR. KNAUSS:

5         Q.   Did you claim that she was doing great from a

6    chart entry from the doctor's office?

7         A.   "Great" is my word.  The word that's in the

8    report, the Children's Center report, says that her ADHD

9    was with good control and they made a decision not to

10   change her dosage at all.  I did review the Kaiser note

11   prior to coming here and so, yes, doing well with good

12   control on the current dose was documented in the Kaiser

13   note, but I don't know if they used the word "great."

14        Q.   Do you have the Kaiser note with you?

15        A.   I don't.

16        Q.   The -- the clinic obtained the Kaiser records

17   prior to the interview on February 19th?

18        A.   Yes.

19        Q.   And did the family provide that or did you get

20   a release and order it?

21        A.   You know, we -- we have a contract to see

22   Kaiser patients, so we -- we, in essence, are a Kaiser

23   provider.  And so we have access to Kaiser notes as a

24   part of Kaiser's specialty clinic.

25        Q.   You can just go online and look it up, then?

Susan Skinner - X                            307

1        A.    Well, it's not really online and look it up,

2   but we have limited access to Kaiser notes.

3        Q.    Okay.

4        A.    Sometimes -- and I don't know specifically with

5   Jasmine.   Sometimes we are able -- Kaiser has a super

6   secure computer, so sometimes we can access the note and

7   review it.   Sometimes we struggle with that, and so we

8   would call Kaiser clinic and they would send us the last

9   note.

10       Q.    Okay.  Do you have a relationship with Western

11  Psychological?

12       A.    There may be -- I don't remember what it stands

13  for.  It's MOU.  There may be some sort of a partnership

14  between Children's Center and Western Psychological, but

15  not in the same way.

16       Q.    Okay.  Did you have Western Psychological's

17  office visit notes from January of 2015?

18       A.    From my review of the report, they did not.

19       Q.    Okay.

20             Are there side effects in children psychotic

21  in nature, such as hearing voices, believing things that

22  are not true, or suspiciousness?

23       A.    Regarding?

24       Q.    Dexedrine.

25       A.    Not that I'm aware of.

Susan Skinner - X                                    308

1      Q.    Have you prescribed Dexedrine yourself?

2      A.    Maybe a long time ago.

3      Q.    Okay.

4      A.    But certainly not recently.

5      Q.    Have you had occasion to recently look up the

6   side effects for that drug?

7      A.    Yes.

8      Q.    Okay.  When did you do that?

9      A.    Within the past week.

10     Q.    Okay.  Was that for this case?

11     A.    Yes.

12     Q.    Okay.  And your testimony is that there's no

13  known -- or is your testimony that there's no known side

14  effects for children of hearing voices, believing things

15  that are not true, or suspiciousness?

16     A.    Actually, that wasn't my testimony.  I said

17  that not I'm aware of.

18     Q.    Okay.

19     A.    So I -- I did review side effects, but I

20  reviewed the more common side effects.  I -- those may

21  be listed on the side effect list --

22     Q.    Okay.

23     A.    -- somewhere, but I do not specifically

24  remember those.  But that doesn't mean they're not

25  there.

Susan Skinner - X                    309

1        Q.    Did -- do you know if they -- if the father

2   brought medication prescription to the clinic?  Do you

3   know if he did or not?

4        A.    I don't know.

5        Q.    Okay.  So was -- what was your understanding of

6   the number of doses per day that she was prescribed of

7   Dexedrine?

8        A.    Twice a day.

9        Q.    Five milligrams?

10       A.    Yes.

11       Q.    Each?

12       A.    Yes.

13       Q.    Okay.  And in -- you reviewed this report; is

14  that correct?

15       A.    Yes.

16       Q.    Okay.  Of -- dated -- or an evaluation dated

17  February 19th.  Was there any indication in there as to

18  when her father may have administered the dose to the

19  daughter that day?

20       A.    I don't think so.

21       Q.    So I -- I didn't quite get the funding part

22  from the State.  It comes -- a portion of your funding

23  comes from -- by way of the State to Clackamas County,

24  the governing body, and then to your coffers?

25       A.    So I -- I cannot promise I'm saying this

Susan Skinner - X

```
1    exactly right.

2         Q.   Okay.

3         A.   CAMI funds; Child Abuse Multidisciplinary

4    Intervention funds from the State of Oregon are allotted

5    to the 36 counties to assist in assessments of child

6    abuse.

7         Q.   Okay.

8         A.   Each county, depending on their needs and their

9    population, makes a decision at the MDT level as to how

10   to allot those funds.  They come to the county MDT.

11        Q.   Okay.

12        A.   So the Clackamas County MDT.

13        Q.   Do you know how much funding you got from that

14   source in 2015?

15        A.   No.

16        Q.   Do you know what percentage it was?

17        A.   No.  I know that in general the Clackamas

18   County MDT gives money that comes from the State to our

19   center to do child abuse assessments.

20        Q.   Okay.

21             MR. KNAUSS:  No further questions.  Thank

22   you.

23             THE COURT:  Redirect?

24             MS. DUMONT:  None, Your Honor.

25             THE COURT:  May this witness be excused?
```

1                    MS. DUMONT:  Yes, Your Honor.

2                    THE COURT:  Any objection, Mr. Knauss?

3                    MR. KNAUSS:  No.

4                    THE COURT:  You're excused.

5                    THE WITNESS:  Thank you.

6                    THE COURT:  Thank you.

7                    MS. DUMONT:  The State rests.

8                    THE COURT:  Did you all come to an

9     agreement about Ms. McVay's testimony and the

10    continuation thereof and is that part of the State's

11    case?

12                   MS. DUMONT:  Your Honor, after you left

13    the bench, Mr. Knauss indicated he was done with his

14    questioning.

15                   I don't want to speak for you if you had a

16    change of heart.

17                   MR. KNAUSS:  I looked it over and I -- I

18    thought I was done, but I wanted to look at my notes

19    and --

20                   THE COURT:  I recall that.

21                   MR. KNAUSS:  -- I have no further

22    questions.

23                   THE COURT:  And you don't have any

24    redirect of her?

25                   MS. DUMONT:  I am deciding not to do

1    redirect.  If at a later point I decide to re-call her,

2    it will be on rebuttal.

3                THE COURT:  I understand.

4                MR. KNAUSS:  Okay.

5                THE COURT:  Mr. Knauss.

6                MR. KNAUSS:  Yes.  I'd like to call Trisha

7    Miller.  That -- she's the person that needs the

8    signers.

9                (Witness summoned.)

10               THE COURT:  Ma'am, if you will come all

11   the way to the front of the courtroom.  When you arrive

12   at the witness stand, first I'm going to have you take a

13   seat for a moment.

14               THE WITNESS:  (Indiscernible.)

15               THE COURT:  Go ahead and have a seat.  And

16   I'm doing that because I want to make it clear for the

17   record we have two American Sign Language interpreters,

18   one of which is very well known to me.  I do

19   presentations on a regular basis with Mr. Alletto.  And

20   the other sign language interpreter looks familiar to

21   me.

22               I don't recall your name, ma'am.

23               MS. WILKES:  Amanda Wilkes.  W-I-L-K-E-S.

24               THE COURT:  And you also are court

25   certified in the American Sign Language?

1          MS. WILKES:  I am not.

2          THE COURT:  You are -- can you explain to

3     me your qualifications, then?

4          MS. WILKES:  Yes.  I have certification

5     from RIB.  And I've been interpreting under Ed Alletto

6     here for several years as a mentee.  He's been mentoring

7     me (indiscernible).  I have passed my written exam for

8     my legal test but I have not become court certified in

9     court.

10          THE COURT:  You have one more step to go

11    through?

12          MS. WILKES:  Yes.

13          THE COURT:  Given my experience with sign

14    language interpretation, it is done in a very team

15    fashion between the two of you, so that whenever you

16    collectively disagree about what an interpretation might

17    mean, you will then confer amongst yourselves so that

18    the interpretation that we are receiving is essentially

19    from two individuals who are interpreting, as opposed to

20    one.  Is that your understanding?

21          MS. WILKES:  Yes, Your Honor.

22          THE COURT:  Mr. Alletto, am I misstating

23    anything about American Sign Language interpretation?

24          MR. ALLETTO:  No, Your Honor.

25          THE COURT:  Do either of the attorneys

1    object to proceeding at this time with an interpreter

2    who has not yet achieved what I know to be an incredibly

3    high level of qualification to receive that final

4    certification?

5                    MS. DUMONT:  I don't have any objection to

6    that.  I just would defer to the defense.

7                    THE COURT:  I appreciate that.

8                    MR. KNAUSS:  No -- no problem.

9                    THE COURT:  All right.

10                    So I'm going to accept the both of you as

11    certified -- as a certified and a qualified interpreter.

12    I believe that we then need to swear you.  Is that

13    correct?

14                    MS. WILKES:  Yes, ma'am.

15                    I would also like to disclose that --

16                    THE COURT:  Let me get to that next.

17                    MS. WILKES:  Okay.  Sorry.

18                    THE COURT:  I appreciate that.

19                    Mr. Ward, if you will please swear this

20    interpreter.

21                    (Interpreter Amanda Wilkes duly sworn.)

22                    THE CLERK:  Please state your full name

23    and spell your last.

24                    MS. WILKES:  Amanda Wilkes.  W-I-L-K-E-S.

25                    THE COURT:  And I previously very rudely

```
1     interrupted you.  My apologies.
2               I believe that you and Mr. Alletto had
3     conveyed to Mr. Ward that there was an indication from
4     this witness that she recognized you.  Could you give us
5     more information in that regard?
6               MS. WILKES:  Yes, Your Honor.
7               She said that we met in 2003.  And I've --
8     I have not worked for her, so I -- I don't think -- I
9     don't really remember.  But I asked her if she was
10    comfortable and she said she was.
11              THE COURT:  So are you indicating that you
12    have any kind of a personal relationship with this
13    witness?
14              MS. WILKES:  No.
15              THE COURT:  And, ma'am, do you have any
16    kind of a personal relationship with this interpreter?
17              THE WITNESS:  (No audible response.)
18              THE COURT:  I think that's sufficient for
19    the record, Ms. Dumont.
20              MS. DUMONT:  I'm satisfied as well, Your
21    Honor.
22              THE COURT:  Mr. Knauss, are you satisfied?
23              MR. KNAUSS:  Yes, I am.
24              THE COURT:  Okay.
25              Before we then swear you, ma'am, let me
```

Trisha Miller                    316

1    speak to you about your language.  My understanding is

2    that you are hard of hearing and that you use, as a form

3    of communication, American Sign Language.

4              THE WITNESS:  Have to make sure that I

5    understand everything.

6              THE COURT:  The interpretation into

7    American Sign Language just happened, and then you

8    responded audibly.  Are you going to be responding

9    audibly or are you going to be responding in American

10   Sign Language?

11             THE WITNESS:  Both.

12             THE COURT:  Both.  I've not yet had that

13   happen before.  Can you tell me how you will choose

14   between responding in American Sign Language and

15   responding audibly?

16             THE WITNESS:  If I need to sign ASL

17   (indiscernible).  I -- when I'm nervous (indiscernible)

18   I shut down, you know.

19             THE COURT:  I understand.

20             The only additional concern that I would

21   have is it's obvious when you're speaking that you

22   learned English when you were hard of hearing because --

23   and I say that because I understood everything you said,

24   but I'm concerned that one of the attorneys or the

25   record might not clearly indicate what you're saying in

Trisha Miller                                317

1    the spoken English language.  So I may need to interrupt

2    after you've said something audibly and ask that you

3    provide that information by American Sign Language as

4    well.

5                   Are you comfortable with that process?

6                   THE WITNESS:  Yes.

7                   THE COURT:  Are both of the attorneys

8    comfortable with that process?

9                   MR. KNAUSS:  Yes, Your Honor.

10                  MS. DUMONT:  Yes, Your Honor.

11                  THE COURT:  Okay.

12                  MR. KNAUSS:  Thank you.

13                  THE COURT:  If you don't understand

14   something that's being interpreted into American Sign

15   Language, I want you to immediately let me know.

16                  THE WITNESS:  I will.

17                  THE COURT:  I'm concerned also because it

18   looks like you are reading my lips at this point and

19   relying on what you may be hearing as opposed to the

20   interpretation.  And I don't care how you proceed.

21                  THE WITNESS:  I --

22                  THE COURT:  I just want to make sure that

23   you're not misinterpreting something.  These folks are

24   certified to know both languages fluently and they can

25   make sure that the interpretation is fully correct.

Trisha Miller                           318

1                    Would it be helpful to you if the
2       interpreters were to be located in a different place?
3                    THE WITNESS:  If -- I can understand you
4       really well.
5                    THE COURT:  Okay.
6                    THE WITNESS:  But if the interpreter may
7       be, like, kind of behind me, just in case if I miss out,
8       you know, then that'll be great.
9                    THE COURT:  Okay.
10                   MR. ALLETTO:  May the interpreter --
11                   THE COURT:  Mr. Alletto, please.
12                   MR. ALLETTO:  -- clarify a question?
13                   THE COURT:  Go ahead.
14                   MR. ALLETTO:  Excuse me.
15                   Right now the judge is speaking -- right
16      now the judge is speaking mostly.  Pretty soon the
17      attorneys will be asking questions.  Would you like us
18      to stand near the person who's speaking?
19                   THE WITNESS:  Yes, please.
20                   THE COURT:  That may be logistically
21      challenging, given that I will be speaking, an attorney
22      will be speaking, and you will be speaking.
23                   Let me ask our interpreters.  Normally I
24      see what you're doing right now, which is one of you
25      signing and one of you not signing.  Have you ever been

Trisha Miller

319

1  in a situation similar to this, where one of you stood

2  behind someone and one of you stood behind the other?

3            MR. ALLETTO:  Your Honor, it's very

4  unusual, but I think if Ms. Wilkes stood up near the

5  bench and was prepared to interpret any -- anything said

6  from the Court.  And if I remain here, which is kind of

7  in the general view, so that the attorneys would be in

8  the same general view as me.  And then if the Court had

9  something to say, Ms. Wilkes would take over.  I could

10  indicate that when Your Honor decides to speak.  And

11  otherwise, she could watch me and watch the attorneys.

12            THE COURT:  Do either of you object to

13  proceeding in that fashion?

14            MR. KNAUSS:  No.

15            MS. DUMONT:  No, Your Honor.

16            THE COURT:  As an aside, of all of the

17  judges in the state of Oregon, I'm probably the one that

18  knows most about court interpretation.  I'm the one that

19  speaks about this on a regular basis to new judges and I

20  present and I go to national seminars.  And what I have

21  just learned about a best practice for interpretation

22  with a hard-of-hearing individual who speaks and reads

23  lips is new to me.  So thank you for the information.

24  That's how we will proceed.

25            I will have you then stand behind me.

1              And, Mr. Alletto, I'm going to defer to

2      the witness about the best place for you to be.

3              Would it make more sense for Mr. Alletto

4      to be here in the well or behind the individual

5      speaking?

6              THE WITNESS:  He's okay over here.  Yeah.

7      I think right here is fine.

8              THE COURT:  Okay.  If you need him to move

9      at any time or if you need her to move or if you need me

10     to move anyone else, I want you to let us know.

11             THE WITNESS:  No.  Everything's good.

12             THE COURT:  If you want us to repeat

13     something, I want you to immediately let us know.

14             And to both of my interpreters, if we're

15     speaking too quickly or too slowly or not pausing with

16     adequate frequency, please let me know and I will change

17     the cadence in the trial.

18             Anything further before we proceed?

19             MS. DUMONT:  No, Your Honor.

20             MR. KNAUSS:  No.

21             THE COURT:  You both are chuckling a

22     little bit.  Have you ever seen anything that thorough?

23             MR. KNAUSS:  Oh, we -- we just had a

24     little side joke.

25             MS. DUMONT:  We had a sidebar.

Trisha Miller                                    321

 1                   THE COURT:  I'm going to -- I'm going to

 2      assume that it was a positive sidebar, or at least a

 3      neutral sidebar.

 4                   That means they had a conversation without

 5      telling me what they were talking about.

 6                   MR. KNAUSS:  We did.

 7                   THE COURT:  And I think they were talking

 8      about me.

 9                   MR. KNAUSS:  No.

10                   THE COURT:  But that's okay.

11                   MR. KNAUSS:  No.  It's like don't take all

12      day to do this witness, so . . .

13                   THE COURT:  Oh, I thought that was don't

14      take all day for the judge to make sure the

15      interpretation was correct.

16                   MS. DUMONT:  Yeah.

17                   MR. KNAUSS:  No.

18                   THE COURT:  And I -- I say that with

19      sarcasm.  The record should pick up on the fact that

20      everyone in the courtroom is chuckling a little bit at

21      this time.

22                   Okay, ma'am.  Do you have any questions

23      about how we're going to proceed today with the

24      interpreters?

25                   THE WITNESS:  (No audible response.)

Trisha Miller - D                                    322

1          THE COURT:  Anything further from either

2     of our interpreters?

3          MR. ALLETTO:  No, Your Honor.

4          THE COURT:  Okay.  If you will now please

5     stand and raise your right hand to be sworn.  Raise your

6     right hand.

7                      TRISHA MILLER,

8     called as a witness on behalf of the defendant, having

9     been first duly sworn, was examined and testified under

10    oath as follows:

11         THE COURT:  Go ahead and have a seat.

12         And please start by stating your full

13    name, spelling your last name for the record.

14         THE WITNESS:  Trisha Marie Miller.  And

15    spell my last name?

16         THE COURT:  Yes, please.

17         THE WITNESS:  Miller.  M-I-L-L-E-R.

18         THE COURT:  All right.

19         Ms. -- Mr. Knauss, please go ahead.

20         MR. KNAUSS:  Yes.

21                   DIRECT EXAMINATION

22    BY MR. KNAUSS:

23       Q.  Were you subpoenaed by the State to appear at

24    trial?

25       A.  Yes.

Trisha Miller - D                                      323

 1        Q.    Okay.  I'd like to discuss your --

 2              MS. DUMONT:  I'm sorry.  I just missed

 3   that first response.

 4              THE COURT:  "Yes."

 5              MS. DUMONT:  "Yes" was the response?

 6              THE COURT:  "Were you subpoenaed by the

 7   State to appear for trial?"

 8              "Yes."

 9              MS. DUMONT:  Thank you.

10   BY MR. KNAUSS:

11        Q.    I'd like to go through your history as far as

12   your hearing.

13              When -- when you born and growing up as a

14   child, could you hear anything?

15        A.    I -- I can hear things, but they weren't -- I'd

16   actually hear more of sounds and stuff when I was

17   growing up.  I was (indiscernible) when I was growing

18   up.  And I didn't learn sign language until I was, like,

19   11 years old.

20        Q.    Okay.

21        A.    That's when I knew other people like me that

22   are deaf and (indiscernible), so I just didn't know.

23   (Indiscernible.)  But anyways.

24        Q.    Did you learn to read lips?

25        A.    Yes.

Trisha Miller - D                              324

1        Q.    How --

2        A.    My whole life.

3        Q.    How -- how old were you when you started that

4    ability?

5        A.    Probably about two or three, when I started

6    talking.

7        Q.    Have you had any surgical help for your

8    hearing?

9        A.    No.  But I just had one recently with my

10    (indiscernible), which is last August.

11       Q.    And what did they do?

12       A.    They -- they put some kind of a actual

13    (indiscernible) that goes down my ear to my eardrum.

14    And so I have -- I forgot what you call it, but it's

15    supposed to make me (indiscernible) a lot more better.

16    And it's more stable.  (Indiscernible) because my whole

17    life when I had a hearing aid, the hearing aids never

18    worked properly or were high enough for the level of my

19    hearing (indiscernible) sound.

20       Q.    Okay.  Do you know, is there a name for that

21    implant or that device?

22       A.    It's called cochlear implant.

23       Q.    Okay.  The surgery was in 2015?

24       A.    Yes.

25       Q.    Okay.

Trisha Miller - D                                    325

1        A.    (Indiscernible) in August.

2        Q.    August.  Okay.

3              How old are you?

4        A.    I'm 31.

5        Q.    And who is this gentleman seated to my right?

6        A.    That's my nephew Jorden.

7        Q.    Okay.  And what color hair does he have?

8        A.    Brown.

9        Q.    Okay.  The -- I want to go through, like, where

10   you lived, just making sure where you lived and then

11   when you moved, okay?

12             Now, first of all, before we do that, what

13   is your education?

14       A.    You mean how far?

15       Q.    Yeah.

16       A.    I graduated from Oregon -- Oregon School for

17   the Deaf and Oregon City High School, both.  And I also

18   took some college at Clackamas Community College for a

19   few years.

20       Q.    All right.  Have you worked outside the home?

21       A.    I did have a job, but not right now.

22       Q.    Okay.  What kind of work did you do?

23       A.    I used to work in a warehouse for -- for Army,

24   Navy, uniforms and patches and medals and everything.

25       Q.    Okay.  Now, do you know Jasmine Jewell?

Trisha Miller - D                                    326

1        A.    Yes.

2        Q.    How old was she when you met her?

3        A.    She was three.

4        Q.    Okay.  Who's her father?

5        A.    Kenneth Jewell.

6        Q.    Have you ever met her mother?

7        A.    Quite a few times.

8        Q.    Okay.  Do you know where she lives?

9        A.    Now, no.  I don't know where she lives now, but

10    I did before.

11        Q.    Okay.  Where were you living when you first met

12    Jasmine and Kenneth?

13        A.    I was living in Milwaukie.

14        Q.    What was the address?

15        A.    (No audible response.)

16        Q.    Or just the street, if that's -- if you can

17    remember that.

18        A.    Okay.  Southeast Boardman.

19        Q.    Okay.  Now, do you remember when you moved from

20    that address?

21        A.    No.

22        Q.    When did you move from that address?

23        A.    I moved from Boardman to the place that I'm

24    living now three years.  Three years ago.

25        Q.    Okay.  So in 2013?

Trisha Miller - D                                    327

1          A.    Yeah.

2          Q.    Okay.  What is your current address?

3          A.    In Oregon City.

4          Q.    Yeah.

5                Now, what is the whole -- what's the street?

6          A.    Oh.  1208 Linn Avenue, Apartment 32, Oregon

7    City, Oregon, 97045.

8          Q.    Okay.

9                Now, going back to when you lived on

10   Boardman, did Kenneth and Jasmine live with you when you

11   lived in Boardman?

12         A.    Yes.

13         Q.    Okay.  From -- if we figure out the year, if

14   she was three years old, that -- she would have been --

15   in 2007 or 2008, does that sound like when she started

16   living with you?

17         A.    Yes.

18         Q.    Okay.  Did she live with you with her father

19   until you moved to Linn Avenue?

20         A.    Yes.

21         Q.    They lived there the whole time?

22         A.    No.  Because we were together for a couple

23   years, and then we split up.  And then we got back

24   together for the second time.  That was right before my

25   first daughter was born.

Trisha Miller - D                                                328

1      Q.    Okay.   Do you remember when you split up the

2  first time?

3      A.    I'm thinking somewhere in 2009.   '08.   2008 or

4  2009.

5      Q.    Okay.   And how long were you apart that time?

6      A.    We were apart maybe about two years.

7      Q.    Okay.

8      A.    Yeah.

9      Q.    So until about 2010 or '11?

10     A.    Yes.

11     Q.    Okay.   When you got back together, did you

12  split up again after that when you -- when you lived at

13  Boardman?

14     A.    I'm sorry.   Can you say that again?

15     Q.    Okay.   Did you have any other separations while

16  you lived on Boardman?

17     A.    No.

18     Q.    Okay.   Now, during that time in Boardman, did

19  Jorden live with you?

20     A.    Yeah.

21     Q.    Okay.   Was he living with you at the time

22  Jasmine and Kenneth arrived?

23     A.    When they were already there.

24     Q.    Okay.   So he came later?

25     A.    Yeah.

Trisha Miller - D                              329

1      Q.    Had he lived there before they came?

2      A.    A little -- just a short time.  It was, like,

3   before and during.

4      Q.    Okay.

5            (Mr. Knauss and the defendant confer

6   privately.)

7   BY MR. KNAUSS:

8      Q.    Are you close to your nephew?

9      A.    Yes.

10     Q.    Okay.

11     A.    Very much.

12     Q.    All right.  Okay.

13           Now, from the time Jasmine started living

14  with you until you left Boardman, how much of the time

15  did Jorden live with you?  You can say percentage or

16  months or years.  However you want to do it.  From --

17     A.    After I moved out from Boardman?

18     Q.    No.  At Boardman, once Jasmine lived there with

19  Kenneth and you --

20     A.    Oh.

21     Q.    -- how much of the time was Jorden there?

22     A.    Probably no more than three months or so.

23     Q.    Okay.  Did you -- did -- did Jorden ever

24  babysit Jasmine by himself --

25     A.    Never.

Trisha Miller - D                          330

1      Q.    -- while you lived at Boardman?

2            Did Jorden have a girlfriend while you were

3    living in Boardman?

4      A.    Yes.

5      Q.    What's her name?

6      A.    Trista.

7      Q.    Last name?

8      A.    I don't know her last name.

9      Q.    Okay.  Is she out in the hallway here?

10     A.    Yes, she is.

11     Q.    Okay.  And did she live at your house when you

12   were in Milwaukie?

13     A.    No.

14     Q.    Okay.  Did she visit Jorden --

15     A.    Yes.

16     Q.    -- at your house?

17     A.    Uh-huh.

18     Q.    Okay.  Did she get to know Jasmine?

19     A.    Yes, she did.

20     Q.    Okay.  Now, when you met Kenneth, where was he

21   working?

22     A.    (Indiscernible.)  That was a long time.  He

23   wasn't working.  He was actually in the military.

24     Q.    Okay.  When he lived at Boardman, what was his

25   first job when you were together?

Trisha Miller - D                                    331

1        A.    I -- I'm trying to remember what the first job

2   he was with.  But I think it was some kind of -- not a

3   warehouse, but some kind of job that goes through Job

4   Corps or something like that.

5        Q.    Okay.  Did he ever work at Safeway while he

6   lived with you?

7        A.    Yes.  That was later.  That was -- I think that

8   was when we moved back in Oregon City.

9        Q.    Okay.  So he worked at -- he didn't work at

10  Safeway when you lived on Boardman?

11       A.    I don't think so.

12       Q.    Okay.  Where else has he worked since?

13       A.    He worked over -- out in Portland and called

14  Gamblin Artists Colors.

15       Q.    Okay.

16       A.    It's a -- it's a paint company.

17       Q.    Was that his next job after the Safeway job?

18       A.    Yes.  Yes.

19       Q.    And he started that when you lived in Oregon

20  City -- when you moved to Oregon City?

21       A.    Yes.

22       Q.    I'm sorry.  I was looking down.  Okay.

23       A.    Yes.  Yeah.

24       Q.    And what was -- what was your relationship to

25  Jasmine?  What had -- let me start over.

Trisha Miller - D                              332

1              What has been your relationship with

2    Jasmine?

3         A.   She was a stepdaughter to me.

4         Q.   I'm sorry.  Could you repeat?

5         A.   She was a stepdaughter to me.

6         Q.   Okay.

7         A.   And I was a stepmom to her.

8         Q.   Okay.

9         A.   Because she never really had a real mother

10   figure.

11        Q.   Okay.  Did she ever call you "Mom"?

12        A.   Hardly.

13        Q.   Okay.

14        A.   Hardly ever called me "Mom."  But maybe once in

15   a while, but she always called me "Trisha."

16        Q.   Okay.  Did you ever take Jasmine to doctor

17   appointments?

18        A.   All the time.

19        Q.   Okay.  Now, we -- we understand she's been

20   diagnosed with ADHD.  Is that correct?

21        A.   Yes.  ADHD and ADD --

22        Q.   Okay.  And when --

23        A.   -- both.

24        Q.   -- when did you find out that she was diagnosed

25   with those?

Trisha Miller - D                           333

1        A.    Well, I kinda knew that she might have both
2    problems before she was actually diagnosed, but I had to
3    get the proof from her doctor's appointment to be sure.
4    It was probably -- I would say probably no more than
5    four years ago.
6        Q.    Okay.
7        A.    (Indiscernible) by now.
8        Q.    Has she been -- has she been prescribed
9    medications?
10       A.    Yes.
11       Q.    Now, do you know what medication she was on at
12   the time of the incident in February of 2015?
13       A.    The problem is that she did take some
14   medications, but she had quite a few medication and it
15   was switched over.  But I'm not sure what medication she
16   took that night.
17       Q.    Okay.  Who --
18       A.    But she did have medication.
19       Q.    Okay.  And who -- who gave her the medication?
20       A.    Her father, Ken.
21       Q.    Okay.  To your knowledge, around the time of
22   this incident was she just taking one type of medication
23   or was she taking more than one kind?
24       A.    At the same time?
25       Q.    Yeah.

Trisha Miller - D                    334

1        A.    She does it just one at a time.  I know she
2   used to maybe one or two pills, like one in the morning
3   and then -- and then it's like one in the afternoon
4   while she's in school.  And then she would have another
5   later that night before she goes to bed.
6        Q.    Okay.  Are they all the same medication?
7        A.    I don't --
8              MS. DUMONT:  Question in aid of an
9   objection.
10             THE COURT:  Go ahead.
11             QUESTIONS IN AID OF OBJECTION
12  BY MS. DUMONT:
13       Q.    During this time that you're talking about
14  Jasmine wasn't living with you, right?
15       A.    Well, what do you mean?
16       Q.    Jasmine had moved to Vancouver with her father,
17  correct?
18       A.    I thought you were talking about afterwards.
19             MR. KNAUSS:  I'll -- I'll clarify it.
20             MS. DUMONT:  Okay.
21             MR. KNAUSS:  I forgot to do that.
22             THE COURT:  I'm going to strike the last
23  question, then.
24             MR. KNAUSS:  Yeah.
25             THE COURT:  And the last answer.  You can

1    go ahead and clarify.

2              MR. KNAUSS:  Okay.

3              <u>DIRECT EXAMINATION RESUMED</u>

4    BY MR. KNAUSS:

5        Q.   I'm going to -- I forgot to clarify.

6              After you and Ken and Jasmine moved to

7    Oregon City, did you ever break up with Ken?

8        A.   We split up.  Yeah.

9        Q.   Okay.  So do you remember when you split up?

10       A.   That -- it was in (indiscernible) two years

11   ago.

12       Q.   Okay.

13       A.   I believe.  About two years ago.

14       Q.   Okay.  All right.

15             So let's talk about this -- the incident of

16   February of last year.  How long had you been split up?

17       A.   Just probably a couple months.

18       Q.   Okay.  So when you split up, was Jasmine

19   getting those three pills a day?

20       A.   Can you please repeat that?

21       Q.   When -- when you split up, before this

22   incident, was she taking medication three times a day?

23       A.   After we split up, I don't know.

24       Q.   No.  I mean right before you split up.

25       A.   Before.  Yeah.

Trisha Miller - D                                      336

1      Q.   Yeah.

2      A.   She was taking medication.

3      Q.   Okay.  Now, has Jasmine been in counseling?

4      A.   She was in counseling.

5      Q.   When was the first time she was in counseling?

6      A.   I will probably say sometime around 2009 to

7  2010 maybe.

8      Q.   Okay.

9      A.   Or '11.

10     Q.   Was she in school then?

11     A.   Yes.

12     Q.   Do you know what grade she was in?

13     A.   Now or --

14     Q.   No.  When she went to counseling, what --

15     A.   Oh, she was third.

16     Q.   Okay.

17     A.   Third grade, I believe.

18     Q.   Do you know, where did she go for the

19  counseling?

20     A.   She went to (indiscernible) office out on

21  McLoughlin.

22     Q.   Do you know --

23     A.   And it's Western Psychological.

24     Q.   Okay.  Do you know how many times she went when

25  she was in the third grade?

Trisha Miller - D                                337

1          A.     We would try to go maybe once or twice every

2     two weeks --

3          Q.     Okay.

4          A.     -- if possible.

5          Q.     How many times did she go when she was in the

6     third grade?

7          A.     Total?

8          Q.     Yeah.

9          A.     Probably about ten visits.

10         Q.     Okay.

11         A.     It wasn't very much.

12         Q.     Did -- did you take her or did Ken take her?

13         A.     I've always taken her.

14         Q.     Okay.  The --

15                THE COURT:  Our interpreters are going to

16     switch.

17                MR. KNAUSS:  Okay.

18     BY MR. KNAUSS:

19         Q.     Do you know if she ever went back for

20     counseling after the third grade?

21         A.     No, she didn't.

22         Q.     Okay.  Do you know whether or not she was in

23     counseling at the time of this incident?

24         A.     No, she wasn't.

25         Q.     She wasn't or you don't know?

Trisha Miller - D                      338

1          A.    I don't -- she wasn't in counseling when it

2    happened.

3          Q.    Okay.

4                Now, when this incident happened, who -- who

5    was living in the house at the time of the incident?

6          A.    It was me and my daughter, Kaeli, and my older

7    sister, Mindy.  And then I had Jorden come to stay four

8    or five (indiscernible) times.

9          Q.    Now, is Mindy Jorden's mother?

10         A.    Yes.

11         Q.    Okay.  How long had Mindy been staying with

12   you?

13         A.    Probably a year.

14         Q.    Okay.  And she's your sister?

15         A.    Yeah.  She's my sister.

16         Q.    Okay.  So when you -- the day you went to the

17   police station with Ken, how long had Ken and Jasmine

18   been staying at your house?

19         A.    They were just there for the weekend.

20         Q.    Pardon?

21         A.    They were only there for the weekend.

22         Q.    Okay.  Do you know how many days they'd been

23   there?

24         A.    Well, before and after the -- after this

25   happened, they were probably there -- a day and a half

Trisha Miller - D                              339

1    he was there.

2        Q.   Okay.  Now, let's talk about the date this

3    happened.

4             Now, were you -- were you at home during the

5    day?

6        A.   Yes.

7        Q.   Okay.  Do you know if Ken was home?

8        A.   During the day?

9        Q.   Yeah.

10       A.   No.  He was at work.

11       Q.   Okay.  And was Jorden there?

12       A.   He wasn't there during the day.

13       Q.   Okay.  Was Mindy there during the day?

14       A.   Yes.

15       Q.   And just for -- just so we clarify, you said

16   Kylie, that's your daughter with Ken?

17             THE DEFENDANT:  Kaeli.

18   BY MR. KNAUSS:

19       Q.   Or Kaeli.  I said it wrong.  Yeah.

20       A.   Kaeli, my daughter.

21       Q.   Yeah.  That's -- Ken's the dad?

22       A.   Yeah.  He's the dad.

23       Q.   Okay.  All right.

24             So was Jasmine home during the day?

25       A.   She goes to school, and then after school she's

Trisha Miller - D

 1  home with me.

 2      Q.   Okay.  So do you know if she went to school

 3  that day?  Do you remember?

 4      A.   Yes, she did.

 5      Q.   Okay.

 6           Now, do you know what time Ken got home?

 7      A.   Usually -- usually doesn't get home till, like,

 8  after 5:30.

 9      Q.   Okay.

10      A.   No later than 7:00.

11      Q.   All right.

12           Can you remember anything that was going on

13  that evening, early in the evening?

14      A.   I can just remember how we were all getting

15  together to have some family time.  And we were all

16  talking and hanging out, like a normal thing to do, you

17  know.

18      Q.   Okay.  Did you have --

19      A.   (Indiscernible.)

20      Q.   Did you have dinner together?

21      A.   Oh, yeah, we did have dinner (indiscernible)

22  that day.

23      Q.   Okay.  All right.

24           So after dinner, did Jorden come to your

25  home?

Trisha Miller - D                              341

```
 1        A.    Not right after dinner.

 2        Q.    Okay.

 3        A.    It was later.

 4        Q.    What time did he get to your home?

 5        A.    Well, 11:00, I think.

 6        Q.    Okay.  Where was Mindy at that time?

 7        A.    She was upstairs in her room.

 8        Q.    Okay.  Is there a bed in Mindy's room?

 9        A.    Yeah.

10        Q.    Would she sleep in that bed?

11        A.    Yeah.

12        Q.    Okay.  Would she ever sleep on the floor?

13        A.    She does sleep on the floor sometimes.  She has

14   back issues.

15        Q.    Okay.  The -- when -- when Jorden got home, was

16   Ken still there?

17        A.    Yes, he was.

18        Q.    And was Jasmine still awake?

19        A.    No.  She was asleep.

20        Q.    Okay.

21              Now, earlier that evening did you notice

22   anything unusual about Jasmine?

23        A.    It -- well, I think she'd been on her

24   medication.  I wouldn't know.  She would kinda doze --

25   doze off.  But that's what the doctor told me that --
```

Trisha Miller - D                              342

1                MS. DUMONT:  Objection.  Hearsay.

2                THE COURT:  Mr. Knauss.

3                MR. KNAUSS:  Yeah.  I -- that's fair.

4                THE COURT:  I'm going to strike the

5    last --

6                MR. KNAUSS:  Yeah.

7                THE COURT:  -- portion, "the doctor told

8    me."

9                MR. KNAUSS:  Yeah.  Okay.

10               THE COURT:  Actually, it wasn't hearsay.

11   It was leading to hearsay.  So I'm simply going to stop

12   the answer there.

13               MR. KNAUSS:  Yeah.  Okay.

14               THE COURT:  Go ahead.

15   BY MR. KNAUSS:

16       Q.   So you said Jasmine was kind of drowsy?

17       A.   Yeah.

18       Q.   Okay.  Just to help you, you can't say what the

19   doctor told you.

20       A.   Yeah.

21       Q.   Okay?

22       A.   Okay.

23       Q.   It's all right.

24       A.   Sorry.

25       Q.   No problem.

Trisha Miller - D                                    343

1              So in what way do you mean she was drowsy?

2        A.    She was drowsy, like, a little out of it.  And

3    she (indiscernible) too much, but her father told me

4    that's how she's supposed to --

5              MS. DUMONT:  Objection.  Hearsay.

6              THE COURT:  Mr. Knauss?

7    BY MR. KNAUSS:

8        Q.    Yeah.  You can't say what Ken said.

9              THE COURT:  I'm going to strike the

10   portion about "her father told me."

11             MR. KNAUSS:  Yep.

12             THE COURT:  Go ahead.

13   BY MR. KNAUSS:

14       Q.    So being drowsy, what did you notice?  How did

15   she look drowsy to you?

16       A.    It actually was like -- like she was out of it.

17   It's like almost like when you ask her something

18   (indiscernible) she kind of delayed responding.

19       Q.    And you -- you know that that's her -- what she

20   looked like that night?

21       A.    Most of the time, yeah.

22       Q.    Okay.  Did she look like that that night?

23       A.    Yeah.  Before she fell asleep.

24       Q.    Okay.  So, now, do you know whether or not she

25   was wearing a bra that night?

Trisha Miller - D                                          344

1        A.    She wasn't wearing a training bra in bed, but

2    she was earlier, before she was in bed.

3        Q.    How do you know that?

4        A.    Because when Ken and I were actually trying to

5    get back together, there was something new about her

6    that I didn't know because she was starting to wear a

7    training bra.  And that was something new that

8    (indiscernible).

9        Q.    Did you notice that she was not wearing the

10   training bra that night?

11       A.    Yeah.  Because her shirt was up.  I pulled her

12   shirt down for her.

13       Q.    So when -- was she awake or asleep when you

14   pulled the shirt down?

15       A.    She was asleep.

16       Q.    And was her shirt high enough to see if there

17   was a bra?

18       A.    Oh, yeah.  It was pretty high on her.  It had

19   almost gone to --

20       Q.    How many times did you pull her shirt down that

21   night when she was asleep?

22       A.    I -- can you repeat that again?

23       Q.    Sure.

24             How many times did you pull her shirt down

25   when she was sleeping?

Trisha Miller - D                           345

```
 1        A.   Oh, just one.

 2        Q.   Once?

 3        A.   Once.  (Indiscernible.)

 4        Q.   Okay.  Now, when -- when Jorden came home, what

 5   happened then?

 6        A.   When he came home, he was out in the backyard

 7   having a cigarette and was just talking, having

 8   conversations.  And we all started to get tired and so

 9   we decided to go to bed.  So Jorden fell asleep on my

10   long couch.  Jasmine was sleeping on my shorter couch --

11   the shorter couch.  And Ken, he went up to bed and I

12   stayed down there for another ten, fifteen minutes,

13   having another cigarette before I went to bed.

14        Q.   So when you and Jorden went outside to smoke

15   the first time, was Ken with you?

16        A.   Yeah.

17        Q.   When you went up to bed after smoking another

18   cigarette, was Jasmine still asleep?

19        A.   Yes.

20        Q.   Was Jorden asleep?

21        A.   When I came out the last time for a cigarette?

22   Yes, he was.

23        Q.   When you went upstairs, was -- after our

24   cigarette, was Jorden asleep or awake?

25        A.   Yes, he was.
```

Trisha Miller - D                                           346

1        Q.    He was asleep?

2        A.    Jorden was asleep.

3        Q.    Okay.  And then did you ever come back

4    downstairs?

5        A.    Not after my last cigarette.

6        Q.    Now, while you lived in -- on Boardman, what

7    kind of activities did you see Jasmine have with Jorden?

8        A.    Play.  They play a lot.  They rough a little

9    up.  They're rough with each other sometimes, because

10   Jasmine's rough.

11             Jorden does actually help me with Jasmine's

12   homework after school sometimes.  Sometimes he'd just

13   sit down and watch some kids' movies.  Go outside and

14   play.  Just like a regular kid should be doing.

15       Q.    Did you ever see Jasmine hesitant around Jorden

16   while you lived in Milwaukie?

17       A.    No.

18       Q.    Did you ever see Jasmine hesitant around Jorden

19   when you lived in Oregon City?

20       A.    No.

21       Q.    Did he ever babysit Jorden -- I'm sorry.

22             Did he ever babysit Jasmine while you lived

23   in Oregon City?

24       A.    Never.

25       Q.    Did you ever notice any inappropriate touching

Trisha Miller - D                                    347

1    or activities between Jorden and Jasmine?

2        A.    No.

3        Q.    Was -- did Jasmine ever hug Jorden?

4        A.    He does give her hugs.

5        Q.    They give each other mutual hugs?  Is that --

6        A.    Yeah.  Not kisses, but like hug, like "good

7    night."

8        Q.    Okay.

9        A.    Like, "See you later."

10       Q.    When you were outside smoking with Jorden,

11   could you tell whether or not he'd been drinking?

12       A.    He was having -- he did have a few beers that

13   night.

14       Q.    Was he intoxicated?

15       A.    He was not drunk.

16       Q.    And when -- when you woke up the next day, did

17   you go downstairs at some point?

18       A.    Are you asking me what time I came down?

19       Q.    Yeah.  That was a stupid question.

20             But anyway, when you -- when you went

21   downstairs, what -- where was -- was Jorden there?

22       A.    No, he was not down there.

23       Q.    Okay.

24       A.    He upstairs in his room.

25       Q.    How do you know that?

Trisha Miller - D                          348

1          A.    In his mom's room.

2          Q.    How do you know he was up in --

3          A.    Because I checked on him; made sure he was

4     here.

5          Q.    Okay.  And was -- where was he sleeping?

6          A.    What do you mean?

7          Q.    Was he in the bed or -- or on the floor?

8          A.    He was on his mom's bed.

9          Q.    Okay.  And where was his mother?

10         A.    His mom slept on the floor that night.

11         Q.    Okay.  And was Jasmine awake when you went

12    downstairs?

13         A.    Yes, she was.  She was playing with my

14    daughter's toys in the little play area.

15         Q.    Did she appear to be in any distress or --

16         A.    No.  She was playing quiet, like you should in

17    the morning when people are sleeping.

18         Q.    Okay.

19         A.    There was no change of act or anything that

20    looked like out of the blue or, you know, something like

21    that.  There was nothing like that.

22         Q.    Okay.  Now, did you and Ken have plans that

23    morning?

24         A.    Not that morning, but we did have it -- plans

25    later that afternoon.

Trisha Miller - D                          349

 1      Q.    Okay.  So did you and Ken leave at some point?

 2      A.    Yeah, we did.  Left for lunch.

 3      Q.    Okay.  Did Jasmine go with you?

 4      A.    Yes.

 5      Q.    Okay.  Did your daughter go, too?

 6      A.    I did too, and my daughter.

 7      Q.    Okay.  And at the time, she was three?  Is that

 8  right?

 9      A.    No.  She was --

10      Q.    How old was she then?  What's her birthday --

11  date of birth?

12      A.    Her birthday is August -- August 21st, 2004.

13      Q.    No.  I'm talking about Kylie.

14            MS. DUMONT:  Kaeli.

15  BY MR. KNAUSS:

16      Q.    Kaeli.

17      A.    Oh, my daughter.

18      Q.    Yeah.

19      A.    May 1st, 2013.

20      Q.    Okay.  So she would have been --

21      A.    She was less than --

22      Q.    -- just short of two then?

23      A.    She was less than two.

24      Q.    Okay.  Was she walking?

25      A.    Sorta.

```
 1       Q.    Okay.  All right.

 2             Where did you go?

 3       A.    We went to Coffee Barn off McLoughlin.

 4       Q.    Okay.  Did you --

 5       A.    (Indiscernible.)

 6       Q.    Did you have a meal?

 7       A.    Yeah.

 8       Q.    Okay.  And did you come to learn that Jasmine

 9  was claiming that Jorden had touched her?

10             MS. DUMONT:  Objection.  Leading.

11             THE COURT:  That is leading.  Why don't

12  you try to rephrase your question.

13             MR. KNAUSS:  Yeah.

14  BY MR. KNAUSS:

15       Q.    The -- did any issue come up while you were

16  eating your meal?

17       A.    It did, but I did not hear until after we

18  walked out the restaurant, outside in the parking lot.

19       Q.    Okay.

20       A.    After we put the kids in the car.

21       Q.    Okay.  And who told you what had happened?

22       A.    Jasmine's father.

23       Q.    Did you ever hear Jasmine -- or did Jasmine

24  ever tell you what happened, at the restaurant or at the

25  car?
```

Trisha Miller - D                                              351

 1        A.    I never heard a word that she said because I
 2   was too busy taking care of my own daughter, helping
 3   feeding her and stuff.  And it was too loud in there
 4   to -- I was having a hard time hearing people.
 5        Q.    Did you and Ken later go to the police?
 6        A.    I was -- talked with them.  I -- we were all at
 7   the same time.
 8        Q.    Okay.  Did you go -- which police station did
 9   you go to?
10        A.    Oregon City police station up here.
11        Q.    Okay.  And did a policeman talk to you?
12        A.    Yeah.
13        Q.    Did you give a statement?
14        A.    I did.
15        Q.    And did you tell them that you heard it?
16              MS. DUMONT:  Objection.  Hear- -- I mean,
17   leading.
18              THE COURT:   "Did you tell him that you
19   heard it?"  That is leading.
20              MR. KNAUSS:  Okay.
21   BY MR. KNAUSS:
22        Q.    You -- you've told us that Ken told you that --
23   that Ken told you what happened when you were in the
24   car.
25        A.    In the parking lot.

Trisha Miller - D                              352

1       Q.    Okay.  Did you change your story when you
2   talked to the policeman?
3       A.    No, I did not.
4       Q.    Okay.  Did you tell the policeman that Jasmine
5   told you what happened?
6               MS. DUMONT:  Objection.  Leading.
7               THE COURT:  Mr. Knauss, that seems like
8   it's leading.
9               MR. KNAUSS:  Yeah.  Okay.  I guess we'll
10  be here till 5:00, but that's all right.
11  BY MR. KNAUSS:
12      Q.    The -- what you told the policeman, was that
13  what Ken told you in the car?
14      A.    I told the policeman what Ken told me out in
15  the parking lot.
16      Q.    Okay.
17      A.    Because I did not hear a word of what Jasmine
18  said, period.
19      Q.    Okay.
20      A.    I was clueless.  I was like, "What's going on?"
21  as soon as we walk out the restaurant.  Go -- so put the
22  kids in the car, and then that's when Ken started
23  telling me what Jasmine said inside the restaurant.
24      Q.    Now, did you later take your cell phone to the
25  police station?

Trisha Miller - D                              353

1      A.    I had my phone on me, yeah.

2      Q.    Okay.  Did -- did you go to the police station?

3      A.    Yeah.

4      Q.    And did they take a picture of your cell phone?

5      A.    Yeah.  Because they asked for a picture.

6      Q.    Okay.  You went there because they asked you to

7   come?

8      A.    No.  We went there because Ken wanted to go the

9   police station.

10     Q.    I'm sorry.  What was -- I missed the last word.

11     A.    We --

12           THE COURT:  "Police station."

13           MR. KNAUSS:  Okay.

14           THE COURT:  Can you repeat your answer?

15           THE WITNESS:  Well, I'm trying to -- I'm

16   trying to (indiscernible), but --

17           THE COURT:  I think you said, "We went

18   there because Ken wanted to go to the police station."

19           THE WITNESS:  Yeah.  Ken -- we went there

20   because Ken wanted to go to the police station.  Yeah.

21   BY MR. KNAUSS:

22     Q.    All right.

23     A.    And -- yeah.

24     Q.    Now, do you have an opinion of Jasmine's

25   veracity for truth-telling, based upon your personal

Trisha Miller - D                    354

```
 1    knowledge?

 2         A.   (No audible response.)

 3         Q.   What is that opinion?

 4         A.   She can be (indiscernible) some point.  Most of

 5    the time (indiscernible) it's really difficult.  She was

 6    a handful for me.

 7         Q.   Okay.

 8         A.   I just had a very hard time with her.

 9         Q.   All right.  Now -- let's see.

10              You went to the Children's Center with Ken

11    and Jasmine?

12         A.   What Children's Center?  The counseling?

13         Q.   No.  After -- after you went to the police

14    station --

15         A.   Oh.

16         Q.   -- with the texts, did you go --

17         A.   Oh, yeah.

18         Q.   -- to the Children's Center?  Okay.

19         A.   Yeah.

20         Q.   Did they ask you any questions?

21         A.   No.  (Indiscernible) asked me any questions.

22         Q.   Did they -- did they --

23         A.   That was more Jasmine.

24         Q.   Did they speak with Ken?

25         A.   They did.
```

Trisha Miller - D                                  355

1        Q.    Okay.  And did -- did Ken stay with you after

2   that?

3        A.    No.

4        Q.    Was he still living at your place when you went

5   to the Children's Center?

6        A.    No.

7        Q.    When did he leave?

8        A.    They left right after everything was done.

9   They left (indiscernible).

10       Q.    You're talking about after you went to the

11  police station he left; is that right?

12       A.    Yes.

13       Q.    Where did he live?

14       A.    He was staying with his father out in

15  Vancouver.

16       Q.    Okay.

17             MR. KNAUSS:  No further questions.

18             THE COURT:  Our interpreters are going to

19  switch.

20             Cross-examination.

21             MS. DUMONT:  Thank you.

22                   CROSS-EXAMINATION

23  BY MS. DUMONT:

24       Q.    I want to talk to you a little bit initially

25  about the houses that you were living at.

Trisha Miller - X                          356

1              You were living, isn't it true, a house at

2    1208 Linn Avenue in Oregon City?

3         A.   Yes.

4         Q.   Okay.  And -- and I want to situate us so that

5    we're talking about the same time frame.  I'm talking

6    about February 13th, 2015.

7         A.   Okay.  The place that I was living at that

8    time?

9         Q.   You were living -- yes.

10        A.   Okay.  Oregon City.

11        Q.   Okay.  And I'm a little confused about the

12   dates that you gave, about when Kenneth Jewell moved

13   out.

14        A.   He moved out --

15        Q.   And I want to clarify that so I'm not mistaken.

16        A.   He moved out Mother's Day before it happened.

17   That night it happened.

18        Q.   Yeah.  Mother's Day is in May, correct?

19        A.   Yeah.

20        Q.   Okay.  So this -- we're talking about February.

21   So are you saying the May before?  So May 2014 is when

22   he moved out?

23        A.   Yeah.  On Mother's Day he moved out, so --

24        Q.   I'm -- I want to be sure.  Are we talking 2014?

25        A.   Yes.

Trisha Miller - X                                                   357

 1        Q.    Okay.  So May 2014, Kenneth --

 2        A.    He moved out.

 3        Q.    -- moved out with Jasmine and left to

 4   Vancouver?

 5        A.    Yes.

 6        Q.    Okay.  All right.

 7              And so -- and you testified, I think, that

 8   your daughter Kaeli was born in 2000- --

 9        A.    3rd, 2013.

10        Q.    2013.  Okay.

11              And it's my understanding, and I want to

12   make sure I'm right, that you moved from the Boardman

13   Avenue address to the Oregon City address right around

14   the time -- or right before Kaeli was born.  Is that

15   right?

16        A.    I was pregnant with Kaeli.  When I moved up to

17   Oregon City --

18        Q.    Okay.

19        A.    -- three months after, she was born.  When I

20   was in Oregon City.

21        Q.    Okay.  She was born and then you moved or you

22   moved and then she was born?

23        A.    I moved and I was still pregnant.

24        Q.    Okay.  And she was born in May of 2013?

25        A.    Yes.  I moved up to Oregon City in December of

Trisha Miller - X                          358

1   2012.

2        Q.   December of 2012 you moved.  She's born in May.

3   And you're then at the Linn Avenue address?

4        A.   Uh-huh.

5        Q.   Okay.  Great.

6             So now I'm going to go back.  We're going

7   back to --

8        A.   Okay.

9        Q.   -- the Linn Avenue address on February of 2015,

10  when this happened.  And at that point, it's true, is it

11  not, that Kenneth and Jasmine hadn't been living there

12  for a long time?

13       A.   Not a long time, but quite a few months.

14       Q.   Okay.  And they came --

15       A.   Over for (indiscernible).

16       Q.   -- for -- to visit?

17       A.   To visit and to try to get our relationship to

18  work back together.  See if it will work.

19       Q.   Okay.  And at that time, when did your sister

20  Mindy move in?  Was Mindy at the house when Kenneth was

21  at the house or did Mindy come after Kenneth left?

22       A.   After Ken moved out, my sister moved in with me

23  to help me with my daughter.

24       Q.   Okay.  So after Mother's Day 2014 is when Mindy

25  lived there?

Trisha Miller - X                      359

    1        A.    Yeah.  Yeah.  It was like a week or two after.

    2        Q.    Okay.  I see.

    3              And back in February of 2015, when this

    4    happened, your sister was there.  And she was staying in

    5    a bedroom upstairs, right?

    6        A.    Yeah.

    7        Q.    Okay.  And was -- she wasn't sharing a bedroom

    8    with you, right?

    9        A.    No.

   10        Q.    No.  And her bedroom, was that the bedroom that

   11    Jasmine used to have?

   12        A.    Yes.

   13        Q.    Okay.  And that was up the stairs on the

   14    left-hand side?

   15        A.    Up the left-hand side.  Yeah.

   16        Q.    Okay.  And so when Jasmine came to visit, she

   17    would stay on the short couch in the downstairs?

   18        A.    Downstairs on the sofa, yes.

   19        Q.    All right?

   20        A.    Yes.

   21        Q.    Okay.  And what did that couch look like?

   22        A.    It's a black leather couch.

   23        Q.    Okay.  Was there another couch in the room?

   24        A.    Yeah.  A long black leather couch.

   25        Q.    Okay.  A long black leather couch.  And was

Trisha Miller - X                          360

1    there a play area in the room?

2        A.    Yeah.   In between both couches.

3        Q.    Okay.   And so there's a short couch, the long

4    couch, and then a play area in between the two of them?

5        A.    The -- the entrance and the door.

6        Q.    Uh-huh.

7        A.    And then there's a window.   In front of a

8    window is the short couch.

9        Q.    Uh-huh.

10       A.    In the corner, there's a little play area for

11   my daughter.

12       Q.    Right.

13       A.    And then there's a longer couch on the other

14   side of the wall.

15       Q.    Okay.   And what did the play area have?  Did it

16   have some alphabet, like, spongy kind of things?   Or

17   what was it like?

18       A.    It had play mats, stuffed animals, lots of kid

19   toys.

20       Q.    Okay.

21       A.    My daughter's toys.

22       Q.    And what?   I didn't hear.

23       A.    My -- my daughter's toys.

24       Q.    Your daughter's toys.

25       A.    Kaeli's toys.

Trisha Miller - X                                361

 1        Q.    Okay.  And you talked a little bit -- at that
 2   time that Jasmine was there in February of 2015, she was
 3   ten years old, right?
 4        A.    Yes.
 5        Q.    Okay.  And at that point, she was able to dress
 6   herself, right?
 7        A.    No.  She -- dress herself?
 8        Q.    Uh-huh.
 9        A.    No.
10        Q.    She needed help to get dressed?
11        A.    Pick out her clothes, matching them, yes, she
12   does need help.
13        Q.    Oh, I --
14        A.    She couldn't do her own hair or anything like
15   that.
16        Q.    Right.  So you would help -- or -- well, you
17   hadn't been helping her.  She had been living in
18   Vancouver, right?
19        A.    She was staying in Vancouver.  Someone else
20   helped her get dressed, pick out her clothes, I'm sure.
21        Q.    Okay.  So she could get them on herself after
22   they'd been picked out?
23        A.    Yeah.
24        Q.    Okay.  You're saying just stylistically, you
25   would help make sure they matched and looked good.  Is

Trisha Miller - X                           362

1    that what you're saying?

2        A.    Yeah.  She has a problem with color matching,

3    yes.

4        Q.    Oh, okay.

5        A.    Yeah.

6        Q.    Okay.  And you testified that defendant -- I'm

7    going to refer to Jorden Hollingsworth as the defendant,

8    okay?  Just so we're clear.  You testified that Jorden

9    came home that evening.

10       A.    Yes.

11       Q.    And that he had been drinking.  Is that right?

12       A.    (Indiscernible.)

13       Q.    Okay.  And that your sister, Mindy, was

14   upstairs in the bedroom, right?

15       A.    Yep.

16       Q.    And that Jasmine was downstairs on the couch?

17       A.    Yes.

18       Q.    Okay.  And -- (pause).

19             Do you remember talking to a defense

20   investigator in January of this year?

21       A.    Before all this happened?

22       Q.    January of this year, 2016.

23       A.    Oh, oh.  Yeah.

24       Q.    So not Mr. Knauss that you talked to, I think

25   in his office, but someone from his office maybe came

Trisha Miller - X                              363

 1    and talked to you in January of this year.  Do you
 2    remember that?
 3         A.    At my house?
 4         Q.    Did you talk to someone from Mr. Knauss's
 5    office this year?
 6         A.    Not his office?
 7         Q.    On February -- Saturday, January 9th, at your
 8    residence, at 1208 Linn Avenue --
 9         A.    Oh, so it was at my house.
10         Q.    -- S. Castleman came to your house.  Do you
11    remember that?
12         A.    Oh.  Yeah.
13         Q.    Okay.
14         A.    Yeah.  I -- I remember now.
15         Q.    Okay.  And you -- you remember that happening?
16         A.    Yes.
17         Q.    Okay.  And you agreed to talk to him, right?
18         A.    Yes, I did.
19         Q.    Okay.  And you talked -- do you remember
20    talking to the -- Mr. Castleman and said that Jasmine
21    would tell her dad the truth every single time.  Do you
22    remember that?
23         A.    Yes.
24         Q.    Okay.  And that's different than what you said
25    today, right?

Trisha Miller - X                                        364

1        A.    I'm sorry, but --

2        Q.    Never mind.

3        A.    -- it --

4        Q.    That's okay.

5        A.    I'm -- I --

6        Q.    I'll just --

7        A.    (Indiscernible.)

8        Q.    I'm going to read -- I'm going to just move on

9   with the next question now.

10            You -- after this happened, you testified,

11   did you not, that you went to the Coffee Barn, correct?

12       A.    Yes.

13       Q.    Okay.  And you testified that you were eating

14   breakfast.  What time was that around?

15       A.    (Indiscernible.)

16       Q.    What time was it?

17       A.    It was like 1:00ish, 1:30.

18       Q.    Okay.  So 1 o'clock you're eating.  And what

19   was the table like?

20       A.    It was a little bit longer than a square, but

21   not a rectangle.

22       Q.    Okay.

23       A.    A white sheet over our table, with four chairs.

24   And there's, like, a little highchair on the end of the

25   chair because my daughter's car seat was on top of it.

Trisha Miller - X                                365

1        Q.    Okay.  And you testified that at that point
2    your daughter was -- your daughter Kaeli was sort of
3    walking; is that right?
4        A.    Yes.
5        Q.    Was she still breastfeeding or was she eating a
6    lot of solid foods?
7        A.    I'd still breastfeed her.  I -- yeah, she
8    was --
9        Q.    Do you still today?
10       A.    -- still breastfeeding at the time.
11       Q.    Okay.  So at the time, she's still
12   breastfeeding.
13             And -- and when you -- and when you were
14   talking with Jasmine, where was Jasmine at at the table?
15       A.    She was sitting next to me, on my right side.
16       Q.    Okay.
17       A.    On the same side.
18       Q.    Okay.  And when you were -- after Jasmine had
19   the conversation with -- at -- at lunch -- and you
20   testified you went to the police station, right?
21       A.    After we had lunch.  We were outside talking is
22   what -- Ken told me what Jasmine said.  I was stuck in
23   the same vehicle with Ken.
24       Q.    Well, I'm asking you if you went to the police
25   station.

Trisha Miller - X                          366

 1        A.    Yeah.  We did go to the police station

 2   afterwards.

 3        Q.    Okay.  And when you went to the police station,

 4   you met with an officer, right?

 5        A.    Yes, I did.

 6        Q.    Okay.  And his name was Officer Behan, correct?

 7        A.    Was I familiar with him?

 8        Q.    You don't -- it's fine if you don't remember.

 9   Do you not remember his name?

10        A.    No, I don't.

11        Q.    Okay.  That's fair.  That's fair.

12              And -- but you do remember meeting with an

13   officer?

14        A.    Yes, I do.

15        Q.    Okay.  And you were meeting in a private -- in

16   a room with just the two of you, correct?

17        A.    Me talking with the officer alone.  I wasn't

18   talking with the officer with somebody else.

19        Q.    That's what I'm asking.

20        A.    Okay.  Yeah.

21        Q.    Yeah.

22              And you would agree that right after

23   something happens, it's easier to remember things?

24        A.    Are you asking me a question?

25        Q.    Yeah.  You would agree that it's easier to

Trisha Miller - X                                    367

1   remember things --

2        A.   (Indiscernible - simultaneous speech.)

3        Q.   -- when something first happens, right?

4        A.   Yeah.

5        Q.   Okay.  And so you can forget things after a

6   while?

7        A.   Me?  No.  No.

8        Q.   You never forget anything?

9        A.   No, not really.

10       Q.   Okay.  One way that you can remember is to take

11  notes; isn't that right?

12       A.   Take notes, you said?

13       Q.   Uh-huh.

14       A.   Well, what was -- what was the -- what did you

15  say right before "taking notes"?

16       Q.   "One way to remember."

17       A.   One way to remember?

18       Q.   A method by which you could help to remember

19  things is to take notes?

20       A.   Yeah.

21       Q.   So for example, I wrote down the questions I

22  was going to ask you so that I don't forget anything.

23       A.   Yeah.

24       Q.   And you would agree that's a -- that's a way

25  to -- to train your memory?

Trisha Miller - X                    368

1       A.    Yeah.  That's another way.  Uh-huh.

2       Q.    Okay.  And you didn't take any notes, did you?

3       A.    (No audible response.)

4       Q.    No.  And you didn't write a report, did you?

5       A.    No.

6       Q.    No.  Okay.

7             And when you talked to Officer -- the

8    officer, you told him that you had been engaged to

9    Kenneth in the past; is that correct?

10      A.    Yes, I was.

11      Q.    And that's what you told him, right?

12      A.    I was engaged to him, yeah.

13      Q.    Okay.  What I'm -- okay.

14            What I'm trying to get at is I'm trying to

15   get that you agree or disagree about things that you

16   told the officer.  And so if you agree, then you can

17   say, "Yes."  You can say, "No, I didn't say that."  You

18   can say, "No."

19      A.    Okay.  Yes.

20      Q.    Okay.

21      A.    Sorry.

22      Q.    That's fine.  It's a little bit confusing.

23      A.    Yeah.  (Indiscernible.)

24      Q.    So when you were talking to the officer, you

25   told him you were working on your relationship with

Trisha Miller - X

 1    Kenneth, but you were living separately.

 2        A.    Yes.

 3        Q.    Okay.  And you told the officer that Kenneth

 4    and Jasmine lived in Vancouver.

 5        A.    Yes.

 6        Q.    Okay.  And you told the officer that you lived

 7    in Oregon City with Kaeli.

 8        A.    Yes.

 9        Q.    Okay.  And you told the officer that your

10    sister Mindy also lives in your apartment.

11        A.    Yes.

12        Q.    Okay.  And you told the officer that you and

13    your sister allowed defendant, Mr. Hollingsworth, to

14    stay at the apartment because he had nowhere to live.

15        A.    Yes.

16        Q.    Okay.  And you told the officer that you were

17    at the Coffee Barn with -- in I think it's Gladstone,

18    with Jasmine and Kenneth earlier that day.  Did you tell

19    the officer that?

20        A.    Yes.

21        Q.    Okay.  And you told the officer that you saw

22    Jasmine sleeping on the couch with Jorden near her at

23    about 1:30 a.m., when you went outside to smoke a

24    cigarette.

25        A.    Okay.

Trisha Miller - X                        370

1        Q.    Yes?

2        A.    (No audible response.)

3        Q.    And then you told the officer that you were

4   there when Jasmine said she woke up that night with

5   Jorden's hand under her shirt, feeling her chest.

6        A.    I did not tell the officer that.

7        Q.    Okay.  You told the officer that Jasmine told

8   you that after she woke up, Jorden asked to touch her

9   and she said no.

10       A.    Can you repeat?

11       Q.    You told the officer that Jasmine told you that

12  after she woke up, Jorden asked to touch her and she

13  said no.

14       A.    Jasmine didn't tell me that.

15       Q.    Okay.  And when asked -- I'm sorry.  I'm asking

16  if you told the officer that.  So all of these are just

17  specific to what you told the officer.  And so if you

18  agree that you told the officer, like the other things

19  you agree you told him --

20       A.    Yeah.

21       Q.    -- then you say, "Yes."  And if you disagree,

22  then you say, "No."

23              So I'm sorry to ask a third time.  I'm

24  really sorry.

25              So you're saying you told the officer that

1    you -- Jasmine told you that after she woke up, Jorden

2    asked to touch her and she said, "No."

3         A.   Okay.

4         Q.   Did you tell the officer that?  Yes or no?

5         A.   No.

6         Q.   Okay.  Did you -- you told the officer that

7    Jasmine told you that Jorden offered her $20.

8         A.   No.

9         Q.   Okay.  You're saying the -- you didn't tell the

10   officer that?

11        A.   (No audible response.)

12        Q.   Okay.  You told the officer that Jorden asked

13   her not to tell anyone and offered her money.

14        A.   What?

15        Q.   Jasmine -- you told the officer that Jasmine

16   said that Jorden asked her not to tell anyone --

17        A.   I'm confused -- I'm really confused because you

18   kept saying Jasmine said, Jasmine said, Jasmine said.

19        Q.   Right.

20        A.   Jasmine did not tell me the things.

21        Q.   Okay.  So then you just say, "No," if that's

22   not what you told the officer.

23        A.   Okay.  No, then.

24        Q.   And then -- so your answer is no?

25        A.   To what?

 1        Q.    Did you tell the officer that you said that

 2   Jasmine said that Jorden asked her not to tell anyone

 3   and offered her money?

 4        A.    No.

 5        Q.    Okay.  You told the officer that Jasmine told

 6   Jorden told -- or Jorden offered to take her to the

 7   movies and to babysit her?

 8        A.    No.

 9        Q.    Okay.  Officer Behan asked you about where

10   Jorden was touching Jasmine; is that correct?  Do you

11   remember him asking you that?

12        A.    Yes.

13        Q.    Okay.  So you remember that question.

14             And do you remember telling Officer Behan

15   that Jasmine told you that defendant touched her chest?

16        A.    Yes.

17        Q.    Yes.  Okay.

18             After you met with Officer Behan, you agreed

19   to a safety plan.  Isn't that correct?

20        A.    Uh-huh.  Yes.

21        Q.    And that line of safety plan was that you were

22   going to maintain line of sight vision of Kaeli to

23   protect her from Jorden?

24        A.    Yes.

25        Q.    And the safety plan for Jasmine was that she

Trisha Miller - X

373

1    was going to go home to Vancouver and she was not going

2    to be around Jorden?

3         A.   Yes.

4         Q.   Okay.

5              And, you know, you talked with Counsel about

6    being stuck when you had to go to the police station

7    that day, right?

8         A.   Yes.

9         Q.   Okay.  Well, on -- on the 19th, that was six

10   days later, you actually went to the Children's Center,

11   didn't you?

12        A.   Yes.

13        Q.   I'm sorry, what?

14        A.   Yes.

15        Q.   Okay.  So you weren't stuck at that point?

16        A.   No.

17        Q.   Okay.  And so --

18        A.   I was at the time when we go to the police

19   station.

20        Q.   Okay.  And you text-messaged the defendant

21   after your conversation with Jasmine and Kenneth, didn't

22   you?

23        A.   (No audible response.)

24        Q.   Was that a "yes"?

25        A.   Yes.

Trisha Miller - X                              374

1        Q.   Okay.  And at that point, you were upset,

2   weren't you?

3        A.   I was very upset.

4        Q.   You were worried about Jasmine, weren't you?

5        A.   Yes, I was.

6        Q.   Okay.  And you -- and defendant said that he

7   was sorry, didn't he?

8        A.   Yes, he did.

9        Q.   Okay.  And defendant apologized, didn't he?

10       A.   Yes.

11       Q.   And you and Kenneth believed that those text

12   messages were important to show the police.

13       A.   I wasn't --

14            MR. KNAUSS:  I object to the form of the

15   question, I believe; what Kenneth was thinking.

16            THE COURT:  Any response?

17            MS. DUMONT:  I'll just rephrase.

18            THE COURT:  Okay.  Go ahead and rephrase.

19   BY MS. DUMONT:

20       Q.   You believed that that was important to show

21   the police, right?

22       A.   The text messages?

23       Q.   Yes.

24       A.   Yeah.

25       Q.   Okay.  And so you brought those physically to

Trisha Miller - X                                    375

1    the police station, right?

2        A.    Yeah.

3        Q.    Okay.  And after this incident on February, you

4    and Kenneth continued to date; isn't that right?

5        A.    No.

6        Q.    What?

7        A.    No.

8        Q.    No, you didn't date.

9        A.    After what happened with Jorden and Jasmine, we

10   weren't together anymore.

11       Q.    Was there an incident with a dog and your

12   daughter Kaeli?

13       A.    My dog?

14       Q.    Yes.

15       A.    Yes.

16       Q.    When was that?

17       A.    When it happened -- a lot of stuff's been going

18   on.

19            MR. KNAUSS:  I'm going to object.  I

20   didn't go into this in direct.

21            THE COURT:  Ms. Dumont.

22            MS. DUMONT:  I'm trying to situate when

23   they broke up, and he did talk about that.

24            THE COURT:  I'll allow you a little bit of

25   leeway.

Trisha Miller - X                                376

1              Do you remember what the question was,

2    ma'am?

3              THE WITNESS:  Talking about my dog.

4              THE COURT:  Ms. Dumont, why don't you

5    reask the question.

6    BY MS. DUMONT:

7        Q.   Did -- was there an incident with your dog and

8    Kaeli after this incident with Jorden and Jasmine?

9        A.   Yes.

10       Q.   Okay.  And would it be fair to say that

11   Jasmine's no longer in your life?

12       A.   I'm sorry.  Repeat that again.

13       Q.   Jasmine is no longer in your life, right?

14       A.   No, not now.

15       Q.   Okay.  And you -- when you talk about "my

16   daughter," you've only referred to "my daughter" as

17   Kaeli, right?

18       A.   Yes.  That's my daughter too.

19       Q.   Okay.  So you never viewed Jasmine as your

20   daughter?

21       A.   Not (indiscernible), but I've always called her

22   as my ex- -- my stepdaughter.

23       Q.   Now, defendant is your nephew, right?

24       A.   Yes.

25       Q.   And you -- he is still in your life, right?

Trisha Miller - X                      377

 1        A.    Yeah.

 2        Q.    Okay.  And you're worried about him, right?

 3        A.    Always.

 4        Q.    Okay.  And you love him?

 5        A.    Yes.

 6        Q.    And you don't want anything bad to happen to

 7   him?

 8        A.    No.

 9        Q.    No, you do want something -- I'm sorry.  You --

10   you don't want anything to happen to him?

11        A.    I don't want anything to happen.

12        Q.    Okay.  Okay.

13              And in July of 2015, there was a disturbance

14   at your house, correct?

15        A.    July?

16        Q.    And the police responded and Jorden was there.

17   Was that --

18              MR. KNAUSS:  Your Honor, I'm -- I'm going

19   to object again.  There was some leeway to test the

20   waters as far as when they broke up and all that, but I

21   object to some other incident --

22              THE COURT:  Ms. Dumont.

23              MR. KNAUSS:  -- in July.

24              MS. DUMONT:  That's fine.

25              THE COURT:  All right.  Go ahead with your

Trisha Miller - X                          378

```
 1   next question, then.
 2              MS. DUMONT:  Thank you.
 3   BY MS. DUMONT:
 4       Q.   The Boardman house --
 5       A.   It was an apartment.
 6       Q.   It was an apartment.  Thank you for clarifying
 7   that.
 8              The Boardman apartment, when you walked in,
 9   what was the layout?
10       A.   When I walked into the door, you look straight
11   ahead is my long couch.  And then back to the door on
12   the left side is my small couch.  And then I have a
13   little cot or bed for Kaeli because it's a one-bedroom
14   apartment.
15       Q.   Okay.
16       A.   I mean -- I mean, the taller bed for Jasmine.
17       Q.   Okay.
18       A.   That was the one-bedroom apartment.  And then
19   there's a TV stand.  Then I have a (indiscernible) and
20   then head (indiscernible) back against the wall.
21       Q.   Okay.  And the kitchen was --
22       A.   The kitchen, off --
23       Q.   -- was straight ahead.
24       A.   -- the living room after the door.
25       Q.   Okay.  And you testified, and I want to make
```

Trisha Miller - X                               379

1   sure I understand, that you lived at that Boardman

2   address from around 2000- -- before you got together

3   with Kenneth, so in around 2000- -- when did you start

4   living there?

5        A.   I started living on Boardman 2005, I believe.

6        Q.   Okay.  So you lived at that apartment for a

7   long time?

8        A.   About eight years.

9        Q.   Okay.  So from 2000- --

10       A.   Probably eight years.

11       Q.   From 2005 until right before Kaeli was born in

12  2013 is you lived at that Boardman address?

13       A.   Uh-huh.

14       Q.   Is that a "yes"?

15       A.   Did Ken live with me the whole time?  Is that

16  what you're asking?

17       Q.   No.  Kaeli wasn't born yet.

18       A.   Okay.  Can you please repeat a question?

19       Q.   I was asking -- you're saying from 2005 to

20  2000- -- up until right around when Kaeli was born, you

21  lived at that Boardman apartment?

22       A.   Yes.  Before Kaeli was born, I was living in

23  Boardman.

24       Q.   Okay.  And during that time, you got together

25  with Kenneth and Jasmine lived there with you as well,

Trisha Miller - X                           380

1    right?

2        A.    Yes, she did.

3        Q.    Okay.  And so from around 2009 to 2012, Jasmine

4    was living there with Kenneth as well?

5        A.    I believe so.

6        Q.    Okay.  And you talked about how Jorden was

7    there and you thought maybe for three months or so?

8        A.    Yeah.

9        Q.    Okay.  So he was there also during that time,

10   right?

11       A.    Uh-huh.

12       Q.    Is that a "yes"?

13       A.    Yes.

14       Q.    Okay.  And you testified that Jorden -- well,

15   you testified that you were working at an Army store

16   making things; is that right?

17       A.    Uh-huh.  Yes.

18       Q.    Yes?  Okay.

19            And during the time that you were making

20   those things, would you -- did you do that in the house?

21   Was it like an in-home job or did you go somewhere to do

22   it?

23       A.    Oh, it was at a warehouse.

24       Q.    You went at a warehouse.  And where was that

25   warehouse located?

 1        A.    Milwaukie.

 2        Q.    It was in Milwaukie.  And would you drive there

 3   or would you take the bus or how would you get there?

 4        A.    I'd drive.

 5        Q.    You'd drive there.

 6              And what were your hours, roughly?

 7        A.    I worked 7:00 to 5:00, 6:00, every day.

 8        Q.    Okay.  And so you worked 7:00 to 5:00 every

 9   day.  And then did you work right up until the time that

10   you had Kaeli?

11        A.    I worked all the way through my pregnancy until

12   I had her.

13        Q.    Okay.  Okay.

14              MS. DUMONT:  Nothing further.

15              THE COURT:  Mr. Knauss.

16              MR. KNAUSS:  Yes.

17                    REDIRECT EXAMINATION

18   BY MR. KNAUSS:

19        Q.    Were you ever aware of a situation where

20   Jasmine lied to her father?

21        A.    Sometimes.

22        Q.    Okay.  And those are situ- --

23        A.    But I know that she does have a truthful time.

24        Q.    Okay.  And you discussed that with the

25   investigator that came?

Trisha Miller - ReD                              382

 1        A.   Did I talk about that?

 2        Q.   Yeah.

 3        A.   Okay.

 4        Q.   When -- let's see.

 5                  MR. KNAUSS:  That's all the questions I

 6   have.  Thank you.

 7                  THE COURT:  May this witness be excused?

 8                  MS. DUMONT:  It's his witness.

 9                  THE COURT: I'm sorry.

10                  MR. KNAUSS:  Sure.

11                  THE COURT:  Mr. Knauss, may this witness

12   be excused?

13                  MR. KNAUSS:  Yes, my witness.  Yes.  Thank

14   you.

15                  THE COURT:  Do you have any objection?

16                  MS. DUMONT:  No, Your Honor.

17                  THE COURT:  All right.  Ma'am, you may be

18   excused.

19                  Thank you to our interpreters for

20   unconventional interpretation.  I think it worked very

21   well.  Have a good afternoon.

22                  MS. WILKES:  Thank you so much.

23                  THE COURT:  Mr. Knauss, your next witness.

24                  MR. KNAUSS:  Could we take a comfort break

25   and then call her?

```
 1                    THE COURT:  Yes.  Absolutely.

 2                    MR. KNAUSS:  Thank you.

 3                    THE COURT:  It would be a good time for

 4       that.

 5                    We'll be back in 15 minutes, at 3:25 on

 6       the clock --

 7                    MR. KNAUSS:  Okay.

 8                    THE COURT:  -- on the wall.

 9                    MR. KNAUSS:  All right.  Thank you.

10                    THE COURT:  3:25.

11                    (Recess; 3:10 p.m. to 3:30 p.m.)

12                    THE COURT:  Mr. Knauss, we're back on the

13       record.

14                    MR. KNAUSS:  Thank you.  Deborah Miller.

15                    Just come on up and face this gentleman up

16       here.

17                    THE COURT:  Ma'am, if you'll come all the

18       way to the front of the courtroom.  When you arrive at

19       the witness stand, please remain standing, face my

20       clerk, and raise your right hand to be sworn.

21                    All the way to the front of the courtroom.

22       This chair right next to the flags.

23                    THE WITNESS:  Oh, all right.

24                    THE COURT:  And please remain standing.

25       Raise your right hand and face my clerk.
```

1                    DEBORAH MILLER,

2    called as a witness on behalf of the defendant, having

3    been first duly sworn, was examined and testified under

4    oath as follows:

5                         THE CLERK:  Be seated.

6                         Will you please state your full name and

7    spell your last for the record.

8                         THE WITNESS:  Deborah J. Miller.

9                         THE COURT:  And if you'll spell your last

10   name.

11                        THE WITNESS:  M-I-L-L-E-R.

12                        THE COURT:  Go ahead.

13                        DIRECT EXAMINATION

14   BY MR. KNAUSS:

15        Q.   Where do you live?

16        A.   In Oregon City.

17        Q.   And what's the address?

18        A.   19903 South Leland Road.

19        Q.   Who do you live with?

20        A.   I live with Joseph Lentor [phonetic] and my

21   granddaughter, Tanae'a Hollingsworth.

22        Q.   Okay.  And is she here today; Tanae'a?

23        A.   Yeah.  She's --

24        Q.   Waiting?

25        A.   Yeah.

Deborah Miller - D                               385

       Q.    Okay.  How are you related to Jorden
  2  Hollingsworth?

  3       A.    Jorden's my grandson.

  4       Q.    And Trisha Miller is?

  5       A.    My daughter.

  6       Q.    And Mindy Hollingsworth is?

  7       A.    My daughter.

  8       Q.    Okay.

  9             How are you employed?

 10       A.    Oh, I have two jobs.  I work for Walmart

 11  Neighborhood Market and also H&R Block.

 12       Q.    Okay.  What do you do at Walmart?

 13       A.    I'm a customer service manager.

 14       Q.    How long have you worked there?

 15       A.    At this one, three years.

 16       Q.    Okay.  How --

 17       A.    Since they opened.

 18       Q.    How long have you worked for Walmart?

 19       A.    Probably only about five years.

 20       Q.    Okay.

 21       A.    But I worked --

 22       Q.    Your -- your other job is?

 23       A.    H&R Block.

 24       Q.    Okay.

 25       A.    Since '88.

Deborah Miller - D

```
 1        Q.   Is that seasonal?

 2        A.   1988 probably.

 3        Q.   1988?

 4        A.   Yeah.  It's --

 5        Q.   Okay.

 6        A.   -- been a long time.

 7        Q.   And is that seasonal?

 8        A.   Uh-huh.

 9        Q.   Okay.  Be sure to say "yes" or "no."

10        A.   Oh, I'm sorry.  Yes.

11        Q.   Because when we're in court, we can't say

12   "uh-huh" or "huh-uh."

13        A.   Okay.  I'm --

14        Q.   Okay.

15        A.   -- sorry.

16        Q.   All right.

17             How long have you known Jasmine Jewell?

18        A.   Jasmine was three, I think.  Yeah.

19        Q.   Okay.  Where did you first meet her?

20        A.   I met her over at Trisha's house.

21        Q.   Okay.

22        A.   Her apartment.

23        Q.   Right.

24             And are you close to Trisha?

25        A.   I am.
```

Deborah Miller - D                            387

1      Q.    How often do you see her?

2      A.    Sometimes every day.

3      Q.    Okay.

4      A.    Every other day at least, because I go by there

5    and see -- check and see how they're doing.

6      Q.    Okay.  And has this been going on for years?

7      A.    Oh, yeah.

8      Q.    Okay.  Now, did -- did Jasmine start living

9    there at Trisha's house when she was three?

10     A.    Uh-huh.

11     Q.    And --

12     A.    And Ken.

13     Q.    Okay.  No "uh-huhs," though.

14     A.    Pardon?

15     Q.    No "uh-huhs."

16     A.    Oh, I did it again, didn't I?

17     Q.    So Ken and Jasmine started living there when

18   Jasmine was around three?

19     A.    Yes.

20     Q.    Okay.  And do you recall if Jorden was around

21   during the time your daughter lived on Boardman when Ken

22   and Jasmine were living there?

23     A.    Yes.

24     Q.    Okay.  Did you ever know if -- were you -- did

25   you ever know if Jorden babysat Jasmine?

Deborah Miller - D                           388

1      A.    No.

2      Q.    Okay.  Did Jorden have a girlfriend at the

3   time --

4      A.    Yeah, he did.

5      Q.    -- that your daughter lived in Boardman?

6      A.    He did, yes.

7      Q.    What's her name?

8      A.    Trista.

9      Q.    Do you know her last name?

10     A.    I don't.  I'm sorry.

11     Q.    Okay.  Is she out in the hallway there?

12     A.    Yes.

13     Q.    Okay.  At some point did Jorden move away?

14     A.    He did.

15     Q.    Where did he move to?

16     A.    He was at Longview for a while.  Lakeview.

17     Q.    Lakeview?

18     A.    Lakeview.

19     Q.    Okay.  Big difference.  All right.

20           Do you know if he went with Trista?

21     A.    He -- they lived together for a while.

22     Q.    Okay.  All right.

23           Now, during the time Jorden was around

24   Jasmine at Trisha's Boardman place --

25     A.    Uh-huh.

Deborah Miller - D                              389

1        Q.    -- did you see Jasmine and Jorden interacting

2    together?

3        A.    Yeah.  They played.  He's -- he'd read to her

4    and they'd watch movies.

5        Q.    Okay.  What kind of movies did they watch?

6        A.    Disney.

7        Q.    Okay.  Now, did you ever see any hesitancy by

8    Jasmine towards Jorden when they lived in the Boardman

9    place?

10       A.    No.

11       Q.    Did you ever -- ever see her have any hesitancy

12   with him?

13       A.    I don't see every any.

14       Q.    Okay.  Would she show affection to him?

15       A.    Yeah.  She -- she always gives him hugs.  She

16   loved our family.

17       Q.    Okay.  And did that occur at Boardman?

18       A.    Uh-huh.

19       Q.    And did it occur in Oregon City?

20       A.    Yes.

21       Q.    Okay.  Do you recall when your daughter moved

22   to Oregon City?

23       A.    I don't know how many years she's been over

24   there now.

25       Q.    Did Jorden live there ever?

Deborah Miller - D                    390

1          A.    He came and stayed once in a while.  I don't
2     think he ever lived there?
3          Q.    Okay.  And do you know if Jorden -- I mean, if
4     Jasmine and Ken lived at the Oregon City place?
5          A.    Yes.
6          Q.    How long do you recall them living there?
7          A.    I can't remember the length of time.
8          Q.    Was it --
9          A.    It's probably --
10         Q.    Was it months or years?
11         A.    Well, they -- they've been in there a good year
12    or so.
13         Q.    Okay.  And when this incident occurred in
14    February of 2015, had Ken and Jasmine been living with
15    Trisha at that -- recently?
16         A.    Jasmine and her dad were living over in
17    Vancouver.
18         Q.    Okay.
19         A.    And they came over to see Trisha because they
20    were trying to work things out.
21         Q.    Okay.  And that's at the time of this incident;
22    is that right?
23         A.    Yes.
24         Q.    Okay.  Now --
25         A.    Yes.

Deborah Miller - D                          391

```
 1      Q.    -- you came to learn when the -- what the --
 2   the claim was that a certain touching happened in -- on
 3   February 13th of 2015?
 4      A.    (No audible response.)
 5      Q.    Do you recall learning about the incident?
 6      A.    Uh-huh.
 7      Q.    Okay.
 8      A.    Yes.
 9      Q.    And were you there the night -- or the day or
10   night of that incident?
11      A.    I was, earlier in that evening.
12      Q.    Okay.  Do you know if you worked that day or --
13   or not?
14      A.    I can't remember if I worked that day.  I work
15   quite a bit.
16      Q.    Okay.  How long were you at -- at Trisha's
17   house that day?
18      A.    I wasn't there too long.  I mean, she was --
19   they were eating.  And then Jasmine came over, sat by me
20   on the couch.
21      Q.    Okay.
22      A.    But it wasn't too long.  Maybe half an hour or
23   so.
24      Q.    Okay.  Did you notice anything out of the
25   ordinary with Jasmine?
```

Deborah Miller - D                          392

 1        A.    No.  Except for that she was kinda out of it.

 2        Q.    What do you mean by that?

 3        A.    Well, she looks like she was on something.

 4        Q.    Okay.

 5        A.    She was, like, groggy.  Almost like a zombie.

 6   I was kinda frustrated about it because it looked like

 7   they had given her some medicine and she was out of it.

 8        Q.    Okay.  Did you mention that to anybody?

 9        A.    I did, but --

10        Q.    Don't say what they said, but who did you

11   mention it to?

12        A.    I -- I said something to Trisha.

13        Q.    Okay.  Do you remember what time of evening you

14   left?

15        A.    It was earlier -- early in the evening.

16        Q.    Okay.

17        A.    So, I don't know.  6:00.

18        Q.    Was Jasmine awake or asleep when you left?

19        A.    She was awake.

20        Q.    Okay.  Was Jorden there?

21        A.    No.

22        Q.    Okay.  Ken and Jas- -- and Ken and Trisha

23   there?

24        A.    Yeah, they were there.

25        Q.    And was your daughter Mindy there?

Deborah Miller - D                                     393

1        A.    Mindy was somewhere in the house.

2        Q.    Okay.  Was she living there at the time?

3        A.    She was.

4        Q.    Okay.  Where was she?  Where was her room?

5        A.    She has a room upstairs.

6        Q.    Okay.

7              Now, I asked you -- while Jasmine was living

8   with Trisha, sounds like you were there at least every

9   other day during the whole time Jasmine lived there, off

10  and on.

11       A.    Yes.

12       Q.    Does that sound right?

13       A.    Yes.

14       Q.    Okay.  What is your opinion of Jasmine's

15  veracity or truthfulness, based upon your own personal

16  knowledge?

17       A.    I love the little girl, but she didn't know how

18  to tell the truth.

19       Q.    Okay.  Still love her?

20       A.    I love her.

21       Q.    Okay.

22             MR. KNAUSS:  Thank you.  No further

23  questions.

24             THE WITNESS:  Okay.

25             THE COURT:  Ms. Dumont.

Deborah Miller - X                                    394

1                    CROSS-EXAMINATION

2    BY MS. DUMONT:

3        Q.   So you're defendant's grandmother?

4        A.   Uh-huh.

5             MS. DUMONT:  May I -- may I approach, Your

6    Honor?

7             THE COURT:  Both attorneys may move about

8    the courtroom as they feel the need.

9             MS. DUMONT:  Thanks.

10   BY MS. DUMONT:

11       Q.   I feel like this is irritating you.

12       A.   I think it is.

13       Q.   Yeah.

14       A.   It's kinda like in my face.

15       Q.   I can tell.  I'm just going to -- is that

16   better?

17       A.   Yeah.

18       Q.   Okay.

19            You're -- I think you said yes, but I'm

20   going to ask you anyway.  I was busy doing that.  You're

21   defendant's grandmother?

22       A.   Yes.

23       Q.   Okay.  And you love him, right?

24       A.   Of course I do.

25       Q.   And you don't want him to get into any trouble?

Deborah Miller - X

395

```
 1      A.   I don't want anybody to get into any trouble

 2   ever.

 3      Q.   Okay.  And you testified today that you were

 4   there on February 13th.  Is that right?

 5      A.   The day of -- the day of the happening?

 6      Q.   Uh-huh.

 7      A.   I was there --

 8      Q.   Okay.

 9      A.   -- with my other granddaughter.  We were

10   sitting on the couch with Jasmine.

11      Q.   Okay.  And you said you left around 6:00 p.m.,

12   right?

13      A.   Well, it was early evening.

14      Q.   Was it earlier than that?

15      A.   No.

16      Q.   Okay.  So you said 6:00.  I wasn't trying to be

17   tricky.  You said --

18      A.   No.

19      Q.   Is it still 6:00?

20      A.   It was about 6 o'clock.

21      Q.   Okay.  So you -- you weren't -- and when you

22   left, Jorden wasn't there, right?

23      A.   No.

24      Q.   Was Jorden there?

25      A.   I didn't see him there.
```

```
 1        Q.    Okay.  And you said that you saw -- that you
 2   thought Mindy was there, but it didn't sound like you
 3   saw her.  Where was Mindy?
 4        A.    I think she was upstairs.
 5        Q.    Okay.  What makes you think she was upstairs?
 6        A.    Well, because she was there.
 7        Q.    Did you talk to her?
 8        A.    Well, she came through a couple times.
 9        Q.    Okay.  But she was mainly upstairs?
10        A.    Well, she was upstairs and downstairs both.
11        Q.    Okay.  But you --
12        A.    I didn't -- wasn't keeping track of her.
13        Q.    Okay.  But she wasn't sitting and eating dinner
14   with you?
15        A.    I wasn't eating dinner.  I was just visiting
16   with Jasmine on the couch.
17        Q.    Okay.  For half an hour, then you left?
18        A.    Yeah.
19        Q.    Okay.  And -- and so the rest of the night you
20   weren't there?
21        A.    No.
22        Q.    At 8:00, 9:00, 10:00, 11:00?
23        A.    No.
24        Q.    And the next day, the next morning, you weren't
25   there in the morning, right?
```

Deborah Miller - X                               397

1       A.    No.

2       Q.    Okay.

3       A.    Not until the afternoon.

4       Q.    Okay.

5             MS. DUMONT:  Nothing further.

6             THE COURT:  Mr. Knauss?

7             MR. KNAUSS:  Yes.

8                   REDIRECT EXAMINATION

9    BY MR. KNAUSS:

10      Q.    You said you were sitting on the couch with

11   your other grandchild?

12      A.    Uh-huh.

13      Q.    Who's that?

14      A.    Tanae'a.

15      Q.    Okay.  Did you come with Tanae [sic]?

16      A.    Yeah.  Tanae'a and I came by to see Jasmine.

17      Q.    Okay.  Where does Tanae'a -- where was Tanae'a

18   living at the time?

19      A.    She was living with me.

20      Q.    Okay.  She still living with you?

21      A.    Yes.

22      Q.    Okay.  And I think I heard this, but she left

23   when you left?

24      A.    Yeah.

25      Q.    Okay.

Deborah Miller - ReD                      398

 1      A.    She was with me, so we left together.

 2      Q.    All right.

 3                  MR. KNAUSS:  Thank you.  No further

 4      questions.

 5                  THE COURT:  May this witness be excused?

 6                  MR. KNAUSS:  Yes.

 7                  THE COURT:  Any objection?

 8                  MS. DUMONT:  No, Your Honor.

 9                  THE COURT:  You may be excused.  Thank

10      you.

11                  Mr. Knauss.

12                  (Witness summoned.)

13                  THE COURT:  If you'll come all the way to

14      the front of the courtroom.  When you arrive at the

15      witness stand, please remain standing, face my clerk,

16      and raise your right hand to be sworn.

17                  THE WITNESS:  Which way do you want me to

18      face?

19                  THE COURT:  Right here, please.  Face my

20      clerk.

21                  THE WITNESS:  Okay.

22                  THE COURT:  And raise your right hand.

23                  TANAE'A HOLLINGSWORTH,

24      called as a witness on behalf of the defendant, having

25      been first duly sworn, was examined and testified under

Tanae'a Hollingsworth - D                                      399

1    oath as follows:

2                    THE CLERK:  Be seated.

3                    And please state your full name and spell

4    your last for the record.

5                    THE WITNESS:  Tanae'a Hollingsworth.

6    H-O-L-L-I-N-G-S-W-O-R-T-H.

7                    THE CLERK:  If you could move the mic a

8    little bit forward.  Thank you.

9                    THE WITNESS:  Okay.

10                        DIRECT EXAMINATION

11   BY MR. KNAUSS:

12       Q.   What's your address?

13       A.   19903 South Leland Road, Oregon City, Oregon,

14   97045.

15       Q.   Who do you live with?

16       A.   I live with my grandma.

17       Q.   Okay.  Deborah?

18       A.   Yes.

19       Q.   Okay.  And Jorden is whom to you?

20       A.   He's my big brother.

21       Q.   Excuse me.

22            Are you working currently?

23       A.   Not at the moment.  I have a fractured foot, so

24   I'm kind of --

25       Q.   Okay.  Where do you normally work?

Tanae'a Hollingsworth - D

1      A.   What?

2      Q.   Where do you normally work?

3      A.   I was working at Chipotle for a bit, but then I

4  had to quit because the smell of food makes me sick

5  sometimes, so I couldn't work around the food.  And then

6  I was going to start working at Plaid Pantry until I

7  fractured my foot.  So --

8      Q.   So you're not a good ad for Chipotle?

9      A.   Not at the -- no.

10     Q.   Okay.  All right.

11     A.   Can't work around food.

12     Q.   Okay.

13          How long have you been living with your

14  grandmother?

15     A.   This time, three years.

16     Q.   Okay.

17          Have you met Jasmine Jewell?

18     A.   Yes, I have.

19     Q.   And her dad, Ken?

20     A.   Yes, I have.

21     Q.   Okay.  When did you meet -- or how old was

22  Jasmine when you met her?

23     A.   The first time?

24     Q.   Yeah.

25     A.   I'd say she was around -- almost three, I

Tanae'a Hollingsworth - D                                401

1    believe.  About three.

2        Q.   Okay.  And would you ever go to your Aunt

3    Trisha's house?

4        A.   Yes.  When -- a long time -- when they first

5    got together, I was actually living with my -- with

6    Trisha and Ken at the moment, because I wasn't wanting

7    to live at my dad's.

8        Q.   Okay.  Do you know how long you lived there

9    after Jasmine and Kenneth moved in?

10       A.   A couple months, I think.

11       Q.   Okay.  Did you stay in contact with -- with

12   them?

13       A.   After I moved out?

14       Q.   Yeah.

15       A.   Yes.  I'm --

16       Q.   How often would you see them?  Jasmine and

17   Kenneth.  Mainly Jasmine.

18       A.   After I moved out, I was actually over at

19   Trisha's a lot.  I'm -- I was really close to Trisha, so

20   I was, like, always over there.  Like most every

21   weekend.

22       Q.   Okay.  Did Trisha -- was there any breakup in

23   the relationship of Ken --

24       A.   Yes.

25       Q.   -- and Trisha?

1      A.   Yes, there was.

2      Q.   Do --

3      A.   They -- they broke up for I think it was a

4    couple years, I think.  And then they met up and then

5    they started -- they got back together and they were

6    together for a couple years, and then they got engaged

7    and had a baby.

8      Q.   Okay.  Did they move?

9      A.   Yes.  They moved from Boardman into Oregon

10   City, into an apartment complex on Linn.

11     Q.   Okay.  Would you visit them after they moved?

12     A.   Yes.

13     Q.   How often would you go over to that place?

14     A.   A lot, actually.  I was actually babysitting

15   when Trisha and Ken first moved there and they would --

16   were at work.  Every -- almost every day I was

17   babysitting Jasmine when she got out of school.

18     Q.   Okay.

19     A.   And I'd help her with her homework and stuff

20   like that.

21     Q.   Did Jorden ever babysit Jasmine, either at

22   Boardman or Oregon City?

23     A.   No, I don't believe so.

24     Q.   Okay.

25     A.   Not to my recollection, no.

Tanae'a Hollingsworth - D                403

1        Q.    How -- would Jorden and Jasmine interact with

2    each other at the Boardman place?

3        A.    Yes.

4        Q.    How would they interact?

5        A.    At that time, Jasmine's room was actually in

6    the front room.  So they would play with her toys or

7    they would watch TV together and movies.  Or he would

8    actually go outside and play with her and the neighbor

9    kid.

10       Q.    Okay.

11       A.    Watch them.

12       Q.    How about -- and did he come over to Trisha's

13   house when they moved to Oregon City?

14       A.    Yes.

15       Q.    Did he ever live there?

16       A.    Yes, I believe so.

17       Q.    Okay.

18             And by the way, forgot to ask you, when --

19   when Trisha was living at Boardman, did Jorden have a

20   girlfriend?

21       A.    Yes, he did.

22       Q.    Who was that?

23       A.    Trista.

24       Q.    Okay.  And is she out here in the --

25       A.    Yes, she is.

Tanae'a Hollingsworth - D                              404

1        Q.   Okay.  Did they -- did they stay there?  Ever

2   live there?

3        A.   They lived there for a couple months and then

4   they moved out.  And then they moved to Lakeview.

5        Q.   Okay.

6             And did you ever see any hesitancy by

7   Jasmine towards Jorden when they lived in --

8        A.   Not at all.

9        Q.   -- in Boardman?

10       A.   Not at all.

11       Q.   Okay.

12       A.   Not at all.  He -- she -- she still loved

13  Jorden.  I mean, she -- she's -- she's one of those

14  girls that love affection.  So she likes to, like, come

15  up to you and give you hugs and -- and sit on your lap

16  and stuff.  So --

17       Q.   Okay.

18       A.   -- she likes people.

19       Q.   All right.  And she -- would she hug Jorden as

20  well?

21       A.   Yeah.  Yeah.  She'd walk up to him every time

22  he walked through the door and run up to him and give

23  him a big hug.

24       Q.   Okay.  Did that happen at Trisha's house in

25  Oregon City as well?

Tanae'a Hollingsworth - D                                405

```
 1        A.    Yes, it did.

 2        Q.    Okay.

 3              Did you learn anything about whether or not

 4   Jasmine had any behavior issues?

 5        A.    Yes.

 6        Q.    Okay.  Did you learn of any diagnosis?

 7        A.    Yes, I did.

 8        Q.    When did you learn of the diagnosis?

 9        A.    I'd say it was about a year before Ken and

10   Trisha broke up this last time.

11        Q.    Okay.

12        A.    And she -- but Trisha and Ken had taken her to

13   the doctor's, because Trisha went with her, like, to

14   every appointment.  And she -- they came back and said

15   that she was diagnosed with --

16              MS. DUMONT:  Objection.  Hearsay.

17              MR. KNAUSS:  Yeah.

18              THE COURT:  I'm going to --

19   BY MR. KNAUSS:

20        Q.    Can't say what other people say.

21        A.    Sorry.

22              THE COURT:  I'm going to strike the "and

23   they came back and," from that point onward.

24              MR. KNAUSS:  Okay.

25              THE COURT:  Go ahead, Mr. Knauss.
```

Tanae'a Hollingsworth - D                          406

```
 1   BY MR. KNAUSS:

 2        Q.   Did you know whether or not Jasmine was getting

 3   medications?

 4        A.   Yes.  I've actually had -- when I babysat her,

 5   I had to give her some of her medication, her ADD/ADHD

 6   medication.

 7        Q.   Okay.

 8        A.   It was in a pill bottle in a cupboard in the

 9   kitchen.

10        Q.   All right.

11             Now, before this incident happened in

12   February of last year, were Ken and -- and Trisha living

13   together?

14        A.   When the incident happened?

15        Q.   Yeah.

16        A.   No.

17        Q.   How long had they been broken up?

18        A.   I'd have to say probably a couple -- probably

19   about five months maybe.

20        Q.   Okay.

21        A.   And they broke up in -- on Mother's Day --

22        Q.   Okay.

23        A.   -- in 2013.

24        Q.   Did you know what Ken and Jasmine were doing

25   there in February?
```

Tanae'a Hollingsworth - D                    407

1       A.   Yes.

2       Q.   What were they doing?

3       A.   Trisha and Ken were trying to make it work.  So

4    they were back over there to try and fix things and get

5    together.

6       Q.   How -- how long had they been there that time?

7       A.   I think that time they were there for less than

8    a week.

9       Q.   Okay.  And had you been over there?

10      A.   Yes.

11      Q.   Okay.

12           Now, did you -- were at the house, at

13   Trisha's house, the day that this incident was claimed

14   to have -- have occurred?

15      A.   Yes.  Early in the day I was.

16      Q.   Okay.  When did you get there?

17      A.   That day we were probably there around maybe

18   3-, 4 o'clock.

19      Q.   Okay.  How did you get there?

20      A.   With my grandma.

21      Q.   Okay.  What was going on when you got there?

22      A.   At that moment, Jasmine was in the front room

23   playing with Kaeli.  And Jasmine had come up to me and

24   she wasn't as hyper as she usually was.

25      Q.   Okay.  What was her demeanor?

Tanae'a Hollingsworth - D

1     A.    Blah.

2     Q.    Okay.  What do you mean by that?

3     A.    She -- usually she's really hyper and runs up

4   to people and, like, gets really energetic and --

5     Q.    Uh-huh.

6     A.    -- a little jumpy.  And this time, she just

7   walked up to me and gave me, like, a really soft hug.

8   And she just didn't seem like she was really -- I don't

9   really -- she didn't really seem like she was really all

10  there that day.  Like, she wasn't really coherent.

11    Q.    All right.  Do you know what time you left?

12    A.    I think we were only there for, like, an hour.

13    Q.    Okay.  Was Jorden there when you were there?

14    A.    No.

15    Q.    Okay.  Was Jasmine still awake when you left?

16    A.    Yes.

17    Q.    Okay.

18          Now, what is your opinion of Jasmine's

19  veracity or truthfulness, based upon your own personal

20  knowledge?

21    A.    I don't think she's truthful at all, honestly.

22  I -- she's lied to me multiple times.

23    Q.    Okay.

24    A.    So -- and --

25          MS. DUMONT:  Your Honor, we can't go into

Tanae'a Hollingsworth - D

1    specific examples (indiscernible).

2              MR. KNAUSS:  I -- I told her not to, so --

3              THE WITNESS:  I'm not.

4              MR. KNAUSS:  -- I think she was going to

5    stop here.

6              THE COURT:  I didn't take that as an

7    objection.  I saw it as a preemptive objection.

8              MR. KNAUSS:  Yeah.

9              THE COURT:  I'm just going to allow you to

10   go ahead with your next question.

11             MR. KNAUSS:  Okay.

12   BY MR. KNAUSS:

13       Q.    What was your relationship with Jasmine?

14       A.    She was my step-cousin, I guess.

15       Q.    Okay.

16       A.    Even though they weren't technically married

17   yet.

18       Q.    Okay.

19       A.    But she was still my cousin.

20       Q.    Were you close to her?

21       A.    At first, yes, I was.  I was very close to

22   Jasmine.

23       Q.    Okay.  All right.

24             MR. KNAUSS:  Thank you.  No further

25   questions.

Tanae'a Hollingsworth - X

410

1            THE COURT:  Ms. Dumont.

2            MS. DUMONT:  Thank you.

3                    CROSS-EXAMINATION

4    BY MS. DUMONT:

5        Q.    So the defendant's your brother, right?

6        A.    Yes, ma'am.

7        Q.    Okay.  And you love him?

8        A.    Yes, ma'am.

9        Q.    And you don't want him to get into any trouble?

10       A.    Whatever happens, happens.

11       Q.    Okay.

12              And you mentioned that you were living with

13   your grandmother.  Is that right?

14       A.    Yes, ma'am.

15       Q.    When did you start living with your

16   grandmother?

17       A.    This time or in general?

18       Q.    This time.

19       A.    When I was -- when I was 15, because I was

20   there for my 16th birthday, so I was 15.

21       Q.    Okay.  So you've been living there since you

22   were 15, and how old are you now?

23       A.    Twenty.

24       Q.    Okay.  So you've been living with your grandma

25   for five years.

Tanae'a Hollingsworth - X                     411

1                    And what's your mom's name again?

2          A.    Mindy.

3          Q.    Mindy?  Is she outside?

4          A.    Yes, ma'am.

5          Q.    Okay.  And you talked about how -- you know,

6    how Jasmine looked.  Did you -- did you call DHS to

7    report that?

8          A.    (No audible response.)

9          Q.    "Yes" or "no."

10         A.    No.

11         Q.    Okay.  And did you call the police?

12         A.    Huh-uh.

13         Q.    Is that a "no"?

14         A.    No.

15         Q.    Okay.  And you testified that you arrived

16   around 3:00 or 4:00 and were there for an hour.  So

17   would that mean -- that would mean that you left around

18   4:00?  4:00 or 5:00?

19         A.    Yeah.  About 5:00.

20         Q.    Okay.  And after you left around 5:00, I think

21   you testified -- you said that Jasmine was still awake

22   and Jorden was not there, right?

23         A.    Huh-uh.

24         Q.    Is that correct?

25         A.    Yes.

Tanae'a Hollingsworth - X                    412

1          Q.    Okay.  And so you don't know what happened

2    later that night, right?  You weren't there.

3          A.    I was not there that evening, no.

4          Q.    Okay.  And you don't know what happened that

5    morning, right, when you weren't there?

6          A.    I was only there in the afternoon.

7          Q.    Okay.  And I still want to make sure I

8    understood.

9                When you were talking about the Boardman

10   house --

11         A.    Uh-huh.

12         Q.    -- you weren't living there, right?

13         A.    I was.

14         Q.    Okay.  And when were you living there?

15         A.    I was 11.  Yes.

16         Q.    Were you living there when Kenneth moved in?

17         A.    For a little bit, yes.

18         Q.    Okay.  And then "a little bit" is how long?

19         A.    Probably a month or two after.

20         Q.    Okay.  And so a month or two after Kenneth

21   moved in, you moved out; is that right?

22         A.    Yeah.  Because my mom had gotten her own place,

23   so I moved back with my mom.

24         Q.    Okay.  So you moved back with your mom.

25         A.    Uh-huh.

Tanae'a Hollingsworth - X                         413

 1        Q.    And at that point -- so you were there for

 2    three months.  And then did you move back into there or

 3    did you stay with your mom and then go to your

 4    grandma's?

 5        A.    I've been off and on with my mom and my

 6    grandma.

 7        Q.    Okay.

 8        A.    Since I was in 5th grade.

 9        Q.    Okay.  I understand.

10              MS. DUMONT:  Nothing further.

11              THE COURT:  Mr. Knauss?

12              MR. KNAUSS:  Nothing further.  Thank you.

13              THE COURT:  May this witness be excused?

14              MR. KNAUSS:  Yes.

15              THE COURT:  Any objection?

16              MS. DUMONT:  No objection.

17              THE COURT:  You may be excused.  Thank

18    you.

19              THE WITNESS:  Thank you.

20              MR. KNAUSS:  Call Mindy Solomon.

21              (Witness summoned.)

22              THE COURT:  If you'll come all the way to

23    the front of the courtroom.  When you arrive at the

24    witness stand, remain standing, face my clerk, and raise

25    your right hand to be sworn.

Mindy Solomon - D

414

1                    <u>MINDY SOLOMON</u>,

2    called as a witness on behalf of the defendant, having

3    been first duly sworn, was examined and testified under

4    oath as follows:

5                    THE CLERK:  Be seated.

6                    And please state your full name and spell

7    your last for the record.

8                    THE WITNESS:  Mindy Jean Solomon.

9    S-O-L-O-M-O-N.

10                   <u>DIRECT EXAMINATION</u>

11   BY MR. KNAUSS:

12       Q.   Ms. Solomon, Jorden Hollingsworth is your son?

13       A.   Yes.

14       Q.   And Tanae'a is your daughter --

15       A.   Yes.

16       Q.   -- who just testified?  Okay.

17            And at the time of the incident that we're

18   talking about today, in February of 2015, where were you

19   living?

20       A.   With my sister Trisha.

21       Q.   Okay.  And at -- at what address or location?

22       A.   I'm sorry.  What was the date again?

23       Q.   February of last year.

24       A.   Oh.  In Oregon City.

25       Q.   Okay.  Do you know the road you were living on?

1    Do you remember?

2         A.    Linn.

3         Q.    Okay.  How long had you been living there?

4         A.    Over a year.

5         Q.    Okay.  Did you have a bedroom of your own?

6         A.    Yeah.

7         Q.    Okay.  Was it down or up?

8         A.    Upstairs.

9         Q.    Okay.  Who else had a bedroom upstairs?

10        A.    My sister.

11        Q.    Okay.  Did Jorden ever spend the night at that

12   place in Oregon City?

13        A.    Maybe once or twice, upstairs in my room.

14        Q.    Okay.  All right.

15              And where did Trisha live before the Oregon

16   City address?

17        A.    On Boardman in Milwaukie.

18        Q.    When did you meet Jasmine Jewell and her

19   father, Kenneth?

20        A.    When she was --

21        Q.    Let's say do you know --

22        A.    -- three.

23        Q.    -- how old Jasmine was?  Let's put it that way.

24        A.    I think she was either three or four.

25        Q.    Okay.  How often did you go over to Trisha's

Mindy Solomon - D

```
 1   place --
 2        A.   A lot.
 3        Q.   -- when she lived in Boardman?
 4        A.   A lot.  She's my sister.
 5        Q.   Okay.  You're -- you're close?
 6        A.   Very close.
 7        Q.   Okay.  While she lived in Boardman with Jasmine
 8   and Ken, did they ever break up?
 9        A.   Yes.
10        Q.   Okay.  Do you know how long they were gone?
11        A.   Years.
12        Q.   Okay.  Do you know the number of years?
13        A.   Oh, my gosh.  Eight?  I don't know.  It was a
14   long time.
15        Q.   Okay.  Well, if they -- that would have been
16   2007 or '08 that they started living there.  So do you
17   know how long that they were not living together?
18        A.   It was a long time.  I don't -- six, seven,
19   eight.  I don't know how many years.  I know it was a
20   long time that they were not together.
21        Q.   Okay.  All right.
22             Now, did you get to know Jasmine?
23        A.   Yes.
24        Q.   Okay.  How often would you see Jasmine when
25   they were living there?  Was it every day?  Every week?
```

Mindy Solomon - D                                417

1    Every month?  How often?  When they were living in

2    Boardman.

3         A.    Probably like almost every other day.

4         Q.    Okay.  And when they moved to Oregon City, did

5    you live with Trisha when they moved to Oregon City?

6         A.    I moved in after.

7         Q.    Okay.  Had her baby been born or not when you

8    moved in?

9         A.    Yes.

10        Q.    Which was it?

11        A.    The baby was born.

12        Q.    Okay.  Do you know how old the baby was when

13   you moved in?

14        A.    Just born.

15        Q.    Okay.  And how long did you live there?

16        A.    Like, a year and a half, a year.

17        Q.    Okay.  And then did you move away for a while?

18        A.    Yes.

19        Q.    Okay.  Did you -- were you around when Jasmine

20   was there in Oregon City?

21        A.    I was.

22        Q.    Were you there on a daily basis or every other

23   day, like before, or was it different?

24        A.    No.  I was pretty much there almost every other

25   day.

Mindy Solomon - D                                    418

```
 1        Q.   Okay.

 2             Did Jorden ever babysit Jasmine?

 3        A.   No.

 4        Q.   Okay.  Did Jorden have a girlfriend?

 5        A.   Yes.

 6        Q.   Who's that?

 7        A.   Trista.

 8        Q.   Okay.  And when did he -- when were they

 9    boyfriend and girlfriend?

10        A.   (No audible response.)

11        Q.   Was it when Trisha was still living in Boardman

12    or was it after?

13        A.   No.  When they were on -- living on Boardman.

14        Q.   Okay.  Did they ever live at the Boardman

15    address?

16        A.   Yes, they did.

17        Q.   Okay.  Do you know how long?

18        A.   Six, eight, seven months maybe.

19        Q.   Okay.  Did Trisha interact with Jasmine as

20    well?  Or Trista.  I knew I was going to mess that up.

21        A.   Yes.

22        Q.   Did Trista --

23        A.   Very much.

24        Q.   -- the girlfriend --

25        A.   Yes.
```

Mindy Solomon - D                    419

 1          Q.    -- interact with Jasmine as well?

 2          A.    Yes.

 3          Q.    Okay.

 4                What kind of interaction did Jorden have

 5    with Jasmine when they were living in Boardman, on the

 6    Boardman property?

 7          A.    Like, it was always with his girlfriend.

 8    They -- like, homework, that was a big thing, because my

 9    sister was very serious about homework.

10          Q.    Okay.

11          A.    Homework and picking her up from the bus.

12          Q.    Did you ever see any hesitancy in Jasmine

13    towards Jorden when she lived in Boardman?

14          A.    No.

15          Q.    Okay.  Did she show him affection?

16          A.    Yes.

17          Q.    Right up to the end of when they moved?

18          A.    Yep.

19          Q.    Okay.  How did she show affection?

20          A.    Always giving him hugs, always hanging on him,

21    always -- she had no problems.

22          Q.    All right.

23                Now, let's -- let's go to the incident.

24    Now, you were there in the home on February 12th or

25    13th, whenever this happened?

Mindy Solomon - D                              420

```
 1        A.    Yes.

 2        Q.    You became aware --

 3        A.    Uh-huh.

 4        Q.    After the fact --

 5        A.    Uh-huh.

 6        Q.    -- that there was an allegation?

 7        A.    Right.

 8        Q.    Okay.  And the day of the incident, did you

 9  have occasion to see Jasmine?

10        A.    Did I -- I'm sorry.  What was the word you

11  said?

12        Q.    The day of the incident, did you have a chance

13  to interact with Jasmine?

14        A.    Yeah.

15        Q.    Okay.  Did you notice anything unusual about

16  her demeanor?

17        A.    Well, she was kind of out of it.  I don't --

18        Q.    What do you mean by that?

19        A.    Well, can I show how I -- how she was acting or

20  is that allowed?

21        Q.    Sure.

22        A.    Yes?

23        Q.    Yeah.

24        A.    Okay.  She was like this on the couch.

25        Q.    Okay.  So you're bending your neck back --
```

Mindy Solomon - D                                          421

1        A.    Yeah.

2        Q.    -- and to the side?

3        A.    Yeah.

4        Q.    Okay.  Was she awake or asleep?

5        A.    She was kind of like almost asleep.  Like --

6        Q.    Okay.

7        A.    -- just barely like --

8        Q.    Okay.  What time of day was that?

9        A.    It was in the evening.

10       Q.    Okay.  Was it -- what -- approximately what

11  time was it?

12       A.    I want to say maybe 7:00.

13       Q.    Okay.  Now, was Jorden there?

14       A.    Not at that time.

15       Q.    Okay.  Did you become aware when -- if Jorden

16  arrived there?

17       A.    Yeah.

18       Q.    What time do you think he arrived?

19       A.    Oh, gosh.  Probably like 11:00-something maybe.

20       Q.    Yeah.

21             Now, do you recall when you went upstairs to

22  go to bed?

23       A.    Yes.

24       Q.    About what time?

25       A.    It was a little after midnight.

Mindy Solomon - D                    422

1      Q.    Okay.  Now, did you observe Jasmine asleep?

2      A.    She was all the way asleep by the time that I

3  went upstairs --

4      Q.    Okay.

5      A.    -- to stay upstairs.

6      Q.    All right.  And did you ever see anything with

7  her clothing?

8      A.    Yeah.  Well, when I was outside smoking a

9  cigarette, there was two times that I had to pull her

10  shirt down.

11     Q.    Okay.  How close to when you retired upstairs

12  was the last time you adjusted her shirt?

13     A.    Like, literally the last time that I was going

14  upstairs.

15     Q.    Okay.  So you adjusted it and went upstairs

16  right after you did that?

17     A.    Uh-huh.

18     Q.    Was the shirt high enough to determine whether

19  or not she was wearing any kind of a bra?

20     A.    Yeah.

21     Q.    Was she wearing a bra?

22     A.    No.

23     Q.    The other time you pulled her shirt down, when

24  was that?

25     A.    When they were, like -- they either -- it was

Mindy Solomon - D

423

1   either, like, when they smoked a cigarette -- because

2   that's why I came back downstairs, because they were

3   smoking a cigarette.

4       Q.   Okay.

5       A.   Everybody was smoking a cigarette.

6       Q.   In relation in time, was it an hour before, two

7   hours before, five minutes before, you pulled her shirt

8   down for the last time?

9       A.   Maybe not even a half an hour.

10      Q.   Okay.  Was -- what did you observe -- did you

11  observe her while she was sleeping?

12      A.   Yeah.

13      Q.   Was she laying still?

14      A.   No.

15      Q.   What was she doing?

16      A.   She was, like, all over the couch.

17      Q.   Okay.

18      A.   Like, kind of -- well, one time she was almost

19  off the couch.

20      Q.   Okay.  All right.

21           So before you went to bed, had Jorden

22  arrived?

23      A.   Yes.

24      Q.   Okay.  Did you smoke a cigarette with them?

25      A.   I didn't smoke a cigarette with him, no.

Mindy Solomon - D                                         424

1          Q.    Okay.   Where were you when he arrived?   I may

2     have asked you that already, but --

3          A.    Yeah.   I was upstairs.

4          Q.    Okay.   After he got there, did you ever go back

5     downstairs?

6          A.    I did, to get a drink.

7          Q.    Okay.   Drink of what?

8          A.    Juice.

9          Q.    Okay.   Do you remember where -- was Jasmine

10    asleep on the couch?

11         A.    Yeah.   The little couch by the stairs.

12         Q.    Okay.   Where was Jorden?

13         A.    On the big couch.

14         Q.    What was he doing?

15         A.    Watching TV.

16         Q.    Who else was there?

17         A.    Trisha and Ken.

18         Q.    Okay.   They were watching TV?

19         A.    They were still smoking.

20         Q.    Okay.   So --

21         A.    I didn't stay down there.

22         Q.    -- Jorden -- Jorden was on the couch watching

23    TV.  You got a drink.  What were Trisha and Ken doing?

24         A.    Smoking.

25         Q.    Okay.   Were they in the house or outside?

Mindy Solomon - D                                        425

1        A.    Outside.

2        Q.    Okay.  Do you remember what time that was?

3        A.    Maybe 12:00, 12:30.

4        Q.    Okay.

5        A.    About the time that I went up to go to bed.

6        Q.    All right.

7              Now, at any time during the evening did you

8    become aware of whether or not Jorden was in your room?

9        A.    Yeah.

10       Q.    Do you know when he came to your room?

11       A.    Like -- it wasn't that long after I went up

12   there, because I wasn't asleep.

13       Q.    Okay.  What were you doing when he came up?

14       A.    Watching TV on the floor.

15       Q.    Okay.  Who got the bed?

16       A.    Jorden.

17       Q.    Okay.  Where'd you sleep?

18       A.    I always sleep on the floor because I have a

19   bad back.

20       Q.    Okay.  All right.

21              Now, the next morning -- did you see Jasmine

22   the next morning?

23       A.    Yeah.

24       Q.    Okay.  What was she doing when you first saw

25   her?

Mindy Solomon - D                    426

1        A.    Playing in the front room on the floor.

2        Q.    Okay.  Did she seem to be in any kind of

3   distress?

4        A.    No.  She was jumping around, playing and

5   trying -- she was cleaning up her toys.

6        Q.    Okay.

7        A.    Cleaning up toys.

8        Q.    All right.

9        A.    Mess.  Her mess.

10        Q.    And where was Jorden?

11        A.    Upstairs.

12        Q.    Was he still asleep?

13        A.    Actually, I don't remember.

14        Q.    Okay.

15              Now, where was Ken when you first came down?

16        A.    Downstairs.

17        Q.    Where was -- where was Trisha?

18        A.    Downstairs.

19        Q.    Okay.  Did they leave at some point?

20        A.    Trisha and Ken?

21        Q.    Yeah.

22        A.    Not that I'm aware of.

23        Q.    Okay.  What did you do after you came

24   downstairs?

25        A.    Made something to eat.

Mindy Solomon - D                                427

1       Q.   Okay.  Did you stay there the whole day?

2       A.   Yes.

3       Q.   Did Ken and Trisha leave?

4       A.   I think so.

5       Q.   Okay.  Did they take Jasmine with her?

6       A.   Such a -- I'm sorry.  This is such a long time

7    ago.

8       Q.   With them.  Excuse me.

9       A.   Huh?

10      Q.   Did they take Jasmine with them?

11      A.   I'm -- I'm -- I think so.

12      Q.   Okay.  All right.

13              MR. KNAUSS:  I have -- thank you.  I have

14   no further questions.

15              THE COURT:  Ms. Dumont.

16              MS. DUMONT:  Thank you.

17                   CROSS-EXAMINATION

18   BY MS. DUMONT:

19      Q.   Defendant is your son, right?

20      A.   Yes.

21      Q.   Okay.  And you love him, right?

22      A.   Uh-huh.

23      Q.   I'm sorry.  You just have to say "yes" or "no"

24   because we're recording it.

25      A.   Yes.

```
1        Q.    Okay.

2        A.    I love my son.

3        Q.    Okay.  And you don't want anything bad to

4   happen to him; is that right?

5        A.    Well, no mother would.

6        Q.    Okay.  And you've been talking to the

7   defendant, right?

8        A.    Talking to him how?

9        Q.    About this case.

10       A.    No.

11       Q.    Okay.  Well, when he was in jail, he called you

12   and talked to you, right?

13       A.    Talked to me?

14       Q.    Yeah.

15       A.    No.  I was told I wasn't allowed to talk about

16   the case.

17       Q.    Did defendant make calls to you when he was in

18   jail?

19       A.    To talk to his mother, yes.

20       Q.    Aren't you his mother?

21       A.    Yes.  But not about the case.  I was told not

22   to talk about the case.

23       Q.    Okay.  But he did talk to you -- I'm sorry.

24   It's kind of how we got crosshairs here.

25             What I was trying to say was he called you.
```

Mindy Solomon - X                                429

 1    And I'm not saying what you talked about.  I'm just
 2    saying he called you from the jail, right?
 3        A.   Yes.
 4        Q.   Okay.  And you helped pay to get him out of
 5    jail, right?
 6        A.   (No audible response.)
 7        Q.   You bailed him out, right?
 8        A.   I'm -- I did not, no.
 9        Q.   You did not.  Who bailed him out, then?
10        A.   My -- my mother.
11        Q.   Your -- your mother bailed him out.  Did you
12    help pay the money to get him out?
13        A.   Yeah.
14        Q.   What?
15        A.   Yes.
16        Q.   Okay.  So when you just said you didn't bail
17    him out, you did, in fact, bail him out.  You helped
18    bail him out, right?
19        A.   Well, a lot of people did.
20        Q.   Okay.  And you used some of your tax return
21    money to help bail him out, didn't you?
22        A.   Yes.
23        Q.   Okay.  And you said that your mom helped bail
24    him out?
25        A.   Uh-huh.

Mindy Solomon - X                                            430

1        Q.    Who else?

2        A.    I don't know.

3        Q.    Okay.  So other than you and your mom, are you

4    aware of anyone else who used their money to bail him

5    out of jail?

6        A.    I don't know who.

7        Q.    I'm asking if you're aware of anyone else.

8        A.    I know that a bunch of people put their money

9    up, yes, because they believe in him.

10       Q.    Now, you testified that when you were at the

11   house, you thought that -- on that day, you -- you

12   believe that Jasmine looked -- I think you said that she

13   looked out of it.

14       A.    Uh-huh.

15       Q.    Is that correct?

16       A.    Uh-huh.

17       Q.    I'm sorry.  Can you say --

18       A.    Yes.

19       Q.    I'm -- and I'm not trying -- I'm -- I'm being a

20   stickler just so we have a good record.  So I'm sorry if

21   I keep reminding you.  But I will keep reminding you.

22             So you said that she appeared out of it.

23   And was that before dinner?

24       A.    No.

25       Q.    Okay.  Was that after dinner?

Mindy Solomon - X

```
 1        A.    After dinner.

 2        Q.    Okay.  Was that before you went up to bed?

 3        A.    Well, actually, no, that wasn't.  It was not

 4   after dinner.  It was before dinner.

 5        Q.    Okay.

 6        A.    Because my mom brought her dinner.

 7        Q.    Okay.  So this was before dinner.  And then did

 8   you eat dinner with Jasmine?

 9        A.    Well, we all ate there.

10        Q.    Okay.  So you're -- you're saying that you ate

11   as well?

12        A.    Yes.

13        Q.    Okay.  And then after you ate, did you go back

14   upstairs to your room?

15        A.    No.

16        Q.    No?  Did you stay downstairs?

17        A.    Uh-huh.  Yes.

18        Q.    You could tell I was going to ask you.

19        A.    Sorry.

20        Q.    Okay.

21              THE COURT:  I will reiterate what

22   Ms. Dumont has indicated.  Everything that we're saying

23   is being audibly recorded.  And so if you say "uh-huh"

24   or "huh-uh," that is very unclear on the audio --

25              THE WITNESS:  Okay.
```

```
 1              THE COURT:  -- as opposed to "yes" and
 2    "no."  So that's why she's doing that, and I agree with
 3    her.
 4              Go ahead, Ms. Dumont.
 5              MS. DUMONT:  Thank you.
 6    BY MS. DUMONT:
 7         Q.   So you were talking about -- or I was asking
 8    you about dinner.  And then after dinner did your mother
 9    and your daughter leave?
10         A.   Yes.
11         Q.   Okay.  And after they left, what did you do?
12         A.   I went outside.
13         Q.   You went outside.
14         A.   Uh-huh.
15         Q.   And then what did you do?
16         A.   Smoked a cigarette.
17         Q.   Okay.  At a certain point in the evening, did
18    you go into your room?
19         A.   Not until later.
20         Q.   Okay.  What time do you think you went into
21    your room?
22         A.   Late, like always.
23         Q.   Okay.  What time?  You're saying it always is
24    late.  What is that "always" time?
25         A.   I don't -- it was, like, 11:00, midnight.  I
```

Mindy Solomon - X                                             433

1    don't know.  Because I came downstairs again, it was

2    later.

3         Q.   Okay.  So around 11:00 to midnight, you went

4    upstairs to your bedroom?

5         A.   Uh-huh.

6         Q.   Is that correct?

7         A.   Yes.

8         Q.   Okay.  And when you went upstairs to your

9    bedroom, I think you testified that you were upstairs in

10   your bedroom when defendant returned home.

11        A.   Uh-huh.

12        Q.   Is that correct?

13        A.   Yes.

14        Q.   Okay.  And how did you become aware that he had

15   returned home?

16        A.   My room is directly above the sliding glass

17   door and I heard him come.

18        Q.   Okay.  So you heard the defendant come home.

19   At that point, do you come out of your bedroom?

20        A.   Yes.

21        Q.   Okay.  And did you go downstairs?

22        A.   Yes.

23        Q.   Okay.  And then is that when you went outside

24   and you had a smoke?

25        A.   Yes.  Everybody did.

Mindy Solomon - X                                    434

1      Q.    Okay.  And then after you had the smoke, then
2   you went back upstairs to your bedroom?
3      A.    Not direct -- not immediately, no.
4      Q.    Okay.
5            You testified that the -- that Jasmine was
6   asleep on the small couch.  Is that right?
7      A.    Correct.
8      Q.    Okay.  And is that a black leather couch?
9      A.    Yes.
10     Q.    Okay.  And you said that Jorden was on the big
11  couch, correct?
12     A.    Yes.
13     Q.    And that's a leather couch as well?
14     A.    Yes.
15     Q.    Okay.  And Trisha and Ken were watching TV,
16  correct?
17     A.    Yeah.  For a little bit.
18     Q.    Okay.  And you -- you testified that you got a
19  drink of juice.  And when -- what did you do after you
20  got the drink of juice?
21     A.    Talked to Jorden for a few minutes, then went
22  upstairs.
23     Q.    Okay.  Then after you went upstairs, what did
24  you do?
25     A.    Watched TV.

Mindy Solomon - X                                    435

 1        Q.    And then what did you do?

 2        A.    Watched TV.

 3        Q.    Okay.  Do you remember being interviewed on

 4   August 2nd, 2016, in -- by Mr. Knauss?

 5        A.    Yes.

 6        Q.    Okay.  So that was just, I mean, a week ago,

 7   about.  Is that correct?

 8        A.    Uh-huh.  Yes.

 9        Q.    And at that time, you told him that you went to

10   bed and heard Jorden arrive downstairs?

11        A.    Yes.

12        Q.    Correct?

13        A.    That's what I said.  Sliding glass door.

14        Q.    And that you were watching a movie, correct?

15        A.    Yes.

16        Q.    And then you said later that evening you woke

17   up and noticed that Jorden was asleep, correct?  That's

18   what you told Mr. Knauss.

19        A.    I said that I --

20        Q.    No.  I'm -- is that what you told Mr. Knauss?

21        A.    Yes.

22        Q.    Okay.  So when you just testified for

23   Mr. Knauss, you said that Jorden came upstairs and you

24   talked to him and then you went to sleep.  That's

25   different, correct?

Mindy Solomon - X                        436

1      A.   I -- I did say to him that I dozed off and came

2   back -- was awake.  And I had said that to Dr. -- I

3   mean, the -- Art, yes.  Or whatever his name.

4   Mr. Knauss.  Yes.

5      Q.   Okay.  So you woke up.  What happened was you

6   woke up and then you noticed Jorden was in your room,

7   right?

8      A.   No.  Actually, I woke up because I heard that

9   Trisha -- people coming up the stairs.

10      Q.   Okay.

11           During the time defendant was contacting you

12   from the jail, you weren't supposed to be having any

13   contact with him, right?

14           MR. KNAUSS:  Your Honor, I -- I object to

15   that because we're bringing in hypothetically -- to say

16   he had a no contact order, that's bringing in evidence

17   of other crimes.  So I object to that line of

18   questioning.

19           THE COURT:  Ms. Dumont.

20           MS. DUMONT:  Your Honor, it's the State's

21   position that this witness is perhaps fearful of the

22   defendant; that there has been prior violence between

23   them; and that this is a reason for her bias and her

24   testimony today.

25           THE COURT:  Mr. Knauss.

Mindy Solomon - X                                                   437

1              MR. KNAUSS:  Well, there's no showing
2      that's the situation.  The --
3              THE COURT:  Is there a requirement that --
4              MR. KNAUSS:  We're getting into -- I'm --
5      I'm sorry.
6              THE COURT:  Is there a requirement that
7      there be a showing before questions about bias?
8              MR. KNAUSS:  Well, I mean, she can ask her
9      if she's afraid of him or whatever, but she's trying to
10     bring in other issues that are irrelevant or not
11     admissible as far as my client's past criminal record,
12     which he's going to testify to, but all he has to
13     testify to is the date, the county, the charge, and
14     that's it.  And she's trying to get into other issues
15     about that through the back door that are not
16     permissible under the impeachment for crimes statute.
17     That's what's going on.
18             THE COURT:  I -- I thought that she
19     indicated that she was presenting it as it relates to
20     bias of this witness.
21             MR. KNAUSS:  She can ask her if she has
22     any bias or prejudice against my client.  I mean, that's
23     fair.  But for her to get up and say she has it without
24     asking her, that's inappropriate.
25             THE COURT:  Well, the question at this

Mindy Solomon - X                                      438

1    time was:  You were precluded from contact with him when

2    he called you from the jail, or thereabouts.

3              MR. KNAUSS:  Right.  Well, that's

4    introducing evidence of a potential crime for violating

5    a no contact order.  That's what she's alluding to.

6              The impeachment, you don't get to talk

7    about the underlying facts of the case.  You certainly

8    don't get to talk about PVs or anything like that.  It's

9    strictly if I -- if I were to ask my client, "Explain

10   what happened in the -- your criminal conviction," then

11   that -- then she can ask for factual issues about that

12   on a limited basis.  This is all in Chapter -- Rule 609,

13   ORS 40.355.

14             And they only get to get into the

15   explanation of what the crime's about is if the

16   defendant explains briefly the circumstances of the

17   conviction.

18             THE COURT:  At this point, the question is

19   not:  Have you been -- has he been convicted of a crime

20   relating to you?  The question at this point is:  Was

21   there a no contact order?

22             MR. KNAUSS:  Yeah.  That's it.

23             THE COURT:  Or was he precluded from

24   having contact?  That could be for a number of reasons,

25   including a noncriminal Family Abuse Prevent Act

Mindy Solomon - X                                              439

1    restraining order or stalking protective order or

2    another order of the Court.

3                    MR. KNAUSS:  Yeah, but that's --

4                    THE COURT:  So --

5                    MR. KNAUSS:  -- that's a violation of the

6    law for him to contact, and she's trying to prove

7    evidence of other violations of law by this question,

8    and that's not permissible.

9                    THE COURT:  Ms. Dumont.

10                   MS. DUMONT:  I still would argue that it

11   goes to bias.

12                   MR. KNAUSS:  Is she --

13                   MS. DUMONT:  Your Honor, if I ask if she's

14   fearful of this witness, that'll just (indiscernible).

15                   THE COURT:  I think that's a completely

16   different question and I'll take that --

17                   MS. DUMONT:  I --

18                   THE COURT:  If you want to ask that

19   question, I will not provide a ruling as it relates to

20   the question that is at the table right now.  And I can

21   find it if there's an objection to that question.  Go

22   ahead.

23   BY MS. DUMONT:

24       Q.   Were you fearful of the defendant?

25       A.   No.

Mindy Solomon - X                                    440

1       Q.    Okay.

2             You would agree that usually sex does not

3    happen in public; is that right?

4       A.    That what?

5       Q.    People don't have sex in public, right?

6       A.    Sure.

7       Q.    Is that a "yes" or a "no"?

8       A.    Well, there are some people around the world

9    and downtown that do.  I don't know.

10      Q.    Okay.  Well, typically, generally speaking,

11   people don't engage in sex in public; is that right?

12                  MR. KNAUSS:  Your Honor, there -- I

13   object.  This is not relevant.

14                  THE WITNESS:  I -- you know --

15                  THE COURT:  Hold on.  There's an

16   objection.

17                  What's your objection, Mr. Knauss?

18                  MR. KNAUSS:  Her knowledge of what other

19   people do when they have sex is completely irrelevant to

20   this case.  And if she's trying to put some spin on

21   that --

22                  THE COURT:  What's your legal objection?

23                  MR. KNAUSS:  Relevance.

24                  THE COURT:  Ms. Dumont.

25                  MS. DUMONT:  Counsel asked her repeatedly

Mindy Solomon - X                                441

1    about everything appearing fine, never seeing anything

2    untoward happening.  My point is that these don't --

3    things don't happen in public, and so one would not

4    expect that.  I think it's a fair question for me to

5    ask, given his direct examination.

6                    THE COURT:  Mr. Knauss --

7                    MR. KNAUSS:  That's something --

8                    THE COURT:  -- any other argument?

9                    MR. KNAUSS:  That's something for

10   argument, not -- and -- and is she some kind of expert

11   witness on that?  I mean, that's something she can make

12   that argument in final argument.  But to elicit

13   testimony from her about that is irrelevant.

14                   THE COURT:  I don't think this witness's

15   opinion about whether or not sex generally happens in

16   the public eye or not is relevant, so I'm going to

17   require that you go on with your next question.

18                   MS. DUMONT:  I'm done.

19                   THE COURT:  Mr. Knauss.

20                   MR. KNAUSS:  No further questions.

21                   THE COURT:  May this witness be excused?

22                   MR. KNAUSS:  Yes.

23                   THE COURT:  Ms. Dumont, may this witness

24   be excused?

25                   MS. DUMONT:  Yes, Your Honor.  I

Trista Tobin

442

1   apologize.  I didn't --

2                    THE COURT:  You may be excused.  Thank

3   you.

4                    Mr. Knauss.

5                    MR. KNAUSS:  Yes.

6                    (Witness summoned.)

7                    THE COURT:  Ma'am, if you'll come all the

8   way to the front of the courtroom.  When you arrive at

9   the witness stand, please remain standing, face my

10  clerk, and raise your right hand to be sworn.

11                    TRISTA TOBIN,

12  called as a witness on behalf of the defendant, having

13  been first duly sworn, was examined and testified under

14  oath as follows:

15                    THE CLERK:  Be seated.

16                    And please state your full name and spell

17  your last for the record.

18                    THE WITNESS:  Trista Samantha Lee Tobin.

19  And then --

20                    THE CLERK:  Spell your last.

21                    THE WITNESS:  And what?

22                    THE COURT:  Spell your last name, please.

23                    THE WITNESS:  T-O-B-I-N.

24                    THE COURT:  Go ahead.

25

Trista Tobin - D                                      443

1                          DIRECT EXAMINATION

2        BY MR. KNAUSS:

3            Q.   Where do you live?

4            A.   I live on 270 West Exeter Street in Gladstone.

5            Q.   Okay.  Are you employed?

6            A.   I am.  I'm a full-time caregiver at Elite Care.

7            Q.   And what kind of patients does Elite Care

8        service?

9            A.   I work with patients that have Alzheimer's and

10       dementia.

11           Q.   Okay.  How long have you been doing that?

12           A.   About seven months now.

13           Q.   Okay.

14           A.   Just at this facility.  I worked with a

15       previous facility for about five months.

16           Q.   Okay.  Do you like your work?

17           A.   I do.

18           Q.   Okay.  You were the -- well, what is your

19       relationship to Jorden Hollingsworth?

20           A.   As of right now, we are friends.  Before, we

21       were boyfriend and girlfriend.

22           Q.   Okay.  And do you know Jasmine --

23           A.   I do.

24           Q.   -- Jewell?

25                What -- do you know how old she was when you

Trista Tobin - D                                444

```
 1   met her?
 2        A.   I want to say around the ages between eight and
 3   ten.
 4        Q.   Okay.
 5        A.   Around there.
 6        Q.   And where did you meet her?
 7        A.   On Boardman, when she was living with Trisha.
 8        Q.   Okay.  Did -- did you ever go to that house and
 9   interact with Jasmine?
10        A.   I did.
11        Q.   For what period of time do you think?
12        A.   Anywhere from two to three hours to overnight.
13        Q.   Okay.  How long were you there interacting with
14   Jasmine over -- is it days?  Weeks?  Months?
15        A.   It just depended on the situation.  One day it
16   could have been just a few hours and then I had to go
17   home to my parents' house.  Or it could have been the
18   weekend.  On all actuality, I probably spent a good six
19   months with her.
20        Q.   Okay.  Did you get to know her well?
21        A.   Yes, I did.
22        Q.   Okay.  Did you interact with her?
23        A.   Yes, I did.
24        Q.   Did you and Jorden interact with her?
25        A.   Yes, we did.
```

Trista Tobin - D

1     Q.    What kind of things did you do?

2     A.    We would just make her meals, put movies on for

3  her when she was bored or when her father wasn't really

4  paying attention to her.  He would make her food, help

5  her with her homework, and I would do the same.

6     Q.    Okay.

7     A.    Those kind of things.

8     Q.    All right.

9         Did you ever see any hesitancy on the part

10  of Jasmine towards Jorden?

11     A.    No, I did not.

12     Q.    Did she show affection towards him?

13     A.    Yes, she did.

14     Q.    In what way?

15     A.    She would give him hugs, wrestle with him, play

16  with him, laugh with him, tell him jokes, want to tell

17  him stories when she got home from school.  Because a

18  lot of the time her father was not available to talk to,

19  so she would go talk to Jorden or I --

20     Q.    Okay.

21     A.    -- or Trisha.

22     Q.    All right.

23         Did Jorden -- or did Jasmine show affection

24  towards Jorden?

25     A.    Uh-huh.

Trista Tobin - D                           446

         Q.    And how so?

         A.    Just hugging.  Any -- and the same relationship
that an outgoing niece would show to each other.

         Q.    Okay.  At any point did you see her demeanor
change --

         A.    No, I did not.

         Q.    -- towards Jorden?

               Did she ever appear to be hesitant, afraid
of him, anything like that?

         A.    No, sir.  Not once.  Not in the time that I
knew her.

         Q.    Okay.

               MR. KNAUSS:  Okay.  Thank you.  No further
questions.

               THE COURT:  Ms. Dumont.

               MS. DUMONT:  Thank you.

                     CROSS-EXAMINATION

BY MS. DUMONT:

         Q.    How long did you know the defendant?

         A.    Since I was about 16 years old.

         Q.    Okay.  And did you -- were you dating him at
that time?

         A.    Yes.

         Q.    Okay.  And you guys broke up around 2011?

         A.    Yes.

Trista Tobin - X                                    447

1        Q.    Okay.  So after you broke up in 2011, you

2   didn't really see Jasmine after that?

3        A.    No.  I moved out of state.

4        Q.    But before 2011, you -- it sounds like you

5   were -- you and Jorden were babysitting Jasmine.

6        A.    Uh-huh.

7        Q.    Is that right?

8        A.    Yes.

9        Q.    Okay.  And do you remember, when interviewed

10   by -- on January 7th, 2016, by an S. Castleman -- do you

11   remember someone from the defense coming and talking to

12   you?

13        A.    Yeah.

14        Q.    Oh, maybe you came to the office

15   (indiscernible).

16        A.    Yes, I did.  I was going to say, yeah, I came

17   to the office --

18        Q.    Okay.

19        A.    -- here in Oregon City.

20        Q.    Okay.  So you remember that?

21        A.    Yes.

22        Q.    Okay.  And do you remember telling the -- this

23   S. Castleman that you love him more than anything?

24        A.    Uh-huh.

25        Q.    Is that right?

Trista Tobin - X

1        A.    Yes, ma'am.

2        Q.    Okay.  And that's despite the fact that you've

3    been broken up --

4        A.    Yes, ma'am.

5        Q.    -- for a very long time.  Is that true?

6        A.    Yes.

7        Q.    Okay.

8                    MS. DUMONT:  Nothing further.

9                    THE COURT:  Mr. Knauss.

10                    MR. KNAUSS:  Thank you.  No.  Nothing

11    further.

12                    THE COURT:  May this witness be excused?

13                    MR. KNAUSS:  Yes.

14                    THE COURT:  Any objection?

15                    MS. DUMONT:  No, Your Honor.

16                    THE COURT:  You're excused.  Thank you.

17                    MR. KNAUSS:  Your Honor, my next witness

18    is my client.  We are prepared to go forward.  I would

19    ask the Court that I be allowed to do it in one session,

20    so it's not broken up, so it flows better.

21                    THE COURT:  How many additional witnesses

22    does the defense intend on calling tomorrow?

23                    MR. KNAUSS:  Just Dr. Bourg at 9:00 and --

24                    THE COURT:  Ms. Dumont, do you have any

25    idea of how many rebuttal witnesses you may have?  I

1    realize that might be a moving target at this time.

2              MS. DUMONT:  It -- it is a moving target,

3    Your Honor.

4              THE COURT:  Does the State wish to be

5    heard about recessing early for the afternoon and

6    commencing with the defendant's testimony tomorrow

7    morning?

8              MS. DUMONT:  My concern is that I was

9    hoping to be able to have some sort of resolution, as we

10   talked about with the Court, because the victims are

11   actually flying out of town tomorrow.  And so I was

12   hoping that we could move along today.  And so half an

13   hour, while it doesn't seem like that much, might

14   actually be a big chunk of time.

15             MR. KNAUSS:  I can assure the Court we are

16   totally prepared to do this.  I'm just suggesting to the

17   Court and I'm sure the Court's seen this before,

18   especially for the defendant's testimony, as free and

19   flowing as I can do is a much better scenario to present

20   the defendant's case.  And to do it for half an hour and

21   then chop it up is less effective, in my experience.

22   But I'm not --

23             THE COURT:  I can --

24             MR. KNAUSS:  I'm not ducking anything.

25   We're totally ready to go.

```
 1                    THE COURT:  I can appreciate the request.
 2     As you both are aware, I have the utmost respect for the
 3     both of you as attorneys, as the attorney for the State
 4     and the attorney for the defense.
 5                    Would all of you be able to begin at 8:30
 6     tomorrow, a little bit earlier than normal?
 7                    MR. KNAUSS:  Sure.
 8                    MS. DUMONT:  Yes, Your Honor.
 9                    THE COURT:  Let's -- let's do that.
10                    MS. DUMONT:  Okay.
11                    THE COURT:  We'll lose the half an hour
12     this morning.
13                    MR. KNAUSS:  Okay.
14                    THE COURT:  We'll gain the half -- we'll
15     lose the half an hour this afternoon --
16                    MR. KNAUSS:  Okay.
17                    THE COURT:  -- and we'll gain the half an
18     hour in the morning by starting at 8:30.
19                    MR. KNAUSS:  I can -- I'll contact
20     Dr. Bourg; see if she can come early.
21                    THE COURT:  I -- I respect --
22                    MR. KNAUSS:  Yeah.
23                    THE COURT:  -- the State's concerns
24     about --
25                    MR. KNAUSS:  Yeah.
```

```
 1                THE COURT:  -- preplanned plane flights.
 2                MR. KNAUSS:  Yeah.  No, I -- I appreciate
 3   that.  I'll -- I'll get ahold of her right away and see
 4   if she can come a half hour earlier.
 5                THE COURT:  All right.  Every --
 6                MS. DUMONT:  Well, he can -- if he's going
 7   to testify, then she'll just come at the same time.
 8                MR. KNAUSS:  No.  I want to have her start
 9   and then have -- I want to do him all at once, is what
10   I'm saying.
11                MS. DUMONT:  Okay.
12                MR. KNAUSS:  I'm going to start with
13   Dr. Bourg if she can get here early.
14                THE COURT:  In any case --
15                MS. DUMONT:  Okay.
16                THE COURT:  -- what I want to do is this:
17   I want everyone to be back and ready at 8:30.
18                MR. KNAUSS:  Yeah.
19                MS. DUMONT:  That's fine.
20                THE COURT:  We'll either begin with
21   Dr. Bourg's testimony at that time --
22                MR. KNAUSS:  Yeah.
23                THE COURT:  -- or we'll begin with the
24   defendant's testimony.
25                MR. KNAUSS:  Okay.  Thank you.
```

1          THE COURT:  One of the two.

2          Thank you very much.

3          MR. KNAUSS:  Yeah.  Thank you.

4          (Recess at 4:33 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           BE IT REMEMBERED That the above-entitled

2  matter came on regularly for trial before the HONORABLE

3  KATHERINE E. WEBER, Judge of the Circuit Court of the

4  State of Oregon, for the County of Clackamas, commencing

5  the 11th day of August, 2016.

6

7

8  APPEARANCES:

9  Sarah J. Dumont
   Deputy District Attorney
10 Clackamas County District Attorney's Office
   Clackamas County Courthouse
11 807 Main Street
   Room 7
12 Oregon, City OR  97045
   Appearing on behalf of the State of Oregon

13

   Arthur B. Knauss
14 Attorney at Law
   294 Warner Milne Road
15 Oregon City, OR  97045
   Appearing on behalf of the Defendant
16

17

18

19

20

21

22

23

24

25

Wendy Bourg

454

1                    P R O C E E D I N G S

2                         (August 11, 2016; 8:33 a.m.)

3              THE COURT:  We're back on the record.  If

4    you could call our case.

5              MS. DUMONT:  Thank you.  State vs.

6    Hollingsworth; 1501848.  Sarah Dumont representing the

7    State.  Defendant is present, out of custody,

8    represented by Mr. Knauss.

9              THE COURT:  Mr. Knauss.

10             MR. KNAUSS:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             MR. KNAUSS:  I call Dr. Wendy Bourg.

13             THE COURT:  If you'll come all the way to

14   the front of the courtroom.  When you arrive at the

15   witness stand, do remain standing, face my clerk, and

16   raise your right hand to be sworn.

17                       WENDY BOURG,

18   called as a witness on behalf of the defendant, having

19   been first duly sworn, was examined and testified under

20   oath as follows:

21             THE CLERK:  Be seated.

22             And please state your full name and spell

23   your last for the record.

24             THE WITNESS:  It's Dr. Wendy Bourg, and

25   it's B-O-U-R-G.

1                          <u>DIRECT EXAMINATION</u>

2    BY MR. KNAUSS:

3        Q.   Dr. Bourg, what is your education?

4        A.   I have a PhD in clinical psychology.

5        Q.   Where did you obtain that degree?

6        A.   From the University of Houston in 1995.

7        Q.   Okay.  And what was your undergraduate

8    education?

9        A.   I studied at Texas A&M University and got a

10   degree in psychology.

11       Q.   Are you a licensed psychologist in the state of

12   Oregon?

13       A.   I am.

14       Q.   When did you get the license?

15       A.   Where or when?

16       Q.   When.

17       A.   Oh, okay.

18       Q.   Yeah.

19       A.   2006.

20       Q.   All right.

21            I'll show you what's been marked

22   Exhibit 101.  Is this your curriculum vitae, as far as

23   your professional credentials?

24       A.   Yes.

25       Q.   Okay.

Wendy Bourg - D                                456

1              MR. KNAUSS:  I'd offer Exhibit 101,

2      please.

3              THE COURT:  Any objection?

4              MS. DUMONT:  No objection.

5              THE COURT:  101 will be received.

6              (Defendant's Exhibit 101 received.)

7      BY MR. KNAUSS:

8          Q.   What does your current practice consist of?

9          A.   I work in two primary areas; high-conflict

10     divorce and evaluation of children's statements of

11     sexual abuse.  I do probably 25 -- 20 to 25 percent of

12     my practice in the area of child interviewing and child

13     statements about abuse and the remainder of my practice

14     is in the area of high-conflict divorce.

15         Q.   Okay.  And have you been asked to testify in

16     court?

17         A.   I have.

18         Q.   What's -- what's been the average times you've

19     come to court on discussing child interviews where sex

20     abuse was reported?

21         A.   I end up in court, I've looked at it over the

22     past couple of years, on child sexual abuse matters,

23     about a couple of times a month.

24         Q.   Okay.  Now, when did you start your private

25     practice?

Wendy Bourg - D                              457

1     A.    Well, I started it once in around 2000, 2001,

2     and I took a break because I had a -- I just decided to

3     take care of my children.  And I started it in 2003 on a

4     steady basis going forward --

5     Q.    Okay.

6     A.    -- to now.

7     Q.    Now, have you been involved in the creation of

8     any guide books for the interviewing and evaluating of

9     child sex abuse?

10    A.    Yes.  While I worked at CARES Northwest, the --

11    there was a desire to create more centers in the state

12    of Oregon where all kids in Oregon could have a good

13    evaluation, the way that they were getting at CARES

14    Northwest.  People working there at CARES Northwest,

15    including me, approached the legislature asking for

16    funding for those centers.

17          The legislature wanted accountability, if

18    they were going to give money.  So some funds and they

19    were -- they asked for some guidelines to be created.  I

20    was actually asked to write the guidelines myself.

21          At that point, though, there were different

22    models, and there actually still are, of how to evaluate

23    children properly when there's a concern of abuse.  I

24    wanted to make sure that we did not exclude any good

25    practice that was occurring in the state of Oregon.  And

Wendy Bourg - D

1    so I asked to convene a team, which I did, of people in

2    other centers that were doing a good job in the state.

3    And what I did was I would write the chapter, gather the

4    literature for the group.  They would review the

5    literature, review the chapter, provide me with some

6    feedback, and then we'd put the final chapter in.

7         There were two chapters where the original

8    draft was written by someone else who was on the team.

9    One on developmental disabilities, written by Judy

10   Butler, and then I edited, along with the rest of the

11   team.  And another on multidisciplinary team function

12   original draft written by Ray Broderick, who is also an

13   author on the book.

14        That was published in 1998 as the first

15   draft of the Oregon Interviewing Guidelines, the first

16   edition.  And then it was later published as a book in

17   1999 and used as a training guide through the U.S. and

18   sometimes in some other countries.

19   Q.    Okay.  And was that publication used by then

20   what's called CARES Northwest?

21   A.    Yes, it was.

22   Q.    Okay.  Has it been modified since?

23   A.    Yes.  It was updated in 2004.  That was a minor

24   modification.  And then it was updated again in a major

25   way in 2012.

Wendy Bourg - D                                     459

1        Q.    Okay.  And you've reviewed both subsequent

2    modifications?

3        A.    Yes, in detail.

4        Q.    Okay.

5        A.    Most of the time when I'm evaluating a case or

6    when I'm prepping for court, I go and review the

7    guidelines.

8        Q.    Okay.

9              Now, you indicated you've worked at CARES

10   Northwest.  When was that?

11       A.    From 1992 until 2001.

12       Q.    And what was your role there?

13       A.    I was a child interviewer primarily.  And then

14   I was an assistant scientist also with part of my time.

15   And it was in that role that I led the team that

16   authored the guidelines.

17       Q.    Okay.

18             Now, have you done any initial evaluations

19   of children since 2001?

20       A.    Yes.

21             So I continue to do child sexual abuse

22   interviews, a couple a year.  So it's not as many with

23   the -- just the sexual abuse focus.  Those cases tend to

24   be in unusual situations, such as when there's a

25   psychological -- a concern about the child's

Wendy Bourg - D                    460

1    psychological functioning that someone wants evaluated
2    along with the present interview.
3              I've done interviews of children who are
4    recanting.  And at least historically when a child
5    recants, CARES Northwest and the other centers don't see
6    them.  And so I've been asked to evaluate what's going
7    on.  Is someone influencing this child's statements?
8    Who's influencing the child's statement?
9              I also have done some interviews when, for
10   example, DHS refuses to take the case.  In a family law
11   case, a child is making sexual abuse allegations this
12   year, and the child's attorney asked me to please do a
13   forensic interview of the child because the child was
14   not to be evaluated under the regular system and there
15   was a lot of concern about the child's safety.
16             So I continue to conduct a few a year
17   because the centers do a good job and they do most of
18   the interviewing.  Most of the interviewing is done by
19   them.
20             I also, though -- because of the nature of
21   my high-conflict divorce practice, I implement the
22   procedures, the protocols in the Oregon Interview
23   Guidelines in my conversations with children in
24   high-conflict divorce to ensure that when I'm asking
25   them questions about the experiences in their families

Wendy Bourg - D                                                461

1    that I don't contaminate their statements, that I list

2    reliable statements from the children in that situation.

3              That's more like a screening interview,

4    because I tend to talk to the children for only 15 to 30

5    minutes.  Some older children I'll speak to for a full

6    hour, but it's a less elaborate interview than, say, the

7    whole sexual abuse protocol.

8        Q.    Have you published in the field of child sex

9    abuse?

10       A.    Yes.  Mostly while I was at CARES Northwest.

11       Q.    Okay.  And have you made presentations over the

12   years on this subject matter?

13       A.    Yes.  Presentations to organizations like the

14   Oregon District Attorneys Association.  I've made

15   presentations to law enforcement and DHS.  I've made

16   some presentations to defense organizations.  And then

17   in my family law practice, the Association of

18   Matrimonial Lawyers, for example, has asked me to speak

19   recently.

20       Q.    It looks like in your -- in our Exhibit 101

21   that you've probably engaged in, what, 20, 30

22   presentations?

23       A.    Yes.  And I usually update my vitae in June of

24   every year.  And I didn't make it in 2016, so there's a

25   few presentations that I did in 2015 to 2016 that aren't

Wendy Bourg - D                                462

1    reflected on there.

2        Q.    Okay.

3        A.    And then I have a few upcoming presentations.

4    I tend to talk about two, three times a year.

5        Q.    All right.

6              Now, did I ask you to review the case of

7    Jorden Hollingsworth --

8        A.    Yes.

9        Q.    -- including the Children's Center interview of

10   Jasmine Jewell Shafer?

11       A.    Yes, you did.

12       Q.    Okay.  What materials did you have provided

13   that you reviewed and considered in your review of this

14   record?

15       A.    An indictment against the client.  A page that

16   was titled Clackamas County Sheriff's Office Inmate

17   Information, with a picture.

18             A Notice of Intent I think from the district

19   attorney's office to offer statements made by child

20   victim.

21             A series of Oregon City Police Department

22   reports that were summarizing the child's initial

23   statements and the initial disclosure process.

24   Statements from other family members in the home at

25   the -- at the time of the alleged incident.

1          A police-authored summary of the Children's

2    Center interview; so giving their perceptions of the

3    interview.

4          Reports from the Children's Center

5    summarizing their evaluation of the child, their

6    complete evaluation of the child.  And then I looked at

7    the video-recorded interview myself.

8        Q.    Okay.

9        A.    I also reviewed some research literature

10   regarding children's and adults' cognitive functioning

11   when they're awakened in the middle of a dream state.

12       Q.    Okay.  And what research or review did you do

13   in that regard?

14       A.    I reviewed a series -- I did essentially a full

15   lit search on what's called hypnogogic and hypno- --

16   hypnopompic states, which refers to a period of

17   cognitive confusion that occurs when people are awakened

18   in the middle of the night.  That's the hypnopom- --

19   sorry, hypnopompic state.

20          The hypnogogic state is the period of

21   confusion that occurs as you're starting to drift into

22   sleep.  And I looked at the -- the known cognitive

23   errors and distortions and visual perceptual distortions

24   that are made when people are in those situations of

25   fading in and out of sleep.

Wendy Bourg - D                                    464

1        Q.    Okay.

2              Now, let's -- let's talk about the first

3    matter here.  As far as the time of the interview,

4    the -- the indictment indicates that the allegation is

5    one of these incidents -- this occurred on

6    February 13th, 2015, and the Children's Center interview

7    was on February 19th.  In your view, was that a prompt

8    reaction to the allegations?

9        A.    It was reasonably prompt.  So what -- what is

10   known about forgetting is that -- memory and

11   forgetting -- the more quickly that you --

12             MS. DUMONT:  Your Honor, question in aid

13   of an objection?

14             THE COURT:  Go ahead.

15             QUESTIONS IN AID OF OBJECTION

16   BY MS. DUMONT:

17       Q.    Is your training in memory?

18       A.    I do have some training in --

19       Q.    But your degree is in psychology; is that

20   correct?

21       A.    Yes, that's correct.

22       Q.    Okay.  And so you are not a trained researcher

23   in memory or memory recall; is that correct?

24       A.    I have training and coursework in memory and

25   memory recall.  But I'm not --

Wendy Bourg - D

1      Q.    That's not your area of expertise.

2      A.    -- a researcher --

3      Q.    Okay.

4      A.    -- of memory.

5      Q.    And you haven't written about memory, correct?

6      A.    I have not.

7      Q.    Okay.  And so what you're basing this on is

8   some Googling or Internet research that you did, looking

9   at articles; is that right?

10     A.    That's not correct.

11            So I have written about memory.  I wanted to

12  correct -- I'm sorry, I said "yes" to your question, and

13  then I realized that some of the chapters in my book

14  were on memory, memory and suggestibility, because it

15  impacts how you interview a child.  So it's a research

16  literature that I've kept up with --

17     Q.    What I was talking about --

18     A.    -- for 20 years.

19     Q.    -- was in particular dreams and that sort of

20  medical analysis that you're talking about now.  I

21  understand that you've done some research and written on

22  suggestibility as your -- in your capacity as an

23  interviewer.  I'm talking about the dream section.

24     A.    Okay.  So --

25     Q.    You don't have an expertise in that area; is

Wendy Bourg - D                                    466

1    that right?

2        A.    I want to clarify where the expertise is and

3    isn't.

4              So there's training, when you're on

5    psychology programs, on states of consciousness, sleep

6    and dreaming being among them.  So there's coursework in

7    those areas.  It has come up a couple of times in my

8    child interviewing career about -- because sometimes

9    abuse occurs at night, about whether a child is awake or

10   asleep and what the implications of that on their

11   information processing are.  So a couple of times I've

12   needed to check in on that research.  So it's that --

13       Q.    But this is -- okay.  So you're checking in on

14   research, but you're -- you haven't done any original

15   research.  That's not your area of expertise and this

16   isn't an area that you've written in, correct?

17       A.    That's absolutely correct.

18       Q.    Okay.

19             MS. DUMONT:  Your Honor, I don't believe

20   that she has a proper foundation -- foundation to talk

21   about this area.

22             THE COURT:  Mr. Knauss.

23             <u>DIRECT EXAMINATION RESUMED</u>

24   BY MR. KNAUSS:

25       Q.    With regard to your role as an interviewer and

Wendy Bourg - D                                    467

1    a researcher in the area of child sexual abuse, have you

2    come across cases where there was incidences of

3    allegations of sex abuse that occurred during a dream

4    state?

5        A.   Yes.

6                THE COURT:  Hold on.  I -- I'm concerned

7    because Ms. Dumont had an objection.  I didn't hear a

8    response.  I'm assuming you're laying --

9                MR. KNAUSS:  Oh, oh.

10               THE COURT:  -- additional foundation --

11               MR. KNAUSS:  Yes.

12               THE COURT:  -- regarding her --

13               MR. KNAUSS:  Yes.

14               THE COURT:  -- ability to testify.

15               MR. KNAUSS:  Yes, Your Honor.

16               THE COURT:  Okay.  With that assumption,

17   the question and answer will remain.  Go ahead with your

18   next question.

19               MR. KNAUSS:  Okay.

20               THE WITNESS:  Okay.  So yes, it comes up

21   periodically that there's a question about the child's

22   memory when they're in a state either of actually

23   dreaming or when they're transitioning from dreams to an

24   awake state.

25

Wendy Bourg - D                                          468

1    BY MR. KNAUSS:

2         Q.    Okay.

3         A.    That issue comes up occasionally when examining

4    a child's interview or when interviewing a child

5    yourself.

6         Q.    Okay.  And you indicated that you researched

7    literature pertaining to cognitive functioning when

8    waking up.  Could you elaborate on what -- what you did

9    in the way of research?  What articles and publications

10   you reviewed.

11        A.    So certainly.

12             So first, again, in my -- in my basic

13   training as a psychologist, we are offered coursework on

14   states of consciousness.  So there is making sure that

15   you have a foundation of understanding these phenomena

16   and what -- how people can behave when they're in these

17   states and what their memory and perception is like in

18   these states, was a part of basic coursework.

19             What that does then is when these issues are

20   encountered in my practice in various ways, it gives me

21   a foundation of knowledge to then say, oh, this is

22   something I need to pay attention to and this is

23   something I might need to look into in a little more

24   detail right now because it's impacting my current case.

25   So there's a foundational knowledge.

Wendy Bourg - D

1          Then I looked at the following literature:
2    I updated myself with a book on dreaming.  And it's
3    called Dreamland, and it's about people's behaviors in
4    the states of transition between sleep and waking.
5          I looked at a chapter written by an author,
6    last name Dinges, on different impairments, and I have
7    that chapter with me, that are documented, when people
8    are awakened from sleep and awakened from different
9    stages of sleep.
10          There's four stages of sleep and the levels
11   of impairment are different, depending on the level --
12   the stage of sleep that the individual is awakened from.
13   So when people are awakened, for example, from delta
14   wave deep sleep, their impairment is greater than their
15   awake -- when they're awakened from REM states of sleep;
16   rapid eye movement sleep.
17          I looked at an article by Goodenough and
18   colleagues.  I looked at an article -- and this one I
19   have with me as well -- by Johnson, Kahan, and Raye,
20   1984.  It's called Dreams and Reality Monitoring.
21   Johnson -- Marcia Johnson is a researcher, along with a
22   third author here, Raye, Carol Raye.  They have done a
23   series of research studies on what's called reality
24   monitoring; adults and children's ability to
25   discriminate real events from things that they imagined

1      or dreamed.

2          Q.    Okay.

3          A.    And then I did a literature search on the

4      psychological information database on all of the

5      research studies on hypnopompic and hypnogogic states.

6      So some articles I read in more detail and others I just

7      looked at is this literature relevant at all to the

8      concern that I'm facing right now.  And much of the

9      literature was not relevant.

10         Q.    All right.  We're going to discuss the dream

11     situation later, but what we were talking about when

12     there was an objection is the -- the time period between

13     the allegation and the interview at Children's Center,

14     was that -- any concerns there as far as that it was six

15     days later?

16         A.    No.  And I -- and I don't know if I'm -- should

17     I proceed with my testimony on that?  Because I had a

18     kinda complicated answer to that, which wasn't related

19     to the dream objection, so I feel a little confused

20     right now.

21              THE COURT:  I'm not hearing an objection.

22     Why don't you restate your question and we'll go slowly.

23              MS. DUMONT:  I believe that I heard -- I

24     heard Mr. Knauss saying he was moving -- not going to

25     talk about the dream thing, so I was going to --

Wendy Bourg - D                    471

1              THE COURT:  Yes.  I -- I'm assuming that

2    that issue has been put to the side for a moment.

3              MR. KNAUSS:  Right.

4              THE WITNESS:  Okay.

5              THE COURT:  So go ahead with your

6    questioning, Mr. Knauss.

7              MR. KNAUSS:  Right.

8    BY MR. KNAUSS:

9       Q.    The delay of six days, was there any concern

10   from your end of -- as to the period of time between the

11   disclosure and the interview at Children's Center --

12      A.    Okay.  Yes.

13      Q.    -- six days later?

14      A.    And so yes and no.  If an individual, including

15   a child, is interviewed right after an event, what we

16   know -- and immediately after -- what we know is that

17   the memory is very detailed.  But if you ask the right

18   kinds of questions, invitational and open-ended

19   questions, you tend to get a very large quantity of

20   information.  And importantly, if you don't lead the

21   child, children's accuracy rates are similar to adult

22   accuracy rates, and they resist leads, children and

23   adults.

24              As -- as time passes, after about a month,

25   the vast majority of the information in the original

Wendy Bourg - D                                    472

1    memory is lost.  After about a month, what remains is

2    called in the research literature a memory trace.  Many

3    of our memories leave no trace.  For example, most of us

4    won't remember what we had for breakfast this morning a

5    month from now.  Unless it was a salient event, an

6    emotionally significant event, like an anniversary

7    dinner or a wedding celebration.

8           So when children -- it's written into the

9    Oregon Interview Guidelines that children should be

10   interviewed as soon as possible after the event to

11   maximize their reporting capacity, their ability to

12   report the details, and to minimize their susceptibility

13   to leading and suggestive questions.

14          In this case, the child disclosed

15   immediately, which is actually something that often

16   doesn't happen with sexual abuse, so that's good.  Her

17   memory should have been pretty fresh at the time she

18   disclosed.  And she was brought to the police station

19   the next morning, so that was also again a rapid

20   response.

21          Ideally, she would have been interviewed by

22   a highly trained forensic interviewer the same day, to

23   make sure her memory was most accurate and most

24   detailed.  A week later is better than is often seen.

25   And there probably would have been some forgetting

Wendy Bourg - D                                    473

1    between the incident and a week later.  There's a fair

2    amount of forgetting -- this has been tracked in a

3    number of scientific studies, so we -- we actually know

4    the curve and kind of the slope of the curve, and a lot

5    of forgetting occurs over the first three days.  But

6    again, when you -- when you test someone after a week

7    and evaluate their memory, they still have a fairly

8    detailed memory.

9         So this is a pretty rapid response and

10   pretty good relative to most cases of sexual abuse that

11   I see.  Better than average.

12   Q.    Okay.

13        Now, in reviewing the police reports, did

14   you see anything in there of concern as it relates to

15   the approach of -- of the police officers?

16   A.    I saw something positive and something of

17   concern.  Something positive was the police officer

18   waited for a more highly trained interviewer and didn't

19   do a lot of talking to the child.  Something negative

20   that the officer did was tell the child she was brave

21   for disclosing to her father.

22        What is known is that when people get

23   rewarded in any way for a statement, it has two adverse

24   impacts.  It communicates that their statement is valid

25   and it increases their confidence in their statement, so

Wendy Bourg - D

474

1    that later they may report an incident in a manner that
2    looks more like what people do when they're telling the
3    truth.  It increases the appearance of their
4    truthfulness without increasing the actuality of their
5    truthfulness.
6            So it's important not to bolster anyone's
7    statements and also not to -- just not to influence them
8    at all.  Not to critique their statements or bolster
9    their statements.  Those things have adverse influences
10   on their later reporting.
11   Q.    Okay.
12           Now, when there is indications of some
13   disclosures and interaction with -- with police officers
14   prior to the interview, is there any preferred practice
15   that the interviewer should do in light of some prior
16   disclosures?
17   A.    Yes.  It's important for the interviewer to
18   just ask about prior conversations to establish a chain
19   of evidence.  So we're looking for -- since we know that
20   prior -- prior conversations are the main source of
21   contamination in children's statements, it's important
22   to have some level of tracking of what transpired during
23   those conversations.
24           It's recognized that when people are
25   reporting on prior conversations, they're not going to

Wendy Bourg - D                                    475

1    be perfectly accurate.  But at least if you have some

2    report, you have, again, some foundation for looking at

3    whether there was any adverse influence on the child.

4         Q.   Would an interview -- would an interviewer be

5    well served to ask the child about the impact of the

6    prior disclosure?

7         A.   It's mostly just asking what happened during

8    the conversation.  A child may not be able to track the

9    impact.  I wouldn't expect a child to -- to have the

10   cognitive capacity to --

11        Q.   Okay.

12        A.   -- to say, "Oh, yes.  I changed my story at

13   this point because of this -- this statement that

14   someone else made."

15        Q.   Right.

16             Now, as far as the questioning approach by

17   Ms. McVay, did she follow protocols as far as the manner

18   of questioning?

19        A.   Yes, mostly.  Again, I would like to have

20   ideally seen more invitational questions, which are of

21   the form, "Tell me what happened.  Tell me more about

22   that."

23             But she did ask who, what, where kinds of

24   questions, W-H, which are called open-ended questions.

25   Those are high-quality questions.  They don't tend to --

1    the difference between an invitational question and a

2    W-H question, the invitational questions produce more

3    elaborate recall.  The W-H, who, what, where questions,

4    produce more limited recall, but accuracy rates are

5    similar for those two kinds of questions.  So because of

6    the nature of the questions she asked, I did not worry

7    about any kind of contamination from the interviewer.  I

8    didn't see any instances where I was concerned about her

9    process doing that.

10       Q.   As far as the interviewing protocols, is the

11   interviewer well served to discuss with a child the

12   rules of how they're going to -- excuse me, the basic

13   rules of doing an interview?

14       A.   Yes.  There's a couple of things.

15            Children walk into an interview or a

16   conversation with an adult with some assumptions.  They

17   assume the adult already knows what's happened.  They

18   assume that their job is to please the adult and that

19   the adult is the authority figure in the interaction.

20            It's helpful to children to go over ground

21   rules with them, to help them understand this is a

22   different kind of conversation.  I, the adult, do not,

23   in fact, know what occurred, and I'm relying on you to

24   tell me what happened because I wasn't there.  It was an

25   event in your own experience.  That helps the child

Wendy Bourg - D

1    understand the adult's not the authority figure here.

2              You also are -- it is also in the research

3    protocols for child interviewing that you tell the

4    child, "It's okay to correct me."  If the -- sometimes

5    the adult might mishear the child and repeat something

6    back to the child incorrectly.  Children typically will

7    not correct an adult in that situation.  And letting the

8    child know, "I expect you to correct me and I want you

9    to correct me.  I'm not going to be acting as an

10   authority figure here.  I'm acting as a scribe of your

11   statement."  Those things are helpful.

12             A third thing that's helpful is to review

13   with the child the importance of telling the truth.  And

14   some research studies have shown that if you review the

15   importance with the child of telling the truth and then

16   you elicit a promise from the child to tell the truth,

17   that children, in fact, are more truthful in their

18   statements later.  They're more careful and less likely

19   to make inaccurate statements.

20             The issue I saw with this interview is that

21   usually you want to do each of those tasks in isolation.

22   You want to talk about the importance of, "I don't know

23   everything that happened.  I just met you," and then

24   talk to the child about that separately and get their

25   understanding and affirm their understanding.  Then you

Wendy Bourg - D                                478

1    separately want to assess the child's ability to correct

2    you if you say something wrong, like telling them

3    they're ten when they're eight.

4             And thirdly, you want to assess the child's

5    ability to discriminate the difference between a truth

6    and a lie, and then separately say, "Will you promise to

7    do that?  Will you promise to tell me the truth in this

8    interview?  And I promise to tell you the truth as

9    well."

10            This interviewer really ran through that

11   part and made a very complicated statement to the child,

12   which I sort of partially transcribed.  But all those

13   elements were in one sentence, and then just said to the

14   child, "Will you do that?"  And even as an adult

15   watching the interview, I had trouble tracking what all

16   she was asking the child to promise.  So it would have

17   been better done if it had been separated.

18       Q.   Now, did you come to learn that Jasmine was

19   diagnosed with ADHD?

20       A.   Yes.

21       Q.   And what is the -- your opinion as far as

22   giving her the ground rules when she's a child that

23   suffers from ADHD?

24       A.   So I -- for a little while after I left CARES

25   Northwest and before I started my private practice, I

Wendy Bourg - D

479

1   worked at Summit Research Network doing clinical trials.
2   We did clinical trials on children with ADHD.  So I have
3   a reasonable amount of clinical experience with those
4   kids.  They also come into my office as part of my
5   divorce practice.
6          Children and adults with ADHD have trouble
7   with attention and with focusing their attention.  And
8   especially with focusing their attention on complicated
9   stimuli if they're not of inherent interest to the
10  child.  And so when an adult is speaking with a child
11  who has attention deficit, it's super important to make
12  sure the child's heard you and understood what you've
13  said and doing some checking of that.
14         So again, that sentence concerned me even
15  more because of the child having ADHD, whether the child
16  tracked that promise and tracked the ground rules being
17  different during this conversation.
18  Q.   All right.
19         Now, the -- did you find an acknowledgement
20  of the child during the video that she had -- she had
21  self-proclaimed issues about lying?
22  A.   Yes.
23  Q.   Okay.  And what was your opinion as far as how
24  that issue was dealt with by the interviewer?
25  A.   I think it would have been helpful to remind

Wendy Bourg - D                                    480

1    the child of the importance of telling the truth today.

2         Q.    And secondly, do you have any concern, in your

3    professional opinion, as far as the child disclosing,

4    self-disclosing that she lies and the believability of

5    her statements?

6               MS. DUMONT:  Your Honor, I don't want

7    there to be a comment on the veracity (indiscernible)

8    case law I can (indiscernible).

9               THE COURT:  I agree, Mr. Knauss.  I'm

10   concerned about that question also.

11              MR. KNAUSS:  Yeah.

12              THE COURT:  So I'm not going to allow you

13   to ask it.

14              MR. KNAUSS:  Okay.

15   BY MR. KNAUSS:

16        Q.    Do you -- do you believe that the interviewer

17   sufficiently or adequately pursued that issue in the

18   interview?

19        A.    I think -- as I said, I think that that would

20   have been a good time to remind the child of the

21   importance of telling the truth today.  And in the setup

22   of the interview, it would have been -- it underscores

23   the importance of emphasizing to the child early on how

24   important it is to be really, really careful during

25   today's interview.

Wendy Bourg - D

1     Q.    Okay.

2     A.    Other than that, directly addressing any

3  individual statement would not be advised.

4     Q.    Okay.

5           Now, did you find any disclosures of the

6  child that she had other sources of sexual knowledge?

7     A.    Yes.

8     Q.    And what was that?

9     A.    There were two.  One was that she alleged that

10  the defendant in this case showed her videos.  And the

11  other -- well, actually, there were three.  Another was

12  she reported that she watches a television show that --

13  where there's been incidents of killing and sexual

14  assault displayed and discussed in the television show.

15           And then there's a report of her having

16  another -- an early childhood friend, when she was

17  living with her mother, who engaged in sexualized play

18  with her.

19     Q.    Okay.  And what significance is that exposure?

20     A.    Well, one of the things that is important to

21  understand is -- if a child is making a statement, is

22  this event and this experience the only source of the

23  kind of knowledge that they're relating?

24           If it is -- it's kind of like a process of

25  elimination.  If that's their only source of knowledge

Wendy Bourg - D                                   482

1    of this kind of an event, it tends to suggest that

2    they -- they don't have any kind of foundation of

3    knowledge that could be confused with this event, or

4    that could create a -- what's called a source monitoring

5    difficulty, where they report something from a different

6    event and report it as though it occurred during this --

7    the current event.

8              So what happens in memory is the way that

9    memories are stored is they're stored in groupings,

10   interconnected -- highly interconnected groupings.  And

11   so similar events are linked to each other in memory.

12   And when you activate one memory, you activate the

13   similar memories through neuro firing patterns.

14             And so it's one of the ways in which people

15   end up getting confused is they can have a prior event

16   that gets activated at the same time as the current

17   event, and then those memories will sometimes blend.

18   And so again, when the child has no other experiences,

19   there's no opportunity for that blending to occur, and

20   you can be confident that there's no source monitoring

21   issue occurring.

22             When the child does have prior experiences,

23   then it raises the concern that those memories got

24   simultaneously activated and you could have some

25   blending of the memories occurring.

1        Q.    The -- the reporting of the earlier incident,

2   was that -- was there any discussion of that in the --

3   during the medical exam?

4        A.    The child was asked if she had been touched on

5   her private parts, and she said no.  On her vagina.

6        Q.    But she did disclose that in the -- during the

7   video interview?

8        A.    Yes.  She disclosed an incident, a touching --

9        Q.    All right.

10       A.    -- in that area.

11       Q.    And with regard to your review of her

12  recitation of what happened and the issue of the

13  dream -- of her disclosing that it occurred during a

14  dream, what is your opinion as to whether or not there

15  was -- or do you have an opinion as to how the dream

16  issue that she disclosed affected her disclosure?

17            MS. DUMONT:  I'm going to object again,

18  based on my prior objection.

19            THE COURT:  I think a sufficient

20  foundation has been laid for the questioning.

21            So do you recall what the questioning was?

22            THE WITNESS:  Yes.  So I have an opinion

23  of how the fact that she was awakened from her dream

24  would influence her reporting?  Something like that.

25  I'm sure I'm not quoting the exact words, but it's --

Wendy Bourg - D

1   BY MR. KNAUSS:

2       Q.   Okay.  Go ahead.

3       A.   Okay.

4            Looking at the child's interview, she's very

5   clear in her statement, and the interviewer did a nice

6   job of eliciting this, of asking for an exact sequence

7   of events.  And the child is clear that she was

8   dreaming.  And while she was dreaming, she perceived a

9   touch.  The child's clearly stating the touch occurred

10  during the dream.  Her dream changed and her character

11  in her dream became sad.

12           After that, she woke up.  She heard the

13  suspect's voice.  She saw him dunk behind the couch and

14  she came to the conclusion that he touched her.

15      Q.   Okay.  Now, based upon your experience,

16  expertise and research, as far as a person's ability to

17  relate an event in a dream state, what -- what impact do

18  you -- do you find as far as the child relating that the

19  touching occurred during a dream state?

20      A.   So known phenomena when transitioning between

21  sleep and waking state, cognitive confusion.  So for

22  example, there have been sleep lab documentations of a

23  phone ringing.  The experimenter is trying to contact

24  the subject and the subject picks up a lamp instead of

25  the phone and starts talking to the lamp, and it's a few

Wendy Bourg - D                    485

1    minutes before the subject realizes they don't have a

2    phone; they have a lamp.  So there's confusion about --

3    and behavior that's evident of confusion.  People will

4    speak when they're awakened from those statements -- or

5    from those states, in confused and illogical statements.

6              Cognitive impairments have been observed in

7    executive functions:  Making decisions.  Understanding

8    what just occurred.

9              Moreover, people will report dreams as

10   events.  Children are more likely to do that than adults

11   because their reality monitoring skills are not

12   sufficiently developed.  But it is a known phenomenon

13   that people can report a dream as an actual event.

14             Over time, once they decide that a dream is

15   an actual event, they'll often add details consistent

16   with it having been an actual event to their memory and

17   to their report.

18       Q.   Was there any recitations of the girl, as far

19   as what was said, that evidenced any confusion on her

20   part, as far as what was going on?  Anything nonsensical

21   that you saw?

22       A.   Yes.  She -- she reported some confusion about

23   where the suspect was.  He was behind the couch, but

24   then he was on the small couch, and "He must have

25   sneaked around me, but I'm usually a light sleeper."

Wendy Bourg - D                                486

1    There's a lot of discussion about her being confused

2    about where he was.

3                She also discussed not being sure who

4    touched her.  When she went to sleep, her dad was in the

5    room and the suspect was in the room.  And she decided

6    that it must have been the suspect because the voice was

7    not her dad's voice, and then her dad was upstairs when

8    she woke up.

9        Q.    Okay.

10       A.    So she was reasoning through.  What I observed

11   was, again, what happens when people are transitioning

12   from sleep to awake.  They're trying to understand what

13   they just perceived in their dream.  They're trying to

14   make sense of it from cues around them.  And that's what

15   she was doing.  She was trying to make sense.

16                "I had this perception in my dream state and

17   I'm trying to understand what just occurred by looking

18   around me for clues."

19       Q.    Okay.  She related some purported conversation

20   from Mr. Hollingsworth --

21       A.    Oh, yes, she did.

22       Q.    -- as far as statements she made -- he made?

23       A.    And she said he made some nonsensical

24   statements, like asking her if he could take out the

25   garbage.  I mean, in the middle of also asking her if he

Wendy Bourg - D                                487

1    could touch her.  So she reported things that were

2    consistent with her understanding of her dream, he was

3    asking if he could touch her, and then she reported some

4    things that made no sense, given the context, that he

5    would ask her if he, you know, could take out the

6    garbage at that time.

7         Q.   Now, in her recitation of what was occurring,

8    she indicates that she was asleep and dreaming when she

9    felt a touching.  And then the dream automatically

10   changed and that the boy character in her dream was

11   doing the touching to the other character.

12            Does it appear that she's still relating

13   things that are occurring during the dream when she --

14        A.   Yes.

15        Q.   -- indicates that?

16        A.   I think she was clear about that.

17        Q.   Okay.  Do you have any sense of what she's

18   trying to relate, as far as the boy character was doing

19   the touching?

20        A.   My -- my sense is she's relating her experience

21   that, you know, she's -- she's seeing this in a dream

22   and she's reporting what she's seeing.  And then she's

23   experiencing, in the dream, touching on her body.  And

24   then she wakes up and tries to understand what just

25   happened.

Wendy Bourg - D                                    488

 1        Q.    Okay.

 2        A.    What did I just feel and what did I just see?

 3   And how does that fit with my current circumstances?

 4        Q.    Okay.

 5              MR. KNAUSS:  All right.  Thank you.  No

 6   further questions.

 7              THE COURT:  Ms. Dumont.

 8              MS. DUMONT:  Thank you, Your Honor.

 9                    CROSS-EXAMINATION

10   BY MS. DUMONT:

11        Q.    I want to talk with you initially about some of

12   the concepts that you mentioned, generally speaking,

13   because I think it's important for -- for me to

14   understand and make sure I'm getting what you're saying.

15              So you talked a little bit about

16   suggestibility.

17        A.    Yes.

18        Q.    Right?

19        A.    Yes.

20        Q.    And so this isn't -- this isn't a rocket

21   science.  Suggestibility is sort of -- and I want to

22   make sure I'm -- we're on the same page.

23              If a child comes to me and they're crying

24   and he's holding his eye, and I say, "Johnny hit you,

25   didn't he?" would that be anything towards

Wendy Bourg - X                         489

1    suggestibility?

2         A.    That's a -- that's --

3         Q.    It's a leading question.

4         A.    There's more than one way to create inaccurate

5    statements and to suggest inaccurate statements, and

6    leading questions is one way.  And that would be a

7    leading question.  And so, yes, it -- it could create a

8    inaccurate statement or memory on the part of the child

9    because of that leading question.

10        Q.    Okay.  And so you talked a little about -- I

11   can't remember the phrase you used.  It was W questions,

12   I think.  Who, what, where, why, when?

13        A.    W-H.

14        Q.    W-H.

15        A.    Who, what, where when.

16        Q.    Okay.  And those are the preferred questions,

17   the preferred way to ask questions?

18        A.    The -- the preferred way to ask questions, the

19   best form of a question --

20        Q.    Is to say, "Tell me everything."

21        A.    Exactly.

22        Q.    Okay.

23        A.    W-H questions -- when there's been no kind of

24   prior contamination, W-H questions don't contaminate the

25   child's statement, they -- they produce high accuracy

Wendy Bourg - X

```
 1   rates.  They just don't produce as much detail as the
 2   invitational or "tell me" questions.  You don't get as
 3   complete an account in response to those questions.
 4        Q.   But the W-H questions are good questions to
 5   ask?
 6        A.   They're good questions.
 7        Q.   Okay.  And so if an interviewer is asking those
 8   kind of W-H questions, who --
 9        A.   Who, what, where.
10        Q.   -- why, where, why, when, those --
11        A.   Not "why."
12        Q.   Oh.
13        A.   "Why" is the exception.
14        Q.   Okay.
15        A.   Because "why" feels accusatory.  It's just --
16        Q.   Who, what, where.
17        A.   Social science research shows that people feel
18   accused when you ask them a "why" question, so you don't
19   ask those.
20        Q.   Okay.  Who, what, where, and how.  Thank you.
21        A.   Yeah.  Who, what, why -- who, what, where,
22   when, and how.  Yes.
23        Q.   Okay.  And you, I think, agree that the
24   interviewer in this case asked those good questions.
25        A.   She did.
```

Wendy Bourg - X                          491

```
 1        Q.    Okay.

 2        A.    Yeah.

 3        Q.    And so generally speaking, let me just -- I

 4   want to talk a little bit about, you know, when you're

 5   asking those, "Tell me everything," or W-H questions,

 6   you're wanting -- why are you wanting those kind of

 7   questions?

 8        A.    You want to do two things.  You want to elicit

 9   a complete account in the child's own words.

10        Q.    Okay.

11        A.    And you want to not contaminate the child's

12   statements or memory with your own beliefs about what

13   occurred.

14        Q.    Okay.  So if I were, hypothetically speaking,

15   to ask a child, "Tell me why you're scared to death."

16        A.    Correct.

17        Q.    Would that be anything for -- of a

18   nonsuggestible question?

19        A.    That's an invitation question; a great

20   question.

21        Q.    Okay.  So that's open-ended, that -- will you

22   agree that encourages a narrative response?

23        A.    It does.  It encourages a narrative response.

24        Q.    Okay.  And if I were to say, hypothetically

25   speaking, "What happened next?" would that also be one
```

Wendy Bourg - X                                    492

1    of those good W-H questions?

2         A.   Yes.  And interestingly, "What happened next?"

3    is an invitational question, even though it starts with

4    W-H.  And that's where a little confusion occurs, but,

5    "Then what happened?  Tell me more," and "What happened

6    next?" would all fall into what you're doing is

7    encouraging the narrative to go on.

8         Q.   Okay.

9         A.   You're encouraging the child to continue on

10   telling me what happened.

11        Q.   And if I were to ask, "What would you like to

12   tell me?" would that also be an -- you know, a good

13   question, type of question, to ask?

14        A.   That's a good question.

15        Q.   Okay.  Would that be encouraging a narrative

16   response?

17        A.   Yes.

18        Q.   Okay.  Nonsuggestive?

19        A.   Nonsuggestive.

20        Q.   Okay.  And then hypothetically speaking, and

21   we're still talking about this good -- good kind of

22   questions, trying to get that dialed in, if a child came

23   up and I'm the interviewer and I don't ask any

24   questions, so the child comes up and just starts

25   disclosing --

Wendy Bourg - X                                      493

 1        A.    Correct.
 2        Q.    -- would that be a good situation, in terms of
 3   suggestibility?
 4        A.    That's nonsuggestive, if you just listen to the
 5   child and write down their statements.
 6        Q.    Okay.  And so that would be free from
 7   susceptibility, free from bias at that point if the
 8   interviewer's not (indiscernible).
 9        A.    I wouldn't say "free," necessarily.  So again,
10   children have mirror neurons.  They can read nonverbal
11   cues.  If someone makes a face, if someone --
12        Q.    Sure.
13        A.    -- looks disbelieving, versus if someone looks
14   terrified, it's going to have impacts on the child.
15        Q.    Oh, yeah.
16        A.    So you can have nonverbal impacts, but it's a
17   less-suggestive context than asking a lot of questions.
18        Q.    Okay.  And barring -- so say the person isn't
19   giving these nonverbal clues, which is a really good
20   point, if they're just listening and not responding,
21   that would be free from suggestibility or free from
22   bias?
23        A.    Correct.
24        Q.    Okay.  And at that point, you wouldn't be
25   concerned about that disclosure?

Wendy Bourg - X

494

1       A.    I would not.

2       Q.    Okay.  And the same would be true for the other

3   questioning -- questioning I gave you with, you know:

4   Tell me about why you're here today.  What happened

5   next?  What would you like to tell me?  Those are -- you

6   wouldn't -- if a person responded to that, you wouldn't

7   be concerned about those disclosures?

8       A.    Not a bit.

9       Q.    Okay.

10            Now, you talked a little bit when Counsel

11  was asking you about recantation.  And I want to just --

12  just briefly touch on that.  And what is recantation?

13      A.    It's making a statement about an event

14  occurring and then taking it back.  Saying you lied,

15  saying you got confused.

16      Q.    Okay.  And in the context of recantation with

17  child sex abuse, if the person that discloses is told

18  they're lying or there's a nonsupportive person, is

19  that -- that does increase the risk of recantation,

20  correct?

21      A.    It does increase the risk of recantation.  And

22  again, in those situations where I've done those

23  interviews, that's precisely why.  I'm -- I'm being

24  asked to talk to the child about any conversations

25  they've had with other people that could have influenced

Wendy Bourg - X                                        495

1    their statement one way or the other.

2         Q.   Okay.

3              And then in this case, at the beginning of

4    the interview there were -- there were some questions

5    that the interviewer asked Jasmine.  And if you recall,

6    at the beginning of the interview she said, "In this

7    room, it's just like the other room.  We only talk about

8    real stuff, not pretend stuff."  Do you --

9         A.   Yeah.

10        Q.   You recall that?

11        A.   Yes.

12        Q.   And Jasmine said, "Okay."

13             And then the interviewer asked, "If I say

14   something and you don't understand, you just say,

15   'Amanda, I don't know what you're telling me.'"

16             And Jasmine said, "Okay."  And she smiled.

17             Do you recall that?

18        A.   Yes.  And --

19        Q.   Okay.  And then --

20        A.   -- the interviewer said other things in between

21   there.  But yes, she did say that.

22        Q.   And then the interviewer said, "Sometimes I

23   repeat myself.  If I get something wrong, you just tell

24   me."

25             And Jasmine said, "Okay."  Right?

Wendy Bourg - X                                    496

 1        A.    Yes.

 2        Q.    And then the interviewer asked, "You won't be

 3   in trouble for correcting me, okay?"

 4              And Jasmine said, "Okay."

 5        A.    Correct.

 6        Q.    Okay.  And then the interviewer said, "Does

 7   that sound like a deal?"

 8              And Jasmine said, "Yep."

 9        A.    Okay.

10        Q.    Right?

11        A.    For whatever reason, I didn't write down that

12   sentence.

13        Q.    Okay.  Well, do you -- you didn't write that

14   sentence down.  Do you believe that it could have been

15   said and you just didn't write it down?

16        A.    It could have been said.  I was trying to write

17   down quickly and I sometimes miss part of a phrase.

18        Q.    Okay.

19        A.    So, yeah.

20        Q.    Okay.

21        A.    It's possible.

22        Q.    But is that a question that interviewers would

23   typically say at the beginning, when they're setting up

24   this kind of ground rules?

25        A.    Yes.

Wendy Bourg - X                                497

1       Q.   Okay.

2       A.   Those kinds of questions.

3       Q.   And the interviewer asked, "Do you think you

4  can do all that while we're talking?"

5       A.   Yes.

6       Q.   And then Jasmine said, "Yes."

7       A.   Yes.

8       Q.   Okay.  And then the interviewer asked again,

9  "Yes?"

10           And Jasmine said, "Yes."

11      A.   Yes.  I saw all that.  Yes.

12      Q.   Okay.  Okay.

13           So there was -- there was buy-in by Jasmine

14  about the ground rules, right?

15      A.   There were some "okays" and "yesses."  There

16  were "okays" and "yesses."

17      Q.   Okay.  Okay.

18           So it wasn't as if there was a complete

19  block and there was no response, right?

20      A.   There was some responses by Jasmine throughout.

21      Q.   Okay.  I just -- it sounded, when you were

22  saying it, like there was no response, and I wanted it

23  to be clear that Jasmine was responding.

24      A.   Yes, she was.

25      Q.   And there was a two-way conversation happening.

Wendy Bourg - X

1    A.   She was saying, "Okay."

2    Q.   Okay.

3    A.   She was --

4    Q.   But that's a response, right?

5    A.   She was indicating -- yeah.  There -- she was

6  giving some indicators of tracking.

7    Q.   Okay.  And throughout the interview, she did

8  correct --

9    A.   There were a couple times --

10   Q.   -- the interviewer.

11   A.   She did correct the interviewer sometimes, yes.

12   Q.   Okay.  And so there's some indication that she

13  understood that, right?

14   A.   Yes.

15   Q.   Okay.  And when -- when you talk about

16  suggestibility, age is one of the important factors for

17  suggestibility, right?

18   A.   It is.

19   Q.   Okay.  And you, as an interviewer -- I know you

20  aren't -- I think you said you haven't been doing

21  interviews since 2001.  You now maybe do two a year, but

22  before that I think at CARES you did a lot, right?

23   A.   At CARES I did about four a week for much of --

24  I mean, it varied over time.

25            Again, I interview kids weekly in

Wendy Bourg - X                                           499

 1    high-conflict divorce.

 2         Q.    Right.

 3         A.    And the sex abuse interviews are only about

 4    twice a year.

 5         Q.    Okay.  So -- but since 2001 you haven't been

 6    doing as many interviews, but you've done some in the

 7    past, right?

 8         A.    Correct.

 9         Q.    Okay.  And when we're talking about -- I just

10    lost my train of thought.  Hold on one second.

11              Is there any -- there's no way to go back

12    and figure out what my last question was.

13         A.    You asked me if the child corrected the

14    interviewer.  That's the last one I remember.

15         Q.    Yeah.

16              (Pause in the proceedings.)

17              MS. DUMONT:  Okay.  I'm going to move on.

18    Yes.

19    BY MS. DUMONT:

20         Q.    And in the video with Jasmine, you observed her

21    demeanor and her ability to focus, right?

22         A.    Yes.

23         Q.    Okay.  And she was able to tell narratives,

24    right?

25         A.    She gave some narratives.

Wendy Bourg - X

1      Q.    Okay.  And she was able to respond to
2   questions?
3      A.    She was.
4      Q.    And she was able to focus?
5      A.    Yes.
6      Q.    Okay.  And so when you're talking about
7   needing -- well, I'll leave it with that.
8             Now, you discussed a little bit the
9   questioning about the dream.  And you referred in
10  particular to an early part of the interview --
11     A.    Yes.
12     Q.    -- where she talked about waking up, right?
13     A.    Yes.
14     Q.    Okay.  But that wasn't the only time in the
15  interview that that was discussed, correct?
16     A.    It was discussed, I believe, two more times.
17     Q.    Okay.  And in fact, the interviewer asked, "How
18  do you know Jorden touched you and it wasn't just a
19  dream?"  Isn't that correct?
20     A.    Yes.
21     Q.    Okay.  And her response, Jasmine's response
22  was, "He actually went into the shirt."  Correct?
23     A.    I don't remember --
24     Q.    He said he --
25     A.    -- what her response was --

Wendy Bourg - X

```
 1        Q.    Okay.

 2        A.    -- at that point.

 3        Q.    Does it make sense with your recollection of

 4   the interview as a whole --

 5        A.    She --

 6        Q.    -- that Jasmine --

 7        A.    I have a -- I --

 8        Q.    -- later --

 9        A.    I'm sorry.  I have an answer now.  I -- I did

10   write that down.  She said the boy went into the shirt.

11        Q.    No.  I'm talking about after the break.

12        A.    Okay.

13        Q.    At the end of the interview.  But here, just --

14   I --

15        A.    Okay.

16        Q.    I understand you want to look at your notes.

17   I'll just try and situate you.

18        A.    Okay.  Sorry.

19        Q.    If -- if you want to think about your

20   understanding when -- after the break, when she came

21   back and tried to ask that question about "How do you

22   know it was Jorden and it wasn't just a dream?"

23        A.    Yes.

24        Q.    Okay.  And so she's trying to clarify that

25   point.  And Jasmine said, "He actually went into the
```

```
 1   shirt.  He said please don't tell anyone.  He basically
 2   admitted.  I felt a finger moving on me on my boob."
 3        A.   Yes.
 4        Q.   Okay.  And so she gave details about what she
 5   was feeling --
 6        A.   Yes.
 7        Q.   -- right?
 8        A.   Yes.
 9        Q.   And what the conversation was?
10        A.   She did.
11        Q.   And that he actually went into her shirt,
12   right?
13        A.   Yes.
14        Q.   Okay.
15        A.   The -- the boy went into her shirt is what she
16   said, though.  I just want to be clear on that.  That's
17   what I have written down.
18        Q.   Okay.
19        A.   And then she said, "The suspect admitted it."
20   And she said, "I felt a finger moving."  That's the
21   tracking I have of exactly what she said.  She didn't
22   say, in -- in her statement there, she didn't say, "The
23   suspect went in the shirt."  She said, "The boy went in
24   the shirt.  He admitted it."
25             And then the interviewer said, "Well, what
```

Wendy Bourg - X

503

```
 1   did you feel?"

 2           And she said she felt her -- his finger

 3   moving on -- or a finger moving on her breast.  On her

 4   boob.  That's the tracking I have.  I --

 5       Q.   Okay.  I think that's different than what I

 6   have.

 7       A.   Okay.

 8       Q.   In terms of there was a question, "How did that

 9   feel?"

10       A.   Yeah.

11       Q.   And she said it felt weird.

12       A.   Yes.

13       Q.   But that was a -- that was a question after --

14   a response after.

15       A.   Yeah.  The interviewer asked --

16       Q.   And so --

17       A.   -- twice what she felt, so . . .

18           And I think the child had correctly

19   interpreted the interviewer --

20       Q.   There's not a question right now.

21       A.   Okay.  Sorry.

22           MS. DUMONT:  Nothing further.

23           THE COURT:  Mr. Knauss.

24           MR. KNAUSS:  No further questions.

25           THE COURT:  May this witness be excused?
```

```
 1                MR. KNAUSS:  Yes.

 2                MS. DUMONT:  Yes, Your Honor.

 3                THE COURT:  You may be excused.  Thank

 4   you.

 5                THE WITNESS:  All right.  Thank you.

 6                (Whispered conversation.)

 7                MR. KNAUSS:  Call Mr. Hollingsworth.

 8                THE COURT:  Sir, if you'll come all the

 9   way to the front of the courtroom.  When you arrive at

10   the witness stand, please remain standing, face my

11   clerk, and raise your right hand to be sworn.

12                JORDEN TIMOTHY HOLLINGSWORTH,

13   the defendant herein, called as a witness on his own

14   behalf, having been first duly sworn, was examined and

15   testified under oath as follows:

16                THE CLERK:  Be seated.

17                Please state your full name and spell your

18   last for the record.

19                THE WITNESS:  Jorden Timothy

20   Hollingsworth.  H-O-L-L-I-N-G-S-W-O-R-T-H.

21                    DIRECT EXAMINATION

22   BY MR. KNAUSS:

23        Q.  Mr. Hollingsworth, what's your date of birth?

24        A.  8/1/93.

25        Q.  So you're how old now?
```

Jorden Timothy Hollingsworth - D     505

1     A.    I'm 23 years old.

2     Q.    How long have you lived in Oregon?

3     A.    I've pretty much lived in Oregon all my life,

4 but I moved to Michigan and -- yeah.   Well, Lakeview was

5 Oregon, too.   So I moved to Michigan for about a year

6 back in, I don't know, 2005, 2004.   And then I moved

7 back to Oregon and I've been here ever since.

8     Q.    Okay.   Who did you grow up with?

9     A.    I grew up with my mom's sister and grandmother.

10 I kinda -- I kinda has myself grow up by myself when I

11 was younger, so I've been to a lot of places after I

12 moved back from Michigan.   Yeah.

13     Q.    Okay.   And has your father been in your life?

14     A.    No.   My father has never been in my life.   He's

15 only paid child support.

16     Q.    Okay.

17        Now, what kind of work have you done?

18     A.    I have done warehouse work.   It was pretty much

19 warehouse work.   I've been in school.

20     Q.    Okay.   Did you go to high school?

21     A.    I went to high school.   Graduated from

22 Gladstone.   And went Portland Community College and I

23 was starting to get a degree in business, but then I had

24 to pull out in order to, you know, get a job and get on

25 my feet.

Jorden Timothy Hollingsworth - D                    506

1          Q.    Okay.  Are you currently employed?

2          A.    Yes.  I'm currently employed through Hydrofarm.

3     It is located in northeast Portland, near the airport.

4          Q.    Okay.  And let's -- let's go over a couple

5     things.

6                You have two criminal convictions; is that

7     correct?

8          A.    That is correct.

9          Q.    Okay.  Let me show you.

10               So you have a conviction for assault in the

11    fourth degree constituting domestic violence that the

12    conviction was from November 27th of 2012?

13         A.    That's correct.

14         Q.    That was in Clackamas County?

15         A.    Yes.

16         Q.    And you also have a conviction for harassment;

17    is that correct?

18         A.    That is correct.

19         Q.    And what county was that in?

20         A.    That was in Lake County, when I moved to

21    Lakeview.

22         Q.    Okay.  And your conviction is dated July 16,

23    2012?

24         A.    That is correct.

25         Q.    Okay.

Jorden Timothy Hollingsworth - D                    507

1           Now, you've been listening to the testimony

2    for the last two days.  Did you sit down last night and

3    go over where you lived and when?

4       A.   Yes.

5       Q.   Okay.  And do you -- you have that list in

6    front of you?

7       A.   That is correct.  Do you just want me to start

8    going over the dates or --

9       Q.   Yeah.  Just a sec.

10          So starting from May of 2008, and moving up

11   to the present, let's go through.

12      A.   All right.  So first, this is -- this is about

13   maybe 13 places, so bear with me.

14          First I stayed at my mom's house from May

15   2008 to January 2012.  Then I moved to Lakeview from

16   February 2012 to October 2012.  I lived -- came back

17   from Lakeview.  I stayed -- went there, a guy named

18   Justin (indiscernible), 2013.  From August 2013.

19          Wait all my dates are mixed up.  Or --

20      Q.   What town was that in?

21      A.   That was in Milwaukie.

22      Q.   Okay.  Next?

23      A.   Okay.  My mom's place from August 13th -- I

24   mean, August 2013 to November 2013.  Johnny's house from

25   November 2013 to April 2014.

1    Q.    Where was that?

2    A.    That was in Gladstone.

3    Q.    Okay.

4    A.    Then I stayed with Trisha from April to June

5    2014.  Then I --

6    Q.    And what -- which place was that?

7    A.    That was -- that was at the place in Oregon

8    City.  Ken and Trisha were not together then.

9          And then I stayed -- I was away till

10   May 3rd, 2014, to June 26, 2014.  Then I came back to

11   Trisha's from June 26, 2014, to March 2015.

12   Q.    And that was still at the Oregon City address?

13   A.    That is correct.

14   Q.    Okay.

15   A.    Then I stayed with Kip Lee from March 2015 to

16   May 2015.

17   Q.    And where was that?

18   A.    That was in Oregon City.

19   Q.    Okay.  Next.

20   A.    I lived in Tualatin from May 2015 to June

21   '15 -- 2015.

22         I was living with a friend named Beth in

23   Milwaukie from June 2015 to November 2015.

24         I was in jail because of this crime, which

25   I'm currently out on bail, from November 15th, 2015, to

1    April 24th.  Then I have been living out of Mulino since

2    I've been out, from April 24th to the present.

3         Q.    Okay.

4              Now, let's talk about when -- excuse me.

5    How old was Jasmine when you first met her?

6         A.    So here's the confusing part.  So when Jasmine

7    first came around -- okay.  So I first met Jasmine when

8    she was six.  Everyone met her when she was three.  What

9    happened was Ken and Trisha were together for a

10   six-month period.  They were together from the period of

11   August 2006 to July 2007.  I was not around during the

12   time that Jasmine came for a two-week visit.  She was

13   three at the time.

14             After she visited for two weeks, they broke

15   up for about three years.  They got back together

16   March 24th, 2011.  Stayed together till May 2014.  That

17   is when I officially met Jasmine.

18        Q.    Okay.  Now, during that period of time -- and

19   give me the date again there.

20        A.    Of when I first met Jasmine?

21        Q.    Yeah.

22        A.    March 24th, 2011.

23        Q.    And where was Ken and your aunt living at the

24   time that you met Jasmine in March of 2011?

25        A.    Boardman.  And the only time I ever stayed over

1    there when Jasmine was there was I had this situation

2    with Trista, which is why I had her come as a witness,

3    is because the only time I ever stayed over at Trisha's

4    house while Jasmine was there was because I was dealing

5    with the stuff with Trista.  She was homeless.  She was

6    having problems with her parents.

7                So I -- Trisha's was the only place where I

8    could stay over there with two people.  So I went over

9    there and stayed over there.  That's why I had her

10   testify.  The only time I was ever over at Trisha's with

11   Jasmine there was with Trisha there.

12        Q.   Okay.

13                Now, the interaction you had with Jasmine

14   when you stayed over there in Boardman, what did that

15   consist of?

16        A.   There was a time when I helped her with her

17   homework.  There was times when I played basketball with

18   her.  I was kind of busy with my own life, so I didn't

19   really pertain [sic] to be spending really much time

20   with her.  But when I was around the house, yes, I did

21   play with her.

22        Q.   Okay.  Did you ever babysit her?

23        A.   No.

24        Q.   The relationship that you had with Trisha

25   Miller, your aunt, what is that relationship?

1    A.    I would have to say Trisha's probably the most

2    important -- one of the most important people in my

3    life.  She was there for me when I needed a home.  She

4    was there for me when I needed to talk to somebody.

5    She's one of the closest person [sic] that I have in my

6    life.

7    Q.    Okay.  All right.

8          Now, did anything happen between you and

9    Jasmine at the place in Boardman --

10   A.    No.

11   Q.    -- in the -- in a sexual nature?

12   A.    When the indictment came up, I had no idea

13   where this indictment came from.

14   Q.    Okay.  When you got the indictment, that was

15   the first --

16   A.    Time I'm hear- -- I ever heard about this

17   incident that happened up here.

18   Q.    Well, and did that incident that she described

19   to us two days ago ever happen?

20   A.    Which one, the Boardman or the --

21   Q.    The first one.

22   A.    No.

23   Q.    Now, when -- when you met Ken and Jasmine, what

24   was your relationship with Ken?

25   A.    We bonded a lot.  I was actually proud when I

1    was listening to him testify and he actually said that

2    we were close, because we were close.  He got me a job

3    at the Gamblin Oil Colors.  We worked together.  We

4    confided in each other.  Yeah, we were friends.

5          Q.    Okay.  The -- after you stayed a while at

6    Trisha's in Milwaukie, eventually you moved to Lakeview;

7    is that right?

8          A.    Yeah.  That's correct.

9          Q.    Okay.  And then when you came back, were you --

10         A.    When I came --

11         Q.    -- going over to Trisha's house when you first

12   came back?

13         A.    No.  When I first came back, I was with my mom.

14   She had a place up in Oregon City.  I lived with her

15   till that place, then I moved in with Justin.

16         Q.    Okay.  Now, do you know if Jasmine and Ken were

17   living with Trisha at that time when you moved back from

18   Lakeview?

19         A.    Well, I left to Lakeview February 2012.

20   Jasmine came and lived with them March 24th, 2011.

21         Q.    Okay.  So --

22         A.    So Jasmine was there before I went to Lakeview.

23         Q.    Okay.  And when you came back, was she there?

24         A.    Yes.

25         Q.    Okay.  Did you go over to Trisha's house when

1  Ken and Jasmine were there when you first got back from

2  Lakeview?

3      A.   Well, of course.  Trisha was very close to me

4  and I was very close to Ken.

5      Q.   Okay.

6      A.   But I never really stayed the night over there

7  with Jasmine.

8      Q.   Okay.

9           Now, what is your recollection about when --

10  if they did, when they left Trisha's house, Ken and

11  Jasmine, after you got back from Lakeview?

12      A.   When did they leave next?

13      Q.   Yeah.

14      A.   Well, they broke up Mother's Day of 2014,

15  because Kaeli got bit of [sic] a dog.  And then there

16  was a time when they were trying to work things out.

17  They stopped talking till January of 2015.  And so

18  during that month, they wanted to start working on

19  stuff.

20      Q.   Okay.

21      A.   And so they started working on stuff.  They

22  came and -- Jasmine stayed the night all alone with

23  Trisha a whole weekend during the thing of January.

24  Then in February she came over with Ken and I came over

25  that night.

Jorden Timothy Hollingsworth - D                    514

1        Q.    Okay.

2        A.    During that time, I was crashing there.  They

3    just happened to come at that point when I was staying.

4        Q.    Okay.  So in January and early February, how

5    often were you spending the night at Trisha's?

6        A.    Quite a few times.

7        Q.    Okay.

8        A.    Because my mom had the upstairs and I pretty

9    much had the couch downstairs.

10       Q.    So when did your mom start living with your

11   aunt?

12       A.    As soon as Ken and Trisha broke up for the

13   first time, which -- Mother's Day 2014.

14       Q.    Okay.  All right.

15             Now, when -- do you recall if you were

16   employed during the early 2015?

17       A.    Can you repeat that, please?

18       Q.    Were you employed during early 2015?

19       A.    That's something I did not research.  2015, I

20   think I just got out of school.

21       Q.    Okay.  All right.

22       A.    Or I just started school.

23       Q.    Okay.

24       A.    I -- I'm not sure about that one.

25       Q.    All right.

1            Now, let's talk about what happened on this

2    date in question.  The -- when did you come over to

3    Trisha's house in --

4         A.   Okay.  So I went to the bar.  Had like maybe

5    two, three -- I was not drunk.  I just was buzzed.  I

6    came back from the bar.  Trisha and Ken were outside

7    smoking.  That --

8         Q.   Okay.  Approximately when do you think you came

9    back?

10        A.   I'm guessing around 10:30.

11        Q.   Okay.  So you got there and they were outside

12   smoking?

13        A.   Yeah.

14        Q.   Okay.

15        A.   That's kinda like the smoking spot.  So I went

16   and chilled with them, smoked, we talked, all outside,

17   for probably like an hour, hour and a half.  That was,

18   like, the hangout spot.  And then finally we came

19   inside.  We put on a movie and I passed out to that

20   movie.

21        Q.   Okay.

22            Now, when you came inside, was Jasmine in --

23   in the lower area?

24        A.   Yes.

25        Q.   Okay.

Jorden Timothy Hollingsworth - D                516

1              MR. KNAUSS:  And, Your Honor, I'd like to

2      do a diagram.  I don't know -- I don't see that we have

3      paper, but --

4              THE COURT:  Is there no paper on the

5      easel?

6              THE CLERK:  I don't think so, Your Honor.

7              THE COURT:  I can obtain paper from

8      another easel from another courtroom if you want to --

9              MR. KNAUSS:  That would be great.

10             THE COURT:  -- have him use that.

11             MR. KNAUSS:  Yeah.

12             THE COURT:  All right.  Let's take a

13     break.  Be back on the record at 10 o'clock.  Mr. Ward

14     will obtain some paperwork that we can put on the easel

15     for you.

16             MR. KNAUSS:  Okay.  And I'll -- I'll have

17     the diagram done while we're --

18             (Recess; 9:50 a.m. to 10:03 a.m.)

19             MS. DUMONT:  We're back on the record in

20     State vs. Hollingsworth; 1501848.  Sarah Dumont.

21     Mr. Knauss is here.  Defendant is on the stand.

22             THE COURT:  Thank you.

23             Go ahead, please.

24             MR. KNAUSS:  All right.

25

Jorden Timothy Hollingsworth - D                   517

1    BY MR. KNAUSS:

2        Q.   So you're outside with Ken and Trisha, smoking.

3    And let's pick it up from there.

4             What happens next?  As the three of you are

5    smoking, what's the next thing that happens?

6        A.   After we were done smoking, we went into the

7    house.  Started watching TV.  That's when I fell asleep.

8        Q.   Okay.

9             Now, you've drawn this diagram during the

10   break; is that correct?

11       A.   That is correct.

12       Q.   And that's marked Exhibit 102, that blue tag

13   there?

14       A.   Yeah.

15       Q.   Yeah.  And is that your writing on there?

16       A.   That is correct.

17       Q.   Okay.  With the Court's permission, if you

18   could go up to the board here and stand to my right and

19   I'll have you point some things out, okay?

20       A.   (No audible response.)

21       Q.   Okay.

22       A.   Go ahead now?

23       Q.   Yeah.  Okay.

24       A.   Okay.

25       Q.   So what -- you've got some -- is this the lower

Jorden Timothy Hollingsworth - D                    518

1    area that --

2         A.    This is the lower --

3         Q.    Okay.

4         A.    -- place of the apartment in Oregon City.  This

5    is the front door.  Right when you walk in, here's the

6    stairs.  Over here to the right is a small couch.

7    Here's a playing area, right in between the two couches.

8    This is the big couch, coffee table, TV.  Here's the

9    dining room.  And there was (indiscernible).

10        Q.    Okay.  All right.

11              So when you came in to watch TV, where do

12   the people sit?

13        A.    When we came in -- here's the back door.  We

14   came in through here and sat right -- all three of us

15   sat right here.

16        Q.    So Trisha, Ken, and you; is that right?

17        A.    What?

18        Q.    Trisha, Ken, and you sat there?

19        A.    Yes.  Correct.

20        Q.    Okay.  All right.

21              And was Jasmine there?

22        A.    Yes.  She was sleeping on the small couch.

23        Q.    Okay.  And could you take the pen and maybe --

24   is there a different color up there?

25        A.    Yeah.  Do you want me to put, like, heads or

1   something?

2        Q.   Yeah.  Put a stick figure of where she -- with

3   her head, so we know where she was when -- okay.  So on

4   the left side of the couch, that's where her head was?

5        A.   Yeah.

6        Q.   Okay.  And where were you on the couch, as far

7   as the three of you?

8             I don't -- you don't need to mark it there,

9   but --

10       A.   Yeah.  That, I can't remember --

11       Q.   Okay.

12       A.   -- the exact order that we were in.

13       Q.   All right.

14       A.   So . . .

15       Q.   Okay.  You can go ahead and sit down.

16            And do you recall approximately what time

17  this was that you fell asleep?

18       A.   It was probably an hour later from when we -- I

19  got there, so that was probably around, like, midnight.

20       Q.   Okay.  Now, had you seen that Jasmine was on

21  the couch before you came in from smoking?

22       A.   Yeah.

23       Q.   In other words, had you been in- --

24       A.   Because she was awake at -- she was awake at

25  that time, but she fell asleep when we came back in to

1    watch the movie.

2         Q.   Okay.  So was she awake when you came in?

3         A.   When I came home from the bar, she was awake.

4         Q.   Okay.

5         A.   When I came back from outside, which was an

6    hour later after I got there, she was asleep.

7         Q.   Okay.  Do you know if she woke up during the

8    movie?

9         A.   That, I cannot recall.

10        Q.   Okay.  And do you have any idea how long you

11   watched the movie before you fell asleep?  If you don't

12   know, that's fine.

13        A.   Yeah.  I -- I fell asleep pretty fast.

14        Q.   Okay.  Now, when you -- when you woke up, do

15   you have an idea what time it was?

16        A.   I don't know exactly what time.  I'm guessing

17   it was somewhere between 1:30 -- 1:00, 1:30.

18        Q.   Okay.  All right.

19             What did you do?

20        A.   Went upstairs.  I was on my way to go walk

21   upstairs.  I noticed Kaeli -- half of her body was kinda

22   hanging off --

23        Q.   You're saying "Kaeli."

24        A.   I mean -- yeah.  Sorry about that.  Jasmine's

25   body was, like, kinda halfway off the couch, so -- and

Jorden Timothy Hollingsworth - D                      521

1    the blanket was totally off.  The shirt was, like, kinda

2    tucked up in her arm.  And I went to go pull it down.

3    She, like, woke up in the middle of that.  And I, like,

4    backed up for a minute, because it kinda startled me.

5            And then she was all like, "I'm going to go

6    tell my dad and Trisha."

7            And I told her, "Tell them tomorrow.  This

8    is -- this is done.  I just pulled your shirt down."

9            And then she said that she was going to go

10   wake up Ken and Trisha.  I told her not to do that.

11   "Tell them tomorrow."  And then I just went back

12   upstairs.  It was quick.  It was only, like, 15, 20

13   seconds.

14       Q.   Okay.  So from the time you get up off the

15   davenport -- or the sofa, until you walked up the

16   stairs, how much time transpired?

17       A.   From when I woke up to when I went upstairs?

18       Q.   Yeah.

19       A.   I would say 30 seconds.

20       Q.   Okay.

21               (Cell phone ringing.)

22               THE COURT:  I need everyone to take out

23   their electronic devices and turn them on -- off.  Not

24   on.  Completely off.  Not on vibrate, not on sound.  The

25   next electronic device that emits and audible noise in

Jorden Timothy Hollingsworth - D                    522

1    this morning's court session will be confiscated and

2    held by the Court until Monday at 5:00.

3                    Go ahead, Mr. Knauss.

4                    MR. KNAUSS:  Thank you.

5    BY MR. KNAUSS:

6         Q.    When you got upstairs, where did you go?

7         A.    Upstairs to my mom's bedroom and slept there.

8         Q.    Okay.  Do you remember if your mom was awake or

9    asleep?

10        A.    That, I can't remember.  She kinda goes in and

11   out.  So when she's laying there, she is just laying

12   there with her eyes closed.  Or if she's awake -- yeah.

13   I just kinda crawled into the bed.

14        Q.    All right.

15        A.    I wasn't really paying attention to my mom.

16        Q.    Okay.  Do you recall when you woke up?

17        A.    That next morning?

18        Q.    Yeah.

19        A.    Yeah.  Probably --

20        Q.    Well, let me make sure.

21                    Did you -- did you do anything during the

22   night?  Go back downstairs?

23        A.    No.

24        Q.    Do any other --

25        A.    I was --

 1       Q.    Okay.

 2       A.    -- out for the night.

 3       Q.    Okay.  All right.

 4             So the next morning, or whenever -- when did

 5   you think you waked up -- woke up?

 6       A.    I think I woke around 10:30, 11:00.  I woke up

 7   like 45 minutes, an hour after Trisha and Ken.  And

 8   they -- by the time I got up, they were already almost

 9   out the door.

10       Q.    Okay.  So you came downstairs and what did you

11   see?

12       A.    Them all getting ready and about to go out the

13   door.

14       Q.    Okay.  Had you made any intentions of talking

15   to Ken about this?

16       A.    I had the full intention to speak to not just

17   Ken, but to Trisha and everybody about what happened,

18   because it did -- I wanted to be the first one that

19   brought it up to them, not a little girl.  But they were

20   in a hurry, so kinda didn't have a choice.  But I had

21   every intention to tell them.

22       Q.    Okay.  So did they -- did you stay there or did

23   you leave when you -- after they left?

24       A.    I left.

25       Q.    Okay.  Did you -- when did you learn that they

Jorden Timothy Hollingsworth - D                    524

1    had gone to the police?

2        A.    The moment they went to the police.

3        Q.    Okay.

4        A.    I got notified by my family members.

5        Q.    Do you know which one notified you?

6        A.    My grandmother and Trisha.

7        Q.    Okay.  Was that by phone call or text?

8        A.    I can't remember.  I'm thinking my grandma

9    called me first.  And then I was -- started to text

10   Trisha.

11       Q.    Okay.  And your grandma being Deborah Miller?

12       A.    Correct.

13       Q.    Okay.  And we've been provided the -- with the

14   copy of these texts and we've gone over these?

15       A.    Yes.  Correct.

16       Q.    Okay.  So let me come up by you here.

17             So -- so what was your impression of what

18   was going on with Trisha and Ken during the day or two

19   before this incident happened?

20       A.    During this time, Ken and Trisha were going

21   through a lot.  Especially Trisha.  She just had a

22   newborn.  She was, what, I think about a year old when

23   this happened.

24             Kaeli -- the dog bit -- sock -- bit Kaeli,

25   so they had a breakup.  Yeah.  She was going through a

Jorden Timothy Hollingsworth - D                      525

 1    very rough time, to answer your question.

 2         Q.   Trisha was?

 3         A.   Trisha was.

 4         Q.   Okay.  And -- and you were consciously aware of

 5    that at the time of this incident?

 6         A.   That's correct.

 7         Q.   Okay.  And I'll show you the State's Exhibit 1

 8    that's in evidence.

 9              Is this your telephone number at the top?

10         A.   That is correct.

11         Q.   Okay.  At the time of --

12         A.   Yeah.

13         Q.   And these -- the first page appears to be dated

14    February 13th.  So that was the day that -- that they

15    went to the police, correct?

16         A.   Correct.

17         Q.   And do you recall approximately what time these

18    texts are going?  Does it appear to be --

19         A.   I remember everything about these texts.  And

20    yes, these were around 7:00 p.m. that day, 6:00 p.m.  It

21    was after they went to the police station.

22         Q.   Now, this -- this first one is -- I just want

23    to make sure, where it says "02/02," that means the

24    second text of two?

25         A.   Yeah.  From what I can tell.  The first

1    message, they don't have that first message anywhere in

2    here.  So she probably screen-shotted it from here down.

3         Q.   Okay.  Do you recall what you conveyed to her

4    on the first text?

5         A.   Pretty much.  I pretty much wanted to summarize

6    what happened, without going into detail over text.  I

7    knew that she was going through a lot.  I think I

8    started off the text of, "I wanted to tell you about the

9    situation.  I would never do something like this.  She

10   woke up and was going to go upstairs and tell.  I just

11   freaked out.  I did not want her to.  I didn't know what

12   I was thinking.  I'm so sorry."

13        Q.   Okay.  So what did you mean by that?

14        A.   I don't know what the fuck I was thinking to

15   actually be in this situation.  I should have never been

16   over there.  I shouldn't have even helped her pull down

17   the shirt.  "I'm so sorry," meaning I can't believe that

18   I just put more pressure on Trisha and more pressure on

19   everybody.  And I did feel -- I felt like I messed up

20   over something so stupid.

21        Q.   Did you ever touch Jasmine in a sexual way when

22   you --

23        A.   No.

24        Q.   Now, was the shirt -- and the shirt was how far

25   up on her?

Jorden Timothy Hollingsworth - D                    527

1      A.    It was revealing her breasts.

2      Q.    Now, the next text is from Trisha?

3      A.    That is correct.

4      Q.    Okay.  And who's Kip?

5      A.    Kip is my best friend.  Kip Lee.

6      Q.    And that's one of the fellas you were staying

7   with --

8      A.    That is correct.

9      Q.    -- out in -- from time to time?  That's who you

10   believe she was referring to?

11      A.    Yes.  Correct.

12      Q.    Now, this next one, "Never mind.  Ken,"

13   et cetera.  Who's that?  Whose text is that?

14      A.    Okay.  So she was -- she was pretty much

15   saying, "Please don't come to my house tonight," because

16   supposed -- I was getting all these calls saying that

17   people are waiting at the house for me.  Supposedly Ken

18   and Ken's dad.

19            And then Trisha said, "Never mind.  Ken and

20   Dad are now leaving and they're" -- okay.  "If I start

21   shit with me, then you need to leave."  But then the

22   next message she said, "You," instead of the "I," which

23   makes it, "And if you start shit with me, then you need

24   to leave."

25            I can't even see that.

1        Q.    Well, see if we can't read that.  Let me

2    grab . . .

3              So I'll refer to the -- which text it is

4    just to make sure, but for the record, we can't read

5    this photocopy.

6        A.    Okay.

7              MS. DUMONT:  State's Exhibit 2 is in

8    evidence -- or 1 is in evidence.  That might be --

9              THE COURT:  Mr. Knauss, I'm holding

10   State's 1.

11   BY MR. KNAUSS:

12       Q.    I can -- if I can just go to my copy and

13   confirm that we're talking about --

14       A.    Yeah.  This is when I started explaining.

15       Q.    Okay.  So -- well, maybe -- maybe I won't use

16   that.  Thank you.

17             THE COURT:  I'll give that to Mr. Knauss

18   myself.

19             MR. KNAUSS:  I just want to make sure,

20   following along.

21   BY MR. KNAUSS:

22       Q.    Okay.  So the next page, 2 of Exhibit 1, it's 1

23   of 4.  And just read that out loud and -- and tell the

24   Court what your --

25       A.    "I was headed upstairs and noticed her shirt

Jorden Timothy Hollingsworth - D                529

1    was pulled up.  I leaned over and looked" -- it said,

2    "looked over" -- "leaned over" -- "leaned over her,

3    looked.  I don't know why.  And went to go pull her

4    shirt down and she woke up."  No.  Yeah.

5        Q.    Okay.  And then on the next page, 2 of 4,

6    that's continuing on, the same message?

7        A.    Correct.

8        Q.    Okay.

9        A.    2 of 4 is, "up and said she was gonna go wake

10   you guys up and tell you that I was looking at her or

11   touching her.  I freaked out and just asked her not to.

12   Honestly, it was so quick, it all happened within five

13   seconds.  I knew what it looked like, so I didn't want

14   her to tell.  I was going to tell you first.  I just

15   didn't know how to put it and I'm still trying to.

16              "I don't know how to put it, but I'm still

17   trying to."

18              Is that right?

19       Q.    On the last page.

20       A.    Nice.

21       Q.    So what did you mean by that?  What were --

22   what were you doing when you were texting that to her?

23   What were you trying to relay?

24       A.    This is why I don't talk in text.  But what I

25   was trying to say was "She was going to go wake you guys

 1   up and tell you."  Wait.

 2              Okay.  Okay.  "I was headed upstairs and

 3   noticed her shirt was pulled up.  I leaned over her.

 4   Look, I don't know why.  Went to go pull her shirt down

 5   and she looked.  What I mean is I -- when I went to go

 6   upstairs, I looked in her direction and noticed her

 7   shirt was up.  I went in and helped her.  I don't know

 8   why I even did that."

 9       Q.   Okay.

10       A.   "I was headed upstairs and noticed her shirt

11   was pulled up."

12              "Said that she was going to go wake you guys

13   up and tell you I was looking at her and touching her.

14   I freaked out.  I just asked her not to.  Honestly, it

15   happened so quick."  That's --

16       Q.   So when you were doing that text, you knew that

17   you were accused of sexually touching her?

18       A.   Yes.  That would be fair.  Well, a fair

19   (indiscernible).  Yes.

20       Q.   When -- when you're saying, "I'm so sorry," are

21   you acknowledging that you sexually touched her?

22       A.   No.  I'm acknowledging that I'm sorry for more

23   stress and more things that are happening to Trisha and

24   I.

25       Q.   Okay.  And have you related the things that

1    Jasmine said to you and you said to her?  Is there

2    anything else that was said at the time you pulled the

3    shirt down?

4         A.   No.

5         Q.   Okay.  Did you ever ask her to touch her?

6         A.   No.

7         Q.   Did you ever offer her $20?

8         A.   No.

9         Q.   Did you ever offer her to take her to a movie?

10        A.   No.

11        Q.   Did you crouch down behind the sofa towards the

12   play -- play area?

13        A.   No.

14        Q.   Did you lay down and pretend you were sleeping?

15        A.   No.

16        Q.   So you went from the big sofa to the little

17   sofa, pulled her shirt down, and walked up the stairs.

18   That -- was that the route you took?

19        A.   Yes.  Directly just diagonally.

20        Q.   Okay.  Did you ever crouch down near her face

21   and offer her money or a movie, anything like that?

22        A.   No.

23        Q.   And these texts were the night of the date when

24   they went to the police; is that correct?  Some of them

25   were.

Jorden Timothy Hollingsworth - D                    532

1        A.    Yeah.  Some of them.  I was wrong.  The --

2    those text messages weren't at 7 o'clock.  They were

3    more like 9-, 10 o'clock, because it led over into the

4    next day.

5        Q.    Okay.

6        A.    We were talking at midnight.  That's why those

7    messages are --

8        Q.    All right.  So the dates on the -- on these

9    texts are correct, February 13, and then February --

10   February 13 is on page 1, and then February 14 --

11       A.    That is correct.

12       Q.    -- is on the next page?

13       A.    Correct.

14       Q.    Is that one continuous text on the 14th?

15       A.    Yes.

16       Q.    Do you remember what time that was?

17       A.    It had to be after midnight.

18             Which one are you talking about?  The one

19   at -- the --

20       Q.    The two -- the February 14th text.

21       A.    Yeah.

22       Q.    Where you explain what happened.

23       A.    That was -- it had to be after midnight.

24       Q.    Okay.  So it was the early morning hours of

25   February 14th, then?

Jorden Timothy Hollingsworth - X                 533

1      A.   Yes.

2      Q.   Okay.

3             MR. KNAUSS:  No further questions at this

4   time.

5             THE COURT:  Ms. Dumont.

6             MS. DUMONT:  Thank you.

7                    CROSS-EXAMINATION

8   BY MS. DUMONT:

9      Q.   Counsel asked you about things that you would

10  do with Jasmine and you described playing basketball

11  with her and sometimes hanging out with her, right?

12     A.   Correct.

13     Q.   Okay.  So you got along well with Jasmine?

14     A.   Correct.

15     Q.   And in your description here that you brought

16  to court -- is that still in front of you?

17     A.   Yeah.

18     Q.   Yeah?

19             You know, I'm looking at it and from 2008,

20  the bottom one --

21     A.   Yeah.

22     Q.   -- all the way up to 2014, there's no mention

23  of staying at Trisha's house on Boardman.  But you did

24  stay there, right?

25     A.   Okay.  So --

1      Q.    No, no, no.  Just -- I'm just asking, you did

2   stay at Trisha's house during that time frame, right?

3      A.    With Trista, like I said, because that was --

4   the only time I could stay over at Trisha's -- the only

5   time I could have a girl with me was at Trisha's.  So

6   during that time, the only time that I could have stayed

7   over at Trisha's with Jasmine there was during the time

8   that Trista was present.  That was before I went away to

9   Lakeview.

10     Q.    My question is --

11     A.    Right before.

12     Q.    -- during the time frame from May of 2008 to

13  April of 2014, you don't list staying at Trisha's house

14  at the Boardman address, and that's incorrect, right?

15  You did stay there.

16     A.    That is correct.

17     Q.    Okay.

18     A.    Jasmine was not there, though.

19     Q.    So you stayed there and that's not on your

20  list.  But you are telling us now that you did stay at

21  that Boardman address, right?

22     A.    I was doing dates all the way up till I ever

23  met Jasmine.  I can do things before I met Jasmine, if

24  you want me to.

25     Q.    No.  What I'm asking about is that's -- I'm

Jorden Timothy Hollingsworth - X                535

1    concerned because it's not on your list and I wanted to

2    be clear --

3        A.    Because I didn't know Jasmine yet.

4        Q.    You're saying you met Jasmine after April of

5    2014?

6        A.    What?  I don't know what you're talking about.

7        Q.    Your list.

8        A.    Yes.

9        Q.    The bottom part says, "Mom," right?

10       A.    Correct.  From May 2008 --

11       Q.    2000- --  okay.  I don't want you to read it.

12   I'm -- just look at it in your eye -- mind.

13       A.    Okay.

14       Q.    And then you go up five, and then it says,

15   "Johnny's," right?  Then the fifth one --

16       A.    You're talking about 2013.

17       Q.    I'm asking you -- I don't see Trisha's house

18   listed from May 2008 to April 2004 [sic], correct?

19            Here, I -- I think it will be easier if I

20   approach.

21       A.    Please.

22       Q.    So this list that you made starts here, right?

23   May 2008.

24       A.    Uh-huh.

25       Q.    And then up here, April 2014.  None of those

Jorden Timothy Hollingsworth - X                    536

 1    names are Trisha's, correct?

 2        A.   That's correct.

 3        Q.   Okay.  But that isn't accurate because --

 4        A.   That is accurate, because I was not --

 5        Q.   No.  Just --

 6        A.   -- living here at Trisha's any of these times.

 7        Q.   You stayed at Trisha's house.

 8        A.   Not during that time, no.

 9        Q.   You're telling me from May of 2008 to June --

10    April of 2014, you never once stayed at Trisha's house.

11        A.   That's not what I said.  I said I did not live

12    there.

13        Q.   Did you stay there?

14        A.   When Trisha --

15        Q.   Between May of 2008 and April of 2014, did you

16    stay at the Boardman house?

17        A.   Not with Jasmine there.

18        Q.   That's not my question.  My question is:  Did

19    you stay there?

20        A.   Yes.

21        Q.   Okay.  And that's not on your list, right?

22        A.   These are places that I was living at.

23        Q.   Okay.  But they're pretty inclusive of dates.

24    There's no gaps.  And so there's a problem there because

25    it doesn't include the Boardman address.  Do you

1    understand my point?

2        A.    Yes.

3        Q.    Okay.

4              When you stayed at the Boardman address

5    during those time frames of 2008 to 2014, you would stay

6    in the living room, correct?

7        A.    You're talking about the Boardman place?

8        Q.    Yep, Boardman.

9        A.    (No audible response.)

10       Q.    There was only one bedroom, right?

11       A.    Yes.

12       Q.    Okay.

13       A.    But --

14       Q.    So when you stayed there, were you staying in

15   the bedroom with Trisha.

16       A.    No.

17       Q.    Okay.

18       A.    I was staying in the living room.  But --

19       Q.    Okay.

20       A.    -- Ken wasn't even in the picture yet when I

21   lived there.

22       Q.    I'm asking you if you stayed in the living

23   room.

24       A.    Yes.

25       Q.    Okay.  And you stayed on a couch?

Jorden Timothy Hollingsworth - X                538

 1        A.    Correct.

 2        Q.    Okay.  And so you stayed on the couch in the

 3   living room.  And the kitchen was beyond the living

 4   room; is that correct?

 5        A.    Correct.

 6        Q.    Yes?

 7        A.    Correct.

 8        Q.    Okay.  And the kitchen had a stove that had a

 9   shelf behind it, right?

10        A.    Correct.

11        Q.    Okay.  And after the stove with the shelf,

12   there were some cooking items, flour, sugar, that kind

13   of thing, right?

14        A.    Correct.

15        Q.    Okay.  And it bottomed out into an -- it went

16   around and then it bottomed out, right?

17        A.    Yeah.

18        Q.    Okay.  And you testified that you did stay at

19   the Boardman house when Jasmine was there, right?

20        A.    Correct.

21        Q.    And -- and you said that Trista -- am I saying

22   her name right?

23        A.    Yes.

24        Q.    -- was also there?

25        A.    Yes.

1      Q.    Okay.  Is that right?

2      A.    Yes.

3      Q.    Okay.  So you were there at the Boardman house

4    when Jasmine was there?

5      A.    Correct.

6      Q.    Okay.  And Jasmine had a little pink princess

7    bed, right?

8      A.    Correct.

9      Q.    Okay.  And that was also in the living room,

10   right?

11     A.    Yep.

12     Q.    Okay.  And it had little stickers on it?

13     A.    Yeah.

14     Q.    Okay.  And it's your testimony today that you

15   did not pull your penis out of your pants and show it to

16   her.  Is that correct?

17     A.    I'm testifying that I did not ever do that.

18   Correct.

19     Q.    Okay.  And you're testifying that you did not

20   put your hand down her pants --

21     A.    That is correct.

22     Q.    -- and touch her vagina?

23     A.    That is correct.

24     Q.    Okay.

25           When you went to -- later, if I'm looking at

Jorden Timothy Hollingsworth - X                540

1    this correctly, you agree that you were couch surfing

2    and did stay at Trisha's house at the Linn Avenue

3    address, right?

4         A.   Correct.

5         Q.   Okay.  Now -- and you drew a diagram up there.

6    It -- I think it's Defense Exhibit 102.

7                   MR. KNAUSS:  Yeah.

8    BY MS. DUMONT:

9         Q.   And the couches, they were black leather?

10        A.   Yes.

11        Q.   Okay.  Both couches?

12        A.   Both.

13        Q.   Okay.  And you agree that you were on the

14   larger black couch?

15        A.   Yes.

16        Q.   And Jasmine was on the smaller black couch?

17        A.   Yes.

18        Q.   And that P between the two is a play area,

19   right?

20        A.   Yes.

21        Q.   And that was for Kaeli?

22        A.   Yes.

23        Q.   Okay.  And that had, like, foam pads, right?

24        A.   Yes.

25        Q.   Okay.  And toys?

1       A.    Yeah.

2       Q.    Okay.  And it's your testimony here that you

3   were alone with Jasmine after everyone else had gone to

4   bed and gone upstairs, right?

5       A.    Yes.

6       Q.    Okay.

7             Now, when you were testifying, you said that

8   your mom had the bedroom and you had the couch

9   downstairs, correct?

10      A.    Correct.

11      Q.    Okay.  And you agree that you had been out

12  drinking?

13      A.    Yes.

14      Q.    And your breath would have smelled of alcohol,

15  right?

16      A.    When I first came there, yes.

17      Q.    Okay.

18      A.    When I woke up, no.

19      Q.    Well, you would agree that if you've been

20  drinking alcohol, the smell of alcohol is going to

21  remain for a while.

22      A.    Yeah.  I guess it could.

23      Q.    Okay.  You testified that the reason -- I want

24  to talk to you about these text messages.

25            So on the first page -- first of all, that's

1    your phone number, right?

2        A.    Yes.

3        Q.    Okay.  And you're -- it says, actually, "Jorden

4    Hollings," and that's -- so that's you, right?

5        A.    Yeah.  Just an abbreviation.

6        Q.    Okay.  And the first page is actually

7    February 13th.  So this would have been the first one,

8    right?

9        A.    Yeah.  Well, that's the first one that you have

10   of that conversation, apparently.

11       Q.    Exactly.  Okay.

12              And when you were talking about, your [sic]

13   know, your explanation, you were referring to the 14th,

14   right?  Because that's what you were counting.  You

15   talked about, you know, you don't know why you did it.

16   You went to pull her shirt down.

17              When you were describing that, that was

18   actually this part of the conversation, right?

19       A.    It was the same conversation.

20       Q.    Okay.

21       A.    It just rolled on.

22       Q.    Yeah.

23              Now, this says February 13th and you said,

24   "She woke up and was going to go upstairs and tell."

25   Right?

Jorden Timothy Hollingsworth - X                543

1       A.    Yeah.

2       Q.    And then you said, "I just freaked out and

3    didn't want her to."  Right?

4       A.    Yeah.

5       Q.    "I don't know what the fuck I was thinking.

6    I'm so sorry."

7             Now, you heard -- is that right?

8       A.    That is right.

9       Q.    Okay.  And you heard Trisha testify, correct?

10   You were here in the courtroom.

11      A.    Correct.

12      Q.    And she said that she was worried about

13   Jasmine.  Isn't that right?

14      A.    Yeah.

15      Q.    And she said that she was upset, right?

16      A.    Well, a little girl says this about somebody --

17      Q.    And she -- and she agreed that a safety plan to

18   keep line of sight supervision of Kaeli was necessary.

19   Isn't that right?

20      A.    She did take protocols for it.

21      Q.    I'm -- I'm -- what I'm doing is I'm asking --

22      A.    Yes.  A safety --

23      Q.    -- you about --

24      A.    A safety plan -- a --

25      Q.    Sir, I'm going to ask the question.  Your

 1    attorney will give you --

 2        A.    Okay.

 3        Q.    -- an opportunity to ask anything after I'm

 4    done.

 5            She testified here that she agreed to a

 6    line-of-sight supervision of Kaeli as a safety plan

 7    for -- to protect Kaeli from you.  Isn't that right?

 8        A.    Yes.

 9        Q.    Okay.  So she's upset.  She's worried about

10    Jasmine.  She's worried about Kaeli.  And you're

11    seriously saying that when you said you were sorry about

12    touching Jasmine on the breast that you were sorry that

13    that was for Trisha's stress?  That's what you're saying

14    to this Court today?

15        A.    No, that's not what I'm saying.  I never said

16    I'm sorry for touching her breast because I never did.

17    I said I'm sorry because of all the stuff that she's

18    going through.  Don't twist my words.

19        Q.    So when you said you're sorry, you're expecting

20    this Court to understand that that was for Trisha's

21    stress.  It had nothing to do with the allegations.  It

22    had nothing to do with the fact that she was concerned.

23        A.    I never said it had nothing to do with the

24    allegation.  I said it had to do with an incident

25    happening to me in Trisha's life again.  This was an

Jorden Timothy Hollingsworth - X                          545

1    incident --

2        Q.    You're -- but you're saying that what you were

3    sorry about was the stress for Trisha.

4        A.    I said Trisha and me.  We were both going

5    through a hard time.

6        Q.    So you were sorry that -- about your own

7    stress?

8        A.    Yes.

9        Q.    Okay.

10       A.    Because I'm having what --

11       Q.    Okay.  Okay.  That's fine.

12       A.    -- a little girl saying this stuff about me.

13       Q.    You later came up with this explanation about

14   how you were trying to pull her shirt down.  Isn't that

15   correct?

16       A.    I never came up with an explanation.  That's

17   what happened.

18       Q.    Well, this was later in the conversation.  This

19   is another day that you made --

20       A.    No.  That was --

21       Q.    You talked about --

22       A.    That was a rollover for the day.

23       Q.    Well, the rollover --

24       A.    I was talking to her later that night.

25       Q.    -- into another day, isn't it?

1            MR. KNAUSS:  Your Honor, I'd appreciate it

2    if he could finish his answer before we slide into

3    another one.

4            THE COURT:  What I would -- what I'm more

5    concerned about is you two talking over each other.  The

6    record is going to become very muddled.  So I need for

7    the questions to come from Ms. Dumont and the answers to

8    come from you, sir.  And for those -- for each of you to

9    be speaking alone, as opposed to at the same time.

10            So please go ahead with your next

11    question, Ms. Dumont.

12            MS. DUMONT:  Thank you.

13            THE COURT:  If you want to reask the last

14    one, please do.

15            MS. DUMONT:  Yes, Your Honor.

16    BY MS. DUMONT:

17       Q.   The first message that we have was on

18    February 13th.  Is that correct?

19       A.   Correct.

20       Q.   And then -- and that's the message where you

21    say you're so sorry, correct?

22       A.   Correct.

23       Q.   Okay.

24            The other message we have is from

25    February 14th, correct?

1       A.    Correct.

2       Q.    Okay.  So that's a different day than

3   February 13th, right?

4       A.    Correct.

5       Q.    Okay.  And that is when you talk about you

6   pulled down the shirt.

7       A.    Uh-huh.

8       Q.    Correct?

9       A.    Correct.

10      Q.    Okay.

11            Now, Jasmine didn't say you were pulling

12  down her shirt; isn't that right?

13      A.    That is correct.

14      Q.    She described you rubbing her boob, right?

15      A.    She described a felt kind of feeling.

16      Q.    She described in this courtroom a rubbing of

17  the boob --

18      A.    She --

19      Q.    -- and moved her finger like this, in a

20  side-to-side sweeping motion.  Isn't that correct?

21      A.    She testified that she felt that.  She said

22  that she didn't see a face.

23      Q.    I'm asking about what she testified to.  She

24  said that there was a rubbing of her boob and described

25  a side-to-side motion.  Isn't that correct?

Jorden Timothy Hollingsworth - X                548

1      A.    Yes.

2      Q.    Okay.  And that side-to-side rubbing is not

3  consistent with someone pulling a shirt down.  Isn't

4  that correct?

5      A.    Correct.

6      Q.    Okay.

7            You asked your mom to testify for you,

8  didn't you?

9      A.    All my family volunteered to testify.  All my

10  friends volunteered to testify, but my family were the

11  only ones that actually knew Jasmine and me.

12      Q.    My question is:  You asked your mom to testify

13  for you?

14      A.    I asked all my family to testify.

15      Q.    Okay.  Is that the same for your sister?  Is

16  that correct?

17      A.    They all wanted to testify.

18      Q.    Okay.  And your aunt as well; is that correct?

19      A.    Correct.  Well, you kinda called her in.

20      Q.    And your mother and your grandmother bailed you

21  out of jail; is that correct?

22      A.    Correct.

23      Q.    Okay.  And then --

24      A.    It was my grandmother and my friends.

25      Q.    And when Counsel was asking you about your

1    assault, that was actually a felony assault, wasn't it?

2         A.    An Assault IV in front of a minor who was 16,

3    so it made it a felony.  Correct.

4         Q.    Okay.  So it was a felony assault?

5         A.    Correct.

6                   MS. DUMONT:  Nothing further.

7                   THE COURT:  Mr. Knauss.

8                   REDIRECT EXAMINATION

9    BY MR. KNAUSS:

10        Q.    The time frame for these texts, we have two

11   dates.  Do you know whether or not these were done

12   continuously, all at the same time, or was there a gap

13   in the -- in the time?

14        A.    Mostly all -- those texts are from the same

15   conversation.  But during that time, there was also

16   another conversation when Trisha and me were talking,

17   because she wanted --

18                   MS. DUMONT:  Objection.  Hearsay.

19                   THE COURT:  Mr. Knauss?

20   BY MR. KNAUSS:

21        Q.    Well, let's just talk about the texts first.

22        A.    Okay.

23        Q.    Okay.  So the texts on the 13th, that's dated

24   the 13th, and the text on the 14th that were four texts,

25   those four texts look like one --

Jorden Timothy Hollingsworth - ReD                550

1        A.    Yeah.  They run along --

2        Q.    -- conversa- -- one text that just had to be

3   separated by 1 of 4, 2 of 4, 3 of 4 --

4        A.    Uh-huh.

5        Q.    -- 4 of 4.  That was -- was that one continuous

6   text?

7        A.    Yeah.  That was one big, long text.

8        Q.    Okay.  So when was that -- was that text part

9   of the text from the February 13th or was there a delay

10  in time before --

11       A.    There was a delay in time.

12       Q.    Okay.  Approximately how long?

13       A.    I'm guessing, I don't know, like a half an hour

14  or an hour.  We were having a different conversation

15  during that time.

16       Q.    Okay.  Did you actually speak to her on the

17  phone?

18       A.    No, text.

19       Q.    Okay.

20       A.    She didn't -- she couldn't --

21       Q.    But those texts aren't here?

22       A.    No.  Those texts aren't here.

23       Q.    Now, when you went through and made this list

24  last night, what is this a list of?

25       A.    This is a list of all the places that I have

Jorden Timothy Hollingsworth - ReD                     551

1    lived ever since I have known Jasmine.

2        Q.   Okay.  Now --

3        A.   And --

4        Q.   -- when -- when Ms. Dumont asked you did you

5    stay at -- at Trisha's house when Jasmine was there, at

6    Boardman, did you -- did you spend the night there

7    during that period of time?

8        A.   Yes.

9        Q.   And were you with Trista Tobin at the time?

10       A.   Yes.

11       Q.   You were boy- -- boyfriend and girlfriend?

12       A.   Yes.

13       Q.   Okay.  And approximately do -- can you recall

14   approximately how long you stayed there before you went

15   to Lakeview?

16       A.   About two weeks.  Three weeks.

17       Q.   Okay.  Were you ever left alone with Jasmine?

18       A.   No.

19       Q.   And did Trista Tobin spend the night with you

20   that -- during that time?

21       A.   Correct.

22              MR. KNAUSS:  I don't think I offered '2,

23   so I'd offer that, Your Honor.

24              THE COURT:  Any objection?

25              MS. DUMONT:  No, Your Honor.

Jorden Timothy Hollingsworth - ReD                552

1              THE COURT:  102 will be received.

2              (Defendant's Exhibit 102 received.)

3              MR. KNAUSS:  Thank you.

4    BY MR. KNAUSS:

5       Q.   And staying at Trisha's house before you went

6    to Lakeview, did you go from Trisha's house, staying

7    there -- I'm sorry.

8              Did you go from Trisha Miller's house,

9    staying there with Trista Tobin for that two or three

10   weeks, and then move to Lakeview?  Was that your very

11   next place you stayed?

12      A.   I was staying with a friend with Trista for,

13   like, the last two days or three days before I went to

14   Lakeview.

15      Q.   Okay.  So was it Trisha, left there, stayed a

16   few days with someone else, then go to Lakeview?  Is

17   that the --

18      A.   Yes.

19      Q.   Is that the -- okay.  So two or three weeks

20   with Trisha, with Trista, couple days with a friend,

21   then you went to Lakeview.

22      A.   Correct.

23      Q.   Is that the chronology?  Okay.

24             And you went to Lakeview in February of

25   2012; is that right?

Jorden Timothy Hollingsworth - ReD                    553

1        A.    Yes.

2        Q.    Okay.  During those two to three weeks, was Ken

3    there?

4        A.    Yes.

5        Q.    And he slept with Trisha?

6        A.    Yes.

7        Q.    Okay.  When -- when you first found out that

8    they had gone to the police and before these texts were

9    made, did you know -- did you learn that there was a,

10   quote, safety plan in place?

11       A.    No.

12       Q.    Did you know that Trisha had agreed to a line

13   of sight between her and Kesha?  Or --

14       A.    No.

15       Q.    I always pronounce her name wrong.

16       A.    Kaeli.

17       Q.    Kayla [sic].

18             You learned that later?

19       A.    I learned that in the police report.

20       Q.    Okay.

21       A.    It was covered.

22             MR. KNAUSS:  Nothing further.  Thank you.

23             THE COURT:  Sir, you may step down and

24   retake your seat.

25             MR. KNAUSS:  Defense rests, Your Honor.

```
 1                    THE COURT:  Ms. Dumont?

 2                    MS. DUMONT:  No redirect [sic].

 3                    THE COURT:  Let's return after a 15-minute

 4      break, at 11:00, and I will hear closing arguments.

 5                    Ms. Dumont, how long do you anticipate

 6      your closing argument taking, approximately?

 7                    MS. DUMONT:  I don't anticipate it taking

 8      more than 15 minutes.

 9                    THE COURT:  Mr. Knauss, do you have an

10      approximation?

11                    MR. KNAUSS:  About the same.

12                    THE COURT:  All right.  We'll see everyone

13      back at 11 o'clock.

14                    MR. KNAUSS:  Okay.

15                    (Recess; 10:48 a.m. to 11:04 a.m.)

16                    THE COURT:  We're back on the record.

17                    MS. DUMONT:  State vs. Hollingsworth;

18      1501848.  Sarah Dumont present for the State.

19      Mr. Knauss is here.  The defendant is present as well.

20                    THE COURT:  Go ahead.

21                    MS. DUMONT:  Thank you, Your Honor.

22                    "She woke up and was gonna go upstairs and

23      tell.  I just freaked out and didn't want her to.  I

24      didn't know what the fuck I was thinking.  I'm so

25      sorry."
```

State's Closing Argument                555

1          Those were the defendant's words on

2   February 13; the day, the very day, this incident

3   happened.  The very day that Trisha Miller said that she

4   was worried about Jasmine after Jasmine disclosed the

5   defendant touched her boobs.

6          Trisha Miller testified that she texted

7   the defendant and that the defendant had apologized to

8   her for what had happened.

9          She said she was concerned, so she took

10  Jasmine with Kenneth Jewell to the Children's Center.

11  And she was concerned and so she took her cell phone to

12  the police station and gave those messages to the

13  police.

14          Defendant is guilty of both of these

15  crimes and you should find him guilty on both counts.

16          Count 1 relates to the Linn Avenue

17  incident.  It's the more recent-in-time incident.

18          Kenneth Jewell testified he went to bed

19  and, when he left, Jasmine was asleep on the small

20  couch, defendant was asleep on the big couch.

21          Trisha Miller testified that she told

22  Officer Behan that she came downstairs around 1:30 and

23  that defendant was asleep on the couch and Jasmine was

24  asleep on the other couch.

25          Jasmine also testified that when she went

State's Closing Argument                              556

1    to sleep, she was sleeping on the small couch, and that

2    when she woke up, Jorden was the only one in the room.

3                    Defendant's mother changed her story on

4    the stand, but she initially told the defense counsel

5    that the defendant was downstairs, she was upstairs, she

6    woke up, and defendant was in the bed.

7                    Jasmine describes in the court when she

8    testified, as well as the Children's Center, being

9    touched on her breast.  She said she felt a finger

10   moving under her shirt and bra and touching her breasts.

11   And she described the sensation, the feeling of it.  She

12   said it felt weird.

13                   She said that she said, "Huh?" and she

14   heard a gasp (demonstrative sound), that sounded like

15   the defendant.  And that when she looked over, defendant

16   was the only person in the room and he was hiding,

17   pretending to be asleep.

18                   Why do you apologize if you haven't done

19   something wrong?  Why do you pretend to be asleep if you

20   haven't done something wrong?  Why are you pretending at

21   all?  Why are you trying to prevent her from going and

22   tell her -- her parent if nothing was done that was

23   wrong?

24                   And the reason is because what he did was

25   wrong, and he knew it at the time.  He asked to touch

1   her.  He tried to bribe her.  And she was incredibly

2   consistent with what he tried to bribe her with.  Money.

3   Twenty dollars.  The denomination was the same.  And a

4   movie; the Sponge Bob movie.  And she testified on the

5   stand that that was a movie that she was interested in,

6   but she didn't want to see it with him after this had

7   happened.

8          And Detective Ellis testified that he went

9   and researched that movie and there was a Sponge Bob

10  movie that was released earlier in that month.  And so

11  it would have been a new release and something a child

12  would have seen.  And defendant himself testified that

13  he watched movies with the victim.

14         He was bribing her with money, he was

15  bribing her with a movie; something that she would have

16  liked.  And he got right in her face.  She described for

17  the Court how close he was to her and was essentially

18  begging her not to tell.

19         And she was worried.  She was worried

20  because she could smell the alcohol on his breath and

21  she knew that he had done this before.  And she decided

22  to tell him that she wasn't going to tell.  But she was

23  going to tell.  And that is exactly what she did.

24         The next day, she told her father and she

25  told Trisha that defendant had touched her.  And they

State's Closing Argument

1    went to the police station and then they went to the
2    Children's Center.
3              Count 2 relates to the Boardman incident.
4    Defendant, although his chart that he came up with
5    didn't contain it, admitted on the stand that he had
6    been staying at the house, the Boardman house.  He
7    described and agreed that the victim had a pink princess
8    bed.  He knew about the stickers on the bed.  Those same
9    stickers she described in her testimony before this
10   Court.  And that he, when he stayed there, would stay on
11   the couch.  Again, exactly what the victim described as
12   well.
13             The description also of the kitchen, how
14   you go back and you turn and there would be a -- a stove
15   and there would be a shelf, and then there was a dead
16   end.  Exactly the same description used by the victim.
17   And she talked about in the Children's Center about how
18   it was near the oven or the stove and near where the --
19   the sugar was.
20             And if you recall defendant, he agreed
21   that there was cooking supplies, including sugar and
22   flour.  And if you recall when Mr. Jewell testified, he
23   also testified that that was the area where Trisha kept
24   baking items, like flour and sugar.  These are
25   incredibly detailed descriptions that are entirely

1    consistent with the area where they happened and the

2    time in which it happened.

3            And the -- Jasmine described what

4    happened, that he told her -- defendant told her to come

5    over.  That they went into the kitchen.  And that would

6    have out of sight from where the bedroom was located.

7    And that he pulled out his penis.  And she described how

8    it was sticking up.  And she said it was a sort of

9    stick.  And she actually circled that area at the

10   Children's Center of what he exposed to her.

11           And then he put his hands down her pants

12   and touched her vagina.  That she jumped back and pushed

13   his hand away.  That she didn't understand what was

14   happening.  That she was too young.  She didn't know.

15           But after the Linn incident, after the

16   most recent incident, she was afraid.  And she was

17   afraid and scared because this was the second time.  And

18   she was also worried about her little sister Kaeli.  She

19   didn't want this happening to Kaeli.

20           And what's interesting, when Trisha Miller

21   was describing what happened after the Linn incident,

22   she described getting up rather late in the day and

23   coming downstairs and that Jasmine was playing by

24   herself in the children -- in Kaeli's play area of that

25   house.  And that that was what Jasmine was to do when

State's Closing Argument                          560

1    the adults were sleeping.  She's supposed to be quietly

2    playing.

3                 That's exactly what happened at the

4    Boardman address as well.  Kaeli described -- Jasmine

5    described getting up, that she's playing quietly again

6    in that living area, that same area where defendant is.

7    And that her parents aren't up.

8                 The ADHD I prepared to talk about.  I

9    think it's largely been abandoned after Dr. Skinner's

10   testimony.  Their expert didn't go into it, but agreed

11   that Jasmine was able to concentrate, that she's able to

12   give a narrative.

13                Amanda McVay from the Children's Center

14   described Jasmine as very intelligent, above average for

15   her age group.  She was smart.  She was focused.  She

16   was able to give a narrative.  She had no concerns about

17   her ability to understand the questions and respond

18   appropriately.

19                And the medical report and the testimony

20   is clear that she had switched her medication back in

21   December.  There were no concerns.  It was a low dosage.

22   It was well maintained and that at her follow-up

23   interview, she was doing really great.

24                The counseling, again I think that's a red

25   herring.  I'm just going to touch on that briefly.

State's Closing Argument                            561

1          Trisha Miller testified that Jasmine went

2    to Western Psych when she was in third grade.  So she

3    would have been around eight years old.  That's years

4    before this incident occurred.  Everyone testified that

5    Jasmine was ten years old when this occurred.  So again,

6    not really relevant.

7          I want to spend some time talking about

8    Jasmine's disclosure.

9          This was a spontaneous disclosure.  Nobody

10   asked her.  Nobody told her what to say.  Nobody asked

11   her a suggestive or a leading question.  This came from

12   Jasmine herself.  She told and approached her dad and

13   Trisha and said that something was worrying her.

14         She said, "There's something I want to

15   tell you."

16         And so this wasn't a suggestive time.

17   This wasn't a suggestive question.  And even their

18   expert said that this was a spontaneous disclosure.

19   This was coming from the child herself.

20         And it's particularly noteworthy that this

21   came on the same day as the event that occurred.  She

22   disclosed right after it occurred.  She had a fresh

23   recollection of what occurred.  She was so concerned

24   about it, she told her dad and Trisha.

25         And then her dad asked her -- when she

State's Closing Argument                                          562

1    said, "I have something I want to tell you about

2    Jorden," he -- his question was:  What did you want to

3    tell me?  What did you want to tell me?

4              And I asked their expert, Ms. Bourg, about

5    that question.  And is that a suggestive question?  Is

6    that a biased question?  Is that a good question?  She

7    agreed that that was a good question; that that was a

8    nonleading, nonsuggestive, nonbiased question.  That

9    that is a good question.

10             So the only question that was asked was an

11   entirely nonsuggestive, nonleading question.  And those

12   are the kind of questions that get narrative, that

13   give -- get descriptive, that are the type of questions

14   that interviewers want to have asked and that are the

15   most reliable types of question to get the most reliable

16   types of answers.  And that's the question that was

17   asked and that's the question that Jasmine responded and

18   told what happened.

19             The police did not interview Jasmine.  She

20   was not asked any questions at the police station.  She

21   did talk to the police officer when she was waiting, but

22   they were unsolicited and not made in response to any

23   questioning.

24             So again, I asked their expert about this

25   and she agreed that that was not a leading, not

1    suggestive, not biased.  And, in fact, when I asked

2    Dr. Bourg about that, about what the concern would be if

3    people are calling you a liar, the concern is

4    recantation, not suggestibility, in this case.

5              People are calling her a liar.  That would

6    cause her to change her story and recant.  That's the

7    real concern here.  But because her father was actually

8    supportive, because her father actually went to the

9    Children's Center with her, she didn't recant and she

10   continued to tell the truth; the incredibly consistent

11   truth that you heard in this court and that you saw in

12   that video.

13             And she made consistent statements to her

14   father, Trisha, to Amanda McVay, and here in court.  She

15   gave contextual, sensory, and idiosyncratic detail that

16   only she would be privy to.

17             With the Linn Avenue incident, she

18   described that it felt weird when he moved her boob with

19   his finger.  She said it scared her.  And she described

20   the sound that Jorden made as a gasping sound.  And she

21   described how the defendant smelled like alcohol.  And

22   he agreed he had been drinking alcohol and he agreed

23   that he would probably smell like alcohol.  And she also

24   talked about how she can almost taste the smell on her

25   mouth.

State's Closing Argument                                    564

1           And she moved her finger in a sweeping

2   motion when she was describing how the defendant touched

3   her boob.  And that's, even defendant admitted, not

4   consistent with pulling the shirt down.

5           She described this conversation she had

6   with the defendant, that he tried to convince her that

7   he did it in his sleep, that he tried to bribe her.  And

8   she said she wasn't dreaming.  She said she opened her

9   eyes.  She said she knew it wasn't a dream because he

10  actually went into her shirt.  And he asked her not to

11  tell anyone.  And he basically admitted it.

12          And she said she "felt a finger moving on

13  me, on my boob."  And she drew a picture of what

14  occurred, of where it occurred in the couch.

15          With the Boardman incident also, she

16  described how the defendant motioned to her, how he

17  pulled his penis out of his pants, how his penis was

18  hanging over his pants.  It was sticking up.  That she

19  was trapped in the kitchen, near the oven and the sugar.

20  And then he put his hand down her pants on the bare

21  flesh of her vagina.  She didn't really know it was

22  wrong.  She didn't understand because she was too -- too

23  young.

24          There were a lot of reasons for her not to

25  tell the truth.  She ended up having to leave her family

1    here.  She had to move to Oklahoma.  She described

2    losing her friends, losing her teachers.  She also lost

3    her cousin.  This is the one she liked before this.

4                She had no reason not to tell the truth

5    about this.  And, in fact, she said she wouldn't lie

6    about something like this.

7                She lost her home, her family, her cousin,

8    her friends, her teacher.  But she came in here and she

9    told the truth.  This did happen.  You should hold

10   defendant accountable and find him guilty of both

11   counts.

12               THE COURT:  Mr. Knauss.

13               MR. KNAUSS:  Thank you.

14               I must say that in my 42 years of being a

15   defense attorney, handling many of these kind of cases,

16   and learning from my peers and prosecutors, judges, I

17   have never seen or heard of a case or certainly handled

18   a case where we had these two unique issues.

19               One is a self-admitted liar is making

20   these allegations.  And the other is that on the

21   incident in Oregon City, she was dreaming at the time of

22   the alleged sexual touching.  There was no sexuality, no

23   sexual touching after the dream.

24               Now, we have -- as typically we have in

25   these kind of cases, we have the girl's word versus my

Defendant's Closing Argument

1    client's word.  We don't have any physical evidence.

2                Now, when I say she's a self-admitted

3    liar, she acknowledged in the first event that she

4    said -- claims occurred in Boardman that she did not

5    tell anyone because they think she is lying anyway.  She

6    does not want all the drama because people have been

7    arguing about what happened.  She used to be a liar, but

8    she would lie because she was scared to get in trouble.

9    When asked what she has lied about, she said she forgot

10   what she has lied about.

11               When I cross-examined her on the stand,

12   she admitted that at first she lied once in a while, but

13   then it became a habit.  And she claimed to have stopped

14   lying when she turned eight.  She lied a couple times a

15   week between the ages of eight and nine.  But she also

16   again admitted that she lied after that, even after she

17   was nine.  This is buttressed by two other things.

18               We can say all we want that the family is

19   supporting Jorden and, you know, do anything to help.

20   Well, sure they do.  They're a family.  But the

21   grandmother, the mother, and the sister, and Trisha all

22   confirmed that her reputation -- or their opinion of her

23   veracity or for truthfulness is poor, terrible,

24   supporting the concept that we can't trust her word and

25   that she makes things up.  And she makes things up with

Defendant's Closing Argument                    567

1    elaboration.

2              And I don't mean to be flippant here, but

3    I can't help but point out that even among her peers at

4    school, she felt bullied because they felt her nose was

5    growing.  Well, even her own peer group confirmed that

6    she had problems with lying.

7              Now, when have -- when have we ever seen a

8    situation where we need to look at a child's testimony

9    and take it as true beyond a reasonable doubt when she's

10   a self-admitted liar and chronic -- chronically so?

11             Now, did the Children's Center take enough

12   care to make sure they got the truth?  I submit to you

13   just by watching that tape, and Dr. Bourg's testimony

14   bore this out, in watching that tape, Ms. McVay just

15   went through bang, bang, bang, bang, bang.

16             "Now, we're only going to talk about true

17   stuff.  We're not going to talk about pretend stuff.

18   Not about make-believe.  Just stuff we know.  If I ask a

19   question, if it doesn't make sense, tell me.  Tell me if

20   I made a mistake, get it wrong."

21             And for a ten-year-old girl with ADHD to

22   comprehend those when, as Dr. Bourg would opine, even an

23   adult would have some inquiry about what -- what this

24   all means.  But certainly a ten-year-old girl with ADHD

25   was not adequately cautioned before.

Defendant's Closing Argument

1          And then we have -- she admits she lied

2    through -- about halfway through the interview.  They

3    don't take a timeout and say, "No, let's just make sure

4    now.  You tell me you've lied before and you have

5    problems with lying.  Let's make sure here, because

6    we -- we need to make sure this is true stuff."  Not --

7    none of that occurred.

8          The -- the -- I think that's the most

9    crucial part of that interview.  They didn't go through

10   each one.  And Ms. McVay, who I respect, but she kind of

11   brushed it off.  "Well, she's not a kid, she's not an

12   infant, so I didn't need to go through that."

13         Well, I submit that -- I mean, we even

14   voir dire kids up to the age of 14 if we're worried

15   about them -- you know, do they know what the truth is?

16   Ms. Dumont didn't go through that with her.

17         They're presumed to be competent witnesses

18   when they're 14, under the statute.  But there was no

19   clear, definitive making sure that this ADHD girl knew

20   what these concepts were.  And I submit to you that she

21   really couldn't have been able to grasp those when they

22   went through them so fast.  Now, they knew she was ADHD

23   before they spoke to her in the interview room.

24         Jasmine lied to the Court.  She told us

25   that after she was at the police station and before she

Defendant's Closing Argument                    569

1    went to the Children's Center, she told her grandpa,

2    grandma, and her father in Vancouver that -- about the

3    incident on Boardman.  And I made sure that she was

4    clear on that, that it was in Vancouver, who did you

5    talk to, and all that.  And it's absolutely clear that

6    she didn't tell those people.

7                   Ms. Dumont had a chance to talk to the

8    father, "Did Jasmine tell you that?"  Because he was the

9    next witness.  There was a break and there was an

10   opportunity to do that.  We didn't anything from Ken

11   that Jasmine told the family that before she went to the

12   CARES.

13                  And we also know that Ken told them the

14   same story as he told the police before and that

15   there -- there's no -- nothing new came out of it.  And

16   the policeman had cautioned him, if he -- "Don't

17   question her, but if she brings anything up, tell us."

18   Well, none of that happened.  She lied to the Court.

19                  Now, I submit that she also -- very

20   important issue here, too.  You saw her demeanor on the

21   video.  I mean, she's like bouncing around like almost

22   as if she's, you know, enjoying the experience.  I'm not

23   going to say it that way, but she was, you know, not

24   traumatized, apparently, in her demeanor on the video.

25                  We know that she was asked during the

1    medical exam where she brought up that she was touched
2    by Jorden.  And they made a very clear question to her:
3    Did -- did -- was there any other touching?  And she
4    said, "No."  And it wasn't until halfway through the --
5    the interview on the video, "Oh, yeah.  By the way, this
6    other thing occurred."
7               Now, we also know that she had had about
8    ten appointments at Western Psychological in the past
9    and that she had had three sessions in January of 2015,
10   and no disclosures were made.  There was opportunities
11   for her to make these disclosures and none were made.
12              And to say, "Oh, gosh, she went to Western
13   Psych before the abuse occurred," we don't really know
14   when this abuse occurred.  I mean, are you kidding me?
15              This -- what we have is in the testimony
16   of Jasmine, she says, "I'm not really sure it happened,
17   but I know it happened during the summer."
18              In the CARE- -- in the Children's Center
19   report, she told us that it happened when she was in
20   kindergarten and she was in school.
21              And then we have, "Well, what was your dad
22   doing for a living?"
23              And, you know, whether it was Safeway or
24   not, I mean, we're all over the board.  We have no idea.
25   Not even Ken can really tell us.  But Jasmine thought it

Defendant's Closing Argument                           571

1     was when he was at Safeway, when she testified.

2                   So I submit to you that there should be

3     credence given to this case that she went at least ten

4     times to Western Psych when she was much younger, and

5     didn't disclose.

6                   Now, the second big, huge issue here is

7     that the only allegation of abuse is when Jasmine admits

8     she was dreaming.  And -- and let's go back to what --

9     what was said here.

10                  The interview says that Jorden -- excuse

11    me, Jasmine said that she was asleep and dreaming when

12    she felt the touching.  And then the dream automatically

13    changed.  The boy character in her dream was doing the

14    touching to the other character.

15                  Well, that brings up a couple of issues

16    here.  The -- she felt the touching and then she kept

17    dreaming, not waking up, because she kept dreaming.  And

18    that dream changed to a boy character in her dream was

19    doing the touching.

20                  I submit to you that that's -- every bit

21    could be construed that she was dreaming she was

22    touched.  She has the boy in her dream doing the

23    touching.  She's still not awake when she claims the

24    touching occurred.

25                  And I also submit that that -- that

Defendant's Closing Argument                    572

1    characterization the boy in her dream was doing the

2    touching, that it was the boy in the dream that was

3    doing the touching, not my client.  And that's what was

4    actually going on at the time.  And there is no claim

5    that after she woke up there was any touching of her

6    body.  That's crystal clear.

7                    And I submit to you that the Children's

8    Center did not even adequately clarify that.  They even

9    took a timeout and went back and powwowed about it.  And

10   when they came to try to clarify that, I submit to you

11   that they didn't get to the core of it:  Were you awake?

12   Were you consciously aware that he was touching you?

13                   And they didn't want to go there because

14   they already have it on video that she said it happened

15   when it was in a dream state and that that dream

16   continued on.

17                   Now, so I submit for these two strong

18   issues here, these are rare situations and they're

19   compelling that the State has not proven this case

20   beyond a reasonable doubt.

21                   There's also some issues here about when

22   she's talking about what happened afterwards when she

23   woke up, and that Jorden was talking about taking the

24   garbage out, and that that makes no sense.  A lot of

25   gibberish there.  And I submit that this is all made up

1    by her in her trying to convey something that happened.

2                    And we know from Dr. Bourg about this

3    coming out of a dream state.  And with children, you

4    know, trying to wake up, even adults trying to wake up.

5    Being able to consciously be aware of what's going on

6    around them.  Misperceiving things.  Disorientation.

7    I'd submit that that's all relevant and strong evidence

8    that she's not relating an actual event that happened.

9                    We also have the family witnesses all

10   confirming that -- that Jasmine was drowsy.  Seemed to

11   be knocked out.  More out of it than normal when she

12   went to sleep.  And that goes part and parcel onto the

13   difficulty in her waking up.

14                    Now, we never talked about motive here.

15   And this is final argument.  I'll just espouse this --

16   this idea.

17                    We've got a ten-year-old girl who's got

18   ADHD and we've got a little sister.  And I submit to you

19   that there is a little bit of a motive here, certainly

20   something to consider, that "My dad's going back to

21   Trisha and the little kid.  I'm going to be

22   disenfranchised again.  I'm going to be displaced again.

23   I'm not going to get the full attention of my dad like I

24   get when -- when Kaeli's not around."  I submit to you

25   that there's some modicum of potential motive there.

Defendant's Closing Argument                      574

1           And finally, the texts.  We can isolate

2    on, "Oh, I'm so sorry," and say, "That's it," or, you

3    know, "You confessed."

4           Well, that's not a confession.  And the

5    Court knows the instruction about conveying things and

6    we have to be careful what's truly meant.  Now, that

7    goes for verbal statements, but I submit it should apply

8    to text messages.

9           What my client conveyed to you on the

10   stand is that this is during a very trying time for

11   Trisha.  She's got this three-year-old child, or maybe a

12   year old at the time, and the father's coming back and

13   Jasmine's coming back and they're considering getting

14   back together.  I mean, that's a very emotional time for

15   Trisha.  And my client's close -- very close to her and

16   knows that she's struggling with "What should I do about

17   this?"

18           And then all of a sudden there's this

19   claim that -- that he inappropriately touched her.  And

20   I -- I submit to the Court that his explanation is

21   consistent with his testimony that -- excuse me, is

22   consistent with the texts, in that he was concerned that

23   he was adding even more drama to -- to Trisha's life.

24   And there's kinda -- the highlight there in the text,

25   something that's kind of in the middle of the text about

1     "effing drama."  That seems to be kind of a -- I'm not

2     sure how that got on there, but that certainly was

3     adding to her -- her drama.

4                    And when he knew that he pulled her shirt

5     down and -- and she reacted, thinking that he had

6     molested her, he was concerned that she misconstrued

7     that and wanted to be able to tell Trisha and Ken that

8     that's -- he did not touch her in a sexual way.

9     "Jasmine thinks I did, but I didn't."  And that his

10    concern about what Jasmine was going to claim is the

11    concern that was expressed in these texts.  And it

12    makes -- makes sense.  That -- those texts can be

13    construed in two, I submit, equally [sic] contexts.

14                    Now, the -- the other case, I submit being

15    so remote, with a child that has problems with lying

16    and -- and the age of that and these other issues that

17    I've raised that that -- that case should be dismissed

18    as well, based on -- upon those factors that I've

19    raised; particularly her self-admitted lying.

20                    This is a case of uniqueness in this

21    courthouse and probably in general sex abuse areas.  You

22    heard Dr. Bourg, you know, in all her vast experience

23    there's not that many things -- occasions where there's

24    dream situations.  And I submit that the combination of

25    a girl that lies -- and I -- and we've -- we feel sorry

1    for this girl.  I'm not trying to, like, demean her or

2    demonize her.  She has a lot of issues.

3            But I submit to you that -- that we cannot

4    trust her testimony when even she confirms she's a liar.

5    And the only claim of actual sex abuse in the Oregon

6    City one was when she acknowledges she was dreaming and

7    she kept dreaming after she felt a touch, in her mind.

8            Thank you.

9            THE COURT:  Ms. Dumont.

10           MS. DUMONT:  Yes, briefly.

11           With respect to the lying issue, Jasmine

12   came in here and she admitted that, you know, she has

13   lied.  And she said that she started working on it when

14   she was eight.  And the things that she would lie about

15   would be not -- lie to not get into trouble.  But she

16   said she wouldn't lie about something like this.

17           Trisha herself said that Jasmine would

18   not -- would always tell the truth to her father and

19   that Jasmine does tell the truth most of the time.

20           So I think the lying issue is really not

21   backed up by the testimony of the witnesses and the

22   details and description and particularly the sensory

23   descriptions given by Jasmine to this Court and at the

24   Children's Center.

25           With respect to the date, we know that

State's Rebuttal Argument

1    this -- the first-in-time event happened at the Boardman

2    address.  The date range, Jasmine was ten years old in

3    2015.  And given that she's ten, around 2009 she would

4    have been five, would have been consistent with a

5    kindergarten/first grade type of time frame.  Up until

6    age eight obviously kids have (indiscernible) sometimes.

7    But again, it is only on or about, so I don't really

8    think that's an issue here, given the consistent

9    testimony by everyone that Jorden was in that Boardman

10   house and her description of what occurred at that

11   house.

12            In terms of the dreaming, Dr. Bourg

13   described in great detail, as did Counsel, the first

14   description.  And of course as Oregon Interviewing

15   Guidelines talk about, you also go through and find --

16   rule out is it the truth?  Is it an alternative

17   hypothesis?  And that's exactly what this interviewer

18   did.  She went back and asked open-ended, nonleading

19   questions about what had happened and when she woke up

20   and what she fell when she -- felt when she woke up and

21   what she saw when she woke up.

22            And all of those questions make it very

23   clear.  And, in fact, Jasmine was very clear that she

24   did wake up and she felt this.  And it wasn't just when

25   she was dreaming.  She felt it after she woke up.  And

State's Rebuttal Argument                    578

1    that she then saw the defendant and had a conversation

2    with the defendant and then heard the defendant gasp.

3    And then no one else was there.

4              This happened.  You should find him

5    guilty.  Thank you.

6              THE COURT:  I do believe the State has met

7    its burden and I find the defendant guilty of sexual

8    abuse in the first degree on Count Number 1, and sexual

9    abuse in the first degree on Count Number 2.

10             Mr. Knauss, how would Mr. Hollingsworth

11   like to proceed today?  He will be taken into custody,

12   whether he wishes to proceed with sentencing at this

13   time or not.

14             Mr. Ward, if you'll call me a deputy.

15             MR. KNAUSS:  Yes.  I think I would like to

16   discuss with him how to proceed.  It's my understanding

17   that a presentence is, like, mandatory, unless it's

18   waived, so I'd like to discuss that with him.

19             MS. DUMONT:  On Measure 11 crimes?

20             MR. KNAUSS:  Yeah.  I'm pretty sure on

21   that.  But I have a right to ask for one.  I'm not

22   saying that yet.  And I will confer with Ms. Dumont on

23   that.

24             But I -- I'm gone next week and I need to

25   talk to him tomorrow.  So I would ask that we

1  preliminarily set sentencing at your convenience the

2  following week.

3              THE COURT:  I know I have plea and A

4  docket in the next two weeks.  Hold on just a moment.

5              (Whispered conversation.)

6              THE DEFENDANT:  Can I have a moment with

7  my family?

8              THE COURT:  Sir, you're being taken into

9  custody at this time.

10              THE DEFENDANT:  I know.  Right now,

11  though?

12              THE COURT:  Yes.  There's a deputy that's

13  walking into the courtroom at this time.

14              THE DEFENDANT:  No, I meant, like, can I

15  hug my family, please?

16              THE COURT:  You're in custody of the

17  sheriff's office at this time.  That's up to the

18  sheriff's deputy.

19              MR. KNAUSS:  Your Honor, I --

20              THE COURT:  I would be looking at the week

21  of August 29th.

22              MR. KNAUSS:  Could I have -- run out to my

23  car -- I left my schedule in the car -- so I don't mess

24  this up.  It'll just take me five minutes to go get it.

25  But I --

```
 1                    THE COURT:  Ms. Dumont, how are you the
 2    week of August the 29th?
 3                    MR. KNAUSS:  I'm -- I'm here that week.
 4    Yeah.
 5                    MS. DUMONT:  I -- I am here.  I have -- my
 6    kids (indiscernible).  I have some availability if we
 7    could schedule a specific time maybe to go in the
 8    afternoon.
 9                    THE COURT:  I have some flexibility.
10                    Mr. Knauss, why don't you go and get your
11    calendar.
12                    MR. KNAUSS:  Okay.  It'll just take me
13    five minutes, Your Honor.
14                    THE COURT:  And then I'd like to speak
15    with both of you in chambers --
16                    MR. KNAUSS:  Okay.
17                    THE COURT:  -- before we pick a date.
18                    MR. KNAUSS:  All right.
19                    THE COURT:  Thank you.
20                    (Recess; 11:44 a.m. to 12:06 p.m.)
21                    THE COURT:  Go ahead.
22                    MS. DUMONT:  State vs. Hollingsworth;
23    1501848.  Parties are present and we have selected a
24    sentencing date of September 30th at 1:00 p.m.  And I
25    have a signed notice.
```

```
1                    THE COURT:  All right.

2                    Mr. Knauss.

3                    MS. DUMONT:  Yes, that's correct.  And

4      I'll get with Ms. Dumont to see if we want to waive the

5      presentence and come back earlier.

6                    THE COURT:  As we discussed in chambers, I

7      have -- we created a referral for the presentence

8      investigation.  I think you both have been provided with

9      that.  Sometimes those get lost in translation, for some

10     reason, between here and the Department of Community

11     Corrections, so I would encourage you both to be in

12     contact with Mr. Cooper within the next couple of days

13     to make sure that he knows that it's on, the way

14     they're -- and I know we just faxed it over.

15                   As I indicated, the defendant's release

16     has been revoked and he'll remain in custody pending

17     sentencing.

18                   Any further from the State this morning?

19                   MS. DUMONT:  No, Your Honor.

20                   THE COURT:  Mr. Knauss, anything further?

21                   MR. KNAUSS:  No, Your Honor.

22                   THE COURT:  All right.  We'll see you all

23     back on that next date.

24                   Any no contact provision currently

25     still -- in place and any other pretrial conditions will
```

```
1    remain while the defendant is incarcerated.  Thank you.
2                  (Recess at 12:07 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1              BE IT REMEMBERED That the above-entitled

2    matter came on regularly for sentencing before the

3    HONORABLE KATHERINE E. WEBER, Judge of the Circuit Court

4    of the State of Oregon, for the County of Clackamas,

5    commencing the 24th day of October, 2016.

6

7

8    APPEARANCES:

9    Sarah J. Dumont
     Deputy District Attorney
10   Clackamas County District Attorney's Office
     Clackamas County Courthouse
11   807 Main Street
     Room 7
12   Oregon, City OR  97045
     Appearing on behalf of the State of Oregon
13
     Arthur B. Knauss
14   Attorney at Law
     294 Warner Milne Road
15   Oregon City, OR  97045
     Appearing on behalf of the Defendant
16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2                    (October 24, 2016; 9:28 a.m.)
 3              MS. DUMONT:  State vs. Hollingsworth;
 4    1501848.  Sarah Dumont on behalf of the State.
 5    Defendant is present, in custody, with his attorney,
 6    Mr. Knauss.  Appearing telephonically are the victim,
 7    Jasmine, and her grandmother, Beverly Wallace.
 8              I've had a short communication with them.
 9    They've indicated that Jasmine does have a statement
10    that she would like to read, and I will let them know at
11    the appropriate time.
12              THE COURT:  Mr. Knauss.
13              MR. KNAUSS:  Yes, Your Honor.
14              Before you came out, I provided you a copy
15    of my client's statement that he would like to read when
16    it comes time to do so.  In there, he's expressed his
17    concerns about the jury waiver and my involvement in
18    that.  He -- he and I spoke at length on Thursday and
19    Friday and he wishes to go forward with me representing
20    him at this sentencing proceeding here, in spite of what
21    statements he made in that letter.
22              And I have -- I believe I -- did I mark
23    that as an exhibit?  I can't remember.
24              THE COURT:  I have in my hands at this
25    time the letter from the defendant, handwritten on
```

1   binder paper, as well as Defendant's Exhibit 101, which

2   is a compilation of a number of statements from

3   witnesses.  So if you'd like, we could label the

4   defendant's letter as Exhibit 102.

5                   MR. KNAUSS:  That would be great, so we

6   have a full record here.

7                   So I believe he's prepared to let you know

8   that he wants me to proceed with the sentencing

9   proceeding.

10                  THE COURT:  Is that correct,

11  Mr. Hollingsworth?

12                  THE DEFENDANT:  Yes, it is.

13                  THE COURT:  Did you want to proceed with

14  Mr. Knauss's representation today?

15                  THE DEFENDANT:  Yes.  That is correct,

16  Your Honor.

17                  THE COURT:  Is that sufficient for the

18  State, for the record, at this time?

19                  MS. DUMONT:  Yes, Your Honor.

20                  THE COURT:  Okay.  Why don't I go ahead,

21  Mr. Knauss and Mr. Hollingsworth, have you gentlemen

22  take a seat.  I will hear the State's presentation and

23  then I will hear the defense's presentation.

24                  And I did have the opportunity to review

25  the presentence investigation, which was prepared and

1    filed by Danny Cooper.

2                MS. DUMONT:  Thank you, Your Honor.

3                I'm not going to go over the facts again,

4    as Your Honor had that in this courtroom, and listened

5    to them over several days.  I won't belabor them.  I do

6    want to point out to the Court that there were two

7    separate incidents separated by a specific period of

8    time.  In addition, the defendant's criminal history

9    indicates that he has several convictions for

10   harassment, Assault IV, menacing, interfering, and a

11   failure to appear.

12               In the PSI report it notes that he has not

13   done well on probation.  He's termed a medium-risk

14   offender.  And some of the rationale and recommendations

15   in the PSI report, which talk in particular about him

16   not -- not being willing or wanting to participate in a

17   sex abuse treatment.

18               And then in addition to that, his

19   statement before the Court today, which I realize hasn't

20   happened yet, but I was given a copy, which also

21   expresses a complete disregard for the findings of the

22   Court and the recommendations and the victim's

23   sentiments as well.

24               I think it's clear that this is a

25   Measure 11 crime; that he should be punished

1     commensurate with that.  I believe because there are two

2     incidents, he should receive some concurrent amount of

3     time, so that there's some recognition by the Court and

4     he's held accountable for both instances.

5               And at this juncture, I would like to ask

6     if Jasmine --

7               Jasmine, do you have a statement that you

8     would like to read?

9               JASMINE JEWELL SHAFER:  Yes.

10              MS. DUMONT:  Okay.  Do you want to go

11    ahead and read it now?

12              JASMINE JEWELL SHAFER:  Okay.

13              MS. DUMONT:  Okay.

14              JASMINE JEWELL SHAFER:  All I want to say

15    is I'm so glad that you were found guilty and can't hurt

16    any other little girls.

17              MS. DUMONT:  Is that it?  I -- I'm sorry.

18              JASMINE JEWELL SHAFER:  First of all, I

19    want to say -- say I'm so glad you were found guilty and

20    that you won't be able to hurt any other little girl.

21    (Indiscernible) tell you what you did so that it is out

22    my mind.  And I -- I think that you might come after me

23    to stop me from telling.  So I have to make sure at

24    night (indiscernible) locked tight and (indiscernible).

25              I hate I have to keep telling over and

1    over what you did.  I (indiscernible).  I trusted you.

2    Sometimes I think (indiscernible) talking about this.

3    (Indiscernible) somehow helps, it was all worth it.

4    That's it.

5                    MS. DUMONT:  Thank you, Jasmine.

6                    THE COURT:  What is the State's

7    recommendation?

8                    MS. DUMONT:  Ninety-five months, Your

9    Honor.

10                    THE COURT:  Seventy-five months on each of

11   the two counts, with twenty months concurrent.

12                    MS. DUMONT:  Yes, Your Honor.

13                    THE COURT:  I'm sorry.  Twenty months

14   consecutive, fifty-five months concurrent.

15                    MS. DUMONT:  Yes, Your Honor.

16                    THE COURT:  Thank you.

17                    Mr. Knauss.

18                    MR. KNAUSS:  Thank you, Your Honor.

19                    First of all, I participated in meeting on

20   the presentence with Mr. Cooper with my client.  And I'd

21   like to address some of the things in the presentence

22   that I think are missing some issues here.

23                    As far as the prior convictions, the

24   harassment involved his girlfriend; that there was an

25   allegation of biting her that was treated as a

1   harassment.  And the Assault IV was that he threw a pop
2   can at his mother and it hit her.
3           We do acknowledge he had trouble on
4   probation when he was in Klamath Falls, but he did a lot
5   better when he came up here.
6           And the other thing, Your Honor, he's --
7   he participated in Allies for Change for a long time.
8   He had over 26 sessions with his counselor and had just
9   a handful more to go at the time of this incident, when
10  he -- when he got arrested.  So he was -- he was engaged
11  in treatment and was following the directives of his
12  probation officer at the time.
13          The -- the issue of -- this is not a big
14  item, but there was some discussion on page 9 of the
15  presentence where the father, Kenneth, was discussing
16  about how she's doing at school.  I'm not minimizing the
17  allegations or the findings of the Court, but it was
18  clear that this girl had significant issues all
19  throughout her life.  And particularly Trisha Miller was
20  mindful of that and testified at length about that at
21  the trial.
22          I don't know what to make of the term that
23  she appeared to be in a trance on one occasion that her
24  dad indicated.  Again, not minimizing what happened, but
25  this was an overall lengthy situation where this young

1    lady had significant issues throughout.

2            The other thing -- and I'm not blaming

3    anybody here -- but CARES indicated she should be in

4    counseling back in February of 2015.  Apparently that

5    still hasn't happened.  And hopefully she can get that.

6            The employment-education section I take

7    issue with.  My client explained to him that he was

8    fully employed throughout his young life and was

9    actually going to school at the time.  And I -- it's my

10   belief that on page 9, the education-employment should

11   be indicated as a low risk, because I think Mr. Cooper

12   was misunderstanding that he was working for a temp

13   service agency but he was working full-time and going to

14   school.  So I don't believe that a medium score was

15   warranted on that.

16           He -- he has plans at -- and a lot of

17   plans, as far as the rest of his life.  I spent quite a

18   long time with him discussing those things with him and

19   he has goals in life.  He has a courtroom full of

20   friends and family that you can see.  He could have

21   filled up the courtroom, actually, with his friends and

22   family.

23           He's very motivated to be successful in

24   life.  He has actually started develop -- developing a

25   business plan.  He's going to go back to college.

1    Hopefully -- I don't know that they still allow college
2    in prison, but -- but he -- used to be able to go to
3    Chaminade correspondence courses, but I don't think
4    that's possible now.  But he certainly wants to continue
5    his education.
6              The -- Ms. Dumont has indicated about not
7    accepting -- accepting the outcome of this.  He
8    certainly had a right to have a trial.  When we have a
9    he said/she said issue, that's always in the scheme of
10   thing, in my experience, problematic.
11             He definitely, in his letter, which he'd
12   like to read, will accept whatever sentence you impose.
13   He's not grousing about that in any way.
14             The presentence report indicates a
15   recommendation of 75 months' concurrent time and no
16   departure -- or excuse me, no consecutive time on
17   Count 2.  I join in that request.  Mr. Cooper, as the
18   Court knows, is a very experienced probation officer and
19   has been doing these presentences for several years and
20   has seen all kinds of so-called sex abuse cases over his
21   career.
22             And I also would ask the Court to consider
23   the -- the one pivotal case we've had in the past that
24   I'm sure the Court's familiar with, but I want to put
25   this on the record, it's *State vs. Veronica Rodriguez*

1    *and Darryl Anthony Buck*.  It's 347 Oregon 46.  And I
2    have copies, if the Court wants to review that.
3                I'd ask the Court to consider the
4    proportionality argument, Article I, Section 6 of the
5    Oregon Constitution, the cruel, unusual punishment
6    section.  I would submit that that would apply to any
7    consecutive sentence.
8                There was -- there could even be a
9    construction that this is -- would be cruel and unusual
10   to give him a Ballot Measure 11 sentence under the
11   factors that the -- that the Oregon Court of -- or
12   Supreme Court found.
13               The three factors are a comparison of the
14   severity of the penalty and the gravity of the crime; a
15   comparison of penalties imposed in other related cases;
16   and the criminal history of the defendant.  And the case
17   is noteworthy for its analysis of the -- the section on
18   comparison of the severity of the penalty and the
19   gravity of the crime.  It talks about various analyses
20   of how we got to the sex abuse statute.  Started out
21   that this conduct was probably a misdemeanor before
22   Measure 11 went into effect.  And -- and I think the
23   points made in that opinion of the Supreme Court would
24   apply to this case.
25               I acknowledge that in -- in the

1    Rodriguez/Buck case, those two defendants had no record
2    at all.  I submit that my client's record is not
3    significant.  But I think the analysis in that case
4    would -- would point towards the appropriateness of a
5    concurrent sentence in this case, in considering the
6    circumstances and the facts of the case.
7              The -- and I'm not minimizing sex abuse or
8    anything like that.  But as far as the scale of severity
9    of crimes, no sex abuse is good sex abuse, obviously.
10   But just looking at this set of facts, proportion- --
11   proportionally I submit would not warrant a 95-month
12   sentence.
13             The -- the key here, I think, is this is a
14   young man that actually has strong goals and wishes to
15   be -- wishes to be a successful person.  He's
16   intelligent.  He has motivation.  And as a 23-year-old
17   man, maybe a little older now, but I think that he's
18   going to be a success in life, once he's out of prison.
19   And he certainly has great family support.  So I would
20   ask that you impose the 75-month sentence as a total
21   sentence here.
22             And the State wanted to try to enhance
23   this by some other claims here that they're not
24   presenting, so I would ask that we -- we have a result
25   as I have requested.

1          Mr. -- oh, also, Exhibit 101 are

2     statements that I've offered into evidence; statements

3     from friends and family that did not testify.  You saw

4     his grandmother, his mother, his aunts, and they all

5     testified in support of him and -- and I'd ask that you

6     consider that as well.

7          But these statements of friends that all

8     have kids support the concept that they don't think he's

9     a risk around their children, and I think that's

10    compelling as well.  So I'd ask -- I'd offer those into

11    evidence.

12         And I believe Mr. Hollingsworth would like

13    to read his -- his letter.

14         THE DEFENDANT:  Your Honor, I admit that

15    every time I stood in front of this courtroom and a

16    judge, I have been guilty of these crimes.  This time, I

17    am innocent, Your Honor.  I'm standing here, though, and

18    willing and having to take any amount of time you give

19    me.

20         I could have taken the deal.  I could have

21    give in with the pressure of having to serve the time

22    I'm about to do.  But I believe a good man has to fight

23    and take a stand to prove he is not among the evil

24    that's upon this world.

25         You see, I haven't had an easy childhood

1    nor will I ever say it was the best.  But I am extremely

2    happy of my life.  Not because of the things I have seen

3    or the things that I've done, but because it has made me

4    into the person I am now.  I'm very blessed and grateful

5    of who I am, how I treat people, how I see the world,

6    and the impact I will make in this life.

7              I have managed to take any negative that

8    was in my life and transform it into positive.  Every

9    bad relationship I have ever had is now the best

10   relationship I could ask for.  I have high expectations

11   of myself and dreams I will make into reality.  I have

12   completely turned my life around from the crimes I have

13   committed in the past.

14             I am not a criminal, Your Honor, nor do I

15   ever want to be.  And I'm certainly not a pedophile.  I

16   am somebody who was on the road to becoming very

17   successful.  I'm going to own my own business.  I am

18   going to help the world.  I am going to live the life

19   that I deserve.

20             The amount of time that I have to serve is

21   going to put a huge pause on that life.  This is a big,

22   huge chunk of time, but yet the State is asking for even

23   more time.  There is no words that can explain how I

24   feel about all this.

25             Your Honor, the trial would have gone

1    differently if I was in charge of how to proceed with

2    the trial.  I feel like I was pressured into doing it

3    the attorney's way.  One of the biggest things is that I

4    wanted a jury trial, and that certain things were not

5    presented.  This was supposed to be my trial, not my

6    attorney's.  You would have seen things differently if

7    it was presented how it needed to be presented and

8    handled how it needed to be handled.

9                Granted, I did go through trial and I

10    lost.  I stood up to prove I am innocent and I lost.  I

11    understand that I took everybody through a trial, but I

12    had to, Your Honor.  I had to fight for what I believe

13    in.  I have too much heart and respect in who I am to

14    have taken a deal that I can -- saying that I could

15    commit this kind of evil.  I had to fight to prove that

16    I am truly innocent.  I understand that I lost at trial

17    and I've accepted to serve the time because of that.

18    But I shouldn't have to serve the time for fighting for

19    who I am.

20                What I'm asking for, Your Honor, is for

21    you to understand the person I am and understand why I

22    had to take this to trial.  Please take this in

23    consideration.  Seventy-five months is a tremendous

24    amount of my life, when I have a life worth working for.

25                Thank you, Your Honor.

1               THE COURT:  Mr. Knauss, anything further?

2               MR. KNAUSS:  No, Your Honor.  Thank you.

3               THE COURT:  I want to start by addressing

4    my comments to Jasmine on the phone.

5               Jasmine, this is Judge Weber.  Can you

6    hear me?

7               JASMINE JEWELL SHAFER:  Yes.

8               THE COURT:  Jasmine, I think that you --

9               JASMINE JEWELL SHAFER:  (Indiscernible.)

10              THE COURT:  Can you hear me?

11              JASMINE JEWELL SHAFER:  Yes.

12              THE COURT:  I believe strongly that you

13   were a very, very credible and very, very believable

14   young lady.  There's no doubt whatsoever in my mind that

15   you were sexually abused by Jorden Hollingsworth, as you

16   testified.  And I believe that you were incredibly brave

17   to come forward and tell your story.

18              I am going to impose the sentence of 75

19   months on Count Number 1 and the sentence of 75 months

20   on Count Number 2.  I appreciate the State's argument

21   that a portion of the sentence should run consecutive.

22   I'm going to decline to do that and Counts Number 1 and

23   2 will be concurrent, for a total of 75 months.

24              As required by Ballot Measure 11, that

25   will be without alternative incarceration programs.  It

1    will be with credit for time served, but with no good

2    time and no work time.  That will be followed by

3    post-prison supervision for a 36-month period of time.

4                    You are an 8-C on Count Number 1 and an

5    8-A on Count Number 2.

6                    This is the sentence that is required by

7    Ballot Measure 11.  But furthermore, given the conduct

8    in this case, given the abuse that was perpetrated on

9    this young girl, I do believe that it is an appropriate

10   sentence as well.  That is why I am imposing it today.

11                   You have the right to appeal this sentence

12   by filing a Notice of Appeal with the Court of Appeals

13   within 30 days of today's date.  Your appellate rights

14   notice is part of the court file.

15                   You will be required to register as a sex

16   offender.  I'm being provided with the registration

17   notice at this time.  The Court will receive that.

18                   Mr. Knauss, I assume your client has had

19   the opportunity to review and sign that document today.

20                   MR. KNAUSS:  He did, yes.

21                   THE COURT:  Anything further from the

22   State?

23                   MS. DUMONT:  No, Your Honor.  Thank you.

24                   MR. KNAUSS:  The form doesn't say who gets

25   what copies, but I want to make sure my client gets one

1    and that I get one.

2                    THE COURT:  Yes.  We will simply -- I'll

3    receive the original.  It comes with three copies.  The

4    State will be provided with a copy, the defense will be

5    provided with a copy.

6                    Mr. Knauss, do you need a file copy as

7    well?

8                    MR. KNAUSS:  I would.

9                    THE COURT:  We will provide Mr. Knauss

10   with the third copy.  Any additional copies that need to

11   be distributed will be made from the original signed

12   document and distributed as required.

13                   Anything further, Ms. Dumont?

14                   MS. DUMONT:  No, Your Honor.

15                   THE COURT:  Anything further, Mr. Knauss?

16                   MR. KNAUSS:  No, Your Honor.

17                   THE COURT:  All right.  That'll be all for

18   today.  Thank you.

19                   Good luck, sir.

20                   (Recess at 9:51 a.m.)

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3              I, Brenda Hollister, Court Transcriber for

4    the State of Oregon, do hereby certify that I

5    transcribed the digitally recorded proceedings had upon

6    the hearing of this cause, previously captioned herein;

7    that I reduced to typewriting the foregoing transcript;

8    and that the foregoing transcript, consisting of pages 1

9    through 599, both inclusive, constitutes a full, true,

10   and accurate record of the proceedings had upon the

11   hearing of said cause, and of the whole thereof.

12              WITNESS my hand as court transcriber this

13   1st day of February 2017.

14

15

16

17   _____

18   Brenda Hollister
     Court Transcriber
19   503-399-7934
     brenda.hollister@gmail.com

20

21

22

23

24

25
```

IN THE COURT OF APPEALS OF THE STATE OF OREGON

STATE OF OREGON,
Plaintiff-Respondent,

v.

JORDEN TIMOTHY HOLLINGSWORTH,
Defendant-Appellant.

Clackamas County Circuit Court
CR1501848

A163680

**CERTIFICATE OF PREPARATION AND SERVICE OF TRANSCRIPT**

I certify that I prepared all portions of the transcript directed to be transcribed in the above case of the proceedings held August 9, 2016, August 10, 2016, August 11, 2016, and October 24, 2016.

I certify that this certificate was filed electronically with the Appellate Court Administrator and the trial court administrator via the transcript coordinator of Clackamas County on February 1, 2017.

I certify that on February 1, 2017, a copy of the transcript prepared by me and a copy of this certificate were served electronically on:

| | |
|---|---|
| Emily P. Seltzer, #124513 | Benjamin Gutman, #160599 |
| Office of Public Defense Services | Solicitor General |
| 1175 Court Street NE | 1162 Court St NE |
| Salem, OR 97301 | Salem, OR 97301-4096 |
| Attorney for Defendant-Appellant | Attorney for Plaintiff-Respondent |
| transcripts@opds.state.or.us | e-transcripts@doj.state.or.us |

Dated February 1, 2017

*Brenda Hollister*

Brenda Hollister, Transcriber
503-399-7934
brenda.hollister@gmail.com

FILED
November 28, 2018 11:23 AM
Appellate Court Records

IN THE COURT OF APPEALS OF THE STATE OF OREGON

| | |
|---|---|
| STATE OF OREGON,<br><br>Plaintiff-Respondent,<br><br>v.<br><br>JORDEN TIMOTHY<br>HOLLINGSWORTH,<br><br>Defendant-Appellant. | Clackamas County Circuit Court<br>Case No. CR1501848 |

## NOTICE OF APPEAL

1.

Defendant hereby gives notice of appeal from the judgment entered in this case on November 1, 2016, by Judge Katherine E. Weber in the Clackamas County Circuit Court.

2.

The parties to this appeal are the State of Oregon (Respondent) and Jorden Timothy Hollingsworth (Appellant).

3.

The names, bar numbers, addresses, and telephone numbers of the attorneys for the parties are as follows:

Attorney for Appellant:
    Emily P. Seltzer OSB #124513
    Office of Public Defense Services
    1175 Court Street NE
    Salem, OR 97301-4030
    Emily.Seltzer@opds.state.or.us
    (503) 378-3349

Attorney for Respondent:
    Benjamin Gutman #160599
    Solicitor General
    1162 Court Street NE
    Salem, OR 97301-4096
    benjamin.gutman@doj.state.or.us
    (503) 378-4402

4.

Appellant designates the record in its entirety, including the trial court file, all exhibits offered and/or received into evidence, and the entire record of the oral proceedings listed below:

1. The trial proceedings beginning on or about August 9, 10 and 11, 2016.
2. The sentencing proceedings held on or about October 24, 2016.

Office of Public Defense Services • Appellate Division
1175 Court St. NE • Salem, Oregon 97301-4030
Telephone: (503) 378-3349 • Fax: (503) 378-2163

EXHIBIT 104, Page 1 of 6
Case No. 3:20-cv-01567-MC

5.

The record includes one or more audio or video recordings that were played in the trial court, and the record on appeal should include a transcription of those recordings. Oregon Rules of Appellate Procedure, Rule 3.33(4)(b). The dates of each hearing at which such a recording was played are as follows: the CARES tape played August 11, 2016.

6.

I hereby certify that I served the foregoing Notice of Appeal on November 28, 2016, by having a true copy delivered to Benjamin Gutman #160599, Solicitor General, 1162 Court Street NE, Salem, OR 97301-4096, and by mailing a true copy to each of the following:

Trial Court Administrator  
Clackamas County Courthouse  
807 Main Street  
Oregon City, OR 97045  

Transcript Coordinator  
Clackamas County Courthouse  
807 Main Street  
Oregon City, OR 97045

Clackamas County District Attorney  
807 Main St #7  
Oregon City, OR 97045  

Arthur B. Knauss  
Attorney at Law  
294 Warner Milne Rd.  
Oregon City, OR 97045-4044

7.

I certify that on November 28, 2016, I electronically filed the original of this notice of appeal with the Appellate Court Administrator.

DATED November 28, 2016.

Respectfully submitted,

ERNEST G. LANNET  
CHIEF DEFENDER  
CRIMINAL APPELLATE SECTION  
OFFICE OF PUBLIC DEFENSE SERVICES

*Signed*  
By Emily Seltzer at 10:18 am, Nov 28, 2016  

EMILY P. SELTZER OSB #124513  
DEPUTY PUBLIC DEFENDER  
Emily.Seltzer@opds.state.or.us

Attorneys for Defendant-Appellant  
Jorden Timothy Hollingsworth

Page 2 of 2 – NOTICE OF APPEAL

Office of Public Defense Services • Appellate Division  
1175 Court St. NE • Salem, Oregon 97301-4030  
Telephone: (503) 378-3349 • Fax: (503) 378-2163

EXHIBIT 104, Page 2 of 6  
Case No. 3:20-cv-01567-MC

# IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR THE COUNTY OF CLACKAMAS

| | | |
|---|---|---|
| State of Oregon, | ) | |
| Plaintiff | ) | |
| | ) | Case No.: CR1501848 |
| vs. | ) | |
| | ) | JUDGMENT |
| | ) | |
| JORDEN TIMOTHY HOLLINGSWORTH, | ) | Case File Date: 10/23/2015 |
| Defendant | ) | District Attorney File #: 005270149 |

## DEFENDANT

True Name: JORDEN TIMOTHY HOLLINGSWORTH

Date Of Birth: 08/01/1993                                State Identification No (SID): 19524416OR

Fingerprint Control No (FPN): 00000000

## HEARING

Proceeding Date: 10/24/2016

Judge: Katherine E Weber

Court Reporter: FTR, Courtroom 2

Defendant appeared in person and was in custody. The court determined that the defendant was indigent for purposes of court-appointed counsel, and the court appointed counsel for the defendant. The defendant was represented by Attorney(s) ARTHUR B KNAUSS, OSB Number 731700. Plaintiff appeared by and through Attorney(s) SARAH J DUMONT, OSB Number 035419.

## COUNT(S)

It is adjudged that the defendant has been convicted on the following count(s):

### Count 1 : Sexual Abuse in the First Degree

Count number 1, Sexual Abuse in the First Degree, 163.427, Felony Class B, committed on or about 02/13/2015. Conviction is based upon a Court Verdict of Guilty on 08/11/2016.

Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 1 is 8 and the Criminal History Classification (CHC) is B.

This sentence is pursuant to the following special factors:

- Sentence per ORS 137.700

*State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

Sentence Instructions

Defendant shall:
- Report as a sex offender under ORS 181.596, report with the Department of State Police, a city police department, a county sheriff's office or the supervising agency: (A) When supervision begins; (B) Within 10 days of a change in residence; (C) Once each year within 10 days of the probationer's date of birth; (D) Within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; and (E) Within 10 days of a change in work, vocation or attendance status at an institution of higher education.

Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 75 month(s). Defendant is remanded to the custody of the Clackamas Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The defendant is not eligible for earned time/good time credit. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

Post-Prison Supervision

The term of Post-Prison Supervision is 36 month(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

## Count 2 : Sexual Abuse in the First Degree

Count number 2, Sexual Abuse in the First Degree, 163.427, Felony Class B, committed on or about 08/24/2009. Conviction is based upon a Court Verdict of Guilty on 08/11/2016.

Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 2 is 8 and the Criminal History Classification (CHC) is A.

This sentence is pursuant to the following special factors:
- Sentence per ORS 137.700

EXHIBIT 104, Page 4 of 6
Case No. 3:20-cv-01567-MC

*State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

Sentence Instructions

Defendant shall:

- Report as a sex offender under ORS 181.596, report with the Department of State Police, a city police department, a county sheriff's office or the supervising agency:  (A) When supervision begins; (B) Within 10 days of a change in residence; (C) Once each year within 10 days of the probationer's date of birth; (D) Within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; and (E) Within 10 days of a change in work, vocation or attendance status at an institution of higher education.

Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 75 month(s). Defendant is remanded to the custody of the Clackamas Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The defendant is not eligible for earned time/good time credit. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

This sentence shall be concurrent with the following cases Count number 1.

Post-Prison Supervision

The term of Post-Prison Supervision is 36 month(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

If convicted of a felony or a crime involving domestic violence, you may lose the right to buy, sell, transport, receive, or possess a firearm, ammunition, or other weapons in both personal and professional endeavors pursuant to ORS 166.250, ORS 166.291, ORS 166.300, and/or 18 USC 922(g).

Payment Schedule

Payment of the fines, fees, assessments, and/or attorney's fees noted in this and any subsequent Money Award shall be
scheduled by the clerk of the court pursuant to ORS 161.675.

Payable to:

    Clackamas County Circuit Court
    807 Main St
    Oregon City, Oregon 97045
    P: 503.655.8447
    F: http://courts.oregon.gov/Clackamas

Dated the _____ day of _____ , 20 _____

Signed: 10/24/2016 02:39 PM

Signed: _____
    Katherine E Weber        **Circuit Court Judge Katherine E. Weber**

EXHIBIT 104, Page 6 of 6
Case No. 3:20-cv-01567-MC

FILED September 28, 2017 01:59 PM
Appellate Court Records

IN THE COURT OF APPEALS OF THE STATE OF OREGON

| | |
|---|---|
| STATE OF OREGON, | Clackamas County Circuit Court Case No. CR1501848 |
| Plaintiff-Respondent, | |
| v. | CA A163680 |
| JORDEN TIMOTHY HOLLINGSWORTH, | |
| Defendant-Appellant. | |

### APPELLANT'S MOTION – DISMISS - APPELLANT

Pursuant to ORAP 7.05 and 7.45, defendant-appellant moves the court for an order dismissing the appeal in the above-entitled case. The motion for dismissal is not the result of a negotiated settlement or compromise of the matter.

Opposing counsel has no objection to this motion.

_____          Date: 9/20/17
JORDEN TIMOTHY HOLLINGSWORTH
Defendant-Appellant

I certify that, upon receipt of the confirmation email stating that the document has been accepted by the eFiling system, this Motion will be eServed, pursuant to ORAP 16.45, on Benjamin Gutman #160599, Solicitor General, attorney for respondent.

DATED 20 day of Sept. , 2017.

Respectfully submitted,

ERNEST G. LANNET
CHIEF DEFENDER
CRIMINAL APPELLATE SECTION
OFFICE OF PUBLIC DEFENSE SERVICES

_____
EMILY P. SELTZER OSB #124513
DEPUTY PUBLIC DEFENDER
Emily.Seltzer@opds.state.or.us
Attorneys for Defendant-Appellant
Jorden Timothy Hollingsworth

IN THE COURT OF APPEALS OF THE STATE OF OREGON

STATE OF OREGON,
Plaintiff-Respondent,

v.

JORDEN TIMOTHY HOLLINGSWORTH,
Defendant-Appellant.

Clackamas County Circuit Court
CR1501848

A163680

**ORDER OF DISMISSAL AND APPELLATE JUDGMENT**

Appellant has moved to dismiss the above-entitled appeal. The motion is granted.

Appeal dismissed.

*James W. Nass*          10/02/2017
                          11:31 AM
        JAMES W. NASS
        APPELLATE COMMISSIONER

**DESIGNATION OF PREVAILING PARTY AND AWARD OF COSTS**

Prevailing party: Respondent                    [ X ] No costs allowed

Appellate Judgment Effective Date: October 2, 2017    COURT OF APPEALS

c:  Emily P Seltzer
    Benjamin Gutman
    Clackamas County Trial Court Administrator

km

**ORDER OF DISMISSAL AND APPELLATE JUDGMENT**

EXHIBIT 106, Page 1 of 1
Case No. 3:20-cv-01567-MC

RECEIVED
OCT 3 1 2017
DEPARTMENT OF JUSTICE
TRIAL DIVISION

Verified Correct Copy of Original 10/30/2017.

**IN THE CIRCUIT COURT OF THE STATE OF OREGON** Filed _Oct. 27, 2017_
TRIAL COURT ADMINISTRATOR
By _____

FOR THE COUNTY OF _Umatilla_

In the Matter of the Application of )
)
_Jorden Timothy Hollingsworth_ )
          Petitioner, )
)
      vs. )
)
_Troy Bowser / Two Rivers_ )
(Name of Custodian or Superintendent; )
State of Oregon if not imprisoned) )
)
_Superintendent_ )
(Title)         Defendant. )

_17CV47262_

Case No. _CR1501848_
(To Be Supplied by Court Clerk)

### PETITION FOR POST CONVICTION RELIEF
(ORS 138.510, et. seq.)

Comes now the above named Petitioner, and respectfully petitions this Court for post

conviction relief pursuant to ORS 138.510 - 138.680, and alleges as follows:

1.

Petitioner [X] is [ ] was imprisoned in the _Two Rivers Correctional_

_Institution, Umatilla, Umatilla Co., Oregon_
(Name of Institution, City, County and State)

unlawfully confined and restrained of liberty by the above named Defendent.

2.

Petitioner was imprisoned by virtue of a judgment of conviction and sentence imposed

by the _Clackamas_ County Circuit Court in the case of State of Oregon v. _Hollingsworth_

_____, Case Number _CR1501848_. The judgment was entered on

_August 11, 2016_. Sentence was imposed on _October 24_, _2016_.

The sentencing judge was _Katherine Weber_, and the judgment sentences Petitioner to the

Page 1- Petition for Post Conviction Relief

Verified Correct Copy of Original 10/30/2017.

legal and/or physical custody of the Department of Corrections or County Corrections for a
period not to exceed: (Number of years/months, minimum sentence(s), restitution, etc.)

75 months  with  36 months post-prison

Supervision.

_____

_____

3.

An appeal [X] was [ ] was not taken from said conviction and sentence. The (Oregon)
Court of Appeals or Supreme Court (circle one) entered the appellate judgment on ~~November~~ October 2nd,
~~2016~~ 2017, and the result was  Dismissed

_____

_____

A petition for review [ ] was [X] was not filed in the Oregon Supreme Court. The result of
the petition for review was _____

_____

and this occured on _____ , _____ . The attorney of record on the
appeal was  Emily P. Seltzer  OSB #124513 .

4.

Petition [ ] has [X] has not previously applied for post conviction relief pertaining to this
case. The result of the previous post conviction relief case was _____

_____

_____

Page 2- Petition for Post Conviction Relief

Verified Correct Copy of Original 10/30/2017.

5. Arthur   OSB #731700

Petitioner was represented by attorney ~~Arther~~ Knauss _____ at the trial level

proceedings. Said attorney was [ ] retained [X] appointed.

6.

At the present time, petitioner is financially unable to retain counsel.

7.

Petitioner was charged in the foregoing proceedings with the following offenses:

Sexual Abuse in the first degree (Count 1)

Sexual Abuse in the first degree (Count 2) .

Petitioner was convicted of the following offenses: _____

Sexual Abuse in the first degree (Both Counts)

following a [ ] jury trial [X] bench trial [ ] plea of guilty [ ] plea of no contest [ ] other.

(If other, explain) _____ .

8.

This Petition is being filed within two years of the date that the judgment was entered

(if no appeal was taken) or the date the appellate judgment was entered (if an appeal was taken).

(If outside the two-year limit, state why this Petition is nonetheless timely and should be heard.)

_____

9.

Petitioner believes that the conviction and imprisonment from the proceedings described

above was, and is, illegal. Petitioner was substantially denied his rights in violation of

ORS 138.530 as follows:

FIRST CLAIM FOR RELIEF: Inadequate assistance of

Counsel; ~~Trial~~ Trial Attorney made defendant have

Page 3-Petition for Post Conviction Relief

Verified Correct Copy of Original 10/30/2017

a bench trial; trial Attorney did not enter evidence to make the trial a fair trial for defendant; trial Attorney did not object to subjects he should have.

SECOND CLAIM FOR RELIEF: New Evidence; A women that dated the girls dad came forward saying the dad told her it was all made up.

(State additional claims if appropriate)

Lack of Evidence; There was not enough evidence entered about the drug the girl was taking. This was a key factor in the innocence of the case that did not get explained by the trial Attorney. The girl was an admitted liar on the stand and her story was contradicting.

Page 4-Petition For Post Conviction Relief

Verified Correct Copy of Original 10/30/2017.

WHEREFORE, Petitioner respectfully asks this Court for an order reversing said conviction(s) and sentence(s), expunging the records of Petitioner's arrest and conviction, releasing Petitioner from the custody of the Defendant, and for such further relief as this Court deems just and proper.

Dated: __October 23ʳᵈ__, 20_17_.

Respectfully submitted.

_____
(Sign Full Name)

Two Rivers Correctional Institution
82911 Beach Access Rd.
Umatilla, OR 97882
SID # 19524416
(Address)

**VERIFICATION**

OF OREGON                    )
                             ) SS.
County Of _Umatilla_         )

I, the Petitioner in the foregoing Petition For Post Conviction Relief, state under oath, that I have read and know the content of the Petition, and I declare or verify under penalty of perjury that the facts set forth are true and correct to the best of my knowledge and belief and that all of the documents and exhibits included in, or attached to, the Petition are authentic to the best of my knowledge and belief.

_____
(Signature of Petitioner)

SUBSCRIBED and sworn to before me this _15ᵗʰ_ day of __October__, 20_17_.

_____
Notary Public for Oregon
My Commission Expires: ___9/17/2019___

Page 5- Petition For Post Conviction Relief



OFFICIAL STAMP
RONDA SUZANNE SHAFFER
NOTARY PUBLIC-OREGON
COMMISSION NO. 942672
MY COMMISSION EXPIRES SEPTEMBER 17, 2019

RECEIVED

AUG 3 1 2018

DEPARTMENT OF JUSTICE
TRIAL DIVISION

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF UMATILLA

| | | |
|---|---|---|
| JORDEN HOLLINGSWORTH, | ) | No. 17CV47262 |
| | ) | |
| Plaintiff, | ) | **PETITIONER'S FIRST AMENDED** |
| | ) | **PETITION** |
| vs. | ) | |
| | ) | |
| TROY BOWSER, Superintendent, | ) | |
| | ) | |
| Two Rivers Correctional Institution, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the Petitioner, by and through his attorney, Jonathan Clark, and alleges:

1.

Troy Bowser was the duly appointed, acting superintendent of the Two Rivers Correctional Institution, City of Umatilla, Oregon, at the time of filing the original petition herein, and was thereby in custody and control of Petitioner. Defendant Troy Bowser continues to act in that capacity, and Petitioner continues to reside in that facility.

2.

Petitioner's imprisonment is by virtue of a judgment and sentence imposed on October 24, 2016, by Clackamas County Circuit Court Judge Katherine E. Weber in *State of Oregon v. Jorden Timothy Hollingsworth,* Clackamas County Circuit Court Case No. CR1501848.

3.

Petitioner was charged by Secret Indictment in *State of Oregon v. Jorden Timothy*

Page 1,
PETITIONER'S FIRST AMENDED
PETITION

1  *Hollingsworth,* Clackamas County Circuit Court Case No. CR1501848. He entered pleas of Not

2  Guilty to all charges.  The charges, and the resolution of each, are as follows:

3                              <u>CR1501848</u>

| Charge | Disposition | Sentence |
|--------|-------------|----------|
| <u>Count 1</u><br>Sexual Abuse in the First Degree<br>ORS 163.427<br>(Felony Class B)<br>Ballot Measure 11 | Convicted | 75 months in the Department of Corrections, and 36 months Post-Prison Supervision. |
| <u>Count 2</u><br>Sexual Abuse in the First Degree<br>ORS 163.427<br>(Felony Class B)<br>Ballot Measure 11 | Convicted | 75 months in the Department of Corrections concurrent with Count 1, and 36 months Post-Prison Supervision. |

                                     4.

12       Petitioner was appointed Arthur Knauss as counsel (OSB# 731700, 294 Warner Milne Rd,

13  Oregon City, Oregon 97045).   Arthur Knauss represented Petitioner through trial in the original

14  trial court proceedings.

                                     5.

16       Petitioner pursued an appeal from his criminal convictions in Oregon Court of Appeals Case

17  but his appeal was dismissed October 2, 2017.

                                     6.

19       No prior post-conviction proceedings have been undertaken by Petitioner with respect to the

20  above-referenced conviction. Petitioner's petition for post-conviction relief was filed within the

21  two-year limitations period set forth at ORS 138.510.

22  ////

Page 2,
PETITIONER'S FIRST AMENDED
PETITION

**CLAIMS FOR RELIEF**
(Ineffective Assistance of Counsel)
7.

Petitioner incorporates paragraphs 1 through 7 as if fully set forth herein. Petitioner's imprisonment and restraint, to the best of his knowledge and belief, are unlawful under ORS 138.530 because:

    a.  Petitioner's right to effective and adequate assistance of trial counsel under Article 1 § 11 of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution were violated as further alleged below.

    b.  On each of the following claims, Petitioner alleges that trial counsel's acts and omissions were not the product of an acceptable tactical decision and counsel's performance fell below an objective standard of reasonableness for defense counsel in similar felony criminal proceedings under the then-prevailing professional norms.

    c.  Whether considered cumulatively or individually, the numerous deficiencies in trial counsel's performance are sufficiently significant to undermine confidence in the outcome of Petitioner's trial and sentence. The unreasonable failures by trial counsel eviscerated Petitioner's constitutional rights to a jury trial, confrontation, effective assistance of counsel, and right against self-incrimination, all under Article 1 § 11 of the Oregon Constitution, Article 1 § 12 of the Oregon Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

    d.  There is a reasonable probability that, absent the errors of trial counsel, the result of conviction or sentence would have been different. Any confidence in petitioner's conviction and sentence has been undermined as a result of trial counsel's deficient performance.

////

////

Page 3,
PETITIONER'S FIRST AMENDED
PETITION

1    e.   Trial counsel provided ineffective and inadequate assistance of counsel in the following

2         particulars:

3         I.    Trial Counsel placed Petitioner into a state of duress in order to obtain a

4               waiver of jury.  Trial Counsel demanded the jury waiver the morning of trial,

5               close in time to the beginning of trial, asserting that the jury was needed for

6               another trial and that he (petitioner) did not want a jury.  This contradicted

7               Petitioner's desire and intention, but his will was overcome by the position

8               and influence of Trial Counsel.  Furthermore, Petitioner did not have ample

9               time to consider this tactical decision or discuss its implications with Trial

               Counsel.

10        II.   Trial Counsel failed to call witnesses who could, and were prepared to,

11              provide positive character evidence.  Trial Counsel had in his file

12              investigative reports indicating that four persons who knew Petitioner

13              personally would testify that according to their opinion and according to

14              Petitioner's reputation, Petitioner was good with children, safe for children,

15              and trustworthy for the care of children.  These witnesses are Cyndi

16              Knowles, Courtney Polk, David Mills, and Kipley Edwards.

         III.  One expert informed Trial Counsel that the case file indicates some reports

17              that the child victim had been overdosed with Dexedrine.  The expert then

18              opined, "Withdrawal and rebound effects such as extreme sleepiness and

19              impaired reality testing can occur during recovery from Dexedrine

20              overdoses."   Trial Counsel failed to provide testimony at trial indicating the

21              impact of medication on sleepiness and perception of reality.

22   / / / /

Page 4,
PETITIONER'S FIRST AMENDED
PETITION

8.

All assertions of ineffective and inadequate assistance of counsel are supported by Exhibit 1, the Trial Court File, Exhibit 2, the Trial Transcript, Exhibit 3, Petitioner's Declaration, Exhibit 4, Declaration of Counsel, as well as the foregoing paragraphs, and any evidence developed during the course of litigation of this matter.

All Exhibits will be filed separately on a CD and served contemporaneously on defense counsel.

DATED this 27th day of August, 2018.

/s/ Jonathan Clark
Jonathan Clark, OSB No. 022740
Attorney for Petitioner

Page 5,
PETITIONER'S FIRST AMENDED
PETITION

**CERTIFICATE OF SERVICE**

1

2

3     By signature below, I certify that I served, or caused to be served, the foregoing
document, **PETITIONER'S FIRST AMENDED PETITION,** on the person identified below
on the date indicated below, by

4

5     ___x___ US Mail

6     _____ Facsimile

7     _____ Hand Delivery

8     _____ Email Attachment

9

10    Department of Justice
      Trial Division
11    1162 Court Street NE
      Salem, OR 97301
12

13

14    DATED this 27th day of August, 2018.

15                                    JONATHAN A. CLARK, P.C.

16
                                      /s/ Jonathan Clark
17                                    Jonathan Clark, OSB No. 022740
                                      Attorney for Petitioner
18

19

20

21

22


CERTIFICATE OF SERVICE



**Jonathan Clark**
**Jonathan A. Clark, P.C.**
**317 Court Street NE**
**Salem, Oregon 97301**
**(503) 581-1229**

August 27, 2018

Department of Justice
Trial Division
1162 Court Street NE
Salem, OR 97301

RE:    *Jorden Hollingsworth v. Troy Bowser, Superintendent, TRCI*
       Umatilla County Case No. 17CV47262

Dear Mr. Marshall:

Enclosed please find Petitioner's First Amended Petition in the above-captioned matter.

Thank you.

Sincerely,

Alyssa Nachand
Legal Assistant to Jonathan Clark

JAC:amn
Enclosure

STATE OF OREGON
CLACKAMAS COUNTY COURTS
FILED

15 DEC 14 PM 4:51

CLACKAMAS COUNTY COURT
Filed/Entered
DOCKETED BY

DEC 16 2015

BY: AEM

Verified Correct Copy of Original 12/17/2015

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

| STATE OF OREGON, | ) | Case No. CR1501848 |
|---|---|---|
| Plaintiff, | ) | |
| | ) | NOTICE OF INTENT TO OFFER |
| -vs- | ) | STATEMENT MADE BY A CHILD |
| | ) | VICTIM PURSUANT TO OEC |
| JORDEN TIMOTHY HOLLINGSWORTH, | ) | 803(18a)(b) |
| Defendant. | ) | |
| | ) | DA No. 005270149 |

COMES NOW the State of Oregon by and through a duly appointed Deputy District

Attorney and, pursuant to OEC 803(18a)(b), notifies the Court and the defendant of the State's

intention to offer at trial herein, hearsay statements of Jasmine Jewell-Shafer, a child victim,

which statements concern an act or acts of abuse, as defined in ORS 419B.005, or sexual conduct

performed with or on the child by the defendant. The particulars of said statements are set forth

in the discovery previously furnished to defendant, and include, but are not limited to, the

victim's statement to:

1. Trisha Miller.  Jasmine told Trisha that Jasmine woke up during the night with

    Jorden's hand under her shirt feeling her chest.  Defendant asked to touch her and

    Jasmine told him no.  Defendant offered Jasmine $20 to touch her.  Defendant

    asked her not to tell anyone and offered her money.  Defendant told Jasmine that

    he would take her to the movies and babysit her and let her do anything.  Jasmine

    said that defendant was touching her on her chest.

2. Kenneth Jewell.  Jasmine told him that she really needed to talk to him.  Jasmine

    said that Jorden touched her last night.  Jasmine said that Jorden put his hand

    under her shirt and was playing with her chest.  Jasmine told defendant to stop



Page 1 of 4 — NOTICE OF INTENT TO OFFER STATEMENT MADE BY A CHILD VICTIM / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 / CR1501848

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone: (503) 655-8431  Fax  (503) 650-8943

EXHIBIT 108, Page 8 of 124
Case No. 3:20-cv-01567-MC
Def. Exh.
Page 1 of 99

and he did. Jasmine said that Jorden offered her money. Defendant told Jasmine that she should not tell anyone. Jasmine told him that after Jorden touched her he ducked down behind the couch and pretended to be sleeping. Jasmine told him that Jorden kept asking her to touch him and she told him no and then he asked her if he could take the trash out.

3.  Gaberielle Peterson and Amanda McVay (Children's Center). Jasmine said Jorden touched her right here – pointing to her chest area. Jasmine said Jorden went under her shirt, she woke up and said, "What" and then Jorden ducked down in Kaeli's play area. Jasmine said the gasp she heard sounded like Jorden and she knows it wasn't her dad because he was upstairs and Jorden was by the couch. Jasmine said Jorden touched her while she was sleeping on the couch at Trisha's house. She was dreaming when she felt someone touch her right there -- placing her hand on the side of her chest. Jasmine said Jorden touched her boob with his finger which he moved from side to side. Jasmine described the feeling as weird. Jasmine demonstrated how Jorden's finger moved by sweeping her right index finger back and forth across her chest. Jasmine said Jorden touched her under her bra and only touched one of her boobs. Jasmine said she knows Jorden was the person who touched her because he asked her not to tell anyone. Jasmine said when she heard someone gasp she looked over the couch and saw Jorden acting like he was sleeping. Jasmine said Jorden asked if he could touch her. She told him no. Jasmine said that Jorden asked to take out the garbage and then repeatedly asked Jasmine if he could touch her. Jasmine asked Jorden if he was talking in his sleep and she told him he touched her. She said Jorden told her he does weird stuff in his sleep and she told him she knew he wasn't sleeping.

Page 2 of 4 — NOTICE OF INTENT TO OFFER STATEMENT MADE BY A CHILD VICTIM / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 / CRI501848

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone (503) 655-8431 Fax (503) 650-8943

Verified Correct Copy of Original 12/17/2015

Jasmine said that later Jorden offered her twenty dollars and to take her to the new

Sponge Bob movie if she didn't tell anybody he touched her.  Jasmine said she

couldn't go back to sleep because she was scared.  She told Jorden he couldn't do

that to a kid and that he was an adult.  Jasmine said Jorden asked her over and

over not to tell anyone what he did so she lied to him and said she wouldn't tell.

She said Jorden thanked her and gave her a hug and while hugging her she could

smell alcohol on his breath.  Jasmine said that when she was living at a different

8       apartment Jorden took his crotch out of his plants and reached into her pants.

9       Jasmine said Jorden reached under her underwear and touched the skin of her

10      vagina with his hand before she jumped and pulled his hand out.  Jasmine said

11      Jorden just let his crotch hang out which was sticking up a little and he didn't say

12      anything to her.  Jasmine said everyone else was sleeping when this happened and

13      she felt trapped because she was at the dead end of the kitchen.  Jasmine said she

14      was scared and didn't say anything to Jorden.  She said when Jorden pulled his

15      hand out of her pants he went to the living room and she went to her room until

16      her parents got up.  Jasmine said the kitchen incident occurred when she was in

17      kindergarten and it was during the school year.  Jasmine said that at that time she

18      had a friend named Cody who lived next door to her at this apartment.  Jasmine

19      said she never told anyone about this happening because Jorden has been to jail

20      before and she is scared of him.  Jasmine said she has been having nightmare of

21      Jorden raping her because he knows where she lives and he could make it past the

22      door.  Jasmine said she told her dad and Trisha about Jorden touched her on the

23      couch because it was the second time Jorden had touched her.  Jasmine said she

24      used to feel safe with Jorden because he was a good cousin.  Now Jasmine feels

25

Page 3 of 4 — NOTICE OF INTENT TO OFFER STATEMENT MADE BY A CHILD VICTIM / JORDEN TIMOTHY
HOLLINGSWORTH / 005270149 / CRI501848
Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR  97045
Phone: (503) 655-8431  Fax: (503) 650-8943

EXHIBIT 108, Page 10 of 124
Case No. 3:20-cv-01567-MC
Page 3 of 99

Pam Gathwright
205 SW 2nd St. #89
Estacada, OR 97023



**CERTIFIED MAIL**

7015 0640 0000 6503 7358

Clackamas Co. Courthouse
Susan Norby
807 Main St, Room 200
Oregon City, OR 97045

97045184829

Pet. Exh. 1
Page 4 of 99

Verified Correct Copy of Original 12/17/2015

Verified Correct Copy of Original 12/17/2015.

# CERTIFICATE OF SERVICE

Defendant Name: JORDEN TIMOTHY HOLLINGSWORTH          DA No:      005270149
                                                      Court No:   CR1501848

**CIDC Mailing**

    I hereby certify that I served the forgoing NOTICE OF INTENT TO OFFER STATEMENT MADE BY A CHILD VICTIM PURSUANT TO OEC 803(18a)(b) on Arthur Knauss, attorney of record for defendant JORDEN TIMOTHY HOLLINGSWORTH, on the date listed below, by depositing in the attorney's mail slot in the Clackamas County Courthouse in Oregon City, Oregon, on said day a true copy thereof, certified by me as such and addressed to said attorney.

DATED at Oregon City, Oregon, December 14, 2015.

JOHN S. FOOTE
District Attorney

By _____
Sarah J. Dumont, OSB #035419
SarahDum@co.clackamas.or.us
Deputy District Attorney

Page 1 of 1 — CERTIFICATE OF SERVICE / JORDEN TIMOTHY HOLLINGSWORTH /
005270149 / CR1501848
Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone (503) 655-8431 Fax. (503) 650-8943

EXHIBIT 108, Page 12 of 124
Case No. 3:20-cv-01567-MC
Def. Exh. 0
Page 5 of 99

Verified Correct Copy of Original 1/7/2016

STATE OF OREGON
CLACKAMAS COUNTY CIRCUIT COURTS
FILED

16 JAN -5 AM 3:00
ENTERED

ENTERED BY 2016
DOCKETED JAN 0 5 2016
By:HRM

DEFENDANT'S ATTORNEY: ARTHUR B. KNAUSS
DISTRICT ATTORNEY: SARAH DUMONT
PRIOR SETTINGS: 0

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

| | | |
|---|---|---|
| STATE OF OREGON, | ) | CASE NO: CR 15-01848 |
| Plaintiff. | ) | |
| | ) | MOTION TO CONTINUE |
| vs. | ) | TRIAL DATE |
| | ) | |
| JORDEN TIMOTHY HOLLINGSWORTH, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW, Defendant, by and through his attorney, Arthur B. Knauss,

and moves the Court for an Order postponing the trial date of January 12, 2016, in

the above entitled matter.

In support of his Motion, Defendant relies upon the Declaration of counsel,

which is filed contemporaneously with this Motion, and incorporated herein by this

reference. Opposing counsel, Sarah Dumont, takes no position as to this request.

DATED this ____5____ day of ___January___, 2016.

_____
ARTHUR B. KNAUSS    OSB#731700
Attorney for Defendant

Page    1. MOTION TO CONTINUE

ARTHUR B. KNAUSS
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon  97045
Office: 503-659-5337 Fax: 503-650-0367
Email: art@abknaussatty.com

CR1501848
MOCO
Motion — Continuance
4070167

EXHIBIT
Case No. 3:20-cv-01567-MC
Page 6 of 99

Verified Correct Copy of Original 1/7/2016

DEFENDANT'S ATTORNEY: ARTHUR B. KNAUSS
DISTRICT ATTORNEY: SARAH DUMONT
PRIOR SETTINGS: 0

STATE OF OREGON
CLACKAMAS COUNTY COURTS
FILED

16 JAN -5 AM 9: 00
ENTERED JAN 0 5 2016
DOCKETED JAN 0 5 2016
By: HAW

## IN THE CIRCUIT COURT OF THE STATE OF OREGON

## FOR THE COUNTY OF CLACKAMAS

| STATE OF OREGON, | ) | CASE NO:  CR 15-01848 |
|---|---|---|
| Plaintiff. | ) | |
| vs. | ) | DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY |
| JORDEN TIMOTHY HOLLINGSWORTH, | ) | |
| Defendant. | ) | |

I, Arthur B. Knauss, state as follows:

1.    I am the court-attorney for the defendant, in the above-captioned matter.

2.    Deputy District Attorney, Sarah Dumont, takes no position with regard to this request to set over the trial date in this case.  The trial is currently set for January 12, 2016.

3.    Defendant is charged with two counts of Sexual Abuse In The First Degree (alleged to have occurred on February 13, 2015, and an incident between 2009 and 2012).

4.    Defendant is in custody.   This is the first request for a continuance of this matter.

Page    1.  DECLARATION

ARTHUR B. KNAUSS
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon  97045
Office: 503-659-5337 Fax: 503-650-0367
Email:  art@abknaussatty.com



CR1601848
DD
Declaration
4070235
EXHIBIT ... 24
Case ... MC
Page ... 99

Verified Correct Copy of Original 1/7/2016

5.    I respectfully request a continuance for the following reasons:

a.    I was appointed on November 17, 2015. This case involves two separate charges alleged to have occurred when the alleged victim was in kindergarten, and the other incident in February of 2015. There are several family member witnesses that have been interviewed, but I will need further time to prepare for trial.

b.    This case involves a so-called "late disclosure" adding a layer of complexity to the case.

c.    I have been diligently attempting to obtain mitigating materials to present to the Ballot Measure 11 committee, but need further time to prepare those documents.

d.    So far this case is likely to go to trial. Both attorneys are prepared to try this case in late April 2016. I have checked with docketing and there is room for a three-day jury trial the late week of April 2016 (starting April 26, 2016). Deputy District Attorney, Sarah Dumont, is checking with her witnesses to make sure they are available for that time period. Defendant will likely be bailed out in early February 2016, as his family is attempting to come up with the bail money. It would be much easier to prepare defendant for his trial if he is out of custody at the time of trial. Defendant faces a potential sentence of 150 months were he to be convicted of both counts.

The defense requests to continue the trial of this case to be fully prepared for trial.

2.  DECLARATION

ARTHUR B. KNAUSS
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon 97045
Office: 503-659-5337 Fax: 503-650-0367
Email: art@abknaussatty.com

Verified Correct Copy of Original 1/7/2016.

6.    Defendant has signed a Waiver of Right to Speedy Trial, a copy of which is attached to this motion.

I hereby declare that the above statements are true to the best of my knowledge and belief, and that I understand they are made for use as evidence in court and are subject to penalty for perjury.

DATED this __5__ day of __January__ 2016.

_____
ARTHUR B. KNAUSS    OSB#731700
Attorney for Defendant

3.    DECLARATION

Arthur B. Knauss
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon  97045
Office: 503-659-5337 Fax: 503-650-0367
Email:  art@abknaussatty.com

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

STATE OF OREGON,

      Plaintiff,

      vs.

Jorden Timothy Hollingsworth

      Defendant.

Case No.: CR  1501848

WAIVER OF RIGHT TO SPEEDY TRIAL

    I understand that I have the right to a speedy trial guaranteed to me under the United States Constitution, the Oregon Constitution and the Oregon Revised Statutes. After consulting with my attorney I agree to postpone my trial until the date written below, and agree that there are good reasons to postpone the trial. I understand that by postponing the trial there is the possibility that my ability to defend myself could be impaired for many reasons, including the possibility that witnesses and evidence may become unavailable and that witness' memories may  fade with the passage of time. I nevertheless agree that a postponement of my trial is reasonable. I have signed this document freely and voluntarily.

    DATED this __5__ day of __January__, 20_16_.

Jorden Hollingsworth
Defendant

Defense Attorney

_____
New trial date

Rev. 01.05 13

WAIVER OF RIGHT TO SPEEDY TRIAL - 1

EXHIBIT ___1___
PAGE ___1 of 1___

Verified Correct Copy of Original 1/7/2016

## CERTIFICATE - TRUE COPY

     I hereby certify that the foregoing copy of  MOTION TO CONTINUE AND ORDER and DECLARATION is a complete and exact copies of the original.
     DATED this _____ day of _____ 2016.

_____
**ARTHUR B. KNAUSS**

### ACCEPTANCE OF SERVICE
     Due service of the within _____ is hereby accepted on _____, 2016, by receiving a true copy thereof.

_____
Attorney for _____

### CERTIFICATES OF SERVICE
**Personal**
     I certify that on the _____ day of _____ 2016, I served the within MOTION AND ORDER TO CONTINUE and DECLARATION on Sarah Dumont, Deputy District Attorney, for plaintiff  by personally handing to said Deputy District Attorney, a certified true copy thereof.

_____
Arthur B. Knauss, Attorney for Defendant

**At Office**
     I certify that on the _5_ day of _Jan_ 2016, I served the within MOTION AND ORDER TO CONTINUE and DECLARATION on Sarah Dumont, Deputy District Attorney, for Plaintiff, by leaving a true copy thereof at said attorney's office with said clerk therein, or with a person apparently in charge thereof, at Oregon City, Oregon.

_____
Arthur B. Knauss, Attorney for Defendant

**Mailing**
     I hereby certify that I served the foregoing Motion and Order To Continue and Declaration, on _____, Deputy District Attorney, this date, by mailing to said attorney a true copy thereof, certified by me as such, addressed to said attorney at said attorney's last known address, to-wit: 807 Main Street, Oregon City, Oregon 97045,  and deposited in the mail in Oregon City, Oregon.
     DATED this ____ day of _____ 2016.

_____
**ARTHUR B. KNAUSS**

ARTHUR B. KNAUSS
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon  97045
Office:  (503) 659-5337 Fax:  (503) 650-0367
Email: art@abknaussatty.com

1.  **CERTIFICATE OF MAILING**

Verified Correct Copy of Original 1/7/2016.

STATE OF OREGON
CLACKAMAS COUNTY COURTS
FILED

16 JAN -5 AM 3:00

JAN 05 2016
DOCKETED
BY: HHM

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

STATE OF OREGON,                    )
                                    )
            Plaintiff,              )   Case No.: CR 1501848
                                    )
        vs.                         )   WAIVER OF RIGHT TO SPEEDY TRIAL
                                    )
Jorden Timothy Hollingsworth        )
                                    )
            Defendant.              )

        I understand that I have the right to a speedy trial guaranteed to me under the

United States Constitution, the Oregon Constitution and the Oregon Revised Statutes.

After consulting with my attorney I agree to postpone my trial until the date written

below, and agree that there are good reasons to postpone the trial. I understand that

by postponing the trial there is the possibility that my ability to defend myself could be

impaired for many reasons, including the possibility that witnesses and evidence may

become unavailable and that witness' memories may fade with the passage of time. I

nevertheless agree that a postponement of my trial is reasonable. I have signed this

document freely and voluntarily.

        DATED this ___5___ day of ___January___, 20_16_.


___Jorden Hollingsworth___              ___[signature]___
Defendant                               Defense Attorney


_____
        New trial date

Rev. 01.05 13                                   CR1501848
                WAIVER OF RIGHT TO SPEEDY TRIAL - 1    WV
                                                Waiver
                                                4070240


Page 19 of 124
Case No. 3:20-cv-01567-MC
Page 12 of 99

CLACKAMAS COUNTY COURT
Filed/Entered

NOV 24 2015

By: _____ AJP

In the Circuit Court of the State of Oregon for the County of Clackamas
ARRAIGNMENT ORDER AND ORDER TO CONTINUE

On, November 24, 2015 at 3:00 PM the below-numbered cases came before the undersigned Judge, State of Oregon, appearing by a duly appointed Deputy District Attorney, the below-named defendant appearing in person with his attorney, so indicated below, and it appearing to the Court that an accusatory instrument has been filed charging the defendant with the crimes stated below: At this time those defendants as indicated below were duly arraigned with said instrument in open Court and by receiving a true copy of same, and the Court being fully advised; At this time it is ordered that changes to defendants' release status/security amount be made only to those defendants as indicated below:

Judge: VAN DYK    Reporter: FTR    Clerk: AJP

District Attorney for Arraignment Only: REGAN

Attorney for Arraignment only: _____

| FILE NO. | DEFENDANT | ORIG CHARGE | HRG TYPE | DISTRICT ATTORNEY | ATTORNEY | SECURITY STATUS | HOLDS/CAME FROM | NEXT APPEARANCE: DATE/TIME/REASON |
|---|---|---|---|---|---|---|---|---|
| 1848 | HOLLINGSWORTH: JORDEN TIMOTHY | SEX ABUSE I | BAIL REDUCTION | BJB | KNAUSS | $50K | NO HOLD / STREET | BAIL IS REDUCED TO $50K |
| | ☐ Rel Cond ☐ No Alcohol/Drugs ☐ No Firearms/Weap ☐ No DWS/INS ☐ Wkly Contact Atty ☐ No Contact Victim ☐ No Contact Other ☐ No Matrix/EHD/BI or Early Release ☐ Info Dismissed/Indict Filed | | | | | | | | |
| 15-2007 | STOWELL: MICHAEL LEROY | PCS HEROIN | RELEASE | WKS | KNAUSS | $10K | NO HOLD / STREET | BAIL IS REDUCED TO $10K |
| | ☐ Rel Cond ☐ No Alcohol/Drugs ☐ No Firearms/Weap ☐ No DWS/INS ☐ Wkly Contact Atty ☐ No Contact Victim ☐ No Contact Other ☐ No Matrix/EHD/BI or Early Release ☐ Info Dismissed/Indict Filed | | | | | | | | |
| 15-13284 | BARKER: DUWANE ROY | CONTEMPT | ARR | RCC | | $25K | PAROLE HOLD / STREET | CMA 12-15-15 10AM<br>CNTMP HG 12-18-15 1:30 |
| | ☐ Rel Cond ☐ No Alcohol/Drugs ☐ No Firearms/Weap ☐ No DWS/INS ☐ Wkly Contact Atty ☐ No Contact Victim ☐ No Contact Other ☐ No Matrix/EHD/BI or Early Release ☐ Info Dismissed/Indict Filed | | | | | | | | |
| 15-13094 | LEMAY: SERGE MICHEL | DWS | BW ARR | GHH | RECOG | | NO HOLD / TURN IN | CMA 1-6-16 10AM |
| | ☐ Rel Cond ☐ No Alcohol/Drugs ☐ No Firearms/Weap ☐ No DWS/INS ☐ Wkly Contact Atty ☐ No Contact Victim ☐ No Contact Other ☐ No Matrix/EHD/BI or Early Release ☐ Info Dismissed/Indict Filed | | | | | | | | |

IT IS SO ORDERED, that the case(s) be continued as indicated above.

JUDGE: _____    Verified Correct Copy in Original 11/24/2015

Date: NOV 24, 2015

CR1501848
HG
Hearing
4101166

EXHIBIT 108, Page 20 of 124
Case No.: 3:20-cv-01567-MC
Page 13 of 99

FILED/ENTERED
NOV 16 2015
BY: LLM

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF CLACKAMAS

STATE OF OREGON,                      )    CASE NO: CR 15-1848
                    Plaintiff,        )
                                      )    RECOMMENDATION AND ORDER
        vs.                           )    ☐ APPOINTING COUNSEL (ORAC)
                                      )    ☐ DENYING COUNSEL (ORDY)
Jorden Hollingsworth                  )         AND
                                      )    ☒ LIMITED JUDGMENT (JGLN)
                    Defendant.        )    ☐ SUPPLEMENTAL JUDGMENT (JGSK)

Based on the Affidavit of Eligibility and Request for Court-Appointed Counsel, the applicant is found to be:
        ☐ FINANCIALLY ELIGIBLE for court-appointed counsel
        ☒ NOT FINANCIALLY ELIGIBLE for court-appointed counsel

Pursuant to ORS 137.071, the court finds the applicant was determined to be:
        ☒ FINANCIALLY ELIGIBLE for court-appointed counsel
        ☐ NOT FINANCIALLY ELIGIBLE for court-appointed counsel

The court ORDERS the applicant/defendant's request for appointed counsel is:
        ☐ APPROVED
        ☐ DENIED

The court ORDERS the $20 APPLICATION FEE be:
        ☐ WAIVED
        ☒ ORDERED in the amount shown.

The court ORDERS the CONTRIBUTION AMOUNT be:
        ☐ WAIVED
        ☒ ORDERED in the amount of: $    413

Verifiers Initials: LLm
Date: 11-16-15

CR1601848
ORAC
Order – Appointing Counsel
4101159

This Judgment is entered solely to resolve the issues under ORS 151.487 regarding the payment of an application fee and a contribution amount in connection with the defendant's request for court-appointed counsel. It does not dispose of any charges or other issues in the case. This Judgment is subject to review by the trial-level court at any time as provided in ORS 151.487(5).

Civil collection efforts may be taken if you fail to make the payments as ordered. This may include referral to the Department of Revenue and a private collection agency.

Pursuant to ORS 151.487, the defendant is hereby ordered to pay the following monetary amounts.

MONEY AWARD

Judgment Creditor:    State of Oregon        Judgment Debtor: Above named Defendant or _____

    Application Fee (IDAA):                   $    20
    Contribution Amount (IDCC):               $    413
    Total Amount of Money Award:              $    433

FILED/ENTERED
NOV 18 2015
BY: LLM

Payment Schedule:    Payment of the amounts stated in this Money Award shall be made as follows:
☒ Amount ordered shall be paid in full immediately.
☐ Payment shall be made in monthly payments of $ _____ beginning on _____ and each month thereafter until paid in full.

Payable to: STATE OF OREGON, 807 Main Street, Room 104 Accounting, Oregon City, OR 97045

ORS 1.202 authorizes additional costs to be added to this Money Award without further notice or order of the court if your account is assigned for collection or requires payments to be scheduled.

11-16-15                                     _____ /LLm
Date                                         Circuit Court Judge

IDEF 211 – Recommendation and Order and Limited/Supplemental Judgment (2/10)

CLACKAMAS COUNTY COURT
_Verified Correct/Filed/Entered original 1/11/2016._

**Filed/Entered**

**NOV 16 2015**

In the Circuit Court of the State of Oregon for the County of Clackamas
ARRAIGNMENT ORDER AND ORDER TO CONTINUE

On,    November 16, 2015   at 3:00 PM the below-numbered cases came before the undersigned Judge, State of Oregon, appearing by a duly appointed Deputy District Attorney, the below-named defendant appearing in person with his attorney, so indicated below, and it appearing to the Court that an accusatory instrument has been filed charging the defendant with the crimes stated below: At this time those defendants as indicated below were duly arraigned with said instrument in open Court and by receiving a true copy of same, and the Court being fully advised; At this time it is ordered that changes to defendants' release status/security amount be made only to those defendants as indicated below:

Judge: HERNDON    Reporter: FTR    Clerk: AEM    District Attorney for Arraignment Only: AMOS    Attorney for Arraignment only: Beloof

| FILE NO. | DEFENDANT | ORIG CHARGE | HRG TYPE | DISTRICT ATTORNEY | ATTORNEY | SECURITY STATUS | HOLDS/CAME FROM | NEXT APPEARANCE: DATE/TIME/REASON |
|---|---|---|---|---|---|---|---|---|
| ✓ 15-1848 | HOLLINGSWORTH: JORDEN TIMOTHY | SEX ABUSE I | AW ARR | BJB | STIN | Bail Cont | NO HOLD / STREET | Trial  1.12.16    9:00A |
| | ☑Rel Cond ☐No Alcohol/Drugs ☐No Firearms/Weap ☐No DWS/INS ☐Wkly Contact Atty ☑No Contact Victim ☐No Contact Other ☐No Matrix/EHD/BI or Early Release ☐Info Dismissed/Indict Filed | | | | | | | *or any other female under age of 18* |
| ✓ 15-1932 | CROMBIE: JACOB | SODOMY II | AW ARR | RSA | STIN | Bail Cont | NO HOLD / TURN IN | Trial  1.13.16    9:00A |
| | ☐Rel Cond ☐No Alcohol/Drugs ☐No Firearms/Weap ☐No DWS/INS ☑Wkly Contact Atty ☑No Contact Victim ☐No Contact Other ☐No Matrix/EHD/BI or Early Release ☑Info Dismissed/Indict Filed | | | | | | | *or any other female under age of 18* |
| ✓ 15-1945 | FULLILOVE: ELIJAH LEE | PCS HEROIN | ARR | CWO | STIN | Recog | CLACK HOLD / STREET | CMA.  12.23.15    8:30 |
| | ☑Rel Cond ☐No Alcohol/Drugs ☐No Firearms/Weap ☐No DWS/INS ☐Wkly Contact Atty ☐No Contact Victim ☐No Contact Other ☐No Matrix/EHD/BI or Early Release ☐Info Dismissed/Indict Filed | | | | | | | |
| ✓ 14-2153 | LAMBERT: EDUARDO | CRIM MISCH I | BW APP | WKS | (meaney) | Bail Cont | NO HOLD/ MULT | CMA  12.22.15   10:00A    Trial  1.14.16    9:00A |
| | ☐Rel Cond ☐No Alcohol/Drugs ☐No Firearms/Weap ☐No DWS/INS ☑Wkly Contact Atty ☐No Contact Victim ☐No Contact Other ☐No Matrix/EHD/BI or Early Release ☐Info Dismissed/Indict Filed | | | | | | | |

IT IS SO ORDERED, that the case(s) be continued as indicated above.

JUDGE: _____    Date: 11.16.15

CR1501848
AR
Arraignment
4101156

Verified Correct Copy of Original 1/11/2016

CLACKAMAS COUNTY COURT
Filed/Entered

OCT 23 2015 AM 11: 40

By: DOCKET     TAE

1

2

3              IN THE CIRCUIT COURT OF THE STATE OF OREGON

4                     FOR THE COUNTY OF CLACKAMAS

5    STATE OF OREGON,                    )
                          Plaintiff,     )    Court No. CR1501848
6                                        )
               vs.                       )
7                                        )    INDICTMENT
     JORDEN TIMOTHY HOLLINGSWORTH,        )
8    DOB: 08/01/1993                     )
     DL: OR 2735840                      )    DA No. 005270149
9                     Defendant.         )

10          The above-named defendant is accused by the Grand Jury of the County of Clackamas,
     State of Oregon, by this Indictment as follows:
11

                     SEXUAL ABUSE IN THE FIRST DEGREE
12                         COUNT 1 (ORS 163.427)
                              Class B Felony
13          The defendant, on or about February 13, 2015, in Clackamas County, Oregon, did
     unlawfully and knowingly subject Jasmine Jewell Shafer a person under the age of 14 years, to
14   sexual contact by touching her breast, a sexual or intimate part of Jasmine Jewell Shafer.

15                   SEXUAL ABUSE IN THE FIRST DEGREE
                           COUNT 2 (ORS 163.427)
16                            Class B Felony
            The defendant, on or between August 24, 2009 and August 23, 2012, in Clackamas
17   County, Oregon, did unlawfully and knowingly subject Jasmine Jewell Shafer a person under the
     age of 14 years, to sexual contact by touching her genitals, a sexual or intimate part of Jasmine
18   Jewell Shafer.

19   /////

20   /////

21   /////

22   /////

23   /////

24   /////

25   Page 1 of 2 – INDICTMENT / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 / CR1501848
                            Clackamas County District Attorney
                       807 Main Street, Room 7, Oregon City, OR  97045
                       Phone: (503) 655-8431  Fax  (503) 650-8943

CR1501848
SI
Secret Indictment
4101163

1    /////

     Said act(s) contrary to statutes in such cases made and provided, and against the peace
2    and dignity of the State of Oregon.

3    Dated this 19th day of October, 2015.

4                            A TRUE BILL          Witnesses examined before the Grand Jury
                                                  (unless otherwise specified, witness gave
5    _____            testimony in person):
     Foreman of the Grand Jury                    Sean Ellis
6                                                 Kenneth Jewell
                                                  Jasmine Jewell Shafer
7                                                 Trisha Miller

8    JOHN S. FOOTE
     District Attorney
9
     By _____
10      Bryan J. Brock, OSB# 962335
        BryanBro@co.clackamas.or.us
11      Deputy District Attorney

12   NOTICE:    Where this accusatory instrument charges one or more misdemeanor crimes, the district
     attorney hereby declares that the state intends that said offense(s) proceed as a misdemeanor(s).
13
     CONTROL #:    / SID #OR19524416
14   Agency:       Oregon City Police Department/15-0539

15

16

17

18

19

20

21

22

23

24

25   Page 2 of 2 – INDICTMENT / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 / CR1501848

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone (503) 655-8431 Fax: (503) 650-8943

EXHIBIT 108, Page 24 of 124
Case No. 3:20-cv-01567-MC
Page 17 of 99

Verified Correct Copy of Original 1/11/2016

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR CLACKAMAS COUNTY
CLACKAMAS COUNTY COURTHOUSE
807 Main Street  Oregon City, Oregon    97045
(503)  655-8447

November 20, 2015

FILE COPY

**Oregon State Of/Hollingsworth Jorden Timoth**
Case#:  **CR1501848**    Offense Felony
  Sexual Abuse 1
Incident Date:  2/13/15

**NOTICE OF SCHEDULED COURT PROCEEDING**

Scheduled Proceeding: **Hearing**
Date:                 **11/24/15**
Time:                 **3:00PM**
Room:
Additional Information:
      bail reduction

IMPORTANT NOTICE: PLEASE READ
Failure to appear at this court event may result in an order being
rendered against you in this case.

**CC:**
RUSSELL SWANSON AMOS
      courtnotices@co.clackamas.or.us
ARTHUR B KNAUSS
      art@abknaussatty.com

Verified Correct Copy of Original 1/11/2016.

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR CLACKAMAS COUNTY
CLACKAMAS COUNTY COURTHOUSE
807 Main Street  Oregon City, Oregon   97045
(503)  655-8447

Verified Correct Copy of Original 1/11/2016.

November 20, 2015

FILE COPY

**Oregon State Of/Hollingsworth Jorden Timoth**
Case#:  **CR1501848**    Offense Felony
Sexual Abuse 1
Incident Date:  2/13/15

**NOTICE OF SCHEDULED COURT PROCEEDING**

Scheduled Proceeding: **Hearing**
Date:                 **12/24/15**
Time:                 **3:00PM**
Room:
Additional Information:
bail reduction

IMPORTANT NOTICE: PLEASE READ
Failure to appear at this court event may result in an order being
rendered against you in this case.

**CC:**
RUSSELL SWANSON AMOS
courtnotices@co.clackamas.or.us
ARTHUR B KNAUSS
art@abknaussatty.com

1

2

3    IN THE CIRCUIT COURT OF THE STATE OF OREGON

4    FOR THE COUNTY OF CLACKAMAS

5    STATE OF OREGON,                    )   Court No. CR1501848
                    Plaintiff,           )
6              vs.                       )
                                         )   ARREST WARRANT
7    JORDEN TIMOTHY HOLLINGSWORTH,       )
     DOB: 08/01/1993                     )
8                   Defendant.           )   DA No. 005270149

9    **IN THE NAME OF THE STATE OF OREGON:**
     **TO ANY PEACE OFFICER OF THIS STATE, GREETINGS:**

10

11   An Indictment having been found on October 19, 2015, in the Circuit Court for the County
     of Clackamas, charging the above-named defendant with the offense(s) of:

12   Count 1:    Sexual Abuse in the First Degree; B Felony; ORS 163.427
     Count 2:    Sexual Abuse in the First Degree; B Felony; ORS 163.427
13

14   YOU ARE COMMANDED to arrest the above-named defendant forthwith and bring said
     defendant before me, or, in case of my absence or inability to act, before the nearest or most
     accessible magistrate in the county, or if no magistrate is available, to deliver said defendant into
15   the custody of the Jailer of this county.

16   ☐    You are hereby authorized to enter premises in which you have probable cause to believe
     that the above-named defendant is present, without giving notice of your authority and purpose.
17

18   Security Amount:    $ 250,000

     Issued in the above County on the 23rd day of October, 2015.
19

20                                        /S/ KATHERINE E. WEBER
                                          CIRCUIT COURT JUDGE
21

22

23

24

25   Page 1 - WARRANT OF ARREST / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 /
            CR1501848

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone: (503) 655-8431  Fax: (503) 650-8943

EXHIBIT 108, Page 27 of 124
Case No. 3:20-cv-01567-MC
Page 20 of 99

Verified Correct Copy of Original 1/11/2016

Verified Correct Copy of Original 1/11/2016.

1

2    RETURN OF SERVICE

3    The undersigned Peace Officer hereby returns that he/she has executed the within WARRANT by arresting the within-named defendant on _____.

4

5    _____
                    (signature)

6    Name: _____
                         (type or print)

7    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

8    Agency:    Oregon City Police Department/ 15-0539
     Control #:
9    SID #:      OR19524416

10   **NOTE:  The State will extradite this defendant from anywhere in the UNITED STATES.**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Page 2 - WARRANT OF ARREST / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 /
            CR1501848

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone: (503) 655-8431  Fax. (503) 650-8943

EXHIBIT 108, Page 28 of 124
Case No. 3:20-cv-01567-MC
**Def. Exh.**
**Page 21 of 99**

# IN THE CIRCUIT COURT OF THE STATE OF OREGON
## FOR THE COUNTY OF CLACKAMAS
### NOTICE OF COURT APPEARANCE

STATE OF OREGON                                    Case No. _CR1501848_

            vs.

TO _Hollingsworth, Jorden_ , Defendant

**If requesting a Court appointed attorney report to Room 200 immediately.**

You are required to appear in person in this Court as follows; failure to do so may subject you to criminal prosecution:

**Hearing:** _trial_    **Date:** _Apr. 26, 2016_   **Time:** _9:00 am_

**NOTE:  Failure to so appear or report as above will result in a warrant for your arrest.**
**You are required to maintain contact with your attorney.**

You should come to sentencing prepared to pay all fines, fees, and costs. A clerk or your attorney can tell you how much you may have to pay. Payment in full may be required at sentencing.
If you have luxury items such as a boat, motorcycle, ATV, video game system, iPod, television, etc. you may be required to sell those items to satisfy your fines, fees, and costs.

ACKNOWLEDGEMENT:                           Clerk: _Young_

I have been provided with a copy of the foregoing notice and hereby acknowledge its receipt

Dated this ___12___ day of ___Jan.___ , 20_16_ .

Defendant _____  Phone No. _____  Attorney: _____

Distribution: White - Court , Canary - District Attorney, Pink - Defense Attorney, Gold - Defendant

Pet. Exh. 1

**Page 22 of 99**

C32(Rev 5/11/10)

Verified Correct Copy of Original 1/7/2016

1  DEFENDANT'S ATTORNEY: ARTHUR B. KNAUSS
2  DISTRICT ATTORNEY: SARAH DUMONT
   PRIOR SETTINGS: 0
3
4
5          IN THE CIRCUIT COURT OF THE STATE OF OREGON
6
                FOR THE COUNTY OF CLACKAMAS
7
8  STATE OF OREGON,                    )
                                       )    CASE NO:  CR 15-01848
9              Plaintiff.              )
                                       )    ORDER TO CONTINUE
10          vs.                        )    TRIAL DATE
                                       )
11  JORDEN TIMOTHY HOLLINGSWORTH,      )
                                       )
12             Defendant.              )
                                       )
13  _____

14        BASED UPON THE MOTION of the Defendant, by and through his attorney, Arthur B.

15  Knauss, and the Declaration in support of Motion for continuance of trial date;

16
17        **IT IS HEREBY ORDERED** as follow:

18        ▪_____    The Motion for continuance of the Trial date in the above entitled case is
                      allowed.
19
20        _____     The Motion for continuance of the trial date in the above entitled case is
                      denied.
21
          _____     Other Orders _____
22
23        _____

24        DATED this _____ day of _____, 2016.        Signed: 1/13/2016 11:14:51 AM

25                                     _____
                                       CIRCUIT COURT JUDGE  Circuit Court Judge Thomas J. Rastetter
26

Page   1.  ORDER TO CONTINUE

**ARTHUR B. KNAUSS**
**Attorney at Law**
**294 Warner Milne Road**
**Oregon City, Oregon   97045**
**Office: 503-659-5337 Fax: 503-650-0367**
**Email:   art@abknaussatty.com**


CR1501848
PPOR
Order – Proposed
4086669

Verified Correct Copy of Original 1/7/2016.

Sex abuse in the 1st degree X2

**MOTION TO CONTINUE**
CRIMINAL

| TRIAL ☑ CMA o Hearing o DATE: | 1 12 16 |
| DATE SET: | 11 24 15 |
| CASE FILED: | 10 23 15 |
| ARRAIGNMENT DATE: | 10 23 15 |
| PARTY: o PTF ☑ DEF / PRIOR SETS: | 0 |

CUSTODY STATUS: ___X___ IN _____ OUT

OBJECTIONS? _____ YES _____ NO
_____ ATTACHED
___X___ NO POSITION _____ STIPULATED
_____ UNKNOWN _____ NO RESPONSE

NEW DATE REQUESTED:

COMMENTS:

GRANTED: _____ DENIED: _____

NOTIFIED: ___FAX ___PHONE ___E-MAIL ___CARDS

Hollingsworth

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR Clackamas COUNTY

CLACKAMAS COUNTY COURT
Filed/Entered

JAN 1 2 2016

BY: AEM

JUDGE Rastetter, Thomas J - Courtroom 7
January 12, 2016 - Tuesday

Verified Correct Copy of Original 1/20/2016.

| Time | Case Title | Relationship | Room | Disposition |
|------|-----------|--------------|------|-------------|
| Case # | Matter / Charge / Case Type | Attorney | Judge | |

**8:30 AM**

CR1513301     State of Oregon VS. TERRANCE RAY BRADLEY    P.    CLACKAMAS, COUNTY LAW CLERK
                                                          D. ✓ BERNSTEIN, JAMES E

*CMA  1·26·16      10:00*

11/27/2015          File Scanned

Related Cases:    Hearing - Case Management     Interfering w/ Peace/Parole and Probation    Offense
                  Comment: CTA;                  Officer                                     Misdemeanor
                                                 Theft of Services

---

**8:30 AM**

CR1501848     State of Oregon VS. JORDEN TIMOTHY ✓    P·  REGAN, MICHAEL P
              HOLLINGSWORTH                            D ✓ KNAUSS, ARTHUR B

*Trial  4·26·16     9:00*

10/23/2015          Appearance
                    app/rst; m/c granted

Related Cases:                                   Sexual Abuse in the First Degree            Offense Felony

                                                 Sexual Abuse in the First Degree

---

**8:30 AM**

CR1512224     State of Oregon VS. EARLY LAWRENCE SMITH    P.   CLACKAMAS COUNTY DISTRICT ATTORNEY
                                                    YC    D: ✓ KMETIC, SHANNON M

*MHC  1·19·16     9:00A*

08/18/2015          File Scanned

Related Cases:    Hearing - Probation Violation     Contempt of Court - Punitive              Offense Violation
                  ACP $100

---

CR1501848
OR
Order
4116767

Judge   Rastetter
DA      Salvas
Reporter  ERT
Clerk     AEM

Page 1 of 6

These Matters came before the Court the 12
day of Jan, 20 16, the state appearing by
a duly appointed Deputy District Attorney, the
Defendant appearing as indicated and the Court
being fully advised in the premises, It is Hereby
Ordered as specified above

Judge

EXHIBIT 108, Page 32 of 124
Pet. Ex. 0
Case No. 3:20-cv-01567-MC
**Page 25 of 99**

*Verified Correct Copy of Original 2/12/2016*

CLACKAMAS COUNTY COURT
Filed/Entered
NOV 18 2015
BY: SBB

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

| | |
|---|---|
| STATE OF OREGON, | ) Court No. CR1501848 |
| Plaintiff, | ) |
| vs. | ) |
| | ) ARREST WARRANT |
| JORDEN TIMOTHY HOLLINGSWORTH, | ) |
| DOB: 08/01/1993 | ) |
| Defendant. | ) DA No. 005270149 |

**IN THE NAME OF THE STATE OF OREGON:
TO ANY PEACE OFFICER OF THIS STATE, GREETINGS:**

An Indictment having been found on October 19, 2015, in the Circuit Court for the County of Clackamas, charging the above-named defendant with the offense(s) of:

Count 1:    Sexual Abuse in the First Degree; B Felony; ORS 163.427
Count 2:    Sexual Abuse in the First Degree; B Felony; ORS 163.427

YOU ARE COMMANDED to arrest the above-named defendant forthwith and bring said defendant before me, or, in case of my absence or inability to act, before the nearest or most accessible magistrate in the county, or if no magistrate is available, to deliver said defendant into the custody of the Jailer of this county.

☐    You are hereby authorized to enter premises in which you have probable cause to believe that the above-named defendant is present, without giving notice of your authority and purpose.

Security Amount:    $*250,000*

Issued in the above County on the *23* day of October, 2015.

_____
CIRCUIT COURT JUDGE

Katherine E. Weber
Circuit Court Judge

CR1501848
RSWT
Return — Service Warrant
4303002

Page 1 - WARRANT OF ARREST / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 /
CR1501848

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone (503) 655-8431 Fax (503) 650-8943

EXHIBIT 108, Page 33 of 124
Case No. 3:20-cv-01567-MC
Def. Exh.
Page 26 of 99

RETURN OF SERVICE

The undersigned Peace Officer hereby returns that he/she has executed the within WARRANT by arresting the within-named defendant on ___11 – 15 – 15_____.

_____
(signature)

Name: _Nicholson / OCPD_
(type or print)

Agency:    Oregon City Police Department/ 15-0539
Control #:
SID #:    OR19524416

**NOTE:  The State will extradite this defendant from anywhere in the UNITED STATES.**

Page 2 - WARRANT OF ARREST / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 /
        CR1501848

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone: (503) 655-8431  Fax: (503) 650-8943

EXHIBIT 108, Page 34 of 124
Case No. 3:20-cv-01567-MC
Page 27 of 99

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

| | | |
|---|---|---|
| STATE OF OREGON, | ) | Court No. CR1501848 |
| Plaintiff, | ) | |
| vs. | ) | |
| JORDEN TIMOTHY HOLLINGSWORTH , | ) | DEMAND FOR DISCOVERY |
| DOB: 08/01/1993 | ) | |
| Defendant. | ) | |
| | ) | DA No. 005270149 |

COMES NOW the State of Oregon by the undersigned Deputy District Attorney, and

demands that the above-named defendant disclose to the District Attorney of Clackamas

County the following information and material within his possession or control:

1.   The names and addresses of persons, including himself, whom he intends to call as witnesses at trial, together with relevant written or recorded statements or memoranda of any oral statements of such persons other than himself.

2.   Any reports or statements of experts, made in connection with the particular case, including results of physical or mental examinations and/or scientific tests, experiments or comparisons, which the defendant intends to offer in evidence at the trial.

3.   Any books, papers, documents, photographs or tangible objects which the defendant intends to offer in evidence at trial.

DATED: 4/4/2016

JOHN S. FOOTE
District Attorney

By _____
Sarah J. Dumont, OSB #035419
SarahDum@co.clackamas.or.us
Deputy District Attorney

**POINTS & AUTHORITY:**
ORS 135.835.

Page 2 of 2 - STATE'S DISCOVERY TO DEFENDANT

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR  97045
Phone: (503) 655-8431  Fax: (503) 650-8943

## CERTIFICATE OF SERVICE

Defendant Name: JORDEN TIMOTHY HOLLINGSWORTH          DA No:    005270149
                                                      Court No:  CR1501848

### CIDC Mailing

I hereby certify that I served the forgoing DEMAND FOR DISCOVERY on Arthur Knauss, attorney of record for defendant JORDEN TIMOTHY HOLLINGSWORTH, on the date listed below, by depositing in the attorney's mail slot in the Clackamas County Courthouse in Oregon City, Oregon, on said day a true copy thereof, certified by me as such and addressed to said attorney.

DATED at Oregon City, Oregon, April 4, 2016.

JOHN S. FOOTE
District Attorney

By _____
Sarah J. Dumont, OSB #035419
SarahDum@co.clackamas.or.us
Deputy District Attorney

Page 1 of 1 — CERTIFICATE OF SERVICE / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 / CR1501848
Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR  97045
Phone: (503) 655-8431  Fax: (503) 650-8943

EXHIBIT 108, Page 36 of 124
Case No. 3:20-cv-01567-MC
Pet. Exh. 1
Page 29 of 99

```
1

2

3

4

5

6

7
```

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

| | |
|---|---|
| 8  STATE OF OREGON, ) | CASE NO: CR 15-01848 |
| 9      Plaintiff. ) | |
| | NOTICE OF INTENT TO |
| 10      vs. ) | OFFER STATEMENT MADE |
| | BY A CHILD VICTIM |
| 11  JORDEN TIMOTHY HOLLINGSWORTH, ) | PURSUANT TO OEC 803(18a)(b) |
| 12      Defendant. ) | |
| 13 _____ ) | |

```
14
```
        COMES NOW the Defendant by and through his attorney, Arthur B. Knauss
```
15
```
and, pursuant to OEC 803(18a)(b), notifies the Court and State of Defendant's
```
16
```
intention to offer at trial herein, hearsay statements of Jasmine Jewell-Shafer, an
```
17
```
alleged child victim, which statements concern alleged acts of abuse, as defined in
```
18
```
ORS 419B.005, or sexual conduct alleged to have been performed with or on the
```
19
```
child by the Defendant. The particulars of said statements are set forth in the
```
20
```
discovery previously furnished to the state, and include, but are not limited to, the
```
21

22

23

24

25

26
```
Page  1. NOTICE OF INTENT

Arthur B. Knauss
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon 97045
Office: 503-659-5337 Fax: 503-650-0367
Email: art@abknaussatty.com

1   alleged victim's statements to:

2

3       1.    <u>Trisha Miller</u>: On February 14, 2015, three to four different stories about

4 the incident on February 13, 2015.

5      DATED this __5__ day of April 2016.

6

7                               ARTHUR B. KNAUSS   OSB#731700

8                               Attorney for Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21   **POINTS & AUTHORITIES:**

22      ORS 40.460

23      OEC 803(18a)(b)

24

25

26

Page   2. NOTICE OF INTENT

Arthur B. Knauss
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon 97045
Office: 503-659-5337 Fax: 503-650-0367
Email: art@abknaussatty.com

## CERTIFICATE - TRUE COPY

I hereby certify that the foregoing copy of Notice of Intent is a complete and exact copy of the original.

DATED this _____ day of _____ 2016.

_____
Attorney for Defendant

## ACCEPTANCE OF SERVICE

Due service of the within _____ is hereby accepted on _____, 2016, by receiving a true copy thereof.

_____
Attorney for _____

## CERTIFICATES OF SERVICE
### Personal
I certify that on the _____ day of _____ 2016, I served the within _____ on _____, attorney of record for Plaintiff, by personally handing to said attorney a true copy thereof.

_____
Attorney for Defendant

### At Office
I certify that on the _____ day of _____, 2016, I served the within _____ on _____, attorney of record for plaintiff, by leaving a true copy thereof at said attorney's office with her/his clerk therein, or with a person apparently in charge thereof, at Oregon City, Oregon.

_____
Attorney for Defendant

Email: sarahdum@clackamas.us

I hereby certify that I served the foregoing Notice of Intent, on Sarah Dumont, attorney of record for Plaintiff, this date, by emailing to said attorney a true copy thereof, certified by me as such, addressed to said attorney at attorney's email.

DATED this __5__ day of _____ 2016.

_____
Attorney for Defendant

**ARTHUR B. KNAUSS**
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon   97045
(503) 659-5337  Fax: (503) 650-0367
Email: art@abknaussatty.com

## 1. CERTIFICATE OF MAILING

1 DEFENDANT'S ATTORNEY: ARTHUR B. KNAUSS
2 DISTRICT ATTORNEY: SARAH DUMONT
  PRIOR SETTINGS: 1
3

4

5
              IN THE CIRCUIT COURT OF THE STATE OF OREGON
6
                  FOR THE COUNTY OF CLACKAMAS
7

8 STATE OF OREGON,                )
                                  )   CASE NO:  CR 15-01848
9              Plaintiff.          )
                                  )   MOTION TO CONTINUE
10             vs.                 )   TRIAL DATE
                                  )
11 JORDEN TIMOTHY HOLLINGSWORTH,  )
12                                )
              Defendant.          )
13 _____

14
       COMES NOW, Defendant, by and through his attorney, Arthur B. Knauss,
15
   and moves the Court for an Order postponing the trial date of April 26, 2016, in the
16
   above entitled matter.
17

18     In support of his Motion, Defendant relies upon the Declaration of counsel,
19 which is filed contemporaneously with this Motion, and incorporated herein by this
20 reference. Opposing counsel, Sarah Dumont, objects to this request.
21
   DATED this 22 day of ___April___, 2016.
22

23
                              ARTHUR B. KNAUSS   OSB#731700
24                            Attorney for Defendant

25

26

Page   1. MOTION TO CONTINUE

                    Arthur B. Knauss
                    Attorney at Law
                    294 Warner Milne Road
                    Oregon City, Oregon  97045
        Office: 503-659-5337 Fax: 503-650-0367
              Email: art@abknaussatty.com

DEFENDANT'S ATTORNEY: ARTHUR B. KNAUSS
DISTRICT ATTORNEY: SARAH DUMONT
PRIOR SETTINGS: 1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

STATE OF OREGON,                    )
                                    )    CASE NO:  CR 15-01848
            Plaintiff,              )
                                    )    DECLARATION OF
      vs.                           )    ARTHUR B. KNAUSS,
                                    )    ATTORNEY
JORDEN TIMOTHY HOLLINGSWORTH,       )
                                    )
            Defendant.              )

I, Arthur B. Knauss, state as follows:

1.    I am the court-attorney for the defendant, in the above-captioned matter.

2.    Deputy District Attorney, Sarah Dumont, objects to this request to set over the trial date in this case.  The trial is currently set for April 26, 2016.

3.    Defendant is charged with two counts of Sexual Abuse In The First Degree (alleged to have occurred on February 13, 2015, and a second alleged incident between 2009 and 2012).  His maximum sentence is 140 months.

4.    Defendant is in custody.  This is the second request for a continuance of this matter.

1. DECLARATION

Arthur B. Knauss
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon  97045
Office: 503-659-5337 Fax: 503-650-0367
Email: art@abknaussatty.com

EXHIBIT 108, Page 41 of 124
Case No. 3:20-cv-01567-MC
Page 34 of 99

5.    I respectfully request a continuance for the following reasons:

a.    I was appointed on November 17, 2015. This case involves two separate charges alleged to have occurred when the alleged victim was in kindergarten, and the other incident in February of 2015.

b.    This case involves a so-called "late disclosure" adding a layer of complexity to the case. I hired a memory expert, with whom I had consulted with previously, to review the discovery. He testified for me previously in that case.

c.    The first setting of this case was on January 12, 2016. The expert advised me by February 19, 2016, that he was unavailable for trial on April 26, 2016 due to previous commitments. More importantly, he declined to testify due to a purported "complicated" relationship with Clackamas County due to his involvement in a currently pending high profile case (which is still pending).

d.    In surveying the CIDC group for another expert, I learned that I would probably have to look out of state. In all candor, from that time forward, I have been overwhelmed with my responsibilities as President of CIDC, and personal matters involving the sale of my home, the building of a new home and the attempts to acquire a mortgage. All of these endeavors intruded on my practice.

e.    On April 4, 2016, I found another lead on a memory expert but have been unable to contact this expert through a local attorney that specializes in these types of cases.

f.    Due to the fact that defendant has been in custody all this time, my thoughts were to go ahead and try this case without expert testimony. I learned

Page    2. DECLARATION

Arthur B. Knauss
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon  97045
Office: 503-659-5337 Fax: 503-650-0367
Email: art@abknaussatty.com

1

2 yesterday (April 21) that defendant's mother has the $5,000.00 to bail defendant out

3 of jail. His family had promised to do so over the last four months but only came up

4 with the money yesterday.

5         g.    I advised Sarah Dumont, Deputy District Attorney, yesterday of

6 my quandary.   One of her concerns is that the alleged victim lives in Oklahoma and

7 has to be flown out here.

8       In reflecting upon my obligation to the defendant, I am respectfully

9 requesting that this case be continued one last time so that I can obtain the services

10 of an out of state memory expert and/or locate the local expert after more diligent

11 efforts. I take full responsibility for this quandary but my obligation is to the

12 defendant to provide a competent defense.

13         i.    Ms. Dumont objects to this Motion to Continue and particularly

14 concerned about the delays as it relates to the alleged victim and the cost of her

15 transportation.

16         j.    I will have defendant sign a Waiver of Speedy trial by

17 Monday.

18

19       I hereby declare that the above statements are true to the best of my

20 knowledge and belief, and that I understand they are made for use as evidence in

21 court and are subject to penalty for perjury.

22     DATED this  22  day of _____ 2016.

23

24

                          _____

25                     ARTHUR B. KNAUSS   OSB#731700
                    Attorney for Defendant

26

Page   3. DECLARATION

Arthur B. Knauss
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon  97045
Office: 503-659-5337 Fax: 503-650-0367
Email: art@abknaussatty.com

## CERTIFICATE - TRUE COPY

I hereby certify that the foregoing copy of Motion to Continue, Order to Continue and Declaration are complete and exact copies of the original.

DATED this _____ day of _____ 2016.

_____
Attorney for Defendant

## ACCEPTANCE OF SERVICE

Due service of the within _____ is hereby accepted on _____, 2016, by receiving a true copy thereof.

_____
Attorney for _____

## CERTIFICATES OF SERVICE
### Personal

I certify that on the _____ day of _____ 2016, I served the within  Motion to Continue, Order to Continue and Declaration on Sarah Dumont, attorney of record for Plaintiff, by personally handing to said attorney a true copy thereof.

_____
Attorney for Defendant

### At Office

I certify that on the 22 day of April, 2016, I served the within  Motion to Continue, Order to Continue and Declaration on Sarah Dumont, attorney of record for plaintiff,  by leaving a true copy thereof at said attorney's office with her/his clerk therein, or with a person apparently in charge thereof, at Oregon City, Oregon.

_____
Attorney for Defendant

### Mail:

I hereby certify that I served the foregoing _____, on _____, attorney of record for Plaintiff, this date, by emailing to said attorney a  true copy thereof, certified by me as such, addressed to said attorney at attorney's email.

DATED this _____ day of _____ 2016

_____
Attorney for Defendant

**ARTHUR B. KNAUSS**
Attorney at Law
294 Warner Milne Road
Oregon City, Oregon  97045
(503) 659-5337  Fax: (503) 650-0367
Email: art@abknaussatty.com

1.  CERTIFICATE OF MAILING

CR 15-01848

1  DEFENDANT'S ATTORNEY: ARTHUR B. KNAUSS
2  DISTRICT ATTORNEY: SARAH DUMONT
   PRIOR SETTINGS: 1
3

4

5          IN THE CIRCUIT COURT OF THE STATE OF OREGON

6              FOR THE COUNTY OF CLACKAMAS

7  STATE OF OREGON,                    )
8                  Plaintiff.          )     CASE NO:   CR 15-01848
                                       )
9                                      )     ORDER TO CONTINUE
                vs.                    )     TRIAL DATE
10                                     )
11 JORDEN TIMOTHY HOLLINGSWORTH,       )
                                       )
12              Defendant.             )
13 _____

14        BASED UPON THE MOTION of the Defendant, by and through his attorney, Arthur B.

15 Knauss, and the Declaration in support of Motion for continuance of trial date;

16        **IT IS HEREBY ORDERED** as follow:

   Signed: 4/26/2016 11:48 AM
17    _____        The Motion for continuance of the Trial date in the above entitled case is
18                   allowed.

19    _____        The Motion for continuance of the trial date in the above entitled case is
                     denied.
20

21    _____        Other Orders _____

22    _____

23

24

25                                          Signed: 4/26/2016 11:48 AM

26

                                            Hon. Susie L. Norby
Page                                        _____
   1.  ORDER TO CONTINUE                     Circuit Court Judge Susie L. Norby

                        Arthur B. Knauss
                         Attorney at Law
                       294 Warner Milne Road
                     Oregon City, Oregon   97045
              Office: 503-659-5337 Fax: 503-650-0367
                     Email: art@abknaussatty.com

CR1601848
OR
Order
4793504

CLACKAMAS COUNTY COURT
Filed/Entered

APR 2 6 2016

BY: AEM

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR Clackamas COUNTY

JUDGE - Norby, Susie L – Courtroom 9
April 26, 2016 - Tuesday

Verified Correct Copy of Original 4/26/

| Time Case # | Case Title Matter / Charge / Case Type | Relationship Attorney | Room Judge | Disposition |
|---|---|---|---|---|
| 9:00 AM | | | | ΔFTA BW $100K |
| CR1502041 | State of Oregon VS. RYAN THOMAS HARLAN | P: CLACKAMAS, COUNTY LAW CLERK | | |
| | | D: BERNSTEIN, RHETT L | | STIN Jack Bernstein |
| 11/09/2015 | File Scanned | | | |
| | Appearance | Unauthorized Use of a Vehicle | | Offense Felony |
| Related Cases: | | Possession of a Stolen Vehicle | | |
| | | Possession of Methamphetamine | | |

| 9:00 AM | | | | Trial 7.6.16 9:00 |
| CR1513148 | State of Oregon vs JULIA STAFFORD HARTLEY | P: CLACKAMAS COUNTY DISTRICT ATTORNEY | | Law Clerk |
| | | D: Badeau, Ernest H | | |
| 12/08/2015 | File Scanned | | | |
| | Appearance | Theft in the Second Degree | | Offense Misdemeanor |
| Related Cases: | app/rst; m/c granted | | | |

| 9:00 AM | | | | Trial 8.9.16 9:00 A |
| CR1501848 | State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH | P: REGAN, MICHAEL P | | |
| | | D: KNAUSS, ARTHUR B | | status chk 6.23.16 8:30 |
| 10/23/2015 | File Scanned | | | |
| | Appearance | Sexual Abuse in the First Degree | | Offense Felony |
| Related Cases: | app/rst; m/c granted see notes per RDH on order | Sexual Abuse in the First Degree | | |

Judge Norby

FTR9
AEM

Page 1 of 2

These Matters came before the Court the 26
day of APr 20 16 the state appearing by
a duly appointed Deputy District Attorney, the
Defendant appearing as indicated and the Court
being fully advised in the premises, It is Hereby
Ordered as specified above.

Judge Susie

# IN THE CIRCUIT COURT OF THE STATE OF OREGON
## FOR THE COUNTY OF CLACKAMAS
### NOTICE OF COURT APPEARANCE

STATE OF OREGON                                    Case No. CR1501648

vs.

TO Hollingsworth, Jorden _____, Defendant

**If requesting a Court appointed attorney report to Room 200 immediately.**

You are required to appear in person in this Court as follows; failure to do so may subject you to criminal prosecution:

| Hearing: | Date: | Time: |
|---|---|---|
| Trial Status | August 9, 2016 | 9:00am |
| | June 23, 2016 | 8:30am |

**NOTE:  Failure to so appear or report as above will result in a warrant for your arrest.
        You are required to maintain contact with your attorney.**

You should come to sentencing prepared to pay all fines, fees, and costs. A clerk or your attorney can tell you how much you may have to pay. Payment in full may be required at sentencing.
If you have luxury items such as a boat, motorcycle, ATV, video game system, iPod, television, etc. you may be required to sell those items to satisfy your fines, fees, and costs.

ACKNOWLEDGEMENT:                          Clerk: _____

I have been provided with a copy of the foregoing notice and hereby acknowledge its receipt.

Dated this _____ day of _April_ , 20 _16_ .

Defendant _____ Phone No. _____ Attorney: _____

Def. Ex. 1
Page 40 of 99

Verified Correct Copy of Original 4/27/2016.

CLACKAMAS COUNTY COURT
Filed/Entered

APR 2 7 2016

BY: AEM

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF CLACKAMAS

STATE OF OREGON,

    Plaintiff,

    vs.

Jorden Timothy Hollingsworth

    Defendant.

Case No.: CR 1501848

WAIVER OF RIGHT TO SPEEDY TRIAL

I understand that I have the right to a speedy trial guaranteed to me under the United States Constitution, the Oregon Constitution and the Oregon Revised Statutes. After consulting with my attorney I agree to postpone my trial until the date written below, and agree that there are good reasons to postpone the trial. I understand that by postponing the trial there is the possibility that my ability to defend myself could be impaired for many reasons, including the possibility that witnesses and evidence may become unavailable and that witness' memories may fade with the passage of time. I nevertheless agree that a postponement of my trial is reasonable. I have signed this document freely and voluntarily.

DATED this 26 day of April, 20 16

_____        _____
Defendant                              Defense Attorney

August 9, 2016 @ 9:00 am
New trial date

Rev 01.05 13

CR1601848
WV
Waiver
4800441

WAIVER OF RIGHT TO SPEEDY TRIAL - 1

Clackamas County
Official Receipt
Oregon City, Oregon 97045

Date: 4/22/2016
Time: 5:32:13 PM

2016 APR 25  PM 4: 47

| | | | |
|---|---|---|---|
| Defendant: | JORDEN TIMOTHY HOLLINGSWORTH | Citizen: | DEBORAH JEAN MILLER |
| Address: | 19903 LELAND RD | Address: | 19903 LELAND RD |
| City/St/Zip: | OREGON CITY, OR 97045 | City: | OREGON CITY, OR 97045 |
| Phone: | 971-267-7071 | Phone: | 5039357165 |
| Amount Posted: | **$0.00** | Amount Posted: | **$5,000.00** |

Charge(s):

1) SEXUAL ABUSE I - CASE # 15-1848
2) SEXUAL ABUSE I - CASE # 15-1848

Date to Appear:                                    Time:
Court: CLACKAMAS  CIRCUIT COURT
Total Amount: $5,000.00
Receipt No: (008902)                              Booking No: 2015-030534

Case Manager Date: April 26, 2016                Time: 09:00 AM

Deputy: (TLE)

----------------------------------------
Deputy Signature

**Notice**

**Posting Security Deposit (Bail)**

The Court may order that fines/fees be paid from posted security release, and the Court will retain 15% of the security release posted.

ORS 135.265 (2)
When conditions of the release agreement have been met and the defendant discharged from ALL OBLIGATIONS in the cause, pursuant to ORS 135.265 (2) the Clerk, unless otherwise ordered by the Court, shall first deduct 15% of the security release and then may apply the remaining security deposit amount to any court ordered obligations the defendant may owe.
If you have any further questions, please contact the Court Clerk/Trial Court Administrator of the court the defendant appears in.

IN THE CIRCUIT COURT
FOR THE COUNTY OF CLACKAMAS
FOR THE STATE OF OREGON

| | | | |
|---|---|---|---|
| STATE OF OREGON | , Plaintiff | ) | Security Release Agreement |
| vs | | ) | |
| JORDEN TIMOTHY HOLLINGSWORTH | , Defendant | ) | |
| (2015030534) | | | |

Having been confined in the Clackamas County Jail upon the charge(s) of:
1) SEXUAL ABUSE I - CASE # 15-1848
2) SEXUAL ABUSE I - CASE # 15-1848

I do hereby agree to the following terms governing my release from custody upon a security release:

I understand that the security amount has been set at $50,000.00. If I am released, I promise to appear in Court to answer the charges against me and thereafter until discharged or until final order of the Court.

I choose to deposit ten percent of this amount in cash (not less than $25) and have deposited $5,000.00 with the Sheriff.

**GENERAL CONDITIONS:**
I will appear in Court as ordered by the Court until discharged or final order of the Court;
I will submit to the orders and process of the Court;
I will not leave the State of Oregon without permission of the Court; and
I will comply with other conditions, which the Court may impose.
After judgement, I will immediately appear as required by the trial Court following the decision of the Appellate Court.

**NO CONTACT CONDITIONS:**
I understand that I am prohibited from having any contact with the victim(s) , **JASMINE JEWELL SHAFER**, of the crime(s) I am alleged to have committed unless I have prior authorization of the Court or unless it is supervised by the Department of Human Services or it has been approved in writing by DHS.

**PROHIBITED CONTACT INCLUDES, BUT IS NOT LIMITED TO:**
No personal contact with the victim(s).
Coming into the visual or physical presence of or following the victim(s).
No contact with the victim(s) through any other person.
Contacting, or attempting to contact, victim by telephone, mail or any other electronic means.
Entering or attempting to enter victim's current or subsequent residence, business or place of employment, or the victim's school.
Entering or attempting to enter an area surrounding victims current or subsequent residence, victim's school, place of employment or business.

**I HAVE READ AND UNDERSTAND WHAT PROHIBITED CONTACT MEANS:** _____ **(Initials)**

I understand that if I fail to appear as required, the entire amount first above mentioned may be forfeited and that the intentional failure to appear in Court as required by this agreement constitutes the crime of FAILURE TO APPEAR for which I may be prosecuted.

I understand that I am to appear in CIRCUIT COURT, State of Oregon, 807 MAIN ST. in OREGON CITY, OR 97045 at:
**Court Appearance Dates:**
April 26, 2016   Time: 09:00 AM
   Time:

I understand that it is my responsibility to make contact with my attorney upon release.

NOTE: Pursuant to ORS 135.265(2) the clerk, unless otherwise ordered by the Court, shall first deduct fifteen percent of the security release and then apply the remaining security deposit amount to any court ordered obligations the defendant may owe.

I have read and received a copy of this Security Release Agreement and will obey its terms and conditions. I understand that I am subject to arrest for contempt if I violate any terms or conditions of this release agreement.

Date:                              22nd Day of April, 2016

Court: 807 MAIN ST.
OREGON CITY, OR 97045
**SPECIAL CONDITIONS**
**MUST LIVE ON LELAND ROAD WITH GRANDMOTHER**

Subscribed and sworn to before me this, 22nd Day of April, 2016 and receipt of the sum of $5,000.00 is acknowledged.

Defendant's Signature: _____
                              JORDEN TIMOTHY HOLLINGSWORTH
                              19903 LELAND RD
                              OREGON CITY, OR
                              971-267-7071
                              )
                              )                    TRIAL COURT ADMINISTRATOR
                              )
Receipt No: 008902 Booking No: 2015-030534          By: _____          , Deputy

IN THE CIRCUIT COURT
FOR THE COUNTY OF CLACKAMAS
FOR THE STATE OF OREGON

STATE OF OREGON          , Plaintiff      )     Security Release Agreement

vs                                 )

JORDEN TIMOTHY HOLLINGSWORTH   , Defendant     )

(20155030534)

Having been confined in the Clackamas County Jail upon the charge(s) of:
1) SEXUAL ABUSE I - CASE # 15-1848
2) SEXUAL ABUSE I - CASE # 15-1848

I do hereby agree to the following terms governing my release from custody upon a security release:

I understand that the security amount has been set at $50,000.00. If I am released, I promise to appear in Court to answer the charges against me and thereafter until discharged or until final order of the Court.

I choose to deposit ten percent of this amount in cash (not less than $25) and have deposited $5,000.00 with the Sheriff.

**GENERAL CONDITIONS:**
    I will appear in Court as ordered by the Court until discharged or final order of the Court;
    I will submit to the orders and process of the Court;
    I will not leave the State of Oregon without permission of the Court; and
    I will comply with other conditions, which the Court may impose.
    After judgement, I will immediately appear as required by the trial Court following the decision of the Appellate Court.

**NO CONTACT CONDITIONS:**
I understand that I am prohibited from having any contact with the victim(s) , **JASMINE JEWELL SHAFER**, of the crime(s) I am alleged to have committed unless I have prior authorization of the Court or unless it is supervised by the Department of Human Services or it has been approved in writing by DHS.

**PROHIBITED CONTACT INCLUDES, BUT IS NOT LIMITED TO:**
    No personal contact with the victim(s).
    Coming into the visual or physical presence of or following the victim(s).
    No contact with the victim(s) through any other person.
    Contacting, or attempting to contact, victim by telephone, mail or any other electronic means.
    Entering or attempting to enter victim's current or subsequent residence, business or place of employment, or the victim's school.
    Entering or attempting to enter an area surrounding victims current or subsequent residence, victim's school, place of employment or business.

**I HAVE READ AND UNDERSTAND WHAT PROHIBITED CONTACT MEANS:** _____ **(Initials)**

I understand that if I fail to appear as required, the entire amount first above mentioned may be forfeited and that the intentional failure to appear in Court as required by this agreement constitutes the crime of FAILURE TO APPEAR for which I may be prosecuted.

I understand that I am to appear in CIRCUIT COURT, State of Oregon, 807 MAIN ST. in OREGON CITY, OR 97045 at:
**Court Appearance Dates:**
April 26, 2016   Time: 09:00 AM
   Time:

I understand that it is my responsibility to make contact with my attorney upon release.

NOTE: Pursuant to ORS 135.265(2) the clerk, unless otherwise ordered by the Court, shall first deduct fifteen percent of the security release and then apply the remaining security deposit amount to any court ordered obligations the defendant may owe.

I have read and received a copy of this Security Release Agreement and will obey its terms and conditions. I understand that I am subject to arrest for contempt if I violate any terms or conditions of this release agreement.

Date:                          22nd Day of April, 2016

Court: 807 MAIN ST.
OREGON CITY, OR 97045
**SPECIAL CONDITIONS**
**MUST LIVE ON LELAND ROAD WITH GRANDMOTHER**

Subscribed and sworn to before me this, 22nd Day of April, 2016 and receipt of the sum of $5,000.00 is acknowledged.

Defendant's Signature:    _____
                          JORDEN TIMOTHY HOLLINGSWORTH
                          19903 LELAND RD
                          OREGON CITY, OR
                          971-267-7071
                          )
                          )                    TRIAL COURT ADMINISTRATOR
                          )
Receipt No: 008902 Booking No: 2015-030534      By: _____        , Deputy _____

# OFFICIAL RECEIPT
## OREGON JUDICIAL DEPARTMENT
**Payments Accepted Online**
**www.courts.oregon.gov Select *OJD Courts E-Pay***

Payor                                                              Receipt No.
Miller, Deborah Jean                                          **2016-2084374**
19903 S Leland RD
Oregon City, OR 97045                                        Transaction Date
                                                                04/26/2016

| Description | Amount Paid |
|---|---|

On Behalf Of  HOLLINGSWORTH, JORDEN TIMOTHY
CR1501848
State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH
Bond Account

| | |
|---|---|
| Security Release | 5,000 00 |
| **SUBTOTAL** | **5,000.00** |

| PAYMENT TOTAL | **5,000.00** |
|---|---|

| | |
|---|---|
| Check (Ref #83416) Tendered | 5,000.00 |
| Total Tendered | **5,000.00** |
| Change | 0.00 |

| 04/26/2016 | Cashier | Audit |
|---|---|---|
| 11:28 AM | Station CLACSH020 | 247442638 |

## OFFICIAL RECEIPT

83416

```
Date      :
Amount    : $ 5000.00
Payee     : CLACKAMAS COUNTY CIRCUIT COURT
Memo      : SECURITY RELEASE

Check #   : 83416
Type      : WDRAWAL CHECK
Station   : 5
Operator  : 19524416
Resident  : HOLLINGSWORTH, JORDEN TIMOTHY
```

Verified Correct Copy of Original 4/27/2016.

STATE OF OREGON
CLACKAMAS CIRCUIT COURT
FILED

2016 APR 25  PM 4:47

ENTERED_____BY___—

---

DO NOT ACCEPT THIS CHECK UNLESS THE PINK LOCK & KEY ICONS FADE WHEN WARMED AND YOU CAN SEE HEXAGONS IN A DUAL-TONE TRUE WATERMARK WHEN HELD TO THE LIGHT

**CLACKAMAS COUNTY**
JAIL INMATE ACCOUNT
2051 KAEN RD. #430
OREGON CITY, OR 97045
(503) 742-5990

US BANK
24-22/1230

83416

April 22, 2016

5000.00

PAY  Five Thousand and 00/100

TO THE ORDER OF

CLACKAMAS COUNTY CIRCUIT COURT

SECURITY RELEASE

VOID AFTER 90 DAYS

⑈083416⑈ ⑈123000220⑈ 153695235926⑈

RUB OR BREATHE ON THE PINK LOCK & KEY ICONS—COLOR WILL FADE AND THEN REAPPEAR ON AN AUTHENTIC CHECK—IF COLOR DOES NOT FADE DO NOT ACCEPT

---

CLACKAMAS COUNTY · JAIL INMATE ACCOUNT

83416

```
Date      :
Amount    : $ 5000.00
Payee     : CLACKAMAS COUNTY CIRCUIT COURT
Memo      : SECURITY RELEASE

Check #   : 83416
Type      : WDRAWAL CHECK
Station   : 5
Operator  : 19524416
Resident  : HOLLINGSWORTH, JORDEN TIMOTHY
```

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR Clackamas COUNTY

JUDGE Rastetter, Thomas J - Courtroom 7
June 23, 2016 - Thursday    --    June 23, 2016 - Thursday

Verified Correct Copy of Original 6/23/2016

| Time<br>Case # | Case Title<br>Matter / Charge / Case Type | Relationship<br>Attorney | Room<br>Judge | Disposition |
|---|---|---|---|---|

**8:30 AM**

**CR1501848**

**State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH**                    P:    ~~REGAN, MICHAEL R~~
                                                                        D:    KNAUSS, ARTHUR B

**10/23/2015**

File Scanned

Related Cases:    Hearing - Status Check    Sexual Abuse in the First Degree    Offense Felony
                  Trial 8/9/16

                  Sexual Abuse in the First Degree

✓ LOFT

---

**8:30 AM**

**16CR23092**

**State of Oregon**                    P:    CLACKAMAS COUNTY DISTRICT ATTORNEY
**vs**                                 D:    Prose
**Aron James Hartman**

**04/19/2016**

                  Hearing - Case Management    Theft in the First Degree    Offense Felony
Related Cases:

✓ CMA July 29, 2016 @ 830am

---

**8:30 AM**

**16CR10664**

**State of Oregon**                    P:    CLACKAMAS COUNTY DISTRICT ATTORNEY
**vs**                                 D:    RADER, DIANE C
**DOUGLAS O GRAY**

**02/24/2016**

                  Hearing - Case Management    Theft in the Third Degree    Offense
Related Cases:    add $215.00                                               Misdemeanor

✓ Pleads lo sentencing July 13, 2016 @ 830am

---

Judge    Rastetter
DA       Brooks
Reporter FTR
Clerk    KRL

Page 3 of 4

These Matters came before the Court the 23rd day of June, 2016, the state appearing by a duly appointed Deputy District Attorney, the Defendant appearing as indicated and the Court being fully advised in the premises, It is Hereby Ordered as specified above.

Judge

1

2

3

4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                        FOR THE COUNTY OF CLACKAMAS

STATE OF OREGON,                    )   Court No. CR1501848
6                    Plaintiff,      )
            vs.                      )
7   JORDEN TIMOTHY HOLLINGSWORTH ,   )   DEMAND FOR DISCOVERY
    DOB: 08/01/1993                  )
8                    Defendant.      )
                                     )   DA No. 005270149
9            COMES NOW the State of Oregon by the undersigned Deputy District Attorney, and

10  demands that the above-named defendant disclose to the District Attorney of Clackamas

11  County the following information and material within his possession or control:

12  1.    The names and addresses of persons, including himself, whom he intends to call as
          witnesses at trial, together with relevant written or recorded statements or memoranda
13        of any oral statements of such persons other than himself.

14  2.    Any reports or statements of experts, made in connection with the particular case,
          including results of physical or mental examinations and/or scientific tests,
15        experiments or comparisons, which the defendant intends to offer in evidence at the
          trial.
16
    3.    Any books, papers, documents, photographs or tangible objects which the defendant
17        intends to offer in evidence at trial.

18  DATED: 8/2/2016

19  JOHN S. FOOTE
    District Attorney
20
    By _____
21    Sarah J. Dumont, OSB #035419
      SarahDum@co.clackamas.or.us
22    Deputy District Attorney

23  **POINTS & AUTHORITY:**
    ORS 135.835.
24

25                          Clackamas County District Attorney
                         807 Main Street, Room 7, Oregon City, OR 97045
                         Phone: (503) 655-8431  Fax: (503) 650-8943

## CERTIFICATE OF SERVICE

Defendant Name: JORDEN TIMOTHY HOLLINGSWORTH      DA No:      005270149
                                                  Court No:   CR1501848

### CIDC Mailing

    I hereby certify that I served the forgoing DEMAND FOR DISCOVERY on Arthur Knauss, attorney of record for defendant JORDEN TIMOTHY HOLLINGSWORTH, on the date listed below, by depositing in the attorney's mail slot in the Clackamas County Courthouse in Oregon City, Oregon, on said day a true copy thereof, certified by me as such and addressed to said attorney.

DATED at Oregon City, Oregon, August 2, 2016.

                                          JOHN S. FOOTE
                                          District Attorney

                                          By _____
                                          Sarah J. Dumont, OSB #035419
                                          SarahDum@co.clackamas.or.us
                                          Deputy District Attorney

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone: (503) 655-8431 Fax: (503) 650-8943

1

2

3

4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                        FOR THE COUNTY OF CLACKAMAS

6   STATE OF OREGON,                    )  Court No. CR1501848
                      Plaintiff,        )
                vs.                     )
7   JORDEN TIMOTHY HOLLINGSWORTH ,      )  STATE'S DEMAND FOR DISCOVERY
    DOB: 08/01/1993                     )  AND LEGAL MEMORANDUM
8                     Defendant.        )
                                        )
9   _____    DA No. 005270149

10          COMES NOW the State of Oregon by the undersigned Deputy District Attorney,

11   Sarah Dumont and requests that the Court to impose a deadline of August 5th at 10am by

12   which the defendant must provide discovery in the above-captioned matter.  If the defense

13   fails to provide the discovery by that date and time then the State requests that the Court

14   impose sanctions on the defense and disallow the testimony of their purported "expert."

15                              I.  Factual History

16          This is the third trial setting of this case.  Several days before the second trial date of

17   April 26, 2016, I was informed by the defense that they were intending to call a memory

18   expert and that because the expert was unavailable they needed to set over the trial.  This was

19   surprising because the State had not previously been notified that the defense was intending

20   to call an expert.  Further, because the victim and another essential witness live in Oklahoma

21   the State had already made travel plans to fly them to Oregon.  The State objected to the

22   motion to set over the trial date.  The trial got reset to August 9, 2016.

23

24   Page 2 of 2 - STATE'S DISCOVERY TO DEFENDANT

         Clackamas County District Attorney
         807 Main Street, Room 7, Oregon City, OR  97045
25       Phone: (503) 655-8431  Fax: (503) 650-8943

1    The State filed its first Demand for Discovery on April 4, 1016.  There was a status

2    check date of June 23, 2016.  At that time I had received the name of the defense expert but

3    no other information about this purported expert.  I verbally renewed my request for

4    discovery to the defense attorney and specifically requested the expert report.  I did not

5    receive a report.  Having not received a response to the first written demand for discovery or

6    the verbal demand on the status check date, the State filed a second Demand for Discovery

7    August 2, 2016.  The State did not receive a report as requested.  The State renewed its

8    request for the defense report via email.

9    Trial is currently set for August 9th.  The State still does not have a defense report

10    although the defense has indicated that one will be forwarded.  Essentially, the defense has

11    had its expert since at least June 23rd but has still not provided a report.  Again, the State has

12    made travel plans to fly the victim and the other essential witness from Oklahoma but is not

13    in receipt of reciprocal discovery necessary to prepare its case for trial.

14

15                              II. Legal Argument

16            A. Generally

17

18    "[O]ne of the primary purposes of the criminal discovery statutes is to assure to both

19    the state and the defendant the opportunity, in advance of trial, to be provided with the

20    information required by these statutes *so as to enable each party to prepare adequately for

21    trial and to prevent 'surprise' at the time of trial* . . . [H]owever, another important purpose

22    of the criminal discovery statutes is one of efficient judicial administration, *i.e.*, to avoid

23    unnecessary trials, to expedite trials and to prevent the expense and delay of continuances

24    Page 2 of 2 - STATE'S DISCOVERY TO DEFENDANT

25

1    when either party claims to be unprepared to go to trial because of failure by the other party

2    to comply with these discovery statutes." *State v. Dyson*, 292 Or 26, 35-36 (1981) (emphasis

3    added).

4            Under ORS 135.835 – 135.845, it is the defense's obligation to disclose "*as soon as*

5    *practicable*" after the filing of an accusatory instrument the following information:

6    1.    The names and addresses of persons, including himself, whom he intends to call as
            witnesses at trial, together with relevant written or recorded statements or memoranda
7            of any oral statements of such persons other than himself.

8    2.    Any reports or statements of experts, made in connection with the particular case,
            including results of physical or mental examinations and/or scientific tests,
9            experiments or comparisons, which the defendant intends to offer in evidence at the
            trial.
10

11    3.    Any books, papers, documents, photographs or tangible objects which the defendant
            intends to offer in evidence at trial.

12    4.    The defense must provide timely discovery to the prosecution any exhibits or
            information counsel can "reasonably predict" may be used to impeach a state's
13            witness. *State v. Young*, 94 Or App 683, 689 (1989).

14    The defense has a continuing duty to "promptly notify" the State of the aforementioned

15    evidence as it becomes available.  ORS 135.845(2).

16                    B. Reciprocal Discovery

17            In *State v. Mai*, 294 Or 269, 274 (1982), (a case out of Clackamas County) defense

18    counsel advised the jury in his opening statement that he would present certain witnesses.

19    The witnesses had previously not been disclosed to the prosecution and the state objected to

20    the calling of the witnesses. The court found that defense counsel had in fact failed to comply

21    with ORS 135.835 and directed him to make his witnesses available for interviews during the

22    recess. Defense counsel then obstructed the prosecutor's attempt to interview the witnesses

23    by advising them that they need not answer the state's questions during the interview. After

24    Page 2 of 2 - STATE'S DISCOVERY TO DEFENDANT

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR  97045
Phone: (503) 655-8431  Fax: (503) 650-8943

25

EXHIBIT 108, Page 61 of 124
Case No. 3:20-cv-01567-MC
Def. Ex. D
Page 54 of 99

1  being advised of defense counsel's conduct, the trial court imposed sanctions and prohibited

2  the calling of the defendant's girlfriend as a witness as a penalty for violation of the

3  reciprocal discovery statutes and obstruction of the discovery process. Because the

4  defendant's attorney thwarted the court's efforts "to avoid prejudice to the defendant and to

5  the state," the state was prejudiced by its inability to talk to the witnesses in advance.

6          In deciding _Mai_, the Oregon Supreme Court specifically referred to "reciprocal

7  discovery," noting: "Reciprocal discovery is a recent development in the field of criminal

8  law. Following the decisions in _Brady v. Maryland_, 373 U.S. 83, 83 S Ct 1194, 10 L Ed 2d

9  215 (1963), and _Jencks v. United States_, 353 U.S. 657, 77 S Ct 1007, 1 L Ed 2d 1103 (1957),

10  most states enacted reciprocal discovery statutes. Oregon's reciprocal discovery statutes were

11  enacted in 1973. Or Laws 1973, ch 836, §§ 213-220. Discovery tends to equalize the

12  investigative power of the parties. As a result, defendants are better able to defend, for to

13  some extent they have the benefit of the vast power of the state in investigating crimes. Such

14  statutes benefit the defendant in particular by tending to take away the edge the state enjoys

15  by virtue of its powerful investigational resources. However, the legislature, in requiring the

16  prosecution to make discovery under ORS 135.845, exacted a _quid pro quo_ -- discovery from

17  the defendant under ORS 135.835 -- in default of which the trial judge could impose the

18  sanction and "refuse to permit the witness to testify." ORS 135 ORS 135.865 (emphasis

19  added). The Court held a trial court does not violate a defendant's right to compulsory

20  process under Article I, section 11 of the Oregon Constitution and the Sixth Amendment to

21  the federal constitution when it prohibits a witness from testifying because the defense fails

22  to disclose the name of the witness to the State prior to trial. _Id_. at 271.

23

24  Page 2 of 2 - STATE'S DISCOVERY TO DEFENDANT

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone: (503) 655-8431 Fax: (503) 650-8943

25

1    In *State v. Wolfe*, 273 Or 518 (1975), after five days of trial the state rested its case.

2  The defense called as its first witness, Frances Howard. The State objected on the ground that

3  defendant had not previously disclosed to the state the name of that witness, as required by

4  ORS 135.835.  In response, the defense attorney stated that he told the prosecuting attorney

5  "yesterday that [he] intended to call a number of people, and [he] don't know whether [he]

6  gave [the prosecutor] the names." The trial judge held that "under the provisions of [ORS]

7  135.865, the court is going to refuse to permit the witness to testify." The defendant made no

8  offer of proof of what the witness's testimony would have been. Under these facts, the Court

9  held that under the terms of ORS 135.835, 135.845 and 135.865 the trial court was justified

10  in invoking sanctions provided by ORS 135.865 for use in the event of violations of ORS

11  135.835 and 135.845.

12      C.  The Defendant Must Disclose Evidence, Including Impeachment
            Evidence, He May "Reasonably Predict" He Will Use at Trial
13

14      The defendant may argue that he is not required to disclose impeachment evidence he

15  "intends" to offer at trial until the necessity for using that evidence arises.  The defense

16  counsel in *State v. Young*, 94 Or. App. 683 (1989), however, made and lost the same

17  argument.

18      Five days before the trial began, defense counsel gave the state a list of witnesses.

19  She did not list any exhibits. In court, on the morning of trial, the prosecutor saw defense

20  counsel mark a tape and transcripts of the tape as exhibits. She had had the tape for about two

21  weeks and had made two transcripts of it but had not disclosed the tape or the transcripts to

22  the prosecutor. Defendant's counsel explained to the court that the tape was of a recent

23  telephone conversation between defendant's son and the victim and that she had no objection

24  to the prosecutor listening to the tape and reading the transcripts.

24  Page 2 of 2 - STATE'S DISCOVERY TO DEFENDANT

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR  97045
Phone: (503) 655-8431  Fax: (503) 650-8943

25

1    From the tape and transcripts, a jury could find that the victim had told defendant's

2    son that defendant had not committed the offense and that a CSD worker had promised the

3    victim immunity from prosecution on certain juvenile charges if he testified against

4    defendant at the sodomy trial but, otherwise, the state would prosecute him on the juvenile

5    charges and for perjury for his grand jury testimony against defendant.

6    The prosecution told the court that the discovery statutes required that defendant

7    timely disclose the tape and transcripts to him and that the state would be prejudiced if

8    defendant used the tape and transcripts at trial. Apparently, the prosecutor urged the court to

9    suppress the tape and transcripts:

10    "[THE STATE]: * * * [I]f I had done this to the defense, what would the sanction be?

11    "THE COURT: You know what I would do * * *.

12    "[THE STATE]: I do know what you would do and I'm asking for the same sanction

13    in regard to the defense."

14    Defendant's counsel asserted that she had not committed a discovery violation,

15    because ORS 135.835(3) and ORS 135.845 only apply to evidence that a defendant "intends"

16    to offer. She argued that she intended to offer the tape and transcripts for impeachment

17    purposes only if the victim were to testify contrary to his statements on the tape.

18    Consequently, she argued, she did not "intend" to offer the tape and transcripts within the

19    meaning of the discovery statutes.

20    The court found that defendant's counsel had committed a discovery violation. The

21    Court of Appeals agreed, finding defendant's counsel's failure to disclose the tape and

22    transcripts to the prosecutor was a violation of ORS 135.835(3) and ORS 135.845. The court

23    noted that in "*State v. Burdge*, 295 Or 1, 664 P2d 1076 (1983), the court discussed the

24    Page 2 of 2 - STATE'S DISCOVERY TO DEFENDANT

Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone: (503) 655-8431 Fax: (503) 650-8943

25

1    applicability of the discovery statutes to impeachment witnesses. It recognized that 'in many

2    cases [it is] reasonably predictable what an adverse witness will testify to, therefore making

3    the selection of impeachment witnesses possible.'" 295 Or at 6. Therefore, when it becomes

4    "reasonably predictable" what an adverse witness will testify to, selecting the impeachment

5    witness and/or impeachment information is possible and therefore must be discovered.

6        "What the court said with respect to impeachment witnesses applies also to exhibits.

7    We conclude that, if defense counsel, even though not certain, can 'reasonably predict' that

8    she will use certain exhibits to impeach a state's witness, she must give timely discovery to

9    the prosecutor." *Young* at 689.

10                                     III. Conclusion

11        The defense has known the identity of its expert since at least June 23rd and intends to

12    provide an expert report. Unfortunately, no report has been provided. This is crucial

13    information. The State is flying witnesses from out of State. The State requests that the

14    Court require the defense to provide their expert report by August 5th at 10am. If that date is

15    not met then the State further requests that the Court exclude the expert testimony as a

16    sanction for the defense discovery violation.

17    DATED: 8/4/2016

18    JOHN S. FOOTE
       District Attorney

19

20    By

         Sarah J. Dumont, OSB #035419

21    SarahDum@co.clackamas.or.us
       Deputy District Attorney

22

       **POINTS & AUTHORITY:**

23    ORS 135.835.

24    Page 2 of 2 - STATE'S DISCOVERY TO DEFENDANT

25

## CERTIFICATE OF SERVICE

Defendant Name: JORDEN TIMOTHY HOLLINGSWORTH          DA No:     005270149
                                                      Court No:   CR1501848

### CIDC Mailing

    I hereby certify that I served the forgoing STATE'S DEMAND FOR DISCOVERY AND LEGAL MEMORANDUM on Arthur Knauss, attorney of record for defendant JORDEN TIMOTHY HOLLINGSWORTH, on the date listed below, by depositing in the attorney's mail slot in the Clackamas County Courthouse in Oregon City, Oregon, on said day a true copy thereof, certified by me as such and addressed to said attorney.

DATED at Oregon City, Oregon, August 4, 2016.

                           JOHN S. FOOTE
                           District Attorney

                           By _____
                           Sarah J. Dumont, OSB #035419
                           SarahDum@co.clackamas.or.us
                           Deputy District Attorney

Page 1 of 1 — CERTIFICATE OF SERVICE / JORDEN TIMOTHY HOLLINGSWORTH / 005270149 / CR1501848
Clackamas County District Attorney
807 Main Street, Room 7, Oregon City, OR 97045
Phone: (503) 655-8431  Fax: (503) 650-8943

EXHIBIT 108, Page 66 of 124
Case No. 3:20-cv-01567-MC
Pet. Exh. 1
Page 59 of 99

IN THE CIRCUIT COURT OF THE STATE OF OREGON
IN AND FOR THE COUNTY OF CLACKAMAS

ENTERED
AUG 16 2016
BY:HRM

State of Oregon,

                                    Plaintiff

                vs.                              Case No. _CR150184?_

Jorden Timothy Hollingsworth         WAIVER OF JURY TRIAL

                                    Defendant

*Verified Correct Copy of Original 8/16/2016.*

I _Jorden T Hollingsworth_, the defendant in this matter, appearing in person and with my attorney, ___Apt Knauss___, understand, and my attorney has explained to me, that:

- I have the right to a jury trial on the determination of whether I am guilty or not guilty of the crime(s) charged;
- I have the right to a jury trial on sentence-enhancement facts that the state has alleged, except as to any sentence-enhancement facts that I admit;
- If the sentence-enhancement facts relate to me and not to the crime(s) charged, I am entitled to a jury trial on those facts separately if the jury finds me guilty of the crime(s) charged;
- If I waive the right to a jury trial on the issue of guilt, I also waive the right to a jury trial on any sentence-enhancement facts; the judge would decide all issues of fact as to guilt and as to sentencing.

After being fully advised, and of my own free will, I wish to waive my rights to jury trial in this matter as follows:

I WAIVE my right to have a jury decide whether I am guilty or not guilty of the crime(s) charged and any sentence-enhancement facts.

I DO NOT waive my right to have a jury decide whether I am guilty or not guilty of the crime(s) charged, but I WAIVE my right to have a jury decide the following sentence-enhancement facts *(check all that apply)*:

- o Any enhancement facts related to me as the DEFENDANT.
- o Any enhancement facts related to the OFFENSES charged in the accusatory instrument.

___8-9-16___                _____        _____
Date                        Defendant                   Defense Attorney

**THE COURT FINDS:** Defendant's waiver of jury trial is intelligent, knowing, and voluntary, and the court accepts that waiver.

___8/9/2016___              _____
Date                        Judge

(02/23/11)

CR1601848
WVJT
Waiver – Jury Trial
6600268

ENTERED
AUG 16 2016
By:HRM

To:    Chief Corrections Officer
       Clackamas County Jail

Verified Correct Copy of Original 8/16/2016.

## CUSTODY MEMORANDUM

Defendant: Hollingsworth, Jordan Timothy    Charge: Sex Assault 1 x 2

Circuit Court File No.: CR 1501848

The custodial status of the above-named defendant has today been affected by the undersigned Judge as follows:

☐    Sentenced to:

       ☐ **Clackamas County Jail** for _____ .
                                              (Period of Time)
       ☐ **Clackamas County Jail** for _____ ,
                                              (Period of Time)
       as a condition of probation.

       ☐ **Department of Corrections** for _____ .
                                              (Period of Time)

☐    Security amount set: _____ .

☑    Other: Defendant found guilty of
       Count I & Count II; Hold
       Pending Sentencing. No release,

       _____

       _____

Date: 8/11/16 _____

                                    _____
                                              Circuit Court Judge

CR1501848
MM
Memorandum
6600246

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR Clackamas COUNTY

STATE OF OREGON
CLACKAMAS COUNTY COURTS
FILED

16 AUG 11 PM 5: 55

ENTERED _____ BY _____
DOCKETED _____ BY _____

ENTERED
BY
AUG 16 2016
By:HRM

JUDGE Weber, Katherine E - Courtroom 2
August 11, 2016 - Thursday  --  August 11, 2016 - Thursday

Verified Correct Copy of Original 8/16/2016.

| Time Case # | Case Title Matter / Charge / Case Type | Relationship Attorney | Room Judge | Disposition |
|---|---|---|---|---|

**9:00 AM**

**CR1501848**

**10/23/2015**

**State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH**

P:  Dumont, Sarah
D:  KNAUSS, ARTHUR B

File Scanned

Trial - Court
DAY 3

Sexual Abuse in the First Degree

Offense Felony

Sexual Abuse in the First Degree

**Related Cases:**

8:33 - 9:30
10:03 - 10:47
11:07 - 11:44

12:06 - 12:07

Ct. 1 - Guilty
Ct. 2 - Guilty

CR1501848
OR
Order
6600164

Judge    Weber
DA       Dumont
Reporter FTR2
Clerk    JMW

Page **1** of 1

These Matters came before the Court the 11th day of Aug , 20 16 , the state appearing by a duly appointed Deputy District Attorney, the Defendant appearing as indicated and the Court being fully advised in the premises, It is Hereby Ordered as specified above.

Judge _____

STATE OF OREGON
IN THE CIRCUIT COURT OF THE STATE OF OREGON CLACKAMAS COUNTY COURTS
FOR Clackamas COUNTY    FILED

JUDGE  Weber, Katherine E - Courtroom 2    16 AUG 11  PM 12:33

August 10, 2016 - Wednesday   --   August 10, 2016 - Wednesday    ENTERED_____ BY ENTERED

DOCKETED_____ BY

Disposition AUG 16 2016

By: HRM

Verified Correct Copy of Original 8/16/2016.

| Time | Case Title | Relationship | Room |
| Case # | Matter / Charge / Case Type | Attorney | Judge |

**9:00 AM**

**CR1501848**    **State of Oregon VS. JORDEN TIMOTHY**    P:    Dumont, Sarah
**HOLLINGSWORTH**    D:    KNAUSS, ARTHUR B

**10/23/2015**

File Scanned

Trial - Court    Sexual Abuse in the First Degree    Offense Felony
DAY 2

Sexual Abuse in the First Degree

**Related Cases:**

9:06 - 9:43
9:57 - 10:12
10:16 - 10:31

10:39 - 10:47
11:50 - 12:01    Cont'd  to  8/11/16 @ 8:30
1:18 - 3:10
3:30 - 4:33

CR1501848
OR
Order
6600163

Judge  Weber
DA   Dumont
Reporter  FTR2
Clerk   Jmv

Page **1** of **1**

These Matters came before the Court the 10th day of Aug , 20 16 , the state appearing by a duly appointed Deputy District Attorney, the Defendant appearing as indicated and the Court being fully advised in the premises, It is Hereby Ordered as specified above.

Judge

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR Clackamas COUNTY

JUDGE  -  Weber, Katherine E – Courtroom 2
August 09, 2016 - Tuesday

STATE OF OREGON
CLACKAMAS COUNTY COURTS
FILED

16 AUG 11  PM 2: 33
ENTERED _____  ENTERED
DOCKETED _____  AUG 16 2016
                   By:HRM

*Verified Correct Copy of Original 8/16/2016*

| Time Case # | Case Title Matter / Charge / Case Type | Relationship Attorney | Room  Disposition Judge |
|---|---|---|---|
| **9:00 AM** | | | |
| CR1501746 | **State of Oregon VS. CHRISTOPHER JAMES BARTLETT** | P: Berzins, Eriks D: MOORE, CHARLES A | |
| 10/19/2015 | File Scanned | | |
| 9:14 - 9:15 | Trial - Twelve Person Jury 2 DAY JURY TRIAL | Unlawful Use of a Weapon | Offense Felony |
| **Related Cases:** 9:21 - 9:22 | | Possession of Methamphetamine | |
| Reset to 11/8/16 - 2 day Jury trial | | Possession of Cocaine | |

| | | | |
|---|---|---|---|
| **9:00 AM** | | | |
| CR1501848 | **State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH** | P: Dumont, Sarah D: KNAUSS, ARTHUR B | |
| 10/23/2015 | File Scanned | | |
| 9:34 - 11:05 | Trial - Court 3 DAY COURT TRIAL | Sexual Abuse in the First Degree | Offense Felony |
| **Related Cases:** 1:16 - 2:46 3:00 - 3:00 | · Cont'd to 8/10/16 @ 9 AM | Sexual Abuse in the First Degree | |

CR1601848
OR
Order
6560162

Judge Weber
DA Berzins / Dumont
Reporter FTR2
Clerk JMW

Page 1 of 1

These Matters came before the Court the 9th day of Aug , 20 16 , the state appearing by a duly appointed Deputy District Attorney, the Defendant appearing as indicated and the Court being fully advised in the premises, It is Hereby Ordered as specified above.

Judge _____

# IN THE CIRCUIT COURT OF THE STATE OF OREGON
## FOR THE COUNTY OF CLACKAMAS
### NOTICE OF COURT APPEARANCE

STATE OF OREGON                                    Case No. _CR1501848_

vs

TO: _Hollingsworth, Jordan Timothy_ , Defendant

**If requesting a Court appointed attorney report to Room 200 immediately.**

You are required to appear in person in this Court as follows; failure to do so may subject you to criminal prosecution:

Hearing: _Sent. w/ KEW_     Date: _9/30/16_     Time: _1:00_

**NOTE:  Failure to so appear or report as above will result in a warrant for your arrest.**
         **You are required to maintain contact with your attorney.**

> You should come to sentencing prepared to pay all fines, fees, and costs. A clerk or your attorney can tell you how much you may have to pay. Payment in full may be required at sentencing.
> If you have luxury items such as a boat, motorcycle, ATV, video game system, iPod, television, etc. you may be required to sell those items to satisfy your fines, fees, and costs.

ACKNOWLEDGEMENT:                                    Clerk: _JMW_

I have been provided with a copy of the foregoing notice and hereby acknowledge its receipt.

Dated this _11th_ day of _August_ . 20 _16_ .

Defendant _____     Phone No. _____     Attorney: _Knauss_

Distribution  White - Court, Canary - District Attorney, Pink - Defense Attorney, Gold - Defendant          CIRF2232(Rev 5/11/10)

**Pet. Exh. 1**
**Page 65 of 99**

Verified Correct Copy of Original 8/16/16.

**CLACKAMAS COUNTY COMMUNITY CORRECTIONS**
1024 MAIN STREET • OREGON CITY • OREGON • 97045
TELEPHONE 503-655-8603 • • • FAX 503-650-8942

Capt. Chris Hoy
Director

_ Verified Correct Copy of Original 8/25/2016 _

## PSI Referral Memorandum

TO:               Clackamas County Community Corrections
FROM:             Honorable Judge   Katherine Weber

DEFENDANT:        Hollingsworth, Jordan Timothy
                  ☑ In Custody          ☐ Out of Custody
DOB:              8/1/93
CASE #:           CR1501848
CHARGE(S):        Sex Abuse 1 x 2
REFERRAL DATE:    8/11/16
SENTENCING DATE:  9/30/16
DEFENSE ATTORNEY: Knauss, Art
DEFENSE EMAIL:    art@abknaussatty.com

SPECIAL NOTES:    _____
                  _____
                  _____
                  _____

☐   Provide copy of referral to defendant with instructions to report to Community
    Corrections immediately
☑   Fax copy of referral to Community Corrections, 503-650-8942

**If you are receiving this referral you are to report immediately to Clackamas County
Community Corrections, 1024 Main Street and present this form. At that time you will be
provided with further reporting instructions.**

CR1501848
MM
Memorandum
5549197

Verified Correct Copy of Original 8/26/2016

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**
**FOR THE COUNTY OF CLACKAMAS**

ACKNOWLEDGMENT OF RECEIPT OF EXHIBITS

ENTERED

AUG 2 6 2016

By: MAP

Case Name: **State**                              v. **Hollingsworth, Jorden Timothy**

In the Matter of:

Case Number(s):  **CR1501848**

Clerk:  **JMW**                    Trial/Hearing Date(s):  **8/09 – 8/11/2016**

Type of Proceeding:  **Criminal – Court Trial**

## CUSTODIAN FOR PLAINTIFF / PETITIONER

I acknowledge receipt of the exhibits as listed in the attached list and submitted by Plaintiff /
Petitioner in the above matter, subject to the requirements of Uniform Trial Court Rule 6.120.

_8/11/16_
Date

_[signature]_
Signature of Custodian

_Sarah Dumont_
Printed Name

## CUSTODIAN FOR DEFENDANT / RESPONDENT

I acknowledge receipt of the exhibits as listed in the attached list and submitted by Defendant /
Respondent in the above matter, subject to the requirements of Uniform Trial Court Rule 6.120.

_8/11/16_
Date

_[signature]_
Signature of Custodian

_Art Knauss_
Printed Name

CT-MS-01(5/1/2012)

CR1501848
RPEB
Receipt – Exhibit
5570366

Verified Correct Copy of Original 8/26/2016

# EXHIBITS

Date: 8/09/ - 8/11/2016
Judge: Katherine Weber
Clerk: Jered Ward

Case #: CR1501848
Case Name: State v Hollingsworth, Jorden
Attorneys: State: Dumont, Sarah
Def.: Knauss, Art

**Plaintiff/Petitioner**

| Marked | Description | Offered | Received |
|--------|-------------|---------|----------|
| 1 | Photo of Step-Mother's text messages | X | X |
| 2 | Childrens' Center Interview Video – CD | X | X |
| 3 | Drawings from Children's Center | X | X |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |

**Defendant/Respondent**

| Marked | Description | Offered | Received |
|--------|-------------|---------|----------|
| 101 | Dr. Wendy Bourg Curriculum Vitae | X | X |
| 102 | Living Room Diagram | X | X |
| 103 | | | |
| 104 | | | |
| 105 | | | |
| 106 | | | |
| 107 | | | |
| 108 | | | |
| 109 | | | |
| 110 | | | |
| 111 | | | |
| 112 | | | |
| 113 | | | |
| 114 | | | |
| 115 | | | |
| 116 | | | |

*Page 1 of 2*



**CLACKAMAS COUNTY COMMUNITY CORRECTIONS**
1024 MAIN STREET • OREGON CITY • OREGON • 97045
TELEPHONE 503-655-8603 • • • FAX 503-650-8942

Capt. Chris Hoy
Director

_Verified Correct Copy of Original 9/1/2016._

August 15, 2016

Attn: Judge Weber

RE: PSI for Hollingsworth, Jordan Timothy
Case: CR1501848

**ENTERED**
AUG 0 1 2016
By: KLT

Honorable Judge Weber:

Community Corrections and the Courthouse have an agreement to allow for 60 days for any PSI that has been ordered. We are requesting an extension on the above PSI, to allow for the full 60 days. We are requesting that the sentencing date be moved to 10/14/16 or later to allow PO Cooper enough time to complete his other PSI's as well as this one.

Feel free to contact me with any questions, 503-655-8739. Thank you for your consideration.

Sincerely,

Kelly Kuklenski
Community Corrections Supervisor

CR1501848
LT
Letter
5695805



**CLACKAMAS COUNTY COMMUNITY CORRECTIONS**
1024 MAIN STREET • OREGON CITY • OREGON • 97045
TELEPHONE 503-655-8603 • • • FAX 503-650-8942

Capt. Chris Hoy
Director

<div style="text-align:left">_Verified Correct Copy of Original 9/1/2016_</div>

# PSI Referral Memorandum

TO:              Clackamas County Community Corrections

FROM:            Honorable Judge Katherine Weber

DEFENDANT:       Hollingsworth, Jordan Timothy 547991-00

☑ In Custody          ☐ Out of Custody

DOB:             8/1/93

CASE #:          CR1501848

CHARGE(S):       Sex Abuse 1 x 2

REFERRAL DATE:   8/11/16

SENTENCING DATE: 9/30/16

DEFENSE ATTORNEY: Krauss, Art

DEFENSE EMAIL:   art@abKraussatty.com

SPECIAL NOTES:   _____
                 _____
                 _____
                 _____

☐ Provide copy of referral to defendant with instructions to report to Community
    Corrections immediately

☑ Fax copy of referral to Community Corrections, 503-650-8942

If you are receiving this referral you are to report immediately to Clackamas County
Community Corrections, 1024 Main Street and present this form. At that time you will be
provided with further reporting instructions.

State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848

# IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR THE COUNTY OF CLACKAMAS

| | | |
|---|---|---|
| State of Oregon, | ) | |
| Plaintiff | ) | |
| | ) | Case No.: CR1501848 |
| vs. | ) | |
| | ) | JUDGMENT |
| | ) | |
| JORDEN TIMOTHY HOLLINGSWORTH, | ) | Case File Date: 10/23/2015 |
| Defendant | ) | District Attorney File #: 005270149 |

## DEFENDANT

True Name: JORDEN TIMOTHY HOLLINGSWORTH

Date Of Birth: 08/01/1993                    State Identification No (SID): 19524416OR

Fingerprint Control No (FPN): 00000000

## HEARING

Proceeding Date: 10/24/2016

Judge: Katherine E Weber

Court Reporter: FTR, Courtroom 2

Defendant appeared in person and was in custody. The court determined that the defendant was indigent for purposes of court-appointed counsel, and the court appointed counsel for the defendant.  The defendant was represented by Attorney(s) ARTHUR B KNAUSS, OSB Number 731700. Plaintiff appeared by and through Attorney(s) SARAH J DUMONT, OSB Number 035419.

## COUNT(S)

It is adjudged that the defendant has been convicted on the following count(s):

### Count 1 : Sexual Abuse in the First Degree

Count number 1, Sexual Abuse in the First Degree, 163.427, Felony Class B, committed on or about 02/13/2015. Conviction is based upon a Court Verdict of Guilty on 08/11/2016.

Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 1 is 8 and the Criminal History Classification (CHC) is B.

This sentence is pursuant to the following special factors:
- Sentence per ORS 137.700

EXHIBIT 108, Page 78 of 124
Case No. 3:20-cv-01567-MC
Page 71 of 99

State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848

## Sentence Instructions

Defendant shall:

- Report as a sex offender under ORS 181.596, report with the Department of State Police, a city police department, a county sheriff's office or the supervising agency:  (A) When supervision begins; (B) Within 10 days of a change in residence; (C) Once each year within 10 days of the probationer's date of birth; (D) Within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; and (E) Within 10 days of a change in work, vocation or attendance status at an institution of higher education.

### Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 75 month(s). Defendant is remanded to the custody of the Clackamas Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The defendant is not eligible for earned time/good time credit. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

### Post-Prison Supervision

The term of Post-Prison Supervision is 36 month(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

## Count 2 : Sexual Abuse in the First Degree

Count number 2, Sexual Abuse in the First Degree, 163.427, Felony Class B, committed on or about 08/24/2009. Conviction is based upon a Court Verdict of Guilty on 08/11/2016.

### Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 2 is 8 and the Criminal History Classification (CHC) is A.

This sentence is pursuant to the following special factors:

- Sentence per ORS 137.700

State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848

Sentence Instructions

Defendant shall:

- Report as a sex offender under ORS 181.596, report with the Department of State Police, a city police department, a county sheriff's office or the supervising agency:  (A) When supervision begins; (B) Within 10 days of a change in residence; (C) Once each year within 10 days of the probationer's date of birth; (D) Within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; and (E) Within 10 days of a change in work, vocation or attendance status at an institution of higher education.

Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 75 month(s). Defendant is remanded to the custody of the Clackamas Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The defendant is not eligible for earned time/good time credit. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

This sentence shall be concurrent with the following cases Count number 1.

Post-Prison Supervision

The term of Post-Prison Supervision is 36 month(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

If convicted of a felony or a crime involving domestic violence, you may lose the right to buy, sell, transport, receive, or possess a firearm, ammunition, or other weapons in both personal and professional endeavors pursuant to ORS 166.250, ORS 166.291, ORS 166.300, and/or 18 USC 922(g).

EXHIBIT 108, Page 80 of 124

State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848

Payment Schedule

Payment of the fines, fees, assessments, and/or attorney's fees noted in this and any subsequent Money Award shall be
scheduled by the clerk of the court pursuant to ORS 161.675.

Payable to:

    Clackamas County Circuit Court
    807 Main St
    Oregon City, Oregon 97045
    P: 503.655.8447
    F: http://courts.oregon.gov/Clackamas

Dated the _____ day of _____, 20_____

Signed: 10/24/2016 02:39 PM

Signed: _____

    Katherine E Weber         **Circuit Court Judge Katherine E. Weber**

NAME: _Jorden Timothy Hollingsworth_ DOB: _8/1/93_    SID# (IF KNOWN): _195 244 16_

## COURT NOTICE OF SEX OFFENDER REGISTRATION OBLIGATION
•Please Have the Offender Read the Following and Sign in the Space Provided•

Anyone convicted in Oregon of certain sex offenses must register as a sex offender for life under Oregon Revised Statutes (ORS) Chapter 181.

You must report in person to an Oregon law enforcement agency within **ten (10) days** of your discharge or release from jail, prison, or detention facility, OR release or placement on probation by the courts. Report in the county where you were discharged or released. The residence address must be where you reside (live). A post office box is not acceptable.

You must also report in person:
(A) within ten (10) days of a change of residence (whether or not you are homeless or transient);
(B) once each year within ten (10) days of your birthday, regardless of whether you have changed residence;
(C) within ten (10) days of being employed or attending classes at an Oregon accredited college; **and**
(D) within ten (10) days of any change in employment or attending classes at an Oregon accredited college.

If you plan to move out of Oregon, you must report your expected out-of-state address to your supervising official or an Oregon law enforcement agency. Under federal law you must also contact the appropriate agency in the new state within ten (10) days of arriving in that state. If you live in Oregon and work or attend school in another state, you must report to the appropriate agency in that state.

*CLACKAMAS COUNTY COUR*
*Filed/Entered*
*OCT 24 2016*
*By: ___*

### PENALTIES:

| | | |
|---|---|---|
| Failure to make initial report | Class C Felony | Up to $125,000 fine and 5 years imprisonment |
| Failure to report annually within ten (10) days of birthday *or* to provide complete and accurate information | Class A Misdemeanor | Up to $6,250 fine and 1 year imprisonment |
| Failure to report a change of residence, school enrollment, or employment | Class C Felony if the crime for which you are required to register is a felony | Up to $125,000 fine and 5 years imprisonment |
| | Class A Misdemeanor if the crime for which you are required to register is a misdemeanor | Up to $6,250 fine and 1 year imprisonment |
| Failure to provide complete and accurate report information | Class A Misdemeanor | Up to $6,250 fine and 1 year imprisonment |
| Failure to sign and return an address verification form | Violation | A presumptive fine of $260 and a maximum fine of $1,000 |

**I have read and I understand the registration requirements and penalties above.**

_(signature)_                    _Jorden Hollingsworth_                    _10/24/16_
Offender's Signature            Offender's Printed Name                    Date

Home Address:

_1408 Linn Ave. Oregon City, OR    Apt.32_        _97045_
Street Address                          City          State          Zip Code

This notification was provided in the following case as required by ORS Chapter 181:
**County:** _Clackamas_    **Case #:** _15-01848_    **Date of Sentencing:** _10/24/16_
**Name of Sentencing Judge:** _Weber_

Conviction for the Following Registerable Crimes (See ORS 181.805 (5)): _Sexual Abuse in the First Degree X 2_

**Sentenced to:** ☒ Incarceration ☐ Probation    **Authority:** ☒ DOC ☐ County    **Length:** _75_

_Sarah Dumont_                              _(signature)_
Printed Name of Person Providing Notice    Signature of Person Providing Notice

_DDA_                                       _10/24/16_
Position of Person Providing Notice         Date Notice Provided

CR1601848
NO
Notice
5936369

**COURT CLERK:** Send original form within **3 days** to:
**Oregon State Police, Sex Offender Registration Unit, 255 Capitol Street NE, 4th Floor, Salem, OR 97310**

Revised 2/2015

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR Clackamas COUNTY

JUDGE  Weber, Katherine E - Courtroom 2
October 24, 2016 - Monday

Verified Correct Copy of Original 10/24/2016._

| Time<br>Case # | Case Title<br>Matter / Charge / Case Type | Relationship<br>Attorney | Room<br>Judge | Disposition |
|---|---|---|---|---|
| 9:00 AM | | | *sentenced* | |
| CR1501848 | State of Oregon VS. JORDEN TIMOTHY<br>HOLLINGSWORTH | P: REGAN, MICHAEL P<br>D: KNAUSS, ARTHUR B | | |
| 10/23/2015 | File Scanned | | | |
| | Hearing - Sentencing | Sexual Abuse in the First Degree | | Offense Felony |
| **Related Cases:** | | Sexual Abuse in the First Degree | | |

CLACKAMAS COUNTY COURT
Filed/Entered
OCT 24 2016
By: _____ **SKB**

CR1501848
OR
Order
5936372

Page **1** of **1**

These matters came before the Court
the 24 day of October 2016,
the Plaintiff appearing as indicated and
the Defendant appearing as indicated
and the Court being fully advised in the
premises. It Is Hereby Ordered as
specified above.
Judge

Judge  Weber
DA    Dumont.
Reporter  FTR
Clerk   SKB

**IN THE CIRCUIT COURT OF THE STATE OF OREGON**
**FOR THE COUNTY OF CLACKAMAS**

STATE OF OREGON,                           )
                    Plaintiff,             )      No.  C R 1501848
                                           )
          vs.                              )      **APPEAL RIGHTS**
                                           )
Jorden Timothy Hollingsworth              )
                    Defendant              )

*CLACKAMAS COUNTY COURT*
*Filed/Entered*
*OCT 24 2016*
*By: SKB*

Everyone convicted of a crime has a right to appeal.

If you PLEAD GUILTY, your appeal is limited to whether the <u>sentence</u> is unlawful or is cruel and unusual.

If you went to trial and were found GUILTY, your appeal could be based on whether the <u>trial</u> contained legal errors and/or whether the <u>sentence</u> is unlawful or is cruel and unusual.

If your current attorney is appointed and you wish to pursue an appeal the attorney shall transmit to the State Public Defender the information necessary to perfect an appeal. You may also contact them at their address: 1175 Court Street NE, Salem, OR 97301.

To begin an appeal, a Notice of Appeal m u s t  b e  f i l e d  with the Clerk of the Oregon Court of Appeals, 1163 State Street, Salem, Oregon, within 30 days of the day of judgment. Copies of the Notice must be served on the Clackamas County District Attorney, the Circuit Court Clerk, and the trial court transcript coordinator for your court proceedings (if a transcript is required).

If you are in custody, the trial judge may decide whether to release you or allow you to post bail during your appeal.

**BY SIGNING THIS FORM YOU ARE TELLING THE COURT**
**YOU UNDERSTAND THESE RIGHTS.**

Dated this _____ 24 _____ day of, _____ Oct _____ , 20 16

Signature of Defendant: _____

Signature of Defendant's Attorney: _____

Printed Name of Defendant's Attorney: _____ Art Knauss _____

I declare that I am the court appointed interpreter of record for the above named defendant. I have sight translated this form to the defendant.

Signature of Defendant's Interpreter: _____

Printed Name of Defendant's Interpreter: _____

CR-07-(Rev - 01.25.2016)          Original to File          Copy to Defendant

CR1501848
NORA
Notice – Advise Appeal Rights
5936363



Verified Correct Copy of Original 10/25/2016

## IN THE CIRCUIT COURT OF THE STATE OF OREGON
## FOR THE COUNTY OF CLACKAMAS

## ACKNOWLEDGMENT OF RECEIPT OF EXHIBITS

ENTERED

OCT 24

By: MAP

Case Name: **State** _____ v. **Hollingsworth, Jorden Timothy** _____

In the Matter of: _____

Case Number(s): **CR1501848** _____

Clerk: **JMW** _____    Trial/Hearing Date(s): **10/24/2016** _____

Type of Proceeding: **Sentencing** _____

## CUSTODIAN FOR PLAINTIFF / PETITIONER

I acknowledge receipt of the exhibits as listed in the attached list and submitted by Plaintiff / Petitioner in the above matter, subject to the requirements of Uniform Trial Court Rule 6.120.

_____
Date

_____
Signature of Custodian

_____
Printed Name

## CUSTODIAN FOR DEFENDANT / RESPONDENT

I acknowledge receipt of the exhibits as listed in the attached list and submitted by Defendant / Respondent in the above matter, subject to the requirements of Uniform Trial Court Rule 6.120.

_10-24-16_____
Date

_____
Signature of Custodian

_____
Printed Name



CR1501848
RPEB
Receipt - Exhibit
6938262



Verified Correct Copy of Original 10/25/2016.

# EXHIBITS

Date: 10/24/2016
Judge: Katherine Weber
Clerk: Jered Ward

Case #: CR1501848
Case Name: State v Hollingsworth, Jorden
Attorneys: State: Dumont, Sarah
Def.: Knauss, Art

**Plaintiff/Petitioner**

| Marked | Description | Offered | Received |
|--------|-------------|---------|----------|
| 1 | | | |
| 2 | | | |
| 3 | | | |
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |

**Defendant/Respondent**

| Marked | Description | Offered | Received |
|--------|-------------|---------|----------|
| 101 | Written statements from defendant's friends & family | X | X |
| 102 | Defendant's letter to court | X | X |
| 103 | | | |
| 104 | | | |
| 105 | | | |
| 106 | | | |
| 107 | | | |
| 108 | | | |
| 109 | | | |
| 110 | | | |
| 111 | | | |
| 112 | | | |
| 113 | | | |
| 114 | | | |
| 115 | | | |
| 116 | | | |

*Page 1 of 2*

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

16 NOV 29 AM 10: 43

ENTERED_____ BY_____

IN THE COURT OF APPEALS OF THE STATE OF OREGON

| | |
|---|---|
| STATE OF OREGON,<br><br>Plaintiff-Respondent,<br><br>v.<br><br>JORDEN TIMOTHY<br>HOLLINGSWORTH,<br><br>Defendant-Appellant. | Clackamas County Circuit Court *DOCKETED 11/29/16 BY* Rich<br>Case No. CR1501848<br><br>CA163680 |

## NOTICE OF APPEAL

1.

Defendant hereby gives notice of appeal from the judgment entered in this case on November 1, 2016, by Judge Katherine E. Weber in the Clackamas County Circuit Court.

2.

The parties to this appeal are the State of Oregon (Respondent) and Jorden Timothy Hollingsworth (Appellant).

3.

The names, bar numbers, addresses, and telephone numbers of the attorneys for the parties are as follows:

Attorney for Appellant:
    Emily P. Seltzer OSB #124513
    Office of Public Defense Services
    1175 Court Street NE
    Salem, OR 97301-4030
    Emily.Seltzer@opds.state.or.us
    (503) 378-3349

Attorney for Respondent:
    Benjamin Gutman #160599
    Solicitor General
    1162 Court Street NE
    Salem, OR 97301-4096
    benjamin.gutman@doj.state.or.us
    (503) 378-4402

4.

Appellant designates the record in its entirety, including the trial court file, all exhibits offered and/or received into evidence, and the entire record of the oral proceedings listed below:

1. The trial proceedings beginning on or about August 9, 10 and 11, 2016.
2. The sentencing proceedings held on or about October 24, 2016.

Office of Public Defense Services • Appellate Division
1175 Court Street NE • Salem, Oregon 97301-4030
Telephone (503) 378-3349 • Fax (503) 378-2163

5.

The record includes one or more audio or video recordings that were played in the trial court, and the record on appeal should include a transcription of those recordings. Oregon Rules of Appellate Procedure, Rule 3.33(4)(b). The dates of each hearing at which such a recording was played are as follows: the CARES tape played August 11, 2016.

6.

I hereby certify that I served the foregoing Notice of Appeal on November 28, 2016, by having a true copy delivered to Benjamin Gutman #160599, Solicitor General, 1162 Court Street NE, Salem, OR 97301-4096, and by mailing a true copy to each of the following:

Trial Court Administrator
Clackamas County Courthouse
807 Main Street
Oregon City, OR 97045

Transcript Coordinator
Clackamas County Courthouse
807 Main Street
Oregon City, OR 97045

Clackamas County District Attorney
807 Main St #7
Oregon City, OR 97045

Arthur B. Knauss
Attorney at Law
294 Warner Milne Rd.
Oregon City, OR 97045-4044

7.

I certify that on November 28, 2016, I electronically filed the original of this notice of appeal with the Appellate Court Administrator.

DATED November 28, 2016.

Respectfully submitted,

ERNEST G. LANNET
CHIEF DEFENDER
CRIMINAL APPELLATE SECTION
OFFICE OF PUBLIC DEFENSE SERVICES

> **Signed**
> By Emily Seltzer at 10:18 am, Nov 28, 2016

EMILY P. SELTZER OSB #124513
DEPUTY PUBLIC DEFENDER
Emily.Seltzer@opds.state.or.us

Attorneys for Defendant-Appellant
Jorden Timothy Hollingsworth

Office of Public Defense Services • Appellate Division
1175 Court St NE • Salem, Oregon 97301-4030
Telephone (503) 378-3349 • Fax (503) 378-2163

*State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

# IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR THE COUNTY OF CLACKAMAS

| | | |
|---|---|---|
| State of Oregon, | ) | |
|      Plaintiff | ) | |
| | ) | Case No.: CR1501848 |
| vs. | ) | |
| | ) | JUDGMENT |
| | ) | |
| JORDEN TIMOTHY HOLLINGSWORTH, | ) | Case File Date: 10/23/2015 |
|      Defendant | ) | District Attorney File #: 005270149 |

## DEFENDANT

True Name: JORDEN TIMOTHY HOLLINGSWORTH

Date Of Birth: 08/01/1993               State Identification No (SID): 19524416OR

Fingerprint Control No (FPN): 00000000

## HEARING

Proceeding Date: 10/24/2016

Judge: Katherine E Weber

Court Reporter: FTR, Courtroom 2

Defendant appeared in person and was in custody. The court determined that the defendant was indigent for purposes of court-appointed counsel, and the court appointed counsel for the defendant. The defendant was represented by Attorney(s) ARTHUR B KNAUSS, OSB Number 731700. Plaintiff appeared by and through Attorney(s) SARAH J DUMONT, OSB Number 035419.

## COUNT(S)

It is adjudged that the defendant has been convicted on the following count(s):

### Count 1 : Sexual Abuse in the First Degree

Count number 1, Sexual Abuse in the First Degree, 163.427, Felony Class B, committed on or about 02/13/2015. Conviction is based upon a Court Verdict of Guilty on 08/11/2016.

Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 1 is 8 and the Criminal History Classification (CHC) is B.

This sentence is pursuant to the following special factors:

- Sentence per ORS 137.700

---

*Document Type  Judgment*           *Page 1 of 4*           *Printed on 10/24/2016 at 9:50 AM*

*State of Oregon VS JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

Sentence Instructions

Defendant shall:
- Report as a sex offender under ORS 181.596, report with the Department of State Police, a city police department, a county sheriff's office or the supervising agency: (A) When supervision begins; (B) Within 10 days of a change in residence; (C) Once each year within 10 days of the probationer's date of birth; (D) Within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; and (E) Within 10 days of a change in work, vocation or attendance status at an institution of higher education.

Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 75 month(s). Defendant is remanded to the custody of the Clackamas Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The defendant is not eligible for earned time/good time credit. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

Post-Prison Supervision

The term of Post-Prison Supervision is 36 month(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

## Count 2 : Sexual Abuse in the First Degree

Count number 2, Sexual Abuse in the First Degree, 163.427, Felony Class B, committed on or about 08/24/2009. Conviction is based upon a Court Verdict of Guilty on 08/11/2016.

Sentencing Guidelines

The Crime Severity Classification (CSC) on Count Number 2 is 8 and the Criminal History Classification (CHC) is A.

This sentence is pursuant to the following special factors:
- Sentence per ORS 137.700

*Document Type Judgment*                    *Page 2 of 4*                    *Printed on 10/24/2016 at 9:50 AM*

*State of Oregon VS JORDEN TIMOTHY HOLLINGSWORTH, Case No. CR1501848*

Sentence Instructions

Defendant shall:
- Report as a sex offender under ORS 181.596, report with the Department of State Police, a city police department, a county sheriff's office or the supervising agency:  (A) When supervision begins; (B) Within 10 days of a change in residence; (C) Once each year within 10 days of the probationer's date of birth; (D) Within 10 days of the first day the person works at, carries on a vocation at or attends an institution of higher education; and (E) Within 10 days of a change in work, vocation or attendance status at an institution of higher education.

Incarceration

Defendant is sentenced to the custody of Oregon Dept of Corrections, for a period of 75 month(s). Defendant is remanded to the custody of the Clackamas Sheriff for transportation to the Oregon Dept of Corrections for service of this sentence. The defendant is not eligible for earned time/good time credit. Defendant may receive credit for time served.

The Defendant may not be considered by the executing or releasing authority for any form of Reduction in Sentence, Conditional or Supervised Release Program, Temporary Leave From Custody, Work Release. The Defendant may not be considered for release on post-prison supervision under ORS 421.508(4) upon successful completion of an alternative incarceration program.

This sentence shall be concurrent with the following cases Count number 1.

Post-Prison Supervision

The term of Post-Prison Supervision is 36 month(s). If the Defendant violates any of the conditions of post-prison supervision, the defendant shall be subject to sanctions including the possibility of additional imprisonment in accordance with the rules of the State Sentencing Guidelines Board.

If convicted of a felony or a crime involving domestic violence, you may lose the right to buy, sell, transport, receive, or possess a firearm, ammunition, or other weapons in both personal and professional endeavors pursuant to ORS 166.250, ORS 166.291, ORS 166.300, and/or 18 USC 922(g).

*State of Oregon VS JORDEN TIMOTHY HOLLINGSWORTH, Case No CR1501848*

Payment Schedule

Payment of the fines, fees, assessments, and/or attorney's fees noted in this and any subsequent Money Award shall be scheduled by the clerk of the court pursuant to ORS 161.675.

Payable to:

    *Clackamas County Circuit Court*
    *807 Main St*
    *Oregon City, Oregon 97045*
    *P: 503.655.8447*
    *F: http://courts.oregon.gov/Clackamas*


Dated the _____ day of _____, 20_____


Signed  10/24/2016 02 39 PM

Signed: _____

    Katherine E Weber        Circuit Court Judge Katherine E. Weber

STATE OF
CLACKAMAS COUNTY
FILED:

16 DEC 21 AM 9: 45

IN THE COURT OF APPEALS OF THE STATE OF OREGON

Document 12/21/16 RKM

STATE OF OREGON,
Plaintiff-Respondent,

v.

JORDEN TIMOTHY HOLLINGSWORTH,
Defendant-Appellant.

Clackamas County Circuit Court
CR1501848

A163680

**ORDER GRANTING MOTION FOR EXTENSION OF TIME**

Transcriber has moved for an extension of time to file the transcript. The motion is granted. The certificate of preparation and service of the transcript is now due **February 15, 2017**.

Please be advised that the Appellate Court may reassign this transcript if it believes that the transcript is not being completed in a timely manner.

Erika L. Hadlock    12/21/2016
                    9:26 AM
ERIKA L. HADLOCK
CHIEF JUDGE, COURT OF APPEALS

c:  Emily P Seltzer
    Benjamin Gutman
    Brenda Hollister
    Clackamas County Transcript Coordinator

ab

**ORDER GRANTING MOTION FOR EXTENSION OF TIME**

STATE OF OREGON,
CLACKAMAS COUNTY COURT
FILED:

17 FEB 23 AM 11: 50

ENTERED_____BY_____
DOCKETED 02/23/17 BY RKM

IN THE COURT OF APPEALS OF THE STATE OF OREGON

STATE OF OREGON,
Plaintiff-Respondent,

v.

JORDEN TIMOTHY HOLLINGSWORTH,
Defendant-Appellant.


Clackamas County Circuit Court
CR1501848

A163680

**NOTICE**

TO TRANSCRIBER(S):

Please be advised that the transcript in the above-entitled case has settled and, pursuant to ORAP 3.33, each court reporter/transcriber who has prepared a transcript must file with the Appellate Court Administrator an electronic version of the transcript on compact disk, or as a PDF filed through the appeals clerk mailbox, and a certificate of filing. The electronic transcript and the certificate are due within 14 days from the date of this notice.


TO PARTIES:

The opening brief(s) is/are due on September 14, 2017.

Questions regarding this notice should be directed to the Appellate Court Records Section at 503-986-5555.


Date:  02/23/2017

c:  Emily P Seltzer
    Benjamin Gutman
    Brenda Hollister
    Clackamas County Transcript Coordinator

ab

**NOTICE**

REPLIES SHOULD BE DIRECTED TO.  State Court Administrator, Records Section,
Supreme Court Building, 1163 State Street, Salem, OR  97301-2563

Page 1 of 1

EXHIBIT 108, Page 94 of 124
Case No. 3:20-cv-01567-MC
Def. Exh.
Page 87 of 99

Verified Correct Copy of Original 2/23/2017

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 MAR 20 PM 2:59

ENTERED _____ BY ____

DOCKETED ⌐3⌐ 2017 BY RKM

IN THE COURT OF APPEALS OF THE STATE OF OREGON

STATE OF OREGON,
Plaintiff-Respondent,

v.

JORDEN TIMOTHY HOLLINGSWORTH,
Defendant-Appellant.

Clackamas County Circuit Court
CR1501848

A163680

**NOTICE**

ORS 19.365(3) requires records on appeal be sent to the appellate courts upon request. Please forward the record(s), including documentary exhibits pursuant to ORAP 3.25(5), within 30 days from the date of this notice.

NOTE: Please return a copy of this notice with the requested record(s).

Questions regarding this notice should be directed to the Records Clerk at 503-986-5555.

Date: 03/20/2017

c: Clackamas County Trial Court Administrator

bm

**NOTICE**

REPLIES SHOULD BE DIRECTED TO    State Court Administrator, Records Section, Supreme Court Building, 1163 State Street, Salem, OR 97301-2563

Page 1 of 1

Verified Correct Copy of Original 3/20/2017



STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 MAR 22 AM 10: 50

Court Administrator
655-8670

Traffic/Accounting/
Collections
655-8453

Case Processing
655-8447

Criminal/Calendaring
655-8643

Records Management
655-8447

ENTERED_____BY_____

DOCKETED 03/22/17 BY RM

# FIFTH JUDICIAL DISTRICT
## COUNTY OF CLACKAMAS
COUNTY COURTHOUSE
807 MAIN STREET
OREGON CITY, OREGON  97045

March 22, 2017

Sarah J. Dumont, Deputy District Attorney
807 Main Street, Room 7
Oregon City, Oregon 97045

**CASE NO:** CR1501848 – CA163680

Case Name: **State of Oregon v. Jorden Timothy Hollingsworth**

Dear Counsel,

Our office is in receipt of a request from the Court of Appeals for all documentary exhibits in the above-entitled matter.  The receipt for exhibits which you signed, dated 08/11/2016, indicates that exhibits were released to you following trial.  For your convenience, we have attached a copy of the clerk's exhibit log, which clearly lists the documentary exhibits we need you to return to us for appeal purposes.

*Please forward only the "Documentary Exhibits" before 03/31/2017, so that we may comply* with the request from the Court of Appeals in a timely fashion.

We do not require that you return any exhibits that will not be transmitted to the Court of Appeals.  Per Oregon Rules of Appellate Procedures 3.25 (5), "Documentary Exhibits" include text documents, photographs and maps, if not oversized, and audio and video tapes.  An oversized document is one larger than standard letter size or legal size.

Any exhibits which you do not transmit to us for appeal purposes must be retained in your custody and control until the appeal is concluded and the court enters an order of destruction or disposition.  Please keep a clear record for future reference of any exhibit retained by you per Rule 3.25 (5).

Sincerely,

Robyn K. Moore, Appeals Clerk

Enclosures
cc: Court of Appeals



Verified Correct Copy of Original

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 MAR 22 AM 10: 50

ENTERED _____ BY _____

DOCKETED 03/22/17 BY RKM

Court Administrator
655-8670
Traffic/Accounting/
Collections
655-8453
Case Processing
655-8447
Criminal/Calendaring
655-8643
Records Management
655-8447

# FIFTH JUDICIAL DISTRICT

COUNTY OF CLACKAMAS
COUNTY COURTHOUSE
807 MAIN STREET
OREGON CITY, OREGON  97045

March 22, 2017

Arthur B. Knauss, Attorney at Law
294 Warner Milne Road
Oregon City, OR  97045

**CASE NO:** CR1501848  –  CA163680

Case Name:  **State of Oregon v. Jorden Timothy Hollingsworth**

Dear Counsel,

Our office is in receipt of a request from the Court of Appeals for all documentary exhibits in the above-entitled matter.  The receipts for exhibits which you signed, dated 08/11/2016 and 10/24/2016, indicate that exhibits were released to you following trial. For your convenience, we have attached copies of the clerk's exhibit logs, which clearly list the documentary exhibits we need you to return to us for appeal purposes.

*Please forward only the "Documentary Exhibits" before 03/31/2017, so that we may comply* with the request from the Court of Appeals in a timely fashion.

We do not require that you return any exhibits that will not be transmitted to the Court of Appeals.  Per Oregon Rules of Appellate Procedures 3.25 (5), "Documentary Exhibits" include text documents, photographs and maps, if not oversized, and audio and video tapes.  An oversized document is one larger than standard letter size or legal size.

Any exhibits which you do not transmit to us for appeal purposes must be retained in your custody and control until the appeal is concluded and the court enters an order of destruction or disposition.  Please keep a clear record for future reference of any exhibit retained by you per Rule 3.25 (5).

Sincerely,

Robyn K. Moore, Appeals Clerk

Enclosures
cc: Court of Appeals

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 MAR 27 AM 11: 25

IN THE CIRCUIT COURT OF THE STATE OF OREGON ENTERED _____ BY _____

FOR THE COUNTY OF CLACKAMAS ⊗ DOCKETED *03/27/17* BY *RKM*

State of Oregon,                    )
                                    )
        Plaintiff-Respondent,       )
                                    )
        v.                          )        Case No. CR1501848
                                    )        Appeal No.  CA163680
Jorden Timothy Hollingsworth,       )
                                    )
        Defendant-Appellant.        )
_____     )        **CLERK'S CERTIFICATE**

        I, Robyn K. Moore, Court Operation Specialist of the Circuit Court of the State of Oregon, in and for the County of Clackamas, a Court of record, do hereby certify that the Trial Court File, sent by Electronic Transmission on 03/27/2017, is the true, correct, imaged copy of the original file of the above-entitled court and cause, as has been filed in my office and in my care and custody.

        I further certify that I am enclosing the Trial Exhibits, as returned to my care and custody after having been released to the parties after trial per Uniform Trial Court Rule 6.120.   Said exhibits are listed and described in the Clerk's Exhibit Log.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of Court this **27th day of March, 2017.**

        Robyn K. Moore - Appellate Clerk
        Court Operation Specialist III

*Verified Correct Copy of Original 3/27/2017*

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 MAR 27 PM 1: 23

ENTERED _03/27/17_ BY _RM_

Robyn Moore/CLA/OJD
03/27/2017 01.23 PM

To:  Appeals Clerk/SCA/OJD
cc:  (bcc: Robyn Moore/CLA/OJD)
Subject  CA163680; ELECTRONIC TRANSMISSION OF TRIAL COURT
:   FILE

Greetings,    CR1501848

- 1 Volume Trial Court File sent eTransmission;

- Trial Court Exhibits (State and Defendant), copy of Clerk's Certificate and Return
  Receipt sent via shuttle.

Please let me know if I can be of further assistance.

*Robyn K. Moore*
*Appeals/Exhibits/Subpoenaed Records Clerk*
*Clackamas County Circuit Court*
*807 Main Street, Room 11*
*Oregon City, OR  97045*
*Phone:  (503) 650-8936*

Verified Correct Copy of Original 3/27/2017

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 APR -3 AM 8: 34

ENTERED_____BY_____
DOCKETED 04/03/17 BY Rickm

FIFTH JUDICIAL DISTRICT

Clackamas County Courthouse Room 11

807 Main Street

Oregon City, Oregon 97045

(503) 650-8936

## RETURN RECEIPT REQUEST

## CASE RECORDS DIVISION - COURT OF APPEALS

Upon receipt of: **Case #CR1501848 — Appeal #CA163680**

**Case Name:** **State of Oregon v. Jorden Timothy Hollingsworth**

Please check appropriate boxes, sign, and return receipt via Shuttle to the above address.

X   Trial Court File (sent eTransmission)

☐   Transcripts

X   Plaintiff/Petitioner Exhibits (1 envelope sent via shuttle)

X   Defendant/Respondent Exhibits (1 envelope sent via shuttle)

☐   Pre-Sentence Report

☐   Miscellaneous

Date file was received:   3-29-17

Date receipt was returned:  _____

Clerk's Signature:   _Curll_

Clerk's Printed Name   _Corin Sullee_

Appeals Clerk

Verified Correct Copy of Original 4/3/2017.

Verified Correct Copy of Original 10/3/2017

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 OCT -3 AM 9: 27

ENTERED_____ BY_____
DOCKETED 10/3/17 BY RCu

IN THE COURT OF APPEALS OF THE STATE OF OREGON

STATE OF OREGON,
Plaintiff-Respondent,

v.

JORDEN TIMOTHY HOLLINGSWORTH,
Defendant-Appellant.

Clackamas County Circuit Court
CR1501848

A163680

**NOTICE**

The appellate judgment in the above-captioned appeal issued on October 2, 2017.

Returned herewith are the records consisting of:

Appellate Judgment & 2 Envelopes Exhibits

Date received: ___10/03/2017___

Clackamas County Circuit Court

By: _____

Sent via:
_xx_ Shuttle Bus

Please sign and return original receipt.


Date:  10/02/2017

km


**NOTICE**
_____

REPLIES SHOULD BE DIRECTED TO·  State Court Administrator, Records Section,
Supreme Court Building, 1163 State Street, Salem, OR  97301-2563

Verified Correct Copy of Original 10/3/2017.

CLACKAMAS COUNTY COURT
FILED:

17 OCT -3 AM 9: 27

BY

DOCKETED 10/03/17 BY RCL

IN THE COURT OF APPEALS OF THE STATE OF OREGON

STATE OF OREGON,
Plaintiff-Respondent,

v.

JORDEN TIMOTHY HOLLINGSWORTH,
Defendant-Appellant.

Clackamas County Circuit Court
CR1501848

A163680

**ORDER OF DISMISSAL AND APPELLATE JUDGMENT**

Appellant has moved to dismiss the above-entitled appeal. The motion is granted.

Appeal dismissed.

*James W. Nass*                10/02/2017
                               11:31 AM
JAMES W. NASS
APPELLATE COMMISSIONER

---

**DESIGNATION OF PREVAILING PARTY AND AWARD OF COSTS**

Prevailing party: Respondent          [ X ] No costs allowed

Appellate Judgment Effective Date. October 2, 2017    COURT OF APPEALS

c:  Emily P Seltzer
    Benjamin Gutman
    Clackamas County Trial Court Administrator

km

THIS IS THE APPELLATE JUDGMENT OF
THE APPELLATE COURTS AND SHOULD
BE ENTERED PURSUANT TO ORS 19.450.

**ORDER OF DISMISSAL AND APPELLATE JUDGMENT**

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF CLACKAMAS
807 Main St  Oregon City Oregon  97045
503.655.8643

October 03, 2017

KNAUSS, ARTHUR B
294 WARNER MILNE RD
OREGON CITY, OR 97045

Re: State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH
Case #: CR1501848
        Offense Felony

### NOTICE OF EXHIBIT DISPOSITION

The court is holding exhibits for this case. Unless you pick up your exhibits within **30 days** from
the date of this notice, the court will dispose of them.

Please contact the court to arrange pickup of your exhibits.

Exhibits held:

| 101-102 | 101-102 Returned from Court of Appeals |
|---------|----------------------------------------|

Verified Correct Copy of Original 10/3/2017.

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 OCT -3 AM 10: 59

BY _____
DOCKETED 10/3/17 BY ___

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF CLACKAMAS
807 Main St  Oregon City Oregon  97045
503.655.8643

October 03, 2017

KNAUSS, ARTHUR B
294 WARNER MILNE RD
OREGON CITY, OR 97045

Re: State of Oregon VS. JORDEN TIMOTHY HOLLINGSWORTH
Case #: CR1501848
     Offense Felony

### NOTICE OF EXHIBIT DISPOSITION

The court is holding exhibits for this case. Unless you pick up your exhibits within **30 days** from the date of this notice, the court will dispose of them.

Please contact the court to arrange pickup of your exhibits.

Exhibits held:

| 101-102 | 101-102 Returned from Court of Appeals |
|---|---|

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 OCT -3 PM 3:02

ENTERED_____ BY_____

**IN THE CIRCUIT COURT OF THE STATE OF OREGON** ETED 10/3/17 BY RCh
**FOR THE COUNTY OF CLACKAMAS**

1

2

3

4

5      State of Oregon,                   )

6                                      )     Case No. CR1501848, CA163680
    Plaintiff-Respondent,         )

7                                      )     **RELEASE OF EXHIBITS**
        v.                           )

8                                      )
    Jorden Timothy Hollingsworth,   )

9                                      )
    Defendant-Appellant.          )

10

11  EXHIBITS RELEASED:   State's Exhibits 1-3

12

13  RELEASED TO:  Krysta Criss -- District Attorney's Office

14

15       For the reason that said property is no longer needed for the above-named case.

16       Dated this 3rd day of October, 2017.

17

18                            Recipient's Signature _Krysta Criss_

19                            Printed Name _Krista Criss_

20                            Exhibit Clerk's Signature _Robyn Moore_

21

22

23

24

25

26

Verified Correct Copy of Original 10/3/2017

STATE OF OREGON
CLACKAMAS COUNTY COURT
FILED:

17 OCT 12 AM 10: 19

IN THE CIRCUIT COURT OF THE STATE OF OREGON    BY_____
FOR THE COUNTY OF CLACKAMAS    10/12/17 BY RLCW
☞DOCKETED

## ACKNOWLEDGMENT OF RECEIPT OF EXHIBITS

**Case Name:** _State of Oregon_    v. _Hollingsworth_

**In the Matter of:** _____

**Case Number(s):** _CR 1501848_

**Clerk:** _____    **Trial/Hearing Date(s):** _____

**Type of Proceeding:** _____

## CUSTODIAN FOR PLAINTIFF / PETITIONER

I acknowledge receipt of the exhibits as listed in the attached list and submitted by Plaintiff / Petitioner in the above matter, subject to the requirements of Uniform Trial Court Rule 6.120.

_____    _____
Date    Signature of Custodian

_____
Printed Name

## CUSTODIAN FOR DEFENDANT / RESPONDENT

I acknowledge receipt of the exhibits as listed in the attached list and submitted by Defendant / Respondent in the above matter, subject to the requirements of Uniform Trial Court Rule 6.120.

_10/12/2017_    _____
Date    Signature of Custodian

_Defendant's Exhibits_
_#101-102 released to_    _Art Knauss_
CT-MS-01(5/1/2012) _Attorney Art Knauss_    Printed Name

Verified Correct Copy of Original 10/12/2017.

RECEIVED

SEP 1 0 2018

DEPARTMENT OF JUSTICE
TRIAL DIVISION

1

2

3              IN THE CIRCUIT COURT OF THE STATE OF OREGON

4                      FOR THE COUNTY OF UMATILLA

5   JORDEN HOLLINGSWORTH,              ) No. 17CV47262
                                       )
6                    Plaintiff,        ) **DECLARATION OF JORDEN**
                                       ) **HOLLINGSWORTH IN SUPPORT OF**
7          v.                          ) **HIS FIRST AMENDED PETITION**
                                       )
8   TROY BOWSER, Superintendent,       )
    Two Rivers Correctional Institution, )
9                                      )
                     Defendant,        )
10

11      Pursuant to ORCP 1E, I, Jorden Hollingsworth, do hereby declare as follows:

12      1. I am the Petitioner, Jorden Hollingsworth, in the above-entitled post-conviction

13         proceeding.

14      2. Trial Counsel came to me right before the commencement of trial. He told me that the

15         jury was needed for another trial and that I did not want a jury trial. I in fact did want a

16         jury trial; however, he demanded that I sign a jury waiver.

17      3. Due to my reliance on him, and the timing of the demand, his influence overcame my

18         will and I agreed to sign the jury waiver. I did not have time to consider this tactical

19         change, nor did I have time to discuss with him the pros and the cons of making this

20         change.

21      4. I did not expect, nor did I want, a bench trial.

22   ////

     ////

Page 1, DECLARATION OF JORDEN
HOLLINGSWORTH

1    5.  I have read the First Amended Petition. It is true and accurate to the best of my memory

2        and belief.

3

4    **I hereby declare that the above statement is true to the best of my knowledge and**

5  **belief, and that I understand that it is made for use as evidence in Court and is subject to**

6  **penalty of perjury.**

7

    DATED this   _31_   day of  _August_  , 2018.

8

9

10                         Jorden Hollingsworth
                            Petitioner

11

12

13

14

15

16

17

18

19

20

21

22

Page 2, DECLARATION OF JORDEN
HOLLINGSWORTH

RECEIVED

SEP 1 0 2018

DEPARTMENT OF JUSTICE
TRIAL DIVISION

**Jonathan Clark**
**Jonathan A. Clark, P.C.**
**317 Court Street NE**
**Salem, Oregon 97301**
**(503) 581-1229**

September 7, 2018

Department of Justice
Trial Division
1162 Court Street NE
Salem, OR 97301

**RE:** *Jorden Hollingsworth v. Troy Bowser, Superintendent, TRCI*
Umatilla County Case No. 17CV47262

Dear Mr. Marshall:

Enclosed please find Pet. Exh. 3 of Petitioner's First Amended Petition in the above-
captioned matter.

Thank you.

Sincerely,

Alyssa Nachand
Legal Assistant to Jonathan Clark

JAC:amn
Enclosure



JONATHAN A. CLARK
ATTORNEY AT LAW

317 COURT STREET NE, SUITE 203
SALEM, OREGON 97301-3526

07 SEP 2018 PM 5 L

USA
FOREVER

Department of Justice
**ATTN: Ward Douglas Marshall**
Trial Division
1162 Court Street NE
Salem, OR 97301

97301-409699

1

2

3          IN THE CIRCUIT COURT OF THE STATE OF OREGON

4              FOR THE COUNTY OF UMATILLA

5    JORDEN HOLLINGSWORTH,          )   No. 17CV47262
                                     )
6                      Plaintiff,    )   **DECLARATION OF JONATHAN CLARK**
                                     )   **IN SUPPORT OF PETITIONER'S FIRST**
7              v.                    )   **AMENDED PETITION**
                                     )
8    TROY BOWSER, Superintendent,    )
     Two Rivers Correctional Institution, )
9                                    )
                       Defendant,    )
10   _____

11

12   Pursuant to ORCP 1E, I, Jonathan A. Clark, do hereby declare as follows:

13   1.  I am the attorney representing Petitioner, Jorden Hollingsworth in the above-entitled

         post-conviction proceeding.

14   2.  Attached to this Declaration are investigative reports which were available to Trial

15       Counsel.  I obtained them from his file.  Each of the following persons had testimony

16       beneficial to Petitioner.  Each of the following could have testified that according to his

17       or her opinion, and according to his or her knowledge of Petitioner's reputation,

18       Petitioner was good around children, safe for children, and trustworthy for children.

19       a.   Cyndi Knowles.    Attachment A.

20       b.   Courtney Polk.    Attachment B.

         c.   David Mills.      Attachment C.

21       d.   Kipley Edwards.   Attachment D.

22   3.  Also attached to this Declaration as Attachment E is a report from Dr. Wendy Bourg

Page 1, DECLARATION OF JONATHAN
CLARK

1    which I obtained from Trial Counsel's file.   Dr. Bourt indicates that misuse of the

2    victim's medication, Dexedrine, can impact her connection to reality.

3

4        **I hereby declare that the above statement is true to the best of my knowledge and**

5    **belief, and that I understand that it is made for use as evidence in Court and is subject to**

6    **penalty of perjury.**

7

DATED this 27ᵗʰ day of August, 2018.

8

9                                        /s/ Jonathan Clark
                                         _____
10                                       Jonathan Clark, OSB No. 022740
                                         Attorney for Petitioner
11

12

13

14

15

16

17

18

19

20

21

22

Page 2, DECLARATION OF JONATHAN
CLARK

**RE: JORDEN HOLLINGSWORTH**        **STATEMENT**
**WEDNESDAY, JANUARY 6, 2016**        **S. CASTLEMAN**

Case No.                15-01848

Mentioned:          Hollingsworth, Jorden DOB 08-01-1993
Custody at the Clackamas County Jail
1208 Linn Avenue #32
Oregon City, OR 97045

Jewell-Shafer, Jasmine DOB 08-24-2004 (victim)
Contact Information Withheld

Jewell, Kenneth DOB 07-26-1985 (father of victim)
Contact Information Withheld

Miller, Trisha DOB 03-06-1985 (fiancé of the father of victim and
the Defendant's aunt)
Contact Information Withheld

Hollingsworth, Mindy DOB 03-28-1975 (mother of suspect/sister
of Trisha Miller)
Contact Information Withheld

Tobin, Trista (defendant's girlfriend)
13287 Moccasin Way
Oregon City, OR 97045
971-712-4832

Knowles, Cyndi
14290 S. Marjorie Lane
Oregon City, OR 97045
971-998-9710
cyndiannknowles88@gmail.com

Subject:            Statement of Cyndi Knowles

On Wednesday, January 6, 2016 contact was made with Cyndi Knowles in an effort to obtain a
statement with the following results:

Cyndi Knowles will be for now and hereafter be referred to as Knowles.

1

Confidential Attorney Work Product
ATTACHMENT A

Knowles stated in substance that she has known Hollingsworth for two or three years. She stated that she and Hollingsworth are really good friends. She stated she a small group of really good friends and he is part of that group. Knowles described the group as a "tight knit family".

She stated that Hollingsworth is happy and spontaneous. She stated that Hollingsworth is always there for people. She stated if someone asks him to do something he would normally do it. Knowles stated Hollingsworth is really nice to everyone. She stated she has brought Hollingsworth around her friends and family that do not know him and once they meet him they love him. She stated Hollingsworth has always been a good guy.

Knowles stated she has seen Hollingsworth interact with her nieces and her friend's children. She stated is very nice to them and plays with them "just like any other general person". She stated she has never seen Hollingsworth act inappropriately around young children. Knowles stated Hollingsworth has never acted inappropriately or aggressive toward her. She stated that Hollingsworth has spent the night at her house and slept in her bed with her and was very appropriate. She stated Hollingsworth "never tried anything". Knowles stated if she had children she would feel comfortable to have Hollingsworth around her children.

Knowles stated Hollingsworth has always been a caring and giving guy. She stated he has always been really nice and has never done anything wrong toward her, her family or anyone that she knows. Knowles stated that anyone who meets Hollingsworth absolutely loves him.

Cyndi Knowles was unable to provide any further relevant information. I discontinued my statement at this time.

End Report.

Confidential Attorney Work Product

ATTACHMENT A

**RE: JORDEN HOLLINGSWORTH**                          **STATEMENT**
**WEDNESDAY, JANUARY 6, 2016**                       **S. CASTLEMAN**

Case No.                        15-01848

Mentioned:                      Hollingsworth, Jorden DOB 08-01-1993
                                Custody at the Clackamas County Jail
                                1208 Linn Avenue #32
                                Oregon City, OR 97045

                                Jewell-Shafer, Jasmine DOB 08-24-2004 (victim)
                                Contact Information Withheld

                                Jewell, Kenneth DOB 07-26-1985 (father of victim)
                                Contact Information Withheld

                                Miller, Trisha DOB 03-06-1985 (fiancé of the father of victim and
                                the Defendant's aunt)
                                Contact Information Withheld

                                Hollingsworth, Mindy DOB 03-28-1975 (mother of suspect/sister
                                of Trisha Miller)
                                Contact Information Withheld

                                Tobin, Trista (defendant's girlfriend)
                                13287 Moccasin Way
                                Oregon City, OR 97045
                                971-712-4832

                                Knowles, Cyndi
                                14290 S. Marjorie Lane
                                Oregon City, OR 97045
                                971-998-9710
                                cyndiannknowles88@gmail.com

                                Mills, David
                                4300 SE 102 Ave.
                                Portland, OR 97266
                                971-340-3783
                                dlmillz44@gmail.com

                                Polk, Courtney
                                120 E. Jersey Street
                                Gladstone, OR 97027
                                503-208-0221
                                anayamarie2008@gmail.com

1

Confidential Attorney Work Product

Subject:                        Statement of Courtney Polk

On Wednesday, January 6, 2016 contact was made with Courtney Polk in an effort to obtain a statement with the following results:

Courtney Polk will be for now and hereafter be referred to as Polk.

Polk stated in substance that she has known Hollingsworth for about one year. She stated that Hollingsworth is "super sweet". She stated that any time she needs help with anything she knows she can call him. She stated that Hollingsworth is a really good person. Polk stated she has never had any problems with him. She stated they have never argued. Polk stated they always have fun together whether they are just talking or are at a friend's house having a drink together. She stated their time together is always "happy go lucky". Polk stated Hollingsworth is one of her best friends and he is a great guy. She said she "loves him to death".

Polk stated that Hollingsworth has never made her feel uncomfortable and that he has never been sexual aggressive toward her. She stated she has a seven-year old daughter that Hollingsworth has been around and he has never been inappropriate toward her. Polk stated Hollingsworth has never acted inappropriate toward any of the women in their group that they hang out with. Polk stated she feels comfortable with Hollingsworth around her daughter. She stated she has never had any strange or awkward vibes from Hollingsworth.

Polk stated that Hollingsworth is one of the happiest, joyful and most trustworthy people that she has ever met. She stated Hollingsworth is always smiling and that when someone is not happy, he is the first person to jump in to try to cheer up the person.

Polk was unable to provide any further relevant information. I discontinued my statement at this time.

End Report.

2

Confidential Attorney Work Product

ATTACHMENT B

EXHIBIT 108, Page 116 of 124
Case No. 3:20-cv-01567-MC
Def. Exh. 4
Page 6 of 14

**RE: JORDEN HOLLINGSWORTH**                    **STATEMENT**
**WEDNESDAY, JANUARY 6, 2016**                  **S. CASTLEMAN**

Case No.                15-01848

Mentioned:              Hollingsworth, Jorden DOB 08-01-1993
                        Custody at the Clackamas County Jail
                        1208 Linn Avenue #32
                        Oregon City, OR 97045

                        Jewell-Shafer, Jasmine DOB 08-24-2004 (victim)
                        Contact Information Withheld

                        Jewell, Kenneth DOB 07-26-1985 (father of victim)
                        Contact Information Withheld

                        Miller, Trisha DOB 03-06-1985 (fiancé of the father of victim and
                        the Defendant's aunt)
                        Contact Information Withheld

                        Hollingsworth, Mindy DOB 03-28-1975 (mother of suspect/sister
                        of Trisha Miller)
                        Contact Information Withheld

                        Tobin, Trista (defendant's girlfriend)
                        13287 Moccasin Way
                        Oregon City, OR 97045
                        971-712-4832

                        Knowles, Cyndi
                        14290 S. Marjorie Lane
                        Oregon City, OR 97045
                        971-998-9710
                        cyndiannknowles88@gmail.com

                        Mills, David
                        4300 SE 102 Ave.
                        Portland, OR 97266
                        971-340-3783
                        dlmillz44@gmail.com

Subject:                Statement of David Mills

On Wednesday, January 6, 2016 contact was made with David Mills in an effort to obtain a
statement with the following results:

1

Confidential Attorney Work Product

ATTACHMENT C

David Mills will be for now and hereafter be referred to as Mills.

Mills stated in substance that he has known Hollingsworth for a little over two years. He stated he met Hollingsworth through a co-worker, Kipley Edwards. He stated they all had a lot of similar interests so they would hang out after work.

Mills stated Hollingsworth is very personable and sociable. He stated within minutes after meeting Hollingsworth people love him. Mills stated Hollingsworth has a good character and is a lot of fun to be around.

Mills stated that Hollingsworth told him that he was being accused of sexual assault against a young female. He stated that Hollingsworth stated that the young female stayed at his house. Mills stated that Hollingsworth stated the young female was asleep on the couch with the blanket off of her and her shirt was up. Mills stated Hollingsworth told him that he covered her up with the blanket and pulled her shirt down. He stated Hollingsworth told him the young female woke up and saw him "touching her and freaked out and called it sexual assault".

Mills stated he knows Hollingsworth's character and he is positive that he can trust Hollingsworth around his son and other children. Mills stated he has seen Hollingsworth interact with children including young females. He stated Hollingsworth has never acted inappropriate toward them. He stated Hollingsworth "has always been awesome with little kids".

Mills stated that Hollingsworth loves women and he loves being around them. He stated Hollingsworth is really good at talking to women. Mills stated that within his group of friends, Hollingsworth is the most respectful guy when it comes to females. He stated Hollingsworth has never been aggressive with females. Mills stated that Hollingsworth is non-threatening.

Mills stated that there was once an incident where Hollingsworth was with him and a group of friends. He stated there was a newer girl in the group that got really drunk. Mills stated that Hollingsworth took the girl home, dropped her off, "made sure she was good to go" and then went back to the group of friends. Mills stated Hollingsworth is "a good dude" and he will "make sure that you're taken care of". Mills stated Hollingsworth is a protector, especially to the people that are around him. He stated Hollingsworth is always there for people. He stated he is always there to help out.

David Mills was unable to provide any further relevant information. I discontinued my statement at this time.

End Report.

Confidential Attorney Work Product

**ATTACHMENT C**

**RE: JORDEN HOLLINGSWORTH**                          **STATEMENT**
**THURSDAY, JANUARY 7, 2016**                         **S. CASTLEMAN**

Case No.                    15-01848

Mentioned:                  Hollingsworth, Jorden DOB 08-01-1993
                            Custody at the Clackamas County Jail
                            1208 Linn Avenue #32
                            Oregon City, OR 97045

                            Jewell-Shafer, Jasmine DOB 08-24-2004 (victim)
                            Contact Information Withheld

                            Jewell, Kenneth DOB 07-26-1985 (father of victim)
                            Contact Information Withheld

                            Miller, Trisha DOB 03-06-1985 (fiancé of the father of victim and
                            the Defendant's aunt)
                            Contact Information Withheld

                            Hollingsworth, Mindy DOB 03-28-1975 (mother of suspect/sister
                            of Trisha Miller)
                            Contact Information Withheld

                            Tobin, Trista (defendant's girlfriend)
                            13287 Moccasin Way
                            Oregon City, OR 97045
                            971-712-4832

                            Knowles, Cyndi
                            14290 S. Marjorie Lane
                            Oregon City, OR 97045
                            971-998-9710
                            cyndiannknowles88@gmail.com

                            Mills, David
                            4300 SE 102 Ave.
                            Portland, OR 97266
                            971-340-3783
                            dlmillz44@gmail.com

                            Polk, Courtney
                            120 E. Jersey Street
                            Gladstone, OR 97027
                            503-208-0221
                            anayamarie2008@gmail.com

Confidential Attorney Work Product

**ATTACHMENT D**

1

EXHIBIT 108, Page 119 of 124
Pet. Exh. 4
Case No. 3:20-cv-01567-MC
**Page 9 of 14**

Tobin Trista
13287 Moccasin Way
Oregon City, OR 97045
971-712-4832
tristasamanthalee@hotmail.com

Edwards, Kipley
15004 S. Graves Road
Mulino, OR 97042
503-750-9147
kipleyedwards@gmail.com

Subject:                  Statement of Kipley Edwards

On Thursday, January 7, 2016 contact was made with Kipley Edwards in an effort to obtain a statement with the following results:

Kipley Edwards will be for now and hereafter be referred to as Edwards.

Edwards stated in substance that he has known Hollingsworth for about four years. He stated that Hollingsworth is a "smart kid" and that he has hung out with him every day since he has met him. Edwards stated Hollingsworth is his best friend. Edwards describes Hollingsworth as "a go getter". He stated that when Hollingsworth puts his mind to something he gets it done. He stated that Hollingsworth is a good worker and would never do anything to hurt his friends or family. Edwards stated that Hollingsworth just seems to be always in the wrong place at the wrong time.

Edwards stated that he has met Jasmine a couple of times when he would go over to Hollingsworth's aunt's house. He stated that from what he saw Jasmine was under a pretty strict schedule. He stated she was always reading. He stated he saw something on the wall with a list of her chores. Edwards stated he does not know Jasmine too well.

Edwards stated that Hollingsworth and Jasmine would play around and that Hollingsworth treated Jasmine like "any uncle or cousin would". Edwards stated that Hollingsworth never acted inappropriately with Jasmine. He stated Jasmine never acted intimidated or afraid of Hollingsworth. He stated he saw Hollingsworth and Jasmine together about four or five times.

Edwards stated that Hollingsworth told him that Hollingsworth went home one night and Jasmine's shirt was up so he went to go pull it down and began to put a blanket on her. He stated that Hollingsworth told him that Jasmine woke up and "got awkward" and told Hollingsworth she was going with her dad. Edwards stated that Hollingsworth told him that he told Jasmine that it was not necessary to go to her dad and to go back to bed. He stated Hollingsworth told him Jasmine went to her dad anyway and everybody "got all freaked out". Edwards stated Hollingsworth was at the wrong place at the wrong time.

Edwards stated he has never seen Hollingsworth act inappropriately toward any females. He stated he would not be best friends with someone who treated females inappropriately.

Confidential Attorney Work Product

**ATTACHMENT D**

2

EXHIBIT 108, Page 120 of 124
Pet. Exh. 4
Case No. 3:20-cv-01567-MC
**Page 10 of 14**

Edwards stated that a couple of weeks before Hollingsworth was arrested that Hollingsworth told Edwards that he was going through 'rough time with his aunt". He stated that Hollingsworth was crying. Edwards stated that Hollingsworth's aunt and Jasmine's father broke up for a while and the night they got back together was when the incident occurred. Edwards stated that Hollingsworth's whole family is "always something" and that "they are weird".

Kipley Edwards was unable to provide any further relevant information. I discontinued my statement at this time.

End Report.

**Confidential Attorney Work Product**

**ATTACHMENT D**

# WENDY BOURG, PH.D., LLC

Licensed Psychologist
**3906 SW Kelly Avenue**
Portland, OR  97239
Phone:  503.320.6996  Fax: 503.327.8696
Email: drwendybourg@gmail.com

8/3/16

Mr. Arthur B. Knauss
Attorney at Law
294 Warner Milne Road
Oregon City, OR  97045

Mr. Knauss:

This letter summarizes for you my findings from review of discovery you provided me in
State v. Hollingsworth.  I reviewed the following materials prior to my consultation with
you:  the Indictment against your client, a page titled Clackamas County Sheriff's Office
Inmate information, a Notice of Intent to Offer Statements made by a Child Victim, a
series of Oregon City Police Department reports summarizing the child's initial
disclosure process, statements from other family members in the home at the time of the
alleged incident, a summary of the Children's Center interview by police, reports from
the Children's Center regarding their evaluation of the child Jasmine, video recorded
interview of the child Jasmine and research literature pertaining to cognitive functioning
when waking in the middle of the night.

- The child was brought to the police station shortly after her initial disclosure. The
  short interval of time between disclosure and notification of authorities is positive
  because it reduces the window for both contamination and fading of memories.
- However, during her interview, the child expresses that some people think she is
  lying.  Then the police officer told her she was brave for telling her father.  It is
  concerning that the child has been exposed to conversations about her disclosures.
  Conversations with individuals who have any bias (e.g. that she is lying or telling
  the truth) raise concerns about contamination of her reporting in various
  directions.  The interviewer did not ask the child to relate the content of these
  prior conversations so that the impact, if any, on the child's statements could be
  evaluated.
- The interviewer primarily relies on open ended questions (Who, What, Where),
  which are reasonable questions to use in a child interview and which are unlikely
  to contaminate the child's statement.  While I did not see as much use of the
  highest quality invitational questions (e.g. "Tell me everything that happened") as
  would be ideal, I also did not observe instances of the interviewer supplying
  contaminating information.
- At the beginning of the forensic interview, the interviewer uses a very complex
  sentence structure to ask the child simultaneously to only talk about true things

not pretend and not make believe, just stuff we know and that if the interviewer says something that doesn't make sense the child should signal lack of understanding and if the interviewer makes a mistake the child should notify the interviewer. After all of that information in a single statement (admittedly challenging for an adult to follow), the interviewer asks the child "Can you do all that?" There is research establishing that children's reports are somewhat more likely to be factual when the interviewer ensures that a child understands the obligation to tell the truth, elicits a promise from the child to tell the truth and ensures that the child understands that the ground rules for this conversation with an adult are different (e.g. the child can correct the adult and the adult is not all-knowing). However, the process for accomplishing these goals is multi-step and relies on the interviewer checking the child's understanding of each concept along the way. The manner of setting ground rules in this interview was not consistent with practices that would facilitate accurate reporting.

- Reportedly the child Jasmine has been diagnosed with ADHD. Going slowly and checking understanding is particularly important when working with a child who has ADHD.

- The child acknowledges concerns with lying throughout her interview, expressing that lying to the suspect "got me somewhere" when she lied to him by assuring him she wouldn't tell but she did

- The child reports that she felt a touch in her dream and that her character in the dream became sad and then she heard a gasp and woke up. She related other dream events including her sister and her dog trying to wake her up by pouncing on the bed. She heard a gasp and she saw the suspect behind the couch. She did report being awake when she saw him behind the couch and when they conversed about what had just occurred. Thus she is clearly reporting that her knowledge of any touching derived from feeling something while her eyes were closed and she was dreaming and that her conclusion that Mr. Hollingsworth touched her arose from circumstantial evidence of his proximity to her and a conversation that occurred when she was abruptly awakened from a midnight dream. She related elements of the conversation that did not make sense (like him asking if he could take out the garbage). She also related that he was behind the couch and then on the couch and she concluded he must have snuck past her.

- The child's report regarding her dream state and her reasoning process upon sudden midnight wakening is consistent with research on cognitive impairments among individuals suddenly awakened in the middle of their sleep. The phenomenon is known as "sleep drunkenness" or "sleep intertia" and there is a body of scientific evidence documenting that individuals are confused, disoriented, prone to misperceive information, experience difficult making decisions and have impaired memories when they are so awakened. The child acknowledges that aspect of her conscious state, "When I wake up sometimes things get fuzzy."

- The child has other sources of sexual knowledge aside from possible sexual abuse. She specifically reports that she regularly watches a television show that involves killing and sexual assault. She also had an early childhood friend who shared sexual information with her.

ATTACHMENT E

- The child has been inconsistent in her statements. She denied vaginal touch during her medical exam but alleged vaginal touch during her interview. She has been in therapy and did not disclose a prior incident that she alleged during her forensic interview.
- There are reports that her father overdosed her with Dexedrine earlier that day. Withdrawal and rebound effects such as extreme sleepiness and impaired reality testing can occur during recovery from Dexedrine overdoses

I hope that this information is helpful to you and anyone else who is evaluating the evidence in this case. Please let me know if I can be of further assistance.

Sincerely,

Wendy Bourg, Ph.D.

RECEIVED

MAR 1 3 2019

DEPARTMENT OF JUSTICE
TRIAL DIVISION

1

2

3              IN THE CIRCUIT COURT OF THE STATE OF OREGON

4                   FOR THE COUNTY OF UMATILLA

5   JORDEN HOLLINGSWORTH,           )   No. 17CV47262
                                    )
6                  Plaintiff,       )   **PETITIONER'S TRIAL MEMORANDUM**
                                    )
7            v.                     )
                                    )
8   TROY BOWSER, Superintendent,    )
    Two Rivers Correctional Institution,  )
9                                   )
                   Defendant,       )
10  _____

11

12                        **INTRODUCTION**

13       Petitioner seeks post-conviction relief from convictions and sentences imposed in *State of*

*Oregon v. Jorden Timothy Hollingsworth,* Clackamas County Circuit Court Case No.

14  CR1501848.  Because of substantial violations in his state and federal right to effective and

15  adequate representation by his trial counsel, the Court should enter a judgment granting him post-

16  conviction relief, finding his judgments of conviction void and remanding his case to the Clackamas

17  County Circuit Court for further proceedings.

18

19                        **TRIAL EVIDENCE**

20       The complainant in this matter asserted that while sleeping she had a dream.  Her dream

    included herself and a boy.  She dreamt that the boy put his hand inside her shirt and she became

21  sad.  As she woke up, she saw Mr. Hollingsworth near her.  (Exhibit 7: Tr. pages 484-488; 501-

22  502.)

Page 1, PETITIONER'S TRIAL
MEMORANDUM

1     The complainant had been left to sleep on a couch on the first floor of the residence. Mr.

2  Hollingsworth had returned to the home about 10:30 p.m. Thereafter he spent about sixty to ninety

3  minutes on the porch smoking with two others. Those three came into the first floor and put on a

4  movie during which he fell asleep on a different couch. He woke up sometime after midnight. As

5  he headed upstairs to sleep, he noticed that the complainant was uncovered. As he covered her up,

6  she woke up from her dream. (Exhibit 7: Tr. pages 515-522.)

7     That is to say, not only is this a "she said, he said" case, it is one that relies on the perception

8  of a youth coming out of a sleep and dream state.

9

10              **INEFFECTIVE ASSISTANCE OF COUNSEL: THREE CLAIMS**

11     In this matter, Petitioner asks the court to find ineffective assistance of counsel on three

12  claims.

13     First, on the morning of trial, trial counsel demanded that Petitioner waive his rights to a

14  jury trial. This was contrary to Petitioner's desire and intention, was done with no time for

15  Petitioner to weigh this tactical decision or discuss its implications with trial counsel.

16     Second, trial counsel failed to call witnesses who were available to provide positive

17  character testimony.

18     Third, in trial counsel's direct examination of his expert, he failed to ask regarding the

19  impact on a child's perception of reality of medication. He failed to ask this despite the clear

20  statement in the expert's pre-trial report that medication would impair the perception of reality.

21

22                              **ANALYSIS**

23     The Court must first consider whether Petitioner was denied his rights under the Oregon

24  Constitution before conducting an analysis under the United States Constitution. *Stevens v. State of*

Page 2, PETITIONER'S TRIAL
MEMORANDUM

1  *Oregon*, 322 Or 101, 108, 902 P2d 1137 (1995), *State v. Kennedy*, 295 Or 260, 666 P2d 1316 (1983

2  (setting forth methodology).

3        Article 1, section 11, of the Oregon Constitution calls for "an adequate performance by

4  counsel of those functions of professional assistance which an accused person relies upon counsel to

5  perform on his behalf." Where claims are evaluated under Article I section 11, a Petitioner must

6  show "that trial counsel failed to exercise reasonable professional skills and judgement necessary to

7  diligently and conscientiously advance the defense and that the petitioner suffered prejudice as a

8  result. *Stevens*, 322 Or at 108; *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991).

9  "Prejudice" is established when the acts or omissions by counsel "have a tendency to affect the

10  result of the prosecution." *Lichau v. Baldwin*, 333 Or 350, 363, 39 P3d 851 (2002); *Gorham v.*

11  *Thompson*, 322 Or 560 564, 34 P3d 161 (2001); *Soderick v. Baldwin,* 142 Or App 271, 275, 921

12  P2d 979 (1996).

13        Failure to investigate the facts and prepare a defense based on the law and the facts is

14  required of competent counsel; this court cannot ignore decisions made in a defense that reflect a

15  suspension of professional duties. *Krummacher v. Gierloff*, 290 Or 867, 874-876. Petitioner is

16  entitled to post-conviction relief when trial counsel's omissions have a tendency to affect the result

17  of the prosecution. *Id*. at 883.

18        The standard under the Sixth and Fourteenth Amendments to the United States Constitution

19  is similar to the standard under Article I, section 11 of the Oregon Constitution. *Chew v. State of*

20  *Oregon,* 121 Or App 474, 477, 855 P2d 120 (1993). In *United States v. Cronic,* the United States

21  Supreme Court states:

22            The special value of the right to assistance of counsel explains why "[i]t has long
             been recognized that the right to counsel is the right to effective assistance of
             counsel" *McMann v. Richardson*, 397 US 759, 771 n. 14 (1970) . . . [T]he accused is
             entitled to "a reasonably competent attorney" whose advice is "within the range of
             competence demanded of attorneys in criminal cases."

Page 3, PETITIONER'S TRIAL
MEMORANDUM

1

2  466 us 648, 654-55, 104 s.Ct 2039, 2044, 80 L.Ed. 2d 657 (1984) (citations omitted).

3      The test to establish a Sixth Amendment claim of ineffective assistance of counsel is set

4  forth in *Strickland v. Washington*, 466 SU 668, 686-88 (1984), which requires that Petitioner must

5  prove, first, that counsel's representation, measured against "prevailing professional norms[,] . . .

6  fell below an objective standard of reasonableness," and second, that the deficient performance

7  prejudiced the defense. *Wiggins v. Smith*,  539 US 510, 123 S. Ct. 2527, 2535, 156 L.Ed. 2d 471

   (2003); *Avila v. Galaza*, 297 F.3d 911, 918 ((th Cir. 2002); *Mayfiled v. Woodford*, 270 F.3d 915,
8
   927 (9th Cir. 2001).
9
       Most importantly, the burden on Petitioner is to show that "there is a reasonable probability
10
   that, but for counsel's unprofessional errors, the result of the proceeding would have been
11
   different." *Strickland*, 466 US at 694; *Avila*, 297 F.3d at 918.  Where that "reasonable probability"
12
   exists, confidence in the outcome has been undermined and post-conviction relief is available to
13
   Petitioner.  The central question is "whether counsel's deficient performance renders the result of
14
   the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 US 364, 372,
15
   113 S. Ct. 838, 122 L.Ed. 2d 180 (1993).

16

17                    **FACTUAL AND PROCEDURAL BACKGROUND**

       Following trial, Petitioner was convicted and sentenced on two counts of Sexual Abuse in
18
   the First Degree in Clackamas County Case No. CR1501848 which are the subject of this Petition
19
   for Post-Conviction Relief.
20
   ////
21
   ////
22
   ////


Page 4, PETITIONER'S TRIAL
MEMORANDUM

1

**CLAIMS FOR RELIEF**

2

**FIRST CLAIM FOR RELIEF:** JURY WAIVER

3

Petitioner has a right to a jury trial. He was resolute in his desire for a jury trial. On the

4

morning of trial, trial counsel overcame his will in pressuring him to accept a bench trial, claiming

5

that that the jury was needed elsewhere. See Exhibit 1, Declaration of Petitioner.

6

7

**SECOND CLAIM FOR RELIEF:** CHARACTER WITNESSES

Trial counsel failed to call character witnesses. Four witnesses had been found by his

8

investigator. Exhibits 2, 3, 4, 5. These witnesses were in the courthouse and available to testify.

9

Exhibit 8, paragraph 4. At least two of those witnesses have been found and are available to testify

10

at a re-trial. Exhibit 8, Paragraphs 3 and 4. All four were available at the first trial.

11

Under OEC 404(2)(a) a criminal defendant may offer evidence of a pertinent trait of

12

character. For example, in this case, trial counsel could have, and should have, called each of these

13

four persons to testify. Trial counsel should have first asked each of these four persons whether

14

they knew Mr. Hollingsworth by reputation and/or their opinion to be a law-abiding person?

15

Second, trial counsel should have offered through each of these four witnesses' evidence of Mr.

16

Hollingsworth's character for sexual propriety. *State v. Enakiev*, 175 Or. App. 589, 29 P3d 1160

17

(2001). See Exhibits 2-5. Each of these persons would have testified favorably for Mr.

18

Hollingsworth. The investigative reports attached do not indicate an exact question and answer

19

format answer that would be used at trial. They do show however that trial counsel had information

20

in his possession that these four witnesses were able to testify to Mr. Hollingsworth's reputation in

21

their community, as well as to their opinion, regarding his character for following the law and

22

sexual propriety

In a "she said, he said" case, where the complaining witness had no clear experience of the

Page 5, PETITIONER'S TRIAL
MEMORANDUM

events complained of, failure to call these character witnesses is not a reasonable trial tactic. No conclusion is possible but to say that there is a reasonable probability that, but for this unprofessional error of counsel, the result of the proceeding would have been different. *Stickland* at 694.

**THIRD CLAIM FOR RELIEF: INCOMPLETE EXPERT TESTIMONY**

Prior to trial, trial counsel received the attached report of Dr. Bourg. Exhibit 6. Dr. Bourg is an expert in interviewing children who raise claims of suffering trauma. She is an expert in the function of memory. Her trial testimony is at pages 454 through 503 which has been previously filed in this matter.

Dr. Bourg clearly informed trial counsel that medication may have impacted the child's perceptions leading to the accusations against Mr. Hollingsworth. She reported to trial counsel as follows: "There are reports that [complainant's] father overdosed her with Dexedrine earlier that day. Withdrawal and rebound effects such as extreme sleepiness and *impaired reality testing can occur during recovery* from Dexedrine overdoses." Exhibit 6, page 3; emphasis added.

Nowhere during the direct examination, cross examination, or re-direct examination did this information get presented to the court.

In a case where the conviction rests solely on the perception of a child trying to make a separation between a dream about a boy touching her and someone in the room trying to cover her up, calling an expert in child interviewing and memory, yet failing to question her as to the potential effects of medication on the child's perception of reality is not a reasonable trial tactic. No conclusion is possible but to say that there is a reasonable probability that, but for this unprofessional error of counsel, the result of the proceeding would have been different. *Stickland* at 694.

Page 6, PETITIONER'S TRIAL
MEMORANDUM

1

**CONCLUSION**

2    Based on the foregoing points and authorities, Petitioner has met his burden to prove a

3    substantial violation of his state and federal constitutional right to effective and adequate assistance

4    of counsel on every claim alleged herein.  When a case resolves on the credibility of the

5    complaining witness and of petitioner, failure to call available character witnesses cannot be

6    defended as an acceptable trial tactic.  When the evidence upon which conviction is based is *solely*

7    the memory of a child coming out of sleeping state in which she reports dreaming about a boy

8    touching her, failure to ask the memory expert about the impact of medications cannot be defended

    as an acceptable trial tactic.

9    Petitioner respectfully requests that based upon the points and authorities set forth above, the

10   Court grant him post-conviction relief in the form of remand to the Clackamas County Circuit Court

11   for re-trial.

12

13   DATED this 13th day of March, 2019.

14                                    /s/ Jonathan Clark
                                      Jonathan Clark, OSB No. 022740
15                                    Attorney for Petitioner

16

17

18

19

20

21

22

Page 7, PETITIONER'S TRIAL
MEMORANDUM

**CERTIFICATE OF SERVICE**

By signature below, I certify that I served, or caused to be served, the foregoing document, **PETITIONER'S TRIAL MEMORANDUM**, on the person identified below on the date indicated below, by

_____ US Mail

_____ Facsimile

\_\_\_X\_\_\_ Hand Delivery

_____ Email Attachment

Ward Douglas Marshall
Department of Justice
Trial Division
1162 Court Street NE
Salem, OR 97301

DATED this 13th day of March, 2019.

JONATHAN A. CLARK, P.C.

/s/ Jonathan Clark
Jonathan Clark, OSB No. 022740
Attorney for Petitioner

CERTIFICATE OF SERVICE



hand delivered by Alyssa

RECEIVED

MAR 1 3 2019     4:50 pm
                 CM

DEPARTMENT OF JUSTICE
TRIAL DIVISION

JONATHAN A. CLARK
ATTORNEY AT LAW

317 COURT STREET NE, SUITE 203
SALEM, OREGON 97301-3526

Department of Justice
**ATTN: Ward Douglas Marshall**
Trial Division
1162 Court Street NE
Salem, OR 97301

VIA HAND DELIVERY ONLY

RECEIVED

MAR 13 2019

DEPARTMENT OF JUSTICE
TRIAL DIVISION

1

2

3                IN THE CIRCUIT COURT OF THE STATE OF OREGON

4                       FOR THE COUNTY OF UMATILLA

5  JORDEN HOLLINGSWORTH,              )   No. 17CV47262
                                      )
6                     Plaintiff,      )   **PETITIONER'S TRIAL**
                                      )   **MEMORANDUM EXHIBIT LIST**
7              v.                     )
                                      )
8  TROY BOWSER, Superintendent,       )
   Two Rivers Correctional Institution, )
9                                     )
                      Defendant,      )
10 ────────────────────────────────────────────────────────

11

12     Petitioner submits the following exhibits in support of his Trial Memorandum:

       Exh. 1        Declaration of Petitioner
13
       Exh. 2        Private Investigator Report: Knowles
14
       Exh. 3        Private Investigator Report: Polk
15
       Exh. 4        Private Investigator Report:  Mills
16
       Exh. 5        Private Investigator Report: Edwards
17
       Exh. 6        Evidence Review by Dr. Bourg
18
       Exh. 7        Transcript Selections
19
       Exh. 8        Declaration of Heather Carver
20

21  DATED this 13th day of March, 2019.

22                                          /s/ Jonathan Clark
                                            Jonathan Clark, OSB No. 022740
                                            Attorney for Petitioner

Page 1, PETITIONER'S TRIAL
MEMORANDUM EXHIBIT LIST

1

## CERTIFICATE OF SERVICE

2    By signature below, I certify that I served, or caused to be served, the foregoing document,
**PETITIONER'S TRIAL MEMORANDUM EXHIBIT LIST**, on the person identified below
3    on the date indicated below, by

4
        _____ US Mail
5
        _____ Facsimile
6
        __X___ Hand Delivery
7
        _____ Email Attachment
8

9
        Ward Douglas Marshall
10       Department of Justice
        Trial Division
11       1162 Court Street NE
        Salem, OR 97301
12

13

14   DATED this 13th day of March, 2019.

15                               JONATHAN A. CLARK, P.C.

16
                                 /s/ Jonathan Clark
17                               Jonathan Clark, OSB No. 022740
                                 Attorney for Petitioner
18

19

20

21

22


CERTIFICATE OF SERVICE

1

2

3                   IN THE CIRCUIT COURT OF THE STATE OF OREGON

4                          FOR THE COUNTY OF UMATILLA

5   JORDEN HOLLINGSWORTH,              )   No. 17CV47262
                                       )
6              Plaintiff,              )   **DECLARATION OF JORDEN**
                                       )   **HOLLINGSWORTH IN SUPPORT OF**
7        v.                            )   **HIS FIRST AMENDED PETITION**
                                       )
8   TROY BOWSER, Superintendent,       )
    Two Rivers Correctional Institution, )
9                                      )
               Defendant,              )
10  ─────────────────────────────────────────────

11

12      Pursuant to ORCP 1E, I, Jorden Hollingsworth, do hereby declare as follows:

13      1.  I am the Petitioner, Jorden Hollingsworth, in the above-entitled post-conviction

14          proceeding.

        2.  Trial Counsel came to me right before the commencement of trial. He told me that the
15
            jury was needed for another trial and that I did not want a jury trial. I in fact did want a
16
            jury trial; however, he demanded that I sign a jury waiver.
17
        3.  Due to my reliance on him, and the timing of the demand, his influence overcame my
18
            will and I agreed to sign the jury waiver. I did not have time to consider this tactical
19
            change, nor did I have time to discuss with him the pros and the cons of making this
20
            change.
21
        4.  I did not expect, nor did I want, a bench trial.
22
    ////

    ////


    Page 1, DECLARATION OF JORDEN
    HOLLINGSWORTH


                                                          EXHIBIT 1
                                                          Page 1 of 2

5. I have read the First Amended Petition. It is true and accurate to the best of my memory and belief.

**I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand that it is made for use as evidence in Court and is subject to penalty of perjury.**

DATED this _31_ day of _August_ , 2018.

Jorden Hollingsworth
Petitioner

Page 2, DECLARATION OF JORDEN
HOLLINGSWORTH

EXHIBIT 1
Page 2 of 2

**RE: JORDEN HOLLINGSWORTH**                    **STATEMENT**
**WEDNESDAY, JANUARY 6, 2016**                  **S. CASTLEMAN**

Case No.              15-01848

Mentioned:            Hollingsworth, Jorden DOB 08-01-1993
                      Custody at the Clackamas County Jail
                      1208 Linn Avenue #32
                      Oregon City, OR 97045

                      Jewell-Shafer, Jasmine DOB 08-24-2004 (victim)
                      Contact Information Withheld

                      Jewell, Kenneth DOB 07-26-1985 (father of victim)
                      Contact Information Withheld

                      Miller, Trisha DOB 03-06-1985 (fiancé of the father of victim and
                      the Defendant's aunt)
                      Contact Information Withheld

                      Hollingsworth, Mindy DOB 03-28-1975 (mother of suspect/sister
                      of Trisha Miller)
                      Contact Information Withheld

                      Tobin, Trista (defendant's girlfriend)
                      13287 Moccasin Way
                      Oregon City, OR 97045
                      971-712-4832

                      Knowles, Cyndi
                      14290 S. Marjorie Lane
                      Oregon City, OR 97045
                      971-998-9710
                      cyndiannknowles88@gmail.com

Subject:              Statement of Cyndi Knowles

On Wednesday, January 6, 2016 contact was made with Cyndi Knowles in an effort to obtain a
statement with the following results:

Cyndi Knowles will be for now and hereafter be referred to as Knowles.

Confidential Attorney Work Product

1

EXHIBIT 2
Page 1 of 2

EXHIBIT 112, Page 1 of 2
Case No. 3:20-cv-01567-MC

Knowles stated in substance that she has known Hollingsworth for two or three years. She stated that she and Hollingsworth are really good friends. She stated she a small group of really good friends and he is part of that group. Knowles described the group as a "tight knit family".

She stated that Hollingsworth is happy and spontaneous. She stated that Hollingsworth is always there for people. She stated if someone asks him to do something he would normally do it. Knowles stated Hollingsworth is really nice to everyone. She stated she has brought Hollingsworth around her friends and family that do not know him and once they meet him they love him. She stated Hollingsworth has always been a good guy.

Knowles stated she has seen Hollingsworth interact with her nieces and her friend's children. She stated is very nice to them and plays with them "just like any other general person". She stated she has never seen Hollingsworth act inappropriately around young children. Knowles stated Hollingsworth has never acted inappropriately or aggressive toward her. She stated that Hollingsworth has spent the night at her house and slept in her bed with her and was very appropriate. She stated Hollingsworth "never tried anything". Knowles stated if she had children she would feel comfortable to have Hollingsworth around her children.

Knowles stated Hollingsworth has always been a caring and giving guy. She stated he has always been really nice and has never done anything wrong toward her, her family or anyone that she knows. Knowles stated that anyone who meets Hollingsworth absolutely loves him.

Cyndi Knowles was unable to provide any further relevant information. I discontinued my statement at this time.

End Report.

**RE: JORDEN HOLLINGSWORTH**                          **STATEMENT**
**WEDNESDAY, JANUARY 6, 2016**                        **S. CASTLEMAN**

Case No.                    15-01848

Mentioned:                  Hollingsworth, Jorden DOB 08-01-1993
                            Custody at the Clackamas County Jail
                            1208 Linn Avenue #32
                            Oregon City, OR 97045

                            Jewell-Shafer, Jasmine DOB 08-24-2004 (victim)
                            Contact Information Withheld

                            Jewell, Kenneth DOB 07-26-1985 (father of victim)
                            Contact Information Withheld

                            Miller, Trisha DOB 03-06-1985 (fiancé of the father of victim and
                            the Defendant's aunt)
                            Contact Information Withheld

                            Hollingsworth, Mindy DOB 03-28-1975 (mother of suspect/sister
                            of Trisha Miller)
                            Contact Information Withheld

                            Tobin, Trista (defendant's girlfriend)
                            13287 Moccasin Way
                            Oregon City, OR 97045
                            971-712-4832

                            Knowles, Cyndi
                            14290 S. Marjorie Lane
                            Oregon City, OR 97045
                            971-998-9710
                            cyndiannknowles88@gmail.com

                            Mills, David
                            4300 SE 102 Ave.
                            Portland, OR 97266
                            971-340-3783
                            dlmillz44@gmail.com

                            Polk, Courtney
                            120 E. Jersey Street
                            Gladstone, OR 97027
                            503-208-0221
                            anayamarie2008@gmail.com

Confidential Attorney Work Product

1

Subject:                    Statement of Courtney Polk

On Wednesday, January 6, 2016 contact was made with Courtney Polk in an effort to obtain a statement with the following results:

Courtney Polk will be for now and hereafter be referred to as Polk.

Polk stated in substance that she has known Hollingsworth for about one year. She stated that Hollingsworth is "super sweet". She stated that any time she needs help with anything she knows she can call him. She stated that Hollingsworth is a really good person. Polk stated she has never had any problems with him. She stated they have never argued. Polk stated they always have fun together whether they are just talking or are at a friend's house having a drink together. She stated their time together is always "happy go lucky". Polk stated Hollingsworth is one of her best friends and he is a great guy. She said she "loves him to death".

Polk stated that Hollingsworth has never made her feel uncomfortable and that he has never been sexual aggressive toward her. She stated she has a seven-year old daughter that Hollingsworth has been around and he has never been inappropriate toward her. Polk stated Hollingsworth has never acted inappropriate toward any of the women in their group that they hang out with. Polk stated she feels comfortable with Hollingsworth around her daughter. She stated she has never had any strange or awkward vibes from Hollingsworth.

Polk stated that Hollingsworth is one of the happiest, joyful and most trustworthy people that she has ever met. She stated Hollingsworth is always smiling and that when someone is not happy, he is the first person to jump in to try to cheer up the person.

Polk was unable to provide any further relevant information. I discontinued my statement at this time.

End Report.

**Confidential Attorney Work Product**

2

EXHIBIT 3
Page 2 of 2

EXHIBIT 113, Page 2 of 2
Case No. 3:20-cv-01567-MC

**RE: JORDEN HOLLINGSWORTH**                    **STATEMENT**
**WEDNESDAY, JANUARY 6, 2016**                  **S. CASTLEMAN**

Case No.                15-01848

Mentioned:              Hollingsworth, Jorden DOB 08-01-1993
                        Custody at the Clackamas County Jail
                        1208 Linn Avenue #32
                        Oregon City, OR 97045

                        Jewell-Shafer, Jasmine DOB 08-24-2004 (victim)
                        Contact Information Withheld

                        Jewell, Kenneth DOB 07-26-1985 (father of victim)
                        Contact Information Withheld

                        Miller, Trisha DOB 03-06-1985 (fiancé of the father of victim and
                        the Defendant's aunt)
                        Contact Information Withheld

                        Hollingsworth, Mindy DOB 03-28-1975 (mother of suspect/sister
                        of Trisha Miller)
                        Contact Information Withheld

                        Tobin, Trista (defendant's girlfriend)
                        13287 Moccasin Way
                        Oregon City, OR 97045
                        971-712-4832

                        Knowles, Cyndi
                        14290 S. Marjorie Lane
                        Oregon City, OR 97045
                        971-998-9710
                        cyndiannknowles88@gmail.com

                        Mills, David
                        4300 SE 102 Ave.
                        Portland, OR 97266
                        971-340-3783
                        dlmillz44@gmail.com

Subject:                Statement of David Mills


On Wednesday, January 6, 2016 contact was made with David Mills in an effort to obtain a
statement with the following results:

1

Confidential Attorney Work Product

EXHIBIT 4
Page 1 of 2

EXHIBIT 114, Page 1 of 2
Case No. 3:20-cv-01567-MC

David Mills will be for now and hereafter be referred to as Mills.

Mills stated in substance that he has known Hollingsworth for a little over two years. He stated he met Hollingsworth through a co-worker, Kipley Edwards. He stated they all had a lot of similar interests so they would hang out after work.

Mills stated Hollingsworth is very personable and sociable. He stated within minutes after meeting Hollingsworth people love him. Mills stated Hollingsworth has a good character and is a lot of fun to be around.

Mills stated that Hollingsworth told him that he was being accused of sexual assault against a young female. He stated that Hollingsworth stated that the young female stayed at his house. Mills stated that Hollingsworth stated the young female was asleep on the couch with the blanket off of her and her shirt was up. Mills stated Hollingsworth told him that he covered her up with the blanket and pulled her shirt down. He stated Hollingsworth told him the young female woke up and saw him "touching her and freaked out and called it sexual assault".

Mills stated he knows Hollingsworth's character and he is positive that he can trust Hollingsworth around his son and other children. Mills stated he has seen Hollingsworth interact with children including young females. He stated Hollingsworth has never acted inappropriate toward them. He stated Hollingsworth "has always been awesome with little kids".

Mills stated that Hollingsworth loves women and he loves being around them. He stated Hollingsworth is really good at talking to women. Mills stated that within his group of friends, Hollingsworth is the most respectful guy when it comes to females. He stated Hollingsworth has never been aggressive with females. Mills stated that Hollingsworth is non-threatening.

Mills stated that there was once an incident where Hollingsworth was with him and a group of friends. He stated there was a newer girl in the group that got really drunk. Mills stated that Hollingsworth took the girl home, dropped her off, "made sure she was good to go" and then went back to the group of friends. Mills stated Hollingsworth is "a good dude" and he will "make sure that you're taken care of". Mills stated Hollingsworth is a protector, especially to the people that are around him. He stated Hollingsworth is always there for people. He stated he is always there to help out.

David Mills was unable to provide any further relevant information. I discontinued my statement at this time.

End Report.

Confidential Attorney Work Product

2

EXHIBIT 4
Page 2 of 2

EXHIBIT 114, Page 2 of 2
Case No. 3:20-cv-01567-MC

**RE: JORDEN HOLLINGSWORTH**                          **STATEMENT**
**THURSDAY, JANUARY 7, 2016**                         **S. CASTLEMAN**

Case No.                        15-01848

Mentioned:                      Hollingsworth, Jorden DOB 08-01-1993
                                Custody at the Clackamas County Jail
                                1208 Linn Avenue #32
                                Oregon City, OR 97045

                                Jewell-Shafer, Jasmine DOB 08-24-2004 (victim)
                                Contact Information Withheld

                                Jewell, Kenneth DOB 07-26-1985 (father of victim)
                                Contact Information Withheld

                                Miller, Trisha DOB 03-06-1985 (fiancé of the father of victim and
                                the Defendant's aunt)
                                Contact Information Withheld

                                Hollingsworth, Mindy DOB 03-28-1975 (mother of suspect/sister
                                of Trisha Miller)
                                Contact Information Withheld

                                Tobin, Trista (defendant's girlfriend)
                                13287 Moccasin Way
                                Oregon City, OR 97045
                                971-712-4832

                                Knowles, Cyndi
                                14290 S. Marjorie Lane
                                Oregon City, OR 97045
                                971-998-9710
                                cyndiannknowles88@gmail.com

                                Mills, David
                                4300 SE 102 Ave.
                                Portland, OR 97266
                                971-340-3783
                                dlmillz44@gmail.com

                                Polk, Courtney
                                120 E. Jersey Street
                                Gladstone, OR 97027
                                503-208-0221
                                anayamarie2008@gmail.com

                                                                                          1

Confidential Attorney Work Product

                                                                            EXHIBIT 5
                                                                            Page 1 of 3

Tobin Trista
13287 Moccasin Way
Oregon City, OR 97045
971-712-4832
tristasamanthalee@hotmail.com

Edwards, Kipley
15004 S. Graves Road
Mulino, OR 97042
503-750-9147
kipleyedwards@gmail.com

Subject:            Statement of Kipley Edwards

On Thursday, January 7, 2016 contact was made with Kipley Edwards in an effort to obtain a statement with the following results:

Kipley Edwards will be for now and hereafter be referred to as Edwards.

Edwards stated in substance that he has known Hollingsworth for about four years. He stated that Hollingsworth is a "smart kid" and that he has hung out with him every day since he has met him. Edwards stated Hollingsworth is his best friend. Edwards describes Hollingsworth as "a go getter". He stated that when Hollingsworth puts his mind to something he gets it done. He stated that Hollingsworth is a good worker and would never do anything to hurt his friends or family. Edwards stated that Hollingsworth just seems to be always in the wrong place at the wrong time.

Edwards stated that he has met Jasmine a couple of times when he would go over to Hollingsworth's aunt's house. He stated that from what he saw Jasmine was under a pretty strict schedule. He stated she was always reading. He stated he saw something on the wall with a list of her chores. Edwards stated he does not know Jasmine too well.

Edwards stated that Hollingsworth and Jasmine would play around and that Hollingsworth treated Jasmine like "any uncle or cousin would". Edwards stated that Hollingsworth never acted inappropriately with Jasmine. He stated Jasmine never acted intimidated or afraid of Hollingsworth. He stated he saw Hollingsworth and Jasmine together about four or five times.

Edwards stated that Hollingsworth told him that Hollingsworth went home one night and Jasmine's shirt was up so he went to go pull it down and began to put a blanket on her. He stated that Hollingsworth told him that Jasmine woke up and "got awkward" and told Hollingsworth she was going with her dad. Edwards stated that Hollingsworth told him that he told Jasmine that it was not necessary to go to her dad and to go back to bed. He stated Hollingsworth told him Jasmine went to her dad anyway and everybody "got all freaked out". Edwards stated Hollingsworth was at the wrong place at the wrong time.

Edwards stated he has never seen Hollingsworth act inappropriately toward any females. He stated he would not be best friends with someone who treated females inappropriately.

2

Confidential Attorney Work Product

EXHIBIT 5
Page 2 of 3

Edwards stated that a couple of weeks before Hollingsworth was arrested that Hollingsworth told Edwards that he was going through 'rough time with his aunt". He stated that Hollingsworth was crying. Edwards stated that Hollingsworth's aunt and Jasmine's father broke up for a while and the night they got back together was when the incident occurred. Edwards stated that Hollingsworth's whole family is "always something" and that "they are weird".

Kipley Edwards was unable to provide any further relevant information. I discontinued my statement at this time.

End Report.

# WENDY BOURG, PH.D., LLC
### Licensed Psychologist
**3906 SW Kelly Avenue**
Portland, OR 97239
Phone: 503.320.6996  Fax: 503.327.8696
Email: drwendybourg@gmail.com

8/3/16

Mr. Arthur B. Knauss
Attorney at Law
294 Warner Milne Road
Oregon City, OR 97045

Mr. Knauss:

This letter summarizes for you my findings from review of discovery you provided me in
State v. Hollingsworth. I reviewed the following materials prior to my consultation with
you: the Indictment against your client, a page titled Clackamas County Sheriff's Office
Inmate information, a Notice of Intent to Offer Statements made by a Child Victim, a
series of Oregon City Police Department reports summarizing the child's initial
disclosure process, statements from other family members in the home at the time of the
alleged incident, a summary of the Children's Center interview by police, reports from
the Children's Center regarding their evaluation of the child Jasmine, video recorded
interview of the child Jasmine and research literature pertaining to cognitive functioning
when waking in the middle of the night.

- The child was brought to the police station shortly after her initial disclosure. The
  short interval of time between disclosure and notification of authorities is positive
  because it reduces the window for both contamination and fading of memories.
- However, during her interview, the child expresses that some people think she is
  lying. Then the police officer told her she was brave for telling her father. It is
  concerning that the child has been exposed to conversations about her disclosures.
  Conversations with individuals who have any bias (e.g. that she is lying or telling
  the truth) raise concerns about contamination of her reporting in various
  directions. The interviewer did not ask the child to relate the content of these
  prior conversations so that the impact, if any, on the child's statements could be
  evaluated.
- The interviewer primarily relies on open ended questions (Who, What, Where),
  which are reasonable questions to use in a child interview and which are unlikely
  to contaminate the child's statement. While I did not see as much use of the
  highest quality invitational questions (e.g. "Tell me everything that happened") as
  would be ideal, I also did not observe instances of the interviewer supplying
  contaminating information.
- At the beginning of the forensic interview, the interviewer uses a very complex
  sentence structure to ask the child simultaneously to only talk about true things

not pretend and not make believe, just stuff we know and that if the interviewer says something that doesn't make sense the child should signal lack of understanding and if the interviewer makes a mistake the child should notify the interviewer. After all of that information in a single statement (admittedly challenging for an adult to follow), the interviewer asks the child "Can you do all that?" There is research establishing that children's reports are somewhat more likely to be factual when the interviewer ensures that a child understands the obligation to tell the truth, elicits a promise from the child to tell the truth and ensures that the child understands that the ground rules for this conversation with an adult are different (e.g. the child can correct the adult and the adult is not all-knowing). However, the process for accomplishing these goals is multi-step and relies on the interviewer checking the child's understanding of each concept along the way. The manner of setting ground rules in this interview was not consistent with practices that would facilitate accurate reporting.

- Reportedly the child Jasmine has been diagnosed with ADHD. Going slowly and checking understanding is particularly important when working with a child who has ADHD.

- The child acknowledges concerns with lying throughout her interview, expressing that lying to the suspect "got me somewhere" when she lied to him by assuring him she wouldn't tell but she did

- The child reports that she felt a touch in her dream and that her character in the dream became sad and then she heard a gasp and woke up. She related other dream events including her sister and her dog trying to wake her up by pouncing on the bed. She heard a gasp and she saw the suspect behind the couch. She did report being awake when she saw him behind the couch and when they conversed about what had just occurred. Thus she is clearly reporting that her knowledge of any touching derived from feeling something while her eyes were closed and she was dreaming and that her conclusion that Mr. Hollingsworth touched her arose from circumstantial evidence of his proximity to her and a conversation that occurred when she was abruptly awakened from a midnight dream. She related elements of the conversation that did not make sense (like him asking if he could take out the garbage). She also related that he was behind the couch and then on the couch and she concluded he must have snuck past her.

- The child's report regarding her dream state and her reasoning process upon sudden midnight wakening is consistent with research on cognitive impairments among individuals suddenly awakened in the middle of their sleep. The phenomenon is known as "sleep drunkenness" or "sleep intertia" and there is a body of scientific evidence documenting that individuals are confused, disoriented, prone to misperceive information, experience difficult making decisions and have impaired memories when they are so awakened. The child acknowledges that aspect of her conscious state, "When I wake up sometimes things get fuzzy."

- The child has other sources of sexual knowledge aside from possible sexual abuse. She specifically reports that she regularly watches a television show that involves killing and sexual assault. She also had an early childhood friend who shared sexual information with her.

- The child has been inconsistent in her statements. She denied vaginal touch during her medical exam but alleged vaginal touch during her interview. She has been in therapy and did not disclose a prior incident that she alleged during her forensic interview.
- There are reports that her father overdosed her with Dexedrine earlier that day. Withdrawal and rebound effects such as extreme sleepiness and impaired reality testing can occur during recovery from Dexedrine overdoses

I hope that this information is helpful to you and anyone else who is evaluating the evidence in this case. Please let me know if I can be of further assistance.

Sincerely,

Wendy Bourg, Ph.D.

EXHIBIT 6
Page 3 of 3

EXHIBIT 116, Page 3 of 3
Case No. 3:20-cv-01567-MC

Wendy Bourg - D                    484

1    BY MR. KNAUSS:

2         Q.    Okay.   Go ahead.

3         A.    Okay.

4               Looking at the child's interview, she's very

5    clear in her statement, and the interviewer did a nice

6    job of eliciting this, of asking for an exact sequence

7    of events.   And the child is clear that she was

8    dreaming.   And while she was dreaming, she perceived a

9    touch.   The child's clearly stating the touch occurred

10   during the dream.   Her dream changed and her character

11   in her dream became sad.

12              After that, she woke up.   She heard the

13   suspect's voice.   She saw him dunk behind the couch and

14   she came to the conclusion that he touched her.

15        Q.    Okay.   Now, based upon your experience,

16   expertise and research, as far as a person's ability to

17   relate an event in a dream state, what -- what impact do

18   you -- do you find as far as the child relating that the

19   touching occurred during a dream state?

20        A.    So known phenomena when transitioning between

21   sleep and waking state, cognitive confusion.  So for

22   example, there have been sleep lab documentations of a

23   phone ringing.   The experimenter is trying to contact

24   the subject and the subject picks up a lamp instead of

25   the phone and starts talking to the lamp, and it's a few

Wendy Bourg - D                                    485

1    minutes before the subject realizes they don't have a

2    phone; they have a lamp.  So there's confusion about --

3    and behavior that's evident of confusion.  People will

4    speak when they're awakened from those statements -- or

5    from those states, in confused and illogical statements.

6              Cognitive impairments have been observed in

7    executive functions:  Making decisions.  Understanding

8    what just occurred.

9              Moreover, people will report dreams as

10   events.  Children are more likely to do that than adults

11   because their reality monitoring skills are not

12   sufficiently developed.  But it is a known phenomenon

13   that people can report a dream as an actual event.

14             Over time, once they decide that a dream is

15   an actual event, they'll often add details consistent

16   with it having been an actual event to their memory and

17   to their report.

18        Q.   Was there any recitations of the girl, as far

19   as what was said, that evidenced any confusion on her

20   part, as far as what was going on?  Anything nonsensical

21   that you saw?

22        A.   Yes.  She -- she reported some confusion about

23   where the suspect was.  He was behind the couch, but

24   then he was on the small couch, and "He must have

25   sneaked around me, but I'm usually a light sleeper."

Wendy Bourg - D                    486

1    There's a lot of discussion about her being confused

2    about where he was.

3              She also discussed not being sure who

4    touched her.  When she went to sleep, her dad was in the

5    room and the suspect was in the room.  And she decided

6    that it must have been the suspect because the voice was

7    not her dad's voice, and then her dad was upstairs when

8    she woke up.

9         Q.   Okay.

10        A.   So she was reasoning through.  What I observed

11   was, again, what happens when people are transitioning

12   from sleep to awake.  They're trying to understand what

13   they just perceived in their dream.  They're trying to

14   make sense of it from cues around them.  And that's what

15   she was doing.  She was trying to make sense.

16             "I had this perception in my dream state and

17   I'm trying to understand what just occurred by looking

18   around me for clues."

19        Q.   Okay.  She related some purported conversation

20   from Mr. Hollingsworth --

21        A.   Oh, yes, she did.

22        Q.   -- as far as statements she made -- he made?

23        A.   And she said he made some nonsensical

24   statements, like asking her if he could take out the

25   garbage.  I mean, in the middle of also asking her if he

Wendy Bourg - D                                          487

1    could touch her.  So she reported things that were

2    consistent with her understanding of her dream, he was

3    asking if he could touch her, and then she reported some

4    things that made no sense, given the context, that he

5    would ask her if he, you know, could take out the

6    garbage at that time.

7         Q.   Now, in her recitation of what was occurring,

8    she indicates that she was asleep and dreaming when she

9    felt a touching.  And then the dream automatically

10   changed and that the boy character in her dream was

11   doing the touching to the other character.

12             Does it appear that she's still relating

13   things that are occurring during the dream when she --

14        A.   Yes.

15        Q.   -- indicates that?

16        A.   I think she was clear about that.

17        Q.   Okay.  Do you have any sense of what she's

18   trying to relate, as far as the boy character was doing

19   the touching?

20        A.   My -- my sense is she's relating her experience

21   that, you know, she's -- she's seeing this in a dream

22   and she's reporting what she's seeing.  And then she's

23   experiencing, in the dream, touching on her body.  And

24   then she wakes up and tries to understand what just

25   happened.

Wendy Bourg - D                                          488

1        Q.    Okay.

2        A.    What did I just feel and what did I just see?

3   And how does that fit with my current circumstances?

4        Q.    Okay.

5              MR. KNAUSS:  All right.  Thank you.  No

6   further questions.

7              THE COURT:  Ms. Dumont.

8              MS. DUMONT:  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10  BY MS. DUMONT:

11       Q.    I want to talk with you initially about some of

12  the concepts that you mentioned, generally speaking,

13  because I think it's important for -- for me to

14  understand and make sure I'm getting what you're saying.

15             So you talked a little bit about

16  suggestibility.

17       A.    Yes.

18       Q.    Right?

19       A.    Yes.

20       Q.    And so this isn't -- this isn't a rocket

21  science.  Suggestibility is sort of -- and I want to

22  make sure I'm -- we're on the same page.

23             If a child comes to me and they're crying

24  and he's holding his eye, and I say, "Johnny hit you,

25  didn't he?" would that be anything towards

Wendy Bourg - X                              501

1       Q.    Okay.

2       A.    -- at that point.

3       Q.    Does it make sense with your recollection of

4   the interview as a whole --

5       A.    She --

6       Q.    -- that Jasmine --

7       A.    I have a -- I --

8       Q.    -- later --

9       A.    I'm sorry.  I have an answer now.  I -- I did

10  write that down.  She said the boy went into the shirt.

11      Q.    No.  I'm talking about after the break.

12      A.    Okay.

13      Q.    At the end of the interview.  But here, just --

14  I --

15      A.    Okay.

16      Q.    I understand you want to look at your notes.

17  I'll just try and situate you.

18      A.    Okay.  Sorry.

19      Q.    If -- if you want to think about your

20  understanding when -- after the break, when she came

21  back and tried to ask that question about "How do you

22  know it was Jorden and it wasn't just a dream?"

23      A.    Yes.

24      Q.    Okay.  And so she's trying to clarify that

25  point.  And Jasmine said, "He actually went into the

Wendy Bourg - X                                    502

1    shirt.  He said please don't tell anyone.  He basically

2    admitted.  I felt a finger moving on me on my boob."

3         A.   Yes.

4         Q.   Okay.  And so she gave details about what she

5    was feeling --

6         A.   Yes.

7         Q.   -- right?

8         A.   Yes.

9         Q.   And what the conversation was?

10        A.   She did.

11        Q.   And that he actually went into her shirt,

12   right?

13        A.   Yes.

14        Q.   Okay.

15        A.   The -- the boy went into her shirt is what she

16   said, though.  I just want to be clear on that.  That's

17   what I have written down.

18        Q.   Okay.

19        A.   And then she said, "The suspect admitted it."

20   And she said, "I felt a finger moving."  That's the

21   tracking I have of exactly what she said.  She didn't

22   say, in -- in her statement there, she didn't say, "The

23   suspect went in the shirt."  She said, "The boy went in

24   the shirt.  He admitted it."

25             And then the interviewer said, "Well, what

Jorden Timothy Hollingsworth - D                    515

1          Now, let's talk about what happened on this

2    date in question.  The -- when did you come over to

3    Trisha's house in --

4          A.   Okay.  So I went to the bar.  Had like maybe

5    two, three -- I was not drunk.  I just was buzzed.  I

6    came back from the bar.  Trisha and Ken were outside

7    smoking.  That --

8          Q.   Okay.  Approximately when do you think you came

9    back?

10         A.   I'm guessing around 10:30.

11         Q.   Okay.  So you got there and they were outside

12   smoking?

13         A.   Yeah.

14         Q.   Okay.

15         A.   That's kinda like the smoking spot.  So I went

16   and chilled with them, smoked, we talked, all outside,

17   for probably like an hour, hour and a half.  That was,

18   like, the hangout spot.  And then finally we came

19   inside.  We put on a movie and I passed out to that

20   movie.

21         Q.   Okay.

22              Now, when you came inside, was Jasmine in --

23   in the lower area?

24         A.   Yes.

25         Q.   Okay.

EXHIBIT 7
Page 8 of 15

EXHIBIT 117, Page 8 of 15
Case No. 3:20-cv-01567-MC

Jorden Timothy Hollingsworth - D                516

1           MR. KNAUSS:  And, Your Honor, I'd like to
2    do a diagram.  I don't know -- I don't see that we have
3    paper, but --
4           THE COURT:  Is there no paper on the
5    easel?
6           THE CLERK:  I don't think so, Your Honor.
7           THE COURT:  I can obtain paper from
8    another easel from another courtroom if you want to --
9           MR. KNAUSS:  That would be great.
10          THE COURT:  -- have him use that.
11          MR. KNAUSS:  Yeah.
12          THE COURT:  All right.  Let's take a
13   break.  Be back on the record at 10 o'clock.  Mr. Ward
14   will obtain some paperwork that we can put on the easel
15   for you.
16          MR. KNAUSS:  Okay.  And I'll -- I'll have
17   the diagram done while we're --
18          (Recess; 9:50 a.m. to 10:03 a.m.)
19          MS. DUMONT:  We're back on the record in
20   State vs. Hollingsworth; 1501848.  Sarah Dumont.
21   Mr. Knauss is here.  Defendant is on the stand.
22          THE COURT:  Thank you.
23          Go ahead, please.
24          MR. KNAUSS:  All right.
25

Jorden Timothy Hollingsworth - D                 517

1    BY MR. KNAUSS:

2        Q.   So you're outside with Ken and Trisha, smoking.

3    And let's pick it up from there.

4             What happens next?  As the three of you are

5    smoking, what's the next thing that happens?

6        A.   After we were done smoking, we went into the

7    house.  Started watching TV.  That's when I fell asleep.

8        Q.   Okay.

9             Now, you've drawn this diagram during the

10   break; is that correct?

11       A.   That is correct.

12       Q.   And that's marked Exhibit 102, that blue tag

13   there?

14       A.   Yeah.

15       Q.   Yeah.  And is that your writing on there?

16       A.   That is correct.

17       Q.   Okay.  With the Court's permission, if you

18   could go up to the board here and stand to my right and

19   I'll have you point some things out, okay?

20       A.   (No audible response.)

21       Q.   Okay.

22       A.   Go ahead now?

23       Q.   Yeah.  Okay.

24       A.   Okay.

25       Q.   So what -- you've got some -- is this the lower

Jorden Timothy Hollingsworth - D                        518

1    area that --

2         A.    This is the lower --

3         Q.    Okay.

4         A.    -- place of the apartment in Oregon City.  This

5    is the front door.  Right when you walk in, here's the

6    stairs.  Over here to the right is a small couch.

7    Here's a playing area, right in between the two couches.

8    This is the big couch, coffee table, TV.  Here's the

9    dining room.  And there was (indiscernible).

10        Q.    Okay.  All right.

11              So when you came in to watch TV, where do

12   the people sit?

13        A.    When we came in -- here's the back door.  We

14   came in through here and sat right -- all three of us

15   sat right here.

16        Q.    So Trisha, Ken, and you; is that right?

17        A.    What?

18        Q.    Trisha, Ken, and you sat there?

19        A.    Yes.  Correct.

20        Q.    Okay.  All right.

21              And was Jasmine there?

22        A.    Yes.  She was sleeping on the small couch.

23        Q.    Okay.  And could you take the pen and maybe --

24   is there a different color up there?

25        A.    Yeah.  Do you want me to put, like, heads or

Jorden Timothy Hollingsworth - D                519

1    something?

2         Q.    Yeah.  Put a stick figure of where she -- with

3    her head, so we know where she was when -- okay.  So on

4    the left side of the couch, that's where her head was?

5         A.    Yeah.

6         Q.    Okay.  And where were you on the couch, as far

7    as the three of you?

8              I don't -- you don't need to mark it there,

9    but --

10        A.    Yeah.  That, I can't remember --

11        Q.    Okay.

12        A.    -- the exact order that we were in.

13        Q.    All right.

14        A.    So . . .

15        Q.    Okay.  You can go ahead and sit down.

16             And do you recall approximately what time

17   this was that you fell asleep?

18        A.    It was probably an hour later from when we -- I

19   got there, so that was probably around, like, midnight.

20        Q.    Okay.  Now, had you seen that Jasmine was on

21   the couch before you came in from smoking?

22        A.    Yeah.

23        Q.    In other words, had you been in- --

24        A.    Because she was awake at -- she was awake at

25   that time, but she fell asleep when we came back in to

EXHIBIT 7
Page 12 of 15

EXHIBIT 117, Page 12 of 15
Case No. 3:20-cv-01567-MC

Jorden Timothy Hollingsworth - D                    520

1    watch the movie.

2        Q.    Okay.  So was she awake when you came in?

3        A.    When I came home from the bar, she was awake.

4        Q.    Okay.

5        A.    When I came back from outside, which was an

6    hour later after I got there, she was asleep.

7        Q.    Okay.  Do you know if she woke up during the

8    movie?

9        A.    That, I cannot recall.

10       Q.    Okay.  And do you have any idea how long you

11   watched the movie before you fell asleep?  If you don't

12   know, that's fine.

13       A.    Yeah.  I -- I fell asleep pretty fast.

14       Q.    Okay.  Now, when you -- when you woke up, do

15   you have an idea what time it was?

16       A.    I don't know exactly what time.  I'm guessing

17   it was somewhere between 1:30 -- 1:00, 1:30.

18       Q.    Okay.  All right.

19             What did you do?

20       A.    Went upstairs.  I was on my way to go walk

21   upstairs.  I noticed Kaeli -- half of her body was kinda

22   hanging off --

23       Q.    You're saying "Kaeli."

24       A.    I mean -- yeah.  Sorry about that.  Jasmine's

25   body was, like, kinda halfway off the couch, so -- and

Jorden Timothy Hollingsworth - D                          521

1    the blanket was totally off.  The shirt was, like, kinda

2    tucked up in her arm.  And I went to go pull it down.

3    She, like, woke up in the middle of that.  And I, like,

4    backed up for a minute, because it kinda startled me.

5              And then she was all like, "I'm going to go

6    tell my dad and Trisha."

7              And I told her, "Tell them tomorrow.  This

8    is -- this is done.  I just pulled your shirt down."

9              And then she said that she was going to go

10   wake up Ken and Trisha.  I told her not to do that.

11   "Tell them tomorrow."  And then I just went back

12   upstairs.  It was quick.  It was only, like, 15, 20

13   seconds.

14   Q.    Okay.  So from the time you get up off the

15   davenport -- or the sofa, until you walked up the

16   stairs, how much time transpired?

17   A.    From when I woke up to when I went upstairs?

18   Q.    Yeah.

19   A.    I would say 30 seconds.

20   Q.    Okay.

21              (Cell phone ringing.)

22              THE COURT:  I need everyone to take out

23   their electronic devices and turn them on -- off.  Not

24   on.  Completely off.  Not on vibrate, not on sound.  The

25   next electronic device that emits and audible noise in

Jorden Timothy Hollingsworth - D                    522

1    this morning's court session will be confiscated and

2    held by the Court until Monday at 5:00.

3              Go ahead, Mr. Knauss.

4              MR. KNAUSS:  Thank you.

5    BY MR. KNAUSS:

6        Q.   When you got upstairs, where did you go?

7        A.   Upstairs to my mom's bedroom and slept there.

8        Q.   Okay.  Do you remember if your mom was awake or

9    asleep?

10       A.   That, I can't remember.  She kinda goes in and

11   out.  So when she's laying there, she is just laying

12   there with her eyes closed.  Or if she's awake -- yeah.

13   I just kinda crawled into the bed.

14       Q.   All right.

15       A.   I wasn't really paying attention to my mom.

16       Q.   Okay.  Do you recall when you woke up?

17       A.   That next morning?

18       Q.   Yeah.

19       A.   Yeah.  Probably --

20       Q.   Well, let me make sure.

21              Did you -- did you do anything during the

22   night?  Go back downstairs?

23       A.   No.

24       Q.   Do any other --

25       A.   I was --

EXHIBIT 7
Page 15 of 15

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF UMATILLA

| | | |
|---|---|---|
| JORDEN HOLLINGSWORTH, | ) | No. 17CV47262 |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF HEATHER CARVER** |
| | ) | |
| v. | ) | |
| | ) | |
| TROY BOWSER, Superintendent, | ) | |
| Two Rivers Correctional Institution, | ) | |
| | ) | |
| Defendant, | ) | |

I, Heather Carver, do hereby declare as follows:

1. I am the private investigator on the above-captioned matter. As part of my investigation, I have reviewed evidence involved in this case and conducted interviews related to the charges and the evidence.

2. This included the trial attorney's file. The trial attorney's file contained investigation reports for four people available to provide character evidence for Mr. Hollingsworth. The four people are Kipley Edwards, David Mills, Courtney Polk, and Cyndi (Cynthia) Knowles.

3. Kipley Edwards confirmed to me that he spoke with the private investigator, Scott Castleman, hired by attorney Arthur Knauss in January of 2016. Edwards told me that he was available to testify at trial in August of 2016. Mr. Edwards has since moved to Montana, but he said that he would be willing to travel back to Oregon to testify at a second trial.

Page 1, DECLARATION OF HEATHER CARVER

EXHIBIT 8
Page 1 of 2

4.  I have also spoken with David Mills. Mr. Mills confirmed that he was interviewed by Scott Castleman. Mr. Mills told me that Kipley Edwards, Courtney Polk, and Cyndi Knowles were in the courthouse at trial, available to testify on behalf of Mr. Hollingsworth. Mr. Mills told me that he approached attorney Arthur Knauss and let him know that he was available and wanted to testify. Mr. Mills said that Mr. Knauss brushed him off and never approached the subject of him testifying. Mr. Mills told me that he would be available to testify at a second trial.

5.  I have not heard back from Courtney Polk or Cyndi Knowles.

**I hereby declare that the above statements are true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury. I understand that the Law Office of Jonathan Clark, and/or its agents, prepared this document. While the phrasing and/or word choice may not be mine, each paragraph accurately reflects statements I have made. I have had ample opportunity to review this document prior to signing.**

DATED this ___13th___ day of March, 2019.

_Heather Carver_
Heather Carver
PI-ID 85195

Page 2, DECLARATION OF HEATHER
CARVER

EXHIBIT 8
Page 2 of 2

1

2

3

4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                            FOR THE COUNTY OF UMATILLA

6    JORDEN TIMOTHY HOLLINGSWORTH,          Case No. 17CV47262

7              Petitioner,                  DEFENDANT'S TRIAL MEMORANDUM

8         v.                                **POST CONVICTION**

9    TROY BOWSER, Superintendent,
     Two Rivers Correctional Institution,   **ORS 20.140 - State fees deferred at filing**
10
              Defendant.
11

12                                      **I**

13                          **PROCEDURAL POSTURE**

14         Petitioner was convicted at a court trial in August 2016 of two counts of Sexual Abuse I

15   and sentenced to a 75-month prison sentence.[1]  Petitioner appealed but ultimately dismissed the

16   proceeding.[2]

17                                      **II**

18                             **BACKGROUND**

19         On February 13, 2015, 11-year-old J reported to her father that the night before,

20   petitioner had put his hands under her shirt, as she was sleeping on the couch.[3]  A few days later,

21   J was interviewed at the Children's Center and described how petitioner had touched her "boob"

22   and rubbed his hand across the nipple area of her breast.[4]  J reported that when she asked

23   _____

24   [1] Exhibit 101, Judgment.

25   [2] Exhibit 102, Appellate Judgment.

     [3] Exhibit 103, Police Reports, pp. 3-4.
26
     [4] *Id.*, pp. 9-10.

Page 1 -   DEFENDANT'S TRIAL MEMORANDUM
           WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 1 of 18
Case No. 3:20-cv-01567-MC

1  petitioner what he was doing, petitioner variously tried to pretend he had been asleep and was

2  not aware of his actions, or had done nothing, but he also asked J if he could touch her.[5]  When

3  she refused, petitioner asked J not to tell what he had done and offered to give her money, and

4  promised to take her to the new Sponge Bob movie, if she would not disclose the touching.[6]

5       During the Children's Center interview, J also disclosed that a few years prior, when she

6  lived at a different address, petitioner had pulled his "crotch" out of his pants, that it was sticking

7  up some, and he had put his hand down her pants, before she could pull it from her vagina and

8  jump away from petitioner.[7]

9       The first amended petition alleges three claims.[8]  First, petitioner claims he was coerced

10  into waiving a trial.  Second, he faults counsel for not calling character witnesses.  Third, he

11  complains that counsel did not ask Dr. Wendy Bourg about the side effects of Dexedrine.  None

12  of the claims have been proven by a preponderance of the evidence.  As demonstrated below, the

13  claims have little to no factual or legal basis and will not be grounds for awarding petitioner

14  post-conviction relief.

15                     **III**

16                **ARGUMENT**

17       In a post-conviction proceeding, "[t]he burden of proof of facts alleged in the petition

18  shall be upon the petitioner to establish such facts by a preponderance of the evidence."

19  ORS 138.620(2).  Petitioner will not meet this burden and will not establish any basis for post-

20  conviction relief.

21

22

23

_____

24  [5] *Id.*

25  [6] *Id.*

   [7] *Id.*

26  [8] They are set forth verbatim in the appendix.

Page 2 -   DEFENDANT'S TRIAL MEMORANDUM
    WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 2 of 18
Case No. 3:20-cv-01567-MC

1  **A.**    **The principles used when measuring whether counsel provided adequate assistance.**

2      The clearest outline of the principles by which a claim of constitutionally ineffective

3  assistance of counsel is to be measured is that of the United States Supreme Court in

4  *Strickland v. Washington*, 466 U.S. 668 (1984):[9]

5          A convicted defendant's claim that counsel's assistance was so defective
       as to require reversal of a conviction or death sentence has two components.
6      First, the defendant must show that counsel's performance was deficient.  This
       requires showing that counsel made errors so serious that counsel was not
7      functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.
       Second, the defendant must show that the deficient performance prejudiced the
8      defense.  This requires showing that counsel's errors were so serious as to deprive
       the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant
9      makes both showings, it cannot be said that the conviction or death sentence
       resulted from a breakdown in the adversary process that renders the result
10     unreliable.

11  466 U.S. at 687.

12      The first component of the *Strickland* standard requires petitioner to point to:

13          * * * acts or omissions of counsel that are alleged not to have been the result of
       reasonable professional judgment.  The court must then determine whether, in
14     light of all the circumstances, the identified acts or omissions were outside the
       wide range of professionally competent assistance.

15

16  466 U.S. at 690.  A petitioner must demonstrate that counsel's representation fell below an

17  objective standard of reasonableness, *id.* at 688.  The second component of the *Strickland*

18  standard requires petitioner to show that "there is a reasonable probability that, but for counsel's

19  unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

20      At a more general level, in assessing whether counsel achieved the required level of

21  performance, the performance must be evaluated from counsel's perspective at the time of the

22  alleged error, *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986), and the "court must indulge a

23  strong presumption that counsel's conduct falls within the wide range of reasonable professional

24  _____

25  [9] *Krummacher v. Gierloff*, 290 Or 867 (1981), as reaffirmed by the Oregon Supreme Court,
    requires a petitioner to show the omissions by trial counsel prejudiced his case, and "that the
26  requisite 'prejudice' consists of acts or omissions 'which would have a tendency to affect the
    result.'"  *Stevens v. State of Oregon*, 322 Or 101, 110 fn 5 (1995).

Page 3 -    DEFENDANT'S TRIAL MEMORANDUM
WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 3 of 18
Case No. 3:20-cv-01567-MC

1   assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances,

2   the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington,*

3   *supra*, 466 U.S. at 689.  Put differently, an attorney need not automatically do the defendant's

4   bidding or suspend his or her professional judgment, because "the strategy, tactics, and manner

5   of advocacy of the defense are for counsel to determine based upon the exercise of professional

6   skill and judgment."  *Krummacher v. Gierloff, supra*, 290 Or at 874-75.

7           Trial counsel's representation of petitioner was well within the broad limits set by

8   *Strickland* and *Krummacher.*

9   **B.     <u>Petitioner received adequate assistance of trial counsel</u>.**

10  **1.     Counsel fully advised petitioner concerning the risks and benefits of having a
           jury trial or a court trial.  After being advised, petitioner made the decision**
11  **to waive a jury.  Petitioner was not coerced.  To the contrary, he made a
           knowing, voluntary, and intelligent decision to waive a jury, and the trial**
12  **court so found.**

13          Petitioner's first claim is that counsel coerced him into waiving his right to have a jury

14  trial.  This is false.  The Honorable Katherine Weber engaged in a colloquy with petitioner

15  before the trial about what would be involved if he chose to have a jury trial.[10]  Judge Weber also

16  discussed whether petitioner instead wanted to have her, and only her, decide whether he was

17  guilty or innocent.[11]  Petitioner told Judge Weber that he wanted to have her make the decision in

18  his case.[12]  At the end of this colloquy, the court concluded that petitioner was making a

19  knowing, voluntary, and intelligent decision to waive jury.[13]  Notably, petitioner never told

20  Judge Weber that counsel had pressured him into waiving a jury.[14]  Nor did he disclose that

21  counsel had supposedly threatened him into waiving his right to a jury trial or told him that a jury

22  

23  _____
    [10] Exhibit 104, Trial Transcript, pp. 8-10.

24  [11] *Id.*

25  [12] *Id.*

26  [13] *Id.*

    [14] *Id.*

Page 4 -    DEFENDANT'S TRIAL MEMORANDUM
            WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 4 of 18
Case No. 3:20-cv-01567-MC

1  was not available.[15]  Indeed, Judge Weber said a jury was ready and waiting across the hall.[16]

2  Accordingly, because petitioner gave answers which demonstrated that he knew what his choices

3  were and was exercising his right to choose a bench trial, Judge Weber made the finding that his

4  waiver of a jury was knowing, voluntary, and intelligent.[17]

5        Moreover, the declaration of attorney Arthur B. Knauss establishes that he had more than

6  one discussion with petitioner whether to have a bench trial or a jury trial.[18]  They discussed that

7  a judge might be more receptive than a jury to a defense theory that depended on expert

8  testimony (Dr. Wendy Bourg) and the contention that the victim had problems sometimes being

9  truthful.[19]  In particular, as to the February 2015 incident, the defense theory would be focusing

10  on J's admission that she was awakening from being asleep when she thought she had been

11  touched, and the defense would be trying to show that there was a reasonable doubt regarding

12  this incident, because J could have mistaken petitioner's innocent touch for abuse.[20]

13  Mr. Knauss's declaration demonstrates that petitioner – after considering this advice and the

14  greater likelihood that a jury rather than a judge would make the decision based on sympathy for

15  the victim – made the decision to waive a jury.[21]

16        It is unquestionably true that counsel's declaration provides a lot more information than

17  petitioner's declaration about what was discussed on this issue of a jury waiver.  It is also

18  unquestionable that the court transcript is consistent with counsel's declaration in supporting the

19  conclusion that the decision to waive a jury was petitioner's knowing, voluntary, and intelligent

20  choice.  As a result, the only reasonable conclusion is that petitioner cannot prove by a

21  _____

22  [15] *Id.*

23  [16] *Id.*

24  [17] *Id.*, particularly page 10, lines 10-12.

25  [18] Exhibit 105, pp. 3-5.  Exhibit 106 is a copy of the waiver.

26  [19] *Id.*

    [20] *Id.*

    [21] *Id.*

Page 5 -  DEFENDANT'S TRIAL MEMORANDUM

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

1  preponderance of the evidence that counsel coerced him into waiving a jury, and that the waiver

2  was against his will.  It follows that the first claim will fail on both the performance prong and

3  the prejudice prong and will not be a basis for granting petitioner relief.

4      **2.    Counsel correctly chose not to call character witnesses because petitioner has
5           impeachable convictions and had previously been investigated for having
            sexual relations with an underage female.**

6      Petitioner's second claim faults counsel for not calling general character witnesses.

7  According to the first amended petition, four persons could have testified that petitioner is "good

8  with children, safe for children, and trustworthy for the care of children."[22]  In his trial

9  memorandum, petitioner alters this claim by arguing that the witnesses could have testified that

10  petitioner has a reputation in the community for following the law and being sexually proper, and

11  the same is their personal opinion.  There are several reasons why this claim must fail.

12      First, the pleadings limit the claims that can be raised at a post-conviction trial.  This is so

13  because Oregon courts have held that the petition must "set forth specifically the grounds upon

14  which relief is claimed."  ORS 138.580; *Bowen v. Johnson,* 166 Or App 89, 92 (2000).  Any

15  grounds not asserted in the petition are "deemed waived," are not claims properly before this

16  Court, and cannot provide grounds for post-conviction relief.  *See* ORS 138.550(3); *Bowen v.*

17  *Johnson, supra*; *Hagel v. Hill,* 200 Or App 361, 364-65 (2005); *Ramirez v. State of Oregon,*

18  214 Or App 400, 401 (2007); *Leyva-Grave-De-Peralta v. Blacketter,* 232 Or App 441 (2009).  In

19  the present case, the second claim is that petitioner has a reputation for being good for, and

20  around, children.[23]  There is no allegation that witnesses could have testified about petitioner's

21  supposed sexual propriety and general character for being a law-abiding citizen.[24]

22

23

---

24  [22] Petition, page 4, lines 14-15.

25

26  [23] Petition, page 4, lines 14-15.
    [24] *Id.*

Page 6 -    DEFENDANT'S TRIAL MEMORANDUM
       WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 6 of 18
Case No. 3:20-cv-01567-MC

1    Second, petitioner has not presented any sworn testimony from the suggested witnesses.

2    That is, petitioner has not presented an affidavit, or even a declaration, from any of the persons

3    whom he faults counsel for not calling as witnesses.

4    Third, assuming that petitioner can advance the claim he argued, rather than the claim he

5    pleaded, it fails on the merits.  This is necessarily so because petitioner first complains that

6    counsel did not ask the character witnesses about whether by reputation (or their opinion)

7    petitioner is a law-abiding person.[25]  As counsel points out in his declaration, he made a

8    considered and informed decision not to present evidence on petitioner's character because

9    petitioner has impeachable convictions:

10       I also learned that [petitioner] had prior convictions for misdemeanor Harassment
         in Lake County  (July 16, 2012), misdemeanor Assault in the Fourth Degree in
11       Clackamas County (November 27, 2012), …

12       Because of his convictions for Assault IV and Harassment, he had impeachable
         offenses pursuant to ORS 40.355 (Oregon Rule of Evidence 609(2)), which I
13       carefully explained to him.[26]

14   Counsel's research into petitioner's past convictions and OEC 609 led him to conclude that

15   calling four character witnesses could backfire because this would allow the prosecutor to ask the

16   witnesses if they were aware of petitioner's past criminal history.[27]  Petitioner has not submitted

17   any evidence proving that the four witnesses were aware of this history and could nevertheless

18   have testified that petitioner was a "law-abiding" person.[28]

19       In addition, it does not appear that any of the four persons who were interviewed by

20   Arthur Knauss's investigator actually expressed an opinion about petitioner's character trait for

21

22   _____

23   [25] Trial Memorandum, p. 5, lines 13-14.

     [26] Exhibit 105, pp. 2-3.

24   [27] *Id.*, p. 6.

25   [28] While it is true that Judge Weber was going to hear about the impeachable convictions
     anyway, when petitioner testified, counsel's considered opinion -- that it would not help
26   petitioner to create opportunities for the prosecutor to refer multiple times to the convictions – is
     certainly entitled to respect and deference.

Page 7 -   DEFENDANT'S TRIAL MEMORANDUM
         WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 7 of 18
Case No. 3:20-cv-01567-MC

1   being a generally law-abiding person.[29]  Even if they had expressed such a general opinion, there

2   is nothing in the statements they gave to the investigator to show that they have any personal or

3   otherwise sufficient knowledge of whether petitioner is a law-abiding person.[30]  As Professor

4   Laird Kirkpatrick teaches:

5           A character witness, whether testifying as to reputation or opinion, will
        not be allowed to testify until a foundation has been laid showing that the witness
6       has either sufficient acquaintance with the reputation of the person in the relevant
        community or sufficient personal contact with the person to provide a basis for an
7       opinion regarding that person's character.  The contact must have been recent
        enough so that there will be a current basis for testimony.[31]
8

9   None of the four witnesses stated that they knew anything about petitioner's past and whether he

10  had a criminal history.[32]  The superintendent submits that the four witnesses could not have

11  testified that petitioner is a law-abiding person because there is no evidence that a sufficient

12  foundation could have been laid demonstrating that the witnesses actually have knowledge of

13  petitioner's criminal history and have sufficient basis to render an opinion regarding whether

14  petitioner is law abiding.  The records collected by an investigator for the Oregon Department of

15  Justice prove that petitioner has a criminal history, has impeachable criminal convictions, and

16  probably could not be accurately described as a "law-abiding person" (at least there is enough

17  evidence that he is sometimes NOT law abiding and thus no showing of a general character trait

18  that is true of petitioner, across time and for all situations).[33]

19          Similarly with respect to sexual propriety, if petitioner is allowed to proceed with the

20  second claim as argued rather than as pleaded, then this portion of the argued-claim must also

21  fail on the merits.  The information collected by the investigator for the superintendent's counsel

22  _____

23  [29] Exhibits 2-5.

    [30] Id.
24
    [31] Laird Kirkpatrick, Oregon Evidence, pp. 268-269 (6th ed., 2013).
25
    [32] Exhibits 2-5.  Some of the supposed witnesses specifically referred to what they knew of
26  petitioner at the present time, and remarked that they did not delve into each other's past.
    [33] Exhibit 107.

Page 8 -   DEFENDANT'S TRIAL MEMORANDUM
    WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 8 of 18
Case No. 3:20-cv-01567-MC

1    included petitioner's prior convictions, arrests, and police investigations, as noted above.[34]  This

2    information revealed that petitioner was investigated in 2013 and 2014 for having sexual

3    relations with a 15-year-old, when he was 21.[35]  The victim in that instance reluctantly reported

4    that she had had sexual intercourse with petitioner 10-15 times, in various parks in Clackamas

5    County, and that petitioner knew she was only 15.[36]  Ultimately, petitioner was not prosecuted

6    for Rape III, but only because the victim would not testify at grand jury and claimed that she had

7    lied about the reported sexual intercourse.[37]

8              Nevertheless, if counsel had blundered into putting on witnesses about petitioner's

9    supposed sexual propriety, he may well have opened the door to the prosecutor putting on

10   evidence of the investigation into petitioner's sexual relationship with an underage female.

11   Again, as Professor Kirkpatrick teaches:

12             Although inquiry into specific instances of conduct is generally prohibited
               during direct examination of a character witness, it is expressly allowed during
13             cross-examination.  For example, if a criminal defendant offers evidence of a
               pertinent trait of character under Rule 404(2)(a) as circumstantial evidence of
14             innocence, the prosecution may cross-examine the character witnesses called by
               the defendant regarding specific instances of the defendant's prior conduct
15             bearing upon that that trait.

16             ***

17             If a character witness is called, that witness may be asked on cross-
               examination about prior relevant convictions of the person whose character is at
18             issue, and also about prior relevant arrests.  [citations to cases omitted]
               **Questions can also be asked regarding other prior conduct, even though not
19             the subjection of a conviction or offense, upon a good faith showing that such
               conduct occurred and that it is relevant to the character trait about which
20             the witness testified on direct examination.**[38]

21   The superintendent submits that not only could the witnesses have been questioned about

22   petitioner's prior impeachable convictions, but also about the investigation in 2013-2014 of his

---

23   [34] *Id.*

24   [35] *Id.*

25   [36] *Id.*

26   [37] *Id.*

[38] Kirkpatrick, *supra*, pp. 270-271 (emphasis supplied).

Page 9 -    DEFENDANT'S TRIAL MEMORANDUM
            WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 9 of 18
Case No. 3:20-cv-01567-MC

1   having sexual intercourse with an underage female.  Even though that minor refused to testify at

2   the grand jury, the police report wherein she admitted to having sexual intercourse on 10-15

3   occasions would certainly demonstrate that the prosecutor could make a good faith showing that

4   the conduct occurred and is relevant to any opinion expressed by a character witness that

5   petitioner has a character trait for being sexually proper.

6        In sum, the second claim must fail on the performance prong.  It is evident that it was

7   reasonable for Arthur Knauss to conclude that it would be too risky to open the question of

8   petitioner's character at his criminal trial.[39]  As counsel stated, he thought the better course was

9   to keep the focus on the issue about the complainant awakening to petitioner supposedly

10  touching her.[40]  As counsel noted, this allowed him to keep the court focused on whether the

11  complainant was perhaps mistaken due to being in a twilight state when the supposed incident

12  occurred.[41]  In addition, the second claim must fail on the prejudice prong.  There is no evidence

13  that had counsel called character witnesses, they would have been allowed to testify (and could

14  have, based on sufficient personal knowledge) about petitioner's law-abiding character and his

15  sexual propriety.  And even if they had been allowed to offer such testimony, there is no

16  evidence that it would have had a tendency to affect the decision of the Honorable Katherine

17  Weber, particularly after such witnesses had been cross-examined.

18        It follows that the second claim must fail on both prongs and will not be grounds for

19  awarding petitioner post-conviction relief.

20

21

22

23

24
_____
25  [39] Exhibit 105, pp. 2-3.

26  [40] *Id.*
    [41] *Id.*

Page 10 -  DEFENDANT'S TRIAL MEMORANDUM
WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 10 of 18
Case No. 3:20-cv-01567-MC

1    **3.    Dr. Bourg is a forensic psychologist, not a medical doctor, and could not have
2    testified about the side effects of Dexedrine.  Counsel correctly chose to not
     attempt to elicit testimony about Dexedrine from Dr. Bourg, which would
     have been beyond Dr. Bourg's expertise and something she could not have
3    provided.**

4         Petitioner's final complaint faults counsel for not having Dr. Wendy Bourg testify about

5    the supposed side effects of Dexedrine, if taken in too high a dose.  Dr. Bourg is well-known in

6    post-conviction cases.  As she testified at petitioner's trial, she has a doctorate in clinical

7    psychology and her practice is interviewing children, and always has been.[42]  She is not a

8    medical doctor.[43]  There is nothing to show that she would have had the expertise to opine that J

9    may have been confabulating the reported sexual abuse in February 2015, supposedly due to

10   having ingested too much Dexedrine.  Indeed, there is no credible evidence that delusions or

11   false reports of sexual abuse are even a documented potential side effect of Dexedrine.[44]

12        As counsel notes, Dr. Skinner, who is a medical doctor, and has long worked at the

13   Children's Center where J was interviewed, testified that she was unaware of a potential side

14   effect of Dexedrine being delusions or hallucinations.[45]  In addition, as Dr. Skinner testified, J's

15   dose of Dexedrine was "low normal."[46]  Thus, for at least two reasons – lack of expertise and no

16   factual basis to support the notion – Dr. Bourg could not have testified that J's report of being

17

18

_____

19   [42] Exhibit 104, pp. 455-457.

20   [43] *Id.*

21   [44] Exhibit 105, pp. 3-5.  Petitioner also incorrectly claims that Dr. Bourg is a memory expert.
     She is not.  The superintendent's counsel took a lengthy deposition of Dr. Bourg in the Scott
22   Graue post-conviction case in May 2018 and Dr. Bourg's "expertise" consists of a few
     undergraduate psychology courses she took at the University of Houston in the mid-1980s and
23   reading that she has since done on her own.  By this measure, the superintendent's counsel is a
     classical history expert since he took classes in Greek and Roman history from Professor Jerzy
24   Linderski at the University of Oregon in the mid-1970s and has since read, on his own,
     translations of Plutarch, Livy, Tacitus, *et cetera*.  In both examples, any claim of expertise is
25   wholly unwarranted.

     [45] Exhibit 104, pp. 301-309.
26
     [46] *Id.*

Page 11 -  DEFENDANT'S TRIAL MEMORANDUM
         WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 11 of 18
Case No. 3:20-cv-01567-MC

1    sexually abused by petitioner, in February 2015, could possibly have been the product of a

2    Dexedrine overdose.[47]

3        The superintendent submits that counsel reasonably chose to not attempt to have

4    Dr. Bourg offer an opinion that would have been well outside her area of expertise and

5    unsupported by the facts in the case.[48]  It is reasonable to surmise that the prosecutor, who

6    challenged whether Dr. Bourg had sufficient expertise on other issues, would not have refrained

7    from objecting if counsel had attempted to elicit testimony from Dr. Bourg regarding potential

8    side effects where a person has overdosed on Dexedrine.  In sum, there is no evidence that Dr.

9    Bourg could have even given admissible testimony on the potential side effects of Dexedrine, let

10   alone done so in such a persuasive fashion it would have had a tendency to affect the outcome of

11   the case.  It follows that the third claim must fail and will not be grounds for awarding petitioner

12   post-conviction relief.

13

14

15

16

17

18

19

20

21

22

23

24

25   [47] Plainly, Dexedrine could have had nothing to do with petitioner exposing himself to J, and
      fondling her vagina, a few years before 2015.
26   [48] Exhibit 105, pp. 3-5.

Page 12 -  DEFENDANT'S TRIAL MEMORANDUM
WDM/kk4/9201333-v1

1          IV

2          **<u>CONCLUSION</u>**

3          For the reasons discussed above, the claims in petitioner's First Amended Petition for

4    Post-Conviction Relief are incorrect and have not been proven by a preponderance of the

5    evidence.  The superintendent respectfully requests that relief be denied and the petition

6    dismissed with prejudice.

7          DATED March __20__, 2019.

8                                          Respectfully submitted,

9                                          ELLEN F. ROSENBLUM
                                           Attorney General
10

11
                                           _____*s/ W. Douglas Marshall*_____
12                                         W. DOUGLAS MARSHALL #872956
                                           Senior Assistant Attorney General
13                                         Trial Attorney
                                           Tel (503) 947-4700
14                                         Fax (503) 947-4794
                                           W.D.Marshall@doj.state.or.us
15                                         Of Attorneys for Defendant

16

17

18

19

20

21

22

23

24

25

26

Page 13 -  DEFENDANT'S TRIAL MEMORANDUM
WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 13 of 18
Case No. 3:20-cv-01567-MC

1

**APPENDIX**
**PETITIONER'S ALLEGATIONS**

2

(Ineffective Assistance of Counsel)

3

7.

4

Petitioner incorporates paragraphs 1 through 7 as if fully set forth herein. Petitioner's imprisonment and restraint, to the best of his knowledge and belief, are unlawful under ORS 138.530 because:

5

a.    Petitioner's right to effective and adequate assistance of trial

6

counsel under Article 1 § 11 of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution were violated as further alleged below.

7

b.    On each of the following claims, Petitioner alleges that trial

8

counsel's acts and omissions were not the product of an acceptable tactical decision and counsel's performance fell below an objective standard of reasonableness for defense counsel in similar felony criminal proceedings under the then-prevailing professional norms.

9

10

c.    Whether considered cumulatively or individually, the numerous deficiencies in trial counsel's performance are sufficiently significant to undermine confidence in the outcome of Petitioner's trial and sentence.  The unreasonable failures by trial counsel eviscerated Petitioner's constitutional rights to a jury trial, confrontation, effective assistance of counsel, and right against self-incrimination, all under Article 1 § 11 of the Oregon Constitution, Article 1 § 12 of the Oregon Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

11

12

13

d.    There is a reasonable probability that, absent the errors of trial

14

counsel, the result of conviction or sentence would have been different.  Any confidence in petitioner's conviction and sentence has been undermined as a result of trial counsel's deficient performance.

15

e.    Trial counsel provided ineffective and inadequate assistance of

16

counsel in the following particulars:

17

I.    Trial Counsel placed Petition into a state of duress in order to obtain a waiver of jury.  Trial Counsel demanded the jury waiver the morning of trial, close in time to the beginning of trial, asserting that the jury was needed for another trial and that he (petitioner) did not want a jury.  This contradicted Petitioner's desire and intention, but his will was overcome by the position and influence of Trial Counsel.  Furthermore, Petitioner did not have ample time to consider this tactical decision or discuss its implications with Trial Counsel.

18

19

20

II.    Trial Counsel failed to call witnesses who could, and were prepared to, provide positive character evidence.  Trial Counsel had in his file investigative reports indicating that four persons who knew Petitioner personally would testify that according to their opinion and according to Petitioner's reputation, Petitioner was good with children, safe for children, and trustworthy for the care of children.  These witnesses are Cyndi Knowles, Courtney Polk, David Mills, and Kipley Edwards.

21

22

23

III.    One expert informed Trial Counsel that the case file indicates some reports that the child victim had been overdosed with Dexedrine. The expert then opined, "Withdrawal and rebound effects such as extreme sleepiness and impaired reality testing can occur during recovery from Dexedrine overdoses."  Trial Counsel failed to provide testimony at trial indicating the impact of medication on sleepiness and perception of reality.

24

25

26

8.

Page 14 -  DEFENDANT'S TRIAL MEMORANDUM
WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 119, Page 14 of 18
Case No. 3:20-cv-01567-MC

1
2
3

       All assertion of ineffective and inadequate assistance of counsel are supported by Exhibit 1, the Trial Court File, Exhibit 2, the Trial Transcript, Exhibit 3, Petitioner's Declaration, Exhibit 4, Declaration of Counsel, as well as the foregoing paragraphs, and any evidence developed during the course of litigation of this matter.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

Page 15 -  DEFENDANT'S TRIAL MEMORANDUM
WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

1                         **CERTIFICATE OF SERVICE**

2         I certify that on March __20__, 2019, I served the foregoing DEFENDANT'S TRIAL

3    MEMORANDUM upon the parties hereto by the method indicated below, and addressed to the

4    following:

5    Jonathan A. Clark                     ___ HAND DELIVERY

6    Jonathan A. Clark PC               _X_ MAIL DELIVERY

        317 Court Street NE                ___ OVERNIGHT MAIL

7    Salem, OR 97301                     ___ SERVED BY E-FILING

8

9                              *s/ W. Douglas Marshall*

10                       W. DOUGLAS MARSHALL #872956

                          Senior Assistant Attorney General

11                       Trial Attorney

                          Tel (503) 947-4700

12                       Fax (503) 947-4794

                          W.D.Marshall@doj.state.or.us

13                       Of Attorneys for Defendant

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 1 -   CERTIFICATE OF SERVICE
WDM/kk4/8606364-v1

**King Kathryn**

| | |
|---|---|
| **From:** | efilingmail@tylerhost.net |
| **Sent:** | Wednesday, March 20, 2019 4:19 PM |
| **To:** | King Kathryn |
| **Subject:** | Filing Accepted for Case: 17CV47262; JORDEN TIMOTHY HOLLINGSWORTHvsTim Causey Supt DRCI; Envelope Number: 4350531 |



# Filing Accepted
Envelope Number: 4350531
Case Number: 17CV47262
Case Style: JORDEN TIMOTHY
HOLLINGSWORTHvsTim Causey Supt DRCI

The filing below was reviewed and has been accepted by the clerk's office. You may access the file stamped copy of the document filed by clicking on the below link.

| Filing Details | |
|---|---|
| **Court** | Judicial District 6 |
| **Case Number** | 17CV47262 |
| **Case Style** | JORDEN TIMOTHY HOLLINGSWORTHvsTim Causey Supt DRCI |
| **Date/Time Submitted** | 3/20/2019 4:13 PM PST |
| **Date/Time Accepted** | 3/20/2019 4:18 PM PST |
| **Accepted Comments** | |
| **Filing Type** | Memorandum - Trial - MMTL |
| **Filing Description** | |
| **Activity Requested** | EFileAndServe |
| **Filed By** | Kathryn King |
| **Filing Attorney** | W. Douglas Marshall |

| Document Details | |
|---|---|
| **Lead Document** | Hollingsworth 7262 PLD Def Trial Memorandum wAllegations.pdf |
| **Lead Document Page Count** | 16 |
| **File Stamped Copy** | [Download Document](Download Document) |
| This link is active for 45 days. | |

**Please Note:** If you have not already done so, be sure to add yourself as a service contact on this case in order to receive eService.

EXHIBIT 119, Page 17 of 18
Case No. 3:20-cv-01567-MC

For technical assistance, contact your service provider

Odyssey File & Serve

(800) 297-5377

Please do not reply to this email. It was automatically generated.

4

1

2

3

4          IN THE CIRCUIT COURT OF THE STATE OF OREGON

5              FOR THE COUNTY OF UMATILLA

6  JORDEN TIMOTHY HOLLINGSWORTH,          Case No. 17CV47262

7              Petitioner,                DEFENDANT'S EXHIBIT LIST

8        v.                               **POST CONVICTION**

9  TROY BOWSER, Superintendent,
   Two Rivers Correctional Institution,   **ORS 20.140 - State fees deferred at filing**
10
              Defendant.
11

12      Exhibit 101 – Judgment

13      Exhibit 102 – Appellate Judgment

14      Exhibit 103 – Police Reports

15      Exhibit 104 – Trial Transcript

16      Exhibit 105 – Declaration of Attorney Arthur Knauss

17      Exhibit 106 – Waiver of Jury Trial

18      Exhibit 107 – Declaration of AAG Marshall with petitioner's criminal history

19      DATED March __20__, 2019.

20                               Respectfully submitted,

21                               ELLEN F. ROSENBLUM
                                 Attorney General
22

23                               ___*s/ W. Douglas Marshall*_____
                                 W. DOUGLAS MARSHALL #872956
24                               Senior Assistant Attorney General
                                 Trial Attorney
25                               Tel (503) 947-4700
                                 Fax (503) 947-4794
26                               W.D.Marshall@doj.state.or.us
                                 Of Attorneys for Defendant

Page 1 -   DEFENDANT'S EXHIBIT LIST
           WDM/kk4/9201333-v1

                                              EXHIBIT 120, Page 1 of 4
                                              Case No. 3:20-cv-01567-MC

**CERTIFICATE OF SERVICE**

1

2    I certify that on March __20__, 2019, I served the foregoing DEFENDANT'S EXHIBIT

3    LIST upon the parties hereto by the method indicated below, and addressed to the following:

4    Jonathan A. Clark                           ___ HAND DELIVERY
5    Jonathan A. Clark PC                      _X_ MAIL DELIVERY
     317 Court Street NE                       ___ OVERNIGHT MAIL
6    Salem, OR 97301                           ___ SERVED BY E-FILING

7

8
                                              ___*s/ W. Douglas Marshall*_____
9                                             W. DOUGLAS MARSHALL #872956
                                              Senior Assistant Attorney General
10                                            Trial Attorney
                                              Tel (503) 947-4700
11                                            Fax (503) 947-4794
                                              W.D.Marshall@doj.state.or.us
12                                            Of Attorneys for Defendant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 1 -    CERTIFICATE OF SERVICE
            WDM/kk4/8606364-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

**King Kathryn**

| | |
|---|---|
| **From:** | efilingmail@tylerhost.net |
| **Sent:** | Wednesday, March 20, 2019 4:19 PM |
| **To:** | King Kathryn |
| **Subject:** | Filing Accepted for Case: 17CV47262; JORDEN TIMOTHY HOLLINGSWORTHvsTim Causey Supt DRCI; Envelope Number: 4350531 |



# Filing Accepted

Envelope Number: 4350531
Case Number: 17CV47262
Case Style: JORDEN TIMOTHY
HOLLINGSWORTHvsTim Causey Supt DRCI

The filing below was reviewed and has been accepted by the clerk's office. You may access the file stamped copy of the document filed by clicking on the below link.

| Filing Details | |
|---|---|
| **Court** | Judicial District 6 |
| **Case Number** | 17CV47262 |
| **Case Style** | JORDEN TIMOTHY HOLLINGSWORTHvsTim Causey Supt DRCI |
| **Date/Time Submitted** | 3/20/2019 4:13 PM PST |
| **Date/Time Accepted** | 3/20/2019 4:18 PM PST |
| **Accepted Comments** | |
| **Filing Type** | Exhibit - List - EBLS |
| **Filing Description** | |
| **Activity Requested** | EFileAndServe |
| **Filed By** | Kathryn King |
| **Filing Attorney** | W. Douglas Marshall |

| Document Details | |
|---|---|
| **Lead Document** | Hollingsworth 7262 PLD Def Trial Memorandum Exhibit list.pdf |
| **Lead Document Page Count** | 2 |
| **File Stamped Copy** | [Download Document](#) |
| This link is active for 45 days. | |

**Please Note:** If you have not already done so, be sure to add yourself as a service contact on this case in order to receive eService.

EXHIBIT 120, Page 3 of 4
Case No. 3:20-cv-01567-MC

For technical assistance, contact your service provider

Odyssey File & Serve

(800) 297-5377

Please do not reply to this email. It was automatically generated.

1

2

3

4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                         FOR THE COUNTY OF UMATILLA

6    JORDEN TIMOTHY HOLLINGSWORTH,          Case No. 17CV47262

7              Petitioner,                  DEFENDANT'S AMENDED EXHIBIT LIST

8         v.                                **POST CONVICTION**

9    TROY BOWSER, Superintendent,
     Two Rivers Correctional Institution,   **ORS 20.140 - State fees deferred at filing**
10
               Defendant.
11

12        Exhibit 101  – Judgment

13        Exhibit 102  – Appellate Judgment

14        Exhibit 103  – Police Reports

15        Exhibit 104  – Trial Transcript

16        Exhibit 105  – Declaration of Attorney Arthur Knauss

17        Exhibit 106  – Waiver of Jury Trial

18        Exhibit 107  – Declaration of AAG Marshall with petitioner's criminal history

19        Exhibit 108  – Declaration of Deputy District Attorney Sarah Dumont

20        DATED April __2__, 2019.

21                                     Respectfully submitted,

22                                     ELLEN F. ROSENBLUM
                                       Attorney General
23
                                       _s/ W. Douglas Marshall_
24                                     W. DOUGLAS MARSHALL #872956
                                       Senior Assistant Attorney General
25                                     Trial Attorney
                                       Tel (503) 947-4700
26                                     W.D.Marshall@doj.state.or.us
                                       Of Attorneys for Defendant

Page 1 -   DEFENDANT'S EXHIBIT LIST
       WDM/kk4/9201333-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 121, Page 1 of 4
Case No. 3:20-cv-01567-MC

1        **CERTIFICATE OF SERVICE**

2            I certify that on April  2 , 2019, I served the foregoing DEFENDANT'S AMENDED

3    EXHIBIT LIST upon the parties hereto by the method indicated below, and addressed to the

4    following:

5    Jonathan A. Clark                                    ___ HAND DELIVERY
     Jonathan A. Clark PC                                  X  MAIL DELIVERY
6    317 Court Street NE                                  ___ OVERNIGHT MAIL
     Salem, OR 97301                                      ___ SERVED BY E-FILING
7

8

9                                                    *s/ W. Douglas Marshall*
                                                     W. DOUGLAS MARSHALL #872956
10                                                   Senior Assistant Attorney General
                                                     Trial Attorney
11                                                   Tel (503) 947-4700
                                                     Fax (503) 947-4794
12                                                   W.D.Marshall@doj.state.or.us
                                                     Of Attorneys for Defendant
13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 1 -   CERTIFICATE OF SERVICE
WDM/kk4/8606364-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 121, Page 2 of 4
Case No. 3:20-cv-01567-MC

**King Kathryn**

| | |
|---|---|
| **From:** | efilingmail@tylerhost.net |
| **Sent:** | Tuesday, April 2, 2019 2:52 PM |
| **To:** | King Kathryn |
| **Subject:** | Filing Accepted for Case: 17CV47262; JORDEN TIMOTHY HOLLINGSWORTHvsTim Causey Supt DRCI; Envelope Number: 4392988 |



# Filing Accepted
Envelope Number: 4392988
Case Number: 17CV47262
Case Style: JORDEN TIMOTHY
HOLLINGSWORTHvsTim Causey Supt DRCI

The filing below was reviewed and has been accepted by the clerk's office. You may access the file stamped copy of the document filed by clicking on the below link.

| Filing Details | |
|---|---|
| **Court** | Judicial District 6 |
| **Case Number** | 17CV47262 |
| **Case Style** | JORDEN TIMOTHY HOLLINGSWORTHvsTim Causey Supt DRCI |
| **Date/Time Submitted** | 4/2/2019 2:47 PM PST |
| **Date/Time Accepted** | 4/2/2019 2:52 PM PST |
| **Accepted Comments** | |
| **Filing Type** | Exhibit - List - EBLS |
| **Filing Description** | |
| **Activity Requested** | EFileAndServe |
| **Filed By** | Kathryn King |
| **Filing Attorney** | W. Douglas Marshall |

| Document Details | |
|---|---|
| **Lead Document** | Hollingsworth 7262 PLD Def Amnd Ex. List.pdf |
| **Lead Document Page Count** | 2 |
| **File Stamped Copy** | [Download Document](#) |
| This link is active for 45 days. | |

**Please Note:** If you have not already done so, be sure to add yourself as a service contact on this case in order to receive eService.

1

For technical assistance, contact your service provider

Odyssey File & Serve

(800) 297-5377

Please do not reply to this email. It was automatically generated.

2

Received:                          Nov  8 2017 10:14am

5037223787        Oregon City Police          Oregon City Police        11:19:36 a.m.    11-08-2017        2 /31

C.L.A.S.S.
OREGON CITY POLICE DEPARTMENT
320 WARNER MILNE RD.
OREGON CITY, OR 97045

**INCIDENT REPORT**

☒ CRIME    ☐ VEHICLE    ☐ PERSON    Classification

TARGETS

SUSPECT ACTIONS

Received: Nov 8 2017 10:16am

5037223787 Oregon City Police Oregon City Police 11:20:52 a.m. 11-08-2017 3 /31

☐ MORE THAN TWO SUSPECTS

# ☒ SUSPECT ☐ PERSON REPORT

INCIDENT NO. 15-0575

## SUSPECT #1

| Field | Entry |
|---|---|
| CUSTODY ACTION | ☒ Not Contacted |
| NAME (Last, First, Middle) | Hollingsworth, Jordan Timothy |
| RESIDENCE (Street, City, St, Zip) | 12 [illegible] Linn Ave #32 OC OR |
| RES. PHONE | 503 962 87[illegible] |
| BUS. PHONE | |
| EMPLOYER | |
| OCCUPATION | |
| BUSINESS ADDRESS | |
| D.O.B. | 8 / 1 / 93 |
| SEX | ☒ Male |
| HT | 5'8 |
| WT | 150 |
| PLACE OF BIRTH | USA |
| SS No. | 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 |
| DRIVER'S LICENSE | 2375840 OR |
| OTHER INFORMATION | |

## SUSPECT #2

CUSTODY ACTION: ☐ Cited & Released ☐ In Custody Booking No.: ☐ Not Contacted ☐ Contacted / Not Arrest

NAME (Last, First, Middle) · ☐ Alias · ☐ Nickname · RESIDENCE (Street, City, St, Zip) · RES. PHONE · BUS. PHONE · EMPLOYER · OCCUPATION · BUSINESS ADDRESS · D.O.B. · SEX ☐ Male ☐ Female · HT · WT · PLACE OF BIRTH · SS No. · DRIVER'S LICENSE · OTHER INFORMATION

## PERSON

HT · WT · PLACE OF BIRTH · SS No. · DRIVER'S LICENSE · CLOTHING DESCRIPTION · DENTIST

## SUSPECT / PERSON DETAIL

RACE (#1): ☒ White · EYE COLOR: ☒ Brown · HAIR COLOR: ☒ Brown · HAIR LENGTH: ☒ Short · HAIR TYPE: ☒ Coarse · HAIR STYLE: ☒ Bushy · BUILD: ☒ Thin · COMPLEXION: ☒ Medium

TEETH · GLASSES · GEN. APPEARANCE · SPEECH · MISCELLANEOUS · SCARS - MARKS - TATTOOS

## SUSPECT / PERSON VEHICLE

VEHICLE · LICENSE NO. · STATE · VEHICLE TOWED BY · VEHICLE TOWED TO · VEHICLE COLOR ☐ Two-Tone · SPECIAL VEHICLE FEATURES · ADDITIONAL VEHICLE DESCRIPTION

OCF COC50 (Rev. 4/03)

Received:                                Nov  8 2017 10:17am
5037223787      Oregon City Police        Oregon City Police        11:21:53 a.m.    11-08-2017      4 /31

| Page # 1 | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case #15-0539 |
|---|---|---|
| | | |
| | | |

## MENTIONED

Jorden Hollingsworth-suspect/not contacted
8/1/1993
1208 Linn Ave. #32
Oregon City OR 97045

Jasmine M. Jewell-Shafer-victim
8/24/2004
11005 NE 76th St.
Vancouver WA 98662

Kenneth L. Jewell III-father of victim
7/26/1985
11005 NE 76th St.
Vancouver WA 98662
360 553 2331

Trisha Miller-fiancée father of victim
Hearing impaired if contacted
3/6/1985
1208 Linn Ave. #32
Oregon City OR 97045
971 229 9748

Mindy Hollingsworth-mother of suspect/sister of Trisha Miller
3/28/1975
1208 Linn Ave. #32
Oregon City OR 97045

Kaeli Jewell-daughter of Trisha Miller and Kenneth Jewell III
5/3/2013
1208 Linn Ave. #32
Oregon City OR 97045

Sgt. Edwards-OCPD
Sgt. Gates-OCPD

## ACTION TAKEN

On 2/13/2015 at about 1500 hours I met with Kenneth Jewell and Trisha Miller with Jasmine Jewell-Shafer and Kaeli Jewell at the Oregon City Police Department regarding a possible Sex Abuse III to 9

| Officer JR Behan | DPSST# 38915 | Agency: OCPD |
|---|---|---|

EXHIBIT 122, Page 3 of 31
Case No. 3:20-cv-01567-MC

Received:                                          Nov  8 2017 10:17am

5037223787        Oregon City Police        Oregon City Police        11:22:29 a.m.    11-08-2017        5/31

| Page # 2 | OREGON CITY POLICE DEPT. 320 Warner Milne Road, Oregon City, Oregon 97045 **Continuation Report** | Case #15-0539 |
|---|---|---|
| | | |
| | | |

year old Jasmine by an extended family member Jorden Hollingsworth which occurred on 2/13/2015 at 1208 Linn Ave. #32 at about 0130 hours.

I was briefed prior to meeting with the family by Sgt. Gates regarding her initial contact with the family. Sgt. Gates told me Jasmin disclosed the sex abuse to Trisha and Kenneth earlier in the day I met initially in the lobby of the police department with the listed family members. I asked to speak with Trisha in another room.

The family was cooperative and Trisha went to an interview room with me. I asked Trisha to tell me what was disclosed to her by Jasmine and the circumstances surrounding what occurred. Trisha is hearing impaired but can read lips told me the following. Trisha told me she was engaged to Kenneth in the past. Trisha told me they have been working on their relationship but have been living separately. Trisha told me Kenneth lives in Vancouver with Jasmine (not her biological daughter) while she lives in Oregon City with Kaeli (her daughter with Kenneth) at 1208 Linn Ave #32. Trisha told me Kenneth has been spending time at her apartment in part to work on the relationship and partly for visitation with Kaeli. This includes staying overnight on occasions

Trisha told me she lives at the apartment with her sister, Mindy Hollingsworth. Trisha told me she and Mindy have allowed Jorden Hollingsworth (Mindy's son) to stay at the apartment because he has nowhere to live.

Trisha told me earlier in the day she was present at Koffee Barn in Gladstone with Jasmine and Kenneth. Trisha told me she was present when Jasmine disclosed that she woke up during the night with Jorden's hand under her shirt feeling her chest. Trisha told me Jasmine disclosed that after she woke up Jorden asked to touch her and she said no. Trisha told me Jasmine disclosed that Jordan offered her $20 to touch her. Trisha told me Jasmine disclosed that Jorden asked her not to tell anyone and offered her money. Trisha told me Jasmine told her Jorden offered to take her to the movies and to babysit her and let her do anything she wanted.

I asked Trisha if Jasmine was specific about where Jorden was touching her. Trisha told me Jasmine stated Jorden was touching her chest. Trisha told me she saw Jasmine sleeping on the couch with Jorden near her at about 0130 hours in 2/13/2015 when she went outside to smoke a cigarette.

I concluded my interview shortly after and met with Kenneth Jewell.

Kenneth told me he has been spending time at Trisha's apartment like she described and had stayed the night on 2/13/2015. Kenneth told me he got up later than normal this morning. Kenneth told me he got up at about 1000 hours and then at about 1300 hours he went to get lunch at the Koffee Barn in Gladstone with Trisha, Jasmine and Kaeli. Kenneth told me they were at the restaurant (the first place they stopped after leaving the apartment) when Jasmine said "Dad I really need to talk to you". Kenneth told me Jasmine then told him "Jorden touched me last night." Kenneth told me Jasmine stated "Jorden put his hand under my shirt and was playing with my chest".

| Officer JR Behan | DPSST# 38915 | Agency: OCPD |
|---|---|---|

| Page # 3 | **OREGON CITY POLICE DEPT.**<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case #15-0539 |
|---|---|---|
| | | |
| | | |

Kenneth told me Jasmine told him she asked Jorden to stop which he did.  Kenneth told me Jasmine told him Jorden offered her money.  Kenneth told me Jasmine stated Jorden explained to her that she should not tell anyone.  Kenneth told me Jasmine told him she was scared and after the incident Jorden went upstairs.  Kenneth told me Jasmine told him she was afraid to go upstairs to tell him what happened.  Kenneth explained he was asleep at the time in a second floor bedroom.

Kenneth told me he was awake at 2300 hours on 2/12/2015 and saw Jorden return from a bar.  Kenneth told me Jorden appeared very intoxicated when he got home.  Kenneth told me Jasmine was sleeping on the couch at the time.  Kenneth told me he went to bed at about 0100 hours on 2/13/2015.  Kenneth told me Jasmine was sleeping on the couch and Jorden was in the living room watching a movie on the couch as well.  Kenneth told me he didn't think anything about it because Jorden has been "couch surfing" at the apartment.

Kenneth told me once Jasmine disclosed the abuse he called police and arranged to meet at OCPD.  Kenneth told me they had not been back to the apartment and he did not think Jorden was aware Jasmine disclosed or they were making this report.

I later arranged a safety plan with Trisha and Kenneth who were receptive and cooperative.  Kenneth who lives in Vancouver told me he was going to take Jasmine to their home in Vancouver and would not allow contact between her and Jorden.  Sgt. Gates arranged for Jasmine to be interviewed at the Children's Center on Thursday, 2/19/2015, at 0900.  Kenneth told me he would be there for the appointment.  Kenneth also agreed not to attempt to talk with the suspect.  I instructed Trisha and Kenneth not to question Jasmine regarding the incident but if she volunteered any information to be a good listener.

I talked with Sgt. Edwards regarding a safety plan for Kaeli who resides in the home with Jorden.  We discussed a line of sight safety plan which I later confirmed with Kenneth and Trisha.  Kenneth told me Kaeli sleeps in the same bed as Trisha and she could keep an eye on Kaeli not allowing unsupervised contact with Jordan.  I also contacted the DHS hotline and cross reported the incident.

I contacted Detective Sgt. Young and advised him about this report.  Sgt. Young told me to forward this report to detectives for assignment.

**ACTION RECOMMENDED**
Forward to Detectives for assignment.

| Officer JR Behan | DPSST# 38915 | Agency: OCPD |
|---|---|---|

Received:                                          Nov  8 2017 10:19am

5037223787        Oregon City Police        Oregon City Police        11:24:37 a.m.    11-08-2017        7 /31

| 1 DISTRIBUTION | | C.L.A.S.S. OREGON CITY POLICE DEPARTMENT 320 Warner Milne Road, Oregon City | 2 INCIDENT NO.: 15-0538 | |
|---|---|---|---|---|
| | | | 3 REPORT TYPE ☐ Supplemental ☒ Original ☐ MSR | |
| 4 CONNECT NUMBERS: | | SPECIAL REPORT | 5 CASE STATUS: ☐ Cr By Arrest ☐ Retained | ☐ Suspended ☐ Cleared ☐ Pending ☐ Reactional |
| 6 CONNECT REPORTS: | | 7 INCIDENT TYPE Sex Abuse III | 8 CLASSIFICATION ☐ Criminal  ☐ No Crime Committed  ☒ Information | |
| 9 SUBJECT OF REPORT Victim statements | | | | |

| 10 ORIGINAL REPORT 02  13  15 | 11 THIS REPORT 02  14  15 | 12 LOCATION OF OCCURRENCE 1205 Linn Avenue #32, Oregon City, OR. 97045 | | |
|---|---|---|---|---|

| 13 NAME: Jewell-Shafer, Jasmine M. | 14 DOB: 08  26  04 | 15 SEX: F | 16 RACE: W |
|---|---|---|---|
| 17 RESIDENCE 11005 NE 76th Street, Vancouver WA. 98662 | 18 RES. PHONE: (360) 553-2331 | | |
| 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR: | 20 OCCUPATION / POSITION: | 21 BUS. PHONE: | |

| 22 NAME: Hollingsworth, Jorden Timothy | 23 DOB: 08  01  91 | 24 SEX: M | 25 RACE W/B |
|---|---|---|---|
| 26 RESIDENCE 1208 Linn Avenue #32, Oregon City, OR. 97045 | 27 RES. PHONE: | 28 RES. PHONE: | |

**29 DETAILS**

**Action Taken:**

On 2/13/15 at approximately 2:40 pm, I met with Kenneth Jewell, Trisha Miller and Jasmine Jewell-Shafer in the lobby of the Oregon City Police Department. Dispatch had advised that Mr. Jewell was there to report that his 10 year-old daughter had reported that she had been inappropriately touched by his ex-finance's nephew the night before, at 1208 Linn Avenue #32, in Oregon City.

I did not want to question Mr. Jewell in front of Jasmine, so I escorted him back to an interview room. Mr. Jewell appeared upset and teary eyed as he spoke. I asked him some basic information. Mr. Jewell stated that he and Jasmine live in Washington, but had stayed the night at his ex-fiance, Trisha Miller's apartment the night prior. He told me that he trusted everyone in the apartment, and that Jasmine had slept on the couch. Today, he, Trisha and Jasmine were out at lunch, when Jasmine told him that Jorden, Trisha's nephew, had touched her inappropriately the night before. According to Mr. Jewell, Jasmine told him that Jorden, who had been drinking night before, had come to her while she was on the couch, and asked if he could touch her. She told him no, and he put his hand down her shirt and started rubbing her breasts. Mr. Jewell stated that Jasmine has begun to develop breasts. Jasmine told Mr. Jewell that after touching her, Jorden told her reasons why she shouldn't tell anyone. I asked Mr. Jewell if he had contacted Jorden or told anyone about the disclosure, and he told me he had not, and had driven straight to the police department.

Because sex abuse investigations can be very time consuming and swing shift was coming on duty at 3:00 pm, Mr. Jewell agreed to take Jasmine to the nearby McDonalds until a swing shift officer could speak with him. At approximately 3:15 pm, after briefing Officer Behan on the situation, I called Mr. Jewell back to the PD and introduced all of them to Officer Behan. Officer Behan escorted Ms. Miller to an interview room while I sat with Mr. Jewell and Jasmine in the lobby. While with them, I explained to Jasmine that we didn't want her to have to tell numerous people what had happened, and told her about the Children's Center. I did not ask her any questions about the incident. Jasmine sporadically made statements about what had occurred. Mr. Jewell told Jasmine that they were going to the zoo the following day, and she asked, "Jorden isn't going to be there is he". She appeared scared and upset when she asked this. Mr. Jewell told her that he would not, and that she would not have to be around him anymore. I told her that she did the right thing by telling her dad, and that she was very brave. Jasmine stated that Jorden was lucky he ducked down when he did, or she would have hit him. She then told me that Jorden had told her that he would take her to a movie or give her money so she wouldn't tell her dad what happened. She then stated that she told him OK because she could smell alcohol on his breath. She told me she was scared to go upstairs at that time and tell her dad, because she didn't want to, "Get hurt by my own __?_ " (I don't recall the work she used, but she referred to Jorden as a nephew, cousin, or something along those lines).

**Action Recommended:**
Attach to Officer Behan's report.

| 30 TIME RECEIVED: | 31 TIME DISPATCHED: | 32 TIME ARRIVED: | 33 TIME CLEARED: |
|---|---|---|---|
| 34 REPORTING OFFICER C. Gatos | 35 DPSST: 40117 | 36 AGENCY: OCPD | 37 APPROVED |
| 38 REPORTING OFFICER: | 39 DPSST: | 40 AGENCY: | 41 DATA ENTRY: |

Received:                                    Nov  8 2017 10:21am

5037223787        Oregon City Police          Oregon City Police        11:25:54 a.m.    11-08-2017        8/31

| 1 DISTRIBUTION | | C.L.A.S.S. OREGON CITY POLICE DEPARTMENT 320 Warner Milne Road, Oregon City | 2 INCIDENT NO. | 15-0539 |
|---|---|---|---|---|
| 4 CONNECT NUMBERS | | | 3 REPORT TYPE: ☐ Supplemental  ☐ MWR    ☒ Special | |
| 5 CONNECT REPORTS | | SPECIAL REPORT | 5 CASE STATUS: ☐ Clr By Arrest  ☐ Suspended  ☐ Pending  ☐ Referral  ☐ Unknown  ☐ Unfounded | |
| | | 7 INCIDENT TYPE: Sex Abuse | 8 CLASSIFICATION: ☒ Cleared  ☐ No Crime Committed  ☐ Unfounded | |

9 SUBJECT OF REPORT
**Jasmine Jewell-Shafer's Children's Center interview on February 19, 2015.**

| 10 ORIGINAL REPORT | | | 11 TIME REPORT | | | 12 LOCATION OF OCCURRENCE |
|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 02 | 19 | 15 | 1713 Penn Lane, Oregon City, OR 97045 |

| 13 NAME | | | 14 DOB | | | 15 SEX | 16 RACE |
|---|---|---|---|---|---|---|---|
| Jewell-Shafer, Jasmine M. | | | 08 | 24 | 04 | F | W |

| 17 RESIDENCE | 18 RES. PHONE |
|---|---|
| 11005 NE 76th Street, Vancouver, WA 98662 | |

| 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR | 20 OCCUPATION / POSITION | 21 BUS. PHONE |
|---|---|---|
| | | |

| 22 NAME | | | 23 DOB | | | 24 SEX | 25 RACE |
|---|---|---|---|---|---|---|---|
| Hollingsworth, Jorden Timothy | | | 08 | 01 | 93 | M | W/B |

| 26 RESIDENCE | 27 RES. PHONE | 28 RES. PHONE |
|---|---|---|
| 1208 Linn Avenue #32, Oregon City, OR 97045 | | |

29 DETAILS

**See attached narrative**

| 30 TIME RECEIVED | 31 TIME DISPATCHED | 32 TIME ARRIVED | 33 TIME CLEARED |
|---|---|---|---|
| 34 REPORTING OFFICER | 35 OFFICER | 36 AGENCY | 37 APPROVED BY |
| Ellis, Sean | 47648 | OCPD | 1.7 |
| 38 REPORTING OFFICER | 39 OFFICER | 40 AGENCY | 41 DATA ENTRY |

Received:                          Nov  8 2017 10:21am

5037223787        Oregon City Police          Oregon City Police          11:26:32 a.m.    11–08–2017        9 / 31

| Page # 1 | C.L.A.S.S. | Case # 15-0539 |
| --- | --- | --- |
|  | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045 |  |
|  | **Continuation Report** |  |

### MENTIONED:

Hollingsworth, Jorden Timothy                                  Suspect
DOB – 8-1-93
1208 Linn Ave. #32, Oregon City, OR 97045

Jewell-Shafer, Jasmine M.                                        Victim
DOB – 8-24-04
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Jewell, Kenneth L.                                               Jasmine's father
DOB – 7-26-85
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Miller, Trisha                                                   Kenneth's fiance
1208 Linn Ave. #32, Oregon City, OR 97045
971-229-9748

Jewell, Kailea                                                   Kenneth/Trisha dtr.
DOB – 5-3-13
1208 Linn Ave. #32, Oregon City, OR 97045

### ACTION TAKEN:

On February 19, 2015, at about 9:00 AM, Jasmine Jewell-Shafer was seen at the
Clackamas County Children's Center located at 1713 Penn Lane in Oregon City, OR
97045. What follows is a summary of her interview at The Children's Center, which was
videotaped in its entirety. The following summary has been condensed for the ease of
the reader, and is not necessarily in the order in which it was discussed. The video
recording contains a verbatim account of the interview (**SEE DVD AUDIO RECORDING
OF THE INTERVIEW FOR FULL DETAILS AND VICTIM'S STATEMENTS**).

When I arrived at the Children's Center, I walked into the viewing room. The medical
examiner was Gabrielle Peterson and the interviewer was Amanda McVay. A short
time later the staff walked into the room with Jasmine's father, Kenneth Jewell. Mr.
Jewell told The Children's Center staff that Jasmine hasn't said anything about what
happened to her and he hasn't asked Jasmine to talk about it.

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
| --- | --- | --- |

Received:                                    Nov  8 2017 10:22am
5037223787        Oregon City Police        Oregon City Police        11:27:19 a.m.    11-08-2017    10 /31

| Page # 2 | C.L.A.S.S. | Case # 15-0539 |
|---|---|---|
|  | OREGON CITY POLICE DEPT. |  |
|  | 320 Warner Milne Road, |  |
|  | Oregon City, Oregon  97045 |  |
|  | **Continuation Report** |  |

Mr. Jewell said he and Jasmine were staying at his fiancé, Trisha Miller's, apartment when Jorden Hollingsworth came home and was "kind of intoxicated." Mr. Jewell said Jorden is Ms. Miller's nephew. Mr. Jewell said the next day, Jasmine told him Jorden put his hand down her shirt and then told her not to tell anyone because it would "cause problems."

Mr. Jewell said Jasmine is happy most of the time but since Jorden touched her, she has been nervous and scared. He said Jasmine hasn't told anyone else what happened to her and he has told others not to talk with her about it.

**Medical**

After the staff finished speaking with Mr. Jewell, he was escorted out of the interview room and into the lobby. Jasmine was then brought into the medical room and seen by Gabrielle Peterson. This portion of the interview is not recorded, nor can I view what takes place in the room. I can only hear voices of the people talking in the medical room.

Jasmine was asked why she was at the Children's Center and she said because Trisha's nephew, Jorden, "decided to touch me". Jasmine said she woke up from a dream when Jorden touched her and she saw him duck behind a couch.

Jasmine was asked what words she uses when she is referring to different body parts and her responses are as follows:

Jasmine refers to her vagina as "my vagina"
Jasmine refers to her breasts as "my boobs"
Jasmine refers to her buttocks as "my bottom"

**Interview**

After the medical exam was concluded, Jasmine was transitioned into the interview room and interviewed by Amanda McVay. The second part of the Children's Center interview took place in a small room which was audio and video recorded. Jasmine was interviewed while I sat behind a one-way glass and could see and hear the entire interview of Jasmine.

When Jasmine was asked to tell what Jorden did to her, she said he touched "right here." As she said this, Jasmine moved her left hand over the right side of her chest. Jasmine said Jorden touched her under her shirt and when she woke up, she heard Jorden "gasp" before ducking behind the arm of the couch. Jasmine said the gasp she heard sounded like Jorden and she knows it wasn't her dad because he was upstairs

| Detective: Sean Ellis |  | DPSST# 47648 | Agency: OCPD |
|---|---|---|---|

Received:                                              Nov  8 2017 10:23am

5037223787          Oregon City Police          Oregon City Police          11:28:17 a.m.    11-08-2017       11 /31

| Page # 3 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 15-0539 |
| --- | --- | --- |

and Jorden was by the couch. Jasmine said she knows her dad wouldn't do something like that to her because he called the police.

Jasmine said Jorden touched her while she was sleeping on the couch at Trisha's house.  She said she was dreaming when she felt someone touch her "right here." Jasmine demonstrated where she was touched by placing her right hand on the right side of her chest.

Jasmine said Jorden touched her "boob" with his finger which he moved from side to side.  Jasmine described this as feeling "weird."  Jasmine demonstrated how Jorden's finger moved by sweeping her right index finger back and forth across her chest. Jasmine said Jorden touched her under her bra and only touched one of her boobs. Jasmine said she knows Jorden was the person who touched her because he asked her not to tell anyone.

Jasmine said when she heard someone gasp she looked over the couch, and saw Jorden acting like he was sleeping.  Jasmine said Jorden asked "can I touch you?" and she told him "no."  She said Jorden asked to take out the garbage and then repeatedly asked Jasmine if he could touch her.

Jasmine said Jorden asked if he was talking to her in his sleep and she told him he touched her.  She said Jorden told her he does "weird stuff" in his sleep and she told him she knew he wasn't sleeping.  Jasmine said later, Jorden offered her money and to take her to the new Sponge Bob movie if she didn't tell anybody he touched her.

Jasmine said she couldn't go back to sleep because she was scared, even though later she heard Jorden snoring.  She said nobody was up when Jorden touched her because it was in the middle of the night.  She said she told Jorden "you can't do that to a kid. You're an adult".  Jasmine said Jorden asked her "over and over" to not tell anyone what he did so she lied to him and said she wouldn't tell.  She said Jorden thanked her and gave her a hug and while hugged her, she smelled alcohol on his breath.  Jasmine said she knows what alcohol smells like because she has smelled cleaning alcohol before.

When Jasmine was asked if Jorden has touched her before, she said when she was living at a different apartment, Jorden took his "crotch" out of his pants and reached into her pants.  Jasmine said Jorden reached under her underwear and touched the skin of her vagina with his hand before she jumped and pulled his hand out.  She said Jorden just let his "crotch" hang out, which was "sticking up a little" and he didn't say anything to her.

| Detective: Sean Ellis | | DPSST# 47648 | Agency: OCPD |
| --- | --- | --- | --- |

Received:                          Nov  8 2017 10:24am

5037223787        Oregon City Police        Oregon City Police        11:29:18 a.m.    11-08-2017        12/31

| Page # 4 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|
| | | |
| | | |

Jasmine said everyone else was sleeping when this happened and she felt trapped because she was at the dead end of the kitchen.  Jasmine said she was scared and didn't say anything to Jorden.  She said when Jorden pulled his hand out of her pants, he went to the living room and she went to her room until her parents got up.  Jasmine said she never told anyone about this happening because Jorden has been to jail before and she is scared of him.

Jasmine acknowledged she has lied in the past and it's something she is "working on." Jasmine said she used to lie because she was scared of getting in trouble, but she wouldn't lie about something like this.

When Jasmine was asked if she's worried about anything, she said she has been having nightmares of Jorden "raping" her because he knows where she lives and he could "make it past her door."  Jasmine was asked what the word "rape" means to her and she said "kill and sexual assault."  Jasmine said she doesn't know how to explain what sexual assault is, but she has seen it on a TV show.

Jasmine said she told her dad and Trisha about Jorden touching her on the couch because it was the second time Jorden has touched her.  Jasmine said before Jorden touched her, she felt safe with him because he was a good cousin.  Now she says she doesn't want anything to do with him.  Jasmine said she feels like Jorden will hurt Kailea and do to Kailea what he did to her.  She said Jorden watches Kailea sometimes and she is worried because Kailea can't speak for herself yet.

Jasmine said she didn't go to her dad's room in the middle of the night was because when Jorden asked her not to tell anyone what happened, she smelled alcohol on his breath.  Jasmine said she is "frustrated" because she has heard people say she is lying.

Jasmine was asked if Jorden has done anything else to her that wasn't OK.  Jasmine said a couple days before Jorden touched her in the kitchen, he showed her a video on his phone of naked adults in the shower.  Jasmine was asked what the adults were doing and she said "they were taking a shower."  Jasmine said she and Jorden were alone in a car listening to music when he showed her the video.

During her interview, Jasmine was asked to draw the layout of the room she was in when Jorden touched her on the couch.  Jasmine was also shown a picture of boy with no clothes on and asked to circle the area of the boy she referred to as the "crotch." (See attached copies of Jasmine's drawing and picture of the boy).

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                              Nov  8 2017 10:25am
5037223787          Oregon City Police          Oregon City Police          11:30:22 a.m.



Received:                                        Nov  8 2017 10:26am
5037223787         Oregon City Police              Oregon City Police          11:31:16 a.m.     11-08-2017     14 /31



Crotch thing

JEWELL-SHAFER, JASMINE
DOB 08.24.04
DOS 02.19.15
15.02.2861

| 1 DISTRIBUTION: | | | C.L.A.S.S. OREGON CITY POLICE DEPARTMENT 320 Warner Milne Road, Oregon City SPECIAL REPORT | 2 INCIDENT NO. | | 15-0539 |
|---|---|---|---|---|---|---|
| | | | | 3 REPORT TYPE: ☐ Supplemental ☐ Clearance | ☒ Special ☐ MSR | |
| 4 CONNECT NUMBERS: | | | | 5 CASE STATUS ☐ Cir By Arrest ☒ Referred | ☐ Suspended ☐ Clearance | ☐ Pending ☐ Exception |
| 6 CONNECT REPORT(S) | | | 7 INCIDENT TYPE Sex Abuse | 8 CLASSIFICATION: ☒ Crestion | ☐ No Crime Committed | ☐ Information |
| 9 SUBJECT OF REPORT Follow up with Kenneth Jewell and Trisha Miller. | | | | | | |

| 10 ORIGINAL REPORT 02 | 13 | 15 | 11 THIS REPORT 02 | 19 | 15 | 12 LOCATION OF OCCURRENCE 1713 Penn Lane, Oregon City, OR 97045 | | |
|---|---|---|---|---|---|---|---|---|

| | 13 NAME Jewell-Shafer, Jasmine M. | | 14 DOB 08 | 24 | 04 | 15 SEX F | 16 RACE W |
|---|---|---|---|---|---|---|---|
| | 17 RESIDENCE 11005 NE 76th Street, Vancouver, WA 98682 | | | | | 18 RES. PHONE | |
| | 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR | 20 OCCUPATION / POSITION | | | | 21 BUS. PHONE | |

| | 22 NAME Hollingsworth, Jorden Timothy | | 23 DOB 08 | 01 | 93 | 24 SEX M | 25 RACE W/B |
|---|---|---|---|---|---|---|---|
| | 26 RESIDENCE 1298 Linn Avenue #32, Oregon City, OR 97045 | 27 RES. PHONE: | | | | 28 RES PHONE | |

29 DETAILS

See attached narrative

| 30 TIME RECEIVED. | 31 TIME DISPATCHED | 32 TIME ARRIVED. | 33 TIME CLEARED. | |
|---|---|---|---|---|
| 34 REPORTING OFFICER Ellis, Sean | 35 DPSST 47648 | 36 AGENCY OCPD | 37 APPROVED JG H |
| 38 REPORTING OFFICER | 39 DPSST | 40 AGENCY | 41 DATA ENTRY |

EXHIBIT 122, Page 14 of 31
Case No. 3:20-cv-01567-MC

Received:                                    Nov  8 2017 10:27am

5037223787        Oregon City Police        Oregon City Police        11:32:17 a.m.    11-08-2017        16/31

| Page # 1 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|

### MENTIONED:

Hollingsworth, Jorden Timothy                           Suspect
DOB – 8-1-93
1208 Linn Ave. #32, Oregon City, OR 97045

Jewell-Shafer, Jasmine M.                               Victim
DOB – 8-24-04
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Jewell, Kenneth L.                                      Jasmine's father
DOB – 7-26-85
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Miller, Trisha                                          Kenneth's fiancé
1208 Linn Ave. #32, Oregon City, OR 97045
971-229-9748

### ACTION TAKEN:

On February 19, 2015, Jasmine Jewell-Shafer was seen at the Children's Center after she disclosed being touched by Jorden Hollingsworth at an apartment in Oregon City. During her interview, Jasmine disclosed being sexually abused by Mr. Hollingsworth when she was younger, possibly in kindergarten. Jasmine did not know the address where she lived at the time but said Mr. Hollingsworth touched her in the kitchen, which had a "dead end." Jasmine said at the time, her father worked at Safeway and his girlfriend, Trisha, worked at an RV factory.

After Jasmine's interview was complete, I met with Mr. Jewell and explained Jasmine disclosed being touched by Mr. Hollingsworth when she was younger. I told Mr. Jewell this touching took place at an apartment he lived in while he worked at Safeway. Mr. Jewell said he and Jasmine move to 4800 SE Boardman in Milwaukie, Oregon in August, 2007 and lived there until June, 2009. He said they moved back sometime in 2011 and lived there until December, 2013. Based on the information Jasmine gave, Mr. Jewell believes this is where they lived when Jorden touched Jasmine the first time.

Later the same day, Mr. Jewell called me and said his fiancé, Trisha Miller, had text messages on her phone from Mr. Hollingsworth. Mr. Jewell said the texts proved Mr. Hollingsworth knew he touched Jasmine and he wanted me to see them.

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                    Nov  8 2017 10:28am
5037223787        Oregon City Police        Oregon City Police        11:33:09 a.m.    11-08-2017        17/31

| Page # 2 | **C.L.A.S.S.** OREGON CITY POLICE DEPT. 320 Warner Milne Road, Oregon City, Oregon 97045 **Continuation Report** | Case # 15-0539 |
|---|---|---|
| | | |
| | | |

Ms. Miller arrived at Oregon City Police Department and showed me the text messages on her phone. Ms. Miller was not able to forward the messages to me, but I took digital photographs of them (See attached photographs). Ms. Miller told me there was an additional text message sent by Mr. Hollingsworth she was not able to see anymore for an unknown reason. Ms. Miller told me the missing message said something to the effect of "I'm so sorry. I don't know what I was thinking. I didn't touch her, I was just looking because her shirt was up. I pulled it down and she woke up."

At a later time, I asked Property Officer Davis to download the photographs to this case file.

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                              Nov 8 2017 10:29am
5037223787        Oregon City Police        Oregon City Police        11:33:43 a.m.    11-08-2017        18/31



02/02: She woke up and was
gonna go upstairs and tell. I just
freaked out and didn't want her
to. I didn't know what the fuck I
was thinking. I'm so sorry

Pls dont come to my house
tonight... go to kips or
somebody pls!!!

Nevermind ken jas r leaving.
And if i start shit with me then u
need to leave.

U*

Type message



Received:                          Nov  8 2017 10:35am

5037223787        Oregon City Police        Oregon City Police        11:39:49 a.m.    11-08-2017        20 /31



01/04 I was heading upstairs and I noticed her shirt was pulled up. I leaned over her looked, I don't know why. And went to pull her shirt down. And she woke

02/04 up and said she was gonna go wake you guys up and tell you I was looking at her or touching her. I freaked out and just asked her not to. Honestly it was

03/04 so quick. All this happened within like 5 seconds.



Jorde'n Hollings...
(503) 957-8700

she woke

02/04 up and said she was
gonna go wake you guys up and
tell you I was looking at her or
touching her. I freaked out and
just asked her not to. Honestly it
was

03/04 so quick. All this
happened within like 5 seconds.
I knew what it looked like so I
didn't want her to tell. I was
gonna tell you first. I just didn't
know

I understand that point of view

Type message

Received:                                    Nov 8 2017 10:41am
5037223787        Oregon City Police         Oregon City Police         11:46:29 a.m.    11-08-2017    22 /31



Fking dramas.

04/04: how to put it. I still don't but I'm trying.

01/04:I was heading upstairs and I noticed her shirt was pulled up. I leaned over her, looked, I dont know why. And went to pull her shirt down. And she woke

02/04:up and said she was gonna go wake you guys up and

Received:                                Nov  8 2017 10:45am

5037223787        Oregon City Police          Oregon City Police        11:49:39 a.m.    11-08-2017        23/31

| | | C.L.A.S.S.<br>OREGON CITY POLICE DEPARTMENT<br>320 Warner Milne Road, Oregon City<br><br>**SPECIAL REPORT** | 2 INCIDENT NO:<br>**15-0539** |
|---|---|---|---|

1 DISTRIBUTION:

4 CONNECT NUMBERS:

2 REPORT TYPE: ☐ Supplemental ☒ Special ☐ Clearance ☐ MBR

5 CONNECT REPORTS:  7 INCIDENT TYPE: **Sex Abuse**

5 CASE STATUS: ☐ Clr By Arrest ☐ Suspended ☐ Pending ☒ Referred ☐ Clearance ☐ Exceptional

6 CLASSIFICATION: ☒ Criminal ☐ No Crime Committed ☐ Informational

8 SUBJECT OF REPORT:
**Follow up with Kenneth Jewell and and Jorden Hollingsworth.**

| 9 ORIGINAL REPORT | | | 11 THIS REPORT | | | 12 LOCATION OF OCCURRENCE: |
|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 05 | 20 | 15 | 18440 SW Boones Ferry Rd., #J301, Tualatin, OR |

13 NAME: **Jewell, Kenneth L.**  14 DOB: 07 26 85  15 SEX: M  16 RACE: W
17 RESIDENCE: **11805 NE 76th Street, Vancouver, WA 98662**  18 RES. PHONE: **(360) 553-2331**
19 SCHOOL / EMPLOYER / BUS. PROPRIETOR:   20 OCCUPATION / POSITION:   21 BUS. PHONE:

22 NAME: **Hollingsworth, Jorden Timothy**  23 DOB: 08 01 93  24 SEX: M  25 RACE: W/B
26 RESIDENCE: **18440 SW Boones Ferry Rd. #J301, Tualatin, OR**  27 RES. PHONE: **(971) 331-0739**  28 RES. PHONE:

29 DETAILS

**See attached narrative**

| 30 TIME RECEIVED: | 31 TIME DISPATCHED: | 32 TIME ARRIVED: | 33 TIME CLEARED: |
|---|---|---|---|
| 34 REPORTING OFFICER: **Ellis, Sean** | 38 DPSST **47648** | 36 AGENCY: **OCPD** | 37 APPROVED: |
| 38 REPORTING OFFICER: | 39 DPSST | 40 AGENCY: | 41 DATA ENTRY: |

EXHIBIT 122, Page 22 of 31
Case No. 3:20-cv-01567-MC

Received:                                    Nov  8 2017 10:45am

5037223787        Oregon City Police        Oregon City Police        11:50:18 a.m.    11-08-2017        24 /31

| Page # 1 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|
|  |  |  |
|  |  |  |

## MENTIONED:

Hollingsworth, Jorden Timothy                     Suspect
DOB – 8-1-93
18440 SW Boones Ferry Rd., #J301, Tualatin, OR
971-331-0739

Jewell-Shafer, Jasmine M.                          Victim
DOB – 8-24-04
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Jewell, Kenneth L.                                 Jasmine's father
DOB – 7-26-85
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Hollingsworth, Mindy                               Jorden's mother
1208 Linn Avenue #32, Oregon City, OR 97045

Hollingsworth, Tanaea                              Jorden's sister
1208 Linn Avenue #32, Oregon City, OR 97045
971-204-2580

Miller, Trisha                                     Kenneth's fiancé
1208 Linn Ave. #32, Oregon City, OR 97045
971-229-9748

Jacob Skokan                                       Mult. Cty. P.O.

Detective Lysaght                                  OCPD

## ACTION TAKEN:

On April 17, 2015, I contacted Kenneth Jewell by telephone to update him on this case.
During this conversation, Mr. Jewell told me Jasmine was now living with her
grandmother in Oklahoma. I asked Mr. Jewell if he still wanted to pursue charges
against Jorden Hollingsworth and he said he did. Mr. Jewell said he would do whatever
was necessary moving forward with the case, including bringing Jasmine back to give
any necessary testimony.

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                          Nov  8 2017 10:46am

5037223787          Oregon City Police          Oregon City Police          11:50:58 a.m.     11-08-2017          25 /31

| Page # 2 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|
|  |  |  |

On May 19, 2015, I contacted Jorden Hollingsworth's probation officer, Jacob Skokan, by telephone. Mr. Skokan provided me with Jorden's address, which was current as of two days prior.

Detective Lysaght and I drove to 1208 Linn Avenue #32, in Oregon City, to look for Jorden. I contacted Jorden's mother, who identified herself as Mindy Hollingsworth, at the front door. Mindy told me Jorden was not there and hadn't been for some time. I asked Mindy for Jorden's current telephone number and she said her daughter may have the number.

Ms. Hollingsworth's daughter, Tanaea Hollingsworth, came to the front door but refused to give Jorden's phone number since I wouldn't tell her why I was asking to talk with him. I gave Tanaea my business card and she said she would tell Jorden to call me.

On May 20, 2015, Detective Lysaght and I drove to Jorden's apartment but nobody came to the door. I called the phone number listed for Jorden on the text messages he sent to Trisha Miller and left him a voice mail. I left my business card on the door to Jorden's apartment, asking him to call me.

When I returned to my office, I had a voice mail from Jorden. I returned Jorden's call and he told me he had been expecting me to follow up with him. I asked Jorden when we could get together to talk about this case. Jorden told me he didn't want to talk with me without legal representation. I told Jorden I understood and I did not ask him anything more questions.

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                    Nov  8 2017 10:47am

5037223787        Oregon City Police          Oregon City Police       11:51:45 a.m.   11-08-2017      26/31

| 1 DISTRIBUTION | | C.L.A.S.S.<br>OREGON CITY POLICE DEPARTMENT<br>320 Warner Milne Road, Oregon City<br>**SPECIAL REPORT**<br>**Sex Abuse** | 2 INCIDENT NO.<br>**15-0539** |
|---|---|---|---|
| | | | 3 REPORT TYPE:  ☐ Supplemental  ☒ Special<br>                ☐ Clearance   ☒ Next |
| 4 CONNECT NUMBERS: | | | 8 CASE STATUS:  ☐ Clr By Arrest  ☐ Suspended  ☐ Pending<br>                ☒ Referred   ☐ Clearance  ☐ Exceptional |
| 6 CONNECT REPORTS: | | 7 INCIDENT TYPE | 9 CLASSIFICATION<br>☒ Criminal  ☐ No Crime Committed  ☐ Information |

| 9 SUBJECT OF REPORT |
|---|
| Follow up with Katrina Johnson |

| 10 ORIGINAL REPORT | | | 11 THIS REPORT | | | 12 LOCATION OF OCCURRENCE |
|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 04 | 15 | 16 | OCPD |

| | 13 NAME | | | | 14 DOB | | | 15 SEX | 16 RACE |
|---|---|---|---|---|---|---|---|---|---|
| **INFORMANT** | Johnson, Katrina Marie | | | | 09 | 09 | 98 | F | W |
| | 17 RESIDENCE<br>2820  SE Roswell Avenue, Milwaukie, OR 97222 | | | | | 18 RES. PHONE<br>(503) 207-8373 | | | |
| | 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR | | | 20 OCCUPATION / POSITION | | 21 BUS. PHONE | | | |

| | 22 NAME | | | | 23 DOB | | | 24 SEX | 25 RACE |
|---|---|---|---|---|---|---|---|---|---|
| **SUBJECT** | Hollingsworth, Jorden Timothy | | | | 08 | 01 | 93 | M | W/B |
| | 26 RESIDENCE | | | 27 RES. PHONE | | 28 BUS. PHONE | | | |

**29 DETAILS**

See attached narrative

| 30 TIME RECEIVED | 31 TIME DISPATCHED | 32 TIME ARRIVED | 33 TIME CLEARED |
|---|---|---|---|
| 34 REPORTING OFFICER<br>Ellis, Sean | 35 DPSST<br>47848 | 36 AGENCY<br>OCPD | 37 APPROVED<br>JN |
| 38 REPORTING OFFICER | 39 DPSST | 40 AGENCY | 41 DATA ENTRY |

EXHIBIT 122, Page 25 of 31
Case No. 3:20-cv-01567-MC

Received:                                    Nov  8 2017  10:47am
5037223787        Oregon City Police        Oregon City Police        11:52:21 a.m.    11–08–2017        27/31

| Page # 1 | C.L.A.S.S. OREGON CITY POLICE DEPT. 320 Warner Milne Road, Oregon City, Oregon 97045 **Continuation Report** | Case # 15-0539 |
|---|---|---|
| | | |

### MENTIONED:

Hollingsworth, Jorden Timothy                        Suspect
DOB – 8-1-93

Johnson, Katrina Marie                               Mentioned
DOB – 9-9-98
2820 SE Roswell Ave., Milwaukie, OR 97222
503-207-8373

Hollingsworth, Mindy                                 Jorden's mother
DOB – 3-8-75

Miller, Trisha                                       Jorden's aunt
DOB – 3-6-85

Hollingsworth, Tanaea                                Jorden's sister

Hollingsworth, Debra                                 Jorden's grandma

Miller, Trisha                                       Jorden's aunt
DOB – 3-6-85

Philpott, Mandi                                      Mentioned

### ACTION TAKEN:

On January 29, 2016, I attended a prearranged meeting with Katrina Johnson and her attorney, Mandi Philpott. During this meeting, Katrina told me she was in a sexual relationship with Jorden Hollingsworth from July, 2013 until December, 2014. Katrina told me she received a subpoena to testify about her relationship with Mr. Hollingsworth in Grand Jury but lied during her testimony to protect him.

On April 15, 2016, I contacted Katrina on the telephone and spoke with her again. During our conversation, Katrina told me during her relationship with Mr. Hollingsworth, they engaged in sexual intercourse as well as oral sex. She told me she was 14 years old at the time and Mr. Hollingsworth was 19 years old. Katrina told me Mr. Hollingsworth knew how old she was because her mom told him and he responded by saying he "felt dirty." Katrina said Mr. Hollingsworth pursued a relationship with her after knowing she was 14 years old.

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                    Nov  8 2017 10:48am

5037223787        Oregon City Police        Oregon City Police        11:53:06 a.m.    11-08-2017        28/31

| Page # 2 | C.L.A.S.S. OREGON CITY POLICE DEPT. 320 Warner Milne Road, Oregon City, Oregon 97045 Continuation Report | Case # 15-0539 |
|---|---|---|

Katrina told me Mr. Hollingsworth was charged with multiple sex crimes after she disclosed their relationship to a caseworker she had at the time. She said after Mr. Hollingsworth's arrest, she had regular contact with his family, including his mother, sister, grandmother, and aunt. Katrina identified the following people and their relationship with Mr. Hollingsworth:

Mindy Hollingsworth is Mr. Hollingsworth's mother
Tanaea Hollingsworth is Mr. Hollingsworth's sister
Debra Hollingsworth is Mr. Hollingsworth's grandmother
Trisha Miller is Mr. Hollingsworth's aunt

Katrina told me Mr. Hollingsworth's family members "pled" with her to not say anything about her relationship with Mr. Hollingsworth during her Grand Jury testimony. She said Mr. Hollingsworth's family members told her if she testified, it would "ruin his life." Katrina told me it was mostly Mindy and Debra Hollingsworth who talked with her but Tanaea also asked her to not say anything because she wanted her brother to be safe.

Katrina told me Mr. Hollingsworth's family members talked to her about her testimony "anytime the situation came up." She said they told her to testify that Mr. Hollingsworth was "just a friend" and they did not have a sexual relationship.

Katrina told me Debra and Tanaea drove her to the courthouse for Grand Jury. She said while they drove, Debra and Tanaea "went over the plan" of what they wanted her to say during her testimony. Katrina said during her Grand Jury testimony, she "lied through her teeth and everyone knew it." Katrina told me Debra and Tanaea drove her home after Grand Jury.

Katrina told me her relationship with Mr. Hollingsworth continued after she went to Grand Jury. She said she and Mr. Hollingsworth continued having sexual intercourse and oral sex with each other. Katrina said her relationship with Mr. Hollingsworth ended in December, 2014. She said Mr. Hollingsworth "stalked" her in December, 2014, after they broke up. She said Mr. Hollingsworth showed up at her friend's house with a rose and followed her to school. She said she had to lie to Mr. Hollingsworth to get him to go away and that was the last time she has been with him.

### ACTION RECOMMENDED:

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                    Nov  8 2017 10:49am
5037223787        Oregon City Police        Oregon City Police        11:54:04 a.m.    11-08-2017    29/31

| 1 DISTRIBUTION: | C.L.A.S.S. OREGON CITY POLICE DEPARTMENT 320 Warner Milne Road, Oregon City SPECIAL REPORT | 2 INCIDENT NO. 15-0539 |
|---|---|---|
| 4 CONNECT NUMBERS: | | 3 REPORT TYPE: ☐ Supplemental ☐ MBR ☒ Special |
| 6 CONNECT REPORTS: | | 5 CASE STATUS ☐ Clr By Arrest ☒ Related ☐ Suspended ☐ Clearance ☐ Pending ☐ Exceptional |
| | 7 INCIDENT TYPE Sex Abuse | 8 CLASSIFICATION ☒ Criminal ☐ No Crime Committed ☐ Information |
| 9 SUBJECT OF REPORT: Jorden Hollingsworth jail calls made in June, 2014. | | |
| 10 ORIGINAL REPORT 02  13  15 | 11 THIS REPORT 05  27  16 | 12 LOCATION OF OCCURRENCE: OCPD |

| INFORMANT | 13 NAME Johnson, Katrina Marie | 14 DOB 09  09  98 | 15 SEX F | 16 RACE W |
|---|---|---|---|---|
| | 17 RESIDENCE 2820 SE Roswell Avenue, Milwaukie, OR 97222 | 18 RES. PHONE (503) 207-8373 | | |
| | 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR | 20 OCCUPATION / POSITION | 21 BUS. PHONE | |

| SUBJECT | 22 NAME Hollingsworth, Jorden Timothy | 23 DOB 08  01  93 | 24 SEX M | 25 RACE W/S |
|---|---|---|---|---|
| | 26 RESIDENCE | 27 RES. PHONE | 28 RES. PHONE | |

29 DETAILS


See attached narrative


| 30 TIME RECEIVED | 31 TIME DISPATCHED | 32 TIME ARRIVED | 33 TIME CLEARED |
|---|---|---|---|
| 34 REPORTING OFFICER: Ellis, Sean | | 35 DPSST 47648 | 36 AGENCY: OCPD |
| 38 REPORTING OFFICER: | | 37 DPSST | 40 AGENCY: | 41 DATE ENTRY |

Received:                                    Nov  8 2017 10:50am
5037223787        Oregon City Police          Oregon City Police          11:54:41 a.m.    11–08–2017      30 /31

| Page # 1 | **C.L.A.S.S.** OREGON CITY POLICE DEPT. 320 Warner Milne Road, Oregon City, Oregon  97045 **Continuation Report** | Case # 15-0539 |
|---|---|---|
|  |  |  |
|  |  |  |

**MENTIONED:**

**ACTION TAKEN:**

Over the course of this investigation, I have listened to jail calls Jorden Hollingsworth has made while in custody at the Clackamas County Jail (CCJ).  Some of these calls were made while Mr. Hollingsworth was in custody during June of 2014.  I checked a law enforcement database and saw Grand Jury for the case Mr. Hollingsworth was in custody for was set for June 11, 2014.

What follows is a summary of a few of Mr. Hollingsworth's telephone calls between June 1, 2014 and June 30, 2014.  These calls have been condensed for the ease of the reader.  The digital recording contains a verbatim account of the interview (**SEE DIGITAL AUDIO RECORDING OF THE INTERVIEW FOR FULL DETAILS).**

On June 2, 2014, at about 3:28 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Deborah Miller.  Mr. Hollingsworth speaks with two different females, one he refers to as "mom", during his conversation.  Mr. Hollingsworth thanks "mom" for giving him "that number and stuff."  "Mom" responds to Mr. Hollingsworth by saying "after this I don't want to be a part of it."

On June 5, 2014, at about 1:34 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Mindy Jean Solomon Hollingsworth.  During this call, Mr. Hollingsworth and a female discuss "Trisha" being fired from her job and a fight the female was now in with "Trisha."  Toward the end of the conversation, Mr. Hollingsworth tells the female he will let them "handle that situation."

On June 10, 2014, at about 11:42 AM, Mr. Hollingsworth makes a call to a person the phone system identifies as Mindy Jean Solomon Hollingsworth.  During this call, Mr. Hollingsworth speaks with a female he refers to as "mom."  As they talk, "mom" says this is ridiculous because "you and Katrina have never had sexual relations."

On June 10, 2014, at about 9:29 PM, Mr. Hollingsworth make a call to a person the phone system identifies as Deborah Miller.  During this call, Mr. Hollingsworth tells a female the cop is a "big problem" because he subpoenaed "that person" for tomorrow.  He said there is going to be Grand Jury because they are trying to get him third degree rape.

Mr. Hollingsworth asks to talk with his "mom", and when he does, he asks her to "make that call please."  Mr. Hollingsworth confirms his "mom" knows who he is talking about,

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                    Nov 8 2017 10:51am
5037223787        Oregon City Police        Oregon City Police        11:55:42 a.m.    11-08-2017    31 /31

| Page # 2 | C.L.A.S.S. | Case # 15-0539 |
|---|---|---|
| | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | |

but does not give a name. He asks "mom" to not "freak her out, just calm her down and shit."

On June 11, 2014, at about 1:31 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Deborah Miller. Mr. Hollingsworth asked the female if she was "going down there" and the female says she is. Mr. Hollingsworth tells the female she should expect a phone call because "she" needs a ride. The female tells Mr. Hollingsworth "this is getting too crazy." The female tells Mr. Hollingsworth the only thing she can think of is "her" dad is trying to "pull some bull shit." Mr. Hollingsworth tells the female "they're trying to get her to testify against me." The female asked Mr. Hollingsworth how he knows the person will need a ride and he asked if it needed to be explained. Mr. Hollingsworth said "they scared the shit out of her."

I drove to CCJ and had a disk made with these phone calls recorded onto it. I made a copy of the disk before securing the original disk in evidence.

<u>**ACTION RECOMMENDED:**</u>

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                    Nov  8 2017 10:14am

5037223787        Oregon City Police        Oregon City Police        11:19:05 a.m.   11-08-2017      1/31

DOJ-TRIAL DIVISION    Fax:503-947-4794      Nov  9 2017 09:49am  P001/001

ELLEN F. ROSENBLUM                                                    FREDERICK M. BOSS
Attorney General                                                     Deputy Attorney General



DEPARTMENT OF JUSTICE
TRIAL DIVISION

November 8, 2017

By Facsimile (503) 655-8530                    11/8/17
                                               31 pgs
Records Department
Oregon City Police Department
320 Warner Milne Rd
Oregon City, Oregon 97045

Re:    *Jorden Timothy Hollingsworth v. Troy Bowser*
       Umatilla County Circuit Court Case No. 17CV47262
       **Underlying Conviction:  Clackamas County Case No. CR1501848**

Dear Records Clerk:

       Our office is handling a post-conviction case in the above-entitled matter  In order for us
to complete our investigation and preparation for the defense of this case, it is necessary for us to
obtain a copy of all police reports related to originating agency #15-0539, incident date of
February 19, 2015, in *State of Oregon v. Jorden Timothy Hollingsworth*, Clackamas County
Case No. CR1501848.

       If you have any questions, please feel free to call me.  Thank you in advance for your
cooperation in this matter.

                                    Sincerely,

                                    */ Galilio Abrego*

                                    Galilio Abrego
                                    Legal Secretary for
                                    W. Douglas Marshall
                                    Senior Assistant Attorney General
                                    Galilio.L.Abrego@doj.state.or.us

8606322-v1/WDM/kk4

1162 Court Street NE, Salem, OR  97301-4096
Telephone: (503) 947-4700  Fax: (503) 947-4794  TTY: (800) 735-2900  www.doj.state.or.us

EXHIBIT 122, Page 31 of 31
Case No. 3:20-cv-01567-MC

1

2

3

4

5

6

7                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

8                          FOR THE COUNTY OF UMATILLA

9    JORDEN HOLLINGSWORTH,                    )
                                              )
10                      Plaintiff,            )       NO:  17CV47262
                                              )
11                      vs.                   )       DECLARATION OF
                                              )       ARTHUR B. KNAUSS
12   TROY BOWSER, Superintendent,             )
     Two Rivers Correctional Institution,     )
13                                            )
                        Defendant.            )
14   ─────────────────────────────────────

15        I, Arthur B. Knauss, Attorney at Law, hereby submit this declaration in

16   response to the claims of inadequate assistance of counsel.

17                                  1.

18        I have been a full time attorney since September 1973.  I am now

19   semi-retired from the practice of law, limiting my practice to providing mediation

20   services.  My criminal law experience was as follows:

21        (a)     Forty-five years of full time criminal law practice.

22        (b)     Past president of the Clackamas Indigent Defense Corporation, the

23   Clackamas County consortium that provides court-appointed services for indigent

24   defendants, having served in that position for over ten years.

25

26   Page 1.  DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

                          Arthur B. Knauss
                           Attorney at Law
                         11073 S.E. Main Street
                        Milwaukie, Oregon  97222
                          Phone: (503) 659-5337
                       Email: art@abknaussatty.com

1    (c)    I was the sole trial attorney on the capital murder case involving
2    Dayton Leroy Rogers, which resulted in a jury verdict of life in prison, thus
3    avoiding the death penalty (he is on death row for other charges).  I also handled
4    at least five other murder cases through the late 80's, all but one were tried.

5    (d)    I have averaged at least two sex crimes cases per year, retained and
6    appointed. In handling cases of this nature, I have used various forensic experts,
7    including psycho-sexual evaluators and memory experts.  These cases have
8    involved both jury and court trials.

9                                    2.

10    On November 16, 2015, I was appointed to represent Jorden Timothy
11    Hollingsworth on Clackamas County Circuit Court case #CR1501848, on charges
12    of two counts of Sexual Abuse In The First Degree, alleged to have occurred on
13    February 13, 2015, and August 24, 2009.  For most of my representation of Mr.
14    Hollingsworth, he was in custody in the Clackamas County Jail.  On April 22,
15    2016, his family posted $5,000.00 bail.  On November 24, 2015, I had managed to
16    convince a judge to reduce his bail to the minimum for a Ballot Measure 11 case,
17    $50,000.00, which occurs infrequently in Clackamas County.

18    (e)    During my representation of Mr. Hollingsworth, I learned he had a
19    high school diploma and a little less than three years of college with ITT
20    Technical and Portland Community College.  I also learned that he had prior
21    convictions for misdemeanor Harassment in Lake County (July 16, 2012),
22    misdemeanor Assault In the Fourth Degree in Clackamas County (November 27,
23    2012), and a misdemeanor Failure to Appear In the Second Degree in Lake
24    County (February 24, 2014).  He thus had previous experience with the criminal

25

26    Page 2.  DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

Arthur B. Knauss
Attorney at Law
11073 S.E. Main Street
Milwaukie, Oregon  97222
Phone: (503) 659-5337
Email: art@abknaussatty.com

1  legal system.  His psychosexual evaluation confirmed he was functioning in the

2  average range of intelligence.

3                                        3.

4          As to the first allegation of petitioner, he claims that I placed him in a

5  "state of duress" in order to obtain his waiver of jury at the commencement of trial

6  on August 9, 2016.  He claims that I "demanded the jury waiver the morning of

7  trial," "asserting that the jury was needed for another trial," and claimed that I

8  told him he "did not want a jury."

9          (a)     At no time did I "demand" that he waive a jury trial, nor suggest that

10  he should not proceed with a jury trial, nor demand that he sign a jury waiver.

11  At least two times in the week before the trial, the subject of his options as to

12  whether he should have a jury trial or court trial were discussed at length.  I

13  thoroughly explained to him the pros and cons of a court trial verses a jury trial.

14  Because of his convictions for Assault IV and Harassment, he had impeachable

15  offenses pursuant to ORS 40.355(Oregon Rule of Evidence 609(2), which I

16  carefully explained to him.  I have notes and copies of my research in my file.

17          I also informed him that a judge might be more receptive of our theory of

18  the case than a jury.  Our theory was that the girl had admitted to being a liar

19  when she was younger (Tr p.52), and could have been confused as to whether she

20  had just dreamed versus what actually happened, as she awakened with client

21  allegedly touching her sexually.  My expert witness, Dr. Wendy Bourg, PhD, a

22  Clinical Psychologist, testified about this sort of "twilight" state and the

23  possibility of her confusing a dream with reality.  In my experience, expert

24  testimony is typically, at least, considered by the judge, whereas jurors can be

25

26  Page 3.   DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

Arthur B. Knauss
Attorney at Law
11073 S.E. Main Street
Milwaukie, Oregon  97222
Phone: (503) 659-5337
Email: art@abknaussatty.com

1    unduly affected by or have undue sympathy for the child victim.

2    　　　Prior to the trial, I reasonably believed that he was leaning towards a court

3    trial but had him think it over and tell me for sure the morning of trial. Judge

4    Katherine Weber was an excellent draw for a court trial, in my ten plus years of

5    experience with her.

6    　　　(b)　　I have _never_ demanded of a client, nor even recommended that they

7    waive jury. I have always explained to my clients, including petitioner, that it

8    was their personal choice, not mine. I had always assumed this case would be

9    tried to a jury. In my opinion, I believe he made an intelligent choice in waiving

10   the jury, irrespective of the outcome.

11   　　　(c)　　At no time did I assert that "the jury was needed for another

12   trial." That statement is categorically false. Prior to the start of the trial, Judge

13   Weber confirmed:

14   　　　　　"We actually have jurors waiting right now across the
　　　　　courtyard to come over and be jurors on at least one other
15   　　　　　case." (Tr p. 9)

16   In context, she was referring to our case had a jury waiting.

17   　　　(d)　　I had told Judge Weber in chambers the morning of the trial that I

18   had carefully gone over defendant's right as to the jury, as well. On page 9

19   through page 10, the court carefully went through his rights to have a jury. He

20   confirmed several times that was _his_ wish.

21   　　　(e)　　Defendant expressed his concerns about the jury waiver several

22   times after the verdict was rendered. We had requested a pre-sentence

23   investigation, and he was not sentenced until October 24, 2016, almost two and

24   one-half months after the trial. On page 584 of the transcript, I pointed out to the

25

26   Page 4.　DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

Arthur B. Knauss
Attorney at Law
11073 S.E. Main Street
Milwaukie, Oregon 97222
Phone: (503) 659-5337
Email: art@abknaussatty.com

1  judge, prior to his being sentenced as follows:

2       "Mr. Knauss: Before you came out, I provided you a copy
        of my client's statement that he would like to read when
3       it comes time to do so. In there, he has expressed his
        concerns about the jury waiver and my involvement
4       in that. He and I spoke at length on Thursday and
        Friday, and he wishes to go forward with me representing
5       him at this sentencing proceeding here, in spite of what
        statements he made in that letter."
6
        A little later, it was confirmed as follows:
7
        "Mr. Knauss: So I believe he's prepared to let you know that
8       he wants me to proceed with the sentencing proceeding.

9       The court: Is that correct, Mr. Hollingsworth?

10      The defendant: Yes, it is.

11      The court:  Did you want to proceed with Mr. Knauss'
        representation today?
12
        The defendant:  Yes. That is correct, Your Honor."
13      (Tr p.585)

14      (f)    If I had any belief that defendant was hesitant to waive a jury,

15  I would have insisted that he go ahead with the jury trial. I did not tell him so,

16  but I thought that his decision was a sound one in light of his prior convictions.

17  I was also concerned about his over-confident demeanor and how that would come

18  across to a jury.

19                                  4.

20      As to the second allegation, petitioner alleges that I "failed to call

21  witnesses, who could, and were prepared to, provide positive character evidence."

22  These witnesses were interviewed by our investigator and were in court prepared

23  to testify. In my experience, character witnesses are not typically effective as

24  they do not address key issues in a trial. When character witnesses testify,

25

26  Page 5.  DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

                    Arthur B. Knauss
                    Attorney at Law
                    11073 S.E. Main Street
                    Milwaukie, Oregon 97222
                    Phone: (503) 659-5337
                    Email: art@abknaussatty.com

1  typically the prosecutor will then try to undermine their comments by bringing up

2  a defendant's prior record. Four other family members and friends had already

3  testified to crucial issues, his appropriate and loving relationship with the victim

4  and the fact that the child had never shown any hesitancy in being around Mr.

5  Hollingsworth.

6      In my opinion, the four witnesses alluded to in the petition would not have

7  had an impact upon the outcome of the case. In my experience calling so-called

8  "character witnesses" can backfire, particularly where the prosecutor is entitled

9  to question the witnesses as to their awareness of Mr. Hollingsworth's past

10  criminal history. The approach to the case was to focus on the victim, and her

11  history of lying, her admittedly dreaming and awakening, and the possibility that

12  Dexedrine had made her "dopey" as several defense witnesses confirmed.

13                  5.

14      As to the third allegations, petitioner alleges that I failed to provide

15  testimony at trial indicating the impact of Dexedrine on sleepiness and the

16  perception of reality.

17      The state called Dr. Susan Skinner, the medical director of the Children's

18  Center, where the child was interviewed. Her position there was a "child abuse

19  pediatrician." (She is board certified in general pediatrics and child abuse

20  pediatrics). Dr. Skinner confirmed that the victim was prescribed Dexedrine for

21  her ADHD symptoms. She testified that this drug was used to help a child with

22  focus and concentration. She acknowledged that a child could have a difficult

23  time falling asleep if the drug is taken too close to bedtime. Dr. Skinner

24  confirmed that the child's dosage prescribed was "minimal" (Tr p. 305). Her

25

26  Page 6.  DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

Arthur B. Knauss
Attorney at Law
11073 S.E. Main Street
Milwaukie, Oregon 97222
Phone: (503) 659-5337
Email: art@abknaussatty.com

1    dosage was 10 milligrams a day and the maximum recommended dosage is 30

2    milligrams a day. On cross-examination, she denied that Dexedrine has side

3    affects such as hearing voices, or believing things that are not true or suspicious.

4    (Tr p. 307).

5         Dr. Wendy Bourg was called as a defense witness, who is an expert in the

6    evaluation of children's statements of sex abuse. She had previously worked at

7    CARES Northwest, the predecessor of the Children's Center. She actually wrote

8    the guidelines for how to evaluate children properly when there is a concern for

9    abuse. This document was first published in 1998 and has been used as a

10   training guide throughout the US and in other countries. She worked at CARES

11   Northwest from 1992 until 2001. She had also reviewed the literature of

12   hypnopompic states, which refers to a period of cognitive confusion that occurs

13   when people are awaken in the middle of the night.

14        During Dr. Bourg's testimony she confirmed that when a child transitions

15   between sleep and an awaken state, cognitive confusion occurs, including

16   misunderstanding as to what had just occurred (Tr p. 485). It was further

17   elicited that particularly children are more likely to report dreams as actual

18   events. Her theory was also born out by the victim, who told the Children's

19   Center's interviewer that the touching occurred between sleeping and awakening

20   (Tr p. 189-193). She further testified the touching occurred while she "woke up."

21   (Tr p. 58). She also indicated some nonsensical statements of the defendant

22   during the incident (Tr p. 196-197 and Tr p. 60).

23        I elicited from Trisha Miller (petitioner's aunt and girlfriend of the victim's

24   father) that the night before the incident, the child appeared drowsy, like she was

25

26   Page 7.  DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

Arthur B. Knauss
Attorney at Law
11073 S.E. Main Street
Milwaukie, Oregon 97222
Phone: (503) 659-5337
Email: art@abknaussatty.com

1  out of it, and that she had delayed responses to questions (Tr p. 343). I also

2  called Tanae' A. Hollingsworth, defendant's sister, who confirmed that the victim

3  was normally really hyper and energetic but the night before the incident it didn't

4  seem like she was really all there, and wasn't really coherent (Tr p. 408).

5        I did not ask Dr. Bourg anything further on the Dexedrine issue as we

6  confirmed that I could not qualify her as an expert as to the affects of Dexedrine.

7  As it relates to the overall defense of the case, I believe that there was sufficient

8  evidence that the trier of fact could confirm that the victim was possibly affected

9  by Dexedrine and that Dr. Skinner had confirmed what those side affects might

10  have been. In addition, Dr. Skinner had testified that the victim's dosage was on

11  the lower end of the therapeutic range which could have foreclosed the possibility

12  of having Dr. Bourg testify about the Dexedrine side affects when she was on a

13  low dose. Dr. Skinner had also confirmed that hallucinations would not be

14  common side affects of a Dexedrine over dosage. As to this issue, in my

15  experience, we had a credible argument that the victim had self-admittedly lied in

16  the past, and also a credible argument that her transitioning from dreaming to

17  awakening had led to possible confusion.

18                    6.

19                CONCLUSION

20        Petitioner alleges that:

21            "There is a reasonable probability that, absent the
          errors of trial counsel, the result of conviction or

22            sentence would have been different. Any confidence
          in petitioner's conviction and sentence has been

23            undermined as a result of trial counsel's deficient
          performance."

24

25        Mr. Hollingsworth was convicted primarily because the victim-witness was

26  Page 8.  DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

Arthur B. Knauss
Attorney at Law
11073 S.E. Main Street
Milwaukie, Oregon 97222
Phone: (503) 659-5337
Email: art@abknaussatty.com

1   convincing, articulate, unduly poised, and held up under my rigorous cross

2   examination. On the other hand, petitioner was ineffective as a witness,

3   particularly in his attempt to explain away his texts right after the victim

4   disclosure. After the incident, Mr. Hollingsworth texted his aunt, Trisha Miller,

5   as follows:

6       "She woke up and was gonna go upstairs and tell.
        I just freaked out and didn't want her to. I don't
7       know what the fuck I was thinking. I'm so sorry."
        (Trial exhibit states #1)

8       DATED this _19_ day of ___March___ 2019.

9

10           ARTHUR B. KNAUSS   OSB#731700
           Attorney At Law

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   Page 9.  DECLARATION OF ARTHUR B. KNAUSS, ATTORNEY AT LAW

Arthur B. Knauss
Attorney at Law
11073 S.E. Main Street
Milwaukie, Oregon 97222
Phone: (503) 659-5337
Email: art@abknaussatty.com

IN THE CIRCUIT COURT OF THE STATE OF OREGON
IN AND FOR THE COUNTY OF CLACKAMAS

ENTERED
AUG 16 2016
By:HRM

State of Oregon,

                                                    Plaintiff

                          vs.

Jorden Timothy Hollingsworth

                                                    Defendant

Case No. CR150184

WAIVER OF JURY TRIAL

I Jorden T Hollingsworth, the defendant in this matter, appearing in person and with my attorney, Art Krauss                    , understand, and my attorney has explained to me, that:

- I have the right to a jury trial on the determination of whether I am guilty or not guilty of the crime(s) charged;
- I have the right to a jury trial on sentence-enhancement facts that the state has alleged, except as to any sentence-enhancement facts that I admit;
- If the sentence-enhancement facts relate to me and not to the crime(s) charged, I am entitled to a jury trial on those facts separately if the jury finds me guilty of the crime(s) charged;
- If I waive the right to a jury trial on the issue of guilt, I also waive the right to a jury trial on any sentence-enhancement facts; the judge would decide all issues of fact as to guilt and as to sentencing.

After being fully advised, and of my own free will, I wish to waive my rights to jury trial in this matter as follows:

I WAIVE my right to have a jury decide whether I am guilty or not guilty of the crime(s) charged and any sentence-enhancement facts.

I DO NOT waive my right to have a jury decide whether I am guilty or not guilty of the crime(s) charged, but I WAIVE my right to have a jury decide the following sentence-enhancement facts *(check all that apply)*:

   o Any enhancement facts related to me as the DEFENDANT.
   o Any enhancement facts related to the OFFENSES charged in the accusatory instrument.

8-9-16
Date

Defendant

Defense Attorney

**THE COURT FINDS:** Defendant's waiver of jury trial is intelligent, knowing, and voluntary, and the court accepts that waiver.

8/9/2016
Date

Judge

(02/23/11)

CR1501848
WWJT
Waiver – Jury Trial
5500268

Verified Correct Copy of Original 8/16/2016

1

2

3

4                    IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                         FOR THE COUNTY OF UMATILLA

6    JORDEN TIMOTHY HOLLINGSWORTH,     | Case No. 17CV47262

7              Petitioner,             | DECLARATION OF AAG W. DOUGLAS
                                       | MARSHALL
8         v.                           |
                                       | **POST CONVICTION**
9    TROY BOWSER, Superintendent,      |
     Two Rivers Correctional Institution, |
10                                     | **ORS 20.140 - State fees deferred at filing**
            Defendant.                 |
11

12   I, W. Douglas Marshall, hereby declare:

13        I am an attorney licensed to practice law in the State of Oregon and a Senior Assistant

14   Attorney General with the Oregon Department of Justice; in that capacity I represent

15   Superintendent Cain.  This declaration is filed in support of defendant's trial memorandum and

16   to convey the results of the investigation into petitioner's criminal history.

17        1.    Attached as Exhibit 107 are true and accurate records of petitioner's past

18   convictions and involvement with law enforcement, even when a conviction did not result.

19   These records were obtained at my request by an investigator with the Oregon Department of

20   Justice.

21        2.    In particular, at about 55 pages into the collected documents (as counted when the

22   exhibit was printed double-sided), begin the pages on the investigation by the Clackamas County

23   Sheriff's Office into a report that petitioner was having sexual relations with a 14 or 15 year old

24   female, when he was 20 or 21.

25

26

Page 1 -   DECLARATION OF AAG W. DOUGLAS MARSHALL
           WDM/kk4/9501187-v1

                              Department of Justice
                              1162 Court Street NE
                              Salem, OR 97301-4096
                         (503) 947-4700 / Fax: (503) 947-4794

1       **I hereby declare that the above statement is true to the best of my knowledge and**

2    **belief, and that I understand it is made for use as evidence in court and is subject to penalty**

3    **for perjury.**

4       DATED March __13__, 2019.

5

6                             ___*s/ W. Douglas Marshall*___
                                   W. DOUGLAS MARSHALL

7                                   Senior Assistant Attorney General

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 2 -   DECLARATION OF AAG W. DOUGLAS MARSHALL
          WDM/kk4/9501187-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

08-12394

# OREGON UNIFORM CITATION AND COMPLAINT

Use for All Violations or Crimes Where Separate Complaint Will Not Be Filed ORS 153.045 or 133.069

POLICE RECORDS **158623**

☐ CRIME(S)          OR          ☐ VIOLATION(S)          ☐ Traffic  ☐ Other     ☐ Wildlife
(See A on Back)   (Not Both)   (See B on Back)          ☐ Boating  ☐ Commercial Fishing

STATE OF OREGON

Docket No.

CITY/OTHER PUBLIC BODY _____     Court:  ☐ Municipal     ☐ Justice
COUNTY OF _____ CLACKAMAS _____             ☒ Juvenile     ☐ Circuit
                                              ☐ Community

## THE UNDERSIGNED CERTIFIES AND SAYS THAT THE FOLLOWING PERSON:

ID Type   *None*                  ID No.              State     Tel No.

Name: Last  *Hollingsworth*  First *Jorden*  M.I. *Timothy*

Address  *L9903 S. Leland Rd.*                  License Class     ☐ Employed to drive
         *Oregon City, OR 97045*                Def is:  ☐ Passenger

Sex *M*  Race *W*  DOB *0801'97*  Height *5'11*  Weight *145*  Hair *Brn*  Eyes *Brn*

## AT THE FOLLOWING TIME AND PLACE IN THE ABOVE-MENTIONED STATE AND COUNTY:

Offense Date on or about:  *MARCH 31 08, 1255*   ☐ AM ☒ PM   ☐ Highway   ☐ Premises open to public

At or near location:  *S 27th @ HARK St, Milw, OR.*

## INVOLVING THE FOLLOWING:

Type          Reg'le/VIN/ID No.              State      ☐ Accident    ☐ Injury
                                                        ☐ Property Damage  ☐ Endanger others
Vehicle year, make, model, style, color, OR Other, describe:   ☐ Driver not Reg. Owner
                                                               ☐ Commerical Veh.  ☐ Haz Material
☐ Other

## DID THEN AND THERE COMMIT THE FOLLOWING OFFENSE(S):

1. Violated (cite ORS/ORD/rule)  *162.247*   Describe   *Interfering w/peace Officer*   Alleged Spd   Designated Spd   ☐ Posted Limit   ☐ Radar
                                                                                                                       ☐ Pace
                                                                                                                       ☐ Laser
                                                                          ☐ Psted Sch Zn  ☐ Hwy Wk Zn
☐ Intentional  ☐ Knowing  ☐ Reckless  ☐ Criminal negligence  ☐ No culpable mental state   1. Base Fine: *TBA*

1. Violated (cite ORS/ORD/rule)  *162.315*   Describe   *Resisting Arrest*
☐ Intentional  ☐ Knowing  ☐ Reckless  ☐ Criminal negligence  ☐ No culpable mental state   1. Base Fine: *TBA*

1. Violated (cite ORS/ORD/rule)            Describe
☐ Intentional  ☐ Knowing  ☐ Reckless  ☐ Criminal negligence  ☐ No culpable mental state   1. Base Fine:

Expl:

I certify under ORS 153.045 and 153.990 and under applicable law and under penalties for false swearing; do swear/affirm that I have sufficient grounds to and do believe that the above-mentioned defendant/person committed the above offense(s) and I have served the defendant/person with this complaint.

Officer(s) Agency ID

Date Issued  *03 31 08*      1st Officer Signature  _____      1st Officer ID No.  *15645*

Print 1st Officer Name                                                 2nd Officer ID No.

2nd Officer of Arresting Person (If Not Officer)    Signature                Print Name

## YOUR COURT APPEARANCE DATE, TIME AND LOCATION ARE

Mo/Day/Year  *TBA*   Time   ☐ AM   Location  ☐ Circuit Court          ☐ Estacada Municipal
                            ☐ PM             ☐ Wilsonville Municipal Court  ☐ Community Court
                                             ☐ Happy Valley Municipal Court  ☐ Other
                                                                    (See reverse for court location)

| C/A | CAT | CDA | DA | DHS | DIVERT | JUV | MCU | CITIES | | | | CLACKAMAS COUNTY SHERIFF | Inc. No.: 08-12394 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ME | MENTAL | PIO | P&P | PRDP | RSL | DIM | SIU | □ E | | | | 2223 KAEN ROAD | | | |
| | | | | | | | | □ H □ W | | | | OREGON CITY, OR 97045 | Custody Disp: □ CCJ □ DEL □ C/R | | |
| MDP X | OTHER Cuit | | | | | | | | | | | (503) 655-8218 | X Cite □ JRC □ POH □ DETOX | | |
| | | | | | | | | **CUSTODY REPORT** | | | | | Connect Nos.: | | |

**ARRESTED**

Arrest Time: 1505  Date: 033108  Booking Time/Date: Citation  Arrest Location: SE 27th & PARK, Milw.

Name (Last, First, Middle): Hollingsworth, Jorden Timothy   □ Alias:   □ Nickname:

Residence (Street, City, St, Zip): 19903 S. Leland Rd. Oregon City   Residence Phone: None   Business Phone:

Employer: Student   Occupation:   Business Address:

Illness/Injury: Indicated his finger on left hand hurts   Medication:   Doctor's Name: None   Marital Status: X Single □ Divorced □ Married □ Separated

Notify in Emergency/Relation to Arrested:   Emergency Notification Street Address:   Emergency Phone:

D.O.B. 08/01/93   Sex: X Male □ Female   Ht. (Inches):   Weight:   Place of Birth:   State:   S.S.N.:   Driver's License:   State:

**DESCRIPTION**

| A RACE | B EYE COLOR | C HAIR COLOR | D HAIR LENGTH | F HAIR STYLE | G FACIAL HAIR | H BUILD |
|---|---|---|---|---|---|---|
| 1 X White | 1 □ Brown | 1 □ Black | 1 □ Bald | 1 □ Wig | 1 □ None | 1 □ Small |
| 2 □ Black | 2 □ Blue | 2 □ Brown | 2 □ Short | 2 □ Wavy / Curly | 2 □ Unshaven | 2 □ Thin |
| 3 □ American Indian | 3 □ Hazel | 3 □ Red | 3 □ Medium | 3 □ Straight | 3 □ Sideburns | 3 □ Medium |
| 4 □ Oriental | 4 □ Green | 4 □ Gray | 4 □ Shoulder | 4 □ Bushy | 4 □ Mustache | 4 □ Large |
| 5 □ Hispanic | 5 □ Gray | 5 □ White | 5 □ Long | 5 □ Ponytail | 5 □ Fu Manchu | 5 □ Heavy |
| 6 □ Other: | 6 □ Other | 6 □ Blond | | 6 □ Afro / Natural | 6 □ Goatee | 6 □ Musc. |
| | | 7 □ Other | E HAIR TYPE | 7 □ Greasy / Dirty | 7 □ Full Beard | 7 □ Other: |
| | | | 1 □ Fine | 8 □ Styled / Processed | 8 □ Other: | |
| | | | 2 □ Coarse | 9 □ Braids | | |
| | | | 3 □ Thick | 10 □ Other: | | |
| | | | 4 □ Thinning | | | |

| I COMPLEXION | J TEETH | L GEN. APPEARANCE | M SPEECH | N MISCELLANEOUS | O SCARS - MARKS - TATTOOS | P |
|---|---|---|---|---|---|---|
| 1 □ Dark | 1 □ Missing | 1 □ Casual | 1 □ High Pitch | 1 □ Weapon | 1 □ Names / Initials | 1 □ Head / Neck |
| 2 □ Medium | 2 □ Gold / Silver | 2 □ Dirty | 2 □ Low Pitch | 2 □ Martial Arts | 2 □ Mom/Mother/Love | 2 □ Shoulder/Bicep |
| 3 □ Light | 3 □ Decayed/Dirty | 3 □ Disguise | 3 □ Nasal | 3 □ Apologetic | 3 □ Heart / Dagger | 3 □ Forearm/Hand |
| 4 □ Pale | 4 □ Other | 4 □ Flashy | 4 □ Raspy | 4 □ Calm | 4 □ Military Insignia | 4 □ Fingers |
| 5 □ Freckled | | 5 □ Good-looking | 5 □ Accent | 5 □ Nervous | 5 □ Misc. Pictures | 5 □ Leg/Foot |
| 6 □ Acne | | 6 □ Well-groomed | 6 □ Rapid | 6 □ Angry/Violent | 6 □ Homemade Tattoo | 6 □ Chest/Stomach |
| 7 □ Pock-marked | K GLASSES | 7 □ Other: | 7 □ Slow | 7 □ Polite | 7 □ Missing Extremity | 7 □ Back |
| 8 □ Ruddy | 1 □ Plain-Wire | | 8 □ Sp. Imped. | 8 □ Uncooperat. | 8 □ Scar: (Lg.) - (Sm.) | 8 □ Eye |
| 9 □ Tanned | 2 □ Sun-Wire | | 9 □ Other: | 9 □ Other | 9 □ Birth Mark | 9 □ Other: |
| 10 □ Other: | 3 □ Plain-Plastic | | | 10 □ Other: | 10 □ Other: | |
| | 4 □ Sun-Plastic | | | | | |
| | 5 □ Other: | | | | | |

**JUV**

Parent/Guardian: Hollingsworth, Mindy Jean   Parent Notified By: Name D.E. Willard   1505   033108

Address (Street, City, St, Zip): None / Trashicut   Residence Phone: None   Business Phone:

**CHARGES**

| | ORS/CODE Number | Crime Classification | Parole/Probation Officer | Bail | Jurisdiction |
|---|---|---|---|---|---|
| 1 | X Charge □ Hold  162.247  □ Warrant □ Def'r X Citation □ T/O  158623  □ P/C | Interfering w/Peace Officer | | TBA  □ Circuit □ Federal X Juvenile □ Parole □ Municipal | Clackamas |
| 2 | X Charge □ Hold  162.315  □ Warrant □ Def'r X Citation □ T/O  158623  □ P/C | Resisting Arrest | | TBA  □ Circuit □ Federal X Juvenile □ Parole □ Municipal | Clackamas |
| 3 | □ Charge □ Hold  □ Warrant □ Def'r □ Citation □ T/O  □ P/C | | | □ Circuit □ Federal □ Juvenile □ Parole □ Municipal | |

**VEHICLE**

Year:   Make:   Model:   Style:   License No.:   State:

| Vehicle Status | Tow Status | Vehicle Color — Two-Tone | | Vehicle Special Features | |
|---|---|---|---|---|---|
| 1 □ Inventoried □ Drivable | 1 □ Towed □ Private Req. | 1 □ Black | 10 □ Purple | 19 □ White | 1 □ Keys in Vehicle  8 □ Level Altered  15 □ Damage - Left |
| □ Release Req. □ Hold | □ At Scene | 2 □ Blue | 11 □ Green | 20 □ Cream | 2 □ CB Antenna  9 □ Glass Damage  16 □ Damage - Right |
| Location Towed | | 3 □ Aqua | 12 □ Yellow | 21 □ Yellow | 3 □ Special Antenna  10 □ Tinted Glass  17 □ Sticker/Decal - Window |
| | | 4 □ Turquoise | 13 □ Olive | 22 □ Orange | 4 □ Vinyl Top  11 □ Special Interior  18 □ Sticker/Decal - Body |
| | | 5 □ Green | 14 □ Gray | 23 □ Gold | 5 □ Loud Muffler  12 □ Decorative Paint  19 □ Sticker/Decal - Bumper |
| Towed By | | 6 □ Bronze | 15 □ Silver | 24 □ Primered | 6 □ Custom Wheels  13 □ Damage - Front  20 □ Painted Sign - Body |
| | | 7 □ Tan | 16 □ Red | 25 □ Other: | 7 □ Rust  14 □ Damage - Rear  21 □ Other: |
| | | 8 □ Copper | 17 □ Pink | | |
| | | 9 □ Beige | 18 □ Maroon | | |

**Miscellaneous**

Blood Alcohol Percentage:   Print Name: D.E. Willard   15645   1650

□ Drug Impaired   □ Refused   Second Reporting Officer Print Name:   DPSST:   Agency:

CCP-SF33a (Rev. 5/06)

CLACKAMAS COUNTY SHERIFF
2223 KAEN ROAD
OREGON CITY, OR 97045
**Continuation Report**

Inc #: **2008-012394**

### entioned

STATE OF OREGON - VICTIM-PERSON, DOB: / /
    Phones:

JORDEN TIMOTHY HOLLINGSWORTH - SUSPECT/CUSTODY, DOB: 08/01/1997
    19903 SE LELAND RD  OREGON CITY OR
      SUSPECT

MINDY JEAN HOLLINGSWORTH - WITNESS, DOB: 03/28/1974
      TRANSIANT   , OR
    MOTHER OF SUSPECT

DEBORAH JEAN MILLER, - WITNESS, DOB: 03/29/1953
    19903 S LELAND RD  OREGON CITY, OR 97045
      GRANDMOTHER OF SUSPECT

TRISHA M MILLER - WITNESS, DOB: 03/06/1985
    19903 S LELAND RD  OREGON CITY, OR 97045
      AUNT OF SUSPECT

DEPUTY CUDDEFORD ASSISTED -


### Narrative

On this date I was dispatched on report of a reckless-possible intoxicated driver in a late model Gold Ford Explorer. The caller indicated the vehicle was now stopped on SE 27th just off of SE Park Ave. I responded to the area and located the vehicle. I talked first with the owner of the vehicle DEBORAH JEAN MILLER and advised her of the call. She said she didn't think her daughter, who had been driving the vehicle was drunk and thought everything was okay.

Next I walked up to the vehicle and talked with the person who had been driving the vehicle and was now seated in the back of the vehicle MINDY JEAN HOLLINGSWORTH. I advised her of the call and asked if she was okay to drive or if she had been having any problems. She told me she had run out of gas in the intersection and had made some very quick and jerking moves to get out of the street before the motor died. She said her son pushed the car by himself out of the street to where it was now stopped.

I smelled no odor of alcohol and there were no other indications of intoxication with Mindy. I went back to my car and began to leave/clear the call. Next both DEBORAH JEAN MILLER, the drivers Mother, and TRISHA M MILLER, the drivers sister, stepped into the street in front of my car and waved their hands as if to stop me. I stopped and rolled down the window asking them what they wanted. TRISHA M MILLER said "What are you doing, where are you going? I explained to her that I had talked with Mindy and felt she was not intoxicated and that her explanation was appropriate for what may have been witnessed by another passing motorist so I was leaving.

Trisha said "You must be kidding my sister is high as a kite on meth right now

| WILLARD DAVID EMMET | 15645 | CCSO | 2 | **Printed Date/Time**<br>04/15/2008 18:25 |

| Distribution: Sgt. Tecmark | **CLACKAMAS COUNTY SHERIFF** | | *Incident Number:* **2008-012394** |
|---|---|---|---|

Outside Distribution: UDC/CIDC/RMI PSU JW CMT

2223 KAEN ROAD
OREGON CITY, OR 97045
(503)655-8218

*Connect No's/Reports:*

**CRIME REPORT**

*Crime Classification*
162.247 INTEFERRING WITH PEACE OFFICER
162.315 RESISTING ARREST

| Latent Prints: No | Alcohol Related: No | Drug Related: No | Gambling Related: No | Domestic Violence, Children Present? No |
|---|---|---|---|---|
| Occurred From: 03/31/2008 | 15:05 | MONDAY | Occurred To: 03/31/2008 | 15:07 | MONDAY | Reported: 03/31/2008 | 15:07 | MONDAY |

Location of Occurrence: SE 27TH AT SE PARK ST; MILW, OR 97222 | Grid:

**VICTIM**

Name of Person/Bus.: STATE OF OREGON,  D.O.B.: / / | Sex: | Race:

School/ Employer/ Business/ Proprietor: | Occupation/ Position:

**REPORTING PARTY/WITNESS**

RPW: WITNESS  Number 1 of 4 Name: HOLLINGSWORTH, MINDY JEAN  D.O.B.: 03/28/1974  Sex: F Race: W
Residence Address: TRANSIANT , OR  Residence 503-
Relationship to Victim: MOTHER

RPW: WITNESS  Number 2 of 4 Name: MILLER,, DEBORAH JEAN  D.O.B.: 03/29/1953  Sex: F Race: W
Residence Address: 19903 S LELAND RD  OREGON CITY, OR 97045
Relationship to Victim:

RPW: WITNESS  Number 3 of 4 Name: MILLER, TRISHA M  D.O.B.: 03/06/1985  Sex: F Race: W
Residence Address: 19903 S LELAND RD  OREGON CITY, OR 97045
Relationship to Victim:

**DOCUMENTS**

Document Type | Document Class | Bank or Source of Document | Account Number | Check Amount

What part of doc. written in presence of victim/witness: Face: | Endorsement: | Other: | Check or Document Number:
Document Date: / / | Name of Endorser:

**CASE MANAGEMENT**

| SOLVABILITY FACTORS: | 01-YES Suspect named? | 05-no Useful physical evidence? | 09-no Latent prints? | 13-no Medical release obtai |
|---|---|---|---|---|
| | 02-YES Can suspect be identified? | 06-no Stolen property traceable? | 10-no Suspect vehicle description? | 14-YES Photos? |
| | 03-YES Suspect location known? | 07-no Uncontacted witnesses? | 11-YES Limited # of possible suspects? | 15-no Detective responded? |
| | 04-YES Suspect description? | 08-no Suspect vehicle license # known? | 12-no Significant MO? | 16-no Other |

Other Comment:

**TARGETS**

| 48 - Victim 03 ADULT | Sex N | 49 - Residential | 50 - Non-Residential | 51 - Non-Res. Targets | 52 - Pt. of Entry | 53 - Method of Entry |
|---|---|---|---|---|---|---|
| 54 - Surrounding Area | | 55 - Res. Target | 56 - Type of Security | | Pt. of Exit | Method of Exit |

Other:

Misc:

**SUSPECT ACTIONS**

| Section 1 | Section 2 | Section 3 | Section 4 |
|---|---|---|---|
| 18 Unique/extraordinary | | 08 Used left hand<br>09 Used right hand<br>15 Other | |
| | Type of Weapon | | Type of Drug |

Exact Words:

Unique M.O.:

Other: RESISTED ARREST

Intended Use of Drug

| Time Received | Time Dispatched | Time Arrived | Time Cleared | Reporting Officer(s) | BPST | Agency | Shift | Printed Date/Time | Approved | Data Entry |
|---|---|---|---|---|---|---|---|---|---|---|
| 15:23 | 15:23 | 15:23 | 15:23 | WILLARD DAVID EMMET | 15645 | CCSO | 2 | 03/31/2008 18:5 | | |

**_Continuation Report_**

(continued)

just look at her. I told her I didn't think she was but that I would take a
second look. I backed my patrol car up and got out walking to the Explorer I
looked inside one more time and asked Mindy to please step out of the vehicle I
needed to talk with just a bit more. She then started to get out however her son
JORDEN TIMOTHY HOLLINGSWORTH jumped from the front seat and placed himself
between me and the door where his Mother was seated.

Next holding his hands out in front of me, now only one foot from me, he yelled
to his Mother "Mom you don't need to talk to him he can't make you just stay in
the car." I told this young man that I did need to talk with him more and ordered
he step away and get back inside the vehicle. I also advised him that he could
be arrested if he continued to interfere with my investigation. The young man
stepped towards me and back between me and the vehicle and said "No, you can't
talk to my mom I'm not going to let you talk to her."

At this time I took a hold of his upper arms and gently moved him to his left
asking him once more to please get back inside the vehicle and to stay there
until I was done. Before I could say any more he said "NO, I wont let you and I
don't have to get in the car you can't make me do that." I again explained that
I was involved in a Police Investigation and he was not to interfere further
with that investigation. I told him he was to get out of my way and back in the
car adding that this was an official order and if he chooses not to comply he
may be arrested and put in the back seat of my patrol car.

During this same time both his Mother MINDY JEAN HOLLINGSWORTH and his
Grandmother DEBORAH JEAN MILLER were yelling at him to "get out of the way and
get back in the car." Young Mr. Jorden's response was "No I don't have to do
what you say" as he again stepped from the front drivers area in front of me and
between myself and his mother as she was trying now to get out of the car. At
this time he again held his hands up to my face and said "What are you going to
do taser me? adding I've been tazed before and it don't hurt me."

<u>USE OF FORCE</u>  Next with this level of interference I took a hold of the young
man in a control wrist lock and maneuvered him from the Ford Explorer approx.
three feet back and over the hood of my patrol car. I then re positioned my
hands and body as he was pushing back against me and attempting to swing his
arms towards my face. He was also yelling "I don't have to do this and you can't
make me stop stop." I again grabbed him and told him to stop resisting me. He
continued to pull away and scream as he was placed in the back seat of my patrol
car. During this time he was again attempting to swing his arms towards my face.

SUPERVISOR  _S.L.Ami_

At this time, and with Jorden safely inside my patrol car, I re-interviewed his
mother without further interference. I determined she was not intoxicated and
probably not under the influence of any drug that I was aware of. I told her her
son was under arrest for interfering with my investigation and for resisting
arrest. I went back to the car and opened the door. As I did so I was advised by
dispatch that he had made a call from the back seat of my car and was requesting
medical to respond for a broken finger.

Next I looked at his finger. It was not swollen and was not discolored at all.
He was complaining and said he wanted an ambulance to take him to the hospital.
I requested medical to my location and than advised Jorden of his rights reading
them from the standard pre-printed card. He said he understood and then asked
"Why am I being arrested." I told him what I was charging him with and asked if
he wanted to make any statements. He said "Yes, I very sorry I resisted you and
sorry I didn't get out of your way at the car but I wanted to protect my Mom."

| _WILLARD DAVID EMMET_ | 15645 | CCSO | 2 | _Printed Date/Time_ |
| | | | | _04/15/2008 18:25_ |

| | ***Continuation Report*** | *Page: 5* |
| | (continued) | *Inc #:* **2008-012394** |

I told him about some of the Oregon laws regarding Police authority and asked if he knew he should have gotten out of my way as soon as I had asked him to do so. He said "Yes I know I should have done what you said I'm sorry about everything." Next Clackamas Fire Paramedics arrived and looked at Jorden's hand. They stated they could not find anything wrong with his hand.

Next they asked him if he was injured any place else on his body. He said "No not at all just my finger hurts a little bit. He was moving his hand and fingers at this time however paramedics advised him to seek medical attention and have the hand x-ray at a hospital. He and his Mother refused any further assistance and she signed the refusal form provided by Clackamas Fire. I asked Mindy if she had seen what her son did when he got in front of me. She said "Yes, I saw him he should not have done that he should have gotten back but hes only 14 years old."

I asked her if she felt her son was old enough to understand what I was asking him to do. She said "Yes he is but he doesn't like cops only just a few of them but he really doesn't like cops." She added "he never cry's but you made him cry allot." I did not see him cry at any time during this incident he was only yelling allot and scream at me. I had requested a second deputy to my location and Deputy Cuddeford had just arrived. Deputy Cuddeford took a number of photos of the subject including his hands and legs. (See attached photos)

Next Jorden was issued a citation for both the mentioned charges and I explained than to him and his Mother. I realest him to his Mother's custody and cleared with this report.

## Action Recommended

Reports forwarded to Juvenile district attorney for adjudication.

| | |
|---|---|
| *WILLARD DAVID EMMET        15645        CCSO     2* | *Printed Date/Time* *04/15/2008 18:25* |

| Distribution: WOC/CDC/RMU PSU/CMT | CLACKAMAS COUNTY SHERIFF 2223 KAEN RD. OREGON CITY OR. 97045 | Case Number: 08-12594 |
|---|---|---|
| | | CCJ Number: |
| Outside Distribution: | **USE OF FORCE REPORT** | Connect No's: |

| Incident Date/Time: 33108 041408 | This Report Date/Time: | Location of Occurrence: SE 27th e Park St View | | Grid: |
|---|---|---|---|---|

| Subject Name: Hollingsworth, Jarvey | D.O.B. 68999 | Sex: M | Height: 5-11 | Weight: 145 | Race: W |
|---|---|---|---|---|---|

| K-9 Used: ☐ Yes ☑ No | Drugs / Alcohol: ☐ Yes ☑ No | # of CCSO Deputies: 1 | Agency Assist: ☐ Yes ☐ No | Agency Assisted: |
|---|---|---|---|---|

## CIRCUMSTANCES REQUIRING USE OF FORCE

| | | |
|---|---|---|
| ☐ Animal Injured/Aggressive | ☐ High Risk Traffic Stop | ☐ Riot |
| ☐ Arrest Warrant | ☐ Intoxicated Subject | ☐ Search Warrant |
| ☑ Deputy Safety | ☐ Jail Incident (Booking) | ☐ Subject Hiding in Building/Premises/Cell |
| ☐ Disturbance | ☐ Jail Incident (Housing) | ☐ Suicidal Subject |
| ☐ Domestic Disturbance | ☐ Mental Subject | ☐ Unknown Risk Stop (Vehicle/Subject) |
| ☐ Escape/Elude | ☐ Misdemeanor Incident/Arrest | ☐ Welfare Check |
| ☐ Felony Incident/Arrest | ☐ Prisoner Transport | ☑ Other: Resisting Arrest |
| | ☐ Public Demonstration | |

## ACTIONS OF DEPUTY

| | | |
|---|---|---|
| ☐ Broke Window | ☐ Deployed Spike Strips (Vehicle) | ☑ Subject Detained in Handcuffs |
| ☐ Deployed K9/Subject Bit | ☐ Forced Door | ☑ Subject Placed in Patrol Car |
| ☐ Deployed K9/Subject Located | ☐ P.I.T. Maneuver (Vehicle) | ☐ Handcuffed ☐ Not Handcuffed |
| | ☑ Other: Grasped Arm Placed in Vehicle | |

## METHOD OF FORCE USED

| Physical Control: | Firearm: Display Only ☐ | Taser: Display Only ☐ |
|---|---|---|
| ☐ Pressure Point | Target: Distance from target: Number of rounds fired: Number times target struck: Was use effective: Type of round/caliber: Type of weapon: | Method used: ☐ Probes ☐ Drive stun ☐ Probes & Drive stun Distance from threat: Number times shocked: Was use effective: |
| ☐ Shoulder Lock | | |
| ☐ Hair Hold | | |
| ☐ Restraint Chair | | |
| ☐ Arm Bar Takedown | | |
| ☐ Hair Takedown | O.C. Spray: | Impact Weapon/Munitions: Display Only ☐ |
| ☐ Focus Blow | | Impact Weapon Type: ☐ Baton ☐ PR-24 ☐ Collapsible |
| ☐ Vascular Neck Restraint | Distance from threat: Number times sprayed: Type of spray: Was use effective: | Bean Bag Type: ☐ 12ga ☐ 37mm Distance from threat: Number times struck: Was use effective: |
| ☑ Wrist Lock | | |
| ☑ Joint Manipulation | | |
| ☐ Escort Hold Used | | |
| ☑ Handcuffed/Hobbled | Pepper Ball: | |
| ☐ Other: | Distance from threat: Number times struck: Was use effective: | |

## INJURIES

| Subject Injured: ☐ Yes ☑ No | Injured When: | Type of Injuries: | | Photos Taken: ☐ Yes ☐ No |
|---|---|---|---|---|
| Subject Interviewed Regarding Use of Force: ☑ Yes ☐ No | Interviewed By: D.E.Willard | Medical Care: ☑ Yes ☐ No | Offered: | Requested: ☑ Yes ☐ No | Refused: ☑ Yes ☐ No |
| Deputy Injured: ☐ Yes ☑ No | Injured When: | Type of Injuries: | | Photos Taken: ☐ Yes ☐ No |
| Deputy Interviewed Regarding Use of Force: ☐ Yes ☐ No | Interviewed By: | Medical Care: ☐ Yes ☐ No | Offered: | Requested: ☐ Yes ☐ No | Refused: ☐ Yes ☐ No |

## WITNESS TO USE OF FORCE

| Witness: See Report | D.O.B. | Sex: | Interviewed: ☐ Yes ☐ No | Interviewed By: |
|---|---|---|---|---|
| Address: | | | Home Phone: | Work Phone: | Cell Phone: |
| Witness: | D.O.B. | Sex: | Interviewed: ☐ Yes ☐ No | Interviewed By: |
| Address: | | | Home Phone: | Work Phone: | Cell Phone: |

## FINAL DISPOSITION

| | | | |
|---|---|---|---|
| ☑ Arrested / Lodged | ☐ Escape / Elude | ☐ Peace Officer Hold / Mental | ☐ Subject Shot Himself / Herself |
| ☑ Cited & Released | ☐ Hospitalized | ☐ Pursuit Terminated | ☐ Other |
| ☐ Detoxed | ☐ Housed Inmate | ☐ Released / No Action | |

| Reporting Deputy: D.E. Willard | DPSST: 15695 | Agency: CCSO | Supervisor Approved – in person: See Report | CMT Approved: RM | Updated 12/2007 |
|---|---|---|---|---|---|

| Distribution: | | **CLACKAMAS COUNTY SHERIFF** | | Incident Number: **2008-012394** | |
|---|---|---|---|---|---|
| Outside Distribution: | | 2223 KAEN ROAD OREGON CITY, OR 97045 (503)655-8218 | | Crime Classification 162.247 INTEFERRING WITH PEACE OFFICER 162.315 RESISTING ARREST | |
| Connect No's/Reports: | | **PROPERTY IN CUSTODY REPORT** | | | |
| Report of: X Property in Custody ___ Rec. Stolen Property | | | | Reported: 03/31/2008   15:07 | Destroy: |
| Location : | | | | | Grid: |

### PERSONS

| | Name | | | Sex | Date of Birth | |
|---|---|---|---|---|---|---|
| X Owner | DEPUTY CUDDEFORD ASSISTED, | | | | / / | |
| ___ Reporting Party | | | | | | |
| ___ Victim | | | | | | |
| ___ Finder | Name HOLLINGSWORTH, JORDEN TIMOTHY | | | Sex M | Date of Birth 08/01/1997 | Residence Phone 503- |
| X Suspect | Address 19903 SE LELAND RD  OREGON CITY OREG, ON | | | | | Business Phone |

### VEHICLE

| License Number | State | Vehicle Identification Number | Veh. Year | Make | Model | Style | Color |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Towed By | | | Towed To | | | | |

### PROPERTY CLASSIFICATION

Was the property seized under a search warrant?   **X** Evidence   ___ Contraband   ___ Found Property   ___ Safekeeping   ___ Hold for Processing

### PROPERTY INVENTORY

*For further forfeiture information, contact Office of County Council, 906 Main St., Oregon City, OR 97045 - 655-8362*

| Item Number 1 of 1 | Type Item PHOTO CD | Serial Number | Brand/Make MAGNAVOX | Size/Calibre | ___ Released |
|---|---|---|---|---|---|
| Color | Owner Applied No. | Value $        0.00 | Description | | ___ Tow Co. |
| Other Information | | | | | **X** Prop. Rm. |

|  |  |
|---|---|
| **Property Summary:** | Total line items for this report: 1 |
| | Total listed value of items for this report: $     Total Value 0.00 |

Released To or Received From

| Received-Property Room | | Date Entered By | Reporting Officer(s) | BPST | Agency | Shift | Printed Date/Time | Approved | Data Entry |
|---|---|---|---|---|---|---|---|---|---|
| mo   day   year   initials | | | WILLARD DAVID EMMET | 15645 | CCSO | 2 | 03/31/2008 18:52 | | |

EXHIBIT 125, Page 10 of 144
Case No. 3:20-cv-01567-MC

| Distribution: | | CLACKAMAS COUNTY SHERIFF | | Incident Number: **2008-012394** |
|---|---|---|---|---|
| Outside Distribution: | | 2223 KAEN ROAD OREGON CITY, OR 97045 (503)655-8218 | Crime Classification 162.247 INTEFERRING WITH PEACE OFFICER 162.315 RESISTING ARREST | |
| Connect No's/Reports: | | **PROPERTY IN CUSTODY REPORT** | | |
| Report of: X Property in Custody ___ Rec. Stolen Property | | | Reported: 03/31/2008   15:07 | Destroy: |
| Location : | | | | Grid: |

**PERSONS**

| X Owner | Name DEPUTY CUDDEFORD ASSISTED, | | Sex | Date of Birth / / | |
|---|---|---|---|---|---|
| ___ Reporting Party ___ Victim | | | | | |
| ___ Finder | Name HOLLINGSWORTH, JORDEN TIMOTHY | | Sex M | Date of Birth 08/01/1997 | Residence Phone 503- |
| X Suspect | Address 19903 SE LELAND RD  OREGON CITY OREG, ON | | | | Business Phone |

**VEHICLE**

| License Number | State | Vehicle Identification Number | Veh. Year | Make | Model | Style | Color |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Towed By | | | Towed To | | | | |

**PROPERTY CLASSIFICATION**

Was the property seized under a search warrant?    X Evidence    ___ Contraband    ___ Found Property    ___ Safekeeping    ___ Hold for Processing

**PROPERTY INVENTORY**

For further forfeiture information, contact: Office of County Council, 906 Main St., Oregon City, OR 97045, 655-8362

| Item Number | Type Item | Serial Number | Brand/Make | | |
|---|---|---|---|---|---|
| 1 of 1 | PHOTO CD | | MAGNAVOX | | ___ Released |
| Color | Owner Applied No. | Value $ 0.00 | Description | | ___ Tow Co. |
| Other Information | | | | | X Prop. Rm. |

**Property Summary:**

Total line items for this report: 1

Total listed value of items for this report: $      0.00      Total Value

| Released To or Received From | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Received-Property Room mo day year initials 4 11 08 TY | Data Entered By | Reporting Officer(s) WILLARD DAVID EMMET | BPST 15645 | Agency CCSO | Shift 2 | Printed Date/Time 03/31/2008 18:52 | Approved | Data Entry |

Dec. 11. 2009 3:22PM   CLACK HOTLINE

*Poss Child Neglect* No. 4045

## Clackamas Child Welfare Cross Report Sheet
### DHS-Child Welfare  Phone: (971) 673-7112  Fax: (971) 673-7203

CONFIDENTIALITY NOTICE: The information contained in this facsimile may be confidential and legally privileged. If you have received this fax in error, please notify the sender immediately and destroy this cover sheet along with its contents.:

DATE  12-11-09         TIME  5:00 PM

Case Name **Mindy Hollingsworth/Solomon**  Case Number  **CC87701**

Number of pages (including cover

From: **CINDY MCGREGOR**                    Phone:  971-673-7112

| ☐ CCSO | ☒ Gladstone PD | ☐ Woodburn PD | ☐ WLPD | ☐ Molalla PD |
|---|---|---|---|---|
| FAX: 503-723-4874 | FAX: 503-650-8938 | FAX: 503-982-2370 | FAX: 503-656-0319 | FAX: 503-829-3461 |
| ☐ OCPD | ☐ Lake Oswego PD | ☐ Portland PD | ☐ Oregon State PD | ☐ CARES |
| FAX: 503-655-0530 | FAX: 503-697-7408 | FAX: 503-823-0052 | FAX: 503-731-3029 | FAX: 503-331-2405 |
| | ☐ Canby PD | ☐ Sandy PD | ☒ GRESHAM POLICE DEPT | |
| ☐ Milwaukie PD | FAX: 503-266-9316 | FAX: 503-668-4093 | FAX: | |
| FAX: 503-786-7436 | | | | |

After review of the information it was determined that the information met the criteria to be cross reported:

☐ The same day and will be assigned to a CPS worker for assessment.
   IR ___                                   5-DAY
Assigned Supervisor: Jennie Smith   Phone Number: 503-731-3404
   Tammy Young                           971 673 7200
☐ The same day, but will not be assigned.

☐ No later than ten days after receipt of the information and will be assigned to a CPS worker for assessment.

Assigned Worker:                          Phone Number:

☐ No later than ten days after receipt of the information and will not be assigned.

☐ As a follow up/supplemental cross report.
   Date of original cross report:   LEA Incident #:

OPTIONAL LEA Return Verification:
Date Report Received:  DEC 12 2009 .      LEA Incident #: 09-1420
Received By:
                                SGT. LAWRENCE
                                23731
☐ Case will not be assigned for investigation
☒ Assigned to: ADAMS/GRIFFITHS Phone#:
☐ Case is not within the jurisdiction of this LEA and has been forwarded to:

I:CW Forms/LEA fax form (Rev 9/26/07)

Sto Dec. 11. 2009. 3:22PM    CLACK HOTLINE  INTAKE REFERRAL                No. 4845   P. 2      mas   Branch
Department of Human Services                HOLLINGSWORTH, MINDY J.  CC87701 seq: 5          Children, Adults and Families

| | |
|---|---|
| Status:  Referred | ID Number: 113937800 |
| Information Taken By:  Cindy Mcgregor (03AN) | Case Number:  CC87701 |
| Assigned Worker:  TAMMY L YOUNG (03CA) | Response Time:  **5 Days** |
| Date Assigned:  12/11/2009 3:15 pm | |

**REFERRAL INFORMATION**     New Case: ☐     Re-Open: ☐     Update: ☐     Referral on Open Case: ☐

| | |
|---|---|
| SEQ #:  006 | Date & Time:  **12/11/2009 10:13 am**    Referral Type: Protective Service |
| Medium:  Phone | Perpetrator Type: Familial |
| Consultation:  With Supervisor | Consultation Date: 12/11/2009 3:15 pm |
| Explanation:  Carrie Adamson | |
| CPS Allegations:  *Neglect, Threat Of Harm* | |

**LEA INFORMATION**
| | |
|---|---|
| LEA Date/Time:       12/11/2009 3:30 pm | LEA Name & Rpt #:  Gladstone PD |
| Method of CW Cross Report to LEA: | Electronic transmission |

**FAMILY ADDRESSES:**       HOME                                              MAILING

| | | | |
|---|---|---|---|
| Bld/Apt: | | Bld/Apt: | |
| Street:  113 W HEREFORD | | Street: | |
| City:  GLADSTONE | State: OR   Zip: 97222 | City: | State:        Zip: |
| County  CLAC | Phone: (503)935-2801 x | | |
| Directions To Home | | | |

**FAMILY MEMBERS**   1087330

| PL | Name: | PT | Relationship | Sex | Ethnicity | Hisp. Origin | DOB | Social Security # | Where |
|---|---|---|---|---|---|---|---|---|---|
| A | HOLLINGSWORTH, MINDY J | AD | Self | F | White | Not Hispa | 03/28/1974 | 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 | I |
| | AKA:  SOLOMON, MINDY J; HOLLING ICWA: | Prime #: AMM5931B | | Tribe: | | | | Lang: EN - English | |
| B | HOLLINGSWORTH, JORDEN 0353 10/ | CH | Child | M | White | Not Hispar | 08/01/1993 | 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 | I |
| | AKA:  HOLLINGSWORTH, JORDEN T ICWA: | Prime #: CC87701B | | Tribe: | | | | Lang: EN - English | |
| C | STANLEY, SHAWN G | AP | No Relation | M | White | Unable to | 01/01/1980 | | U |
| | AKA:  STANLEY, SHAWN G        ICWA: | Prime #: CY100X4G | | Tribe: | | | | Lang: EN - English | |
| D | HOLLINGSWORTH, TANAEA | CH | Child | F | White | Not Hispar | 05/15/1996 | 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 | I |
| | AKA:  HOLLINGSWORTH, TANAEA H ICWA: | Prime #: CC87701D | | Tribe: | | | | Lang: EN - English | |

CAF-307A      Printed Time:      12/11/2009 3:16 pm      Printed By:      Cindy Mcgregor                    Page 1 of 5

Str Dec. 11. 2009  3:22PM    CLACK HOTLINE INTAKE REFERRAL         No. 4845   P. 3 xmas  Branch
Department of Human Services       HOLLINGSWORTH, MINDY J   CC87701 seq: 5        Children, Adults and Families

**REPORTER INFORMATION**

| | | |
|---|---|---|
| Name: Dawn Wade- Case worker | Type: Juvenile Court | Also a resource: No |
| Phone #: (503)655-3180 | Description: Work | |
| Street: Juvenile Dept | Building: Clackamas County | |
| City: Oregon City | State: OR   Zip: 97045 | |

* How does the reporter know the information and when did the reporter last see the child?

Juvenile Court worker, Dawn Wade has child on her case load for MIP-Alcohol and mother has abandoned the child.

Why is the reporter calling today, and does the reporter have suggestions about child's safety?

Mandatory reporter

**Intake Extensions**

| | | |
|---|---|---|
| Requested By: CINDY MCGREGOR | Request Date: 12/11/2009 3:14 pm | |
| Approved By: CARRIE ADAMSON | End Date: 12/14/2009 5:00 pm | |

Reason:

Staffing as 5-DAY

**GUIDED SCREENING NARRATIVE**

**\* Screening Decision**

*CPS assessment required within five calendar days:  Document what information indicates the child is unsafe and how the information indicates the child's safety will not be compromised by not responding within 24 hours.*

Staffed with supervisor, Carrie Adamson as up to 5-DAYS due to lack of supervision and access to drugs and being provided with drugs and alcohol.

LEA - Gladstone PD

**\* Report Summary**

*\*Summarize the reported information, including the type of alleged child abuse or neglect and the circumstances surrounding the alleged child abuse or neglect.*

Reporter is working with child, Jorden Hollingsworth (16) on an open MIP-Alcohol charge at the Clackamas County Juvenile Department. Reporter fears Jorden is falling through the cracks. He is basically raising himself.

Jorden contacted reporter on Wednesday, 12-9-09 and reported he is living with a 25 year old adult male, in an Gladstone apartment. Mrs Miller told reporter, the 25 year old's name is Johnny and he provides alcohol and "pot" for Jorden.

Reportedly, his mother, Mindy Solomon is not providing a stable home environment nor enforcing school attendance. Reporter has spoken with maternal grandmother, Deborah Miller (503) 935 7165),  several times on the case. But, Ms Solomon gets very upset any time Mrs Miller steps in to help. Mrs Miller has been able to get Jorden to his appointment to met his MIP requirements. Mrs Miller also updates reporter on the where abouts of mother and children.

Reportedly, Ms Solomon had dropped off both children, Jorden and daughter, Tanaea (13) with Mrs Miller for long periods of time, then takes them back when she upset with Mrs Miller. Mrs Miller has expressed concerns for Jorden as he is diagnosed with Bi-Polar and was given 5 prescriptions to get filled. Ms Solomon refused to fill them due to lack of funds. Mrs Miller believes this leads Jorden to self-medicate and use "pot" and alcohol.

Reporter stated, each time Ms Solomon has given reporter a new phone contact, it gets

Ste                                                          mas    Branch
Department of Human Services         HOLLINGSWORTH, MINDY J  CC87701 seq: 5              Children, Adults and Families

disconnected within a week. Thus, no contact phone for her. She remains living at 113 W Hereford, Gladstone, Oregon. Reporter learned from Ms Solomon that she has medical issues. Mrs Miller confirmed that and stated, that Ms Solomon keeps Tanaea home from school to be with Ms Solomon.

Mrs Miller told reporter the children's Aunt, Trisha Miller (23) (503 473 7680) is willing to care for the children. She is hearing impaired. Mrs Miller stated, Trisha could provide a safe and stable home life for the children. But, Ms Solomon will not allow it, yet she doesn't even keep track of Jorden.

* **Identified Persons**

*Alleged victim's name, age and current location.*

Name: JORDEN HOLLINGSWORTH Age: 16

Name: TANAEA HOLLINGSWORTH Age: 13

*Parent and caregiver's name and current location.*

Maternal grandmother: Deborah J Hollingsworth, DOB: 3-29-53
19903 S Leland Rd, Oregon City, OR 97045

Mother, Mindy Hollingsworth, aka: Solomon

113 W Hereford, Gladstone, OR 97027
PO BOX 1057, Clackamas, OR 97015

Maternal Aunt, Trisha M Miller, aka: Hixon, DOB: 3-6-85

Father of Jorden, Justin H Gordon, PO Box 249, Medford, OR 97501
Father of Jorden, Shawn G Stanley
*Active child support
4524 SE Pennywood Dr, Portland, OR 97222
Employment: Schwabe/Williamson/Wyatt, 1211 SW 5th Ave, Portland, OR 97204
Father of Tanaea, Jalson Anderson, CRCI, 9111 NE Sundrland Ave, Ptld, OR 97211
* Active child support

**Perpetrator/Suspect**

*Who is/are the alleged perpetrator(s)? What is their relationship & access to the child?*

Mother, Mindy J Soloman , aka: Holtingsworth in the home with full access to the child.

Lives at:

113 W Hereford St
Gladstone, OR 97027
503-935-2801

**Child Vulnerabilities**

*For each alleged child victim describe how the child is reported to be vulnerable.*

Mother as child, self as Deborah Hollingsworth, AMM5931, exspouse,David Hollingsworth, DOB: 1-26-51
No founded referrals.

Ste Dec. 11. 2009 3:22PM    CLACK HOTLINE   **INTAKE REFERRAL**     No. 4845   P. 5  kmas.   Branch

Department of Human Services     **HOLLINGSWORTH, MINDY J   CC87701 seq: 5**     Children, Adults and Families

**CPS HX continued**

CAS 3/25/08 - Concerns about Jorden being homeless.

CAS 1/24/08 - Concerns about Jorden not residing with his mother as she was evicted. Child residing with his aunt.

CAS 1/9/07 - Report Ms. Hollingsworth did not want to care for Jorden due to his "high needs."

CAS 8/9/06 - Police completed a welfare check as Jorden was accused of being a "child molester."

REF #2: "Founded for Threat of Harm: Neglect to Mindy Hollingsworth. There is reasonable cause to believe that the mother's addiction to prescription medication has placed her 9 and 12 yr old children at threat of substantial harm..."

REF #1: Due to the age of the referral this screener was unable to obtain any additional information.

**\* CPS History**

*\*CPS History and Pattern of Abuse*

| I/R. | Date | Status | Seq | Wkld | TP | Source | Asmt Date | Rpt Disp | Categories |
|------|------|--------|-----|------|----|--------|-----------|----------|------------|
| I | 10/20/2009 | Closed at Screening | | 03AN | | | | | |
| I | 07/07/2009 | Closed at Screening | | 03AD | | | | | |
| R | 04/14/2009 | Completed | 004 | 78AL | PS | POLICE | 06/05/2009 | UNFOUNDED | |
| R | 09/16/2008 | Completed | 003 | 78BG | PS | JUVENILE C | 10/14/2008 | Unable To Locate | |
| I | 03/25/2008 | Closed at Screening | | 03AS | | | | | |
| I | 01/24/2008 | Closed at Screening | | 48CF | | | | | |
| I | 01/09/2007 | Closed at Screening | | 03AN | | | | | |
| I | 08/09/2006 | Closed at Screening | | 48CP | | | | | |
| R | 11/07/2005 | Completed | 002 | 49CS | PS | MEDICAL | 12/14/2005 | FOUNDED | THR |
| R | 02/04/1994 | Completed | 001 | 03AD | PS | MEDICAL | 02/04/1994 | UNFOUNDED | |

7/09-CAS; Neglect of children by mother, Mother where about are unknown. Duplication information from 4/09 which is unfounded.

4/09 - Unfounded ; PHY; Ms. Hollingsworth and Jorden both report they were involved in a physical altercation in which Jorden ended up with a scratch on his neck. By the time DHS responded the scratch was gone and no injury was visible. Both of them report a mutual altercation and it does not appear it was anyones intent to cause an injury.

**Self Sufficiency**

*Current self sufficiency case & worker?*

OPEN 0303 NC

Mother, Mindy Hollingsworth, aka: Solomon

Children:

Jorden Hollingsworth (16)

Tanaea Hollingsworth (13)

113 W Hereford, Gladstone, OR 97027

PO BOX 1057, Clackamas, OR 97015

09-14220

St Dec. 11. 2009  3:23PM     CLACK HOTLINE  INTAKE REFERRAL                    No. 4845   P.  6mas   Branch
Department of Human Services              HOLLINGSWORTH, MINDY J   CC87701 seq: 5          Children, Adults and Families
    OPEN 0302 EX
    Maternal grandmother: Deborah J Hollingsworth, DOB: 3-29-53
    CHILD:
    Royal S Miller DOB 1-28-90
    address:
    19903 S Leland Rd, Oregon City, OR 97045
    PO BOX 1057, Clackamas, OR 97015

CAF-307A        Printed Time:     12/11/2009 3:18 pm     Printed By:     Cindy Mcgregor                        Page 5 of 5

EXHIBIT 125, Page 17 of 144
Case No. 3:20-cv-01567-MC

000219

| GLADSTONE POLICE DEPT | INVESTIGATION REPORT | | 3141 | PAGE/OF 1/4 |
|---|---|---|---|---|

**CASE NUMBER** 10-000219

**REFER CASE NUMBER**

**CLASSIFICATION** Menacing 0415

**DATE / TIME REPORTED** 03/01/10     1321

**DATE / TIME OCCURRED (START)** 03/01/10     1300

**DATE / TIME OCCURRED (END)** 03/01/10     1321

☒ RADIO (R)   ☐ S4 (S)
☐ PHONE (P)
☐ PHONE-IN (P)

**LOCATION OF OCCURRENCE** 113 W. Hereford, Gladstone OR 97027

**PREMISE TYPE** 100 - Dwelling, Residence

**PRECINCT OF OCCURRENCE**

**ONE SENTENCE SUMMARY OF INCIDENT**
Juvenile, JORDEN HOLLINGSWORTH committed Menacing while armed & Interfered w/making 911 report.

**PERSONS** BU - Business Complainant  KN - Person w/Knowledge  OW - Owner  PF - Property Finder  SB - Subject  RP - Reporting Person  VI - Victim  WI - Witness

| | CODE | NAME (Last, First Middle) | | CRN | SEX | RACE | DOB |
|---|---|---|---|---|---|---|---|
| COPIES | VI | SOLOMON, MINDY JEAN | 10-2133 | | F | W | 032874 |

☐ CP
☐ DA
☐ DHS
☐ DET
☑ JUV
☐ P&P

**HOME ADDRESS** SA. above

**CITY**

**STATE**

**ZIP**

**HOME PHONE** n/a

**BUSINESS/SCHOOL ADDRESS** n/a

☐ WORK PHONE  ☐ MSG. PHONE  **MOBILE PHONE** 503-422-1354

| CODE | NAME (Last, First Middle) | | CRN | SEX | RACE | DOB |
|---|---|---|---|---|---|---|
| WI | HOLLINSGWORTH, TANAEA MARIE | | | F | W | 051596 |

**HOME ADDRESS** SA. above

**CITY**

**STATE**

**ZIP**

**HOME PHONE**

**BUSINESS/SCHOOL ADDRESS**

☐ WORK PHONE  ☐ MSG. PHONE  **MOBILE PHONE**

| CODE | NAME (Last, First Middle) | | CRN | SEX | RACE | DOB |
|---|---|---|---|---|---|---|
| KN | MILLER, DEBORAH JEAN | | | F | W | 032952 |

**HOME ADDRESS** 19903 S. Leland Rd.

**CITY** Oregon City

**STATE** Oregon

**ZIP** 97045

**HOME PHONE** 503-935-7165

**BUSINESS/SCHOOL ADDRESS**

☐ WORK PHONE  ☐ MSG. PHONE  **MOBILE PHONE**

**X1,X2, - X9 - SUSPECTS** MI - Missing  RW - Runaway  DK - Drunk  DE - Deceased  AS - Attempt Suicide  ME - Mental

| CODE | NAME (Last, First Middle) | | CRN | SEX | RACE | DOB |
|---|---|---|---|---|---|---|
| XV | HOLLINGSWORTH, JORDEN TIMOTHY | | 253101 | M | W | 080193 |

**HOME ADDRESS** SA. above

**CITY**

**STATE**

**ZIP**

**HEIGHT** 5'8

**WEIGHT** 145

**HAIR** BLK

**EYES** BRO

**CUSTODY?** ☑ YES ☒ NO

**AKA/MONIKER**

☐ WRK PHN ☑ MSG PHONE  503-4221354

**MOBILE PHONE**

**HOME PHONE**

**OTHER DESCRIPTION**

**VEHICLE** S - Stolen  R - Recovered  L - Locate  A - Abandoned  T - Towed  V - Victim's Vehicle  X - Suspect Vehicle

**IDENTIFICATION DIVISION NOTIFIED?** ☐ YES ☐ NO

**OUTSIDE AGENCY NOTIFIED/REFERRED TO?**

**COMPUTER ENTRY**

☐ Person

☐ Vehicle

☐ Crime/Prop

**PROPERTY**    S - STOLEN    L - LOST    F - FOUND    D - DAMAGED    K - SAFEKEEPING    R - RECOVERED    E - EVIDENCE

**NARRATIVE** - The order of appearance for additional information will be:

ITEM 1: N/A

ITEM 2: N/A

ITEM 3: N/A

ITEM 4: ADDITIONAL WORTHLESS DOCUMENTS - Record multiple worthless documents on a fraud supplemental form. Record in the narrative the total number of worthless documents written.

ITEM 5: N/A

ITEM 6: ADDITIONAL OFFICERS - List all officers present and identify their involvement with the incident being reported.

ITEM 7: SUMMARY - A short summary is necessary if the narrative is more than one full page in length.

ITEM 8: NARRATIVE - List in chronological order, all of the relevant details of the incident and/or elements of the crime or violation.

**NARRATIVE**

On Mon. 030110 Sgt. WAYNE LAWRENCE, Det. DAVID PLUMMER & I responded to the Del Mar Apts. on 911 disturbance call.

**REPORTING OFFICER(S)** M. Adams

**DPSST** 16477

**PREC / DIV**

**RLF / SHIFT**

**ASSN / DIST**

**SUPERVISORS SIGNATURE** SGT. WL
#253131

GPD-CX-1 10/84

787 (05/07)

EXHIBIT 125, Page 18 of 144
Case No. 3:20-cv-01567-MC

| 10-000219 | GLADSTONE POLICE DEPT | INVESTIGATION REPORT | PAGE/OF 2 / 4 |

Tenant, MINDY SOLOMON reported her 16 year old son, JORDEN HOLLINGSWORTH was armed with a knife and had threatened to kill her.

CCOM details were limited as caller was reportedly hysterical, (CAD 387).

At Approx. 1321Hrs. we arrived on scene. I took a position along side the apartment, left of the front door, Taser at the ready.

Sgt. LAWRENCE and I am familiar with this residence from recent domestic disturbance, JORDEN being out of control

As Sgt. LAWRENCE made arrangements for a phone call inside, I could hear banging, a woman scream and a young male's voice shout, "I'll fucking kill you!"

I knocked and announced at the front door.

It opened and JORDEN was ordered outside and was detained in handcuffs without incident.

I went inside and found MINDY and her 13 year old daughter, TANAEA inside.

MINDY SOLOMON appeared terrified, she was crying, and breathing hard enough that at first speech was difficult.

She was cooperative, I had her sit on the living room love seat, where she sobbed and calmed.

I determined neither occupant were injured.

I checked the apartment interior to confirm no others were present.

I saw a floor fan broken, lying in the small hall, food splattered (tarter sauce) on JORDEN's bedroom wall and corresponding bottle on bedroom floor.

JORDEN's bedroom was messy, it was unclear what else may have been damaged or strewn about.

I questioned MINDY SOLOMON alone.

I learned JORDEN had been acting up overnight.

MINDY said he had been in great pain from a dental problem.

She displayed a small black handle paring knife that JORDEN had overnight, in apparent attempt to fix his dental pain himself, (he had not actually done so).

She said he was very angry, claiming his mother wasn't doing enough to help him.

MINDY told me they had been in route this morning to an emergency dental appointment, but that JORDEN became too angry and disruptive in his grandmother's car, (DEBORAH MILLER), that he was kicked out, and eventually walked home.

MINDY described JORDEN and yelling and striking the vehicle seatback, in anger, and couldn't be reasoned with.

She recalled JORDEN saying, "I'm gonna fucking kill you guys!"

I learned JORDEN had been diagnosed as bi-polar, however he refuses counseling and/or medications.

I was told he does not attend school nor work.

MINDY mentioned attempts to get JORDEN a medical marijuana card to help with his anger issues.

MINDY SOLOMON said she and TENEA were home when JORDEN came back and the situation quickly escalated.

She said JORDEN was screaming and pacing from room to room, knocking items about.

She said he broke the floor fan.

I asked specifically about the reported knife.

I was shown a kitchen drawer, containing one large, wooden handle single edge knife.

Both mother and daughter identified it as the one JORDEN had used this morning, to threaten MINDY.

**COPIES**
- ☐ CP
- ☐ DA
- ☐ DHS
- ☐ DET
- ☐ JUV
- ☐ P&P
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐

**COMPUTER ENTRY**
- ☐ Person

OPR
- ☐ Vehicle

OPR
- ☐ Crime/Prop

OPR
- ☐ Book

OPR

| REPORTING OFFICER(S) | DPSST | PREC / DIV | RLF / SHIFT | ASSN / DIST | SUPERVISOR'S SIGNATURE |
| A Adams | 164 | 75 | | | SGT. WL |

GPD-C-1-10/84

| GLADSTONE POLICE DEPT | INVESTIGATION REPORT | PAGE/OF 3 / 4 |
|---|---|---|

**CASE NUMBER:** -000219

TANEA said she saw JORDEN put the knife back in the drawer, after he learned police had been called.

I asked MINDY where/how JORDEN was positioned while armed with this knife.
MINDY demonstrated she was seated on the love seat, with JORDEN standing over her, knife held in his hand, at his side, blade pointing out.

I asked what JORDEN said?
MINDY replied, JORDEN repeatedly stated, "I'm gonna fuck'n kill you!"
She estimated he yelled it directly at her about 5 times.
MINDY said she was so frightened she cowered/covered her head in her hands, not able to look directly at JORDEN.
MINDY sobbed, and added, This was the "First time I ever really thought he was going to kill me."

I asked MINDY what she thought motivated such anger?
She replied, his belief she didn't care about him.
MINDY was unable to estimate the time period this occurred, but agreed the threats lasted about 20-30 minutes.
She agreed this was likely the worst JORDEN has ever acted.
At one point she became apologetic, referred to his dental pain making him crazy.

I asked about the interrupted 911 call?
MINDY said she was the one who called, using her cell phone.
She said as she was on the line with dispatcher, JORDEN became enraged and grabbed her phone, ending the call.
I asked, and MINDY said yes, JORDEN knew she was calling for the police, which made even angrier.
She said JORDEN then returned the knife to the drawer.

MINDY SOLOMON said TANAEA was in the living room and eyewitness to the above actions.
MINDY said they were both crying.
She said, JORDEN never approached TANAEA with the knife nor threatened her.

I then spoke alone w/TANAEA, who gave a similar consistent account.
She heard JORDEN calling their mother the "c word" & "bitch".
She saw him standing over her mother with the knife.
TANAEA described JORDEN as holding the knife up at shoulder height, blade toward his mother as she was seated.
TANAEA said she heard JORDEN threaten to "kill" her mother more than once.
TANAEA presented her mother's red cell phone JORDEN had thrown on his bed.
I saw it was undamaged, and MINDY displayed both the initial 911 call and subsequent disconnect about 1 minute apart.
MINDY SOLOMON explained her phone required pressing * and # to disconnect 911 emergency calls, as indicated by the second entry on the phone.

Det. PLUMMER took photos, seized both knives, and read JORDEN the Miranda warnings.

I provided MINDY SOLOMON DV card, w/case number, and written statement form for her to complete.
I explained the abuse prevention statute and joined other units outside, where JORDEN was secured in my car.

**COPIES**
☐ CP
☐ DA
☐ DHS
☐ DET
☐ JUV
☐ P&P
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐

**COMPUTER ENTRY**
☐ Person
OPR
☐ Vehicle
OPR
☐ Crime/ Prop
OPR
Jak
OPR

| REPORTING OFFICER(S) Ty ADAMS | DPSST 16477 | PREC / DIV | RLF / SHIFT | ASSN / DIST | SUPERVISOR'S SIGNATURE #25731 |
|---|---|---|---|---|---|

GPD-C-1-0/84                                                                                           767 (08/07)

| GLADSTONE POLICE DEPT | INVESTIGATION REPORT | PAGE/OF 4 / 4 |
|---|---|---|

CASE NUMBER: 10-000219

By now JORDEN HOLLINGSWORTH had calmed down.
I saw he had been crying.
He complained we had this all wrong, but said, "I'll do the time."

I confirmed with JORDEN he had been read and understood his Miranda.
He replied, "Yeah."
I told him it was his choice to speak with me.
He complained it wouldn't do any good, but then said "yeah" he would talk w/me.

JORDEN HOLLINGSWORTH admitted "yeah" he broke the fan.
He said he was angry and upset, saying he was in great tooth pain and complained nobody would help him.
I asked about the substance on his wall, JORDEN admitted it was "tater sauce" he'd thrown.

JORDEN HOLLINGSWORTH denied threatening his mother or sister, either by word or conduct.
JORDEN denied ever arming himself with a kitchen knife.
He said the only knife he had was the paring knife the previous night so he could work on his tooth.
JORDEN acknowledged being aware the police had been called, but denied preventing his mother from calling 911.
He claimed he wanted her cell only so he could call his grandma apparently for a ride.

I then confronted JORDEN that I had specifeially heard him yell, "I'll fucking kill you!" while I was standing outside his apartment.
He replied, "No you didn't!"

I asked if he ever gets so angry he cant' control himself?
JORDEN replied, "Yeah" and acknowledged this was about the worst.
I asked if he ever gets so angry he can't recall what he may have done or said?
JORDEN replied, "Yes."

I asked JORDEN to rate his level of anger today on 1-10 scale, (10 being most extreme) JORDEN replied, "9".

I transported JORDEN to JCR without incident and cleared w/this report.

COPIES
☐ CP
☐ DA
☐ DHS
☐ DET
☐ JUV
☐ P&P
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐

COMPUTER ENTRY
☐ Person
OPR
☑ Vehicle
OPR
☐ Crime/ Prop
OPR
☐ Book
OPR

| REPORTING OFFICER(S) | DFSST | PREC / DIV | RLF / SHIFT | ASSN / DIST | SUPERVISORS SIGNATURE SGT. WL |
|---|---|---|---|---|---|
| | 16477 | | | | #23791 |

GPD-C-1-10/84

787 (08/07)

OG15

**GLADSTONE POLICE DEPARTMENT**
535 Portland Avenue, Gladstone, OR
**CUSTODY REPORT**

DISTRIBUTION: ☐ D.A.  ☒ Juv.  ☐ Sgt.  ☐ Det.
☐ D/C  ☐ M/C  ☐ Court
CONNECT NO'S/REPORTS

INCIDENT NO. 10-0219
BOOKING NO.

**ARRESTED**

| ARREST DATE | ARREST TIME | BOOKING DATE | BOOKING TIME | ARREST LOCATION |
|---|---|---|---|---|
| 1324 | 03 01 10 | 03 01 10 | 113s Address Herford ST Gladstone OR |

NAME: Last Hollingsworth First Jordan Middle Timothy ☐ Alias: ☐ Nickname:

RESIDENCE Street 113 W Herford ST City Gladstone State OR  RES. PHONE  BUS. PHONE

EMPLOYER  OCCUPATION N/A  BUSINESS ADDRESS  City  State

ILLNESS/INJURY Severe Toothache  MEDICATION None  DOCTOR'S NAME

MARITAL STATUS: ☒ Single ☐ Divorced ☐ Married ☐ Separated  NOTIFY IN EMERGENCY: Mindy Solomon  Address S/A  Phone

**DESCRIPTION**

| D.O.B. 8 11 93 | SEX ☒ Male ☐ Fem. | HT. 6 8 | WT. 145 | P.O.B. Milwaukie State/Co. OR | SS No. (unk.) | DRIVER'S LICENSE Number State |
|---|---|---|---|---|---|---|

| A Race | B Eye Color | C Hair Color | D Hair Length | F Hair Style | G Facial Hair | H Build |
|---|---|---|---|---|---|---|
| 1 ☒ White | 1 ☒ Brown | 1 ☐ Black | 1 ☐ Bald | 1 ☐ Wig | 1 ☐ None | 1 ☐ Small |
| 2 ☐ Black | 2 ☐ Blue | 2 ☒ Brown | 2 ☒ Short | 2 ☐ Wavy/Curly | 2 ☒ Unshaven | 2 ☒ Thin |
| 3 ☐ American Indian | 3 ☐ Hazel | 3 ☐ Red | 3 ☐ Medium | 3 ☐ Straight | 3 ☐ Sideburns | 3 ☐ Medium |
| 4 ☐ Oriental | 4 ☐ Green | 4 ☐ Gray | 4 ☐ Shoulder | 4 ☐ Bushy | 4 ☐ Mustache | 4 ☐ Large |
| 5 ☐ Hispanic | 5 ☐ Gray | 5 ☐ White | 5 ☐ Long | 5 ☐ Ponytail | 5 ☐ Fu Manchu | 5 ☐ Heavy |
| 6 ☐ Other: | 6 ☐ Other: | 6 ☐ Lt. Blond | | 6 ☐ Afro/Natural | 6 ☐ Goatee | 6 ☐ Muscular |
| | | 7 ☐ Other: | E Hair Type | 7 ☐ Greasy/Dirty | 7 ☐ Full Beard | 7 ☐ Other: |
| | | | 1 ☐ Fine | 8 ☐ Styled/Processed | 8 ☐ Other: | |
| | | | 2 ☒ Coarse | 9 ☐ Braids | | |
| | | | 3 ☐ Thick | 10 ☐ Other: | | |
| | | | 4 ☐ Thinning | | | |
| | | | 5 ☐ Other: | | | |

| I Complexion | J Teeth | L Gen. Appear. | M Speech | N Miscellaneous | O Scars - Marks - Tattoos | P |
|---|---|---|---|---|---|---|
| 1 ☐ Dark | 1 ☐ Missing | 1 ☒ Casual | 1 ☐ High Pitch | 1 ☐ Weapon | 1 ☐ Name/Initials | 1 ☐ Head/Neck |
| 2 ☐ Medium | 2 ☐ Gold/Silver | 2 ☐ Dirty | 2 ☐ Low Pitch | 2 ☐ Martial Arts | 2 ☐ Mother/Lover | 2 ☒ Shoulder/Bicep |
| 3 ☒ Light | 3 ☐ Decayed/Dirty | 3 ☐ Disguise | 3 ☐ Nasal | 3 ☐ Apologetic | 3 ☐ Heart/Dagger | 3 ☐ Forearm/Hand |
| 4 ☐ Pale | 4 ☐ Other: | 4 ☐ Fleshy | 4 ☐ Raspy | 4 ☐ Calm | 4 ☐ Military Insignia | 4 ☐ Fingers |
| 5 ☐ Freckled | | 5 ☐ Good-looking | 5 ☐ Accent | 5 ☐ Nervous | 5 ☐ Misc. Pictures | 5 ☐ Leg/Foot |
| 6 ☐ Acne | K Glasses | 6 ☐ Well-groomed | 6 ☐ Rapid | 6 ☒ Angry/Violent | 6 ☒ Homemade Tattoo | 6 ☐ Chest/Stomach |
| 7 ☐ Pock-marked | 1 ☐ Plain-Wire | 7 ☐ Other: | 7 ☐ Polite | 7 ☐ Greasy/Dirty | 7 ☐ Missing Extremity | 7 ☐ Back |
| 8 ☐ Ruddy | 2 ☐ Sun-Wire | | 8 ☐ Speech Impediment | 8 ☐ Uncooperative | 8 ☐ Scar(Lg) - (Sm.) | 8 ☐ Eye |
| 9 ☐ Tanned | 3 ☐ Plain-Plastic | | 9 ☒ Other: crazy(ns) | 9 ☒ Odor | 9 ☐ Birth Mark | 9 ☐ Other: |
| 10 ☐ Other: | 4 ☐ Sun-Plastic | | | 10 ☐ Other: | 10 ☐ Other: | |

Tattoo - Rt Arm "JTH"
Pierced Ear

OTHER DESCRIPTION: Blk Tank Top  Gry Sweats

**JUV.**

PARENT/GUARDIAN: Mindy Solomon  ADDRESS: Street a/N/A  City  State  RES. PHONE 503-422-1354  BUS. PHONE

PARENT NOTIFIED BY: Name (on scene)  Date  AUTHORIZING AGENT  DISPOSITION

**CHARGES**

| ☒ Charge ☐ Hold | Menacing APA Felon | BAIL | ☐ Circ. ☐ Mun. ☐ Dist. ☐ Fed. ☒ Juv. ☐ Par. | JURISDICTION Clackamas |
|---|---|---|---|---|
| ORS 163.190 | NCIC | ☐ Warrant No. ☐ Citation No. ☒ P/C | | PAROLE/PROB. OFF. |

| ☒ Charge ☐ Hold | Interfer w/ making 911 Report | BAIL | ☐ Circ. ☐ Mun. ☐ Dist. ☐ Fed. ☐ Juv. ☐ Par. | JURISDICTION Clackamas |
|---|---|---|---|---|
| ORS 165.572 | NCIC | ☐ Warrant No. ☐ Citation No. ☒ P/C | | PAROLE/PROB. OFF. |

| ☐ Charge ☐ Hold | | BAIL | ☐ Circ. ☐ Mun. ☐ Dist. ☐ Fed. ☐ Juv. ☐ Par. | JURISDICTION |
|---|---|---|---|---|
| ORS | NCIC | ☐ Warrant No. ☐ Citation No. ☐ P/C | | PAROLE/PROB. OFF. |

**VEHICLE**

VEHICLE Year Make  Model  Style  ☐ Vehicle Color ☐ Two-Tone
LICENSE NO.  STATE  ☐ Towed ☐ At Scene

| Vehicle Color | | Special Vehicle Features | |
|---|---|---|---|
| 1 ☐ Black | 14 ☐ Gray | 1 ☐ Keys in Vehicle | 14 ☐ Damage - Rear |
| 2 ☐ Blue | 15 ☐ Silver | 2 ☐ CB Antenna | 15 ☐ Damage - Left |
| 3 ☐ Aqua | 16 ☐ Red | 3 ☐ Special Antenna | 16 ☐ Damage - Right |
| 4 ☐ Turquoise | 17 ☐ Pink | 4 ☐ Vinyl Top | 17 ☐ Sticker/Decal - Window |
| 5 ☐ Brown | 18 ☐ Maroon | 5 ☐ Loud Muffler | 18 ☐ Sticker/Decal - Body |
| 6 ☐ Bronze | 19 ☐ White | 6 ☐ Custom Wheels | 19 ☐ Sticker/Decal - Bumper |
| 7 ☐ Tan | 20 ☐ Cream | 7 ☐ Rust | 20 ☐ Painted Sign - Body |
| 8 ☐ Copper | 21 ☐ Yellow | 8 ☐ Level Altered | 21 ☐ Other: |
| 9 ☐ Beige | 22 ☐ Orange | 9 ☐ Glass Damage | |
| 10 ☐ Purple | 23 ☐ Gold | 10 ☐ Tinted Glass | |
| 11 ☐ Green | 24 ☐ Primered | 11 ☐ Special Interior | |
| 12 ☐ Lime | 25 ☐ Other: | 12 ☐ Decorative Paint | |
| 13 ☐ Olive | | 13 ☐ Damage - Front | |

LOCATION TOWED

☐ Inventoried ☐ Drivable
☐ Release Required ☐ Hold

OTHER INFORMATION:

REPORTING OFFICER Robert Adams  BPST NO. 1647  AGENCY GPD  APPROVED 23731  SGT. VR

DCH-CG35

EXHIBIT 125, Page 22 of 144
Case No. 3:20-cv-01567-MC

I have arrested the defendant in police custody for the charges listed above. In addition, I will testify as a witness against the defendant; and I will appear at the District Attorney's office to sign a complaint if requested. I will save harmless, indemnify, and defend Clackamas County, and its officers, agents and employees from any and all claims for damage of any kind, nature, and description arising out of my arrest and delivery of this person.

I have arrested the defendant on behalf of _____

with whom my relationship is _____

Signature: _____    Date: _____    Time: _____

RESPONDED ON DOMESTIC DISTURBANCE, MOM (MINDY) REPORTS 16 YOA SON ARMED & THREATENING W/ KNIFE. 911 CALL INTERRUPTED BY JUV. (JORDEN) SUSPECT, TAKING THE HER CELL PHONE, & THREATS TO KILL HER FOR CALLING POLICE.

I AM FAMILIAR W/ FAMILY FOR SIMILAR DV CALLS. UPON POLICE ARRIVAL ON SCENE LOUD YELLING & BANGING HEARD. I SPECIFICALLY HEARD JUV. MALE STATE " I'LL FUCKING KILL YOU!" TO OCCUPANTS INSIDE APT.

2 KNIVES RECOVERED @ SCENE & IDENTIFIED BY VICTIM(S). DISTURBANCE WITNESSED BY 13 YOA SISTER, WHO ALSO SAW JORDEN W/ KNIFE. BOTH MOTHER & SISTER CRYING. MOM STATES SHE COWERED FEARING SHE WAS ABOUT TO BE KILLED AS JORDEN STOOD OVER HER W/ LARGE KITCHEN KNIFE IN HAND.

POST MIRANDA JORDEN CALMS BUT DENIES SAME, ADMITS TO ANGER ISSUES RESULTING IN ACTION HE CANT RECALL / CONTROL.

Gladstone Police Department
535 Portland Ave. Gladstone, OR 97027
**MIRANDA WARNING**

Incident #
10 - 0219

**MIRANDA WARNING**

1. You have the right to remain silent.

2. Anything you say can and will be used against you in court.

3. You have the right to consult a lawyer before any questioning and have a lawyer present during questioning.

4. If you desire a lawyer and cannot afford one, a lawyer will be appointed for you at public expense.

Anything you say must be freely and voluntarily said.

Do you understand these rights?

"*Yes*"

_____
(Answer)

CCF-DA25 (12/00)

**Warnings read or shown to:**

Hollingsworth, Jorden T
_____
(name)

on __3/1/10__          at __1325__
    (date)                    (time)

by  David Plummer  33548
_____
(peace officer)

**JOHN S. FOOTE**
**DISTRICT ATTORNEY**

| David Plummer    33548 | Approved by |
|---|---|

| CASE NUMBER 10-000219 | GLADSTONE POLICE DEPT | *FORCE DATA COLLECTION REPORT* | PAGE/OF 2 / 2 |
|---|---|---|---|

**NARRATIVE**

On 030110 Officer Adams, Det Plummer and I responded to the listed address on a domestic disturbance. Victim Solomon called 911 and reported that her son [suspect Hollingsworth] had threatened to kill her and was armed with a knife. The line then disconnected. Hollingsworth is known to me from prior contact.

Upon arrival we could hear yelling from inside the apartment. Officer Adams knocked on the door and then backed away to about 15-20 feet to the left of the door out of the direct sight line with a Taser at the ready. I was positioned about 20 feet away with my weapon at the ready near a tree with sight line inside the apartment and in a position to cover Officer Adams.

Victim Solomon opened the door. She was crying and appeared to be in distress. I directed her to step outside but she retreated back into the apartment. Almost immediately suspect Hollingsworth appeared at the door. With my weapon pointed at the suspect I directed him outside and then directed him into a prone position face down on the sidewalk. Suspect Hollingsworth complied with my commands and was cuffed and detained with the assistance of Det Plummer.

**COPIES**
- ☐ CP
- ☐ DA
- ☐ DHS
- ☐ DET
- ☐ JUCV
- ☐ P&P
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐
- ☐

**COMPUTER ENTRY**
- ☐ Desk

**DPSST**
- ☐ Person

**DPSST**
- ☐ Entry / Vehicle

**DPSST**
- ☐ Distribution

DPSST

| REPORTING OFFICER(S) | DPSST | PREC / DIV | RLF / SHIFT | ASSN / DIST | SUPERVISOR'S SIGNATURE |
|---|---|---|---|---|---|
| SGT W. Lawrence | 23731 | | 2 | | |

797 (11/07)
03-02-10 1048

EXHIBIT 125, Page 25 of 144
Case No. 3:20-cv-01567-MC

| OA | JUV | INV | DET | CHIEF | MH | CA | OCPD | **GLADSTONE POLICE DEPARTMENT** | **Inc. No.:** 10 — 0219 |
|----|-----|-----|-----|-------|----|----|------|---|---|
| SGT | CCSO | MCSO | PPB | ME | MC | CDC | DNS | 535 PORTLAND AVE.<br>GLADSTONE, OR 97027<br>(503) 557-2797 | Crime Classification/ORS:<br>Menacing (APA) |

OTHER

Innact No's/Reports:

**PROPERTY IN CUSTODY REPORT**

| Date of Seizure: | Time: | **Destroy:** |
|---|---|---|
| | | ☐ Yes ☐ No |

Report of: ☐ Property in Custody   ☐ Rec. Stolen Property   ☐ Receipt

Location Where Seized: 113 W Hereford St    Gladstone   OR   97027

**PERSONS**

| | Name (Last, First, Middle) | Sex | Date of Birth | Res. |
|---|---|---|---|---|
| ☐ Owner<br>☐ Rep. Party<br>☐ Victim | | | | Bus.<br>Other |
| ☐ Finder<br>☑ Suspect | Hollingsworth, Jorden Timothy | M | 8/1/93 | Res.<br>Bus.<br>Other |
| | Residence Address (Street, City, St, Zip)  S/A | | | |

**PROPERTY CLASSIFICATION**

Was the property seized under a search warrant? ☐ Yes ☑ No   ☑ Evidence   ☐ Contraband   ☐ Found Property   ☐ Safekeeping

**PROPERTY INVENTORY**

| Item Number | Type Item | Serial Number | Brand/Make | Size/Calibre | |
|---|---|---|---|---|---|
| 1 | Knife | | | Approx 9 inch | ☐ Released<br>☐ Tow Co.<br>☑ Prop. Rm. |
| Color: black | Owner Applied No. | | Description | | |
| Release To | | | Additional Information: on Dining Room Floor | | |
| 2 | Knife | | | Approx 12 inch | ☐ Released<br>☐ Tow Co.<br>☑ Prop. Rm. |
| Color: brown | Owner Applied No. | | Description: wood handle | | |
| Release To | | | Additional Information: Kitchen drawer | | |
| 3 | 1 Photo Disc | | | | ☐ Released<br>☐ Tow Co.<br>☑ Prop. Rm. |
| Color | Owner Applied No. | | Description: DIGITAL PHOTOGRAPHS OF SCENE | | |
| Release To | | | Additional Information: Vict & Suspect | | |
| Item Number | Type Item | Serial Number | Brand/Make | Size/Calibre | ☐ Released<br>☐ Tow Co.<br>☐ Prop. Rm. |
| Color | Owner Applied No. | | Description | | |
| Release To | | | Additional Information | | |
| Item Number | Type Item | Serial Number | Brand/Make | Size/Calibre | ☐ Released<br>☐ Tow Co.<br>☐ Prop. Rm. |
| Color | Owner Applied No. | | Description | | |
| Release To | | | Additional Information | | |
| Item Number | Type Item | Serial Number | Brand/Make | Size/Calibre | ☐ Released<br>☐ Tow Co.<br>☐ Prop. Rm. |
| Color | Owner Applied No. | | Description | | |
| Release To | | | Additional Information | | |

Released To or Received From: Mindy Sisomsouk

| Received-Property Room | | | | Date Entered by | Reporting Officer(s): Robert Adams | DPSST 16477 | Agency G80 | Shift | Approved SGT WA #23731 | Date Entry |
|---|---|---|---|---|---|---|---|---|---|---|
| mo | day | year | Initials | | | | | | | |

White - Property Room    Yellow - Records    Pink - Owner/Finder               CCP-CG42 (Rev. 6/08).

01/15/2019 TUE 13:49   Received: FAX                    Jan 15 2019 01:32pm            ☑010/014

# Lake County Sheriff's Office
## JAIL LODGING REQUEST

LCSO 701

| CASE NUMBER | CH |
|---|---|
| 19-0292 | |
| CAD NUMBER | DA INTAKE |
| # OF # PERSONS ARRESTED 1 OF 1 | PAGE NUMBER 1 |

**ARRESTED PERSON'S NAME:** JORDEN Timothy HOLLINGSWORTH

**DATE OF LODGING:** 060412   **TIME OF LODGING:** 1945HRS

**ARRESTED PERSON'S ADDRESS CITY, STATE, ZIP CODE:** 1170 S EST#3 LAKEVIEW OR 97630

**DATE OF BIRTH:** 080193   **SEX:** ☑M ☐F

| | CHARGE/WARRANT | COUNTS | CLASS | ORS | BAIL |
|---|---|---|---|---|---|
| 1 | ☑CHARGE ☐WARRANT ASSAULT IV D.V. | 1 | A/m | 163.160 | $2,500 |
| 2 | ☑CHARGE ☐WARRANT HARASSMENT | 1 | B/m | 166.065 | $1,500 |
| 3 | ☐CHARGE ☐WARRANT | | | | |
| 4 | ☐CHARGE ☐WARRANT | | | | |
| 5 | ☐CHARGE ☐WARRANT | | | | |
| 6 | ☐CHARGE ☐WARRANT | | | | |
| 7 | ☐CHARGE ☐WARRANT | | | | |
| 8 | ☐CHARGE ☐WARRANT | | | | |
| 9 | ☐CHARGE ☐WARRANT | | | | |
| 10 | ☐CHARGE ☐WARRANT | | | | |
| X | LOCATION OF ARREST | | | BAIL TOTAL $4,000 | |

**LODGING AUTHORITY** — Arresting/Lodging Deputy/Officer: One of the following four documents must be included with this lodging request or custody will not be accepted.

☑ PROBABLE CAUSE
☐ ARREST WARRANT
☐ P&P DETAINER
☐ COURT COMMITMENT

*Lodging Officer's signature below acknowledges one of these four documents is attached this request.*

**LODGING AGENCY**
☑ LAKE COUNTY SHERIFF
☐ LAKEVIEW POLICE
☐ OREGON STATE POLICE
☐ COMMUNITY CORRECTIONS
☐ BUREAU OF LAND MANAGEMENT
☐ US FOREST SERVICE
☐

### SUICIDE RISK ASSESSMENT
1. ☐YES ☑NO  Did the arrested person say anything else about wanting to die or kill themselves?
2. ☐YES ☑NO  Did the arrested person attempt to do any type of self destructive act?
3. ☐YES ☑NO  Did any of the arrested person's actions cause you to believe the person was a suicide risk?
4. ☐YES ☑NO  Do you have any concerns about the arrested person's mental health?
5. ☐YES ☑NO  Do you believe the arrested person may be a suicide risk now?

☐ IF YOU HAVE ANSWERED YES TO ANY OF THE FIVE QUESTIONS ABOVE, EXPLAIN YOUR ANSWER(S) HERE.
☐ ADD ANY ADDITIONAL INFORMATION OF WHICH CORRECTIONS PERSONNEL SHOULD BE AWARE.

SIGNATURE OF ☐ARRESTING ☑LODGING DEPUTY/OFFICER

PRINTED NAME AND IDENTIFICATION OF ARRESTING/LODGING DEPUTY/OFFICER: DANIEL TAGUE 4525   DATE SIGNED: 060412

SIGNATURE OF RECEIVING CORRECTIONS DEPUTY   PRINTED NAME AND IDENTIFICATION OF RECEIVING CORRECTIONS DEPUTY   DATE SIGNED

# Lake County Sheriff's
## JAIL LODGING REQUEST
NOTIFICATION REQUEST

SHERIFF USE   DISTRICT ATTORNEY

01/15/2019 TUE 13:49 FAX    Received:

Jan 15 2019 01:33pm    ☑011/014

*Lake County Sheriff's Office*

**NO CONTACT AND RELEASE
NOTIFICATION REQUEST**

LCSO
702

| | | CASE NUMBER | CH |
|---|---|---|---|
| | | 12-0292 | |
| | | CAD NUMBER | DA INTAKE |
| | | CASE NAME | PAGE NUMBER 2 |

| | ARRESTED PERSON'S NAME | | SEX | RACE | DOB | AGE |
|---|---|---|---|---|---|---|
| 1 | JORDEN TIMOTHY HOLLINGSWORTH | | m | | 080193 | 18 |
| 2 | PRIMARY ARREST CHARGE ASSAULT IV DV | | DATE LODGED 060412 | TIME LODGED 1945 | | |

| | | DOMESTIC VIOLENCE | ALCOHOL INVOLVED | CONTROLLED SUBSTANCE | MOTOR VEHICLE CRIME | DOMESTIC VIOLENCE | WARRANT | | | DOMESTIC TERRORISM |
|---|---|---|---|---|---|---|---|---|---|---|
| 3 | CORRECTIONS CATEGORY TRACKING ☐ IF APPLICABLE | ☑ | | | ☐ | | LOCAL | OUT OF COUNTY | OUT OF STATE | |

| | | | |
|---|---|---|---|
| A | ARRESTING DEPUTY / OFFICER RELEASE RECOMMENDATIONS | ☐ --- The operation of a motor vehicle was involved with this crime. A condition of release should be proper licensing. | |
| | | ☐ --- Alcoholic beverages or other intoxicants were involved or are believed to have been involved with this crime. A condition of release should be no use of alcoholic beverages or other intoxicants. | |
| | | ☑ --- Other persons were involved in this crime with this arrested person. Other persons may have been as other accused persons, as victims, and/or as witnesses. A condition of release should be no contact with the person(s) identified below. | |
| | | ☐ --- I have no basis to request any special release recommendations. | |
| | | ☐ --- | |

| | NO CONTACT LIST | THE INDIVIDUALS NAMED BELOW ARE PERSONS WHOM THE ARRESTED PERSON SHOULD HAVE NO CONTACT WITH | | | | | |
|---|---|---|---|---|---|---|---|
| B | ☑Vic ☐ Wit ☐ Subj ☐ | NAME OF PERSON FOR NO CONTACT TRISTA SAMANTHA LEE TOBIN | SEX F | DOB 053194 | AGE 18 | CONTACT PHONE |
| | ☐Vic ☐ Wit ☐ Subj ☐ | NAME OF PERSON FOR NO CONTACT | SEX | DOB | AGE | CONTACT PHONE |
| | ☐Vic ☐ Wit ☐ Subj ☐ | NAME OF PERSON FOR NO CONTACT | SEX | DOB | AGE | CONTACT PHONE |
| | ☐Vic ☐ Wit ☐ Subj ☐ | NAME OF PERSON FOR NO CONTACT | SEX | DOB | AGE | CONTACT PHONE |

A checkmark in this column ▶ | A | Indicates the individual has asked for notification when this arrested person is released from jail.
| | A | Is there any other person not on the "no contact" list who should be notified if the arrestee is released from custody? If yes, identify these persons below.

| | NAME OF PERSON TO BE NOTIFIED IF PERSON IS RELEASED | CONTACT PHONE | AGENCY OR REASON FOR NO CONTACT |
|---|---|---|---|
| C | | | |
| | NAME OF PERSON TO BE NOTIFIED IF PERSON IS RELEASED | CONTACT PHONE | AGENCY OR REASON FOR NO CONTACT |

Is there any specific address(es) or location(s) the arrested person is to have "no contact" with? If yes, identify these locations below.

| | ADDRESS | REASON FOR NO CONTACT |
|---|---|---|
| D | 1170 S. EST. #3 | ADDRESS OF VICTIM |
| | ADDRESS | REASON FOR NO CONTACT |

| | |
|---|---|
| E | If there is any additional information concerning the safety of victim(s) or witnesses of which the Corrections Staff should be aware or have made part of the release agreement, indicate this information here. |

SIGNATURE OF ☐ ARRESTING ☑ LODGING DEPUTY / OFFICER

PRINTED NAME AND IDENTIFICATION OF ARRESTING / LODGING DEPUTY / OFFICER
DANIEL TAGUE 45325

DATE SIGNED
060412

**Lake County Sheriff's
Office**
**NO CONTACT AND RELEASE
NOTIFICATION REQUEST**

| SHERIFF USE | DISTRICT ATTORNEY |
|---|---|
| | |

01/15/2019 TUE 13:49 FAX    Received:    Jan 15 2019 01:33pm    ☑012/014

Police No. 12-0292    Court No. _____

STATE OF OREGON    }
                    } SS.    PROBABLE CAUSE AFFIDAVIT
COUNTY OF LAKE     }

I, the undersigned police officer, after first being duly sworn upon oath do hereby affirm that the following information is true to the best of my knowledge and belief:

Name of Arrestee: JORDEN TIMOTHY HOLLINGSWORTH
Lodging Officer (print): DANIEL TAGUE    Agency: LAKE CO. S.O.
Date of Arrest: 060412    Time of Arrest: 1940 HRS
Crime(s) Alleged: ASSAULT IV, DV, HARASSMENT
Date of Crime(s): 060412
Location of Crime(s) in Lake Co.: 1170 S. E ST. #3
Brief summary of probable cause: DISPATCHED TO 1170 S.E #3 REGARDING A
DOMESTIC BETWEEN JORDEN HOLLINGSWORTH AND TRISTA TOBIN
(BOYFRIEND/GIRLFRIEND). JORDEN ADMITTED TO PUSHING TRISTA
AND GOING TO THE GROUND AND SHE WAS ON TOP OF
HIM AND HE BIT HER ON HER SIDE TO GET HER OFF
OF HIM. TRISTA SHOWED OFFICER HITE AND I THE
BITE MARK ON HER SIDE. TRISTA TOLD US THE OTHER
BRUISES WERE FROM FALLING ON THE STEPS.
JORDEN WAS ARRESTED AND LODGED WITHOUT INCIDENT.

_____ Additional statement is attached and incorporated herein.

_____
Police Officer

SUBSCRIBED AND SWORN to before me this _____ day of _____ 20____

_____
Clerk of the Court

_____ I find probable cause exists to believe the arrestee committed the crime(s).

_____ I find insufficient probable cause exists, based on the information provided herein.

_____    _____    _____
Judge                        Date                 Time

_____ Defendant released before probable cause determination.

_____    _____    _____
Corrections Officer          Date                 Time

F01221    White - Court    Yellow - D.A.    Pink - Jail    Goldenrod - Arresting Agency

EXHIBIT 125, Page 29 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:35 FAX    Received:    Jan 15 2019 01:18pm    ☑002/014

LAKE COUNTY DISTRICT ATTORNEY'S OFFICE
**INTAKE / DISCOVERY FORM**

This is submission number

o1DT

by me concerning this case number.

INDICATE ANY AGENCY CONTROL
NUMBER CONCERNING THIS SPECIFIC INTAKE

DATE OF REPORT          060412
SUBMITTING OFFICER / AGENCY    D. Tague/Lcso
AGENCY CASE NUMBER      **12-0292**    SUPPLEMENT #
DEFENDANT               **JORDEN TIMOTHY HOLLINGSWORTH**    ☑ 911 Call
LEAD OFFICER / AGENCY   D. Tague/Lcso    ☐ Non Emergency Call
ALLIED AGENCY CASE #    ☐ Unknown

THIS IS A COMPUTER GENERATED FORM. THIS FORM CAN NOT BE HAND COMPLETED.

A NEW INTAKE FORM IS REQUIRED EACH TIME A NEW REPORT OR EVIDENCE IS SUBMITTED IN THIS CASE. DATA IS NOT CUMULATIVE. FOR EXAMPLE, IF PHOTOGRAPHS WERE SUBMITTED WITH A PREVIOUS REPORT BUT NO PHOTOGRAPHS ARE SUBMITTED WITH THIS REPORT, THEN THERE ARE "NO PHOTOGRAPHS". SAME WITH "RECORDINGS" AND "EVIDENCE".

REPORT:                 INVESTIGATION IS:    NOTES ARE:
☑ Initial               ☑ Complete    ☑ Incorporated and Destroyed

OTHER OFFICERS PRESENT    Agency    Is a report / supplemental expected?
1.  OFFICER L. HITE     LPD    ☐ Yes ☑ No ☐ Unknown
2.                      ☐ Yes ☐ No ☐ Unknown
3.                      ☐ Yes ☐ No ☐ Unknown

VICTIM RIGHTS CARDS - Crime Victim Rights Cards were given to the following person(s):
1.  Trista Samantha Lee Tobin    2.
3.                               4.
5.                               6.

☑    ☐    Are **PHOTOGRAPHS** submitted? (Photos only - Does Not Include Video or Audio mediums)
YES  NO    Photos are          **DIGITAL**    ☐ Photos taken by another agency
           Photo storage       **CD (Standard)**    Name:
           Photos are retained: **In CASE FILE**    Agency:
☐          Photos have been taken but are not yet submitted    Copy submitted for. ☑ DA ☑ Discovery
           Department or case disk or file number of this/these photos/disk:    1 complete set consists of 1 disks.

☐    ☑    Are **RECORDING(S)** submitted? (Includes Video or Audio mediums)
YES  NO    Recordings are      - - - - - - - - - - -    ☐ Photos taken by another agency
           Recordings storage  - - - - - - - - - - -    Name:
           Recordings are retained: - - - - - - - - - -    Agency:
☑          Recordings were made but are not yet submitted (Includes DASHCAM)    Copy submitted for: ☐ DA ☐ Discovery
           Department or case disk or file number of this/these recordings/disk:    1 complete set consists of    disks.

☐    ☑    Was any **EVIDENCE** seized ?    ☐ Evidence seized by another agency
YES  NO    Evidence sheet attached? - - - - - - - - - - - -    Name:
           Evidence is retained:  - - - - - - - - - - - -    Agency:
           If evidence was seized but no evidence report is attached, describe the evidence below.

☑    ☐    Other than that noted above, is there **ANYTHING** in your agency file that the DA's Office does not have?
YES  NO    IF YES, DETAIL

Tammy Ledbetter took digital photographs at LDH. Dash-Cam will be downloaded and submitted as soon as possible.

Signature _____    Officer ID **45325**    Date **060412**

LAKE COUNTY DISTRICT ATTORNEY FORM 606 (OLD 90 I) – INTAKE/DISCOVERY FORM - 6EP05 REV SEP08 // FVRKA

01/15/2019 TUE 13:35   Received:            Jan 15 2019 01:13pm              ☑003/014
                       FAX



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
| --- |
| REPORT NUMBER |

AGENCY LCSO              CAD EVENT  1206040021  RELATED CASES
CLASSIFICATION 163.160  ASSAULT FOURTH DEGREE  A/MIS
MAJOR VIOLATION 163.160          STATUS   Cleared by Arrest
DISPOSITION  Cleared by Arrest
OFFENSES 163.160  ASSAULT FOURTH DEGREE  A/MIS
         166.065  HARASSMENT  B/MIS

REPORTED  06/04/12 18:30        OCCURRED  06/04/12 18:30  MON  TO  06/04/12 00:00  MON

LOCATION  1170 S F    APARTMENT/SUITE: 3

PREMISE
CITY  LAKEVIEW  97630        OUCR ____  1        MEDIA ____        ADD FU ____

NATURE  ☐ Computer Used      ☐ Hate/Bias         ☐ Child Abuse          ☐ Arson
        ☐ Alcohol Related    ☐ Officer Assault    ☒ Domestic Violence   ☐ > VIO / RESTRAINING
        ☐ Drug Related       ☐ Senior Citizen     ☐                      ☐ > VIO / RELEASE
        ☐ Gang Related       ☐ Juvenile           ☐                      ☐ > WARRANT ARREST
        ☐ .                  ☐ ANIMAL COMPLAINT   ☐ MEDICAL

OFFICER  45325  TAGUE, DANIEL                  REPORT FILED  08/05/12 00:00
APPROVED                                        APPROVAL DATE

SYNOPSIS

On June 4, 2012 at approximately 6:30 pm, the Lake County Sheriff's Office was dispatched to a domestic at 1170 South F Street, Space #3. Investigation revealed that Jorden Hollingsworth and Trista Tobin had a verbal altercation that led to pushing and eventually Jorden biting Trista on the side. Jorden was arrested and lodged at the Lake County Jail.

SIGNATURES

Submitted By  _____  ID  45325     Date  060512

Approved by  _____  ID  _____   Date  _____

Assigned to  _____  ID  _____   Date  _____

Printed 6/5/2012 7:23:00 AM            FOR OFFICIAL USE ONLY                    Page 1

EXHIBIT 125, Page 31 of 144
Case No. 3:20-cv-01567-MC



# LAKE COUNTY SHERIFF'S OFFICE
## LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
| --- |
| REPORT NUMBER |

## ADDITIONAL INCIDENT DATA

**ARREST**
- ☐ No arrest / No custody arrest
- ☒ No physical force needed
- ☐ Hands only to guide to arrest
- ☐ Physical force
- ☐ Taser
- ☐ Mace or capstun
- ☐ ASP or baton
- ☐ Lethal force
- ☐ Other force (Refer Narrative)
- ☐ Use of force report completed

**ELUDE / FOOT**
- ☒ None
- ☐ Elude before contact
- ☐ Ran after contact/Captured
- ☐ Ran after contact/Escaped
- ☐ Ran to vehicle/No chase
- ☐ Ran to vehicle/Pursuit followed
- ☐ Ran in residence/No chase
- ☐ Ran in residence/Chased
- ☐ Ran other/No chase
- ☐ Ran other/Chased

**ELUDE / VEHICLE**
- ☒ None
- ☐ Pursuit TERMINATED
- ☐ Pursuit - Subj ESCAPED
- ☐ Pursuit - Subj CRASHED
- ☐ Pursuit - Subj INTERVENTION
- ☐ Involved - Primary LCSD Only
- ☐ > LCSD Primary & other LCSD
- ☐ > LCSD Primary & other agency
- ☐ > LCSD not as primary
- ☐ Pursuit report attached

**LE AGENCIES INVOLVED**
- ☐ Lake Sheriff Only
- ☐ Police - Oregon State Police
- ☒ Police - Lakeview Police
- ☐ Sheriff - Deschutes County
- ☐ Sheriff - Harney County
- ☐ Sheriff - Klamath County
- ☐ Sheriff - Modoc County
- ☐ Federal LE - BLM
- ☐ Federal LE - USFS
- ☐ Other

**SUSPECT INJURY**
- ☒ N/A
- ☐ None
- ☐ Unknown
- ☐ Complained / Nothing seen
- ☐ Minor injury
- ☐ Moderate / Severe injury
- ☐ To seek own medical
- ☐ Ambulance / Tx refused
- ☐ Ambulance / Transported
- ☐ Fatal

**VICTIM INJURY (VICTIM 1)**
- ☐ N/A
- ☐ None
- ☐ Unknown
- ☐ Complained / Nothing seen
- ☒ Minor injury
- ☐ Moderate / Severe injury
- ☐ To seek own medical
- ☐ Ambulance / Tx refused
- ☐ Ambulance / Transported
- ☐ Fatal

**VICTIM INJURY (VICTIM 2)**
- ☒ N/A
- ☐ None
- ☐ Unknown
- ☐ Complained / Nothing seen
- ☐ Minor injury
- ☐ Moderate / Severe injury
- ☐ To seek own medical
- ☐ Ambulance / Tx refused
- ☐ Ambulance / Transported
- ☐ Fatal

**RECORDINGS**
- ☐ No recordings
- ☐ 35mm photos - Not developed
- ☐ 35mm photos - Developed
- ☐ Polaroid
- ☒ Digital
- ☒ Dashcam
- ☐ Video camera
- ☐ Audio recording
- ☐ 911 recording requested
- ☐ Refer report

**CRIME STAT - LOCATION**
- ☐ 01/ Adel
- ☐ 02/ Alkali Lake
- ☐ 03/ Christmas Valley
- ☐ 04/ Fort Rock
- ☒ 05/ Lakeview
- ☐ 06/ New Idaho
- ☐ 07/ New Pine Creek
- ☐ 08/ Paisley
- ☐ 09/ Plush
- ☐ 10/ Quartz Mountain
- ☐ 11/ Silver Lake
- ☐ 12/ Summer Lake
- ☐ 13/ Valley Falls
- ☐ 14/ Westside
- ☐ 91/ Deschutes County
- ☐ 92/ Harney County
- ☐ 93/ Humbolt County
- ☐ 94/ Klamath County
- ☐ 95/ Modoc County
- ☐ 96/ Washoe County

**DISTRIBUTION**
- ☐ Case File ONLY
- ☒ Case File PLUS below
- ☒ District Attorney
- ☐ Medical Examiner
- ☐ Police - OSP Detectives
- ☐ Police - OSP Lakeview
- ☐ Police - Lakeview
- ☐ DHS - Child Welfare
- ☐ DHS - Elder Services
- ☐ LE / BLM
- ☐ LE / USFS
- ☐ LAKE: Building Dept
- ☐ LAKE: Commissioners
- ☐ LAKE: CommCorrections
- ☐ LAKE: Juvenile
- ☐ LAKE: Mental Health
- ☐ LAKE: Public Health
- ☐ LAKE: Road Dept
- ☐ Refer Report Facepage

01/15/2019 TUE 13:36  Received:  FAX                    Jan 15 2019 01:19pm                    ☑005/014



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
|--------|
| REPORT NUMBER |

**NAMES**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | ☐ Juvenile | | ☐ Non-Disclosure |
| CR REFERENCE # | 1 | SYSTEM # | 1 | INVOLVEMENT RP Reporting Party | | TYPE |
| NAME | MCKEE, RITA | | | | | |
| ADDRESS | NEW PINE CREEK | | | | | PHONE (530) 946-4004 |
| | | | | | | PHONE |
| ALT.ADDRESS | | | | | | PHONE |
| DOB | | AGE | | SSN | | |
| DL NO | | | | FBI ID | | |
| LOCAL ID | | | | STATE ID | | |
| DESCRIPTION | | | | | | |
| CAUTION | | | | | | |
| EMPLOYER | | | | | | PHONE (541) |
| | ADDRESS | | | | | |
| OCCUPATION | | | | | | RES.STATUS R |
| COMMENTS | | | | | | |
| ADDITIONAL INFO | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | ☐ Juvenile | | ☐ Non-Disclosure |
| CR REFERENCE # | 2 | SYSTEM # | 2 | INVOLVEMENT VI Victim | | TYPE |
| NAME | TOBIN, TRISTA SAMANTHA LEE | | | | | |
| ADDRESS | 1170 S F ST Apt. 3 | | | | | PHONE |
| | LAKEVIEW, OR 97630 | | | | | PHONE |
| ALT.ADDRESS | | | | | | PHONE |
| DOB | 05/31/1994 | AGE 18 | | SSN | | |
| DL NO | 3206303 | | | FBI ID | | |
| LOCAL ID | | | | STATE ID | | |
| DESCRIPTION | HEIGHT 502 WEIGHT 130 | | | | | |
| CAUTION | | | | | | |
| EMPLOYER | | | | | | PHONE (541) |
| | ADDRESS | | | | | |
| OCCUPATION | | | | | | RES.STATUS R |
| COMMENTS | | | | | | |
| ADDITIONAL INFO | | | | | | |
| VICTIM OF | | | | | | |
| INJURY | | | | | | |
| RELATIONSHIP | | | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | ☐ Juvenile | | ☐ Non-Disclosure |
| CR REFERENCE # | 3 | SYSTEM # | 3 | INVOLVEMENT QP QP | | TYPE |
| NAME | HOLLINGSWORTH, JORDEN TIMOTHY | | | | | |
| ADDRESS | 1170 S F ST Apt. 3 | | | | | PHONE (541) 417-0015 |
| | LAKEVIEW, OR 97630 | | | | | PHONE |
| ALT.ADDRESS | | | | | | PHONE |
| DOB | 08/01/1993 | AGE 18 | | SSN 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 | | |
| DL NO | 2735840 | | | FBI ID | | |
| LOCAL ID | 007540 | | | STATE ID | | |
| DESCRIPTION | SEX M RACE W HAIR BRO EYES BRO HEIGHT 508 WEIGHT 162 | | | | | |
| CAUTION | | | | | | |
| EMPLOYER | | | | | | PHONE (541) |
| | ADDRESS | | | | | |
| OCCUPATION | | | | | | RES.STATUS R |
| COMMENTS | | | | | | |
| ADDITIONAL INFO | | | | | | |

EXHIBIT 125, Page 33 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:36 FAX    Received:    Jan 15 2019 01:20pm    ☑006/014



# LAKE COUNTY SHERIFF'S OFFICE
## LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
|---|
| REPORT NUMBER |

**NAMES**

| | | |
|---|---|---|
| CR REFERENCE # 4 | SYSTEM # 4 | INVOLVEMENT ☐ Juvenile / IP Involved Party | ☐ Non-Disclosure / TYPE Individual |

NAME HOLLOWAY, LACEY LORENE-ANN
ADDRESS 1015 S "F" ST
LAKEVIEW, OR 97630    PHONE (541) 219-0723
                       PHONE
                       PHONE
ALT.ADDRESS
DOB 05/04/1993    AGE 19    SSN 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
DL NO                       FBI ID
LOCAL ID                    STATE ID
DESCRIPTION SEX F RACE W ETHNICITY N HAIR BLN
CAUTION
EMPLOYER                    PHONE (541)
ADDRESS                     RES.STATUS R
OCCUPATION
COMMENTS
ADDITIONAL INFO

Printed 6/5/2012 7:23:00 AM    FOR OFFICIAL USE ONLY    Page 4

EXHIBIT 125, Page 34 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:36   Received:   FAX            Jan 15 2019 01:20pm            ☑007/014



# LAKE COUNTY SHERIFF'S OFFICE
## LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
|--------|
| REPORT NUMBER |

**NARRATIVE**

**REPORTED BY** 45325  TAGUE, DANIEL          **REPORT FILED**  06/05/2012

On June 5, 2012 I was on duty, in uniform, displaying a badge and operating a marked patrol truck with overhead emergency flashing lights. At approximately 6:30 pm, Lakeview Police Officer Lee Hite was assisting me on serving a restraining order when I was contacted by dispatch to respond to a domestic at 1170 South F Street, Space #3 in Lakeview, Lake County, Oregon.

Officer Hite and I responded; as I pulled into the driveway at 1170 South F Street, I saw a male subject walking towards the front door of space. I made contact with the subject who was identified as JORDEN TIMOTHY HOLLINGSWORTH. I informed Jorden I was there regarding a complaint of domestic violence between him and TRISTA TOBIN. Jorden explained to me it was no big deal, they were fine. I asked Jorden where Trista was and Jorden told me she was walking back to the house from her Grandma's house. I left Jorden with Officer Hite and walked over to the

LAKE COUNTY DISTRICT ATTORNEY'S OFFICE
## INTAKE / DISCOVERY FORM

This is submission number

01DT

by me concerning this case number.

INDICATE ANY AGENCY CONTROL
NUMBER CONCERNING THIS SPECIFIC INTAKE

DATE OF REPORT              060412
SUBMITTING OFFICER / AGENCY    D. Tague/Lcso
AGENCY CASE NUMBER          **12-0292**     SUPPLEMENT #
DEFENDANT            **JORDEN TIMOTHY HOLLINGSWORTH**    ☒ 911 Call
LEAD OFFICER / AGENCY    D. Tague/Lcso               ☐ Non Emergency Call
ALLIED AGENCY CASE #                                  ☐ Unknown

THIS IS A COMPUTER GENERATED FORM. THIS FORM CAN NOT BE HAND COMPLETED.

A NEW INTAKE FORM IS REQUIRED EACH TIME A NEW REPORT OR EVIDENCE IS SUBMITTED IN THIS CASE. DATA IS NOT CUMULATIVE. FOR EXAMPLE, IF PHOTOGRAPHS WERE SUBMITTED WITH A PREVIOUS REPORT BUT NO PHOTOGRAPHS ARE SUBMITTED WITH THIS REPORT, THEN THERE ARE "NO PHOTOGRAPHS". SAME WITH "RECORDINGS" AND "EVIDENCE".

REPORT:                INVESTIGATION IS:              NOTES ARE:
☒ Initial              ☒ Complete                    ☒ Incorporated and Destroyed

OTHER OFFICERS PRESENT         Agency                 Is a report / supplemental expected?
1.  OFFICER L. HITE            LPD                    ☐ Yes ☒ No ☐ Unknown
2.                                                    ☐ Yes ☐ No ☐ Unknown
3.                                                    ☐ Yes ☐ No ☐ Unknown

VICTIM RIGHTS CARDS - Crime Victim Rights Cards were given to the following person(s):
1.  Trista Samantha Lee Tobin          2.
3.                                     4.
5.                                     6.

---

☒   ☐   Are **PHOTOGRAPHS** submitted? (Photos only - Does Not Include Video or Audio mediums)
YES NO  Photos are              **DIGITAL**              ☐ Photos taken by another agency
        Photo storage          **CD (Standard)**         Name:
        Photos are retained:   **In CASE FILE**          Agency:
☐       Photos have been taken but are not yet submitted  Copy submitted for: ☒ DA ☒ Discovery
        Department or case disk or file number of this/these photos/disk:   1 complete set consists of **1** disks.

---

☐   ☒   Are **RECORDING(S)** submitted? (Includes Video or Audio mediums)
YES NO  Recordings are         - - - - - - - - - - - -   ☐ Photos taken by another agency
        Recordings storage     - - - - - - - - - - - -   Name:
        Recordings are retained: - - - - - - - - - - - - Agency:
☒       Recordings were made but are not yet submitted (Includes DASHCAM)  Copy submitted for: ☐ DA ☐ Discovery
        Department or case disk or file number of this/these recordings/disk:   1 complete set consists of ____ disks.

---

☐   ☒   Was any **EVIDENCE** seized ?                    ☐ Evidence seized by another agency
YES NO  Evidence sheet attached? - - - - - - - - - - - -  Name:
        Evidence is retained:   - - - - - - - - - - - -   Agency:
        If evidence was seized but no evidence report is attached, describe the evidence below.

☒   ☐   Other than that noted above, is there **ANYTHING** in your agency file that the DA's Office does not have?
YES NO  IF YES, DETAIL

Tammy Ledbetter took digital photographs at LDH. Dash-Cam will be downloaded and submitted as soon as possible.

Signature _____    Officer ID 45325           Date 060412

LAKE COUNTY DISTRICT ATTORNEY FORM 001 (OLD #01) - INTAKE/DISCOVERY FORM - SEP05 REV SEP08  JI  PW-KA

01/15/2019 TUE 13:46   Received:    Jan 15 2019 01:30pm              ☑003/014
                       FAX



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
|---|
| REPORT NUMBER |

**AGENCY** LCSO          **CAD EVENT** 1206040021  **RELATED CASES**
**CLASSIFICATION** 163.160   ASSAULT FOURTH DEGREE A/MIS
**MAJOR VIOLATION** 163.160            **STATUS**  Cleared by Arrest
**DISPOSITION** Cleared by Arrest
**OFFENSES** 163.160   ASSAULT FOURTH DEGREE  A/MIS
166.065   HARASSMENT B/MIS

**REPORTED** 06/04/12 18:30        **OCCURRED** 06/04/12 18:30  MON  TO  08/04/12 00:00  MON

**LOCATION** 1170 S F   APARTMENT/SUITE: 3

**PREMISE CITY** LAKEVIEW  97630      **OUCR** ____  1       **MEDIA** ____       **ADD FU** ____

**NATURE**
- ☐ Computer Used
- ☐ Alcohol Related
- ☐ Drug Related
- ☐ Gang Related
- ☐

- ☐ Hate/Bias
- ☐ Officer Assault
- ☐ Senior Citizen
- ☐ Juvenile
- ☐ ANIMAL COMPLAINT

- ☐ Child Abuse
- ☒ Domestic Violence
- ☐
- ☐ .
- ☐ MEDICAL

- ☐ Arson
- ☐ > VIO / RESTRAINING
- ☐ > VIO / RELEASE
- ☐ > WARRANT ARREST

**OFFICER** 45325   TAGUE, DANIEL           **REPORT FILED** 06/06/12 00:00
**APPROVED**                                **APPROVAL DATE**

**SYNOPSIS**

On June 4, 2012 at approximately 6:30 pm, the Lake County Sheriff's Office was dispatched to a domestic at 1170 South F Street, Space #3.  Investigation revealed that Jorden Hollingsworth and Trista Tobin had a verbal altercation that led to pushing and eventually Jorden biting Trista on the side.  Jorden was arrested and lodged at the Lake County Jail.

**SIGNATURES**

Submitted By _____  ID _45325_    Date _060512_

Approved by _____  ID _____    Date _____

Assigned to _____  ID _____    Date _____

Received:
01/15/2019 TUE 13:46   FAX                    Jan 15 2019 01:30pm                    ☒004/014



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
| --- |
| REPORT NUMBER |

**ADDITIONAL INCIDENT DATA**

**ARREST**
- ☐ No arrest / No custody arrest
- ☒ No physical force needed
- ☐ Hands only to guide to arrest
- ☐ Physical force
- ☐ Taser
- ☐ Mace or capstun
- ☐ ASP or baton
- ☐ Lethal force
- ☐ Other force (Refer Narrative)
- ☐ Use of force report completed

**ELUDE / FOOT**
- ☒ None
- ☐ Elude before contact
- ☐ Ran after contact/Captured
- ☐ Ran after contact/Escaped
- ☐ Ran to vehicle/No chase
- ☐ Ran to vehicle/Pursuit followed
- ☐ Ran in residence/No chase
- ☐ Ran in residence/Chased
- ☐ Ran other/No chase
- ☐ Ran other/Chased

**ELUDE / VEHICLE**
- ☒ None
- ☐ Pursuit TERMINATED
- ☐ Pursuit - Subj ESCAPED
- ☐ Pursuit - Subj CRASHED
- ☐ Pursuit - Subj INTERVENTION
- ☐ Involved - Primary LCSD Only
- ☐ > LCSD Primary & other LCSD
- ☐ > LCSD Primary & other agency
- ☐ > LCSD not as primary
- ☐ Pursuit report attached

**LE AGENCIES INVOLVED**
- ☐ Lake Sheriff Only
- ☐ Police - Oregon State Police
- ☒ Police - Lakeview Police
- ☐ Sheriff - Deschutes County
- ☐ Sheriff - Harney County
- ☐ Sheriff - Klamath County
- ☐ Sheriff - Modoc County
- ☐ Federal LE - BLM
- ☐ Federal LE - USFS
- ☐ Other

**SUSPECT INJURY**
- ☒ N/A
- ☐ None
- ☐ Unknown
- ☐ Complained / Nothing seen
- ☐ Minor injury
- ☐ Moderate / Severe injury
- ☐ To seek own medical
- ☐ Ambulance / Tx refused
- ☐ Ambulance / Transported
- ☐ Fatal

**VICTIM INJURY (VICTIM 1)**
- ☐ N/A
- ☐ None
- ☐ Unknown
- ☐ Complained / Nothing seen
- ☒ Minor injury
- ☐ Moderate / Severe injury
- ☐ To seek own medical
- ☐ Ambulance / Tx refused
- ☐ Ambulance / Transported
- ☐ Fatal

**VICTIM INJURY (VICTIM 2)**
- ☒ N/A
- ☐ None
- ☐ Unknown
- ☐ Complained / Nothing seen
- ☐ Minor injury
- ☐ Moderate / Severe injury
- ☐ To seek own medical
- ☐ Ambulance / Tx refused
- ☐ Ambulance / Transported
- ☐ Fatal

**RECORDINGS**
- ☐ No recordings
- ☐ 35mm photos - Not developed
- ☐ 35mm photos - Developed
- ☐ Polaroid
- ☒ Digital
- ☒ Dashcam
- ☐ Video camera
- ☐ Audio recording
- ☐ 911 recording requested
- ☐ Refer report

**CRIME STAT - LOCATION**
- ☐ 01/ Adel
- ☐ 02/ Alkali Lake
- ☐ 03/ Christmas Valley
- ☐ 04/ Fort Rock
- ☒ 05/ Lakeview
- ☐ 06/ New Idaho
- ☐ 07/ New Pine Creek
- ☐ 08/ Paisley
- ☐ 09/ Plush
- ☐ 10/ Quartz Mountain
- ☐ 11/ Silver Lake
- ☐ 12/ Summer Lake
- ☐ 13/ Valley Falls
- ☐ 14/ Westside
- ☐ 91/ Deschutes County
- ☐ 92/ Harney County
- ☐ 93/ Humboldt County
- ☐ 94/ Klamath County
- ☐ 95/ Modoc County
- ☐ 96/ Washoe County

(column of empty checkboxes with dots)

**DISTRIBUTION**
- ☐ _____ Case File ONLY
- ☒ _____ Case File PLUS below
- ☒ _____ District Attorney
- ☐ _____ Medical Examiner
- ☐ _____ Police - OSP Detectives
- ☐ _____ Police - OSP Lakeview
- ☐ _____ Police - Lakeview
- ☐ _____ DHS - Child Welfare
- ☐ _____ DHS - Elder Services
- ☐ _____ LE / BLM
- ☐ _____ LE / USFS
- ☐ _____ LAKE: Building Dept
- ☐ _____ LAKE: Commissioners
- ☐ _____ LAKE: CommCorrections
- ☐ _____ LAKE: Juvenile
- ☐ _____ LAKE: Mental Health
- ☐ _____ LAKE: Public Health
- ☐ _____ LAKE: Road Dept
- ☐ _____
- ☐ Refer Report Facepage

EXHIBIT 125, Page 38 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:47    Received:    Jan 15 2019 01:30pm              ☑005/014
                        FAX



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

**120292**

REPORT NUMBER

**NAMES**

| | | |
|---|---|---|
| CR REFERENCE # | 1        SYSTEM # 1 | INVOLVEMENT RP  Reporting Party  ☐ Juvenile    ☐ Non-Disclosure TYPE |
| NAME | MCKEE, RITA | |
| ADDRESS | NEW PINE CREEK | PHONE (530) 946-4004 |
| | | PHONE |
| ALT.ADDRESS | | PHONE |
| DOB | AGE | SSN |
| DL NO | | FBI ID |
| LOCAL ID | | STATE ID |
| DESCRIPTION | | |
| CAUTION | | |
| EMPLOYER | | PHONE (541) |
| | ADDRESS | |
| OCCUPATION | | RES.STATUS R |
| COMMENTS | | |
| ADDITIONAL INFO | | |

| | | |
|---|---|---|
| CR REFERENCE # | 2        SYSTEM # 2 | INVOLVEMENT VI  Victim  ☐ Juvenile    ☐ Non-Disclosure TYPE |
| NAME | TOBIN, TRISTA SAMANTHA LEE | |
| ADDRESS | 1170 S F ST Apt. 3 | PHONE |
| | LAKEVIEW, OR 97630 | PHONE |
| ALT.ADDRESS | | PHONE |
| DOB | 05/31/1994        AGE 18 | SSN |
| DL NO | 3206303 | FBI ID |
| LOCAL ID | | STATE ID |
| DESCRIPTION | HEIGHT 502  WEIGHT 130 | |
| CAUTION | | |
| EMPLOYER | | PHONE (541) |
| | ADDRESS | |
| OCCUPATION | | RES.STATUS R |
| COMMENTS | | |
| ADDITIONAL INFO | | |
| VICTIM OF | | |
| INJURY | | |
| RELATIONSHIP | | |

| | | |
|---|---|---|
| CR REFERENCE # | 3        SYSTEM # 3 | INVOLVEMENT QP  QP  ☐ Juvenile    ☐ Non-Disclosure TYPE |
| NAME | HOLLINGSWORTH, JORDEN TIMOTHY | |
| ADDRESS | 1170 S F ST Apt. 3 | PHONE (541) 417-0015 |
| | LAKEVIEW, OR 97630 | PHONE |
| ALT.ADDRESS | | PHONE |
| DOB | 08/01/1993        AGE 18 | SSN 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 |
| DL NO | 2735840 | FBI ID |
| LOCAL ID | 007540 | STATE ID |
| DESCRIPTION | SEX M  RACE W  HAIR BRO  EYES BRO  HEIGHT 508  WEIGHT 162 | |
| CAUTION | | |
| EMPLOYER | | PHONE (541) |
| | ADDRESS | |
| OCCUPATION | | RES.STATUS R |
| COMMENTS | | |
| ADDITIONAL INFO | | |

EXHIBIT 125, Page 39 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:47   Received:   FAX                    Jan 15 2019 01:31pm                    ☑006/014



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
| --- |
| REPORT NUMBER |

**NAMES**

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| **CR REFERENCE #** 4 | **SYSTEM #** 4 | **INVOLVEMENT** | ☐ Juvenile | ☐ Non-Disclosure | |
| **NAME** HOLLOWAY, LACEY LORENE-ANN | | | IP  Involved Party | **TYPE** Individual | |
| **ADDRESS** 1015 S "F" ST | | | | | |
| LAKEVIEW, OR  97630 | | | | **PHONE** (541) 219-0723 | |
| **ALT.ADDRESS** | | | | **PHONE** | |
| **DOB** 05/04/1993 | **AGE** 19 | | **SSN** 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 | **PHONE** | |
| **DL NO** | | | **FBI ID** | | |
| **LOCAL ID** | | | **STATE ID** | | |
| **DESCRIPTION** SEX F  RACE W  ETHNICITY N  HAIR BLN | | | | | |
| **CAUTION** | | | | | |
| **EMPLOYER** | | | | **PHONE** (541) | |
| **ADDRESS** | | | | | |
| **OCCUPATION** | | | | **RES.STATUS** R | |
| **COMMENTS** | | | | | |
| **ADDITIONAL INFO** | | | | | |

Printed 6/5/2012 7:23:00 AM                FOR OFFICE USE ONLY                              Page 4

01/15/2019 TUE 13:47    Received:    Jan 15 2019 01:31pm    ☑007/014
FAX



## LAKE COUNTY SHERIFF'S OFFICE
## LAKE COUNTY OREGON
### INCIDENT REPORT

120292

REPORT NUMBER

**NARRATIVE**

**REPORTED BY** 45325 TAGUE, DANIEL          **REPORT FILED** 06/05/2012

On June 5, 2012 I was on duty, in uniform, displaying a badge and operating a marked patrol truck with overhead emergency flashing lights. At approximately 6:30 pm, Lakeview Police Officer Lee Hite was assisting me on serving a restraining order when I was contacted by dispatch to respond to a domestic at 1170 South F Street, Space #3 in Lakeview, Lake County, Oregon.

Officer Hite and I responded; as I pulled into the driveway at 1170 South F Street, I saw a male subject walking towards the front door of space #3. I made contact with the subject who was identified as JORDEN TIMOTHY HOLLINGSWORTH. I informed Jorden I was there regarding a complaint of domestic violence between him and a TRISTA TOBIN. Jorden explained to me it was no big deal, they were fine. I asked Jorden where Trista was and Jorden told me she was walking back to the house from her Grandma's house. I left Jorden with Officer Hite and walked over to the alley to look for Trista. I asked dispatch where I could find Trista and dispatch informed me she was at "Brandy's, space #2." I knocked on the door and there was no answer. Just about the time I turned to walk away a female subject emerged from the alley. I asked the female what her name was and she told me, "Trista."

I asked Trista if I could speak to her in the alley (out of eye sight of Jorden). Trista agreed. I noticed that Trista had a bruise on her left cheek and some marks on her neck. I informed Trista I was there regarding a call of domestic violence. Trista told me nothing happened and she was fine. I asked Trista about the bruise on her cheek and she told me she fell up the steps earlier today. I asked Trista if anyone saw her fall and she told me no. I asked Trista if I could look at her arms and she showed me her arms. On one of her arms there was bruising around the wrist. I asked Trista about this bruise and she again told me it was from her fall. I asked Trista to wait there while I went and talked to Officer Hite.

I explained what Trista told me to Officer Hite, and Officer Hite explained to me that Jorden explained to him they had a verbal argument, but nothing physical. Officer Hite contacted the reporting party, RITA MCKEE, who explained to him that she saw Trista and she had bruises and bite marks all over her and was very upset. Rita explained, Jorden kicked a puppy too, but the puppy was taken to New Pine Creek by someone named Joey.

While Officer Hite and I were talking with Jorden and Trista, LACEY HOLLOWAY showed up at 1170 South F Street. Lacey immediately exited her vehicle and started to walk over to Trista. Officer Hite and I both told Lacey to get back into her pick-up and we would talk to her in a minute. Lacey did as Officer Hite and I asked.

After Officer Hite and I were done talking with Jorden and Trista, we explained to both of them it would be a good idea to separate for the night. It was agreed upon that Jorden would leave for the night. Jorden grabbed his coat and started walking west out of the complex. Trista went back into her house.

Printed 6/5/2012 7:23:00 AM          FOR OFFICIAL USE ONLY          Page 5

01/15/2019 TUE 13:48  Received: FAX          Jan 15 2019 01:31pm        ☑008/014



## LAKE COUNTY SHERIFF'S OFFICE
## LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
| --- |
| REPORT NUMBER |

**NARRATIVE**

Officer Hite and I then walked over and spoke with Lacey Holloway. Lacey Holloway explained that Trista was bit by Jorden and Lacey showed Officer Hite and I a photograph on her (Lacey's) phone of a bite mark on the side of Trista's ribcage. After seeing the photo we went back to Trista's house and knocked on the door. Trista answered the door and I asked Trista if she had a bite mark on her side. Trista said she did. I asked Trista (with Officer Hite present) if she would mind showing us the bite mark or going to the hospital to get the bite mark photographed. Trista showed us the bite mark and said it was a dog bite. I informed Trista we (as law enforcement) investigate several dog bites every year, and I know that was a human bite not a dog bite.

I asked Trista to explain and she said she and Jorden were just wrestling and she bites Jorden too. Trista explained it was a "play thing not a fight thing." Officer Hite left my location in an attempt to locate Jorden. After a few minutes, Officer Hite returned to my location at Space #3, with Jorden in handcuffs in his patrol vehicle. Officer Hite asked me to go have Jorden explain what Jorden explained to him.

I asked Jorden to explain to me what was happened and how Trista had a human bite on her side. Jorden explained he "really messed up" and told me he and Trista were fighting and they ended up on the floor and she ended up on top of him and would not get off of him, she had bare skin showing on her side so he decided to bite her. Jorden explained that was not the right thing to do and he was very sorry he bit Trista. I thanked Jorden for telling me the truth.

While I was talking to Jorden, Officer Hite was talking with Trista and asked Trista if she would be willing to go with one of us to the hospital to get photographs of her injuries. Officer Hite and I decided, he would take Trista to Lake District Hospital for photographs while I transported Jorden to the Lake County Jail.

I returned to Officer Hite's patrol vehicle and opened Jorden's door and explained to him I was going to transport him to our jail. I searched Jorden for weapons and means of escape. According to Jorden he was read his constitutional rights as per Miranda by Officer Hite when he was handcuffed.


Jorden was transported to the Lake County Jail where he was lodged without incident.

Officer Hite transported Trista to Lake District Hospital where her injuries were photographed and Trista was given a victim's rights card by the hospital staff and later transported back to her residence by Officer Hite.


Deputy Tague LCSO 45325

ACTION RECOMMENDED:       Closed
ACTION RECOMMENDED:       Forward to Lake County District Attorney

01/15/2019 TUE 13:48   Received:   FAX          Jan 15 2019 01:32pm          ☑009/014



# LAKE COUNTY SHERIFF'S OFFICE
## LAKE COUNTY OREGON
### INCIDENT REPORT

| 120292 |
|--------|
| REPORT NUMBER |

**CASE MANAGEMENT DETAILS**

| | |
|---|---|
| **SUBMITTED BY** 45325  TAGUE, DANIEL | **DATE**  06/05/2012 |
| **APPROVED** | **DATE** |
| **LAST REVIEW** | **DATE** |
| **CASE STATUS**  CURRENT  IN-PROCESS     PREVIOUS | |

| | |
|---|---|
| **ASSIGNED TO** | **DATE** |
| **ASSIGNED BY** | |

**CASE REVIEW HISTORY**

| **TRANSACTION** UPDATED | **DATE**  06/05/12 07:23 | **BY** 45325  TAGUE,DANIEL |
|---|---|---|
| **COPY TO** CASE NARRATIVE | **ROUTE TO** SDA | **CASE STATUS** CA |
| **ASSIGNED TO** | | |

**SUPPLEMENT STATUS**

    NO SUPPLEMENTS FOUND

EXHIBIT 125, Page 43 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:50    Received:    Jan 15 2019 01:33pm    ☑013/014
                        FAX

# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON

**AGENCY LCSO**

| | | | | |
|---|---|---|---|---|
| **CAD EVENT** | 1206040021 | **CALL TYPE** | DOM DOMESTIC | |
| **PRIORITY** | 3 | **SOURCE** P | | |

| | | | |
|---|---|---|---|
| **LOCATION** | 1170 S F  #3, LAKEVIEW | **RESP; AREA** | **ZONE** |
| | | **REPT. ZONE** | |

| | | | |
|---|---|---|---|
| **RP** | RITA MCKEE | **PHONE** | (530) 946-4004 |
| | NEW PINE CREEK | | |

**COMMENT**    RP ADVISED THAT MALE BEAT FEMALE

TRISTA —JORDON

SHE HAS BRUSES AND BITE MARKES ALL OVER ALSO ASSULTED PUPPYS

SHE WENT BACT TO 1170 S F

R/P IS IN NEW PINE CREEK    JOIE CALLED R/P AND TOLD HER THAT WENT BACK TO THE HOUSE 45 MIN AGO

REQUEST  WELFARE CHECK ON FEMALE
--------------------------------[CAD1/50585  06/04/12 18:42:05]
726 LOOKING FOR THE FEMALE   HAVE THE MALE
--------------------------------[CAD1/50585  06/04/12 18:4▮▮6]
403 CALL R/P  CALLED RITA  SHE SAID THAT TRISTA WAS AT BRANDYS ACCROSS THE ALLEY NUMBER 2 403
ADVISED
--------------------------------[CAD1/50585  06/04/12 18:4▮▮4]
LOCATED FEMALE   NO RA
--------------------------------[CAD1/50585  06/04/12 19:4▮▮1]
726 WITH ONE MALE IN CUSTODY FOR ASSAU▮▮ DV

| | | | |
|---|---|---|---|
| **E911 Received** | | | |
| **Created** | 06/04/12 18:30:52 by 50585 at CAD1 | ☐ Non-disclosure | |
| **Dispatched** | 06/04/12 18:31:16 | | |
| **Enroute** | | | |
| **Arrived** | 06/04/12 18:39:63 | | |
| **Cleared** | 06/04/12 20:28:35 | SPOSITION  COM | |
| **Closed** | 06/04/12 20:28:35 | NAL TYPE | **PRIMARY UNIT** 726 |

**CASE NUMBER**    120292

**ASSOCIATED NAMES**

Unit: Reason: RP  Name: MCKEE, RITA
    Address: NEW PINE CREEK  Phone: (530) 946-4004

Unit: 726 Reason: QP  Name: TOBIN, TRISTA 05/31/1994 Age: 18▮▮/130
    Address: 1170 S F ST #3, LAKEVIEW OR, 97630
    Drivers License: 3206303

Unit: 726 Reason: QP  Name: HOLLINGSWORTH, JORDEN 08/01▮▮3 Age: 18 508/162
    Address: 1170 S F ST #3, LAKEVIEW OR, 97630
    Drivers License: 2735840

Unit: 726 Reason: QP  Name: HOLLINGSWORTH, JORDEN 08/01▮▮3 MW

| UNIT | STATUS | TIME | EVENT | DISPO | CODE | COMMENT/LOCATION |
|---|---|---|---|---|---|---|
| 726 | D | 06/04/12 18:31:16 | 1206040021 | | | /1170 S F |
| 403 | D | 06/04/12 18:36:56 | 1206040021 | | | /1170 S F |
| 726 | AR | 06/04/12 18:39:53 | 1206040021 | | | /1170 S F |
| 403 | AR | 06/04/12 18:39:53 | 1206040021 | | | /1170 S F |
| 726 | QP | 06/04/12 18:49:45 | 1206040021 | | | |
| 726 | QP | 06/04/12 18:50:39 | 1206040021 | | | |
| 726 | C4 | 06/04/12 19:14:32 | 1206040021 | | | |
| 403 | EN | 06/04/12 19:42:59 | 1206040021 | | | LDH BEG MI 394 |
| 726 | EN | 06/04/12 19:43:06 | 1206040021 | | | JAIL |

Printed 6/5/2012 6:40:54 AM                                                    Page 1

01/15/2019 TUE 13:50    Received:
FAX

Jan 15 2019 01:34pm

☑014/014

# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON

## AGENCY LCSO

| 403 | 2  | 06/04/12 19:45:36 | 1206040021 |     |
| 726 | QP | 06/04/12 19:50:57 | 1206040021 |     |
| 726 | QP | 06/04/12 19:51:37 | 1206040021 |     |
| 726 | 2  | 06/04/12 19:59:18 | 1206040021 |     |
| 403 | EN | 06/04/12 20:17:26 | 1206040021 |     |
| 403 | 2  | 06/04/12 20:20:04 | 1206040021 |     |
| 403 | C  | 06/04/12 20:20:16 | 1206040021 | COM |
| 726 | 1  | 06/04/12 20:28:29 | 1206040021 |     |
| 726 | C  | 06/04/12 20:28:35 | 1206040021 | COM |

LOH END MI 395

JAIL AT 19:45
SCENE BEG MI 395
SCENE END MI 396

01/15/2019 TUE 13:29 FAX    Received:    Jan 15 2019 01:13pm    ☑002/012

LAKE COUNTY DISTRICT ATTORNEY'S OFFICE
## INTAKE / DISCOVERY FORM

This is submission number
**1**
by me concerning this case number.
INDICATE ANY AGENCY CONTROL
NUMBER CONCERNING THIS SPECIFIC INTAKE

DATE OF REPORT          081512
SUBMITTING OFFICER / AGENCY   Lcad
AGENCY CASE NUMBER      **120417**      SUPPLEMENT #
DEFENDANT               **HOLLINGSWORTH, JORDEN T.**      ☒ 911 Call
LEAD OFFICER / AGENCY   Luke W. Campbell      ☐ Non Emergency Call
ALLIED AGENCY CASE #                          ☐ Unknown

THIS IS A COMPUTER GENERATED FORM. THIS FORM CAN NOT BE HAND COMPLETED.

A NEW INTAKE FORM IS REQUIRED EACH TIME A NEW REPORT OR EVIDENCE IS SUBMITTED IN THIS CASE. DATA IS NOT CUMULATIVE. FOR EXAMPLE, IF PHOTOGRAPHS WERE SUBMITTED WITH A PREVIOUS REPORT BUT NO PHOTOGRAPHS ARE SUBMITTED WITH THIS REPORT, THEN THERE ARE "NO PHOTOGRAPHS". SAME WITH "RECORDINGS" AND "EVIDENCE".

REPORT:               INVESTIGATION IS:          NOTES ARE:
☒ Initial             ☒ Complete                 ☒ Incorporated and Destroyed

OTHER OFFICERS PRESENT      Agency          Is a report / supplemental expected?
1.  LEE HITE            LPD              ☐ Yes ☒ No ☐ Unknown
2.                                       ☐ Yes ☐ No ☐ Unknown
3.                                       ☐ Yes ☐ No ☐ Unknown

VICTIM RIGHTS CARDS - Crime Victim Rights Cards were given to the following person(s):
1.                              2.
3.                              4.
5.                              6.

---

☐ ☒        Are **PHOTOGRAPHS** submitted? (Photos only - Does Not Include Video or Audio mediums)
YES NO     Photos are          - - - - - - - - - - -      ☐ Photos taken by another agency
           Photo storage       - - - - - - - - - - -      Name:
           Photos are retained:  - - - - - - - - - - -     Agency:
☐          Photos have been taken but are not yet submitted    Copy submitted for: ☐ DA ☐ Discovery
           Department or case disk or file number of this/these photos/disk:    1 complete set consists of      disks.

---

☒ ☐        Are **RECORDING(S)** submitted? (Includes Video or Audio mediums)
YES NO     Recordings are       DIGITAL           ☐ Photos taken by another agency
           Recordings storage   CD (Standard)     Name:
           Recordings are retained:  ATTACHED     Agency:
☐          Recordings were made but are not yet submitted (Includes DASHCAM)    Copy submitted for: ☒ DA ☒ Discovery
           Department or case disk or file number of this/these recordings/disk:    1 complete set consists of 1 disks.

---

☐ ☒        Was any **EVIDENCE** seized ?           ☐ Evidence seized by another agency
YES NO     Evidence sheet attached?  - - - - - - - - - - -    Name:
           Evidence is retained:  - - - - - - - - - - -       Agency:
           If evidence was seized but no evidence report is attached, describe the evidence below.

☐ ☒        Other than that noted above, is there **ANYTHING** in your agency file that the DA's Office does not have?
YES NO     IF YES, DETAIL

Luke W. Campbell

Signature _[signature]_     Officer ID **728**        Date  **081612**

LAKE COUNTY DISTRICT ATTORNEY FORM 808 [OLD 801] – INTAKE/DISCOVERY FORM - BEP08 REV BEP08  #  FW-KA

01/15/2019 TUE 13:30    Received:    FAX          Jan 15 2019 01:13pm          ☑003/012



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

| 120417 |
| --- |
| REPORT NUMBER |

**AGENCY** LCSO          **CAD EVENT** 1208150028    **RELATED CASES**
**CLASSIFICATION** 911  Domestic Disturbance/Probation Violation
**MAJOR VIOLATION** Probation Violation          **STATUS**  Active
**DISPOSITION** Sent to DA
**OFFENSES** 911  Domestic Disturbance/Probation Violation
137.000  PROBATION VIOLATION

**REPORTED** 08/15/12 20:36  WED          **OCCURRED** 08/15/12 20:00  WED  **TO**  08/15/12 00:00  WED

**LOCATION** APT. 3 S 1170 SOUTH F STREET ST S     APARTMENT/SUITE: 3

**PREMISE**
**CITY** LAKEVIEW  97630          **OUCR** _____          **MEDIA** _____          **ADD FU** _____

**NATURE**
☐ Computer Used      ☐ Hate/Bias          ☐ Child Abuse        ☐ Arson
☐ Alcohol Related    ☐ Officer Assault    ☒ Domestic Violence  ☐ > VIO / RESTRAINING
☒ Drug Related       ☐ Senior Citizen                          ☒ > VIO / RELEASE
☐ Gang Related       ☐ Juvenile                                ☐ > WARRANT ARREST
☐                    ☐ ANIMAL COMPLAINT   ☐ MEDICAL            ☐

**OFFICER** 36866  CAMPBELL, LUKE          **REPORT FILED**  08/08/12 00:00
**APPROVED**                              **APPROVAL DATE**

**SYNOPSIS**

Wednesday, 081512, at 2038 hours I was dispatched to 1170 South F Street to a domestic disturbance.  Officer lee Hite also responded and arrived on scene first.  Officer Hite called the scene code four at 2041 hours.  I arrived several minutes later.  The male half was on scene and the two females reported to be on scene had gone.  No physical contact was reported.  The male subject, Jorden Timothy Hollingsworth was taken into custody for a probation violation.  Probation Officer Connie Nash requested he be transported to the Lake County Jail.

**SIGNATURES**

Submitted by _~Luke W. Campbell~_    ID _728_    Date _08K12_

Approved by _____    ID _____    Date _____

Assigned to _____    ID _____    Date _____

EXHIBIT 125, Page 47 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:30 FAX    Received:    Jan 15 2019 01:14pm    ☑004/012



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

**120417**

REPORT NUMBER

## ADDITIONAL INCIDENT DATA

**ARREST**
- [ ] No arrest / No custody arrest
- [ ] No physical force needed
- [ ] Hands only to guide to arrest
- [ ] Physical force
- [ ] Taser
- [ ] Mace or capstun
- [ ] ASP or baton
- [ ] Lethal force
- [ ] Other force (Refer Narrative)
- [ ] Use of force report completed

**ELUDE / FOOT**
- [ ] None
- [ ] Elude before contact
- [ ] Ran after contact/Captured
- [ ] Ran after contact/Escaped
- [ ] Ran to vehicle/No chase
- [ ] Ran to vehicle/Pursuit followed
- [ ] Ran in residence/No chase
- [ ] Ran in residence/Chased
- [ ] Ran other/No chase
- [ ] Ran other/Chased

**ELUDE / VEHICLE**
- [ ] None
- [ ] Pursuit TERMINATED
- [ ] Pursuit - Subj ESCAPED
- [ ] Pursuit - Subj CRASHED
- [ ] Pursuit - Subj INTERVENTION
- [ ] Involved - Primary LCSD Only
- [ ] > LCSD Primary & other LCSD
- [ ] > LCSD Primary & other agency
- [ ] > LCSD not as primary
- [ ] Pursuit report attached

**LE AGENCIES INVOLVED**
- [ ] Lake Sheriff Only
- [ ] Police - Oregon State Police
- [ ] Police - Lakeview Police
- [ ] Sheriff - Deschutes County
- [ ] Sheriff - Harney County
- [ ] Sheriff - Klamath County
- [ ] Sheriff - Modoc County
- [ ] Federal LE - BLM
- [ ] Federal LE - USFS
- [ ] Other

**SUSPECT INJURY**
- [ ] N/A
- [ ] None
- [ ] Unknown
- [ ] Complained / Nothing seen
- [ ] Minor injury
- [ ] Moderate / Severe injury
- [ ] To seek own medical
- [ ] Ambulance / Tx refused
- [ ] Ambulance / Transported
- [ ] Fatal

**VICTIM INJURY (VICTIM 1)**
- [ ] N/A
- [ ] None
- [ ] Unknown
- [ ] Complained / Nothing seen
- [ ] Minor injury
- [ ] Moderate / Severe injury
- [ ] To seek own medical
- [ ] Ambulance / Tx refused
- [ ] Ambulance / Transported
- [ ] Fatal

**VICTIM INJURY (VICTIM 2)**
- [ ] N/A
- [ ] None
- [ ] Unknown
- [ ] Complained / Nothing seen
- [ ] Minor injury
- [ ] Moderate / Severe injury
- [ ] To seek own medical
- [ ] Ambulance / Tx refused
- [ ] Ambulance / Transported
- [ ] Fatal

**RECORDINGS**
- [ ] No recordings
- [ ] 36mm photos - Not developed
- [ ] 35mm photos - Developed
- [ ] Polaroid
- [ ] Digital
- [ ] Dashcam
- [ ] Video camera
- [ ] Audio recording
- [ ] 911 recording requested
- [ ] Refer report

**CRIME STAT - LOCATION**
- [ ] 01/ Adel
- [ ] 02/ Alkali Lake
- [ ] 03/ Christmas Valley
- [ ] 04/ Fort Rock
- [ ] 05/ Lakeview
- [ ] 06/ New Idaho
- [ ] 07/ New Pine Creek
- [ ] 08/ Paisley
- [ ] 09/ Plush
- [ ] 10/ Quartz Mountain
- [ ] 11/ Silver Lake
- [ ] 12/ Summer Lake
- [ ] 13/ Valley Falls
- [ ] 14/ Westside
- [ ] 91/ Deschutes County
- [ ] 92/ Harney County
- [ ] 93/ Humboldt County
- [ ] 94/ Klamath County
- [ ] 95/ Modoc County
- [ ] 96/ Washoe County

- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .

- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .
- [ ] .

**DISTRIBUTION**
- [ ] ___ Case File ONLY
- [ ] ___ Case File PLUS below
- [ ] ___ District Attorney
- [ ] ___ Medical Examiner
- [ ] ___ Police - OSP Detectives
- [ ] ___ Police - OSP Lakeview
- [ ] ___ Police - Lakeview
- [ ] ___ DHS - Child Welfare
- [ ] ___ DHS - Elder Services
- [ ] ___ LE / BLM
- [ ] ___ LE / USFS
- [ ] ___ LAKE: Building Dept
- [ ] ___ LAKE: Commissioners
- [ ] ___ LAKE: CommCorrections
- [ ] ___ LAKE: Juvenile
- [ ] ___ LAKE: Mental Health
- [ ] ___ LAKE: Public Health
- [ ] ___ LAKE: Road Dept

- [ ] Refer Report Facepage

---

EXHIBIT 125, Page 48 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:30  Received: FAX          Jan 15 2019 01:14pm          ✇005/012



# LAKE COUNTY SHERIFF'S OFFICE
## LAKE COUNTY OREGON
### INCIDENT REPORT

| 120417 |
|--------|
| REPORT NUMBER |

**NAMES**

| | | | | | |
|---|---|---|---|---|---|
| CR REFERENCE # | 2 | SYSTEM # 1 | INVOLVEMENT RP | ☐ Juvenile | ☐ Non-Disclosure |
| | | | Reporting Party | | TYPE Individual |
| NAME | TOBIN, TEYA LILLY LEE | | | | |
| ADDRESS | 1001 S G ST S Apt. 2 | | | | PHONE |
| | LAKEVIEW, OR 97630 | | | | PHONE (541) 417-1892 |
| ALT.ADDRESS | | | | | PHONE |
| DOB | 03/31/1993 | AGE 19 | SSN | | |
| DL NO | | | FBI ID | | |
| LOCAL ID | | | STATE ID | | |
| DESCRIPTION | SEX F  RACE W | | | | |
| CAUTION | | | | | |
| EMPLOYER | | | | | PHONE (541) |
| | ADDRESS | | | | |
| OCCUPATION | | | | | RES.STATUS R |
| COMMENTS | SISTER OF TRISTA TOBIN | | | | |
| ADDITIONAL INFO | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| CR REFERENCE # | 1 | SYSTEM # 2 | INVOLVEMENT AR | ☐ Juvenile | ☐ Non-Disclosure |
| | | | Arrestee | | TYPE Individual |
| NAME | HOLLINGSWORTH, JORDEN TIMOTHY | | | | |
| ADDRESS | 1170 S F ST S Apt. 3 | | | | PHONE (541) |
| | LAKEVIEW, OR 97630 | | | | PHONE |
| ALT.ADDRESS | | | | | PHONE |
| DOB | 08/01/1993 | AGE 19 | SSN 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 | | |
| DL NO | 2735840  OR | | FBI ID 775792PD3 | | |
| LOCAL ID | | | STATE ID 19624416 | | |
| DESCRIPTION | SEX M  HAIR BRO  EYES BRO  HEIGHT 508  WEIGHT 160 | | | | |
| CAUTION | | | | | |
| EMPLOYER | | | | | PHONE (541) |
| | ADDRESS | | | | |
| OCCUPATION | | | | | RES.STATUS R |
| COMMENTS | | | | | |
| ADDITIONAL INFO | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| CR REFERENCE # | 3 | SYSTEM # 3 | INVOLVEMENT IP | ☐ Juvenile | ☐ Non-Disclosure |
| | | | Involved Party | | TYPE Individual |
| NAME | TOBIN, TRISTA SAMANTHA LEE | | | | |
| ADDRESS | 1170 S F ST S Apt. 3 | | | | PHONE (541) |
| | LAKEVIEW, OR 97630 | | | | PHONE |
| ALT.ADDRESS | | | | | PHONE |
| DOB | 05/31/1994 | AGE 18 | SSN | | |
| DL NO | | | FBI ID | | |
| LOCAL ID | | | STATE ID | | |
| DESCRIPTION | SEX F  RACE W | | | | |
| CAUTION | | | | | |
| EMPLOYER | | | | | PHONE (541) |
| | ADDRESS | | | | |
| OCCUPATION | | | | | RES.STATUS R |
| COMMENTS | GIRLFRIEND OF JORDEN. | | | | |
| ADDITIONAL INFO | | | | | |

EXHIBIT 125, Page 49 of 144
Case No. 3:20-cv-01567-MC

01/15/2019 TUE 13:31   Received:      Jan 15 2019 01:14pm                    006/012
                       FAX



# LAKE COUNTY SHERIFF'S OFFICE
# LAKE COUNTY OREGON
### INCIDENT REPORT

| 120417 |
| --- |
| REPORT NUMBER |

**NARRATIVE**

**REPORTED BY** 36866  CAMPBELL, LUKE          **REPORT FILED**  08/08/2012

Wednesday, 081512 at 2036 I was dispatched to a domestic disturbance at 1170 South F Street, apartment number three. Lakeview Police Officer Lee Hite also responded. I was out on west side because of the fire situation. Officer Hite arrived and advised he was code four at 2041 hours. I arrived several minutes later.

Three people had been involved in the disturbance and only the male, Jorden Hollingsworth, was on scene upon my arrival. The females involved are Trista and Teya Tobin (Sisters). Trista and Jorden are boyfriend and girlfriend. Due to a past domestic incident and Jorden being on probation, there is a no contact order between the two.

I took the following in substance statement from Jorden. See attached CD for dash cam recording with audio. Jorden stated the argument started between he and Trista because she had told Teya she could have one of his dogs. Jorden said he did not want to give the dog to anyone. Jorden said he was the first one to get angry because of the circumstances. Jorden said he and Trista did yell at each other. Jorden said then Teya came in the house and started yelling at him. Jorden said the yelling went on for about seven to ten minutes. Jorden said he finally gave up and went to his bedroom. Jorden said there was nothing physical between anyone. Jorden said it was just a verbal argument. Jorden said Trista left out the back door when she thought the police were arriving. We were not able to locate Trista at or around the residence.

Officer Hite stated he had been to this residence once this week already. I do not know the details of that contact. Hite called Jorden's Probation Officer, Connie Nash, to let her know what was happening. Jorden had admitted he had a marijuana pipe in the residence to Officer Hite. Jorden agreed to get the pipe and show it to me. No Marijuana was found with the pipe. I asked Jorden if he would test positive if he gave a urine sample and he said he would. Jorden admitted to having smoked marijuana. Jorden was also aware of the no contact order that existed between him and Trista.

Connie said she wanted Jorden arrested for violating his probation. Connie stated she would be brining the detainer to the jail. At 2100 hours I advised Jorden that he was under arrest for the probation violations as per P. O. Nash. I told Jorden if he would destroy the pipe, I would not issue him a citation for PCS less than an ounce of marijuana. Jorden agreed and destroyed the pipe so I did not issue him a citation. As mentioned above no other quantity of marijuana was located. Jorden was lodged without incident at 2117 hours. The notice of arrest and detention provided by P. O. Nash will be attached to this report.

At about 2230 hours I spoke with Teya on the phone. Teya confirmed the fight started when she went over to try and get the dog Trista said she could have. They were not able to find the dog and Teya said she left Jorden and Trista's house. Trista said she waited outside for a few minutes because she knew Jorden was not happy about her taking the dog.

Printed 8/16/2012 12:19:42 AM          FOR OFFICIAL USE ONLY                    Page 4

01/15/2019 TUE 13:31 FAX          Received:
                                                    Jan 15 2019 01:15pm          ☒007/012



### LAKE COUNTY SHERIFF'S OFFICE
### LAKE COUNTY OREGON
#### INCIDENT REPORT

| 120417 |
| --- |
| REPORT NUMBER |

**NARRATIVE**

Teya said she heard Jorden and Trista start yelling in the house. Teya said Trista was yelling very loud and she became worried for Trista's safety. Teya said she went in the house. Teya said she could not see any signs of physical fighting. Teya said Jorden was cussing and yelling at her and Trista. Teya said she left and was the person who called the incident in to dispatch. Teya said she has not seen Trista since she left the residence.

At about 2250 Teya called me at the sheriff's office. Teya stated she was just at Trista's house in an attempt to take care of the dogs. Teya said Trista knew she was there but would not answer. Teya stated she thought I would have to sneak in to the residence in order to make contact with Trista.

I arrived at the residence at about 2300 hours to take up an observation point on the house. I requested Officer Hite to assist. When Officer Hite arrived I knocked on the door and Trista answered. I told Trista why I was there and that we were being recorded. At first Trista tried to say she didn't know what was happening. I told her I already knew Jorden had been there and that she Jorden and Teya had been in an argument. I told her my main concern was that she had not been assaulted in the argument. Trista told me the argument was just verbal. I could not see any visible injuries on Trista.

Trista then admitted they had all been in an argument. Her story as to what started the argument matched with Jorden and Teya. Trista said she and Jorden had pretty much resolved their argument when Teya came in the house. Trista said Teya escalated the issue. Trista stated she kept trying to get them to quit arguing. Trista said she asked them if they could just discuss this like adults. Trista said she kept asking Teya to just leave and she would not. Trista stated she finally gave up and went to her room.

Trista stated she knew Jorden had went to jail because she called. I explained that he went to jail for probation violations regarding the no contact order and admitting to smoking marijuana. I told her I would be completing a report on the incident. During my conversation with Trista she did say she and Jorden were living together. Trista said she thought Jorden learned his lesson the first time he was arrested for hitting her. Trista indicated she did not think Jorden would hit her again. I told her if he did hit her, he needed to answer for it. Trista again assured me Jorden did not hit her.

No additional charges were added by me regarding the domestic disturbance. Any further charging decisions will be left to the discretion of the district attorney.
End of report.

01/15/2019 TUE 13:32    Received: FAX    Jan 15 2019 01:15pm    ☑008/012



# LAKE COUNTY SHERIFF'S OFFICE
## LAKE COUNTY OREGON
### INCIDENT REPORT

| 120417 |
|---|
| REPORT NUMBER |

**CASE MANAGEMENT DETAILS**

| | |
|---|---|
| **SUBMITTED BY** 36866  CAMPBELL, LUKE | **DATE** 08/08/2012 |
| **APPROVED** | **DATE** |
| **LAST REVIEW** | **DATE** |
| **CASE STATUS** CURRENT  IN-PROCESS    PREVIOUS | |

| | |
|---|---|
| **ASSIGNED TO** | **DATE** |
| **ASSIGNED BY** | |

**CASE REVIEW HISTORY**

| | | |
|---|---|---|
| **TRANSACTION** PRINTED | **DATE** 08/16/12 00:17 | **BY** 36866  CAMPBELL, LUKE |
| **COPY TO** 36866-CAMPBELL, LUKE | **ROUTE TO** SDA | **CASE STATUS** ACTIVE |
| **ASSIGNED TO** | | |
| **TRANSACTION** UPDATED | **DATE** 08/16/12 00:16 | **BY** 36866  CAMPBELL,LUKE |
| **COPY TO** CASE NARRATIVE | **ROUTE TO** SDA | **CASE STATUS** ACTIVE |
| **ASSIGNED TO** | | |
| **TRANSACTION** UPDATED | **DATE** 08/16/12 00:16 | **BY** 36866  CAMPBELL,LUKE |
| **COPY TO** CASE NARRATIVE | **ROUTE TO** SDA | **CASE STATUS** ACTIVE |
| **ASSIGNED TO** | | |
| **TRANSACTION** UPDATED | **DATE** 08/15/12 23:26 | **BY** 36866  CAMPBELL,LUKE |
| **COPY TO** CASE NARRATIVE | **ROUTE TO** SDA | **CASE STATUS** ACTIVE |
| **ASSIGNED TO** | | |
| **TRANSACTION** VIEWED | **DATE** 08/15/12 23:17 | **BY** 36866  CAMPBELL,LUKE |
| **COPY TO** CASE | **ROUTE TO** SDA | **CASE STATUS** ACTIVE |
| **ASSIGNED TO** | | |
| **TRANSACTION** UPDATED | **DATE** 08/15/12 22:43 | **BY** 36866  CAMPBELL,LUKE |
| **COPY TO** CASE NARRATIVE | **ROUTE TO** SDA | **CASE STATUS** ACTIVE |
| **ASSIGNED TO** | | |

**SUPPLEMENT STATUS**

NO SUPPLEMENTS FOUND

---

EXHIBIT 125, Page 52 of 144
Case No. 3:20-cv-01567-MC

Received:
01/15/2019 TUE 13:32  FAX                    Jan 15 2019 01:16pm                    ☑009/012



**LAKE COUNTY COMMUNITY CORRECTIONS**
**100 North D Street, #1**
**LAKEVIEW, OR 97630**
**(541) 947-6057**

### NOTICE OF ARREST/DETENTION

## ANY SHERIFF OR PEACE OFFICER OF THE STATE OF OREGON
### Time:  8/15/2012

This is your authority to hold          VIOLATOR    HOLLINGSWORTH, JORDEN
the person named as:                    SID:        19524416
                                        CONFINED:  LAKE COUNTY JAIL
☒ Probation Violator                    Held for: Judge
☐ Parole Violator (PPS)                 ORS 144.350(A); ORS144.350 Section 2
☐ Compact Violator                      And ORS 144.360

                                        Kiki Parker-Rose, Director
                                        Lake County Community Corrections

Pending disposition by:

☒ COURT ☐ PAROLE BOARD            *Connie Nash*
☐ DEPARTMENT OF CORRECTIONS       CONNIE NASH
                                  PAROLE/PROBATION OFFICER
                                  DPSST # 27924

HONORABLE:   SIMPSON, Judge
COUNTY:      LAKE
DOCKET:      120176CR/02

---

### MOTION TO REVOKE PROBATION

COMES NOW, the Lake County District Attorney, and moves the Court for an Order revoking
probation heretofore entered by the above-entitled Court in this matter, and in support of this
Motion alleges that the defendant has violated certain terms and conditions of probation as
described in the attached Affidavit hereby incorporated in this Motion.

Dated _____

                                        _____
                                        (Deputy) District Attorney

---

STATE OF OREGON)
COUNTY OF LAKE) SS.        **AFFIDAVIT**

I, CONNIE NASH, Lake County Parole and Probation Officer, being first duly sworn, depose and
say: That I believe the defendant has violated probation herein as follows:

1.  Jorden Hollingsworth had contact with Trista Tobin on or about 08/15/2012, a violation of a special condition.
2.  Jorden Hollingsworth admitted a urinalysis test would be positive for marijuana, a violation of general condition (b)

01/15/2019 TUE 13:32   FAX   Received:   Jan 15 2019 01:16pm   ☑010/012

THE PERSON NAMED IS BEING ARRESTED BY THIS DEPARTMENT FOR YOUR DISPOSITION
AS AN ALLEGED VIOLATOR.  A FULL REPORT COVERING ALLEGED VIOLATION(S) WILL
BE PROMPTLY SUBMITTED.

### *** BOND MAY NOT BE POSTED IF OFFENDER IS DETAINED ***

STATE OF OREGON)
COUNTY OF LAKE)  ss.

     SUBSCRIBED and sworn to before me on this_____day of_____ 2011, at
Lakeview, Oregon.


_____
Notary Public of Oregon


(☑) PO INTENDS TO OFFER DEFENDANT A STRUCTURED SANCTION.  UNLESS AN EXTENSION
IS AUTHORIZED BY PO'S SUPERVISOR, STRUCTURED SANCTION MUST BE OFFERED WITHIN 36
CLOCK HOURS OF ARREST, EXCLUDING WEEKENDS AND HOLIDAYS.  OTHERWISE, DEFENDANT
MUST BE RELEASED.

PO'S INITIALS: _____

01/15/2019 TUE 13:33    Received:    Jan 15 2019 01:16pm    011/012
FAX

## Lake County
# Sheriff's Office

## POLICE EVENT DETAIL

| | | | | |
|---|---|---|---|---|
| **Agency:** | LCSO | | | |
| **EVENT:** | 1208150028 | **Type:** EMERGENCY 911 | **Pri:** 3 | **Source:** P |
| **Location:** | SOUTH F TRAILER PARK # | | | **Report Zone:** |
| | BROWN TRAILER | | | **Response Zone:** |
| **Comment:** | DOMESTIC DISTURBANCE | | | |

JORDAN HOLLINGSWORTH

NO CONTACT ORDER

TRAILER PARK BROWN TRAILER ON SOUTH END

TRISTA TOBIN

POLICE WERE CALLED ON THEM LAST WEEKEND, AND FEMALE PARTY HID IN
THE CLOSET
————————————[CAD1/52304  08/15/12 20:39:35]
403 ADVISED CODE 4
————————————[CAD1/52304  08/15/12 20:41:08]
RP LOCATED AT 1001 S G
————————————[CAD1/52304  08/15/12 20:44:11]
403 WAS GIVEN THE CALLER INFO.  WILL FOLLOW UP FOR FALSE REPORT
————————————[CAD1/52304  08/15/12 20:59:08]
403 ADV 738 WAS RESPONDING TO BACK UP OFFICERS AND HIT DEER AND
MESSED UP RIG
————————————[CAD1/52304  08/15/12 21:14:00]
728 ADV SUBJ IN CUSTODY ON PV
————————————[CAD1/52304  08/15/12 21:16:19]
ISSUED CASE# 120417 FOR AGENCY LCSO by UNIT 728
***** EVENT CLOSED BY CAD1

Case Number(s): 120417

| | | | | |
|---|---|---|---|---|
| **Complainant:** TAIA TOBIN | | | **Phone:** 4171892 | |
| | | | | |
| **Disposition:** COMP | | **Final Type:** | | **Primary Unit:** 728 |

**TIMES**
**E911 Recv:**
**Created:**    Wednesday, 08/15/2012 20:36  by CAD1/52304
**Dispatched:**  08/15/2012 20:38
**Arrived:**
**Cleared:**
**Closed:**    08/15/2012 21:46

| UNIT | STATUS | TIME | DISPOSITION | FINAL TYPE | COMMENT |
|---|---|---|---|---|---|
| 403 | D | 08/15/2012 20:38 | | | |

LCSO
Report  CFS-002B    Printed:  08/15/2012 21:50:42                                    Page  1

01/15/2019 TUE 13:33  Received: FAX          Jan 15 2019 01:17pm          ☑012/012

**Lake County**
# Sheriff's Office



## POLICE EVENT DETAIL

| Agency: | LCSO | | | | |
|---|---|---|---|---|---|
| EVENT: | 1208150028 | Type: EMERGENCY 911 | | Pri: 3 | Source: P |
| 728 | D | 08/15/2012 20:39 | | | |
| 728 | D | 08/15/2012 20:39 | | | SET PRIMARY/COMMAND BY OPERATOR |
| 728 | EN | 08/15/2012 21:15 | | | JAIL |
| 728 | RL | 08/15/2012 21:17 | | | CASE# 120417 FOR AGENCY LCSO |
| 728 | 2 | 08/15/2012 21:18 | | | JAIL |
| 728 | 1 | 08/15/2012 21:45 | | | |
| 728 | C | 08/15/2012 21:45 | COM | | |
| 403 | F | 08/15/2012 21:46 | | | RE-ASSIGNED |

EXHIBIT 125, Page 56 of 144
Case No. 3:20-cv-01567-MC

GLADSTONE
POLICE DEPT

**INVESTIGATION REPORT**

PAGE/OF
1 / 2

12-001169

| CASE NUMBER | REFER CASE NUMBER | |
|---|---|---|
| 12-001169 | | |

| DATE / TIME REPORTED | DATE / TIME OCCURRED (START) | DATE / TIME OCCURRED (END) | ☐ RADIO (R)  ☐ 5# (S) |
|---|---|---|---|
| 09/18/12      1940 | 09/18/12      1930 | 09/18/12      2038 | ☐ PHONE-IN (P) |

LOCATION OF OCCURRENCE
E Exeter ST/Yale Ave (Max Patterson Park), Gladstone, OR 97027

| PREMISE TYPE | PRECINCT OF OCCURRENCE |
|---|---|
| 770 - Area, Woods, Field, Forest | |

ONE SENTENCE SUMMARY OF INCIDENT
Jorden Hollingsworth claimed that Trista Tobin was Harassing him, and she claimed he did the same to her.

PERSONS BU - Business Complainant  KN - Person w/Knowledge  OW - Owner  PF - Property Finder  SB - Subject  RP - Reporting Person  VI - Victim  WI - Witness

| CODE | NAME (Last, First Middle) | | | SEX | RACE | DOB |
|---|---|---|---|---|---|---|
| SB | Hollingsworth, Jorden Timothy | | | M | W | 08/01/1992 |

| HOME ADDRESS | CITY | STATE | ZIP | HOME PHONE |
|---|---|---|---|---|
| 19400 Falcon Drive | Oregon City | Oregon | 97045 | (503) 847-5178 |

| BUSINESS/SCHOOL ADDRESS | ☐ WORK PHONE  ☐ MSG. PHONE | MOBILE PHONE |
|---|---|---|

| CODE | NAME (Last, First Middle) | | | SEX | RACE | DOB |
|---|---|---|---|---|---|---|
| SB | Tobin, Trista | | | F | W | 05/31/1994 |

| HOME ADDRESS | CITY | STATE | ZIP | HOME PHONE |
|---|---|---|---|---|
| 110 SE G st | Lakeview | Oregon | 97045 | None |

| BUSINESS/SCHOOL ADDRESS | ☐ WORK PHONE  ☐ MSG. PHONE | MOBILE PHONE |
|---|---|---|

X1,X2, - X9 - SUSPECTS  MI - Missing  RW - Runaway  DK - Drunk  DE - Deceased  AS - Attempt Suicide  ME - Mental

VEHICLE    S - Stolen  R - Recovered  L - Locate  A - Abandoned  T - Towed  V - Victim's Vehicle  X - Suspect Vehicle

| IDENTIFICATION DIVISION NOTIFIED? | ☐ YES | ☒ NO |
|---|---|---|
| OUTSIDE AGENCY NOTIFIED/REFERRED TO? | | |

PROPERTY    S - STOLEN    L - LOST    F - FOUND    D - DAMAGED    K - SAFEKEEPING    R - RECOVERED    E - EVIDENCE

NARRATIVE-The order of appearance for additional information will be:

| ITEM 1: N/A | ITEM 5: N/A |
|---|---|
| ITEM 2: N/A | ITEM 6: ADDITIONAL OFFICERS - List all officers present and identify their involvement with the incident being reported. |
| ITEM 3: N/A | ITEM 7: SUMMARY - A short summary is necessary if the narrative is more than one full page in length. |
| ITEM 4: ADDITIONAL WORTHLESS DOCUMENTS - Record multiple worthless documents on a fraud supplemental form. Record in the narrative the total number of worthless documents written. | ITEM 8: NARRATIVE - List in chronological order, all of the relevant details of the incident and/ or elements of the crime or violation. |

**NARRATIVE**
On 09/18/12 at around 1940 hours, Jorden Hollingsworth and Trista Tobin came to the Gladstone Police Department to report that they had both been Harassing each other. When I arrived they were both calmly sitting in on the bench in front of the PD.

I first interviewed Jorden away from Trista in front of City Hall. Jorden said he was hanging out with some friends near Max Patterson Park in Gladstone when his now ex-girlfriend Trista came up to him "wanting to talk." Jorden said he told Trista that if she wanted to talk to him she would have to say whatever she wanted to say in front of everyone. Jorden said Trista kept following him and yelling at him to talk to her and would not leave him alone. Jorden said he told Trista he was going to call the police on her if she wouldn't leave him alone and she responded by saying she was going to report him to the police. Jorden said he never touched Trista when they were walking towards the PD. I asked Jorden if there was any history of Domestic Violence between Trista and him and he said he was previously on probation in Lake County for Harassing Communication and there was a disturbance in Oregon City that he said was "nothing."

I then spoke to Trista who said she was trying to talk to Jorden at the Max Patterson Park in Gladstone when

| REPORTING OFFICER(S) | DPSST | PREC / DIV | RLF / SHIFT | ASSN / DIST | SUPERVISOR'S SIGNATURE |
|---|---|---|---|---|---|
| Hutchinson | 45115 | | | | #23731 |

GPD-C.1-10/84

787 (08/07)

12-001169

CASE NUMBER

| GLADSTONE POLICE DEPT | INVESTIGATION REPORT | PAGE/OF 2 / 2 |

he yelled at her to get out his face. Trista said Jorden pushed her away from him and she said she was going to go report him to the police. Trista said she started walking toward the Gladstone Police Department and Jorden followed her. Trista said Jorden told her he was going to get her arrested and that the police would never believe her. Trista said Jorden hit her in the arm 5 or 6 times while she was walking to the PD. I could see some slight bruising on Trista's upper left arm. I asked Trista her pain scale from 0 to 10 and she said it was a 2 or 3.

I photographed Trista's arm and downloaded the pictures onto the shared server.

I informed both Trista and Jorden that I would be writing a report on the matter and advised them to stay away frmo each other. Both parties went in separate directions.

On 09/29/12 I received a copy of Oregon City case # 12-3329 regarding the disturbance involving both Jorden and Trista. In the report it was indicated that Trista was hitting Jorden with her arms and they were both fighting each other. From the look of the bruising on Trista I believe it had been done a few days prior to the incident at Max Patterson park. I believe neither party is credible as a victim in this instance.

Case suspended.

COPIES
☐ CP
☐ DA
☐ DHS
☐ DET
☐ JUV
☐ P&P
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐
☐

COMPUTER ENTRY
☐ Person

OPR
☐ Vehicle

OPR
☐ Crime/ Prop

OPR
☐ Book

OPR

| REPORTING OFFICER(S) Hutchinson | DPSST 45115 | PREC / DIV | RLF / SHIFT | ASSN / DIST | SUPERVISOR'S SIGNATURE SGT. WL. #23731 |

GPD-C-1/10/84

767 (08/07)

**CLACKAMAS COUNTY SHERIFF**
2223 KAEN ROAD
OREGON CITY, OR 97045
(503) 655-8218

**CUSTODY REPORT**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C/A | CAT | CDC | DA X | DHS | DIVERT | JUV | MCU | CITIES ☐ D ☐ E |
| ME | MENTAL | PIO | PAP | PROP | PSU | RIM | SIU | ☐ H ☐ W |
| UDC | OTHER | | | | | | | |

Inc. No.: 12-3730
Custody Disp: ☐ CRJ ☐ DEL ☐ C/R
12-30886  ☐ JRC ☐ POH ☐ DETOX
Connect Nos.: 12-3731

Arrest Time 1634  Date 10/14/12  Booking Time 1650  Date 10/14/12  Arrest Location 691 Molalla Ave, #8 Oregon City, OR 97045

Name (Last, First, Middle): Hollingsworth, Jorden Timothy
Alias: — Nickname: —
Residence (Street, City, St, Zip): 691 Molalla Ave #8 Oregon City, OR 97045  Residence Phone 503-935-7165  Business Phone —

Employer — Occupation — Business Address —

Illness/Injury — Medication — Doctor's Name — Marital Status: ⊙ Single ☐ Divorced ☐ Married ☐ Separated

Notify in Emergency/Relation to Arrested — Emergency Notification Street Address — Emergency Notification Phone —

D.O.B. 08/01/93  Sex ⊙ Male ☐ Female  Ht. (Inches) 68  Weight 160  Place of Birth Milwaukie OR  S.S.N. 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  Driver's License —

**DESCRIPTION**

A RACE: 1 ⊙ White 2 ☐ Black 3 ☐ American Indian 4 ☐ Oriental 5 ☐ Hispanic 6 ☐ Other
B EYE COLOR: 1 ☐ Brown 2 ☐ Blue 3 ☐ Hazel 4 ☐ Green 5 ☐ Gray 6 ☐ Other
C HAIR COLOR: 1 ☐ Black 2 ⊙ Brown 3 ☐ Red 4 ☐ Gray 5 ☐ White 6 ☐ Blond 7 ☐ Other
D HAIR LENGTH: 1 ☐ Bald 2 ⊙ Short 3 ☐ Medium 4 ☐ Shoulder 5 ☐ Long
E HAIR TYPE: 1 ☐ Fine 2 ☐ Coarse 3 ☐ Thick 4 ☐ Thinning
F HAIR STYLE: 1 ☐ Wig 2 ⊙ Wavy/Curly 3 ☐ Straight 4 ☐ Bushy 5 ☐ Ponytail 6 ☐ Afro/Natural 7 ☐ Creasy/Curly 8 ☐ Styled/Processed 9 ☐ Braids 10 ☐ Other
G FACIAL HAIR: 1 ☐ None 2 ☐ Unshaven 3 ⊙ Sideburns 4 ☐ Mustache 5 ☐ Fu Manchu 6 ☐ Goatee 7 ☐ Full Beard 8 ☐ Other
H BUILD: 1 ☐ Small 2 ⊙ Thin 3 ☐ Medium 4 ☐ Large 5 ☐ Heavy 6 ☐ Musc. 7 ☐ Other

I COMPLEXION: 1 ☐ Dark 2 ⊙ Medium 3 ☐ Light 4 ☐ Pale 5 ☐ Freckled 6 ☐ Acne 7 ☐ Pock-marked 8 ☐ Ruddy 9 ☐ Tanned 10 ☐ Other
J TEETH: 1 ☐ Missing 2 ☐ Gold / Silver 3 ☐ Decayed/Dirty
K GLASSES: 1 ☐ Plain-Wire 2 ☐ Sun-Wire 3 ☐ Plain-Plastic 4 ☐ Sun-Plastic 5 ☐ Other
L GEN. APPEARANCE: 1 ☐ Casual 2 ☐ Dirty 3 ☐ Disguise 4 ☐ Flashy 5 ☐ Good-looking 6 ☐ Well-groomed 7 ☐ Other
M SPEECH: 1 ☐ High Pitch 2 ☐ Low Pitch 3 ☐ Nasal 4 ☐ Raspy 5 ☐ Accent 6 ☐ Rapid 7 ☐ Slow 8 ☐ Sp. Imped. 9 ☐ Other
N MISCELLANEOUS: 1 ☐ Weapon 2 ☐ Martial Arts 3 ☐ Apologetic 4 ☐ Calm 5 ☐ Nervous 6 ☐ Angry/Violent 7 ☐ Polite 8 ☐ Unco/operat. 9 ☐ Other
O: 1 ☐ Names / Initials 2 ☐ Mom/Mother/Love 3 ☐ Heart / Dagger 4 ☐ Military Insignia 5 ☐ Misc. Pictures 6 ☐ Homemade Tattoo 7 ☐ Missing Extremity 8 ☐ Scar: (Lg.) - (Sm.) 9 ☐ Birth Mark 10 ☐ Other
SCARS - MARKS - TATTOOS: 1 ☐ Head / Neck 2 ⊙ Shoulder/Bicep 3 ☐ Forearm/Hand 4 ☐ Fingers 5 ☐ Leg/Foot 6 ☐ Chest/Stomach 7 ☐ Back 8 ☐ Eye 9 ☐ Other  "JTH" on R shoulder

**JUV**

Parent/Guardian — Parent Notified By (Name) —
Address (Street, City, St, Zip): — Residence Phone — Business Phone —

**CHARGES**

| # | Charge/Hold | ORS/CODE | Crime Classification | Parole/Probation Officer | Bail | Jurisdiction |
|---|---|---|---|---|---|---|
| 1 | ⊙ Charge ☐ Hold ☐ Warrant ☐ Det'y ☐ Citation ☐ I/O ☐ P/C | 163.160 | Assault IV - APA | | $ 5000 ☐ Circuit ☐ Federal ☐ Juvenile ☐ Parole ☐ Municipal | Clack |
| 2 | ⊙ Charge ☐ Hold ☐ Warrant ☐ Det'y ☐ Citation ☐ I/O ☐ P/C | 163.160 | Assault IV (3) | | $7,500 ☐ Circuit ☐ Federal ☐ Juvenile ☐ Parole ☐ Municipal | Clack |
| 3 | ☐ Charge ☐ Hold ☐ Warrant ☐ Det'y ☐ Citation ☐ I/O ☐ P/C | | | | ☐ Circuit ☐ Federal ☐ Juvenile ☐ Parole ☐ Municipal | |

15000

**VEHICLE**

Year — Make — Model — Style — License No. — State —

Vehicle Status: ☐ Inventoried ☐ Driveable ☐ Release Req. ☐ Hold
Tow Status: ☐ Towed ☐ Private Req. ☐ At Scene
Location Towed —  Towed By —

Vehicle Color: ☐ Two-Tone — 1 ☐ Black 2 ☐ Blue 3 ☐ Aqua 4 ☐ Turquoise 5 ☐ Brown 6 ☐ Bronze 7 ☐ Tan 8 ☐ Copper 9 ☐ Beige 10 ☐ Purple 11 ☐ Green 12 ☐ Lime 13 ☐ Olive 14 ☐ Gray 15 ☐ Silver 16 ☐ Red 17 ☐ Pink 18 ☐ Maroon 19 ☐ White 20 ☐ Cream 21 ☐ Yellow 22 ☐ Orange 23 ☐ Gold 24 ☐ Primered 25 ☐ Other
Vehicle Special Features: 1 ☐ Keys in Vehicle 2 ☐ CB Antenna 3 ☐ Special Antenna 4 ☐ Vinyl Top 5 ☐ Loud Muffler 6 ☐ Custom Wheels 7 ☐ Rust 8 ☐ Level Altered 9 ☐ Glass Damage 10 ☐ Tinted Glass 11 ☐ Special Interior 12 ☐ Decorative Paint 13 ☐ Special - Front 14 ☐ Damage - Rear 15 ☐ Damage - Left 16 ☐ Damage - Right 17 ☐ Sticker/Decal - Glass 18 ☐ Sticker/Decal - Body 19 ☐ Sticker/Decal - Bumper 20 ☐ Painted Sign - Body 21 ☐ Other

Miscellaneous —
Blood Alcohol Percentage: — ☐ Drug Impaired ☐ Refused

First Reporting Officer J. Pagano   525.33   OCPD   Approved —  Data Entry —
Second Reporting Officer —

CCP-SF33a (Rev. 5/06)

*DHS, DA*
*GRID # PP6*
*PHOTOGRAPHS*

**C.L.A.S.S.**
OREGON CITY POLICE DEPARTMENT
320 WARNER MILNE RD.
OREGON CITY, OR 97045

**INCIDENT REPORT**

Inc. No.: *12 - 3730*
Crime Classification/ORS: *163.160 ASSAULT IV APA*
Connect Number: *12 - 3731*   *FELONY*

☒ CRIME    ☐ VEHICLE    ☐ PERSON    Classification: ☐ Run Juv ☐ Dec Acc ☐ Dec Unk ☐ Sick / Injured
☐ Miss Pers ☐ Dec Nat ☐ Suicide ☐ Other

9 Location of Occurrence: *10 1012 V300 SATURN 70 V3 V2 1400 SATURN 70 V4 V2 1538 SUNDAY*
*691 Molalla Ave #8 OC, OR 97045*

11 Name of Person/Bus. (Last, First, Middle): *SOLOMON, MINDY J*
12 D.O.B. *03/28/74*   13 Sex ☒ Male ☐ Female   14 Race
15 Residence Address (Street, City, St, Zip): *691 Molalla Ave #8 OC, OR 9704*   16 Res. *503 935-7165*
Bus.
Other:

17 School/Employer/Business/Proprietor:    18 Occupation/Position:

22 Name (Last, First, Middle): *HOLLINGSWORTH, TANAEA M*
23 D.O.B. *05/15/96*   24 Sex ☐ Male ☒ Female   25 Race
26 Residence Address (Street, City, St, Zip): *SFA #*   27 Res. *503 935-7163*
Other:

29 Relationship to Victim: *DAUGHTER*    30 Witness Involved: *WITNESS*

**STOLEN / REC. VEHICLE**
☐ Stolen   ☐ Rec.   ☐ Tow & Hold

31   32   33   34   35   36
37   38   39   40   41   ☐ Yes ☐ No

42 Loss Value:    43 Recovered Value:

44 Special Features
1 ☐ Days in Vehicle   6 ☐ Custom Wheels   12 ☐ Decorative Paint   17 ☐ Sticker/Decal - Window   22 ☐ Hi Pro Engine
2 ☐ Special Antenna   7 ☐ Rust   13 ☐ Damage - Front   18 ☐ Sticker/Decal - Body   23 ☐ Locking Gas Cap
3 ☐ Canopy / Camper   8 ☐ Level Altered   14 ☐ Damage - Rear   19 ☐ Sticker/Decal - Bumper   24 ☐ Other:
4 ☐ Vinyl Top   9 ☐ Glass Damage   15 ☐ Damage - Left   20 ☐ Painted Sign - Body
5 ☐ Loud Muffler   10 ☐ Tinted Glass   16 ☐ Damage - Right   21 ☐ Four-Wheel Drive   11 ☐ Special Interior

45 Other:    46 Read to victim "I accept liability for towing and storage costs"   VICTIM AGREED: ☐ Yes ☐ No

**BOAT**
☐ Stolen   ☐ Rec.   ☐ Lost

47 Reg. No.:   State:   48 Reg. Yr.:   49 Boat hull material: ☐ Aluminum ☐ Steel ☐ Wood ☐ Fiberglass ☐ Other/Inflatable
50 Boat hull number:   51 Propulsion: ☐ Outboard ☐ Inboard or Inb/Outb ☐ Sail ☐ Steam ☐ Other / Hovercraft
52 Make:   53 Length   In.   54 Boat Color
55 Type of Construction: ☐ Open Boat ☐ Cabin (fixed top) ☐ Cruising Houseboat ☐ Other Houseboat   56 Loss value:   57 Recovered value:

**REC.**
58 Other:
59 Hold: ☐ Yes ☐ No   60 Towed by:   61 Towed to:   62 Released to:
63 Person/ORI notified:   64 Notified by:   65 Date:   66 Time:

| TARGETS | | | SUSPECT ACTIONS | | | |
|---|---|---|---|---|---|---|
| 67 - Victim | 70 - Residential | 72 - Non-Residential | 74 - Pt. of Entry / Exit | 76 - Section 1 | 80 - Section 2 | 81 - Section 3 | 83 - Section 4 |

67 - Victim
☐ Male ☒ Fem.
☐ Child
2 ☐ Juv
☐ Elderly
5 ☐ Mult. Victims
6 ☐ Business

68 - Surroundings
1 ☐ Residential
2 ☐ Business
3 ☐ Industrial/Mfg
4 ☐ Recreational
5 ☐ Institutional
6 ☐ Other

69 - Type Security
1 ☐ Alarm
2 ☐ Bars
3 ☐ Deadbolt
4 ☐ Int. lights
5 ☐ Ext. lights
6 ☐ Business
7 ☐ Operation ID
8 ☐ Security fence
9 ☐ Guard
11 ☐ Priv Sec Pat
12 ☐ Other

70 - Residential
1 ☐ Single Family
2 ☐ Duplex
3 ☐ Apt/condo
4 ☐ Hotel/motel
5 ☐ Travel trailer/ Motorhome
6 ☐ Mobile Home
7 ☐ Group Home
8 ☐ Other

71 - Res. Targets
1 ☐ Entire structure
2 ☐ Basement
3 ☐ Gar/carport
4 ☐ Attic
5 ☐ Kitchen
6 ☐ Bedroom
7 ☐ Family area
8 ☐ Bathroom
9 ☐ Storage area
10 ☐ Other

72 - Non-Residential
1 ☐ Open area-private
2 ☐ Highway/roadway
3 ☐ Open area-public
4 ☐ Construction Site
5 ☐ Vehicle
6 ☐ RV
7 ☐ Office/prof. bldg
8 ☐ Financial Inst.
9 ☐ School
10 ☐ Drug/medical
11 ☐ Supermarket/variety
12 ☐ Convenience store
13 ☐ Liquor store
14 ☐ Restaurant
15 ☐ Fast food
16 ☐ Tavern/bar
17 ☐ Gas station
18 ☐ Church
19 ☐ Warehouse
20 ☐ Specialty shop
21 ☐ Church
22 ☐ Car lot
23 ☐ Mailbox
24 ☐ Computer crimes
25 ☐ Storage unit
26 ☐ Other

73 - Non-Res. Targets
1 ☐ Cash register/ver
2 ☐ Convenience area
3 ☐ Safe/cashbox
4 ☐ Vending machine
5 ☐ Display items
6 ☐ Office
7 ☐ Customer
8 ☐ Storage/locker
9 ☐ ATM
10 ☐ Other

74 - Pt. of Entry / Exit
Entry Exit
1 ☐ Unknown ☐ ☐
2 ☐ Front ☐ ☐
3 ☐ Rear ☐ ☐
4 ☐ Side ☐ ☐
5 ☐ Ground level ☐ ☐
6 ☐ Upper level ☐ ☐
7 ☐ Roof ☐ ☐
8 ☐ Door ☐ ☐
9 ☐ Sliding glass ☐ ☐
10 ☐ Window ☐ ☐
11 ☐ Duct/vent ☐ ☐
12 ☐ Adjacent bldg ☐ ☐
13 ☐ Wall ☐ ☐
14 ☐ Garage ☐ ☐
15 ☐ Trunk/hood ☐ ☐
16 ☐ Other ☐ ☐

75 - Method of Entry / Exit
Entry Exit
1 ☐ Not successful ☐ ☐
2 ☐ No force ☐ ☐
3 ☐ Unlocked ☐ ☐
4 ☐ Hid/remain in structure ☐ ☐
5 ☐ Invited/lawful entry ☐ ☐
6 ☐ Forced entry ☐ ☐
7 ☐ Bodily force ☐ ☐
8 ☐ Kick/slip lock ☐ ☐
9 ☐ Cut/break lock ☐ ☐
10 ☐ Twist knobs ☐ ☐
11 ☐ Sawdrill/burn ☐ ☐
12 ☐ Cut glass ☐ ☐
13 ☐ Broke glass ☐ ☐
14 ☐ Unique/ extraordinary ☐ ☐
15 ☐ Pry Tool ☐ ☐
16 ☐ Other ☐ ☐

76 - Section 1
1 ☐ Mult suspects
2 ☐ Used look-out
3 ☐ Vehicle needed
4 ☐ Took victims vehicle
5 ☐ Used stolen vehicle
6 ☐ Suspect armed
7 ☐ Discharged weapon
8 ☐ Smoked
9 ☐ Ate/drank
10 ☐ Used matches for light
11 ☐ Used victim's tools
12 ☐ Prepared exit
13 ☐ Defecated
14 ☐ Turned lights on/off
15 ☐ Disabled phone
16 ☐ Shut off power
17 ☐ Wore mask
18 ☐ Unique/extraordinary
19 ☐ Punched ignition
20 ☐ Profanity
21 ☐ Used victim's tools
22 ☐ Used force
23 ☐ Hot wired
24 ☐ Other

77 - Type of Drug
1 ☐ Opium ☐ Other narcotic
2 ☐ Heroin ☐ Hashish
3 ☐ Morphine ☐ Marijuana Under Oz.
4 ☐ Cocaine ☐ Marijuana Over Oz.
5 ☐ Codeine ☐ Synthetic

78 Exact Words of Suspect(s):

79 Unique M.O.

80 - Section 2
1 ☐ Vandalized
2 ☐ Ransacked
3 ☐ Knew loc. of prop.
4 ☐ Selective in loot
5 ☐ Took only concealables
6 ☐ Took prop. from vehicle
7 ☐ Slashed loot
8 ☐ Shoplift
9 ☐ Used pillowcase,etc.
10 ☐ Radially motivated
11 ☐ Domestic Violence
12 ☐ Gang Related
13 ☐ Grafitti
14 ☐ Cat burglary
15 ☐ Other

81 - Section 3
1 ☒ Inflicted injury
2 ☐ Threat retaliation
3 ☐ Forced victim to lay on floor
4 ☐ Forced victim into vehicle
5 ☐ Put property in sack/pocket
6 ☐ Snatched purse
7 ☐ Offered assist
8 ☐ Used left hand
9 ☐ Used right hand
10 ☐ Took hostage
11 ☐ Did not speak
12 ☐ Covered vic. face
13 ☐ Bound/gagged victim
14 ☐ Demanded specific items
15 ☐ Other

82 - Intended Use of Drug
☐ Possess for Sale ☐ Manufacture
☐ Selling ☐ Obtain
☐ Possess for Use ☐ Tamper
☐ Furnish ☐ Other
☐ Cultivate

83 - Section 4
1 ☐ Knew victim's name
2 ☐ Molested victim
3 ☐ Unusual odor
4 ☐ Masturbated
5 ☐ Ejaculated
6 ☐ Disabled in act
7 ☒ Struck victim
8 ☐ Made victim disrobe
9 ☐ Required victim to act
10 ☐ Raped
11 ☐ Other sex acts
12 ☐ Other

84 - Type of Weapon
☐ Handgun
☐ Rifle/Shotgun
☐ Other Firearm
☐ Unknown Firearm
☐ Knife
☐ Other weapon
☐ Handfeet

85 Time Received   86 Time Dispatched   87 Time Arrived   88 Time Cleared

89 Approved By: *J. PAGANO   52533*   90 Second Reporting Officer

| 91 ☐ MORE THAN TWO SUSPECTS | ☒ **SUSPECT** | ☐ **PERSON REPORT** | 92 INCIDENT NO. 12-3730 |
|---|---|---|---|

**SUSPECT #1**

| 93 CUSTODY ACTION | 94 NAME (Last, First, Middle): HOLLINGSWORTH, JORDEN J. | | 95 ☐ Alias: |
|---|---|---|---|
| ☐ Cited & Released | | | ☐ Nickname: |
| ☐ In Custody Booking No.: | 96 RESIDENCE (Street, City, St, Zip): | 97 RES. PHONE | 98 BUS. PHONE |
| ☐ Not Contacted | | | |
| ☐ Contacted / No Arrest | 99 EMPLOYER | 100 OCCUPATION | 101 BUSINESS ADDRESS |

| 102 D.O.B. 08/01/93 | 103 SEX ☐ Male ☐ Female | 104 HT. | 105 WT. | 106 PLACE OF BIRTH | 107 SS No. | 108 DRIVER'S LICENSE |
|---|---|---|---|---|---|---|

109 OTHER INFORMATION

**SUSPECT #2**

| 110 CUSTODY ACTION | 111 NAME (Last, First, Middle): | | 112 ☐ Alias: |
|---|---|---|---|
| ☐ Cited & Released | | | ☐ Nickname: |
| ☐ In Custody Booking No.: | 113 RESIDENCE (Street, City, St, Zip): | 114 RES. PHONE | 115 BUS. PHONE |
| ☐ Not Contacted | | | |
| ☐ Contacted / No Arrest | 116 EMPLOYER | 117 OCCUPATION | 118 BUSINESS ADDRESS |

| 119 D.O.B. | 120 SEX ☐ Male ☐ Female | 121 HT. | 122 WT. | 123 PLACE OF BIRTH | 124 SS No. | 125 DRIVER'S LICENSE |
|---|---|---|---|---|---|---|

126 OTHER INFORMATION

**PERSON**

| 127 HT. | 128 WT. | 129 PLACE OF BIRTH | 130 SS No. | 131 DRIVERS LICENSE |
|---|---|---|---|---|

132 CLOTHING DESCRIPTION

133 DENTIST

**SUSPECT / PERSON DETAIL**

| 134 RACE | | 139 EYE COLOR | | 133 HAIR COLOR | | 141 HAIR LENGTH | | 144 HAIR STYLE | | 146 FACIAL HAIR | | 148 BUILD | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| #1 | #2 | #1 | #2 | #1 | #2 | #1 | #2 | #1 | #2 | #1 | #2 | #1 | #2 |
| 1 ☐ White 1 ☐ | | 1 ☐ Brown 1 ☐ | | 1 ☐ Black 1 ☐ | | 1 ☐ Bald 1 ☐ | | 1 ☐ Wig 1 ☐ | | 1 ☐ None 1 ☐ | | 1 ☐ Small 1 ☐ | |
| 2 ☐ Black 2 ☐ | | 2 ☐ Blue 2 ☐ | | 2 ☐ Brown 2 ☐ | | 2 ☐ Short 2 ☐ | | 2 ☐ Wavy / Curly 2 ☐ | | 2 ☐ Unshaven 2 ☐ | | 2 ☐ Thin 2 ☐ | |
| 3 ☐ American Indian 3 ☐ | | 3 ☐ Hazel 3 ☐ | | 3 ☐ Red 3 ☐ | | 3 ☐ Medium 3 ☐ | | 3 ☐ Straight 3 ☐ | | 3 ☐ Sideburns 3 ☐ | | 3 ☐ Medium 3 ☐ | |
| 4 ☐ Oriental 4 ☐ | | 4 ☐ Green 4 ☐ | | 4 ☐ Gray 4 ☐ | | 4 ☐ Shoulder 4 ☐ | | 4 ☐ Bushy 4 ☐ | | 4 ☐ Mustache 4 ☐ | | 4 ☐ Large 4 ☐ | |
| 5 ☐ Hispanic 5 ☐ | | 5 ☐ Gray 5 ☐ | | 5 ☐ White 5 ☐ | | 5 ☐ Long 5 ☐ | | 5 ☐ Ponytail 5 ☐ | | 5 ☐ Fu Manchu 5 ☐ | | 5 ☐ Heavy 5 ☐ | |
| 6 ☐ Other: 6 ☐ | | 6 ☐ Other 6 ☐ | | 6 ☐ Lt. Blond 6 ☐ | | | | 6 ☐ Afro / Natural 6 ☐ | | 6 ☐ Goatee 6 ☐ | | 6 ☐ Musc. 6 ☐ | |
| | | | | 7 ☐ Other | | 142 HAIR TYPE | | 7 ☐ Greasy / Dirty 7 ☐ | | 7 ☐ Full Beard 7 ☐ | | 7 ☐ Other: 7 ☐ | |
| | | | | | | #1 | #2 | 8 ☐ Styled / Processed 8 ☐ | | 8 ☐ Other: 8 ☐ | | | |
| | | | | | | 1 ☐ Fine 1 ☐ | | 9 ☐ Braids 9 ☐ | | | | | |
| | | | | | | 2 ☐ Coarse 2 ☐ | | 10 ☐ Other: 10 ☐ | | | | | |
| | | | | | | 3 ☐ Thick 3 ☐ | | | | | | | |
| | | | | | | 4 ☐ Thinning 4 ☐ | | | | | | | |

| 135 COMPLEXION | | 137 TEETH | | 140 GEN. APPEARANCE | | 143 SPEECH | | 145 MISCELLANEOUS | | 147 SCARS - MARKS - TATTOOS | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| #1 | #2 | #1 | #2 | #1 | #2 | #1 | #2 | #1 | #2 | #1 | #2 | #1 | #2 |
| 1 ☐ Dark 1 ☐ | | 1 ☐ Missing 1 ☐ | | 1 ☐ Casual 1 ☐ | | 1 ☐ High Pitch 1 ☐ | | 1 ☐ Weapon 1 ☐ | | 1 ☐ Names / Initials 1 ☐ | | 1 ☐ Head / Neck 1 ☐ | |
| 2 ☐ Medium 2 ☐ | | 2 ☐ Gold / Silver 2 ☐ | | 2 ☐ Dirty 2 ☐ | | 2 ☐ Low Pitch 2 ☐ | | 2 ☐ Martial Arts 2 ☐ | | 2 ☐ Mom/Mother/Love 2 ☐ | | 2 ☐ Shoulder/Bicep 2 ☐ | |
| 3 ☐ Light 3 ☐ | | 3 ☐ Decayed/Dirty 3 ☐ | | 3 ☐ Dressy 3 ☐ | | 3 ☐ Nasal 3 ☐ | | 3 ☐ Apologetic 3 ☐ | | 3 ☐ Heart / Dagger 3 ☐ | | 3 ☐ Forearm/Hand 3 ☐ | |
| 4 ☐ Pale 4 ☐ | | 4 ☐ Other 4 ☐ | | 4 ☐ Flashy 4 ☐ | | 4 ☐ Raspy 4 ☐ | | 4 ☐ Calm 4 ☐ | | 4 ☐ Military Insignia 4 ☐ | | 4 ☐ Fingers 4 ☐ | |
| 5 ☐ Freckled 5 ☐ | | | | 5 ☐ Good-looking 5 ☐ | | 5 ☐ Accent 5 ☐ | | 5 ☐ Nervous 5 ☐ | | 5 ☐ Misc. Pictures 5 ☐ | | 5 ☐ Leg/Foot 5 ☐ | |
| 6 ☐ Acne 6 ☐ | | 138 GLASSES | | 6 ☐ Well-groomed 6 ☐ | | 6 ☐ Rapid 6 ☐ | | 6 ☐ Angry/Violent 6 ☐ | | 6 ☐ Homemade Tattoo 6 ☐ | | 6 ☐ Chest/Stomach 6 ☐ | |
| 7 ☐ Pock-marked 7 ☐ | | #1 #2 | | 7 ☐ Other 7 ☐ | | 7 ☐ Polite 7 ☐ | | 7 ☐ Missing Extremity 7 ☐ | | 7 ☐ Back 7 ☐ | |
| 8 ☐ Ruddy 8 ☐ | | 1 ☐ Plain-Wire 1 ☐ | | | | 8 ☐ Slow 8 ☐ | | 8 ☐ Unconcerat. 8 ☐ | | 8 ☐ Scar: (Lg.) - (Sm.) 8 ☐ | | 8 ☐ Eye 8 ☐ | |
| 9 ☐ Tanned 9 ☐ | | 2 ☐ Sun-Wire 2 ☐ | | | | 9 ☐ Sp. Imped. 9 ☐ | | 9 ☐ Older 9 ☐ | | 9 ☐ Birth Mark 9 ☐ | | 9 ☐ Other: 9 ☐ | |
| 10 ☐ Other: 10 ☐ | | 3 ☐ Plain-Plastic 3 ☐ | | | | 10 ☐ Other: 9 ☐ | | 10 ☐ Other: 10 ☐ | | 10 ☐ Other: 10 ☐ | | | |
| | | 4 ☐ Sun-Plastic 4 ☐ | | | | | | | | | | | |
| | | 5 ☐ Other: 5 ☐ | | | | | | | | | | | |

**SUSPECT / PERSON / VEHICLE**

| 149 VEHICLE | | 155 VEHICLE COLOR | ☐ **Two-Tone** | 156 SPECIAL VEHICLE FEATURES | |
|---|---|---|---|---|---|
| | | 1 ☐ Black | 14 ☐ Gray | 1 ☐ Keys in Vehicle | 14 ☐ Damage - Rear |
| | | 2 ☐ Blue | 15 ☐ Silver | 2 ☐ Special Antenna | 15 ☐ Damage - Left |
| | | 3 ☐ Aqua | 16 ☐ Red | 3 ☐ Canopy / Camper | 16 ☐ Damage - Right |
| | | 4 ☐ Turquoise | 17 ☐ Pink | 4 ☐ Vinyl Top | 17 ☐ Sticker/Decal - Window |
| | | 5 ☐ Brown | 18 ☐ Maroon | 5 ☐ Loud Muffler | 18 ☐ Sticker/Decal - Body |
| 150 LICENSE NO. | 151 STATE | 6 ☐ Bronze | 19 ☐ White | 6 ☐ Custom Wheels | 19 ☐ Sticker/Decal - Bumper |
| | | 7 ☐ Tan | 20 ☐ Cream | 7 ☐ Rust | 20 ☐ Painted Sign - Body |
| 152 VEHICLE TOWED BY | | 8 ☐ Copper | 21 ☐ Yellow | 8 ☐ Level Altered | 21 ☐ Four-Wheel Drive |
| | | 9 ☐ Beige | 22 ☐ Orange | 9 ☐ Glass Damage | 22 ☐ Other: |
| 153 VEHICLE TOWED TO | | 10 ☐ Purple | 23 ☐ Gold | 10 ☐ Tinted Glass | |
| | | 11 ☐ Green | 24 ☐ Primered | 11 ☐ Special Interior | |
| | | 12 ☐ Lime | 25 ☐ Other: | 12 ☐ Decorative Paint | |
| | | 13 ☐ Olive | | 13 ☐ Damage - Front | |

154 ADDITIONAL VEHICLE DESCRIPTION

CCP-COC30 (Rev. 4/02)

| Page # 1 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |
| | | |

## MENTIONED

Jorden T. Hollingsworth-                 Suspect/Custody
691 Molalla Ave #8
Oregon City, OR 97045
Phone: 503-935-7165
DOB: 08/01/1993

Tanaea M. Hollingsworth-                 Victim
691 Molalla Ave #8
Oregon City, OR 97045
Phone: 503-935-7165
DOB: 05/15/1996

Mindy J. Solomon-                 Victim
691 Molalla Ave #8
Oregon City, OR 97045
Phone: 503-935-7165
DOB: 03/28/1974

Officer I. Booker-                 OCPD

Officer Turpin-                 OCPD

Officer Pagano-                 OCPD

## ACTION TAKEN

On October 14th, 2012 at about 3:28 p.m. Officer Booker and I responded to a domestic disturbance at 691 Molalla Ave #8 in Oregon City, OR. The disturbance was heard only and it was reported a lot of yelling and "stuff" was being thrown around. Officer's Turpin and Pagano also responded.

We arrived and made contact with a male identified as 19 year-old Jorden Hollingsworth, who was sitting on the stairs leading to the apartment. I asked Officer Pagano to speak with Mr. Hollingsworth (**SEE OFFICER PAGANO'S REPORT**).

| Officer: David Edwins | DPSST# 43525 | Agency: OCPD |
|---|---|---|

| Page # 2 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |

I approached the apartment and the front door was open. I made contact with Mr. Hollingsworth's 16 year old sister, Tanaea Hollingsworth and their mother, Mindy Solomon. I asked them if I could come inside and Tanaea told me I could. I immediately noticed Tanaea's mascara had been running down her face from crying. I asked what was going on and Tanaea stated, "He fucking bit me," referring to Mr. Hollingsworth. She then showed me a large red bite mark near the area of her right elbow (**SEE PHOTOGRAPHS ON FILE**).

I had Tanaea come into the kitchen, so I could interview her about the injury and disturbance. She told me she was sitting on the couch and talking to her friend Mariah on Facebook and texting her at the same time. She said Mr. Hollingsworth was in his bedroom and "beating" his dog. I asked her how she knew he was beating his dog and she stated, "Because I could hear his dog yelping." She told me her brother has been beating his dog since he got it. She said she was still sitting on the couch and yelled at him not to beat his dog. She stated Mr. Hollingsworth yelled at her to shut up or he was going to come out and beat her "ass" if she didn't stop.

Tanaea told me she yelled back at Mr. Hollingsworth and told him she wasn't scared of him. She also said she told him that if he hit her she would call the police. She told me Mr. Hollingsworth came out of the bedroom and grabbed the cell phone out of her hand, because she was yelling at him. She said she then went to his bedroom, got his dog, and went outside. She said when he came inside he kicked his dog in the face. She said she told him if he kept hurting his dog she was going to call the police. She said he then grabbed her right arm with both of his hands and bit her with his mouth. She again showed me her arm and said, "You can even see the mark." I asked her if it hurt and she stated, "Yes, very badly," and told me she started crying. She told me the bite lasted five to seven seconds. I asked her to describe the pain and she said, "Like stabbing." I asked her if she was feeling pain right now and she said, "It's still throbbing." I asked her to rate the pain from the bite on a pain scale with one being the least amount of pain she has ever experience and ten being the most. She rated the pain an "8" when it happened and told me it was currently a, "4 or 5".

Tanaea told me she back handed Mr. Hollingsworth in the face after he bit her. She told me she back handed him because she wanted him off her. She told me he stopped biting her and went into his room. She said she told him she was going to call the cops. She said he told her to call the cops because she hit him. She told me she replied, "You bit me."

Tanaea told me her mother was in the kitchen looking out the window when the incident with Mr. Hollingsworth occurred. She told me she was on the floor crying and her mom asked what

| Officer: David Edwins | DPSST# 43525 | Agency: **OCPD** |
|---|---|---|

| Page # 3 | | C.L.A.S.S. | Case # 12-3730 |
| --- | --- | --- | --- |
| | | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | |
| | | | |

happened. She said she told her Mr. Hollingsworth bit her. She said her mom went into Mr. Hollingsworth's room and told him she was calling the cops. She said her mom also told him she couldn't believe he bit his sister.

Tanaea told me Mr. Hollingsworth has a "very violent problem". She told me Mr. Hollingsworth had held a butcher knife to his mom in Gladstone. She said the cops were called and he was arrested. I asked her if he's been physical with her before and she stated, "Millions and millions of times." She went on to tell me he's punched her for not going to school before. She later told me the last time he was physical with her was in Lake View, Oregon in June. She said he grabbed her by the arm really tight and threw her because she wouldn't go in her room.

During my conversation with Tanaea she also told me Mr. Hollingsworth took a full pop can and threw it at their mom last night. She told me the pop can hurt her mom's arm (**SEE OFFICER PAGANO'S INTERVIEW OF MS. SOLOMON FOR FURTHER**).

I briefly spoke to Officer Pagano to find out what Mr. Hollingsworth had told him. He told me Mr. Hollingsworth was saying Tanaea had blocked the door, was swinging at him, and he bit her.

I walked out of the apartment and spoke to Mr. Hollingsworth. I asked him if he bit Tanaea and he said, "Yeah." He told me it wasn't a violent bite and stated it was more of a, "Get the hell off me." He told me Tanaea was blocking the front door, because he was trying to take the dog out to use the restroom. He told me she was upset because he had her phone. He told me Tanaea hit him. I asked where she hit him and he said, "kind of all over," and stated, "I'm not trying to get her in trouble."

I went and spoke to Tanaea again. I explained to her what Mr. Hollingsworth was saying about the incident. She said she stood in front of the door, so he couldn't go out with the phone. She told me he kneed her on her left leg and then she moved. She told me she only hit him after he bit her.

I spoke to Mr. Hollingsworth again and asked him if Tanaea deserved to be bit and he said, "No." I asked him if he was the more aggressive one and he said, "Honestly no." I asked him if he kneed her in the leg. He told me he "corn dogged," her which meant to knee her, but stated it was more of a playful thing. I again asked him about being the aggressive one and he said, "Yes, I'm the more aggressive one if that's what you're getting at." I asked him how

| Officer: David Edwins | DPSST# 43525 | Agency: OCPD |
| --- | --- | --- |

| Page # 4 | C.L.A.S.S. | Case # 12-3730 |
|---|---|---|
| | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | |

many times Tanaea hit him and he stated, "I can't say how many times." He also mentioned an incident which occurred on Friday, in which his mom was trying to get at his girlfriend and was hitting him in the face.

I spoke to Ms. Solomon, who told me she didn't see Mr. Hollingsworth bite Tanaea. However, she did tell me Mr. Hollingsworth was the aggressor. I told her Mr. Hollingsworth was saying Tanaea had hit him. She told me she didn't hear any hitting and stated, "She wasn't." She told me the only thing she could hear was Tanaea telling Mr. Hollingsworth to get off her. She said all of a sudden she heard Tanaea crying. She said Tanaea told her Mr. Hollingsworth bit her.

I asked Tanaea further questions about the pop can incident involving Mr. Hollingsworth and her mom, which occurred on Saturday. She told me yesterday about ten minutes before Mr. Hollingsworth threw the pop at his mom, he pushed her for yelling at him. She later told me her mom was yelling at him about his girlfriend. She told me her mom was then yelling at him for pushing her. She said Mr. Hollingsworth came out of his room and grabbed the pop can, which was sitting on the top of the T.V. and threw it at her arm. She told me her mom started crying and Mr. Hollingsworth told her shut up and called her a baby. She told me there was a huge red mark on her mom's arm the previous night. She told me she was sitting on the couch, which is located in the living room when the incident happened. She said her mom was on the other couch, also located in the living room.

I also discussed with Tanaea what happened on Friday between Mr. Hollingsworth and her mom. She told me on Friday Mr. Hollingsworth was pushing their mom. She said her mom was trying to protect her face. She told me her mom slapped Mr. Hollingsworth in the face and scratched him, but stated it was to protect herself. While on scene, I noticed Mr. Hollingsworth had a red mark on the right side of his eye. Tanaea told me she was pretty sure the mark was a pimple.

While on scene Officer Booker took photographs of Tanaea and Ms. Solomon's injuries. He also took photographs of Mr. Hollingsworth (**SEE PHOTOGRAPHS ON FILE**).

Mr. Hollingsworth was taken into custody for Assault IV. Officer Pagano transported Mr. Hollingsworth to the Clackamas County Jail, where he was lodged on the assault charges.

| Officer: David Edwins | DPSST# 43525 | Agency: **OCPD** |
|---|---|---|

| Page # 5 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |
| | | |

At about 6:36 p.m. I called and spoke to Tanaea on the phone and arranged for Ms. Solomon and her to come to the police department, so I could take additional photographs of their injuries.

At about 7:08 p.m. Officer Pagano and I met with Tanae, Ms. Solomon, and her grandmother in the lobby of the police department. I took additional photographs of Tanaea and Ms. Solomon **(SEE PHOTOGRAPHS ON FILE)**.

At about 7:28 p.m. I called the DHS child abuse hotline and reported the incident.

**EVIDENCE**

Photographs-on file.

**ACTION RECOMMENDED**

Forward to DA's Office for prosecution.

Forward to DHS.

Forward to Lake County Community Corrections.

| Officer: David Edwins | DPSST# 43525 | Agency: OCPD |
|---|---|---|

| Page # 1 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |
| | | |

## SUMMARY

On 10/14/12 at approximately 3:26pm Officers Turpin, Edwins, and myself were dispatched to a disturbance at 691 Molalla Ave. #8 Oregon City, OR 97045. Jorden Hollingsworth was contacted and subsequently arrested for assaulting both his sister, Tanaea Hollingsworth, and his mother, Mindy Solomon. Jorden was transported and lodged in Clackamas County Jail without incident.

## MENTIONED

Jorden Timothy Hollingsworth—Suspect/In Custody
DOB: 08/01/93
691 Molalla Ave. #8 Oregon City, OR 97045
503-935-7165

Mindy Jean Solomon—Victim/Mother of Jorden
DOB: 03/28/74
691 Molalla Ave. #8 Oregon City, OR 97045
503-935-7165

Tanaea M Hollingsworth—Victim/Sister of Jorden
DOB: 05/15/96
691 Molalla Ave. #8 Oregon City, OR 97045
503-935-7165

Trista Samatha Lee Tobin—Mentioned/Girlfriend of Jorden
DOB: 05/31/94
1001 S. G St. Lakeview, OR 97636

Joe Stevens—Mentioned/Friend of Jorden
Oak Grove, OR

Connie Nash—Lake County Community Corrections

Officer Edwins—OCPD

Officer Turpin—OCPD

## ACTION TAKEN

On 10/14/12 at approximately 3:26pm Officers Turpin, Edwins, and myself were dispatched to a disturbance at 691 Molalla Ave. #8 Oregon City, OR 97045. I contacted a male, identified as Jorden Hollingsworth, in front of the apartment at the bottom of a staircase while Officer Edwins went inside the apartment.

| Officer: Joseph Pagano | DPSST# 52533 | Agency: **OCPD** |
|---|---|---|

| Page # 2 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |
| | | |

Jorden told me police were called by a neighbor who heard him and his sister, identified as Tanaea Hollingsworth, having an argument.  He told me the argument started over his sister and mother, identified as Mindy Solomon, not approving of his girlfriend, identified as Trista Tobin, who was currently staying with him since last Friday.  He told me his mother and sister just did not like Trista and constantly berate her.

Jorden said around 3:10pm his dog urinated inside the house.  He told me he was scolding the dog by yelling at it and putting its face in the wet spot.  He said Tanaea began accusing him of abusing the dog and these allegations upset him, creating the beginnings of another argument.  He told me the argument over the treatment of the dog was also fueled by his frustrations over his sister and mother's treatment of Trista.

Jorden told me while arguing with Tanaea, he picked the dog up and began to take it outside so it could finish going to the bathroom.  He told me he grabbed the cell phone from the living room Tanaea uses in an attempt of retaliation.  He said once he grabbed the phone, she physically blocked the front door with her body so he could not get outside.  He described Tanaea as placing each hand inside either side of the frame of the door, with her back facing him.

Jorden said Tanaea began swinging her arm backwards at him as he attempted to get around her body so he could leave.  He said the two of them continued to argue with one another about why he would not give the cell phone back.  He told me as she was swinging at him he bit her in the arm because he could not physically get around her.  I asked him how hard he bit her and he told me, "Mediocre."

Jorden said Tanaea never actually hit him and he sustained no injuries while she was swinging her arms back at him **(See Officer Edwins' report regarding Tanaea's statements and photographs of injury)**.

I noticed some redness on the cheek of Jorden and asked him about it, and he told me it was, "Nothing."  Jorden assured me he did not want to get anyone in trouble, be a victim of any sort of crime, and repeatedly told me he would never hit his sister or mother.

I contacted Trista Tobin in front of the apartment and asked her if she witnessed the argument between Jorden and Tanaea.  Trista told me she was in the bedroom when the argument was occurring and she only heard Jorden and Tanaea arguing.

I went inside the apartment to contact Mindy Solomon and Officer Edwins informed me she told him she only heard the altercation.  I asked Mindy about her treatment of Trista.  She told me she did not want Trista staying in her house because of issues she had caused in the past.  She said Trista filed made-up allegations causing her to be evicted from her last home in Gladstone.  She said she has no way of forcing Trista to leave through the landlord because Jorden's name is on the lease, as well.

| Officer: Joseph Pagano | DPSST# 52533 | Agency: **OCPD** |
|---|---|---|

| Page # 3 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |
| | | |

Mindy informed me Jorden had assaulted her yesterday by grabbing her by the neck and hitting her with a full soda pop can he had thrown.

I asked Mindy to tell me the entire story from the beginning.  She said although she was upset and did not approve of Trista staying in the residence on Friday, she tried not to make a big deal out of the situation once she saw Jorden's anger level begin to escalate after arguing about it.  She said on Saturday afternoon Jorden came out of the bedroom and she heard Trista ask him to make food for her.  She told me while she could not prevent Trista from staying in the apartment since Jorden was on the lease, she did have control over the food in the kitchen since she purchased all of it.  She said she told Jorden that Trista was not allowed to eat any of her food.

Mindy told me Jorden immediately lost his temper and, "Came at me."  She said she was in the living room adjacent to the kitchen when Jorden got nose to nose with her and began yelling at her.  She said Jorden made statements like, "I pay the bills around here."  Mindy said Jorden has no source of income and she pays for all food and living expenses.

As Jorden continued to yell at Mindy, she told me she told him to, "Get out of my face."  She said Jorden ignored her so she pushed him in the shoulders to back him off.  She told me he responded by grabbing her around the neck and forcibly pushing her backwards into the couch.  She told me these actions did not hurt or scare her because Jorden has done things like this in the past.  She said she threatened Jorden to get out of the house in frustration.

Mindy said Jorden walked back towards the television and picked up a full, sealed can of soda pop, turned around, and threw it overhand at her.  She told me the soda can struck her in the outside upper portion of her left arm.  She said she began crying.  I asked her on a scale of 1-10, with one being no pain and ten being the most excruciating pain she has ever felt in her life, how much pain this caused her and she told me a "5".  She described the soda can impacting her arm as feeling like, "A baseball bat hit me."

Mindy said Jorden told her to, "Stop crying like a baby," after the can hit her.  She told me Jorden and Trista left the apartment after the incident, and she called her mother to take her to the hospital.  She said the doctor's at Providence Willamette Falls performed a CAT scan on her neck and x-rays on her arm.  She said she was not prescribed any medication, and was diagnosed with a contusion on her arm and a cervical strain on her neck.

I asked Mindy if the soda pop can was still in the apartment and she told me it was.  She grabbed a 12oz generic Safeway brand of cream soda from the countertop.  The can was approximately ½ full.  It can was dented with a significant crease on one side.  The top of the can was open with the drinking port tab bent upwards, rather than downward as customary.  Officer Turpin took pictures of the soda pop can **(See Officer Edwins' report for pictures)**.

| Officer: Joseph Pagano | DPSST# 52533 | Agency: OCPD |
|---|---|---|

| Page # 4 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|

I asked Mindy if she knew how the drinking tab became bent upwards. She said when the can hit her arm it exploded and soda pop spilt all over the couch. She told me she was sure the can was full when she threw it and she had not manipulated it since.

I spoke with Officer Edwins, who advised Taneae witnessed Saturday's altercation between Mindy and Jorden.

I asked Mindy why she did not report this incident with Jorden on Saturday and she told me she always made efforts to protect her son in the past. She mentioned there has been numerous times in which Jorden has physically assaulted her. She said it was different today, because after he bit Taneae he crossed the line. She told me it is, "Different when he hurts me," but, "I draw the line when he hurts (his) sister."

Mindy told me approximately two years ago Jorden was under the influence of methamphetamine and threatened her with a butcher knife. She said police were called on this occurrence and Jorden did face several charges, but she could not recollect specific ones. She also said Jorden was arrested a couple months ago in Lakeview for allegedly assaulting Trista, and the two have a no-contact order issued by his parole officer. I later checked through LEDS and was unable to find any no-contact order issued between Jorden and Trista.

Mindy said Jorden has been diagnosed with bipolar disorder approximately two years ago. She said he has long had a temper, and always gets right up in her face during arguments.

Jorden was placed into custody at approximately 4:34pm and put in the back of my patrol vehicle. I read him his Miranda Warning at approximately 4:40pm, and he told me, "Yeah, sure" when asked if he understood his rights.

After being placed into custody, Jorden began making accusations his mom had assaulted he and Trista when they came into the apartment Friday. He said the mark on his face I asked him about earlier was caused by Mindy during this incident. He also said his friend, later identified as Joe Stevens, had video footage of the incident. Jorden told me he did not know Joe's birthdate, phone number, or house address when I asked him at the jail. He only knew Joe lived in Oak Grove. I attempted to locate additional contact information regarding Joe but was unable to find any suitable leads using CLASSweb.

I spoke with Mindy regarding the mark I noticed on Jorden's face. She told me the mark was a pimple, and that he had been using her Cover-up makeup the past several days to hide its appearance.

Jorden was transported to Clackamas County Jail where he was lodged without incident.

| Officer: Joseph Pagano | DPSST# 52533 | Agency: **OCPD** |
|---|---|---|

| Page # 5 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|

**EVIDENCE**
See related photographs attached with Officer Edwins' report.

**ACTION RECOMMENDED**
Forward to District Attorney's office.

Forward to DHS.

Forward to Lake County Community Corrections—ATTN: Connie Nash

Connect with Officer Edwins' report.

| Officer: Joseph Pagano | DPSST# 52533 | Agency: OCPD |
|---|---|---|



## CLACKAMAS COUNTY SHERIFF'S DEPARTMENT
### PROBABLE CAUSE FOR LODGING IN CLACKAMAS COUNTY JAIL

DATE CRIME OCCURRED 10 / 14 / 12  CCSO INCIDENT # 12 - 30886

DATE / TIME OF BOOKING 10 / 14 / 12       04 : 50 pm

I, BEING FIRST DULY SWORN ON OATH, DEPOSE AND SAY:

NAME OF ARRESTEE Hollingsworth, Jordan T      DOB 08 / 01 / 193

CRIME(S) ALLEGED Assault IV - APA 163.160 (Vict - Mindy Solomon); Assault IV 163.160 (Vi

LOCATION OF CRIME(S) 691 Molalla Ave. #8 Oregon City, OR 97045                     Tanaea i Hollingsw

VICTIM OF CRIME(S) Mindy J. Solomon / Tanaea M. Hollingsworth    DOB 03/28/74  DOB 05/15/61  } w F

BRIEF SUMMARY OF PROBABLE CAUSE On 10/14/12 at approximately 3:00 pm, Jordan Hollingsworth bit his sister, identified as Tanaea Hollingsworth, on the arm during an argument. The bite left Tanaea in significant pain and a mark. On 10/13/12 at approximately 1:00 pm, Jordan Hollingsworth grabbed his mother, identified as Mindy Solomon, by the neck and threw a full can of soda pop. The can hit Ms. Solomon on the arm and left bruising. Ms. Solomon went to the hospital for her injuries and was diagnosed with an arm contusion and cervical neck strain. The assault on Ms. Solomon was witnessed by Tanaea.

ARRESTING OFFICER J. Pagano                     DATE 10 / 14 / 12

STATE OF OREGON        )
COUNTY OF CLACKAMAS    )

WITNESSED THIS _____ DAY OF _____, 20_____ BY  SERGEANT
_____ OFFICER OF THE DISTRICT AND CIRCUIT COURTS

I FIND ☐ SUFFICIENT ☐ INSUFFICIENT PROBABLE CAUSE EXISTS
TO BELIEVE THE ARRESTEE COMMITTED THE CRIME(S).    JUDGE _____
TELEPHONIC NOTIFICATION ☐

BY _____          JUDGE CONTACTED_____
DATE _____ / _____ / _____    DATE _____ / _____ /_____
TIME_____ : _____   TIME_____ : _____

☐ NUNC PRO TUNC                                          CCP-SF11 (Rev. 6/08)

| CLACKAMAS COUNTY DA: ROUTING SLIP | | SUBMIT ONE SLIP WITH EACH CASE. FILL IN APPLICABLE SHADED BOXES. | |
|---|---|---|---|
| CONTROL NUMBER: | | AGENCY CASE NUMBER: | |

SUSPECT NAME: *HOLLINGSWORTH, JORDEN T*     DOB: *08/01/1993*

LIST CO-SUSPECT(S):     DOB:
*N/A*

| NEW CASE(S) ☒ Yes ☐ No | | SUPPLEMENTAL: ☐ Yes ☒ No | |
|---|---|---|---|
| LIST VICTIM(S): | | CONNECT CASE NUMBER(S): | |

*SOLOMON, MINDY J 3/28/1974*
*HOLLINGSWORTH, TANAEA M 05/15/1996*

| DV: ☒ Yes ☐ No | BM 11: ☐ Yes ☒ No | CAT: ☐ Yes ☒ No |
|---|---|---|

CHARGES:
*163.160 ASSAULT IV A-PA FELONY*
*163.160 ASSAULT IV*

| DATE | REVIEWED BY | DISPOSITION | DATE | REVIEWED BY | DISPOSITION |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

| DA NOTES: | B/O: |
|---|---|
| | CITE: |
| | LTR: |

CCP-DA56 (9/01)

| 1 DA | JUV | BD | DET | DC | CA | CCSO | | | 2 INCIDENT NO. 12-3730 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| X | | | | | | | C.L.A.S.S. OREGON CITY POLICE DEPARTMENT 320 Warner Milne Rd., Oregon City, OR SPECIAL REPORT | | 3 REPORT TYPE ☒ Supplemental ☐ Clearance | ☐ Special ☐ MSR | |
| MC | P/P | ME | OTHER | | | | | | 5 CASE STATUS ☐ Clr. by Arrest ☐ Suspended ☐ Referred ☐ Unfounded | ☒ Pending ☐ Exceptional | |
| 4 CONNECT NUMBERS 12-3731 | | | | | | | | | | | |
| 6 CONNECT REPORTS | | | | | | 7 INCIDENT TYPE RP Statement | | 8 CLASSIFICATION ☐ Criminal ☐ No Crime Committed | ☐ Information | |

9 SUBJECT OF REPORT  Interview of Paige Moles

| 10 ORIGINAL REPORT | 11 THIS REPORT | 12 LOCATION OF OCCURENCE |
|---|---|---|
| 10 14 12 1720 | 10 15 12 1125 | 691 Molalla Ave #9 Oregon City, OR 97045 |

**INFORMANT**

| 13 NAME Moles, Paige Frances | 14 DOB 07 11 68 | 15 SEX ☐ Male ☒ Female | 16 RACE White |
|---|---|---|---|
| 17 RESIDENCE 691 Molalla Ave. #9 Oregon City, OR 97045 | | 18 RES. PHONE 503-752-4810 | |
| 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR | | 20 OCCUPATION / POSITION | 21 BUS. PHONE |

**SUBJECT**

| 22 NAME | | 23 DOB | 24 SEX ☐ Male ☐ Female | 25 RACE |
|---|---|---|---|---|
| 26 RESIDENCE | | 27 RES. PHONE | 28 BUS. PHONE | |

29 DETAILS  See attached narrative.

| 30 TIME RECEIVED 1047 | 31 TIME DISPATCHED 1047 | 32 TIME ARRIVED 1056 | 33 TIME CLEARED 1115 |
|---|---|---|---|
| 34 REPORTING OFFICER J. Pagano | 35 BPST # 52533 | 36 AGENCY OCPD | 37 APPROVED BY MC |
| 38 REPORTING OFFICER | 39 BPST # | 40 AGENCY | 41 DATA ENTRY |

CCP-COC4 (Rev. 4/97)

EXHIBIT 125, Page 74 of 144
Case No. 3:20-cv-01567-MC

| Page # 1 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |
| | | |

## MENTIONED

Paige Frances Moles—Reporting Party
DOB: 07/11/68
691 Molalla Ave. #9 Oregon City, OR 97045
503-752-4810

Samantha Marie Smith—Mentioned/Daughter of Paige
DOB: 11/21/96
691 Molalla Ave. #9 Oregon City, OR 97045
503-490-7940

Jorden Timothy Hollingsworth—Suspect/In Custody
DOB: 08/01/93
691 Molalla Ave. #8 Oregon City, OR 97045
503-935-7165

Mindy Jean Solomon—Victim/Mother of Jorden
DOB: 03/28/74
691 Molalla Ave. #8 Oregon City, OR 97045
503-935-7165

Tanaea M Hollingsworth—Victim/Sister of Jorden
DOB: 05/15/96
691 Molalla Ave. #8 Oregon City, OR 97045
503-935-7165

## ACTION TAKEN

On 10/15/12 at approximately 10:56am I contacted Paige Moles, the reporting party of a disturbance occurring yesterday afternoon, at 691 Molalla Ave. #9 Oregon City, OR 97045.

Paige told me yesterday afternoon between 12:00-1:00pm she heard an argument occurring in the apartment below hers. She identified the individuals involved in the argument as Mr. Jorden Hollingsworth, Ms. Mindy Solomon, and Ms. Tanaea Hollingsworth. She said she heard loud screaming coming from the involved individuals, and then she saw Jorden walk out the front door to a piece of grass in front of the residence. She said Tanaea followed Jorden outside, and she remembered hearing her say, "No one likes you," as the two continued arguing.

Paige said she did not see the argument turn physical outside and she could not remember what the two were arguing about. She told me the argument immediately ended once they saw police arrive in the parking lot, and Tanaea went inside. She described hearing the argument as starting, "Out of nowhere." She also said she heard banging that sounded like, "they were going through walls."

| Officer: Joseph Pagano | DPSST# 52533 | Agency: OCPD |
|---|---|---|

| Page # 2 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |
| | | |

I spoke with Paige's daughter, identified as Samantha Smith, who told me she also heard the argument.  She described the argument as, "Sounding like someone setting off a bomb."  She told me she heard screaming, yelling, and what sounded like objects being thrown against walls.  She said she initially heard Jorden and Tanaea's voices when the argument started and later heard Mindy's voice yelling, too.

I asked Paige and Samantha if either of them heard anything in the days leading up to this argument.  Paige expressed concern to me because she has been hearing dogs crying and yipping for the past week on a regular basis.  She described hearing dogs shrieking with loud yelps.  She told me that she owns her own dog and knows the difference between hearing a dog being disciplined and one being abused.  Both of them said they had not heard any arguments leading up to Sunday's.

**ACTION RECOMMENDED**
Connect with original report.

| Officer: Joseph Pagano | DPSST# 52533 | Agency: OCPD |
|---|---|---|

| 1 DA | JUV | BD | DET | DC | CA | CCSO |
|------|-----|-----|-----|-----|-----|------|

| MC | P/P | ME | OTHER |

**C.L.A.S.S.**
**OREGON CITY POLICE DEPARTMENT**
320 Warner Milne Rd., Oregon City, OR
**SPECIAL REPORT**

2 INCIDENT NO. 12-3730

3 REPORT TYPE ☑ Supplemental □ Special ☐ Clearance □ MSR

5 CASE STATUS ☐ Clr. by Arrest □ Suspended □ Pending ☐ Referred □ Unfounded □ Exceptional

4 CONNECT NUMBERS

6 CONNECT REPORTS

7 INCIDENT TYPE  Follow-up

8 CLASSIFICATION ☑ Criminal □  No Crime Committed  □ Information

9 SUBJECT OF REPORT  Medical Records of Mindy Solomon

| 10 ORIGINAL REPORT 10 14 12 1700 | 11 THIS REPORT 10 17 12 1200 | 12 LOCATION OF OCCURENCE 1500 Division St. Oregon City, OR 97045 |

**INFORMANT**

| 13 NAME | 14 DOB | 15 SEX □ Male □ Female | 16 RACE |

| 17 RESIDENCE | 18 RES. PHONE |

| 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR | 20 OCCUPATION / POSITION | 21 BUS. PHONE |

**SUBJECT**

| 22 NAME  Solomon    Mindy    Jean | 23 DOB 03 28 74 | 24 SEX □ Male ⊚ Female | 25 RACE White |

| 26 RESIDENCE 691 Molalla Ave. #8  Oregon City, OR 97045 | 27 RES. PHONE 503-935-7165 | 28 BUS. PHONE |

29 DETAILS    See attached narrative.

| 30 TIME RECEIVED 1047 | 31 TIME DISPATCHED 1047 | 32 TIME ARRIVED 1047 | 33 TIME CLEARED 1103 |

| 34 REPORTING OFFICER J. Pagano | 35 BPST # 52533 | 36 AGENCY OCPD | 37 APPROVED BY MK |

| 38 REPORTING OFFICER | 39 BPST # | 40 AGENCY | 41 DATA ENTRY |

CCP-COC4 (Rev. 4/97)

| Page # 1 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 12-3730 |
|---|---|---|
| | | |
| | | |

**MENTIONED**
    Mindy Jean Solomon—Mentioned
    DOB:  03/28/74
    691 Molalla Ave. #8 Oregon City, OR 97045
    503-935-7165

**ACTION TAKEN**
On 10/17/12 at approximately 9:30am I contacted Ms. Mindy Solomon at Clackamas County Circuit Court.  Mindy signed a medical release to release her medical records to police from an incident in which she sustained injuries from an assault on 10/13/12.

I contacted the medical records personnel at Providence Willamette Falls Hospital on 1500 Division St. Oregon City, OR 97045 at approximately 11:03am later that morning and obtained the appropriate records.

**EVIDENCE**
See attached medical records.

**ACTION RECOMMENDED**
Connect with original report.

Forward to District Attorney's Office—ATTN:  Ryan Chiotti

| Officer: Joseph Pagano | DPSST# 52533 | Agency: OCPD |
|---|---|---|

CLASSweb DA Case Information                                                      Page 1 of 2

Clackamas Law-Enforcement Automated Support System  (CLASSWeb Version 1.4)   < BACK    Main Menu    DA

10/18/2012 11:58:42 AM                    **DA Case Information**                          OCPD705012

File Nbr: 005250188                                          Search

Name: Hollingsworth, Jorden Timothy      DOB: 8/1/1993        Race: W          Sex: M

Hgt: 508              Wgt: 160              Hair: BR           Eyes: BR

Address: Current: 691 Molalla Ave Apt 8                   City/St/Zip: Oregon City  OR      97045

Lic: 2735840    OR       SSN: 540437086     SID: OR19524416      FBI: 775792PD3

                                                        Def Atty:
AKA:                                                    Case  Assault, Domestic
                                                        Category: Violence

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Refer Agency: Oregon City Police Department  Incident Nbr: 12-3730  LE Status    View Officer Info

DDA: Chiotti Ryan              Closed Dt:          Co-Def Case:

                                       Court                        Court
Advocate: Miller Roxanne               Name:              Case Nbr: CR1201590

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| +Show/-Hide | ORS | ORS Desc | Severity | Incident Date | Disposition[?] |
|---|---|---|---|---|---|
| Count 1: | 163160aFDV | Assault 4 Injury Felony (DV) (2010) | F | 10/14/2012 | |
| Count 2: | 163160a | Assault 4 Injury (2010) | M | 10/14/2012 | |
| Count 3: | 1660651A | Harassment - Physical (Brady) (2010) | M | 10/14/2012 | |
| Count 4: | | ORS Statute Not Found in PbK | | 10/14/2012 | No Action-Insuf Evidence |

Victim 1: Solomon Hollingsworth Mindy Jean    DOB: 3/28/1974    View LE History

Victim 2: Hollingsworth Tanaea Marie          DOB: 5/15/1996    View LE History

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Witness  Mules, Paige                         DOB: 7/11/1968    View LE History

Officer  Turpin, Jared E                                       View LE History

Officer  Edwins, David                                         View LE History

Officer  Booker, Cornelius M                                   View LE History

http://classweb/class/DACMS/DACaseIntakeView.asp?Agy=OCA&FNbr=005250188      10/18/2012

EXHIBIT 125, Page 79 of 144
Case No. 3:20-cv-01567-MC

CLASSweb DA Case Information                                Page 2 of 2

Arresting Officer  **Pagano, Joseph V**                     [ View LE History ]

---------------------------------------------------------------

**Events:** [ SHOW ]
[ Return ]

Page Modified: 4/25/2012 8:45:08 AM           Support: [✉]          Sign Off? [▣][▣][▣]

EXHIBIT 125, Page 80 of 144
Case No. 3:20-cv-01567-MC

**CLACKAMAS COUNTY SHERIFF**
2223 Kaen Road
Oregon City, OR 97045
503-655-8218

## INCIDENT REPORT

**Incident #** 13-34550

Classification: Rape III

ORS 163.355

Connecting Numbers:

| | | |
|---|---|---|
| CIA | CAT | COC | DA | DHS | EVERT | HVCU | JUV | Other |
| ME | Mental | PIO | P&P | PROP | PSU | R/M | S/U | D / E / H / G / W |
| UOC | | Other: | | | | | |

☐ Alcohol Related  ☐ Latent Prints  ☐ Drug Related
☐ Children Present in DV  ☐ Gambling Related

☒ CRIME  ☐ VEHICLE  ☐ SPECIAL  ☐ PERSON Classification

☐ Run Juv  ☐ Miss Per
☐ Dec Acc  ☐ Dec Nat  ☐ Dec Unk  ☐ Suicide  ☐ Sick/Injured  ☐ Other

| Occurred From: | | | Occurred To: | | | Reported: | | |
|---|---|---|---|---|---|---|---|---|
| 6/ 2013 | | | 11/ 2013 | | | 11-6-13 | 1136 | WED |
| Date | Time | Day of Week | Date | Time | Day of Week | Date | Time | Day of Week |

Location of Occurrence *(Street, City, State, Zip)*    Grid
Unknown, Clackamas County

**VICTIM**

Name of Person/Business *(Last, First Middle)*
Johnson, Katrina

Birthdate 9-9-1998  Sex F  Race W

Residence/Business Address *(Street, City, State, Zip)*
17958 SE Addie Street, Milwaukie, OR 97267

(pick phone type)

School/Employer

Occupation/Position

(pick phone type)

**R/P**

Name of Person/Business *(Last, First Middle)*
Leavell, Micaela

Birthdate  Sex  Race

Residence/Business Address *(Street, City, State, Zip)*
N. Clackamas Child Welfare

(pick phone type)
503-731-4575

Relationship to Victim
CPS worker

Witness's Involvement
Investigating Incident

(pick phone type)

**Stolen/Recovered Vehicle**

| | License # | State | Lic. Year | Lic. Type | VIN | | Loss Value |
|---|---|---|---|---|---|---|---|
| Veh Year | Veh Make | Veh Model | Veh Style | Veh Color | Body Damage | | Recover Value |

44. Special Features
☐ 1. Keys in Vehicle  ☐ 5. Loud Muffler  ☐ 9. Glass Damage  ☐ 13. Damage Front  ☐ 17. Sticker/Decal  ☐ 21. Four Wheel Drive
☐ 2. Spec. Antenna  ☐ 6. Custom Wheels  ☐ 10. Tinted Glass  ☐ 14. Damage Rear  ☐ 18. Sticker/Decal Body  ☐ 22. Other
☐ 3. Canopy/Camper  ☐ 7. Rust  ☐ 11. Special Interior  ☐ 15. Damage Left  ☐ 19. Sticker/Decal Bumper
☐ 4. Vinyl  ☐ 8. Level Altered  ☐ 12. Decorative Paint  ☐ 16. Damage Right  ☐ 20. Painted Sign Body

Other:

**Boat** — Records Dept Notified (name):

| Registration # | State | Reg. Yr | Boat Hull Mat. | Boat Hull # | Propulsion | Make |
|---|---|---|---|---|---|---|
| Length  feet/inches | Boat Color | Type of Construction | Loss Value | Recovered Value | Other | |

**Rec.**

| Hold | Towed By | Towed To | Released To | Person ORI Notified | Notified By | Date | Time |
|---|---|---|---|---|---|---|---|

**TARGETS**

| Victim | Sex | Residential | Non Residential | Security | Point of Entry | Method of Entry |
|---|---|---|---|---|---|---|
| 2. Juvenile | F | 1. Single Family | (1-22) | | | |
| Surrounding Area | | | (23-38) | | | |
| | | Residential Targets | Non-Residential Targets | | Point of Exit | Method of Exit |

**SUSPECT ACTIONS**

| Section 1 | Section 2 | Section 3 | Section 4 |
|---|---|---|---|
| ☐ 1. Multiple suspects | ☐ 13. Defeated | ☐ 1. Vandalized | ☐ 9. Used pillowcase | ☐ 1. Inflicted injury | ☐ 10. Took hostage | ☐ 1. Knew vic's name |
| ☐ 2. Used look-out | ☐ 14. Turned lights on | ☐ 2. Ransacked | ☐ 2. Threat retaliation | ☐ 11. Didn't speak | ☐ 2. Molested victim |
| ☐ 3. Vehicle needed | ☐ 14. Turned lights off | ☐ 3. Knew loc. of prop | ☐ 11. Racially motivated | ☐ 3. Forced Victim to lay on floor | ☐ 12. Covered victim's face | ☐ 3. Unusual odor |
| ☐ 4. Took vic. vehicle | ☐ 15. Disabled phone | ☐ 4. Selective in loot | ☐ 12. Domestic violence | ☐ 4. Forced victim into veh | ☐ 13. Bound / gagged victim | ☐ 4. Masturbated |
| ☐ 5. Used stolen vehicle | ☐ 16. Shut off power | ☐ 5. Took concealables | ☐ 13. Gang related | ☐ 5. Put property in sack / pocket | ☐ 14. Demand specific items | ☐ 5. Ejaculated |
| ☐ 6. Suspect armed | ☐ 17. Wore mask | ☐ 6. Took prop from vehicle | ☐ 14. Graffiti | ☐ 6. Snatched purse | ☐ 15. Other | ☐ 6. Unable to erect |
| ☐ 7. Discharged weapon | ☐ 18. Unique | ☐ 7. Stashed loot | ☐ 15. Cat burglar | ☐ 7. Offered assistance | | ☐ 7. Struck victim |
| ☐ 8. Smoked | ☐ 20. Punched ignition | ☐ 8. Shoplift | ☐ 16. Other: | ☐ 8. Used left hand | | ☐ 8. Made vic. disrobe |
| ☐ 9. Ate/Drank | ☐ 22. Cut fence | | | ☐ 9. Used right hand | | ☐ 9. Required vic to act |
| ☐ 10. Used matches for light | ☐ 23. Hot wired | | | | | ☒ 10. Raped |
| ☐ 11. Used victims tools | ☐ 19. Other | | | | | ☐ 11. Other sex acts |
| ☐ 12. Prepared exit | | | | | | ☐ 12. Other |

| Type of Weapon | | Type of Drug | | | | Intended Use of Drug | |
|---|---|---|---|---|---|---|---|
| ☐ 1. Handgun | ☐ 5. Knife | ☐ 2. Heroin | ☐ 12. Ecstasy | ☐ 16. Oxycontin | ☐ 19. Other prescription | ☐ 2. Selling | ☐ 6. Manuf / grow |
| ☐ 2. Rifle/Shotgun | ☐ 7. Hand/Fist | ☐ 4. Cocaine | ☐ 13. Hydrocodone | ☐ 17. Predatory drug | ☐ 6. Other | ☐ 3. Use | ☐ 8. Tamper |
| ☐ 3. Other Firearm | ☐ 8. Other Weapon | ☐ 8. Marijuana | ☐ 14. Inhalant | ☐ 18. Psilocybin | | ☐ 4. Furnish | ☐ 9. Other |
| ☐ 4. Unknown Firearm | | ☐ 11. Meth | ☐ 15. LSD | | | | |

Unique M.O.

Exact Words of Suspect(s)

Approved By PIERCE

Reporting Officer(s)
Paine

DPSST (s)
500154

12/08

| ☐ More Than Two Suspects | | ☒ **SUSPECT** | | ☐ **PERSON REPORT** | | Incident # 13-34550 |

**Person/Suspect #1**

| Custody Action | Name *(Last, First Middle)* | | | | Alias/Nickname | |
|---|---|---|---|---|---|---|
| ☐ Cite & Release | Hollingsworth, Jorden Timothy | | | | | |
| ☐ In Custody | Address *(Street, City, State Zip)* | | | | | |
| Booking # | 19903 Leland Road, Oregon City, OR  97045 | | | (pick phone type) | | (pick phone type) |
| ☒ Not Contacted | | | | 503-839-1600 | | |
| ☐ Contacted/ No Arrest | Employer | | Occupation | | Business Address | |

| Birthdate | Sex | Height | Weight | Place of Birth *(City, State)* | SSN | Driver's License / State |
|---|---|---|---|---|---|---|
| 8-1-1993 | M | 68 | 150 | | 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 | 2735840 / OR |

| Other Information/Clothing | |
|---|---|
| | Dentist Name: |
| | Dentist Address: |

| Race | Eye Color | Hair Color | Hair Length | Hair Type | Hair Style | Facial Hair | Build |
|---|---|---|---|---|---|---|---|
| 1. White | 1. Brown | 2. Brown | Unknown | Unknown | Unknown | Unknown | Unknown |

| Complexion | Teeth | Glasses | Appearance | Speech | Misc. | Scars/Marks/Tattoos |
|---|---|---|---|---|---|---|
| Unknown | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |

**SUSPECT #2**

| Custody Action | Name *(Last, First Middle)* | | | | Alias/Nickname | |
|---|---|---|---|---|---|---|
| ☐ Cite & Release | Address *(Street, City, State Zip)* | | | | | |
| ☐ In Custody | | | | | | |
| Booking # | | | | (pick phone type) | | (pick phone type) |
| ☐ Not Contacted | Employer | | Occupation | | Business Address | |
| ☐ Contacted/ No Arrest | | | | | | |

| Birthdate | Sex | Height | Weight | Place of Birth *(City, State)* | SSN | Driver's License |
|---|---|---|---|---|---|---|
| | | | | | | |

| Other Information/Clothing | |
|---|---|

| Race | Eye Color | Hair Color | Hair Length | Hair Type | Hair Style | Facial Hair | Build |
|---|---|---|---|---|---|---|---|
| Unknown | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |

| Complexion | Teeth | Glasses | Appearance | Speech | Misc. | Scars/Marks/Tattoos |
|---|---|---|---|---|---|---|
| Unknown | Unknown | Unknown | Unknown | Unknown | Unknown | Unknown |

**SUSPECT VEH.**

| Vehicle Year | Make | Vehicle Color | ☐ Two Tone | Special Vehicle Features | |
|---|---|---|---|---|---|
| Model | Style | ☐ 1. Black | ☐ 14. Gray | ☐ 1. Keys in Vehicle | ☐ 13. Damage – Front |
| | | ☒ 2 Blue | ☐ 15. Silver | ☐ 2. Special Antenna | ☐ 14. Damage – Rear |
| License | State | ☐ 3. Aqua | ☐ 16. Red | ☐ 3. Canopy/Camper | ☐ 15. Damage – Left |
| | | ☐ 4. Turquoise | ☐ 17. Pink | ☐ 4. Vinyl Top | ☐ 16. Damage – Right |
| Vehicle Towed To/By | | ☐ 5. Brown | ☐ 18. Maroon | ☐ 5. Loud Muffler | ☐ 17. Sticker/Decal – Window |
| | | ☐ 6. Bronze | ☐ 19. White | ☐ 6. Custom Wheels | ☐ 18. Sticker/Decal – Body |
| Other | | ☐ 7. Tan | ☐ 20. Cream | ☐ 7. Rust | ☐ 19. Sticker/Decal – Bumper |
| | | ☐ 8. Copper | ☐ 21. Yellow | ☐ 8. Level Altered | ☐ 20. Painted Sign – Body |
| | | ☐ 9. Beige | ☐ 22. Orange | ☐ 9. Glass Damage | ☐ 21. Four Wheel Drive |
| | | ☐ 10. Purple | ☐ 23. Gold | ☐ 10. Tinted Glass | ☐ 22. Other |
| | | ☐ 11. Green | ☐ 24. Primered | ☐ 11. Special Interior | |
| | | ☐ 12. Lime | ☐ 25. Other | ☐ 12. Decorative Paint | |
| | | ☐ 13. Olive | | | |

| Reporting Officer (s) | DPSST (s) |
|---|---|
| Paine | 500154 |

# CLACKAMAS COUNTY SHERIFF'S OFFICE

9101 SE Sunnybrook Boulevard, Clackamas, Oregon 97015     (503) 785-5000

**Detective Patrick Bray**

| | |
|---|---|
| **CASE NUMBER:** | **2013 - 34550** |
| Date of This Report: | 11-26-2013 |
| Date of Incident: | 11-06-2013 |
| CLASSIFICATION: | 163.355 – Rape III |
| **CASE STATUS:** | Active |
| REPORT REGARDING: | **Initial Report** |
| VICTIM: | **Katrina Marie Johnson** |
| | DOB: 09/09/1998 |
| | 17958 SE Addie St. |
| | Milwaukie, OR 97267 |
| | (971) 400-9096 |
| SUSPECT: | **Jorden Timothy Hollingsworth** |
| | DOB: 08/01/1992 |
| | 19903 Leland Rd. |
| | Oregon City, OR 97045 |
| | (503) 839-1600 |
| MENTIONED: | **Shawn Ely Johnson** |
| | DOB: 04/09/1960 |
| | 17958 SE Addie St. |
| | Milwaukie, OR 97267 |
| | (971) 400-9096 |
| | |
| | **Melinda Sue Johnson** |
| | DOB: 04/29/1965 |
| | 14155 Beavercreek Rd. #313 |
| | Oregon City, OR 97045 |
| | (971) 276-6330 |
| | |
| | **Sgt. C. Pierce** – CCSO CAT Supervisor |
| | |
| | **Micaela Leavell** – DHS Caseworker |
| WITNESS: | N/A |



Detective Patrick Bray
Clackamas County Sheriff's Office



PIERCE

Page 1 of 2

13-34550

## NARRATIVE:

On 11-13-2013 I was assigned this case for follow up investigation. I reviewed the documents received which included a letter to Sgt. Pierce from DHS caseworker Micaela Leavell. Essentially, Ms. Leavell explained that during her investigations into 15 year old Katrina Johnson living in sub-standard conditions at her father's home, it was disclosed by Ms. Johnson that she is having a sexual relationship with a 21 year old male. This male was identified as Jorden Hollingsworth.

On 11-26-2013 at approx. 1305 hours I spoke with Ms. Leavell by phone. I advised her I was the detective assigned to this matter. Upon discussing how best to interview Katrina about this situation, Ms. Leavell advised that Katrina would likely not cooperate with a Children's Center evaluation. I therefore arranged to meet with Ms. Leavell on 12-02-2013 and we would both then go to Cascade Academics (an alternative school) and meet with Katrina.

I also located the original DHS Form 307 that was cross-reported for the allegations of neglect by Katrina's father (Shawn Johnson) that initiated the contact leading to this disclosure. This cross-report was documented under CCSO #2013-33340.

## ACTION RECOMMENDED:

Investigation continues.

Detective Patrick Bray  #38260



**Detective Patrick Bray**
**Clackamas County Sheriff's Office**

# CLACKAMAS COUNTY SHERIFF'S OFFICE

9101 SE Sunnybrook Boulevard, Clackamas, Oregon 97015    (503) 785-5000

**Detective Patrick Bray**

| | |
|---|---|
| **CASE NUMBER:** | **2013 - 34550** |
| Date of This Report: | 01-09-2014 |
| Date of Incident: | 11-06-2013 |
| CLASSIFICATION: | 163.355 – Rape III |
| CASE STATUS: | Active |
| REPORT REGARDING: | **Interview with Katrina Johnson** |
| VICTIM: | **Katrina Marie Johnson** |
| | DOB: 09/09/1998 |
| | 17958 SE Addie St. |
| | Milwaukie, OR 97267 |
| | (971) 400-9096 |
| SUSPECT: | **Jorden Timothy Hollingsworth** |
| | DOB: 08/01/1992 |
| | 18903 Leland Rd. |
| | Oregon City, OR 97045 |
| | (503) 839-1600 |
| MENTIONED: | **Shawn Ely Johnson** |
| | DOB: 04/09/1960 |
| | 17958 SE Addie St. |
| | Milwaukie, OR 97267 |
| | (971) 400-9096 |
| | |
| | **Melinda Sue Johnson** |
| | DOB: 04/29/1965 |
| | 7872 SE 66th Ave. |
| | Portland, OR 97206 |
| | (503) 933-1948 |
| | |
| | **John Edward Jones** |
| | DOB: 02/13/1959 |
| | 7872 SE 66th Ave. |
| | Portland, OR 97206 |
| | (503) 933-1948 |
| | |
| | **Micaela Leavell** – DHS Caseworker |
| WITNESS: | N/A |

Detective Patrick Bray
Clackamas County Sheriff's Office

**PIERCE**    Page 1 of 3

13-34550

## NARRATIVE:

*The following is a basic summary of the interview; it is not a transcript. For clarity, the information contained in the summary is not necessarily in the order or using the same verbiage in which the information was provided.*

On 01/09/2014 at approx. 0900 hours, DHS caseworker Micaela Leavell and I arrived at Cascade Academics (alternative school) located at 1404 7th St. in Oregon City. We met with Katrina Johnson in an office provided to us for privacy. We introduced ourselves and I explained to Katrina that we were here to interview here about reported concerns involving her. She was very inquisitive as to what we wanted to talk about. I explained to her it was in reference to a relationship she was perhaps involved in. I asked Katrina if she would be okay with me recording our interview. She advised she did not want it recorded.

The interview was began with Ms. Leavell asking Katrina about things at home and miscellaneous other inquiries about her current status. Katrina spent several minutes explaining about her inability to eat an adequate meal at home. I did note that Katrina was very thin. She went on to explain that her father sometimes does not pay the power bill and in turn the power to their residence gets shut off. Katrina said as a result, what food there is goes bad in the fridge and she is still expected to eat it. She said she is "scared" to eat the food at home. She also told us that food she does like and is not rotten such as bananas, are off limits because her father claims they are his.

Eventually a point was reached in our conversation when I explained to Katrina that I wanted to discuss her relationship with Jorden Hollingsworth. She was very reluctant to talk about him. However, in response to direct questioning, she vaguely acknowledged being involved in a relationship with him. She told us her relationship with Mr. Hollingsworth ended in November of 2012. She said last she knew he was perhaps in custody for warrants out of Lakeview, OR. She claimed their "relationship" ended last November.

She said they had been in a relationship for "a month or two." They first met this past July. Her mother introduced Mr. Hollingsworth to her as he was a friend of her mother's boyfriend (John Jones.) This led to a discussion about Katrina's use of marijuana. She admittedly uses it "as often as I can get it." She also conceded that her mother uses it as does Mr. Jones and Mr. Hollingsworth.

Katrina was apprehensive in discussing details of the nature of the relationship she had with Jorden. Initially she only offered that they would see each other once or twice a week, either meeting at the movies or at parks. In regards to intimacy, she at first said they only kissed and "made out." It seemed apparent that Katrina was not being forthcoming about the extent of their relationship. I directly asked her if they had a sexual relationship to which she replied, "yeah." I then specifically asked Katrina if that meant sexual intercourse and she said it did. We then went over verification of what sexual intercourse was defined as.

Katrina was asked how many times she had sex with Mr. Hollingsworth. She answered, "Maybe 10...10-15 times." She acted extremely embarrassed about discussing the topic.

Detective Patrick Bray
Clackamas County Sheriff's Office

Page 2 of 3

13-34550

Katrina eventually explained to us that she was more upset talking about where they had sex than anything else. She explained it typically occurred in parks scattered around the area. I asked her if she recalled any parks specifically. She offered a park on Singer Hill in Oregon City and a park near Clackamas Town Center.
I asked Katrina about other specific sex acts. She offered nothing else other than he touched her breasts around five times. I asked her if they used protection. Katrina said Mr. Hollingsworth wore a condom every time.

I asked Katrina when she last saw Mr. Hollingsworth. She said she has not seen him since last November when he "told me he was done." Katrina clearly cared for Mr. Hollingsworth as she constantly asked about whether or not he was in trouble for this. I asked Katrina if Mr. Hollingsworth new she was only 15 years old when they started seeing each other. She said he did. I asked her how she thought he was. She said she thought he was 18 until DHS told her he was "20" (actually 21.)

Lastly I talked to Katrina about the possibility of participating in an evaluation at the Children's Center. I told her I was concerned that she had reportedly not been examined by a physician for some time and more specifically not since this reported relationship. I explained to her the provisions of the evaluation and she agreed to go provided she could acquire transportation.

### ACTION RECOMMENDED:

Investigation continues.



Detective Patrick Bray, #38260

# CLACKAMAS COUNTY SHERIFF'S OFFICE

9101 SE Sunnybrook Boulevard, Clackamas, Oregon 97015     (503) 785-5000

**Detective Patrick Bray**

| | |
|---|---|
| **CASE NUMBER:** | **2013 - 34550** |
| Date of This Report: | 01/09/2014 |
| Date of Incident: | 01/24/2014 |
| CLASSIFICATION: | 163.355 – Rape III |
| | 163.415 – Sex Abuse III |
| **CASE STATUS:** | Active |
| **REPORT REGARDING:** | **Children's Center Evaluation** |

VICTIM:
> **Katrina Marie Johnson**
> DOB: 09/09/1998
> 17958 SE Addie St.
> Milwaukie, OR 97267
> (971) 400-9096

SUSPECT:
> **Jorden Timothy Hollingsworth**
> DOB: 08/01/1992
> 19903 Leland Rd.
> Oregon City, OR 97045
> (503) 839-1600

MENTIONED:
> **Shawn Ely Johnson**
> DOB: 04/09/1960
> 17958 SE Addie St.
> Milwaukie, OR 97267
> (971) 400-9096

> **Melinda Sue Johnson**
> DOB: 04/29/1965
> 7872 SE 66th Ave.
> Portland, OR 97206
> (503) 933-1948

> **John Edward Jones**
> DOB: 02/13/1959
> 7872 SE 66th Ave.
> Portland, OR 97206
> (503) 933-1948

> **Dr. Sue Skinner** – Medical Examiner
> Children's Center



Detective Patrick Bray
Clackamas County Sheriff's Office

13-34550

**Amanda McVay** – Forensic Interviewer
Children's Center

**Alysha Lacey** – Family Support
Children's Center

**Micaela Leavell** – DHS Caseworker

WITNESS:                    N/A

NARRATIVE:

*The following is a basic summary of the Children's Center evaluation; it is not a transcript. For clarity, the information contained in the summary is not necessarily in the order or using the same verbiage in which the information was provided. For a complete and more detailed account of the evaluation, please refer to the Children's Center report.*

On 01/23/2014 at approx. 1300 hours, I met with staff at the Children's Center for the forthcoming evaluation of Katrina Johnson. Staff included medical examiner Dr. Sue Skinner and forensic interviewer Amanda McVay. We discussed known case information and known history in reference to Katrina Johnson.

At approx. 1300 hours, staff met with Katrina's father Shawn Johnson. I observed this meeting from an observation room via one-way mirror and intercom. During this conversation I noted that Mr. Johnson said he believed Katrina had been to the doctor – months ago for a sinus infection. He also indicated that he believes Katrina is still seeing Mr. Hollingsworth. He said she doesn't want to be the one that puts him in jail.

At approx. 1340 hours, Katrina was brought back into an examination room for the medical portion of the evaluation with Dr. Skinner and Ms. McVay. I was able to hear the medical exam take place from the examination room via intercom. At the beginning of the evaluation, Katrina was weighed. She weighed in at 99.5 pounds. Dr. Skinner advised Katrina that the last time she was at the Children's Center (March 2012) she weighed 117 pounds. They discussed nutrition concerns. Katrina explained as before, about the poor food quality at home and the loss of power for days. She explained the weight loss was related to stress issues.

She also discussed her ongoing marijuana habit and admitted she smokes "three bowls" of marijuana a day.

Katrina was asked about her sexual history. She explained that she has had 4-5 sexual partners since she was last seen at the Children's Center. She indicated these partners were mostly no more than two years older than her. She also disclosed that she contracted Chlamydia this past summer and was treated.

Katrina was specifically asked to talk about Jorden. Katrina referred to him as her "ex-boyfriend" and that he was included in the 4-5 partners mentioned prior. Katrina also stated

Detective Patrick Bray
Clackamas County Sheriff's Office

Page 2 of 3

13-34550

that "the detective" wanted her talk about her ex-boyfriend "because he's too old." She told them her ex-boyfriend is indeed 20 and she has had sex with him. She also explained to them that she is upset that a case is being pursued and would rather not talk about it.

Near the end of the physical exam, Katrina was again asked about the possibility of transitioning into a forensic interview. She declined but indicated they could question her more here in the exam room. She said she did want anything recorded.

She further explained after meeting Jorden, they actually dated from mid-August to November of last year. She also advised that during that time period, Jordan was taken to jail on an unrelated matter out of Lakeview that resulted in a warrant for his arrest. She said he was in jail for five days. When he returned, he told her he was in too much legal trouble already and didn't want to risk it anymore. She clarified he said this because he was aware of how old she was. She then made a statement that they were "technically together" before she was 15. She states she has not seen him since they broke up.

Katrina was apprehensive in talking about the sexual relationship she had with Jorden. When asked where they had sex, she did not answer because she said she was embarrassed. She said they had "regular sex" and clarified what that meant. She said he touched her chest a few times. Katrina was asked if they had sex one time or more than one time. She responded, "I'd rather not say." She denied any other type of sexual act.

Katrina declined the forensic interview.

At approx. 1455 hours, staff met with father briefly to discuss the evaluation that just took place.

**ACTION RECOMMENDED:**

Investigation continues.



Detective Patrick Bray   #38260

Detective Patrick Bray
Clackamas County Sheriff's Office

Page 3 of 3

EXHIBIT 125, Page 90 of 144
Case No. 3:20-cv-01567-MC

# CLACKAMAS COUNTY SHERIFF'S OFFICE

9101 SE Sunnybrook Boulevard, Clackamas, Oregon 97015    (503) 785-5000

**Detective Patrick Bray**

| | |
|---|---|
| **CASE NUMBER:** | **2013 - 34550** |
| Date of This Report: | 01/09/2014 |
| Date of Incident: | 04/16/2014 |
| **CLASSIFICATION:** | 163.355 – Rape III |
| | 163.415 – Sex Abuse III |
| **CASE STATUS:** | Active |
| **REPORT REGARDING:** | **Interview with Jorden Hollingsworth** |
| VICTIM: | **Katrina Marie Johnson**<br>DOB: 09/09/1998<br>17958 SE Addie St.<br>Milwaukie, OR 97267<br>(971) 400-9096 |
| SUSPECT: | **Jorden Timothy Hollingsworth**<br>DOB: 08/01/1993<br>19903 Leland Rd.<br>Oregon City, OR 97045<br>(503) 839-1600 |
| MENTIONED: | **Shawn Ely Johnson**<br>DOB: 04/09/1960<br>17958 SE Addie St.<br>Milwaukie, OR 97267<br>(971) 400-9096 |
| | **Melinda Sue Johnson**<br>DOB: 04/29/1965<br>7872 SE 66th Ave.<br>Portland, OR 97206<br>(503) 933-1948 |
| | **John Edward Jones**<br>DOB: 02/13/1959<br>7872 SE 66th Ave.<br>Portland, OR 97206<br>(503) 933-1948 |
| | **Tanaea Marie Hollingsworth**<br>DOB: 05/15/1996 |



Detective Patrick Bray
Clackamas County Sheriff's Office



Page 1 of 4

13-34550

**Detective Brad Leikem – CCSO CAT**

WITNESS:                          N/A

NARRATIVE:

*The following is a basic summary of the interview; it is not a transcript. For clarity,
the information contained in the summary is not necessarily in the order or using the
same verbiage in which the information was provided. For a complete and verbatim
account of what was said, please refer to the audio file (or video file, when
applicable) contained in evidence.*

On 04/16/2014 at approx. 1100 hours, Detective Brad Leikem and I met with Jorden
Hollingsworth in an interview room located in the Investigations Wing of the Brooks
Building. I advised Mr. Hollingsworth at the onset of the interview that the room was being
both audio and visually recorded. I also advised Mr. Hollingsworth that I would be recording
the audio of our interview with my own person recording device which I activated and set on
the table for all to see. I further verified with Mr. Hollingsworth that he did understand the
interview was being recorded. He acknowledged he understood.

I explain to Mr. Hollingsworth that he was free to leave at any point of our conversation and
that this was completely voluntary. I explained to him that should he wish to terminate this
interview at any time, he could do so and I would escort him back to the lobby and he could
leave. However I also explained to Mr. Hollingsworth that we had to pass several points that
required a key card and the path into this room was somewhat confusing to someone that had
never been here. I told Mr. Hollingsworth that for those reason I would be reading him his
Miranda Rights and did so. I asked him if he understood each of the rights read to him to
which he replied, "Yup." I asked him if there was any part of it he did not understand and he
replied, "Nope."

Initially I clarified his date of birth as some records showed his birth year as 1992 and some
show it as 1993. Mr. Hollingsworth insisted his birth year is 1993. He insisted his birth
certificate would reflect his year of birth to be 1993.

I asked Mr. Hollingsworth what he thought the purpose of our interview was. He
immediately commented that it was because of something initiated by Katrina's dad who
believes he and Katrina are having "contact" with one another. Mr. Hollingsworth initially
summarized his acquaintance with Katrina as he first met her through her mother and now she
is best friends with his younger sister Tanaea. He said he first met Katrina around June of last
year.

Mr. Hollingsworth claimed that Katrina's mother approached him about hanging out with
Katrina as a means to separate her from a dysfunctional relationship with another guy. When
I asked him how he knew her mother, Melinda Johnson, he hesitated then claimed he "just
kinda knew her," and she used to work at H&R Block with his grandmother.

I asked Mr. Hollingsworth to clarify that he was just hanging out with Katrina, nothing more.
He said yes. I asked him what kind of things they would do when they hung out. He said they

Detective Patrick Bray
Clackamas County Sheriff's Office

Page 2 of 4

13-34550

watched fireworks during the 4th of July and his sister went with them and "they hit it off ever since."

Essentially, Mr. Hollingsworth confirmed being around Katrina at various locations and residences. However he claims it to mostly be incidental to Katrina spending time with his sister Tanaea. I asked him how long he hung out with Katrina. He said it was for a few months but he "never really hung out with her alone without someone else there" and that she mostly hung out with his sister. He again emphasized that there was nothing going on and that "he has plenty of girls" in his life. I asked him when the last time he saw her was and he said it's been a while, a "couple weeks" ago at his mother's house in Oregon City.

I asked him who he thought reported this situation with Katrina. He said her father thought she was interested in him. Mr. Hollingsworth commented that she probably was interested in him as "a lot of girls are interested in me." But he added she was his sister's friend and he would "never" touch her. I asked him what he thought Katrina told us. He thought she would say they were just friends. I explained to him that Katrina said that more happened between them than that. He continued to deny any form of physical contact or relationship with Katrina. At one point he offered that he is a student at ITT Tech and "I'm very attractive." I asked him how that explains him not having this type of relationship with Katrina. He replied that "explains everything" and he would never have a relationship with someone under 18.

I then advised Mr. Hollingsworth that I did in fact talk with Katrina, and that she was even somewhat protective of him. I asked him why she would tell me everything they did. He in turn told me, "She didn't tell you exactly what happened." I asked him why she would make something up like this. He responded, "I don't know, you're the detective."

As I repeated the fact that Katrina in fact disclosed their physical relationship, he continued to tell me what I was saying was false because he does not think she told me anything. He acknowledged during our conversation that "she is fucking 15."

He then went on to insist that it was Katrina's dad that initiated all this. He insisted that was not true because he talked with Katrina's dad who told him he had reported it. I told Jorden that in fact, Katrina's dad was contacted for something unrelated to him and he had not reported their relationship. He, in an agitated manner, told me "not to play that bullshit card with me." When asked why Katrina's father thinks something is going on, he offered no explanation other than he brought a bed over to her.

He continued to insist that I was lying in my assertions that Katrina did tell us about their sexual relationship. He offered that she may have a crush on him "like all his sister's friends" do but there was nothing more. When I asked him why she would make this up, was it due to jealousy, or something else. He then answered, "Why would she be jealous because I said you're younger?" He then paused and told me, "You're right I guess that doesn't make any sense."

I went over some direct questions of did he do or not do specific acts, including whether or not he wore a condom when he had sex with Katrina. He told me now knew I was lying because he "never" wears a condom.



Detective Patrick Bray
Clackamas County Sheriff's Office

Page 3 of 4

13-34550

Detective Leikem asked him about what he did to help Katrina get over her previous boyfriend. He was very vague and again only mentioned watching fireworks (at Clackamette Park.)

He was asked about smoking marijuana with Katrina, her mom, and her mom's boyfriend. He said he only smoked marijuana with Katrina's mom. I also read him direct notation from the Children's Center report indicating Katrina did in fact make disclosures. He sarcastically continued to insist he doesn't believe Katrina made any statements.

Detective Leikem asked him about the possibility of Katrina not handling rejection well. He advised he did not specifically say that but only offered it because he claimed all the younger girls are attracted to him. He then made it sound as if he offers an automatic rejection to any younger girl that he comes in contact with because they are all attracted to him (which did not seem practical.) He then admitted that his sister did tell him that Katrina "had a crush" on him.

I then lastly asked him who he thinks I should talk to that may shed some light on this. He initially replied, "Everybody." He then said that I should talk to Katrina because he doesn't think I did so. He also advised I should talk to Katrina's mother.

The interview was then concluded.

The audio/visual recording of this interview is stored as evidence on a secure server at the Clackamas County Sheriff's Office and is available for viewing by the Clackamas County District Attorney's Office. I additionally placed a CD, with the audio recording taken by my personal recorder, into property as evidence.


## ACTION RECOMMENDED:

Investigation continues.



Detective Patrick Bray  #38260

Detective Patrick Bray
Clackamas County Sheriff's Office

| DA | JUV | PROP DET | PERS DET | CDC | PJM | DIIG | PJO | CPAN | MAR | CLACKAMAS COUNTY SHERIFF | Incident # | 2013-34550 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WIV | ME | UCD | SIU | Other | | | | | | 2223 Kaen Road | Classification: | ORS |
| | | | | | | | | | | Oregon City, OR 97045 | Rape III | 163.355 |
| **Report of:** | | | | | | | | | | 503-655-8218 | Connecting #s / Reports: | |
| ☒ Prop in Custody  ☐ Rec. Stolen Prop.  ☐ Receipt | | | | | | | | | | **PROPERTY IN CUSTODY** | | |

| 10. Location of Occurrence | | Reported Date: | Time: | Destroy: |
|---|---|---|---|---|
| Clackamas County | | 11/06/13 | 1136 | ☐ Yes ☒ No |

**PERSONS**

| | 12. Name (Last, First Middle) | | Sex | Date of Birth | Residence Phone |
|---|---|---|---|---|---|
| ☐ Owner | Johnson, Katrina Marie | | F | 09/09/1998 | |
| ☐ Rep. Party | Residence/Business Address (Street, City, State, Zip) | | | | Cell Phone |
| ☒ Victim | | | | | |

| | 20. Name (Last, First Middle) | | Sex | Date of Birth | Residence Phone |
|---|---|---|---|---|---|
| ☐ Finder | Hollingsworth, Jorden Timothy | | M | 08/01/1992 | |
| ☒ Suspect | Residence/Business Address (Street, City, State, Zip) | | | | Business Phone |

**PROPERTY CLASSIFICATION**

Was the property seized under a search warrant? ☐ Yes ☒ No    ☒ Evidence    ☐ Contraband    ☐ Found Property    ☐ Safekeeping    ☐ Hold for Processing

**PROPERTY INVENTORY**

*For further forfeiture information, contact: Office of County Counsel, 906 Main St. Oregon City, OR 97045 – 503-655-8362*

| Item Number | Type Item | | Serial Number | Brand/Make | Size/Calibre | |
|---|---|---|---|---|---|---|
| 1 | CD | | | | | ☐ Released |
| Color | Owner Applied Number | Value | Description | | | ☐ Tow Co. |
| | | | CD w/ audio recording of interview with | | | ☒ Prop Rm. |
| Release To: | | | Additional Information | | | |
| | | | Jorden Hollingsworth on 04/16/2014 | | | |

| Item Number | Type Item | | Serial Number | Brand/Make | Size/Calibre | |
|---|---|---|---|---|---|---|
| | | | | | | ☐ Released |
| Color | Owner Applied Number | Value | Description | | | ☐ Tow Co. |
| | | | | | | ☐ Prop Rm. |
| Release To: | | | Additional Information | | | |

| Item Number | Type Item | | Serial Number | Brand/Make | Size/Calibre | |
|---|---|---|---|---|---|---|
| | | | | | | ☐ Released |
| Color | Owner Applied Number | Value | Description | | | ☐ Tow Co. |
| | | | | | | ☐ Prop Rm. |
| Release To: | | | Additional Information | | | |

| Item Number | Type Item | | Serial Number | Brand/Make | Size/Calibre | |
|---|---|---|---|---|---|---|
| | | | | | | ☐ Released |
| Color | Owner Applied Number | Value | Description | | | ☐ Tow Co. |
| | | | | | | ☐ Prop Rm. |
| Release To: | | | Additional Information | | | |

| Item Number | Type Item | | Serial Number | Brand/Make | Size/Calibre | |
|---|---|---|---|---|---|---|
| | | | | | | ☐ Released |
| Color | Owner Applied Number | Value | Description | | | ☐ Tow Co. |
| | | | | | | ☐ Prop Rm. |
| Release To: | | | Additional Information | | | |

| Item Number | Type Item | | Serial Number | Brand/Make | Size/Calibre | |
|---|---|---|---|---|---|---|
| | | | | | | ☐ Released |
| Color | Owner Applied Number | Value | Description | | | ☐ Tow Co. |
| | | | | | | ☐ Prop Rm. |
| Release To: | | | Additional Information | | | |

| Item Number | Type Item | | Serial Number | Brand/Make | Size/Calibre | |
|---|---|---|---|---|---|---|
| | | | | | | ☐ Released |
| Color | Owner Applied Number | Value | Description | | | ☐ Tow Co. |
| | | | | | | ☐ Prop Rm. |
| Release To: | | | Additional Information | | | |

**Released To or Received From**

| Received – Property Room | | | | Reporting Officer(s) | DPSST | Agency | Shift | Approved | Data Entry |
|---|---|---|---|---|---|---|---|---|---|
| Mo | Day | Year | Initials | Patrick Bray | 38260 | CCSO | Det | | |

D7/05

# CLACKAMAS COUNTY SHERIFF'S OFFICE

9101 SE Sunnybrook Boulevard, Clackamas, Oregon 97015    (503) 785-5000

**Detective Patrick Bray**

| | |
|---|---|
| **CASE NUMBER:** | **2013 - 34550** |
| Date of This Report: | 05/15/2014 |
| Date of Incident: | 01/09/2014 |
| CLASSIFICATION: | 163.355 – Rape III |
| | 163.415 – Sex Abuse III |
| **CASE STATUS:** | Active |
| **REPORT REGARDING:** | **Contact with Jorden Hollingsworth** |
| VICTIM: | **Katrina Marie Johnson** |
| | DOB: 09/09/1998 |
| | 17958 SE Addie St. |
| | Milwaukie, OR 97267 |
| | (971) 400-9096 |
| SUSPECT: | **Jorden Timothy Hollingsworth** |
| | DOB: 08/01/1993 |
| | 19903 Leland Rd. |
| | Oregon City, OR 97045 |
| | (503) 839-1600 |
| MENTIONED: | **Shawn Ely Johnson** |
| | DOB: 04/09/1960 |
| | 17958 SE Addie St. |
| | Milwaukie, OR 97267 |
| | (971) 400-9096 |
| | **Melinda Sue Johnson** |
| | DOB: 04/29/1965 |
| | 7872 SE 66th Ave. |
| | Portland, OR 97206 |
| | (503) 933-1948 |
| | **John Edward Jones** |
| | DOB: 02/13/1959 |
| | 7872 SE 66th Ave. |
| | Portland, OR 97206 |
| | (503) 933-1948 |



Detective Patrick Bray
Clackamas County Sheriff's Office

PIERCE

Page 1 of 3

13-34550

**Mindy J. Solomon**
aka Mindy J. Hollingsworth
DOB: 03/28/1974
(503) 312-9315

**Tanaea Marie Hollingsworth**
DOB: 05/15/1996

**Kelly O'Donnell** – DHS Caseworker

**Detective Paul Wade** – CCSO CAT

WITNESS:                    N/A

<u>NARRATIVE:</u>

On 05/13/2014 at approx. 0935 hours, DHS caseworker Kelly O'Donnell and I met with Jorden Hollingsworth at the Clackamas County Jail, specifically a room located in the booking area. I stood by while Ms. O'Donnell spoke with Mr. Hollingsworth about her assessment of Katrina Johnson and Mr. Hollingsworth's relationship with her. She asked him several questions and at the conclusion of their conversation, Ms. O'Donnell advised Mr. Hollingsworth that he would be founded for sex abuse as it relates to DHS. During this conversation, Mr. Hollingsworth made the unsolicited statement that he talked about "marrying her" (Katrina) when she was 18 years old.

I then advised Mr. Hollingsworth that I was not here to interview him or ask him any specific questions. I did advise him that he was untruthful with Ms. O'Donnell in telling her that he has only contacted Katrina once since he first entered jail recently. I reminded him that all call he has made are recorded and logged. He then spontaneously stated, "Okay, I've talked to her several times." I, in turn, told him I was monitoring the phone calls and was aware of the context in which they were speaking to each other (i.e. I love you, hard being without you, etc.) Clearly they are currently involved in an intimate, romantic relationship. I told him that her number ((971) 261-9067) has been blocked, she is the victim in an ongoing investigation to which he is the suspect, and he is to cease all communication with her. I told him that should he continue to find ways and communicate with her, he risks additional charges of interfering or perhaps witness tampering. I only asked Mr. Hollingsworth if he was clear about what I was saying. He said he was.

On 05/14/2014 at 1639 hours, Mr. Hollingsworth contacted Katrina by phone from the jail, contacting her at (503) 433-3996. The call was 15 minutes in duration and completely inundated with Mr. Hollingsworth grilling Katrina on how much could he trust her and, clearly making assurances to any one listening that they had not done anything. Additionally, Mr. Hollingsworth acknowledged on this call that he was further told by me to not contact Katrina.

On 05/14/2014 at approx. 1703 hours, Mr. Hollingsworth spoke with his mother, Mindy J. Solomon from the jail to (971) 312-9315. During the course of that conversation, he made verification that his mother would be speaking to Katrina.

EXHIBIT 125, Page 97 of 144
Case No. 3:20-cv-01567-MC

13-34550

On 05/15/2014 at approx. 1045 hours, Detective Wade and I contacted Mr. Hollingsworth, again at the Clackamas County Jail. He immediately advised he did not want to talk to me. I told him I was not her to question him. I told him that he clearly did not take what I said seriously about not contacting the victim and I referred him to the call he made to Katrina at a different number. I told him that he has clearly not been truthful about his relationship with Katrina. I informed him I had the new number blocked that he contacted Katrina at, as well as the number he spoke to his mother in which they discussed contacting Katrina. I told him I would now be also requesting charges of hindering prosecution in this matter as he is clearly attempting to persuade Katrina in not cooperating in his prosecution. He became irritated in short order and was and advised he was done. He was then escorted away by jail personnel.

**The relevant jail calls and their contents will be outline in a separate report.**

ACTION RECOMMENDED:

Investigation continues.



Detective Patrick Bray    #38260

Detective Patrick Bray
Clackamas County Sheriff's Office

13-34550

**Mindy J. Solomon**
aka Mindy J. Hollingsworth
DOB: 03/28/1974
(503) 312-9315

**Tanaea Marie Hollingsworth**
DOB: 05/15/1996

WITNESS:                                N/A

NARRATIVE:

On 06/11/2014, this case was presented to the Grand Jury for review.  The victim in
this case, Katrina Johnson, did show up to testify but reportedly recanted her
statements made earlier in the investigation that she had a sexual relationship with
Jorden Hollingsworth.  She claimed she fabricated the statements because she was
mad at him at that time, despite contradictory information.   Although the investigation
shows the likelihood of the sexual relationship, successful prosecution cannot
proceed until, if and when, Katrina Johnson corroborates her initial statements.

This case will be suspended pending further information.


ACTION RECOMMENDED:

Suspended.



Detective Patrick Bray   #38260
_____

Detective Patrick Bray
Clackamas County Sheriff's Office

# CLACKAMAS COUNTY SHERIFF'S OFFICE

9101 SE Sunnybrook Boulevard, Clackamas, Oregon 97015    (503) 785-5000

### Detective Patrick Bray

| | |
|---|---|
| **CASE NUMBER:** | **2013 - 34550** |
| Date of This Report: | 06/12/2014 |
| Date of Incident: | 01/09/2014 |
| CLASSIFICATION: | 163.355 – Rape III |
| | 163.415 – Sex Abuse III |
| **CASE STATUS:** | Suspended |
| **REPORT REGARDING:** | **Case Closure** |
| VICTIM: | **Katrina Marie Johnson** |
| | DOB: 09/09/1998 |
| | 17958 SE Addie St. |
| | Milwaukie, OR 97267 |
| | (971) 400-9096 |
| SUSPECT: | **Jorden Timothy Hollingsworth** |
| | DOB: 08/01/1993 |
| | 19903 Leland Rd. |
| | Oregon City, OR 97045 |
| | (503) 839-1600 |
| MENTIONED: | **Shawn Ely Johnson** |
| | DOB: 04/09/1960 |
| | 17958 SE Addie St. |
| | Milwaukie, OR 97267 |
| | (971) 400-9096 |
| | **Melinda Sue Johnson** |
| | DOB: 04/29/1965 |
| | 7872 SE 66th Ave. |
| | Portland, OR 97206 |
| | (503) 933-1948 |
| | **John Edward Jones** |
| | DOB: 02/13/1959 |
| | 7872 SE 66th Ave. |
| | Portland, OR 97206 |
| | (503) 933-1948 |



Detective Patrick Bray
Clackamas County Sheriff's Office

PIERCE

Page 1 of 2

Received:                    Nov  8 2017 10:14am

5037223787        Oregon City Police          Oregon City Police        11:19:36 a.m.    11-08-2017      2/31

**C.L.A.S.S.**
**OREGON CITY POLICE DEPARTMENT**
320 WARNER MILNE RD.
OREGON CITY, OR 97045

**INCIDENT REPORT**

Inc. No.: 15-0839

| CRIME | VEHICLE | PERSON | Classification |
|---|---|---|---|

(handwritten form fields — illegible)

TARGETS | SUSPECT ACTIONS

EXHIBIT 125, Page 101 of 144
Case No. 3:20-cv-01567-MC

Received:                                    Nov  8 2017 10:16am

5037223787        Oregon City Police          Oregon City Police      11:20:52 a.m.   11-08-2017      3 /31

☒ SUSPECT     ☐ PERSON REPORT

SUSPECT #1

Hollingsworth, Jordan Timothy

1228 Linn Ave # 32 OC, OR          503 763 8738

81/1993     M Male     5'8  150  brn          570 437086     323 5840  OR

SUSPECT #2

PERSON

SUSPECT/PERSON DETAIL

SUSPECT/PERSON VEHICLE

Received:                          Nov  8 2017 10:17am

5037223787      Oregon City Police      Oregon City Police      11:21:53 a.m.    11-08-2017      4/31

| Page # 1 | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case #15-0539 |
| --- | --- | --- |

### MENTIONED

Jorden Hollingsworth-suspect/not contacted
8/1/1993
1208 Linn Ave. #32
Oregon City OR 97045

Jasmine M. Jewell-Shafer-victim
8/24/2004
11005 NE 76th St.
Vancouver WA 98662

Kenneth L. Jewell III-father of victim
7/26/1985
11005 NE 76th St.
Vancouver WA 98662
360 553 2331

Trisha Miller-fiancée father of victim
Hearing impaired if contacted
3/6/1985
1208 Linn Ave. #32
Oregon City OR 97045
971 229 9748

Mindy Hollingsworth-mother of suspect/sister of Trisha Miller
3/28/1975
1208 Linn Ave. #32
Oregon City OR 97045

Kaeli Jewell-daughter of Trisha Miller and Kenneth Jewell III
5/3/2013
1208 Linn Ave. #32
Oregon City OR 97045

Sgt. Edwards-OCPD
Sgt. Gates-OCPD

### ACTION TAKEN

On 2/13/2015 at about 1500 hours I met with Kenneth Jewell and Trisha Miller with Jasmine Jewell-Shafer and Kaeli Jewell at the Oregon City Police Department regarding a possible Sex Abuse III to 9

| Officer JR Behan | DPSST# 38915 | Agency: OCPD |
| --- | --- | --- |

Received:                                          Nov  8 2017 10:17am

5037223787        Oregon City Police        Oregon City Police    11:22:29 a.m.    11-08-2017    5/31

| Page # 2 | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>Continuation Report | Case #15-0539 |
|---|---|---|
|  |  |  |

year old Jasmine by an extended family member Jorden Hollingsworth which occurred on 2/13/2015 at 1208 Linn Ave. #32 at about 0130 hours.

I was briefed prior to meeting with the family by Sgt. Gates regarding her initial contact with the family. Sgt. Gates told me Jasmin disclosed the sex abuse to Trisha and Kenneth earlier in the day I met initially in the lobby of the police department with the listed family members. I asked to speak with Trisha in another room.

The family was cooperative and Trisha went to an interview room with me. I asked Trisha to tell me what was disclosed to her by Jasmine and the circumstances surrounding what occurred. Trisha is hearing impaired but can read lips told me the following. Trisha told me she was engaged to Kenneth in the past. Trisha told me they have been working on their relationship but have been living separately. Trisha told me Kenneth lives in Vancouver with Jasmine (not her biological daughter) while she lives in Oregon City with Kaeli (her daughter with Kenneth) at 1208 Linn #32. Trisha told me Kenneth has been spending time at her apartment in part to work on the relationship and partly for visitation with Kaeli. This includes staying overnight on occasions

Trisha told me she lives at the apartment with her sister, Mindy Hollingsworth. Trisha told me she and Mindy have allowed Jorden Hollingsworth (Mindy's son) to stay at the apartment because he has nowhere to live.

Trisha told me earlier in the day she was present at Koffee Barn in Gladstone with Jasmine and Kenneth. Trisha told me she was present when Jasmine disclosed that she woke up during the night with Jorden's hand under her shirt feeling her chest. Trisha told me Jasmine disclosed that after she woke up Jorden asked to touch her and she said no. Trisha told me Jasmine disclosed that Jordan offered her $20 to touch her. Trisha told me Jasmine disclosed that Jordan asked her not to tell anyone and offered her money. Trisha told me Jasmine told her Jorden offered to take her to the movies and to babysit her and let her do anything she wanted.

I asked Trisha if Jasmine was specific about where Jorden was touching her. Trisha told me Jasmine stated Jorden was touching her chest. Trisha told me she saw Jasmine sleeping on the couch with Jorden near her at about 0130 hours in 2/13/2015 when she went outside to smoke a cigarette.

I concluded my interview shortly after and met with Kenneth Jewell.

Kenneth told me he has been spending time at Trisha's apartment like she described and had stayed the night on 2/13/2015. Kenneth told me he got up later than normal this morning. Kenneth told me he got up at about 1000 hours and then at about 1300 hours he went to get lunch at the Koffee Barn in Gladstone with Trisha, Jasmine and Kaeli. Kenneth told me they were at the restaurant (the first place they stopped after leaving the apartment) when Jasmine said "Dad I really need to talk to you". Kenneth told me Jasmine then told him "Jorden touched me last night." Kenneth told me Jasmine stated "Jorden put his hand under my shirt and was playing with my chest".

| Officer JR Behan | DPSST# 38915 | Agency: OCPD |
|---|---|---|

Received:                                    Nov  8 2017 10:18am
5037223787          Oregon City Police        Oregon City Police        11:23:38 a.m.    11-08-2017        6/31

| Page # 3 | OREGON CITY POLICE DEPT. | Case #15-0539 |
| | 320 Warner Milne Road, | |
| | Oregon City, Oregon 97045 | |
| | **Continuation Report** | |

Kenneth told me Jasmine told him she asked Jorden to stop which he did. Kenneth told me Jasmine told him Jorden offered her money. Kenneth told me Jasmine stated Jorden explained to her that she should not tell anyone. Kenneth told me Jasmine told him she was scared and after the incident Jorden went upstairs. Kenneth told me Jasmine told him she was afraid to go upstairs to tell him what happened. Kenneth explained he was asleep at the time in a second floor bedroom.

Kenneth told me he was awake at 2300 hours on 2/12/2015 and saw Jorden return from a bar. Kenneth told me Jorden appeared very intoxicated when he got home. Kenneth told me Jasmine was sleeping on the couch at the time. Kenneth told me he went to bed at about 0100 hours on 2/13/2015. Kenneth told me Jasmine was sleeping on the couch and Jorden was in the living room watching a movie on the couch as well. Kenneth told me he didn't think anything about it because Jorden has been "couch surfing" at the apartment.

Kenneth told me once Jasmine disclosed the abuse he called police and arranged to meet at OCPD. Kenneth told me they had not been back to the apartment and he did not think Jorden was aware Jasmine disclosed or they were making this report.

I later arranged a safety plan with Trisha and Kenneth who were receptive and cooperative. Kenneth who lives in Vancouver told me he was going to take Jasmine to their home in Vancouver and would not allow contact between her and Jorden. Sgt. Gates arranged for Jasmine to be interviewed at the Children's Center on Thursday, 2/19/2015, at 0900. Kenneth told me he would be there for the appointment. Kenneth also agreed not to attempt to talk with the suspect. I instructed Trisha and Kenneth not to question Jasmine regarding the incident but if she volunteered any information to be a good listener.

I talked with Sgt. Edwards regarding a safety plan for Kaeli who resides in the home with Jorden. We discussed a line of sight safety plan which I later confirmed with Kenneth and Trisha. Kenneth told me Kaeli sleeps in the same bed as Trisha and she could keep an eye on Kaeli not allowing unsupervised contact with Jordan. I also contacted the DHS hotline and cross reported the incident.

I contacted Detective Sgt. Young and advised him about this report. Sgt. Young told me to forward this report to detectives for assignment.

<u>ACTION RECOMMENDED</u>
Forward to Detectives for assignment.

| Officer JR Behan | | DPSST# 38915 | Agency: OCPD |

Received:                                    Nov  8 2017 10:19am

5037223787          Oregon City Police          Oregon City Police          11:24:37 a.m.    11-08-2017          7 /31

| 1 DISTRIBUTION | | C.L.A.S.S. OREGON CITY POLICE DEPARTMENT 320 Warner Milne Road, Oregon City SPECIAL REPORT | | 2 INCIDENT NO.: | | 15-0539 |
|---|---|---|---|---|---|---|
| | | | | 3 REPORT TYPE | ☐ Supplemental ☐ Clearance | ☒ Original ☐ MSR |
| 4 CONNECT NUMBERS: | | | | 5 CASE STATUS | | |
| | | | | ☐ Cr By Arrest ☐ Suspended ☐ Pending | | |
| 6 CONNECT REPORTS: | | | | ☐ Referred ☐ Cleared ☐ Exceptional | | |
| | | | 7 INCIDENT TYPE Sex Abuse III | 8 CLASSIFICATION | | |
| | | | | ☐ Criminal ☒ No Crime Committed ☒ Information | | |

9 SUBJECT OF REPORT:
Victim statements

| 10 ORIGINAL REPORT | | | 11 THIS REPORT | | | 12 LOCATION OF OCCURRENCE: 1208 Linn Avenue #32, Oregon City, OR. 97045 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 02 | 14 | 15 | | | | | |

| 13 NAME: Jewell-Shafer, Jasmine M. | | 14 DOB: 06  26  04 | 15 SEX: F | 16 RACE: W |
|---|---|---|---|---|
| 17 RESIDENCE: 11005 NE 76th Street, Vancouver WA. 98662 | | 18 RES. PHONE: (360) 553-2331 | | |
| 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR: | 20 OCCUPATION / POSITION: | 21 BUS. PHONE: | | |

| 22 NAME: Hollingsworth, Jorden Timothy | | 23 DOB: 08  01  91 | 24 SEX: M | 25 RACE: W/B |
|---|---|---|---|---|
| 26 RESIDENCE: 1208 Linn Avenue #32, Oregon City, OR. 97045 | | 27 RES. PHONE: | 28 BUS. PHONE: | |

26 DETAILS:

**Action Taken:**
On 2/13/15 at approximately 2:40 pm, I met with Kenneth Jewell, Trisha Miller and Jasmine Jewell-Shafer in the lobby of the Oregon City Police Department. Dispatch had advised that Mr. Jewell was there to report that his 10 year-old daughter had reported that she had been inappropriately touched by his ex-fiance's nephew the night before, at 1208 Linn Avenue #32, in Oregon City.

I did not want to question Mr. Jewell in front of Jasmine, so I escorted him back to an interview room. Mr. Jewell appeared upset and teary eyed as he spoke. I asked him some basic information. Mr. Jewell stated that he and Jasmine live in Washington, but had stayed the night at his ex-fiancé, Trisha Miller's apartment the night prior. He told me that he trusted everyone in the apartment, and that Jasmine had slept on the couch. Today, he, Trisha and Jasmine were out at lunch, when Jasmine told him that Jorden, Trisha's nephew, had touched her inappropriately the night before. According to Mr. Jewell, Jasmine told him that Jorden, who had been drinking night before, had come to her while she was on the couch, and asked if he could touch her. She told him no, and he put his hand down her shirt and started rubbing her breasts. Mr. Jewell stated that Jasmine has begun to develop breasts. Jasmine told Mr. Jewell that after touching her, Jorden told her reasons why she shouldn't tell anyone. I asked Mr. Jewell if he had contacted Jorden or told anyone about the disclosure, and he told me he had not, and had driven straight to the police department.

Because sex abuse investigations can be very time consuming and swing shift was coming on duty at 3:00 pm, Mr. Jewell agreed to take Jasmine to the nearby McDonalds until a swing shift officer could speak with him. At approximately 3:15 pm, after briefing Officer Behan on the situation, I called Mr. Jewell back to the PD and introduced all of them to Officer Behan. Officer Behan escorted Ms. Miller to an interview room while I sat with Mr. Jewell and Jasmine in the lobby. While with them, I explained to Jasmine that we didn't want her to have to tell numerous people what had happened, and told her about the Children's Center. I did not ask her any questions about the incident, Jasmine sporadically made statements about what had occurred. Mr. Jewell told Jasmine that they were going to the zoo the following day, and she asked, "Jorden isn't going to be there is he". She appeared scared and upset when she asked this. Mr. Jewell told her that he would not, and that she would not have to be around him anymore. I told her that she did the right thing by telling her dad, and that she was very brave. Jasmine stated that Jorden was lucky he ducked down when he did, or she would have hit him. She then told me that Jorden had told her that he would take her to a movie or give her money so she wouldn't tell her dad what happened. She then stated that she told him OK because she could smell alcohol on his breath. She told me she was scared to go upstairs at that time and tell her dad, because she didn't want to, "Get hurt by my own  _?_ " (I don't recall the work she used, but she referred to Jorden as a nephew, cousin, or something along these lines).

**Action Recommended:**
Attach to Officer Behan's report.

| 30 TIME RECEIVED: | 31 TIME DISPATCHED: | 32 TIME ARRIVED: | 33 TIME CLEARED: |
|---|---|---|---|
| 34 REPORTING OFFICER: C. Gatos | 35 DPSST: 40117 | 36 AGENCY: OCPD | 37 APPROVED: |
| 38 REPORTING OFFICER: | 39 DPSST: | 40 AGENCY: | 41 DATA ENTRY: |

Received: Nov 8 2017 10:21am

5037223787 Oregon City Police Oregon City Police 11:25:54 a.m. 11-08-2017 8 /31

C.L.A.S.S.
OREGON CITY POLICE DEPARTMENT
320 Warner Milne Road, Oregon City

# SPECIAL REPORT

| | |
|---|---|
| 1 DISTRIBUTION: | |
| 2 INCIDENT NO.: | 15-0539 |
| 3 REPORT TYPE: | ☐ Supplemental ☐ Clearance ☒ Special ☐ MSR |
| 4 CONNECT NUMBERS: | |
| 5 CASE STATUS: | ☐ Clr By Arrest ☒ Referred ☐ Suspended ☐ Unfounded ☐ Pending ☐ Exceptional |
| 6 CONNECT REPORTS: | |
| 7 INCIDENT TYPE: | Sex Abuse |
| 8 CLASSIFICATION: | ☒ Crime ☐ No Crime Committed ☐ Information |
| 9 SUBJECT OF REPORT: | Jasmine Jewell-Shafer's Children's Center interview on February 19, 2015. |
| 10 ORIGINAL REPORT: | 02 13 15 |
| 11 THIS REPORT: | 02 19 15 |
| 12 LOCATION OF OCCURRENCE: | 1713 Penn Lane, Oregon City, OR 97045 |

**INFORMANT**

| 13 NAME | 14 DOB | 15 SEX | 16 RACE |
|---|---|---|---|
| Jewell-Shafer, Jasmine M. | 08 24 04 | F | W |

| 17 RESIDENCE | 18 RES. PHONE |
|---|---|
| 11005 NE 76th Street, Vancouver, WA 98662 | |

| 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR | 20 OCCUPATION / POSITION | 21 BUS. PHONE |
|---|---|---|
| | | |

**SUSPECT**

| 22 NAME | 23 DOB | 24 SEX | 25 RACE |
|---|---|---|---|
| Hollingsworth, Jorden Timothy | 08 01 93 | M | W/B |

| 26 RESIDENCE | 27 RES. PHONE | 28 RES. PHONE |
|---|---|---|
| 1208 Linn Avenue #32, Oregon City, OR 97045 | | |

29 DETAILS

See attached narrative

| 30 TIME RECEIVED | 31 TIME DISPATCHED | 32 TIME ARRIVED | 33 TIME CLEARED |
|---|---|---|---|
| | | | |

| 34 REPORTING OFFICER | 35 DPSST | 36 AGENCY | 37 APPROV. |
|---|---|---|---|
| Ellis, Sean | 47646 | OCPD | |

| 38 REPORTING OFFICER | 39 DPSST | 40 AGENCY | 41 DATA ENTRY |
|---|---|---|---|
| | | | |

Received:                                    Nov  8 2017 10:21am
5037223787        Oregon City Police        Oregon City Police        11:26:32 a.m.    11-08-2017        9/31

| Page # 1 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|

**MENTIONED:**

Hollingsworth, Jorden Timothy                    Suspect
DOB -- 8-1-93
1208 Linn Ave. #32, Oregon City, OR 97045

Jewell-Shafer, Jasmine M.                    Victim
DOB -- 8-24-04
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Jewell, Kenneth L.                    Jasmine's father
DOB -- 7-26-85
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Miller, Trisha                    Kenneth's fiancé
1208 Linn Ave. #32, Oregon City, OR 97045
971-229-9748

Jewell, Kailea                    Kenneth/Trisha dtr.
DOB -- 5-3-13
1208 Linn Ave. #32, Oregon City, OR 97045

**ACTION TAKEN:**

On February 19, 2015, at about 9:00 AM, Jasmine Jewell-Shafer was seen at the Clackamas County Children's Center located at 1713 Penn Lane in Oregon City, OR 97045. What follows is a summary of her interview at The Children's Center, which was videotaped in its entirety. The following summary has been condensed for the ease of the reader, and is not necessarily in the order in which it was discussed. The video recording contains a verbatim account of the interview (SEE DVD AUDIO RECORDING OF THE INTERVIEW FOR FULL DETAILS AND VICTIM'S STATEMENTS).

When I arrived at the Children's Center, I walked into the viewing room. The medical examiner was Gabrielle Peterson and the interviewer was Amanda McVay. A short time later the staff walked into the room with Jasmine's father, Kenneth Jewell. Mr. Jewell told The Children's Center staff that Jasmine hasn't said anything about what happened to her and he hasn't asked Jasmine to talk about it.

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

| Detective: Sean Ellis | DPSST #47648 | Agency: OCPD |
|---|---|---|

| | OREGON CITY POLICE DEPT. 320 Warner Milne Road Oregon City, Oregon 97045 Continuation Report | |
|---|---|---|
| Page # 2 | C.L.A.S.S. | Case # 15-0539 |

Mr. Jewell said he and Jasmine were staying at his fiancé, Trisha Miller's, apartment when Jordan Hollingsworth came home and was "kind of intoxicated." Mr. Jewell said Jordan is Ms. Miller's nephew. Mr. Jewell said the next day, Jasmine told him Jordan put his hand down her shirt and then told her not to tell anyone because it would "cause problems."

Mr. Jewell said Jasmine is happy most of the time but since Jordan touched her, she has been nervous and scared. He said Jasmine hasn't told anyone else what happened to her and he has told others not to talk with her about it.

**Medical**

After the staff finished speaking with Mr. Jewell, he was escorted out of the interview room and into the lobby. Jasmine was then brought into the medical room and seen by Gabrielle Peterson. This portion of the interview is not recorded, nor can I view what takes place in the room. I can only hear voices of the people talking in the medical room.

Jasmine was asked why she was at the Children's Center and she said because Trisha's nephew, Jordan, "decided to touch me". Jasmine said she woke up from a dream when Jordan touched her and she saw him duck behind a couch.

Jasmine was asked what words she uses when she is referring to different body parts and her responses are as follows:

Jasmine refers to her vagina as "my vagina"
Jasmine refers to her breasts as "my boobs"
Jasmine refers to her buttocks as "my bottom"

**Interview**

After the medical exam was concluded, Jasmine was transitioned into the interview room and interviewed by Amanda McVay. The second part of the Children's Center interview took place in a small room which was audio and video recorded. Jasmine was interviewed while I sat behind a one-way glass and could see and hear the entire interview of Jasmine.

When Jasmine was asked to tell what Jordan did to her, she said he touched her "right here." As she said this, Jasmine moved her left hand over the right side of her chest. Jasmine said Jordan touched her under her shirt and when she woke up, she heard Jordan "gasp" before ducking behind the arm of the couch. Jasmine said the gasp she heard sounded like Jordan and she knows it wasn't her dad because he was upstairs

Rece'ived:
Nov 8 2017 10:22am
11:27:19 a.m.    11-08-2017    10/31
Oregon City Police    Oregon City Police    5037223787
EXHIBIT 125, Page 109 of 144
Case No. 3:20-cv-01567-MC

Received:                                    Nov  8 2017 10:23am
5037223787        Oregon City Police              Oregon City Police         11:28:17 a.m.    11-08-2017       11/31

| Page # 3 | C.L.A.S.S. | Case # 15-0539 |
|---|---|---|
| | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | |

and Jorden was by the couch. Jasmine said she knows her dad wouldn't do something like that to her because he called the police.

Jasmine said Jorden touched her while she was sleeping on the couch at Trisha's house. She said she was dreaming when she felt someone touch her "right here." Jasmine demonstrated where she was touched by placing her right hand on the right side of her chest.

Jasmine said Jorden touched her "boob" with his finger which he moved from side to side. Jasmine described this as feeling "weird." Jasmine demonstrated how Jorden's finger moved by sweeping her right index finger back and forth across her chest. Jasmine said Jorden touched her under her bra and only touched one of her boobs. Jasmine said she knows Jorden was the person who touched her because he asked her not to tell anyone.

Jasmine said when she heard someone gasp she looked over the couch, and saw Jorden acting like he was sleeping. Jasmine said Jorden asked "can I touch you?" and she told him "no." She said Jorden asked to take out the garbage and then repeatedly asked Jasmine if he could touch her.

Jasmine said Jorden asked if he was talking to her in his sleep and she told him he touched her. She said Jorden told her he does "weird stuff" in his sleep and she told him she knew he wasn't sleeping. Jasmine said later, Jorden offered her money and to take her to the new Sponge Bob movie if she didn't tell anybody he touched her.

Jasmine said she couldn't go back to sleep because she was scared, even though later she heard Jorden snoring. She said nobody was up when Jorden touched her because it was in the middle of the night. She said she told Jorden "you can't do that to a kid. You're an adult". Jasmine said Jorden asked her "over and over" to not tell anyone what he did so she lied to him and said she wouldn't tell. She said Jorden thanked her and gave her a hug and while hugged her, she smelled alcohol on his breath. Jasmine said she knows what alcohol smells like because she has smelled cleaning alcohol before.

When Jasmine was asked if Jorden has touched her before, she said when she was living at a different apartment, Jorden took his "crotch" out of his pants and reached into her pants. Jasmine said Jorden reached under her underwear and touched the skin of her vagina with his hand before she jumped and pulled his hand out. She said Jorden just let his "crotch" hang out, which was "sticking up a little" and he didn't say anything to her.

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                    Nov  8 2017 10:24am
5037223787      Oregon City Police      Oregon City Police      11:29:18 a.m.   11-08-2017      12 /31

| Page # 4 | C.L.A.S.S. OREGON CITY POLICE DEPT. 320 Warner Milne Road, Oregon City, Oregon 97045 **Continuation Report** | Case # 15-0539 |
|---|---|---|

Jasmine said everyone else was sleeping when this happened and she felt trapped because she was at the dead end of the kitchen. Jasmine said she was scared and didn't say anything to Jorden. She said when Jorden pulled his hand out of her pants, he went to the living room and she went to her room until her parents got up. Jasmine said she never told anyone about this happening because Jorden has been to jail before and she is scared of him.

Jasmine acknowledged she has lied in the past and it's something she is "working on." Jasmine said she used to lie because she was scared of getting in trouble, but she wouldn't lie about something like this.

When Jasmine was asked if she's worried about anything, she said she has been having nightmares of Jorden "raping" her because he knows where she lives and he could "make it past her door." Jasmine was asked what the word "rape" means to her and she said "kill and sexual assault." Jasmine said she doesn't know how to explain what sexual assault is, but she has seen it on a TV show.

Jasmine said she told her dad and Trisha about Jorden touching her on the couch because it was the second time Jorden has touched her. Jasmine said before Jorden touched her, she felt safe with him because he was a good cousin. Now she says she doesn't want anything to do with him. Jasmine said she feels like Jorden will hurt Kailea and do to Kailea what he did to her. She said Jorden watches Kailea sometimes and she is worried because Kailea can't speak for herself yet.

Jasmine said she didn't go to her dad's room in the middle of the night was because when Jorden asked her not to tell anyone what happened, she smelled alcohol on his breath. Jasmine said she is "frustrated" because she has heard people say she is lying.

Jasmine was asked if Jorden has done anything else to her that wasn't OK. Jasmine said a couple days before Jorden touched her in the kitchen, he showed her a video on his phone of naked adults in the shower. Jasmine was asked what the adults were doing and she said "they were taking a shower." Jasmine said she and Jorden were alone in a car listening to music when he showed her the video.

During her interview, Jasmine was asked to draw the layout of the room she was in when Jorden touched her on the couch. Jasmine was also shown a picture of boy with no clothes on and asked to circle the area of the boy she referred to as the "crotch." (See attached copies of Jasmine's drawing and picture of the boy).

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|



JEWELL-SHAFER, JASMINE
DOB 08.24.04
DOS 02.19.15
15.02.2861

(E)COPY

13/31    11-08-2017    11:30:22 a.m.

Nov 8 2017 10:25am

Oregon City Police    Oregon City Police

Received:

SD37223787

Received:                           Nov  8 2017 10:26am

5037223787        Oregon City Police        Oregon City Police        11:31:16 a.m.    11-08-2017    14 /31



EXHIBIT 125, Page 113 of 144
Case No. 3:20-cv-01567-MC

Received:                          Nov  8 2017 10:26am
5037223787    Oregon City Police    Oregon City Police    11:31:38 a.m.    11-08-2017    15/31

| | | CLASS | | 2 INCIDENT NO : | 15-0539 |
|---|---|---|---|---|---|

**OREGON CITY POLICE DEPARTMENT**
320 Warner Milne Road, Oregon City

**SPECIAL REPORT**

3 REPORT TYPE:  ☐ Supplemental  ☒ Special
                ☐ Clearance      ☐ NIBR

1 DISTRIBUTION:

4 CONTACT NUMBER/S:

5 CASE STATUS:  ☐ Cir By Arrest  ☐ Suspended  ☐ Pending
                ☒ Referred        ☐ Clearance   ☐ Exceptional

6 CONNECT REPORTS:

7 INCIDENT TYPE: **Sex Abuse**

8 CLASSIFICATION: ☒ Crimbar  ☐ No Crime Committed  ☐ Information

8 SUBJECT OF REPORT:
**Follow up with Kenneth Jewell and Trisha Miller.**

| 10 ORIGINAL REPORT | | | 11 THIS REPORT | | | 12 LOCATION OF OCCURRENCE: |
|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 02 | 19 | 15 | 1713 Penn Lane, Oregon City, OR 97045 |

| 13 NAME: **Jewell-Shafer, Jasmine M.** | 14 DOB | | | 15 SEX | 16 RACE |
|---|---|---|---|---|---|
| | 08 | 26 | 04 | F | W |

17 RESIDENCE: **11905 NE 76th Street, Vancouver, WA 98662**

18 SCHOOL / EMPLOYER / BUS. PROPRIETOR

19 OCCUPATION / POSITION

21 BUS. PHONE

| 22 NAME: **Hollingsworth, Jorden Timothy** | 23 DOB | | | 24 SEX | 25 RACE |
|---|---|---|---|---|---|
| | 08 | 01 | 93 | M | W/B |

26 RESIDENCE: **1208 Linn Avenue #32, Oregon City, OR 97045**

27 RES. PHONE

28 RES. PHONE

29 DETAILS:

See attached narrative

| 30 TIME RECEIVED, | 31 TIME DISPATCHED | 32 TIME ARRIVED, | 33 TIME CLEARED |
|---|---|---|---|

| 34 REPORTING OFFICER **Ellis, Sean** | 35 DPSST: 47648 | 42 AGENCY OCPD | 37 APPROVED .16 H |
|---|---|---|---|

| 38 REPORTING OFFICER | 39 DPSST: | 43 AGENCY | 41 DATA ENTRY: |
|---|---|---|---|

Received:                                    Nov  8 2017 10:27am

5037223787        Oregon City Police              Oregon City Police        11:32:17 a.m.    11-08-2017        16/31

| Page # 1 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|

**MENTIONED:**

Hollingsworth, Jorden Timothy                          Suspect
DOB – 8-1-93
1208 Linn Ave. #32, Oregon City, OR 97045

Jewell-Shafer, Jasmine M.                               Victim
DOB – 8-24-04
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Jewell, Kenneth L.                                      Jasmine's father
DOB – 7-26-85
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Miller, Trisha                                          Kenneth's fiancé
1208 Linn Ave. #32, Oregon City, OR 97045
971-229-9748

**ACTION TAKEN:**

On February 19, 2015, Jasmine Jewell-Shafer was seen at the Children's Center after she disclosed being touched by Jorden Hollingsworth at an apartment in Oregon City. During her interview, Jasmine disclosed being sexually abused by Mr. Hollingsworth when she was younger, possibly in kindergarten. Jasmine did not know the address where she lived at the time but said Mr. Hollingsworth touched her in the kitchen, which had a "dead end." Jasmine said at the time, her father worked at Safeway and his girlfriend, Trisha, worked at an RV factory.

After Jasmine's interview was complete, I met with Mr. Jewell and explained Jasmine disclosed being touched by Mr. Hollingsworth when she was younger. I told Mr. Jewell this touching took place at an apartment he lived in while he worked at Safeway. Mr. Jewell said he and Jasmine move to 4800 SE Boardman in Milwaukie, Oregon in August, 2007 and lived there until June, 2009. He said they moved back sometime in 2011 and lived there until December, 2013. Based on the information Jasmine gave, Mr. Jewell believes this is where they lived when Jorden touched Jasmine the first time.

Later the same day, Mr. Jewell called me and said his fiancé, Trisha Miller, had text messages on her phone from Mr. Hollingsworth. Mr. Jewell said the texts proved Mr. Hollingsworth knew he touched Jasmine and he wanted me to see them.

| Detective: Sean Ellis | DPSST# 47648 | Agency: **OCPD** |
|---|---|---|

Received:                                      Nov  9 2017 10:28am
5037223787        Oregon City Police              Oregon City Police        11:33:09 a.m.    11-08-2017    17/31

| Page # 2 | C.L.A.S.S. | Case # 15-0539 |
|----------|------------|----------------|
|          | OREGON CITY POLICE DEPT. |    |
|          | 320 Warner Milne Road, |    |
|          | Oregon City, Oregon  97045 |    |
|          | **Continuation Report** |    |

Ms. Miller arrived at Oregon City Police Department and showed me the text messages on her phone. Ms. Miller was not able to forward the messages to me, but I took digital photographs of them (See attached photographs). Ms. Miller told me there was an additional text message sent by Mr. Hollingsworth she was not able to see anymore for an unknown reason. Ms. Miller told me the missing message said something to the effect of "I'm so sorry. I don't know what I was thinking. I didn't touch her, I was just looking because her shirt was up. I pulled it down and she woke up."

At a later time, I asked Property Officer Davis to download the photographs to this case file.

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|-----------------------|--------------|--------------|





Received:                                    Nov 8 2017 10:35am
5037223787        Oregon City Police        Oregon City Police        11:39:49 a.m.    11-08-2017    20/31



01/04 I was heading upstairs and I noticed her shirt was pulled up. I leaned over her looked, I dont know why. And went to pull her shirt down. And she woke

02/04 up and said she was gonna go wake you guys up and tell you I was looking at her or touching her. I freaked out and just asked her not to. Honestly it was

03/04 so quick. All this happened within like 5 seconds.

Received:     Nov 8 2017 10:38am

5037223787     Oregon City Police     Oregon City Police     11:43:09 a.m.     11-08-2017     21/31



02/04 up and said she was gonna go wake you guys up and tell you I was looking at her or touching her. I freaked out and just asked her not to. Honestly it was

03/04 so quick. All this happened within like 5 seconds. I knew what it looked like so I didn't want her to tell. I was gonna tell you first. I just didn't know

Type message

Received:                                    Nov 8 2017 10:41am

5037223787          Oregon City Police          Oregon City Police          11:46:29 a.m.    11–08–2017        22 /31



Received:                    Nov  8 2017 10:45am
5037223787      Oregon City Police          Oregon City Police      11:49:39 a.m.   11-08-2017      23 /31

| | |
|---|---|
| 1 DISTRIBUTION | C.L.A.S.S. OREGON CITY POLICE DEPARTMENT 320 Warner Milne Road, Oregon City |

**SPECIAL REPORT**

2 INCIDENT NO. **15-0539**

3 REPORT TYPE: ☐ Supplemental ☒ Special / ☐ MBR

5 CASE STATUS: ☐ Cs By Arrst ☐ Suspended ☐ Pending / ☐ Cleared ☐ Clearance ☐ Nonactived

7 INCIDENT TYPE: **Sex Abuse**

9 CLASSIFICATION: ☒ Closed ☐ No Crime Committed ☐ Information

8 SUBJECT OF REPORT: Follow up with Kenneth Jewell and and Jorden Hollingsworth.

10 ORIGINAL REPORT 02 / 13 / 15    11 TIME REPORT 05 / 20 / 15    12 LOCATION OF OCCURRENCE 18440 SW Boones Ferry Rd., #J301, Tualatin, OR

13 NAME: Jewell, Kenneth L.    14 DOB: 07 / 26 / 85    15 SEX: M   16 RACE: W
17 RESIDENCE: 11805 NE 76th Street, Vancouver, WA 98662    18 RES. PHONE: (360) 553-2331

22 NAME: Hollingsworth, Jorden Timothy    23 DOB: 08 / 01 / 93    24 SEX: M   25 RACE: W/B
26 RESIDENCE: 18440 SW Boones Ferry Rd. #J301, Tualatin, OR    27 RES PHONE: (971) 331-0739

29 DETAILS
See attached narrative

34 REPORTING OFFICER: Ellis, Sean    36 DSN: 47549    38 AGENCY: OCPD

Received:                          Nov  8 2017 10:45am
5037223787      Oregon City Police          Oregon City Police      11:50:18 a.m.   11-08-2017      24 /31

| Page # 1 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>Continuation Report | Case # 15-0539 |
|---|---|---|

**MENTIONED:**

Hollingsworth, Jorden Timothy          Suspect
DOB – 8-1-93
18440 SW Boones Ferry Rd., #J301, Tualatin, OR
971-331-0739

Jewell-Shafer, Jasmine M.          Victim
DOB – 8-24-04
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Jewell, Kenneth L.          Jasmine's father
DOB – 7-26-85
11005 NE 76th St., Vancouver, WA 98662
360-553-2331

Hollingsworth, Mindy          Jorden's mother
1208 Linn Avenue #32, Oregon City, OR 97045

Hollingsworth, Tanaea          Jorden's sister
1208 Linn Avenue #32, Oregon City, OR 97045
971-204-2580

Miller, Trisha          Kenneth's fiancé
1208 Linn Ave. #32, Oregon City, OR 97045
971-229-9748

Jacob Skokan          Mult. Cty. P.O.

Detective Lysaght          OCPD

**ACTION TAKEN:**

On April 17, 2015, I contacted Kenneth Jewell by telephone to update him on this case. During this conversation, Mr. Jewell told me Jasmine was now living with her grandmother in Oklahoma. I asked Mr. Jewell if he still wanted to pursue charges against Jorden Hollingsworth and he said he did. Mr. Jewell said he would do whatever was necessary moving forward with the case, including bringing Jasmine back to give any necessary testimony.

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                                          Nov  8 2017 10:46am

5037223787        Oregon City Police          Oregon City Police          11:50:58 a.m.    11-08-2017          25/31

| Page # 2 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|

On May 19, 2015, I contacted Jorden Hollingsworth's probation officer, Jacob Skokan, by telephone. Mr. Skokan provided me with Jorden's address, which was current as of two days prior.

Detective Lysaght and I drove to 1208 Linn Avenue #32, in Oregon City, to look for Jorden. I contacted Jorden's mother, who identified herself as Mindy Hollingsworth, at the front door. Mindy told me Jorden was not there and hadn't been for some time. I asked Mindy for Jorden's current telephone number and she said her daughter may have the number.

Ms. Hollingsworth's daughter, Tanaea Hollingsworth, came to the front door but refused to give Jorden's phone number since I wouldn't tell her why I was asking to talk with him. I gave Tanaea my business card and she said she would tell Jorden to call me.

On May 20, 2015, Detective Lysaght and I drove to Jorden's apartment but nobody came to the door. I called the phone number listed for Jorden on the text messages he sent to Trisha Miller and left him a voice mail. I left my business card on the door to Jorden's apartment, asking him to call me.

When I returned to my office, I had a voice mail from Jorden. I returned Jorden's call and he told me he had been expecting me to follow up with him. I asked Jorden when we could get together to talk about this case. Jorden told me he didn't want to talk with me without legal representation. I told Jorden I understood and I did not ask him anything more questions.

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                           Nov  8 2017 10:47am
5037223787      Oregon City Police          Oregon City Police          11:51:45 a.m.   11-08-2017      26/31

| 1 DISTRIBUTION | | C.L.A.S.S.<br>OREGON CITY POLICE DEPARTMENT<br>320 Warner Milne Road, Oregon City<br>**SPECIAL REPORT** | 2 INCIDENT NO: | 15-0539 |
|---|---|---|---|---|
| | | | 3 REPORT TYPE: | ☐ Supplement ☒ Special<br>☐ Clearance ☐ Void |
| 4 CONNECT NUMBERS | | | 5 CASE STATUS | |
| | | | ☐ Cir By Arrest ☐ Suspended ☐ Pending<br>☐ Referred ☒ Clearance ☐ Exceptional | |
| 6 CONNECT REPORTS | | | 5 CLASSIFICATION | |
| | | 7 INCIDENT TYPE<br>Sex Abuse | ☒ Criminal ☐ No Crime Committed ☐ Information | |

8 SUBJECT OF REPORT
Follow up with Katrina Johnson

| 10 ORIGINAL REPORT | | | 11 THIS REPORT | | | 12 LOCATION OF OCCURRENCE | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 04 | 15 | 16 | OCPD | | | | |

| INFORMANT | 13 NAME<br>Johnson, Katrina Marie | | | 14 DOB<br>09 | | 09 | 90 | 15 SEX<br>F | 16 RACE:<br>W |
|---|---|---|---|---|---|---|---|---|---|
| | 17 RESIDENCE<br>2820 SE Roswell Avenue, Milwaukie, OR 97222 | | | | | | | 18 RES. PHONE:<br>(503) 207-8373 | |
| | 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR: | | 20 OCCUPATION / POSITION: | | | | | 21 BUS. PHONE: | |

| SUBJECT | 22 NAME<br>Hollingsworth, Jorden Timothy | | | 23 DOB<br>08 | | 01 | 93 | 24 SEX<br>M | 25 RACE<br>W/B |
|---|---|---|---|---|---|---|---|---|---|
| | 26 RESIDENCE: | | | | | | 27 RES. PHONE: | | 28 RES. IN-CARE: |

29 DETAILS

See attached narrative

| 39 TIME RECEIVED | 40 TIME DISPATCHED | 32 TIME ARRIVED | 33 TIME CLEARED |
|---|---|---|---|
| 34 RESPONDING OFFICER<br>Ellis, Sean | 35 DPSST<br>47848 | 36 AGENCY<br>OCPD | 37 APPROVED |
| 38 RESPONDING OFFICER | 39 DPSST | 40 AGENCY | 41 DATA ENTRY |

EXHIBIT 125, Page 125 of 144
Case No. 3:20-cv-01567-MC

Received:                                 Nov  8 2017 10:47am
5037223787        Oregon City Police        Oregon City Police        11:52:21 a.m.    11-08-2017        27 /31

| Page # 1 | C.L.A.S.S. <br> OREGON CITY POLICE DEPT. <br> 320 Warner Milne Road, <br> Oregon City, Oregon 97045 <br> **Continuation Report** | Case # 15-0539 |
|---|---|---|
|  |  |  |
|  |  |  |

## MENTIONED:

| | |
|---|---|
| Hollingsworth, Jorden Timothy <br> DOB – 8-1-93 | Suspect |
| Johnson, Katrina Marie <br> DOB – 9-9-98 <br> 2820 SE Roswell Ave., Milwaukie, OR 97222 <br> 503-207-8373 | Mentioned |
| Hollingsworth, Mindy <br> DOB – 3-8-75 | Jorden's mother |
| Miller, Trisha <br> DOB – 3-6-85 | Jorden's aunt |
| Hollingsworth, Tanaea | Jorden's sister |
| Hollingsworth, Debra | Jorden's grandma |
| Miller, Trisha <br> DOB – 3-6-85 | Jorden's aunt |
| Philpott, Mandi | Mentioned |

## ACTION TAKEN:

On January 29, 2016, I attended a prearranged meeting with Katrina Johnson and her attorney, Mandi Philpott. During this meeting, Katrina told me she was in a sexual relationship with Jorden Hollingsworth from July, 2013 until December, 2014. Katrina told me she received a subpoena to testify about her relationship with Mr. Hollingsworth in Grand Jury but lied during her testimony to protect him.

On April 15, 2016, I contacted Katrina on the telephone and spoke with her again. During our conversation, Katrina told me during her relationship with Mr. Hollingsworth, they engaged in sexual intercourse as well as oral sex. She told me she was 14 years old at the time and Mr. Hollingsworth was 19 years old. Katrina told me Mr. Hollingsworth knew how old she was because her mom told him and he responded by saying he "felt dirty." Katrina said Mr. Hollingsworth pursued a relationship with her after knowing she was 14 years old.

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

EXHIBIT 125, Page 126 of 144
Case No. 3:20-cv-01567-MC

Received:                                    Nov  8 2017 10:48am
5037223787        Oregon City Police          Oregon City Police        11:53:06 a.m.    11-08-2017        28 /31

| Page # 2 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|

Katrina told me Mr. Hollingsworth was charged with multiple sex crimes after she disclosed their relationship to a caseworker she had at the time. She said after Mr. Hollingsworth's arrest, she had regular contact with his family, including his mother, sister, grandmother, and aunt. Katrina identified the following people and their relationship with Mr. Hollingsworth:

Mindy Hollingsworth is Mr. Hollingsworth's mother
Tanaea Hollingsworth is Mr. Hollingsworth's sister
Debra Hollingsworth is Mr. Hollingsworth's grandmother
Trisha Miller is Mr. Hollingsworth's aunt

Katrina told me Mr. Hollingsworth's family members "pled" with her to not say anything about her relationship with Mr. Hollingsworth during her Grand Jury testimony. She said Mr. Hollingsworth's family members told her if she testified, it would "ruin his life." Katrina told me it was mostly Mindy and Debra Hollingsworth who talked with her but Tanaea also asked her to not say anything because she wanted her brother to be safe.

Katrina told me Mr. Hollingsworth's family members talked to her about her testimony "anytime the situation came up." She said they told her to testify that Mr. Hollingsworth was "just a friend" and they did not have a sexual relationship.

Katrina told me Debra and Tanaea drove her to the courthouse for Grand Jury. She said while they drove, Debra and Tanaea "went over the plan" of what they wanted her to say during her testimony. Katrina said during her Grand Jury testimony, she "lied through her teeth and everyone knew it." Katrina told me Debra and Tanaea drove her home after Grand Jury.

Katrina told me her relationship with Mr. Hollingsworth continued after she went to Grand Jury. She said she and Mr. Hollingsworth continued having sexual intercourse and oral sex with each other. Katrina said her relationship with Mr. Hollingsworth ended in December, 2014. She said Mr. Hollingsworth "stalked" her in December, 2014, after they broke up. She said Mr. Hollingsworth showed up at her friend's house with a rose and followed her to school. She said she had to lie to Mr. Hollingsworth to get him to go away and that was the last time she has been with him.

### ACTION RECOMMENDED:

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:                              Nov  8 2017 10:49am
5037223787      Oregon City Police          Oregon City Police      11:54:04 a.m.    11-08-2017      29/31

| 1 DESCRIPTION: | C.L.A.S.S. OREGON CITY POLICE DEPARTMENT 320 Warner Milne Road, Oregon City | 2 INCIDENT NO: 15-0539 |
|---|---|---|
| 4 CONTACT NUMBERS: | | 3 REPORT TYPE: ☐ Supplemental ☒ Special / ☐ Clearance ☐ MBR |
| 6 CONTACT REPORTS: | 7 INCIDENT TYPE SPECIAL REPORT Sex Abuse | 5 CASE STATUS ☐ Cli By Arrest ☐ Suspended ☐ Pending / ☒ Referred ☐ Clearance ☐ Reactivated 6 CLASSIFICATION ☒ Cleared ☐ No Crime Committed ☐ Information |

9 SUBJECT OF REPORT:
**Jorden Hollingsworth jail calls made in June, 2014.**

| 10 ORIGINAL REPORT | | | 11 DATE THIS REPORT | | | 12 LOCATION OF OCCURRENCE |
|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 05 | 27 | 16 | OCPD |

| 13 NAME Johnson, Katrina Marie | 14 DOB: 09  09  93 | 15 SEX: F | 16 RACE: W |
|---|---|---|---|
| 17 RESIDENCE 2820 SE Roswell Avenue, Milwaukie, OR 97222 | | 18 RES PHONE: (503) 207-8373 | |
| 19 SCHOOL / EMPLOYER / BUS, PROPRIETOR | 20 OCCUPATION / POSITION | 21 BUS PHONE | |

| 22 NAME Hollingsworth, Jorden Timothy | 23 DOB: 08  01  93 | 24 SEX: M | 25 RACE: W/B |
|---|---|---|---|
| 26 RESIDENCE | 27 RES. PHONE | 28 RES. PHONE | |

29 DETAILS

See attached narrative

| 30 TIME RECEIVED | 31 TIME DISPATCHED | 32 TIME ARRIVED | 33 TIME CLEARED |
|---|---|---|---|
| 34 REPORTING OFFICER: Ellis, Sean | 35 DPSST 47648 | 36 AGENCY: OCPD | |
| 38 REPORTING OFFICER: | 39 DPSST | 40 AGENCY: | 41 EQUIP EXT ST. |

Received:                              Nov  8 2017 10:50am
5037223787        Oregon City Police       Oregon City Police       11:54:41 a.m.    11-08-2017       30/31

| Page # 1 | C.L.A.S.S. | Case # 15-0539 |
|---|---|---|
| | OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | |

**MENTIONED:**

**ACTION TAKEN:**

Over the course of this investigation, I have listened to jail calls Jorden Hollingsworth has made while in custody at the Clackamas County Jail (CCJ).  Some of these calls were made while Mr. Hollingsworth was in custody during June of 2014.  I checked a law enforcement database and saw Grand Jury for the case Mr. Hollingsworth was in custody for was set for June 11, 2014.

What follows is a summary of a few of Mr. Hollingsworth's telephone calls between June 1, 2014 and June 30, 2014.  These calls have been condensed for the ease of the reader.  The digital recording contains a verbatim account of the interview (**SEE DIGITAL AUDIO RECORDING OF THE INTERVIEW FOR FULL DETAILS).**

On June 2, 2014, at about 3:28 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Deborah Miller.  Mr. Hollingsworth speaks with two different females, one he refers to as "mom", during his conversation.  Mr. Hollingsworth thanks "mom" for giving him "that number and stuff."  "Mom" responds to Mr. Hollingsworth by saying "after this I don't want to be a part of it."

On June 5, 2014, at about 1:34 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Mindy Jean Solomon Hollingsworth.  During this call, Mr. Hollingsworth and a female discuss "Trisha" being fired from her job and a fight the female was now in with "Trisha."  Toward the end of the conversation, Mr. Hollingsworth tells the female he will let them "handle that situation."

On June 10, 2014, at about 11:42 AM, Mr. Hollingsworth makes a call to a person the phone system identifies as Mindy Jean Solomon Hollingsworth.  During this call, Mr. Hollingsworth speaks with a female he refers to as "mom."  As they talk, "mom" says this is ridiculous because "you and Katrina have never had sexual relations."

On June 10, 2014, at about 9:29 PM, Mr. Hollingsworth make a call to a person the phone system identifies as Deborah Miller.  During this call, Mr. Hollingsworth tells a female the cop is a "big problem" because he subpoenaed "that person" for tomorrow.  He said there is going to be Grand Jury because they are trying to get him third degree rape.

Mr. Hollingsworth asks to talk with his "mom", and when he does, he asks her to "make that call please."  Mr. Hollingsworth confirms his "mom" knows who he is talking about,

| Detective: Sean Ellis | | DPSST# 47648 | Agency: OCPD |
|---|---|---|---|

Received:                              Nov  8 2017 10:51am

5037223787        Oregon City Police        Oregon City Police        11:55:42 a.m.    11-08-2017    31/31

| Page # 2 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|
| | | |

but does not give a name.  He asks "mom" to not "freak her out, just calm her down and shit."

On June 11, 2014, at about 1:31 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Deborah Miller.  Mr. Hollingsworth asked the female if she was "going down there" and the female says she is.  Mr. Hollingsworth tells the female she should expect a phone call because "she" needs a ride.  The female tells Mr. Hollingsworth "this is getting too crazy."  The female tells Mr. Hollingsworth the only thing she can think of is "her" dad is trying to "pull some bull shit."  Mr. Hollingsworth tells the female "they're trying to get her to testify against me."  The female asked Mr. Hollingsworth how he knows the person will need a ride and he asked if it needed to be explained.  Mr. Hollingsworth said "they scared the shit out of her."

I drove to CCJ and had a disk made with these phone calls recorded onto it.  I made a copy of the disk before securing the original disk in evidence.

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

Received:

Nov  6 2017 10:14am

5037223787          Oregon City Police          Oregon City Police          11:19:05 a.m.    11-08-2017          1 /31

DOJ-TRIAL DIVISION    Fax:503-947-4794          Nov  8 2017 09:49am  S001/001

ELLEN F. ROSENBLUM
Attorney General



FREDERICK M. BOSS
Deputy Attorney General

## DEPARTMENT OF JUSTICE
TRIAL DIVISION

November 8, 2017

By Facsimile (503) 655-8538                    11/8/17
                                               31 pgs
Records Department
Oregon City Police Department
320 Warner Milne Rd
Oregon City, Oregon 97045

Re:    *Jorden Timothy Hollingsworth v. Troy Bowser*
       Umatilla County Circuit Court Case No. 17CV47262
       **Underlying Conviction:  Clackamas County Case No. CR1501848**

Dear Records Clerk:

        Our office is handling a post-conviction case in the above-entitled matter.  In order for us
to complete our investigation and preparation for the defense of this case, it is necessary for us to
obtain a copy of all police reports related to originating agency #15-0539, incident date of
February 19, 2015, in *State of Oregon v. Jorden Timothy Hollingsworth*, Clackamas County
Case No. CR1501848.

        If you have any questions, please feel free to call me.  Thank you in advance for your
cooperation in this matter.

                                               Sincerely,

                                               s/ Galilio Abrego

                                               Galilio Abrego
                                               Legal Secretary for
                                               W. Douglas Marshall
                                               Senior Assistant Attorney General
                                               Galilio.L.Abrego@doj.state.or.us

8606322-v1/WDM&k4

1162 Court Street NE, Salem, OR  97301-4096
Telephone: (503) 947-4700  Fax: (503) 947-4794  TTY: (800) 735-2900  www.doj.state.or.us



**Oregon City Police Department**
320 WARNER MILNE RD | OREGON CITY, OR 97045 | P: 503.657.4964

---

## Case # 15-2359 - Offense/Incident Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | PRIMARY REPORTER |
|---|---|---|
| Jul 20, 2015 11:23 | Jul 20, 2015 11:00 | NICHOLAS ENNIS #46157 |

**REPORT TAKEN LOCATION**
1208 LINN AVE, OREGON CITY, OR 97045

| STREET CRIME | SHOOTING | EMS / FIRE / OTHER LE AGENCIES ON SCENE |
|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

### NARRATIVE

Author: ENNIS, N Entered: 2015-07-28
ACTION RECOMMENDED

Forward to DHS for information.

Author: ENNIS, N Entered: 2015-07-28
ACTION TAKEN

On 7-20-15 at about 1530 hrs. I received a DHS welfare check regarding possible lack of child supervision at 1208 Linn Ave. #32 in Oregon City.
The referral stated there were concerns that Jorden Hollingsworth was being allowed to stay at the location by Trisha Miller. It stated this was particularly concerning because Jorden was currently being investigated for child sex abuse (OCPD case #15-0539) and he might be having contact with Trisha's daughter, Kaeli Jewell.

I read the original reports from OCPD case #15-0539 and learned a safety plan was put in place on 2-13-15. The safety plan indicated Jorden was not to have any unsupervised contact with Kaeli while he was at the location.
I was familiar with Jorden and Trisha because I responded to a disturbance at the location on 7-8-15. During that contact I was told Jorden did not live at the location but he would stop by and visit. I was told that due
to the disturbance Jorden would be leaving and not allowed to return. I
was not aware of the original sex abuse charges or the safety plan that was in place during this contact.

Sergeant Kramer and I went to the location and met with Trisha. We explained we were there to ensure Jorden was not living at the location. Trisha is deaf but can read lips and speak understandably. Trisha told us Jorden does not live at the location and has not been over since the disturbance. She told me she was aware of the original safety plan and Kaeli has not been unsupervised around Jorden. It was explained to her
that the original allegations were still being investigated and Jorden was to not have any contact with Kaeli. Trisha told me she would adhere to the safety plan until she was advised otherwise. She requested that if she needs to be contacted by DHS that they bring an interpreter that knows sign language.

---

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| NICHOLAS ENNIS #46157   Jul 28, 2015 00:00 (e-signature) | BREANA BAKER #17BBAK   Jul 28, 2015 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| NICHOLAS ENNIS #46157 | BREANA BAKER #17BBAK |

EXHIBIT 125, Page 132 of 144
Case No. 3:20-cv-01567-MC

## INCIDENT INFO

INCIDENT TYPE

**INFO-POSS CHILD NEGLECT**

*OFFENSE LOCATION*

LOCATION NAME / STREET ADDRESS / APT, UNIT, STE / DESCRIPTION

**1208 LINN AVE**

| CITY | STATE | ZIP |
|---|---|---|
| **OREGON CITY** | **OR** | **97045** |

*INVOLVED OTHER-1*

INVOLVED OTHER-1 (PERSON)

**O-1 MILLER, TRISHA M**

DOB / ESTIMATED AGE RANGE

**1985-03-06**

| SEX | RACE / ETHNICITY | PHONE |
|---|---|---|
| **Female** | **White / Unknown** | **(971) 229-9748 (Home)** |

HOME ADDRESS

**1208 LINN AVE, OREGON CITY, OR 97045**

*INVOLVED OTHER-2*

INVOLVED OTHER-2 (PERSON)

**O-2 HOLLINGSWORTH, JORDAN TIMOTHY**

DOB / ESTIMATED AGE RANGE

**1993-08-01**

| SEX | RACE / ETHNICITY | PHONE |
|---|---|---|
| **Male** | **White / Unknown** | **(971) 331-0739 (Work), (971) 281-0827 (Mobile), (503) 875-9107 (Home)** |

HOME ADDRESS

**TRANSIENT, PORTLAND, OR 97216**

LEGACY DATA

**Identification (PPDS CRN): 2353699**

*INVOLVED OTHER-3*

INVOLVED OTHER-3 (PERSON)

**O-3 JEWELL, KAELI**

DOB / ESTIMATED AGE RANGE

**2013-05-03**

| SEX | RACE / ETHNICITY |
|---|---|
| **Female** | **White / Unknown** |

HOME ADDRESS

**1208 LINN AVE, OREGON CITY, OR 97045**

*INVOLVED OTHER-4*

INVOLVED OTHER-4 (PERSON)

**O-4 SOLOMAN, MINDY JEAN**

DOB / ESTIMATED AGE RANGE

**1974-03-28**

| SEX | RACE / ETHNICITY | PHONE |
|---|---|---|
| **Female** | **White / Unknown** | **(503) 875-4156 (Home), (503) 757-9857 (Mobile)** |

HOME ADDRESS

**19903 LELAND RD, OREGON CITY, OR 97045**

*INVOLVED OTHER-5*

INVOLVED OTHER-5 (PERSON)

**O-5 JEWELL, KENNETH LEON III**

DOB / ESTIMATED AGE RANGE

**1985-07-26**

| SEX | RACE / ETHNICITY | PHONE |
|---|---|---|
| **Male** | **White** | **777-3975 (Home)** |

HOME ADDRESS

**8309 SE LAMBERT ST, PORTLAND, OR 97266**

## ATTACHMENTS ADDENDUM

| FILE NAME | UPLOAD DATE/TIME | UPLOADED BY |
|---|---|---|
| **2359.pdf** | **Jul 20, 2015 00:00** | **B. BAKER #17BBAK** |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| NICHOLAS ENNIS #46157  Jul 28, 2015 00:00 (e-signature) | BREANA BAKER #17BBAK  Jul 28, 2015 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| NICHOLAS ENNIS #46157 | BREANA BAKER #17BBAK |

EXHIBIT 125, Page 133 of 144
Case No. 3:20-cv-01567-MC



**Oregon City Police Department**
320 WARNER MILNE RD | OREGON CITY, OR 97045 | P: 503.657.4964

## Case # 15-3567 – Arrest Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | PRIMARY REPORTER |
|---|---|---|
| Nov 15, 2015 16:18 | Nov 15, 2015 16:18 | TRAVIS NICHOLSON #41341 |

| REPORT TAKEN LOCATION |
|---|
| 1839 MOLALLA AVE |

| STREET CRIME | SHOOTING | EMS / FIRE / OTHER LE AGENCIES ON SCENE |
|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

### NARRATIVE

Author: NICHOLSON, T Entered: 2015-11-19
Clear by arrest

Author: NICHOLSON, T Entered: 2015-11-19
On 11-15-15 at about 1609hrs, a subject reported seeing a wanted subject, Jorden Hollingsworth, at the Oregon City Fred Meyer. Several other officers I arrived on scene in a short ammount of time. I got in a position to where I could see Mr. Hollingsworth's vehicle and anyone who was approaching it.

After a few minutes a male who matched Mr. Hollingsworth's description exited the Fred Meyer and got into the car I was watching. As he did this Sgt. Davis, Officer Horton and I blocked Mr. Hollingsworth's car in and
Sgt. Davis and I were able to detain Mr. Hollingsworth without incident. I confirmed the warrant through dispatch and then transported Mr.
Hollingworth to the Clackamas County Jail where he was lodged without incident.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| TRAVIS NICHOLSON #41341    Nov 19, 2015 00:00 (e-signature) | SHARON COUGHLIN #36126    Nov 19, 2015 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| TRAVIS NICHOLSON #41341 | SHARON COUGHLIN #36126 |

EXHIBIT 125, Page 134 of 144
Case No. 3:20-cv-01567-MC

Case # 15-3567 – Arrest Report (Oregon City Police Department)                                    Pg 2 of 2

## ARREST #2015-874

| ARREST DATE / TIME | ARRESTING ORGANIZATION | | DEFENDANT IS JUVENILE |
|---|---|---|---|
| Nov 15, 2015 16:18 | Oregon City Police Department – 17 | | ☐ YES ■ NO |

| ARREST TYPE | ARRESTING OFFICER |
|---|---|
| Warrant Arrest | TRAVIS NICHOLSON #41341 |

**LEGACY DATA**

Legacy Charge Code Text: WARRANT – WARRANT SERVICE – SEX ABUSE
I ; 163.427                                      Legacy Location Subdivision: CL-P3-P3-PP9

*DEFENDANT*

| | DEFENDANT NAME (LAST, FIRST MIDDLE) | | SEX |
|---|---|---|---|
| | D-1 HOLLINGSWORTH, JORDAN TIMOTHY | | Male |
| | DOB / ESTIMATED AGE RANGE | RACE / ETHNICITY | |
| | 1993-08-01 | White / Unknown | |
| | PHONE | EMAIL | |
| | (971) 331-0739 (Work), (971) 281-0827 (Mobile), (503) 875-9107 (Home) | | |
| | HOME ADDRESS | | |
| | TRANSIENT, PORTLAND, OR 97216 | | |

| SSN # | DEFENDANT WAS ARMED WITH |
|---|---|
| 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 | Unarmed |

*ARREST LOCATION*

LOCATION NAME / STREET ADDRESS / APT, UNIT, STE / DESCRIPTION

1839 MOLALLA AVE

*CHARGES*

| CHARGES – 1 | COUNT |
|---|---|
| ARREST WARRANT | 2 |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| TRAVIS NICHOLSON #41341   Nov 19, 2015 00:00 (e-signature) | SHARON COUGHLIN #36126   Nov 19, 2015 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| TRAVIS NICHOLSON #41341 | SHARON COUGHLIN #36126 |

EXHIBIT 125, Page 135 of 144
Case No. 3:20-cv-01567-MC

Case # 15-3567 – Offense/Incident Report (Oregon City Police Department)          Pg 1 of 1

## Case # 15-3567 - Offense/Incident Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | PRIMARY REPORTER |
|---|---|---|
| Nov 15, 2015 16:18 | Nov 15, 2015 16:18 | TRAVIS NICHOLSON #41341 |

REPORT TAKEN LOCATION

1839 MOLALLA AVE

| STREET CRIME | SHOOTING | EMS / FIRE / OTHER LE AGENCIES ON SCENE |
|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

## NARRATIVE

Author: NICHOLSON, T Entered: 2015-11-19
Clear by arrest
Author: NICHOLSON, T Entered: 2015-11-19
On 11-15-15 at about 1609hrs, a subject reported seeing a wanted subject, Jorden Hollingsworth, at the Oregon City Fred Meyer. Several other officers I arrived on scene in a short ammount of time. I got in a position to where I could see Mr. Hollingsworth's vehicle and anyone who was approaching it.

After a few minutes a male who matched Mr. Hollingsworth's description exited the Fred Meyer and got into the car I was watching. As he did this Sgt. Davis, Officer Horton and I blocked Mr. Hollingsworth's car in and
Sgt. Davis and I were able to detain Mr. Hollingsworth without incident. I confirmed the warrant through dispatch and then transported Mr.
Hollingworth to the Clackamas County Jail where he was lodged without incident.

## INCIDENT INFO

INCIDENT TYPE

WARRANT / FUGITIVE

*OFFENSE LOCATION*
LOCATION NAME / STREET ADDRESS / APT, UNIT, STE / DESCRIPTION

1839 MOLALLA AVE

## ATTACHMENTS ADDENDUM

| LE NAME | UPLOAD DATE/TIME | UPLOADED BY |
|---|---|---|
| 3567.pdf | Nov 15, 2015 00:00 | S. COUGHLIN #36126 |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| TRAVIS Nicholson #41341   Nov 19, 2015 00:00 (e-signature) | SHARON COUGHLIN #36126   Nov 19, 2015 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| TRAVIS NICHOLSON #41341 | SHARON COUGHLIN #36126 |



**Oregon City Police Department**
320 WARNER MILNE RD | OREGON CITY, OR 97045 | P: 503.657.4964

## Case # 16-1422 - Offense/Incident Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | PRIMARY REPORTER |
|---|---|---|
| Apr 28, 2016 14:53 | Apr 28, 2016 14:40 | DANIEL GARRETT #55267 |

| REPORT TAKEN LOCATION |
|---|
| 13261 CLAIRMONT WAY, OREGON CITY, OR 97045 |

| STREET CRIME | SHOOTING | EMS / FIRE / OTHER LE AGENCIES ON SCENE |
|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

### NARRATIVE

Author: GARRETT, D Entered: 2016-05-11
Action Taken:
On 04/28/16 I was dispatched to threat call at 13261 Clairmont Way Oregon City, OR. The call indicated the reporting party who was identified as Andrew Henley reported a subject threatened him with an 8" knife. Mr. Helnley stated the suspect left the residence. Additional information indicated the suspect had a large hunting knife on his belt. Mr. Henley reported the suspect threatened to kill him.

When I arrived on scene I met with Mr. Henley and his girlfriend, who was identified as Mindy Solomon. Mr. Henley told me a white male who was later identified as Adam Gill, I showed up at his house and kicked his door in.
He said Mr. Gill was looking for Ms. Solomon's son, who was identified as Jordan Hollingsworth. Mr. Henley said Mr. Gill told him he was going to kick Mr. Hollingsworth's ass for threatening to molest his young daughter.

Mr. Henley told me he and Mr. Gill argued while standing in front of his house. He told me Mr. Gill placed his hand on an 8" black knife on his
belt and said "I'm gonna fucking kill you". Mr. Henley told me he was afraid for his life. Mr. Henley told me Mr. Gill did not take out the
knife out of its holster at any point during the incident. He told me
while he was arguing with Mr. Gill, Mr. Hollingsworth arrived at the residence.

Mr. Henley told me Mr. Gill walked over to Mr. Hollingsworth and began arguing with him. He told me after a few minutes Mr. Gill left the residence.

When I spoke to Ms. Solomon she told me her ex-husband, who was identified as Michael Reynolds started the conflict. She said Mr. Reynolds told Mr. Gill, that Mr. Hollingsworth threatened his daughter. Ms. Solomon told me Mr. Hollingsworth was just released from jail and did not live at the residence. Ms. Solomon told me Mr. Gill kicked in the front door until it broke open. She told me Mr. Gill did not enter the house. Ms. Solomon
told me Mr. Henley went outside and began arguing with Mr. Gill. She said Mr. Gill's hand was on a knife on his right hip while was arguing with Mr. Henley. She told me Mr. Gill told Mr. Henley "I'm going to fucking
kill you". Ms. Solomon said as they were arguing Mr. Hollingsworth arrived at the residence. She told me Mr. Gill argued with Mr. Hollingsworth in
the front yard for a few minutes then he left the residence. Ms. Solomon told me Mr. Gill's hand was on the knife while arguing with Mr. Solomon but he did not take it out of its holster.

At 1805 hrs I was dispatched back to the residence. The reporting party
was identified as Michael Reynolds. The call indicated Mr. Reynolds was
the property manager and Mr. Henley was harassing the owner of the property who was identified as Joe Winter. Mr. Reynolds claimed the front door of the residence was kicked in from the inside causing it to break.

When I arrived on scene I met with Mr. Reynolds. Mr. Reynolds told me Mr. Henley called the owner of the property, who was identified as Joe Winter, multiple times insisting his door needed to be repaired. Mr. Reynolds said he came to the residence to speak with Mr. Henley about the door. He told me Mr. Henley argued with him about how the door was broken.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| ANIEL GARRETT #55267    May 11, 2016 00:00 (e-signature) | MARTHA MANLOVE #17MMAN    May 11, 2016 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| DANIEL GARRETT #55267 | MARTHA MANLOVE #17MMAN |

EXHIBIT 125, Page 137 of 144
Case No. 3:20-cv-01567-MC

Case # 16-1422 - Offense/Incident Report (Oregon City Police Department)                                        Pg 2 of 4

Mr. Reynolds said he was married to Ms. Solomon 15 years ago and she does not belong at the residence. Mr. Reynolds told me Ms. Solomon is not on
the lease and needed to leave immediately. I informed Mr. Reynolds he
would need to deal with the eviction process civilly and I could not make Ms. Solomon leave the residence. Mr. Reynolds provided me with Mr. Gill's phone number.

Mr. Reynolds told me he is married to Mr. Gill's ex-wife. He told me Mr. Gill's daughter lived at his residence. Mr. Reynolds said Mr. Hollingsworth called him on his cell phone at about 1749 hrs on the
previous day (04/27/16) and threatened to molest his step daughter. Mr. Reynolds told Mr. Gill about the threat to his daughter. He told me Mr. Hollingsworth was just released from jail and is a "pedophile". Mr. Reynolds told me he was not aware Mr. Gill was going to confront Mr. Henley or Mr. Hollingsworth about the threat.

I spoke with Mr. Henley and he told me Mr. Reynolds came to his house demanding Ms. Solomon leave the residence. He said he wanted his door repaired and Mr. Reynolds told him it was kicked from the inside and blamed Mr. Henley for the damage. I looked at the door and it appeared there was only one screw holding on the frame of the door and it fell out. I did not see any shoe prints on the door. Mr. Henley told me he installed one screw when he moved into the residence because the door was previously broken.
He told me after Mr. Gill kicked his door the screw must have fallen out.
I asked Mr. Henley if it was possible the screw fell out before and the
door frame was just loose and he told me it was a possibility.

After leaving the residence I contacted Mr. Gill by phone. Mr. Gill
agreed to meet me in the parking lot of Safeway in Oregon City, OR. I met with Mr. Gill at about 2005 hrs. Mr. Gill said Mr. Reynolds told him that Mr. Hollingsworth called and threatened to molest his daughter. He told me Mr. Reynolds told him Mr. Hollingsworth said "I'm gonna do the same thing
to her that I did to that 4 year old girl".

Mr. Gill told me he went to confront Mr. Hollingsworth at Ms. Solomon's residence. He told me he knocked on the door with his hand and he did not kick the door. Mr. Gill said he asked to speak with Mr. Hollingsworth but was told he was not home. He told me he got into an argument with Mr. Henley while at the residence. Mr. Gill told me he did not make any
threats to Mr. Henley, but his knife was on his hip at the time of the argument. He told me he did not put his hand on his knife. He said as he was arguing with Mr. Henley, Mr. Hollingsworth arrived at the residence.
Mr. Gill said he approached Mr. Hollingsworth and asked him about the
threat made against his daughter. He told me he argued with Mr. Hollingsworth and told him "I am going to kick your ass if you touch my daughter". Mr. Gill told me he did not threaten to kill Mr.
Hollingsworth and he did not have his hand on his knife during the
argument.

Mr. Gill did not have his knife with him at the time I spoke with him. Mr. Gill described the knife as a black Benchmade 4 ½" knife in a black case.
I provided my work cell phone number to Mr. Gill and he later sent me a picture of the knife. The pictures matched Mr. Gill's description of the knife (SEE PHOTOS ON FILE).

On 04/29/16 I spoke with Mr. Hollingsworth by phone. He told me when he arrived at Ms. Solomon's residence he was approached by a man he did not know. Mr. Hollingsworth said he thought the man's name was Adam or Brian. He told me the man accused him of threatening to molest his daughter. He said he told the man he didn't know who his daughter was and he did not
make a threat. He said the man told him "if I find out your lying I will kill you. Mr. Hollingsworth told me the man did not threaten him with a knife.

Mr. Hollingsworth told me he called Mr. Reynolds after he was infromed Mr. Reynolds was spreading rumors about him. Mr. Hollingsworth said Mr. Reynolds threatened him by saying "he would put a gun to his head and kill him". He said Mr. Reynolds told him "I would call the cops afterwards and
I would say did this because he touched my daughter".

Mr. Hollingsworth told me he is thankful to be out of jail and would not do anything to chance going back. He said he did not make any threats and he is trying to avoid Mr. Reynolds.

Evidence:

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| DANIEL GARRETT #55267   May 11, 2016 00:00 (e-signature) | MARTHA MANLOVE #17MMAN   May 11, 2016 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| DANIEL GARRETT #55267 | MARTHA MANLOVE #17MMAN |

EXHIBIT 125, Page 138 of 144
Case No. 3:20-cv-01567-MC

Case # 16-1422 – Offense/Incident Report (Oregon City Police Department)                                    Pg 3 of 4

Digitial Photos on File

Author: GARRETT, D Entered: 2016-05-11
Forward to City Attorney for consideration.

Menacing—ORS 163.190

## OFFENSE-1

OFFENSE CODE
INTIMIDATE/CRIM THREAT

| OFFENSE START DATE | OFFENSE COMPLETION | SUSPECTED HATE CRIME | DOMESTIC VIOLENCE |
|---|---|---|---|
| Apr 28, 2016 14:40 | ☐ COMPLETED ☐ ATTEMPTED | ☐ YES ☐ NO | ☐ YES ☐ NO |

| HATE BIAS / MOTIVATION | CRIMINAL ACTIVITIES / ANIMAL CRUELTY |
|---|---|
| None/unknown - None (No Bias) | GANG - NONE/UNKNOWN |

GANG INFORMATION
No Gang Involvement/Unknown

LEGACY DATA
Legacy Location Subdivision: CL-P3-P3-PP9

### OFFENSE LOCATION

LOCATION NAME / STREET ADDRESS / APT, UNIT, STE / DESCRIPTION
13261 CLAIRMONT WAY

| CITY | STATE | ZIP |
|---|---|---|
| OREGON CITY | OR | 97045 |

### VICTIM-1

| VICTIM-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| V-1 HENLEY, ANDREW WILLIAM | 1976-07-31 |

| SEX | RACE / ETHNICITY | PHONE |
|---|---|---|
| Male | White / Unknown | (509) 731-1081 (Mobile), (503) 249-3936 (Home) |

HOME ADDRESS
13261 CLAIRMONT WAY, OREGON CITY, OR 97045

LEGACY DATA
Identification (MCL BOOKING NUMBER): 769392; 772085          Identification (PPDS CRN): 1752912

HISTORY OF DOMESTIC VIOLENCE?
☐ YES ☐ NO

### SUSPECT-1

| SUSPECT-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| S-1 GILL, ADAM GRANT | 1989-04-04 |

| SEX | RACE / ETHNICITY | PHONE |
|---|---|---|
| Male | White / Unknown | (503) 648-1429 (Home), (503) 660-5223 (Mobile) |

HOME ADDRESS
3234 22ND AVE, FOREST GROVE, OR 97116

HISTORY OF DOMESTIC VIOLENCE?
☐ YES ☐ NO

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| ANIEL GARRETT #55267   May 11, 2016 00:00 (e-signature) | MARTHA MANLOVE #17MMAN   May 11, 2016 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| DANIEL GARRETT #55267 | MARTHA MANLOVE #17MMAN |

EXHIBIT 125, Page 139 of 144
Case No. 3:20-cv-01567-MC

Case # 16-1422 – Offense/Incident Report (Oregon City Police Department)                                    Pg 4 of 4

*INVOLVED OTHER-1*

| INVOLVED OTHER-1 (PERSON) | | | DOB / ESTIMATED AGE RANGE |
|---|---|---|---|
| O-1 HOLLINGSWORTH, JORDAN TIMOTHY | | | 1993-08-01 |

| SEX | RACE / ETHNICITY | PHONE | |
|---|---|---|---|
| Male | White / Unknown | (971) 331-0739 (Work), (971) 281-0827 (Mobile), (503) 875-9107 (Home) | |

| HOME ADDRESS |
|---|
| TRANSIENT, PORTLAND, OR 97216 |

| LEGACY DATA |
|---|
| Identification (PPDS CRN): 2353699 |

*INVOLVED OTHER-2*

| INVOLVED OTHER-2 (PERSON) | | | DOB / ESTIMATED AGE RANGE |
|---|---|---|---|
| O-2 SOLOMAN, MINDY JEAN | | | 1974-03-28 |

| SEX | RACE / ETHNICITY | PHONE | |
|---|---|---|---|
| Female | White / Unknown | (503) 875-4156 (Home), (503) 757-9857 (Mobile) | |

| HOME ADDRESS |
|---|
| 19903 LELAND RD, OREGON CITY, OR, 97045 |

*INVOLVED OTHER-3*

| INVOLVED OTHER-3 (PERSON) | | | DOB / ESTIMATED AGE RANGE |
|---|---|---|---|
| O-3 REYNOLDS, MICHAEL WAYNE | | | 1977-07-30 |

| SEX | RACE / ETHNICITY | PHONE | |
|---|---|---|---|
| Male | White / Unknown | (503) 788-3808 (Home), (503) 704-6402 (Mobile) | |

| HOME ADDRESS |
|---|
| 13529 GAFFNEY LN, OREGON CITY, OR 97045 |

## RELATIONSHIPS ADDENDUM

| NAME | RELATIONSHIP | SUBJECT |
|---|---|---|
| ANDREW WILLIAM HENLEY | ACQUAINTANCE OF – VICTIM WAS ACQUAINTANCE | ADAM GRANT GILL |

## ATTACHMENTS ADDENDUM

| FILE NAME | UPLOAD DATE/TIME | UPLOADED BY |
|---|---|---|
| 1422.pdf | Apr 28, 2016 00:00 | M. MANLOVE #17MMAN |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| DANIEL GARRETT #55267   May 11, 2016 00:00 (e-signature) | MARTHA MANLOVE #17MMAN   May 11, 2016 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| DANIEL GARRETT #55267 | MARTHA MANLOVE #17MMAN |

**Oregon City Police Department**   320 WARNER MILNE RD | OREGON CITY, OR 97045 | P: 503.657.4964                    Pg 4 of 4
*Mark43 RMS Form v2.0 generated by B. ALLEN #53807 on Dec 31, 2018 12:17.*
*Imported Report.*

## Case # 16-1672 - Offense/Incident Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | PRIMARY REPORTER |
|---|---|---|
| May 17, 2016 18:30 | May 17, 2016 16:37 | BRIAN WILLARD #48571 |

REPORT TAKEN LOCATION

13261 CLAIRMONT WAY, OREGON CITY, OR 97045

| STREET CRIME | SHOOTING | EMS / FIRE / OTHER LE AGENCIES ON SCENE |
|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

## NARRATIVE

Author: WILLARD, B Entered: 2016-05-23
Forward to Multnomah County Parole and Probation
144.350 - Parole Detainer

Author: WILLARD, B Entered: 2016-05-23
On 05/17/16 at about 4:01pm, I responded to 13261 Clairmont Way, in Oregon City, on a report of domestic disturbance between Misty Solomon and her ex-boyfriend, Andrew Henley. Ms. Solomon told me her son, Jorden Hollingsworth, was at the location when Mr. Henley "pulled a gun" on him. According to Ms. Solomon, Mr. Hollingsworth left because he was scared of the gun. According to Ms. Solomon, she didn't witness it but was told this info by Mr. Hollingsworth. I later asked Mr. Hollingsworth, who returned to the house, if Mr. Henley threatened him in any way and he said "no." I also asked Mr. Hollingsworth why he left and he told me it was just to cool off because he was amped up.

During the investigation Mr. Hollingsworth came back I learned Mr. Hollingsworth was on probation for assault and one of the conditions of his probation was, he was not allowed to have contact with Ms. Solomon, the victim of the assault. I had dispatch contact Mr. Hollingsworth's probation officer and explain the situation. A short time later, I was told by dispatch Mr. Hollingsworth's probation officer placed a detainer on him.

Mr. Hollingsworth was taken into custody without incident and transported to the Clackamas County Jail where he was booked. I cleared with this report.

## INCIDENT INFO

INCIDENT TYPE

WARRANT / FUGITIVE

*OFFENSE LOCATION*

LOCATION NAME / STREET ADDRESS / APT, UNIT, STE / DESCRIPTION

13261 CLAIRMONT WAY

| CITY | STATE | ZIP |
|---|---|---|
| OREGON CITY | OR | 97045 |

*INVOLVED OTHER-1*

| INVOLVED OTHER-1 (PERSON) | DOB / ESTIMATED AGE RANGE |
|---|---|
| O-1 SOLOMAN, MINDY JEAN | 1974-03-28 |

| SEX | RACE / ETHNICITY | PHONE |
|---|---|---|
| Female | White / Unknown | (503) 875-4156 (Home), (503) 757-9857 (Mobile) |

HOME ADDRESS

19903 LELAND RD, OREGON CITY, OR 97045

*INVOLVED OTHER-2*

| INVOLVED OTHER-2 (PERSON) | DOB / ESTIMATED AGE RANGE |
|---|---|
| O-2 HENLEY, ANDREW WILLIAM | 1976-07-31 |

| SEX | RACE / ETHNICITY | PHONE |
|---|---|---|
| Male | White / Unknown | (503) 249-3936 (Home), (509) 731-1081 (Mobile) |

HOME ADDRESS

13261 CLAIRMONT WAY, OREGON CITY, OR 97045

LEGACY DATA

Identification (MCL BOOKING NUMBER): 769392; 772085       Identification (PPDS CRN): 1752912

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| RIAN WILLARD #48571   May 23, 2016 00:00 (e-signature) | JEN GARCIA #17JGAR   May 23, 2016 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| BRIAN WILLARD #48571 | JEN GARCIA #17JGAR |

Case # 16-1672 – Offense/Incident Report (Oregon City Police Department)                                        Pg 2 of 2

## ATTACHMENTS ADDENDUM

| FILE NAME | UPLOAD DATE/TIME | UPLOADED BY |
|---|---|---|
| 1672.pdf | May 17, 2016 00:00 | J. GARCIA #17JGAR |

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| BRIAN WILLARD #48571   May 23, 2016 00:00 (e-signature) | JEN GARCIA #17JGAR   May 23, 2016 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| BRIAN WILLARD #48571 | JEN GARCIA #17JGAR |

EXHIBIT 125, Page 142 of 144
Case No. 3:20-cv-01567-MC



**Oregon City Police Department**
320 WARNER MILNE RD | OREGON CITY, OR 97045 | P: 503.657.4964

## Case # 16-1672 – Arrest Report

| REPORT DATE / TIME | EVENT START DATE / TIME – EVENT END DATE / TIME | PRIMARY REPORTER |
|---|---|---|
| May 17, 2016 18:30 | May 17, 2016 16:37 | BRIAN WILLARD #48571 |

| REPORT TAKEN LOCATION |
|---|
| 13261 CLAIRMONT WAY, OREGON CITY, OR 97045 |

| STREET CRIME | SHOOTING | EMS / FIRE / OTHER LE AGENCIES ON SCENE |
|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | ☐ YES ☐ NO |

### NARRATIVE

Author: WILLARD, B Entered: 2016-05-23
Forward to Multnomah County Parole and Probation
144.350 – Parole Detainer

Author: WILLARD, B Entered: 2016-05-23
On 05/17/16 at about 4:01pm, I responded to 13261 Clairmont Way, in Oregon City, on a report of domestic disturbance between Misty Solomon and her ex-boyfriend, Andrew Henley. Ms. Solomon told me her son, Jorden Hollingsworth, was at the location when Mr. Henley "pulled a gun" on him. According to Ms. Solomon, Mr. Hollingsworth left because he was scared of the gun. According to Ms. Solomon, she didn't witness it but was told this info by Mr. Hollingsworth. I later asked Mr. Hollingsworth, who returned to the house, if Mr. Henley threatened him in any way and he said "no." I also asked Mr. Hollingsworth why he left and he told me it was just to cool off because he was amped up.

During the investigation Mr. Hollingsworth came back I learned Mr. Hollingsworth was on probation for assault and one of the conditions of his probation was, he was not allowed to have contact with Ms. Solomon, the victim of the assault. I had dispatch contact Mr. Hollingsworth's probation officer and explain the situation. A short time later, I was told by dispatch Mr. Hollingsworth's probation officer placed a detainer on him.

Mr. Hollingsworth was taken into custody without incident and transported to the Clackamas County Jail where he was booked. I cleared with this report.

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| RIAN WILLARD #48571    May 23, 2016 00:00 (e-signature) | JEN GARCIA #17JGAR    May 23, 2016 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| BRIAN WILLARD #48571 | JEN GARCIA #17JGAR |

EXHIBIT 125, Page 143 of 144
Case No. 3:20-cv-01567-MC

Case # 16-1672 – Arrest Report (Oregon City Police Department)                                    Pg 2 of 2

## ARREST #2016-586

| ARREST DATE / TIME | ARRESTING ORGANIZATION | DEFENDANT IS JUVENILE |
|---|---|---|
| May 17, 2016 16:37 | Oregon City Police Department – 17 | ☐ YES ■ NO |

| ARREST TYPE | ARRESTING OFFICER |
|---|---|
| Warrant Arrest | BRIAN WILLARD #48571 |

LEGACY DATA

Legacy Charge Code Text: WARRANT – WARRANT SERVICE – PAROLE
DETAINER 144.350                                    Legacy Location Subdivision: CL-P3-P3-PP9

*DEFENDANT*

| | DEFENDANT NAME (LAST, FIRST MIDDLE) | SEX |
|---|---|---|
| | D-1 HOLLINGSWORTH, JORDAN TIMOTHY | Male |

| DOB / ESTIMATED AGE RANGE | RACE / ETHNICITY |
|---|---|
| 1993-08-01 | White / Unknown |

| PHONE | EMAIL |
|---|---|
| (503) 875-9107 (Home), (971) 331-0739 (Work), (971) 281-0827 (Mobile) | |

HOME ADDRESS

TRANSIENT, PORTLAND, OR 97216

| SSN # | DEFENDANT WAS ARMED WITH |
|---|---|
| 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 | Unarmed |

*ARREST LOCATION*

LOCATION NAME / STREET ADDRESS / APT, UNIT, STE / DESCRIPTION

13261 CLAIRMONT WAY

| CITY | STATE | ZIP |
|---|---|---|
| OREGON CITY | OR | 97045 |

*CHARGES*

CHARGES – 1

ARREST WARRANT

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| BRIAN WILLARD #48571   May 23, 2016 00:00 (e-signature) | JEN GARCIA #17JGAR   May 23, 2016 00:00 (e-signature) |
| PRINT NAME | PRINT NAME |
| BRIAN WILLARD #48571 | JEN GARCIA #17JGAR |

**Oregon City Police Department**   320 WARNER MILNE RD | OREGON CITY, OR 97045 | P: 503.657.4964                                    Pg 2 of 2
*Mark43 RMS Form v2.0 generated by B. ALLEN #53807 on Dec 31, 2018 12:14.*
*Imported Report.*

EXHIBIT 125, Page 144 of 144
Case No. 3:20-cv-01567-MC

1

2

3

4              IN THE CIRCUIT COURT OF THE STATE OF OREGON

5                      FOR THE COUNTY OF UMATILLA

6   JORDEN TIMOTHY HOLLINGSWORTH,          | Case No. 17CV47262

7               Petitioner,                | DECLARATION OF DEPUTY DISTRICT
                                           | ATTORNEY SARAH DUMONT
8           v.
                                           | **POST CONVICTION**
9   TROY BOWSER, Superintendent,
    Two Rivers Correctional Institution,
10                                         | **ORS 20.140 - State fees deferred at filing**
              Defendant.
11

12          I, Sarah Dumont, do hereby declare:

13          I am an attorney licensed to practice law in the State of Oregon and a Deputy District

14   Attorney employed by the Clackamas County District Attorney's Office.  I have been a

15   prosecutor for over 13 years.  I prosecuted Jorden Hollingsworth in 2015-2016 on two charges of

16   Sexual Abuse I in Clackamas County Circuit Court Case No. CR1501848.  I make this

17   declaration at the request of Assistant Attorney General Douglas Marshall.

18          1.      I knew about the prior sexual abuse allegations against Jorden Hollingsworth.  It

19   was part of our release recommendation to the court as we believed defendant/petitioner was a

20   danger to the community.

21          2.      During the course of my putting together a case against Mr. Hollingsworth,

22   attorney Mandi Philpott contacted me about the other victim, KJ (Mandi Philpott was KJ's

23   attorney on a DHS case), and let me know that KJ wanted to testify against the defendant.  I

24   understood that KJ now felt terrible that Jorden Hollingsworth had abused someone else.  I

25   certainly had that information and a willing victim had the circumstance presented itself at trial

26

Page 1 -    DECLARATION OF DEPUTY DISTRICT ATTORNEY SARAH DUMONT
       WDM/kk4/9503565-v1

1    (for example, if the defense had tried to put on character witnesses).  Attached hereto as

2    Attachment A is a true and accurate copy of a report dated April 15, 2016 by Detective Sean

3    Ellis of the Oregon City Police Department documenting his interview of KJ on January 29,

4    2016, in the presence of Ms. Philpott.

5         3.    I also had Detective Ellis listen to the phone calls defendant/petitioner made from

6    the jail at the time he was in custody regarding the 2014 sex abuse allegation.  In these calls he

7    tries to have people (some of the same people who were on his witness list during the 2016 trial

8    in J's case) drive the victim to grand jury and have them talk to her.  Attached hereto as

9    Attachment B is a true and accurate copy of a report dated May 27, 2016 by Detective Sean Ellis

10   summarizing what he heard listening to those calls.  I relayed that information to Arthur Knauss

11   as part of discovery in Case No. CR1501848 (Attachment B).  I also provided to Mr. Knauss in

12   discovery Detective Ellis's interview of KJ about the abuse and the people involved (Attachment

13   A).  Basically, Mr. Hollingsworth's family was certainly aware of his relationship with the first

14   victim.  She reports having regular contact with his mother, sister, grandmother, and aunt.  From

15   my perspective the jail tapes corroborated the victim's version of events.  Had Mr. Knauss

16   presented witnesses to testify about Mr. Hollingsworth's character trait for sexual propriety, to

17   the extent that it was allowed by the court I would have explored what each such witness knew

18   of the defendant/petitioner's sexual relationship with an underage female in 2013-2014, given

19   the information from the jail tapes and the first victim.

20        4.    Mr. Hollingsworth also had a conviction for felony DV and had violated his

21   probation; in addition, he had a conviction for DV harassment.  Some of the people on the

22   defendant's witness list at trial were his victims.  I did not believe he had a great character and I

23   would have explored defendant/petitioner's criminal history if the defense had presented

24   witnesses to testify about Mr. Hollingsworth's character trait for being a law-abiding citizen.

25

26

Page 2 -   DECLARATION OF DEPUTY DISTRICT ATTORNEY SARAH DUMONT
           WDM/kk4/9503565-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

EXHIBIT 126, Page 2 of 9
Case No. 3:20-cv-01567-MC

1    I hereby declare that the above statement is true to the best of my knowledge and

2    belief, and that I understand it is made for use as evidence in court and is subject to penalty

3    for perjury.

4    DATED March __22__, 2019.

5

6

7    _____
     SARAH DUMONT
8    Deputy District Attorney

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 3 -   DECLARATION OF DEPUTY DISTRICT ATTORNEY SARAH DUMONT
           WDM/kk4/9503565-v1

Department of Justice
1162 Court Street NE
Salem, OR 97301-4096
(503) 947-4700 / Fax: (503) 947-4794

| 1 DISTRIBUTION: | | **C.L.A.S.S.**<br>**OREGON CITY POLICE DEPARTMENT**<br>320 Warner Milne Road, Oregon City<br><br>**SPECIAL REPORT** | 2 INCIDENT NO.: | | **15-0539** |
|---|---|---|---|---|---|
| | | | 3 REPORT TYPE: | ☐ Supplemental<br>☐ Clearance | ☒ Special<br>☐ MSR |
| 4 CONNECT NUMBERS: | | | 5 CASE STATUS: | ☐ Clr By Arrest<br>☒ Referred | ☐ Suspended ☐ Pending<br>☐ Clearance ☐ Exceptional |
| 6 CONNECT REPORTS: | | 7 INCIDENT TYPE:<br>**Sex Abuse** | 8 CLASSIFICATION: | ☒ Criminal ☐ No Crime Committed | ☐ Information |

| 9 SUBJECT OF REPORT:<br>**Follow up with Katrina Johnson** |
|---|

| 10 ORIGINAL REPORT | | | 11 THIS REPORT: | | | 12 LOCATION OF OCCURRENCE: |
|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 04 | 15 | 16 | OCPD |

| | 13 NAME:<br>**Johnson, Katrina Marie** | | 14 DOB:<br>09 09 98 | 15 SEX:<br>**F** | 16 RACE:<br>**W** |
|---|---|---|---|---|---|
| **INFORMANT** | 17 RESIDENCE:<br>**2820 SE Roswell Avenue, Milwaukie, OR 97222** | | | 18 RES. PHONE:<br>**(503) 207-8373** | |
| | 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR: | 20 OCCUPATION / POSITION: | 21 BUS. PHONE: | | |

| | 22 NAME:<br>**Hollingsworth, Jorden Timothy** | 23 DOB:<br>08 01 93 | 24 SEX:<br>**M** | 25 RACE:<br>**W/B** |
|---|---|---|---|---|
| **SUBJECT** | 26 RESIDENCE: | 27 RES. PHONE: | 26 RES. PHONE: | |

29 DETAILS

**See attached narrative**

| 30 TIME RECEIVED:  - | 31 TIME DISPATCHED:  - | 32 TIME ARRIVED: | 33 TIME CLEARED:  - |
|---|---|---|---|

| 34 REPORTING OFFICER:<br>**Ellis, Sean** | 35 DPSST:<br>**47648** | 36 AGENCY:<br>**OCPD** | 37 APPROVED:<br>JEM |
|---|---|---|---|
| 38 REPORTING OFFICER: | 39 DPSST: | 40 AGENCY: | 41 DATA ENTRY: |

000056

EXHIBIT 126, Page 4 of 9<br>Case No. 3:20-cv-01567-MC

| Page # 1 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon  97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|
|  |  |  |

### MENTIONED:

Hollingsworth, Jorden Timothy                          Suspect
DOB – 8-1-93

Johnson, Katrina Marie                                      Mentioned
DOB – 9-9-98
2820 SE Roswell Ave., Milwaukie, OR 97222
503-207-8373

Hollingsworth, Mindy                                        Jorden's mother
DOB – 3-8-75

Miller, Trisha                                                      Jorden's aunt
DOB – 3-6-85

Hollingsworth, Tanaea                                       Jorden's sister

Hollingsworth, Debra                                         Jorden's grandma

Miller, Trisha                                                      Jorden's aunt
DOB – 3-6-85

Philpott, Mandi                                                  Mentioned

### ACTION TAKEN:

On January 29, 2016, I attended a prearranged meeting with Katrina Johnson and her attorney, Mandi Philpott.  During this meeting, Katrina told me she was in a sexual relationship with Jorden Hollingsworth from July, 2013 until December, 2014.  Katrina told me she received a subpoena to testify about her relationship with Mr. Hollingsworth in Grand Jury but lied during her testimony to protect him.

On April 15, 2016, I contacted Katrina on the telephone and spoke with her again.  During our conversation, Katrina told me during her relationship with Mr. Hollingsworth, they engaged in sexual intercourse as well as oral sex.  She told me she was 14 years old at the time and Mr. Hollingsworth was 19 years old.  Katrina told me Mr. Hollingsworth knew how old she was because her mom told him and he responded by saying he "felt dirty."  Katrina said Mr. Hollingsworth pursued a relationship with her after knowing she was 14 years old.

| Detective: Sean Ellis | DPSST# 47648 | Agency: **OCPD** |
|---|---|---|

000057

| Page # 2 | C.L.A.S.S.<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|
| | | |

Katrina told me Mr. Hollingsworth was charged with multiple sex crimes after she disclosed their relationship to a caseworker she had at the time. She said after Mr. Hollingsworth's arrest, she had regular contact with his family, including his mother, sister, grandmother, and aunt. Katrina identified the following people and their relationship with Mr. Hollingsworth:

Mindy Hollingsworth is Mr. Hollingsworth's mother
Tanaea Hollingsworth is Mr. Hollingsworth's sister
Debra Hollingsworth is Mr. Hollingsworth's grandmother
Trisha Miller is Mr. Hollingsworth's aunt

Katrina told me Mr. Hollingsworth's family members "pled" with her to not say anything about her relationship with Mr. Hollingsworth during her Grand Jury testimony. She said Mr. Hollingsworth's family members told her if she testified, it would "ruin his life." Katrina told me it was mostly Mindy and Debra Hollingsworth who talked with her but Tanaea also asked her to not say anything because she wanted her brother to be safe.

Katrina told me Mr. Hollingsworth's family members talked to her about her testimony "anytime the situation came up." She said they told her to testify that Mr. Hollingsworth was "just a friend" and they did not have a sexual relationship.

Katrina told me Debra and Tanaea drove her to the courthouse for Grand Jury. She said while they drove, Debra and Tanaea "went over the plan" of what they wanted her to say during her testimony. Katrina said during her Grand Jury testimony, she "lied through her teeth and everyone knew it." Katrina told me Debra and Tanaea drove her home after Grand Jury.

Katrina told me her relationship with Mr. Hollingsworth continued after she went to Grand Jury. She said she and Mr. Hollingsworth continued having sexual intercourse and oral sex with each other. Katrina said her relationship with Mr. Hollingsworth ended in December, 2014. She said Mr. Hollingsworth "stalked" her in December, 2014, after they broke up. She said Mr. Hollingsworth showed up at her friend's house with a rose and followed her to school. She said she had to lie to Mr. Hollingsworth to get him to go away and that was the last time she has been with him.

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | DPSST# 47648 | Agency: OCPD |
|---|---|---|

000058

| 1 DISTRIBUTION: | | **C.L.A.S.S.** OREGON CITY POLICE DEPARTMENT 320 Warner Milne Road, Oregon City | 2 INCIDENT NO.: | | **15-0539** |
|---|---|---|---|---|---|
| | | | 3 REPORT TYPE: | ☐ Supplemental ☐ Clearance | ☒ Special ☐ NSR |
| 4 CONNECT NUMBERS: | | **SPECIAL REPORT** | 5 CASE STATUS: ☐ Clr By Arrest ☒ Referred | ☐ Suspended ☐ Clearance | ☐ Pending ☐ Exceptional |
| 6 CONNECT REPORTS: | | 7 INCIDENT TYPE: **Sex Abuse** | 8 CLASSIFICATION: ☒ Criminal ☐ No Crime Committed | | ☐ Information |

9 SUBJECT OF REPORT:
**Jorden Hollingsworth jail calls made in June, 2014.**

| 10 ORIGINAL REPORT | | | 11 THIS REPORT: | | | 12 LOCATION OF OCCURRENCE: |
|---|---|---|---|---|---|---|
| 02 | 13 | 15 | 05 | 27 | 16 | **OCPD** |

| | 13 NAME: **Johnson, Katrina Marie** | | 14 DOB 09 | 09 | 98 | 15 SEX: **F** | 16 RACE: **W** |
|---|---|---|---|---|---|---|---|
| INFORMANT | 17 RESIDENCE: **2820  SE Roswell Avenue, Milwaukie, OR 97222** | | | | 18 RES. PHONE: **(503) 207-8373** | | |
| | 19 SCHOOL / EMPLOYER / BUS. PROPRIETOR: | 20 OCCUPATION / POSITION: | | | 21 BUS. PHONE: | | |

| | 22 NAME: **Hollingsworth, Jorden Timothy** | | 23 DOB 08 | 01 | 93 | 24 SEX: **M** | 25 RACE: **W/B** |
|---|---|---|---|---|---|---|---|
| SUBJECT | 26 RESIDENCE: | | 27 RES. PHONE: | | 28 RES. PHONE: | | |

29 DETAILS

See attached narrative

| 30 TIME RECEIVED: - | 31 TIME DISPATCHED: - | 32 TIME ARRIVED: - | 33 TIME CLEARED: - |
|---|---|---|---|
| 34 REPORTING OFFICER: **Ellis, Sean** | 35 DPSST: **47648** | 36 AGENCY: **OCPD** | 37 APPROVED: |
| 38 REPORTING OFFICER: | 39 DPSST: | 40 AGENCY: | 41 DATA ENTRY: |

000062

| Page # 1 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|
| | | |

**MENTIONED:**

**ACTION TAKEN:**

Over the course of this investigation, I have listened to jail calls Jorden Hollingsworth has made while in custody at the Clackamas County Jail (CCJ). Some of these calls were made while Mr. Hollingsworth was in custody during June of 2014. I checked a law enforcement database and saw Grand Jury for the case Mr. Hollingsworth was in custody for was set for June 11, 2014.

What follows is a summary of a few of Mr. Hollingsworth's telephone calls between June 1, 2014 and June 30, 2014. These calls have been condensed for the ease of the reader. The digital recording contains a verbatim account of the interview (**SEE DIGITAL AUDIO RECORDING OF THE INTERVIEW FOR FULL DETAILS**).

On June 2, 2014, at about 3:28 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Deborah Miller. Mr. Hollingsworth speaks with two different females, one he refers to as "mom", during his conversation. Mr. Hollingsworth thanks "mom" for giving him "that number and stuff." "Mom" responds to Mr. Hollingsworth by saying "after this I don't want to be a part of it."

On June 5, 2014, at about 1:34 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Mindy Jean Solomon Hollingsworth. During this call, Mr. Hollingsworth and a female discuss "Trisha" being fired from her job and a fight the female was now in with "Trisha." Toward the end of the conversation, Mr. Hollingsworth tells the female he will let them "handle that situation."

On June 10, 2014, at about 11:42 AM, Mr. Hollingsworth makes a call to a person the phone system identifies as Mindy Jean Solomon Hollingsworth. During this call, Mr. Hollingsworth speaks with a female he refers to as "mom." As they talk, "mom" says this is ridiculous because "you and Katrina have never had sexual relations."

On June 10, 2014, at about 9:29 PM, Mr. Hollingsworth make a call to a person the phone system identifies as Deborah Miller. During this call, Mr. Hollingsworth tells a female the cop is a "big problem" because he subpoenaed "that person" for tomorrow. He said there is going to be Grand Jury because they are trying to get him third degree rape.

Mr. Hollingsworth asks to talk with his "mom", and when he does, he asks her to "make that call please." Mr. Hollingsworth confirms his "mom" knows who he is talking about,

| Detective: Sean Ellis | DPSST# 47648 | Agency: **OCPD** |
|---|---|---|

000063

| Page # 2 | **C.L.A.S.S.**<br>OREGON CITY POLICE DEPT.<br>320 Warner Milne Road,<br>Oregon City, Oregon 97045<br>**Continuation Report** | Case # 15-0539 |
|---|---|---|
| | | |

but does not give a name. He asks "mom" to not "freak her out, just calm her down and shit."

On June 11, 2014, at about 1:31 PM, Mr. Hollingsworth makes a call to a person the phone system identifies as Deborah Miller. Mr. Hollingsworth asked the female if she was "going down there" and the female says she is. Mr. Hollingsworth tells the female she should expect a phone call because "she" needs a ride. The female tells Mr. Hollingsworth "this is getting too crazy." The female tells Mr. Hollingsworth the only thing she can think of is "her" dad is trying to "pull some bull shit." Mr. Hollingsworth tells the female "they're trying to get her to testify against me." The female asked Mr. Hollingsworth how he knows the person will need a ride and he asked if it needed to be explained. Mr. Hollingsworth said "they scared the shit out of her."

I drove to CCJ and had a disk made with these phone calls recorded onto it. I made a copy of the disk before securing the original disk in evidence.

**ACTION RECOMMENDED:**

Connect with original report

| Detective: Sean Ellis | | DPSST# 47648 | Agency: **OCPD** |
|---|---|---|---|

```
 1
 2            IN THE CIRCUIT COURT OF THE STATE OF OREGON
 3                  FOR THE COUNTY OF UMATILLA
 4                    HON. J. BURDETTE PRATT
 5
 6   JORDEN TIMOTHY HOLLINGSWORTH, )
                                   )
 7        Petitioner-Appellant,    )
                                   )
 8        vs.                      )Case No. 17CV47262
                                   )
 9   TIM CAUSEY, Superintendent,   )
     Deer Ridge Correctional       )
10   Institution,                  )
                                   )
11        Defendant-Respondent.    )
                                   )
12   _____)
13
14                  TRANSCRIPT OF PROCEEDINGS
15                  TUESDAY, APRIL 9, 2019
16
17   APPEARANCES:
18   For the Petitioner:   Mr. Jonathan A. Clark
                           Attorney at Law
19                         317 Court Street NE
                           Salem, OR 97301
20                         (503) 581-1229
21
22   For the Respondent:   Mr. Ward Douglas Marshall
                           1162 Court Street NE
                           Salem, OR 97301
23                         (503) 947-4706
24
     Transcribed from
25   audio files by:       Jan R. Duiven
                           CSR, FCRR, CRC
```

```
 1                        INDEX TO EXHIBITS

 2
      For the Petitioner:
 3
      Exhibit 1  Declaration of Petitioner
 4
      Exhibit 2  Private Investigator Report: Knowles
 5
      Exhibit 3  Private Investigator Report: Polk
 6
      Exhibit 4  Private Investigator Report: Mills
 7
      Exhibit 5  Private Investigator Report: Edwards
 8
      Exhibit 6  Evidence Review by Dr. Bourg
 9
      Exhibit 7  Transcript Selections
10
      Exhibit 8  Declaration of Heather Carver
11

12
      For the Respondent:
13
      Exhibit 101   Judgment
14
      Exhibit 102   Appellate Judgment
15
      Exhibit 103   Police Reports
16
      Exhibit 104   Trial Transcript
17
      Exhibit 105   Declaration of Atty Arthur Knauss
18
      Exhibit 106   Waiver of Jury Trial
19
      Exhibit 107   Declaration of AAG Marshall with
20                  Petitioner's Criminal History
21    Exhibit 108   Declaration of Deputy District
                    Attorney Sarah Dumont
22

23

24

25
```

```
 1              TUESDAY, APRIL 9, 2019; 9:16 A.M.

 2                          -o0o-

 3

 4              THE COURT:  Picking up a case

 5   entitled Jorden Timothy Hollingsworth worth versus

 6   Tim Causey.  It's Case No. 17CV47262.  This is the

 7   time set for postconviction relief trial.

 8              I show Jonathan Clark and Ward

 9   Marshall as attorneys.  Are both of you ready to

10   proceed?

11              MR. CLARK:  Yes, your Honor.

12              MR. MARSHALL:  Yes, your Honor.

13              THE COURT:  Okay.  Anything before

14   taking up exhibits?

15              MR. CLARK:  Nothing from petitioner.

16              MR. MARSHALL:  Nothing from the

17   State, your Honor.

18              THE COURT:  Okay.  Take it down a

19   little bit.  Yeah.  Okay.  Exhibits?  Mr. Clark?

20              MR. CLARK:  Your Honor, we'll offer

21   the exhibits mentioned in my petition.

22              THE COURT:  Okay.  And that's

23   Exhibits 1 through?

24              MR. CLARK:  4.

25              A VOICE:  I had it marked as 1-8.
```

4

```
 1                    MR. MARSHALL:  I -- yeah.  I don't
 2  object, your Honor, but according to the exhibit
 3  list, it's 1 through 8.
 4                    THE COURT:  Okay.
 5                    A VOICE:  We're getting a lot of
 6  echo, your Honor.
 7                    THE COURT:  Pardon?
 8                    A VOICE:  We are getting a lot of
 9  echo.  I don't know if you can turn the sound
10  down.
11                    MR. CLARK:  (Inaudible.)
12                    MR. MARSHALL:  No objection.
13                    THE COURT:  Okay.  We're -- we're
14  working with the sound here a little bit.
15                    1 through 8, any objection?
16                    MR. MARSHALL:  No, your Honor.
17                    THE COURT:  Defense exhibits?
18                    MR. MARSHALL:  101 through 108, your
19  Honor.
20                    THE COURT:  Any objection?
21                    MR. CLARK:  No, your Honor.
22                    THE COURT:  Okay.  (Inaudible) how's
23  the feedback now, Ramona?
24                    A VOICE:  Still not great.  It's a
25  little bit better.
```

```
 1                    THE COURT:  Do I need to make a

 2   (inaudible)?  Okay.  We're working to see if we

 3   can address that.

 4                    A VOICE:  Is this the one?

 5                    A VOICE:  Okay.  Checking now.

 6                    THE COURT:  How's that?

 7                    A VOICE:  Yeah.  That's not great.

 8                    THE COURT:  Is that better?

 9                    A VOICE:  Let me see if I mute mine

10   if (inaudible).

11                    THE COURT:  Okay.  Is that -- is

12   that better?

13                    A VOICE:  I think so.

14                    THE COURT:  Okay.

15                    A VOICE:  I think that's better.

16                    THE COURT:  Okay.  Do either of you

17   have witnesses?

18                    MR. CLARK:  No, your Honor.

19                    MR. MARSHALL:  No, your Honor.

20                    THE COURT:  Okay.  We'll proceed to

21   argument, then.  Mr. Clark.

22                    MR. CLARK:  Thank you, your Honor.

23   We have some feedback on our end.  Everything we

24   say gets repeated back to us.  So I'm going to

25   pause periodically and let that clear up.
```

```
 1                  Our argument focuses on Oregon
 2      Evidence 404(2)(A), every criminal defendant may
 3      offer evidence of a pertinent trait of character
 4      as a defense to a charge.  Our simple claim is
 5      that the trial attorney -- now that feedback's
 6      been cleared up.
 7                  Our central argument is that the
 8      trial attorney had four good witnesses who would
 9      testify that Mr. Hollingsworth was trustworthy
10      around children.  The trial attorney had
11      investigative reports in his file.  Each of those
12      witnesses spoke clearly that, in their opinion, or
13      by reputation, Mr. Hollingsworth was trustworthy
14      around children.
15                  The allegations in this case are an
16      opportunistic onetime touching of a child age 11,
17      and then she says something happened when she was
18      a few years -- or happened a few years prior.
19      That's documented as a kindergarten-level event.
20                  The State's argument is -- I'm
21      sorry.  The defendant's argument is that it was a
22      reasonable tactical decision not to call those
23      four character witnesses because that would have
24      opened the door to other allegations -- or an
25      allegation of a relationship with a 14- or
```

```
 1   15-year-old girl.  Those -- those two issues are
 2   so vastly different, an opportunistic, onetime
 3   touching that possibly occurred on two different
 4   events versus an ongoing relationship, that it
 5   would not have opened the door for that testimony.
 6   It's not a reasonable trial tactic to leave good
 7   character witnesses in the hallway.
 8                    And, again, the State's response is
 9   that, well, the evidence would have been about
10   sexual propriety and law-abiding -- the propensity
11   to be a law-abiding citizen.  Those are two
12   examples given in the Oregon Evidence Code, but
13   the rule does not restrict it to sexual
14   propriety -- I'm sorry -- rule does not restrict
15   character evidence to sexual propriety and
16   reputation for being a law-abiding citizen.  The
17   rule is a pertinent trait of character as a
18   defense to a charge.
19                    And we had four witnesses ready to
20   testify that Mr. Hollingsworth is trustworthy
21   around children.  They testified both to knowing
22   him in the community, knowing him for a
23   number of years, knowing him in their own family.
24   So there would have been no foundational problems
25   bringing in that testimony.
```

```
 1                  The second and our third argument is
 2    the issue around Dr. Bourg's testimony.  The trial
 3    attorney submitted in his affidavit, I'm quoting
 4    now, "He intended to 'keep the focus on the issue
 5    about the complainant awakening to petitioner
 6    supposedly touching her.'"  That's the reason --
 7    that's the reason he gives for not calling
 8    character witnesses.
 9                  First of all, we fault him for not
10    calling those character witnesses, but if that
11    statement is a legitimate reason not to call
12    character witnesses -- which I don't agree with --
13    but, hypothetically, if that's his strategy, your
14    Honor, he cannot then avoid Dr. Bourg's testimony
15    regarding impaired reality testing connected with
16    Dexedrine.
17                  The trial attorney goes on to
18    discuss a battle of the experts and the expert
19    testimony that was already in regarding Dexedrine.
20    But using an expert opinion expands the
21    admissibility, it expands the universe of evidence
22    because the expert can rely on evidence that's not
23    otherwise admissible.
24                  Dr. Bourg was qualified as a memory
25    expert.  She's qualified to give testimony about
```

1   what impacts memory.  The evidence was

2   uncontroverted that this was something that

3   happened while the child was waking up.  That's

4   her allegations.

5               And so to avoid Dr. Bourg's

6   testimony regarding impaired reality testing

7   connected with Dexedrine is a fatal error.  So

8   if -- the trial attorney can't have it both ways.

9   He cannot say, I avoided character witnesses

10  because I wanted to focus on this issue about what

11  happened while petitioner was awakening.  If he --

12  if he develops that strategy, he can't then ignore

13  evidence in his file about what his own expert

14  would have testified to had she been asked the

15  question.

16              So our position is that our petition

17  succeeds on both grounds.  But by the trial

18  attorney's own affidavit, he can't have it both

19  ways.  If that was his trial strategy, he had to

20  go with Dr. Bourg's testimony.

21              Lastly, your Honor, I'm going to

22  address our first issue regarding overcoming the

23  will of petitioner.  You have competing affidavits

24  in front of you from the -- from my client, as

25  well as from the trial attorney, and we don't have

```
 1    additional information to add on that.
 2                    However, I did confirm with my
 3    client, and he stands 100 percent beside the
 4    statements that he made, which is that he had
 5    consistently said and only said, "I want a jury
 6    trial."  And it was the efforts of his trial
 7    attorney the morning of trial that overcame that
 8    decision and forced him into a bench trial.  Thank
 9    you, your Honor.
10                    THE COURT:  I have a question for
11    you, Mr. Clark.  Do -- do we have sworn affidavits
12    or testimony from these character witnesses that
13    you're referring to?
14                    MR. CLARK:  They did not supply new
15    affidavits.  We have the statements from the --
16    that were in the attorney's file, as well as my
17    investigator contacting the one who was still
18    available who said -- and we have her affidavit
19    saying, yes, this witness is available for retrial
20    as a character witness, and his -- and her
21    statement that based on the investigation, she
22    knows that all four were available at the original
23    trial.
24                    THE COURT:  Well, we have -- but we
25    don't have firsthand testimony from those people
```

```
 1   as to what their testimony would have been, do we?
 2                MR. CLARK:  No.  We have the
 3   confirmation that those statements were -- are
 4   good from the first -- from the one that was
 5   available and the materials from the trial
 6   attorney's file that they were -- regarding the
 7   content.
 8                THE COURT:  And do we have testimony
 9   either in the form of the live testimony or
10   affidavits as to what Dr. Bourg would have said?
11   Dr. Bourg?
12                MR. CLARK:  No, your Honor.  We just
13   have her report and the fact that she was
14   testifying and that question was not asked.
15                THE COURT:  Okay.  Mr. Marshall.
16                MR. MARSHALL:  Thank you, your
17   Honor.
18                I'll start with the character
19   witnesses.  The Court's right that petitioner, as
20   a threshold matter, needed to submit declarations
21   or affidavits from the four witnesses establishing
22   that they were available and what they would have
23   testified to.  So we don't have as a threshold
24   matter.  We don't have really competent evidence
25   under Oregon case law with respect to the four
```

```
 1   character witnesses.

 2                   Equally important, your Honor, on

 3   the merits, you can see that Mr. Knauss made a

 4   reasonable decision.  It was his investigator who,

 5   in the month before trial, talked to these four

 6   persons that counsel says could have been

 7   character witnesses.

 8                   But we also know from Exhibit 108,

 9   the declaration of the prosecutor, Sarah Dumont,

10   that in the year preceding the trial, she had

11   given to Mr. Knauss Detective Ellis's -- the

12   additional police reports he had developed

13   regarding the teenage girl, the 14- or 15-year-old

14   girl, whom petitioner had had sex with on a dozen

15   or more occasions in Clackamas County.

16                   And so that was well documented, and

17   she had supplied to to Mr. Knauss so he can -- he

18   can gauge for himself.  And his affidavit -- his

19   declaration speaks to this, that he didn't want to

20   go there because that's going to give DDA Dumont

21   an opportunity with each witness who might be able

22   to testify generally about petitioner's character

23   trait for, I suppose, being law abiding or --

24   having sexual propriety supposedly.

25                   But each -- each time Sarah Dumont
```

```
 1    can come up with, well, look at these multiple

 2    convictions that Mr. Hollingsworth had in the past

 3    for domestic violence offenses, harassment, and

 4    Assault Four, and other things too, and look at

 5    do you know each witness about his having sex with

 6    an underage girl in Clackamas County parks in 2013

 7    and 2014?  Do you know that?

 8              So, you know, Mr. -- Mr. Knauss is

 9    making a reasonable decision here not to put

10    witnesses on.  And even though it's not a jury

11    trial, it's Judge Katherine Weber they're before,

12    he's making what I submit is a reasonable decision

13    not to go there because, on balance, it's not

14    going to be helpful for Mr. Hollingsworth.  So I

15    think it's pretty clear that counsel made the

16    correct decision here.

17              You know, if you look at

18    Kirkpatrick, under 405, OEC 405, that authority

19    says if you call a character witness on

20    cross-examination, not only may you ask about

21    prior convictions, but you can also ask about

22    prior arrests, and you can also ask about prior

23    conduct.  All you have to do -- all the prosecutor

24    has to do is have reasonable information that that

25    prior conduct occurred.
```

1        You know, you can't -- like in the

2   Holbrook case, the prosecutor can't just ask

3   questions with very little basis and to blacken

4   the reputation of the defendant, but we can see

5   here that DDA Dumont was, months before the trial,

6   working with Detective Ellis.  She was locked and

7   loaded and ready to go if Arthur Knauss decides to

8   put character witnesses on.

9        You know, she even has potentially

10  the -- the prior sexual assault victim, underage

11  victim, who now wants to go forward and prosecute

12  petitioner, she even has her potentially in the

13  wings if Judge Weber would allow it to bring her

14  in, you know, and testify.

15       But at the very least, DDA Dumont

16  has a good -- has Detective Ellis's reports, and

17  certainly an easily sufficient basis for asking

18  each of the character witnesses about that

19  2013-2014 investigation into petitioner's sexual

20  relations with an underage female.

21       So, again, I think it's pretty clear

22  from this wealth of records that the counsel made

23  a good decision about not putting character

24  witnesses on on petitioner's behalf.

25       I'd ask, perhaps this is a quibble,

1    your Honor, but, you know, petitioner -- the

2    petition alleges that while petitioner's safe

3    around children, good around children, and that

4    would have been a trait of character or something

5    they could have testified to, but I don't think

6    it's been established, your Honor, that being good

7    around children is a trait of character.

8                You know, we know from the Enakiev

9    decision back in 2003 that it was a pretty close

10   call there whether sexual propriety is actually a

11   character trait for purposes of 404 character

12   witness evidence, and I think the panel in that

13   case, the Court of Appeals panel, said, Well,

14   we're going -- we're going to come down on the

15   side that sexual propriety is a trait of character

16   and -- and (indiscernible) across time is, you

17   know, unchanging across time.

18                Frankly, your Honor, I think that's

19   highly questionable.  We know that people don't

20   act in public the same way they act in private

21   with respect to sexual matters.  Why should they?

22   So I question that decision.

23                But more basically in this case

24   petitioner has not shown us that being,

25   quote-unquote, good around children or safe around

```
 1    children is actually a character trait, something

 2    that someone could testify to, you know, in

 3    changing across time.  I would highly question

 4    that.  We have cases all the time where people act

 5    differently around kids depending if anyone else

 6    is around, whose kids it is -- they are, that kind

 7    of thing.  So I don't think it's even been

 8    established that that's suitable character

 9    evidence, your Honor.

10              With respect to sexual propriety, I

11    agree the case law says it is under State v.

12    Enakiev, but for the reasons I've already

13    explained that was a reasonable decision by

14    counsel not to go to that character evidence.

15              I'll shift now to Dr. Bourg.  We've

16    seen her many times in postconviction, your Honor.

17    I've cross-examined her.  I've deposed her.  She

18    is not a memory expert.  She certainly does have

19    expert on forensic interviewing of children.  She

20    did that at CARES for ten years, stopping in about

21    2002.  CARES in Clackamas County.  And then she's

22    been in private practice as a psychologist ever

23    since that point.

24              But she's a psychologist.  She's not

25    a medical doctor.  She has no medical
```

1   qualifications for opining about Dexedrine and

2   whether an overdose of Dexedrine may lead to

3   delusional conduct or not.

4           Here, Dr. Skinner testified on

5   behalf of the State at the -- at the original

6   trial -- Dr. Skinner was not the doctor who

7   examined the complainant because that -- that, I

8   believe, nurse practitioner was not available, was

9   out of town or something, so Dr. Skinner from the

10  Clackamas County Children's Center had reviewed

11  the file, was the expert testifying on behalf of

12  that forensic evaluation.

13          And you'll recall in the trial, DDA

14  Dumont established that Dr. Skinner, being a

15  medical doctor, had some familiarity with

16  Dexedrine, a little bit, not much.  But she had

17  recently before that trial, before petitioner's

18  trial, looked up the side effects of Dexedrine and

19  said she really didn't know that -- had no

20  knowledge that Dexedrine could lead to any sort of

21  delusional behavior.  So what we have in the

22  record is a medical doctor saying, Ah, I don't

23  think so.

24          And beyond that, Dr. Skinner pointed

25  out that, well, the complainant's dose of

1    Dexedrine is actually 10 milligrams a day.  I

2    think it was divided over two 5-milligram doses,

3    but it was 10 milligrams.  And since the standard

4    dosage could go up to 30 milligrams a day,

5    according to Dr. Skinner, the complainant here was

6    actually on the low end of the potential range of

7    dosages, the therapeutic range.

8              And so the State's position is,

9    number one, Dr. Bourg, as a psychologist, was not

10   qualified to talk about Dexedrine; and number two,

11   there's simply no evidence in the record that the

12   complainant had overdosed on Dexedrine; and, I

13   guess, number three, we really don't have

14   anything -- any sort of authoritative evidence

15   that Dexedrine and -- when someone overdoses on

16   it, can lead to delusional behavior.

17             I think, as Dr. Skinner pointed out,

18   well, since this is essentially an upper, what you

19   would expect is more manic behavior, not

20   delusional conduct.  But, you know, being unable

21   to sleep, restlessness, that kind of thing.

22             So for all of those reasons, I think

23   counsel, again, made the wise choice to get as

24   much as he could out of Dr. Bourg, which was

25   essentially the testimony about the complainant

1    being in the twilight State when she says that

2    Mr. Hollingsworth touched her chest for the most

3    recent incident at that point, but not -- not to

4    go down the path of asking Dr. Bourg about

5    Dexedrine.

6              And I would submit because when you

7    look at Dr. Bourg's testimony, Sarah Dumont did

8    qualify -- did challenge her -- Dr. Bourg's

9    qualifications.  She certainly would have

10   challenged Dr. Bourg's qualifications if that

11   psychologist had been asked to testify about

12   Dexedrine.

13             So I think when you consider all

14   those factors, counsel, again, made the right

15   choice not to go down that path.  So I would

16   submit petitioner loses on both his second and

17   third claims.

18             His first claim is the trial waiver

19   claim.  He cannot possibly prevail on that by a

20   preponderance of the evidence because, as he

21   recognizes himself, there's Mr. Knauss's

22   declaration.  There's petitioner's declaration.

23   At the very best, from petitioner's perspective,

24   they're an equal (inaudible).  He cannot prove by

25   preponderance of the evidence that counsel

1  overbore his will and somehow forced him into

2  waiving a jury trial.

3              And in support of that, of course,

4  we have the in-court colloquy where Judge Weber

5  asked Mr. Hollingsworth:  Do you want to have me

6  as a decision maker?  And Mr. Hollingsworth said,

7  "Yes."  And Judge Weber found that it was a

8  knowing and voluntary waiver of the jury trial

9  right.

10             So if you had Mr. Knauss's

11  declaration and the in-court colloquy, I submit

12  that that -- that outweighs petitioner's evidence

13  on his first claim.

14             And so for those -- all of those

15  reasons, I would ask the Court to deny relief on

16  all three claims.  Thank you, your Honor.

17             THE COURT:  Mr. Clark.

18             MR. CLARK:  Thank you, your Honor.

19             Briefly, in rebuttal, nothing

20  additional in claim one.

21             On the claim regarding character

22  evidence, the character trait is that

23  Mr. Hollingsworth is trustworthy with children.

24  That evidence was available, and had Mr. Knauss

25  not abandoned that long before trial, he simply

1   would have filed a motion in limine to exclude the

2   evidence of this changing story from a teenager,

3   14, 15 by that time, older young woman, about what

4   kind of contact she had had with

5   Mr. Hollingsworth.  And so had he not abandoned

6   that strategy far too soon, he simply could have

7   gotten the contours of what was coming in as

8   evidence and decided how to respond to that so

9   that he could bring in pertinent important

10  character evidence.

11              I disagree with my colleague

12  regarding whether Dr. Bourg is a memory expert or

13  not.  We do agree, though, that she's an expert on

14  interviewing children who are making claims about

15  sexual abuse.  Under that area of expertise, she

16  could testify regarding what happens in this

17  state, waking between dream and reality.

18              And as qualified in this trial --

19  although I've qualified her as an expert in

20  memory -- but as qualified in this trial, that

21  evidence still would have been admissible,

22  relevant, and it was an unreasonable decision not

23  to bring that evidence in.

24              I'll rest there, your Honor.

25              THE COURT:  Okay.  Thank you.

```
1                     Mr. Hollingsworth, I'll take the

2    matter under advisement and issue a decision

3    hopefully within the next 30 to 60 days.  A copy

4    of that will go to your attorney to have an

5    opportunity to review with him.

6                     THE PETITIONER:  Thank you very

7    much, sir.

8                     THE COURT:  Okay.  Thank you.

9                     MR. CLARK:  Thank you, your Honor.

10                    MR. MARSHALL:  Thank you, your

11   Honor.

12        (The proceedings recessed at 9:42 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                    C E R T I F I C A T E

3

4

5   STATE OF OREGON          )
                             )
6   County of Lane          )

7

8            I, JAN R. DUIVEN, Certified Shorthand

9   Reporter for the State of Oregon, in and for the

10  County of Lane, do hereby certify that the

11  foregoing pages 1 to 22, comprise a complete,

12  true, and correct transcript, transcribed from

13  audio files to the best of my ability, of the

14  proceedings held in the above-entitled matter on

15  TUESDAY, APRIL 9, 2019.

16

17       Dated at Eugene, Oregon, this 30th day of

18  June, 2019.

19

20

21

22

23  JAN R. DUIVEN, CSR, FCRR, CRC

24  Certified Shorthand Reporter

25

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF UMATILLA
216 SE 4th Street  Pendleton Oregon  97801

JORDEN TIMOTHY HOLLINGSWORTH
SID#: OR-19524416          Petitioner

v.

Tim Causey Supt DRCI
                              Defendant

**Case No:** 17CV47262

**GENERAL JUDGMENT
DENYING
POST-CONVICTION RELIEF**

This matter came before the court on 04/09/2019 on an action for post-conviction relief.

☐ The Petitioner **withdrew** the following claims:

**Findings of fact** ☐ were made on the record   X included in the legal findings below and
            X as follows:

On February 13, 2015, 11-year-old J reported to her father that the night before, petitioner had put his hands under her shirt, as she was sleeping on the couch. A few days later, J was interviewed at the Children's Center and described how petitioner had touched her "boob" and rubbed his hand across the nipple area of her breast. J reported that when she asked petitioner what he was doing, petitioner variously tried to pretend he had been asleep and was not aware of his actions, or had done nothing, but he also asked J if he could touch her. When she refused, petitioner asked J not to tell what he had done and offered to give her money, and promised to take her to the new Sponge Bob movie, if she would not disclose the touching. During the Children's Center interview, J also disclosed that a few years prior, when she lived at a different address, petitioner had pulled his "crotch" out of his pants, that it was sticking up some, and he had put his hand down her pants, before she could pull it from her vagina and jump away from petitioner.

I find the testimony of Arthur Knauss (Ex 105) and DDA Sarah Dumont (Ex 108) to be credible. I find the testimony of Heather Carver (Ex 8) to be credible but largely irrelevant. Hearsay testimony is not adequate to prove what a witness would have testified to if called as a witness at trial. I find the testimony of Petitioner (Ex 1) to be not credible. His testimony is contrary to that of both Knauss and Dumont and is contrary to the record.

➤ **X** Federal X State Constitution questions were presented and decided

The following claims are **ALLOWED:** None
        For all allowed claims, the following relief is granted: None

The following claims are **DENIED:**

**Claim: 1**      is denied because Petitioner failed to:
                        ☐ utilize or follow available state procedure
                        X establish the merits of the claim

---

JUDGMENT 17CV47262 Jorden Timothy Hollingsworth vs. Tim Causey Supt DRCI          Page 1 of 4

The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in coercing Petitioner to waive jury trial. The declaration of attorney Arthur B. Knauss establishes that he had more than one discussion with petitioner whether to have a bench trial or a jury trial. They discussed that a judge might be more receptive than a jury to a defense theory that depended on expert testimony (Dr. Wendy Bourg) and the contention that the victim had problems sometimes being truthful. Trial counsel did not demand that Petitioner waive jury trial nor was Petitioner told that the jury was needed for another case. There was a jury available for Petitioner's trial. Petitioner made a voluntary and informed decision to waive his right to a jury trial. The Honorable Katherine Weber engaged in a colloquy with petitioner before the trial about what would be involved if he chose to have a jury trial. Judge Weber also discussed whether petitioner instead wanted to have her decide whether he was guilty or not guilty. Petitioner told Judge Weber that he wanted to have her make the decision in his case. At the end of this colloquy, the court concluded that petitioner was making a knowing, voluntary, and intelligent decision to waive jury. Notably, petitioner never told Judge Weber that counsel had pressured him into waiving a jury. Nor did he disclose that counsel had supposedly threatened him into waiving his right to a jury trial or told him that a jury was not available. Indeed, Judge Weber said a jury was ready and waiting across the hall. Accordingly, because petitioner gave answers which demonstrated that he knew what his choices were and was exercising his right to choose a bench trial, Judge Weber made the finding that his waiver of a jury was knowing, voluntary, and intelligent.

Petitioner has also not proven prejudice. Petitioner has not proven that he would not have waived his right to a jury trial if it were not for improper actions of his attorney.

**Claim: 2**    is denied because Petitioner failed to:
☐ utilize or follow available state procedure
X establish the merits of the claim
The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to call character witnesses in Petitioner's behalf at trial. According to the first amended petition, four persons could have testified that petitioner is "good with children, safe for children, and trustworthy for the care of children." Trial counsel had his investigator talk to the people identified and had them present at trial. As counsel points out in his declaration, he made a considered and informed strategic decision not to present evidence on petitioner's character because petitioner has impeachable convictions. Counsel's research into petitioner's past convictions and OEC 609 led him to conclude that calling the four character witnesses could backfire because this would allow the prosecutor to ask the witnesses if they were aware of petitioner's past criminal history. Trial counsel also had information that revealed that petitioner was investigated in 2013 and 2014 for having sexual relations with a 15-year-old, when he was 21. The victim in that instance reluctantly reported that she had had sexual intercourse with petitioner 10-15 times, in various parks in Clackamas County, and that petitioner knew she was only 15. Ultimately, petitioner was not prosecuted for Rape III, but only because the victim would not testify at grand jury and claimed that she had lied about the reported sexual intercourse. Nevertheless, if counsel had blundered into putting on witnesses about petitioner's supposed sexual propriety or safety around children, he may well have opened

---

the door to the prosecutor putting on evidence of the investigation into petitioner's sexual relationship with an underage female.  The DDA testified that the victim in that old case was willing and available to testify in Petitioner's case.

Petitioner also did not prove prejudice.  Petitioner did not offer the sworn testimony from any of the proposed character witnesses to demonstrate what their testimony would have been at trial regarding Petitioner's character.  Petitioner thus did not prove that failure to call the character witnesses could have had a tendency to affect the outcome of the trial.

**Claim: 3**    is denied because Petitioner failed to:
                        ☐ utilize or follow available state procedure
                        X establish the merits of the claim
            The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to have **Dr. Wendy Bourg** testify about the supposed side effects of Dexedrine, if taken in too high a dose.  As she testified at petitioner's trial, she has a doctorate in clinical psychology and her practice is interviewing children, and always has been.  She is not a medical doctor.  There is nothing to show that she would have had the expertise to opine that J may have been confabulating the reported sexual abuse in February 2015, supposedly due to having ingested too much Dexedrine.  Indeed, there is no credible evidence that delusions or false reports of sexual abuse are even a documented potential side effect of Dexedrine.  Dr. Skinner, who is a medical doctor, and has long worked at the Children's Center where J was interviewed, testified that she was unaware of a potential side effect of Dexedrine being delusions or hallucinations.  In addition, as Dr. Skinner testified, J's dose of Dexedrine was "low normal."  Thus, for at least two reasons – lack of expertise and no factual basis to support the notion – Dr. Bourg could not have testified that J's report of being sexually abused by petitioner, in February 2015, could possibly have been the product of a Dexedrine overdose.  Counsel reasonably chose to not attempt to have Dr. Bourg offer an opinion that would have been well outside her area of expertise and unsupported by the facts in the case.

Petitioner has also failed to prove prejudice.  There is no evidence that Dr. Bourg could have even given admissible testimony on the potential side effects of Dexedrine, let alone done so in such a persuasive fashion it could have had a tendency to affect the outcome of the case.

EXHIBIT 128, Page 3 of 4
Case No. 3:20-cv-01567-MC

**Additional findings and orders:**

The court adopts all findings made on the record and incorporates them into this judgment.

All questions presented were decided. This judgment constitutes a final General Judgment for the purposes of appellate review and res judicata.

NOW, THEREFORE, The Petition for Post-Conviction Relief is denied in its entirety and is dismissed with prejudice.

*Judge Signature:*

Signed: 5/28/2019 33:15 PM

Senior Judge J Burdette Pratt

EXHIBIT 128, Page 4 of 4
Case No. 3:20-cv-01567-MC

IN THE COURT OF APPEALS
OF THE STATE OF OREGON

———————

| | |
|---|---|
| JORDEN TIMOTHY HOLLINGSWORTH, | Umatilla County Circuit Court Case No. 17CV47262 |
| Petitioner-Appellant, | CA A171177 |
| v. | |
| TIM CAUSEY, Superintendent, Deer Ridge Correctional Institution, | |
| Defendant-Respondent. | |

APPELLANT'S OPENING BRIEF

———————

Appeal from the Judgment of the Circuit Court
for Umatilla County
Honorable J Burdette Pratt, Senior Circuit Court Judge

———————

| | |
|---|---|
| JASON WEBER #054109 | ELLEN ROSENBLUM #753239 |
| O'Connor Weber LLC | Attorney General |
| 1500 SW First Avenue, Suite 1090 | BENJAMIN GUTMAN #160599 |
| Portland, OR 97201 | Solicitor General |
| (503) 226-0923 | 400 Justice Building |
| jason@oconnorweber.com | 1162 Court Street NE |
| Attorney for Petitioner-Appellant | Salem, OR 97301 |
| | (503) 378-4402 |
| | benjamin.gutman@doj.state.or.us |
| | Attorneys for Defendant-Respondent |

Filed 02/20
_____

## Table of Contents

STATEMENT OF THE CASE ........................................................................1

    Nature of the Proceeding ...................................................................1

    Nature of the Judgment.....................................................................1

    Jurisdiction........................................................................................1

    Notice of Appeal...............................................................................1

    Summary of Historical and Procedural Facts ...................................2

    Significant Motions ..........................................................................8

CONCLUSION........................................................................................8

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

# Table of Authorities

## Cases

*State v. Balfour*,
    311 Or 434, 814 P2d 1069 (1991) ....................................................................1, 8

## Constitutional Provisions and Statutes

Or Const, Art I, §11 ....................................................................................2

US Const, Amend VI ....................................................................................2

Oregon Rule of Evidence (OEC) 609 ....................................................................4, 6

ORAP 5.90 ....................................................................................1, 8

ORS 40.355 ....................................................................................3

ORS 138.650 ....................................................................................1

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

# APPELLANT'S OPENING BRIEF

---

## Section A

## STATEMENT OF THE CASE

### Nature of the Proceeding

This brief is filed pursuant to ORAP 5.90 and *State v. Balfour*, 311 Or 434, 814 P2d 1069 (1991). Appellant, petitioner below and hereafter, appeals from a trial court judgment denying him post-conviction relief. Petitioner filed a *pro se* petition for post-conviction relief and, after counsel was appointed, a first amended petition for post-conviction relief. ER-10-11 (case register). A copy of the first amended petition for post-conviction relief is attached at ER-1-5.

### Nature of the Judgment

The post-conviction trial court denied petitioner relief after a trial. A copy of the general judgment denying relief is attached at ER-6-9

### Jurisdiction

This court has jurisdiction under ORS 138.650.

### Notice of Appeal

Judgment was entered in the Umatilla County Circuit Court on May 29, 2019. ER-11. Petitioner timely filed Notice of Appeal on May 31, 2019.

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

## Summary of Historical and Procedural Facts

Petitioner was charged, by grand jury indictment, in Clackamas County Circuit Court case no. CR1501848 with two counts of sexual abuse in the first degree. Electronic Trial Court File (eTCF) at 55 (Indictment). Both charges were alleged to have been committed against the same victim, J, who was under 14 years of age at the time of the alleged offense. *Id.* The incident dates were years apart. *Id.*

In this post-conviction proceeding petitioner raised three claims for relief. All three claims alleged that petitioner's convictions were obtained in violation of his right to counsel in violation of Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. ER-3.

First, petitioner alleged that trial counsel "placed petitioner into a state of duress in order to obtain a waiver of jury" by demanding the waiver the "morning of trial." ER-4. Petitioner did not have enough time to consider the decision and even though petitioner wanted a jury trial he was "overcome" by the "influence of trial counsel." ER-4.

Second, petitioner alleged that trial counsel failed to call available character witnesses, Cindy Knowles, Courtney Polk, David Mills, and Kipley Edwards. If trial counsel had called them, they would have testified that petitioner had a

Page 2 – APPELLANT'S OPENING BRIEF

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

reputation in the community for being "good with children, safe for children, and trustworthy for the care of children." ER-4.

Third, petitioner alleged that trial counsel "failed to provide testimony at trial indicating the impact of [Dexedrine] on sleepiness and perception of reality." ER-4. An expert at petitioner's trial testified that there was a possibility the child victim had "overdosed on Dexedrine" and opined "Withdrawal and rebound effects such as extreme sleepiness and impaired reality can occur during recovery from Dexedrine overdoses." ER-4.

In response to these claims the state offered, among other things, a declaration from petitioner's criminal defense attorney. Ex 105. The declaration provided in part:

> "At no time did I 'demand' that he waive a jury trial, nor suggest that he should not proceed with a jury trial, nor demand that he sign a jury waiver. At least two times in the week before the trial, the subject of his options as to whether he should have a jury trial or court trial were discussed at length. I thoroughly explained to him the pros and cons of a court trial verses a jury trial. Because of his convictions for Assault IV and Harassment, he had impeachable offenses pursuant to ORS 40.355(Oregon Rule of Evidence 609(2), which I carefully explained to him. * * *

> "I also informed him that a judge might be more receptive of our theory of the case than a jury. Our theory was that the girl had admitted to being a liar when she was younger (Tr p .52), and could have been confused as to whether she had just dreamed versus what actually happened, as she awakened with client allegedly touching her sexually. My expert witness, Dr. Wendy Bourg, PhD, a Clinical

Page 3 – APPELLANT'S OPENING BRIEF

Psychologist, testified about this sort of 'twilight' state and the possibility of her confusing a dream with reality. In my experience, expert testimony is typically, at least, considered by the judge, whereas jurors can be unduly affected by or have undue sympathy for the child victim.

"* * * * *

"I have never demanded of a client, nor even recommended that they waive jury. I have always explained to my clients, including petitioner, that it was their personal choice, not mine. I had always assumed this case would be tried to a jury. In my opinion, I believe he made an intelligent choice in waiving the jury, irrespective of the outcome.

"At no time did I assert that 'the jury was needed for another trial.' That statement is categorically false.

Ex 105 at 3-4.

After a hearing on the claims raised in the petitioner, the post-conviction trial court made the following factual findings in its written judgment:

"On February 13, 2015, 11-year-old J reported to her father that the night before, petitioner had put his hands under her shirt, as she was sleeping on the couch. A few days later, J was interviewed at the Children's Center and described how petitioner had touched her "boob" and rubbed his hand across the nipple area of her breast. J reported that when she asked petitioner what he was doing, petitioner variously tried to pretend he had been asleep and was not aware of his actions, or had done nothing, but he also asked J if he could touch her. When she refused, petitioner asked J not to tell what he had done and offered to give her money, and promised to take her to the new Sponge Bob movie, if she would not disclose the touching. During the Children's Center interview, J also disclosed that a few years prior, when she lived at a different address, petitioner had pulled his 'crotch' out of his pants, that it was sticking up some, and he had put his hand

Page 4 – APPELLANT'S OPENING BRIEF

down her pants, before she could pull it from her vagina and jump away from petitioner.

"I find the testimony of Arthur Knauss (Ex 105) and DDA Sarah Dumont (Ex 108) to be credible. I find the testimony of Heather Carver (Ex 8) to be credible but largely irrelevant. Hearsay testimony is not adequate to prove what a witness would have testified to if called as a witness at trial. I find the testimony of Petitioner (Ex 1) to be not credible. His testimony is contrary to that of both Knauss and Dumont and is contrary to the record."

ER-6.

With regard to petitioner's first claim, the court wrote:

"Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in coercing Petitioner to waive jury trial. The declaration of attorney Arthur B. Knauss establishes that he had more than one discussion with petitioner whether to have a bench trial or a jury trial. They discussed that a judge might be more receptive than a jury to a defense theory that depended on expert testimony (Dr. Wendy Bourg) and the contention that the victim had problems sometimes being truthful. Trial counsel did not demand that Petitioner waive jury trial nor was Petitioner told that the jury was needed for another case. There was a jury available for Petitioner's trial. Petitioner made a voluntary and informed decision to waive his right to a jury trial. The Honorable Katherine Weber engaged in a colloquy with petitioner before the trial about what would be involved if he chose to have a jury trial. Judge Weber also discussed whether petitioner instead wanted to have her decide whether he was guilty or not guilty. Petitioner told Judge Weber that he wanted to have her make the decision in his case. At the end of this colloquy, the court concluded that petitioner was making a knowing, voluntary, and intelligent decision to waive jury. Notably, petitioner never told Judge Weber that counsel had pressured him into waiving a jury. Nor did he disclose that counsel had supposedly threatened him into waiving his right to a jury trial or told him that a jury was not available. Indeed, Judge Weber said a jury was ready and waiting

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

across the hall. Accordingly, because petitioner gave answers which demonstrated that he knew what his choices were and was exercising his right to choose a bench trial, Judge Weber made the finding that his waiver of a jury was knowing, voluntary, and intelligent.

"Petitioner has also not proven prejudice. Petitioner has not proven that he would not have waived his right to a jury trial if it were not for improper actions of his attorney."

ER-7.

With regard to petitioner's second claim the court wrote:

"Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to call character witnesses in Petitioner's behalf at trial. According to the first amended petition, four persons could have testified that petitioner is 'good with children, safe for children, and trustworthy for the care of children." Trial counsel had his investigator talk to the people identified and had them present at trial. As counsel points out in his declaration, he made a considered and informed strategic decision not to present evidence on petitioner's character because petitioner has impeachable convictions. Counsel's research into petitioner's past convictions and OEC 609 led him to conclude that calling the four character witnesses could backfire because this would allow the prosecutor to ask the witnesses if they were aware of petitioner's past criminal history. Trial counsel also had information that revealed that petitioner was investigated in 2013 and 2014 for having sexual relations with a 15-year-old, when he was 21. The victim in that instance reluctantly reported that she had had sexual intercourse with petitioner 10-15 times, in various parks in Clackamas County, and that petitioner knew she was only 15. Ultimately, petitioner was not prosecuted for Rape III, but only because the victim would not testify at grand jury and claimed that she had lied about the reported sexual intercourse. Nevertheless, if counsel had blundered into putting on witnesses about petitioner's supposed sexual propriety or safety around children, he may well have opened the door to the prosecutor putting on evidence of the investigation into petitioner's sexual relationship with an

Page 6 – APPELLANT'S OPENING BRIEF

underage female. The DDA testified that the victim in that old case was willing and available to testify in Petitioner's case.

"Petitioner also did not prove prejudice. Petitioner did not offer the sworn testimony from any of the proposed character witnesses to demonstrate what their testimony would have been at trial regarding Petitioner's character. Petitioner thus did not prove that failure to call the character witnesses could have had a tendency to affect the outcome of the trial."

ER-7-8.

With regard to petitioner's third claim the court wrote:

"Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to have Dr. Wendy Bourg testify about the supposed side effects of Dexedrine, if taken in too high a dose. As she testified at petitioner's trial, she has a doctorate in clinical psychology and her practice is interviewing children, and always has been. She is not a medical doctor. There is nothing to show that she would have had the expertise to opine that J may have been confabulating the reported sexual abuse in February 2015, supposedly due to having ingested too much Dexedrine. Indeed, there is no credible evidence that delusions or false reports of sexual abuse are even a documented potential side effect of Dexedrine. Dr. Skinner, who is a medical doctor, and has long worked at the Children's Center where J was interviewed, testified that she was unaware of a potential side effect of Dexedrine being delusions or hallucinations. In addition, as Dr. Skinner testified, J's dose of Dexedrine was 'low normal.' Thus, for at least two reasons – lack of expertise and no factual basis to support the notion – Dr. Bourg could not have testified that J's report of being sexually abused by petitioner, in February 2015, could possibly have been the product of a Dexedrine overdose. Counsel reasonably chose to not attempt to have Dr. Bourg offer an opinion that would have been well outside her area of expertise and unsupported by the facts in the case.

Page 7 – APPELLANT'S OPENING BRIEF

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

EXHIBIT 129, Page 10 of 36
Case No. 3:20-cv-01567-MC

"Petitioner has also failed to prove prejudice. There is no evidence that Dr. Bourg could have even given admissible testimony on the potential side effects of Dexedrine, let alone done so in such a persuasive fashion it could have had a tendency to affect the outcome of the case."

ER-8.

## Significant Motions

No significant motions have been filed in this PCR appeal.

## CONCLUSION

Counsel submits Section A in compliance with all the requirements articulated in ORAP 5.90 and *State v. Balfour*, 311 Or at 451-52. Counsel has thoroughly reviewed the record and "discussed the case with trial counsel and client." *See* ORAP 5.90(1)(a)(iii). Counsel has not identified any arguably meritorious issues on appeal.

Counsel has supplied petitioner with copies of pertinent post-conviction trial court records including the transcript of the post-conviction proceedings and the trial court record. In addition, counsel has provided petitioner with applicable appellate court rules and has provided petitioner a reasonable opportunity to "raise any issue" in a Section B portion of the brief. 311 Or at 452. Petitioner has provided counsel with "Section B" brief, which is set out below.

///

///

Page 8 – APPELLANT'S OPENING BRIEF

DATED February 11, 2020

Respectfully Submitted,

/s/ Jason Weber

_____

Jason Weber, OSB No. 54109
O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201
(503) 226-0923
jason@oconnorweber.com
Attorney for Petitioner-Appellant
Jorden Timothy Hollingsworth

Page 9 – APPELLANT'S OPENING BRIEF

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

EXHIBIT 129, Page 12 of 36
Case No. 3:20-cv-01567-MC

**Section B begins on the next page.**

Page 10 – APPELLANT'S OPENING BRIEF

## Statement of the case
## Questions presented

Did the court erred in denying the Claim 1 that petitioner did not prove he would not have waived his right to a jury trial if it were not for improper actions of his attorney?

## Summary of Argument

The court erred in denial of claim 1. There was evidence to prove petitioner signed the jury waiver minutes before the trial.

## Assignment of Error

The court erred by denying claim 1, that petitioner did not prove that he would not have waived his right to a jury trial if it were not for improper actions of his attorney.

## Preservation of Error

In the judgment denying Post-Conviction Relief, page 1, Claim 1. It is said that claim is denied because petitioner failed to establish the merits of the claim. The jury waiver should have been present. It was dated the morning of the trial. That is evidence that the decision was made minutes before the trial.

## Standard of Review

The court reviews the denial of Claim 1. It reviews the jury waiver that was signed before the trial. It determines if this is enough evidence to support this claim.

## Argument

It was said all case long that petitioner wanted a jury trial. The morning of the trial, the trial attorney influenced petitioner to sign the waiver. If this was truly the petitioner's decision, why wasn't the the decision to have a judge trial made before the day of trial? The jury waiver was signed minutes before trial. The document should have been available. If it wasn't, the post conviction Attorney erred in this defense.

For all this reasons, this court should reverse the courts denial of Claim 1 and remand to a new trial.

Claim 2

### Statement of the case
### Questions presented

Did the court erred in denying the claim 2 that petitioner did not prove that his character witnesses would have influenced the outcome of the trial?

### Summary of Argument

The court erred in denying claim 2. Petitioner did prove his character witnesses should have been presented at trial and they would have changed the impact of the trial.

### Assignment of Error

The court erred in denying claim 2, that petitioner did not prove his character witnesses would have impacted the outcome of the trial. The trial attorney did not have a good strategy in not presenting the witnesses. He had all the witnesses ready to testify.

### Preservation of Error

In the judgement denying Post conviction relief, Page 2, claim 2. It is said that claim 2 is denied because petitioner failed to establish the merits of the claim. In a case like this, the character witnesses should have been presented.

## Standard of Review

The court reviews the denial of claim 2. It reviews the testimony of these witnesses and determines if this is enough to support claim. It reviews the so called evidence the DA had to cross examine these witnesses.

## Argument

It is said that the strategy of not putting these character witnesses on the stand was a right strategy because it would allow previous allegations to be let in. There is no proof to these other allegations. The 14, 15 year old said at the Grand Jury that she lied about the reported sexual intercourse she had with petitioner. The court could not have brought this up. The previous convictions and allegations had nothing to do with the present case. The petitioner wanted every thing about him and his life brought up in court. The Post conviction attorney did not get sworn affidants from these witnesses. I believe gathering affidants would have impacted this claim. The Attorney erred in this defense.

For these reasons, this court should reverse the courts denial of claim 2, and remand for a new trial.

## Statement of the case
### Questions presented

Did the court erred in denying claim 3 that petitioner failed to prove prejudice?

### Summary of Argument

The court erred in the denial of claim 3. The effects on the medication in this case was big enough that presented in the right way would have affected the outcome of the case.

### Assignment of Error

The court erred in denying the claim 3 that petitioner failed to prove prejudice. That the evidence would have affected the outcome of the case if not for improper actions of his attorney.

### Preservation of Error

In the judgement denying post-conviction relief, page 3, claim 3. It is said that claim 3 was denied because petitioner failed to establish the merits of the claim. It is linked with the medication that a side effect is delusion. This should have been presented at trial.

## Standard of Review

The court reviews the denial of Claim 3. It reviews the side effects of these medication. It reviews the evidence and determines if this is enough evidence to support this claim.

## Argument

There is alot that goes into this case regarding the medication. The side effects of the medication and the impact it can have coming out of a dream state should have been presented at trial. In petitioners Claim before he was appointed a court appointed attorney. It is said that his trial attorney should have had a witness that was an expert on this specific medication and the side effects it can have. The post conviction attorney made an error by limiting this claim to the expert Dr. Boorg. I believe another expert should have presented this evidence.

For all of these reasons, this court should reverse the courts denial of Claim 3 and remand to a new trial.

Jordan Phillips

# EXCERPT OF RECORD INDEX

First Amended Petition for Post-Conviction Relief ................................ ER-1-5

Judgment ................................................................................. ER-6-9

OECI Case Register of Actions ............................................. ER-10-14

O'Connor Weber LLC
1500 SW First Ave, Suite 1090
Portland, OR 97201

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF UMATILLA

| | | |
|---|---|---|
| JORDEN HOLLINGSWORTH, | ) | No. 17CV47262 |
| | ) | |
| Plaintiff, | ) | **PETITIONER'S FIRST AMENDED** |
| | ) | **PETITION** |
| vs. | ) | |
| | ) | |
| TROY BOWSER, Superintendent, | ) | |
| | ) | |
| Two Rivers Correctional Institution, | ) | |
| | ) | |
| Defendant. | ) | |

COMES NOW the Petitioner, by and through his attorney, Jonathan Clark, and alleges:

1.

Troy Bowser was the duly appointed, acting superintendent of the Two Rivers Correctional Institution, City of Umatilla, Oregon, at the time of filing the original petition herein, and was thereby in custody and control of Petitioner. Defendant Troy Bowser continues to act in that capacity, and Petitioner continues to reside in that facility.

2.

Petitioner's imprisonment is by virtue of a judgment and sentence imposed on October 24, 2016, by Clackamas County Circuit Court Judge Katherine E. Weber in *State of Oregon v. Jorden Timothy Hollingsworth,* Clackamas County Circuit Court Case No. CR1501848.

3.

Petitioner was charged by Secret Indictment in *State of Oregon v. Jorden Timothy*

Page 1,
PETITIONER'S FIRST AMENDED
PETITION

*Hollingsworth,* Clackamas County Circuit Court Case No. CR1501848. He entered pleas of Not

Guilty to all charges.  The charges, and the resolution of each, are as follows:

## CR1501848

| Charge | Disposition | Sentence |
|---|---|---|
| Count 1<br>Sexual Abuse in the First Degree<br>ORS 163.427<br>(Felony Class B)<br>Ballot Measure 11 | Convicted | 75 months in the Department of Corrections, and 36 months Post-Prison Supervision. |
| Count 2<br>Sexual Abuse in the First Degree<br>ORS 163.427<br>(Felony Class B)<br>Ballot Measure 11 | Convicted | 75 months in the Department of Corrections concurrent with Count 1, and 36 months Post-Prison Supervision. |

4.

Petitioner was appointed Arthur Knauss as counsel (OSB# 731700, 294 Warner Milne Rd,

Oregon City, Oregon 97045).   Arthur Knauss represented Petitioner through trial in the original

trial court proceedings.

5.

Petitioner pursued an appeal from his criminal convictions in Oregon Court of Appeals Case

but his appeal was dismissed October 2, 2017.

6.

No prior post-conviction proceedings have been undertaken by Petitioner with respect to the

above-referenced conviction. Petitioner's petition for post-conviction relief was filed within the

two-year limitations period set forth at ORS 138.510.

/ / / /

Page 2,
PETITIONER'S FIRST AMENDED
PETITION

**CLAIMS FOR RELIEF**
(Ineffective Assistance of Counsel)
7.

Petitioner incorporates paragraphs 1 through 7 as if fully set forth herein. Petitioner's imprisonment and restraint, to the best of his knowledge and belief, are unlawful under ORS 138.530 because:

a. Petitioner's right to effective and adequate assistance of trial counsel under Article 1 § 11 of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution were violated as further alleged below.

b. On each of the following claims, Petitioner alleges that trial counsel's acts and omissions were not the product of an acceptable tactical decision and counsel's performance fell below an objective standard of reasonableness for defense counsel in similar felony criminal proceedings under the then-prevailing professional norms.

c. Whether considered cumulatively or individually, the numerous deficiencies in trial counsel's performance are sufficiently significant to undermine confidence in the outcome of Petitioner's trial and sentence. The unreasonable failures by trial counsel eviscerated Petitioner's constitutional rights to a jury trial, confrontation, effective assistance of counsel, and right against self-incrimination, all under Article 1 § 11 of the Oregon Constitution, Article 1 § 12 of the Oregon Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

d. There is a reasonable probability that, absent the errors of trial counsel, the result of conviction or sentence would have been different. Any confidence in petitioner's conviction and sentence has been undermined as a result of trial counsel's deficient performance.

/ / / /

/ / / /

Page 3,
PETITIONER'S FIRST AMENDED
PETITION

e.  Trial counsel provided ineffective and inadequate assistance of counsel in the following particulars:

    I.    Trial Counsel placed Petitioner into a state of duress in order to obtain a waiver of jury.  Trial Counsel demanded the jury waiver the morning of trial, close in time to the beginning of trial, asserting that the jury was needed for another trial and that he (petitioner) did not want a jury.  This contradicted Petitioner's desire and intention, but his will was overcome by the position and influence of Trial Counsel.  Furthermore, Petitioner did not have ample time to consider this tactical decision or discuss its implications with Trial Counsel.

    II.    Trial Counsel failed to call witnesses who could, and were prepared to, provide positive character evidence.  Trial Counsel had in his file investigative reports indicating that four persons who knew Petitioner personally would testify that according to their opinion and according to Petitioner's reputation, Petitioner was good with children, safe for children, and trustworthy for the care of children.  These witnesses are Cyndi Knowles, Courtney Polk, David Mills, and Kipley Edwards.

    III.    One expert informed Trial Counsel that the case file indicates some reports that the child victim had been overdosed with Dexedrine.  The expert then opined, "Withdrawal and rebound effects such as extreme sleepiness and impaired reality testing can occur during recovery from Dexedrine overdoses."    Trial Counsel failed to provide testimony at trial indicating the impact of medication on sleepiness and perception of reality.

/ / / /

Page 4,
PETITIONER'S FIRST AMENDED
PETITION

8.

All assertions of ineffective and inadequate assistance of counsel are supported by Exhibit 1, the Trial Court File, Exhibit 2, the Trial Transcript, Exhibit 3, Petitioner's Declaration, Exhibit 4, Declaration of Counsel, as well as the foregoing paragraphs, and any evidence developed during the course of litigation of this matter.

All Exhibits will be filed separately on a CD and served contemporaneously on defense counsel.


DATED this 27th day of August, 2018.

/s/ Jonathan Clark
Jonathan Clark, OSB No. 022740
Attorney for Petitioner

Page 5,
PETITIONER'S FIRST AMENDED
PETITION

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF UMATILLA
216 SE 4th Street  Pendleton Oregon  97801

JORDEN TIMOTHY HOLLINGSWORTH                     **Case No:** 17CV47262
_____
         *SID#: OR-19524416*          Petitioner

           v.                                    **GENERAL JUDGMENT
                                                 DENYING
                                                 POST-CONVICTION RELIEF**

Tim Causey Supt DRCI
_____
                          Defendant

This matter came before the court on 04/09/2019 on an action for post-conviction relief.

☐ The Petitioner **withdrew** the following claims:

**Findings of fact** ☐ were made on the record  X included in the legal findings below and
         X as follows:

On February 13, 2015, 11-year-old J reported to her father that the night before, petitioner had
put his hands under her shirt, as she was sleeping on the couch.  A few days later, J was
interviewed at the Children's Center and described how petitioner had touched her "boob"
and rubbed his hand across the nipple area of her breast.  J reported that when she asked
petitioner what he was doing, petitioner variously tried to pretend he had been asleep and was
not aware of his actions, or had done nothing, but he also asked J if he could touch her.  When
she refused, petitioner asked J not to tell what he had done and offered to give her money, and
promised to take her to the new Sponge Bob movie, if she would not disclose the touching.
During the Children's Center interview, J also disclosed that a few years prior, when she
lived at a different address, petitioner had pulled his "crotch" out of his pants, that it was sticking
up some, and he had put his hand down her pants, before she could pull it from her vagina and
jump away from petitioner.


I find the testimony of Arthur Knauss (Ex 105) and DDA Sarah Dumont (Ex 108) to be credible.
I find the testimony of Heather Carver (Ex 8) to be credible but largely irrelevant.  Hearsay
testimony is not adequate to prove what a witness would have testified to if called as a witness at
trial.  I find the testimony of Petitioner (Ex 1) to be not credible.  His testimony is contrary to
that of both Knauss and Dumont and is contrary to the record.

   ➢ **X** Federal X State Constitution questions were presented and decided

The following claims are **ALLOWED**: None
         For all allowed claims, the following relief is granted: None


The following claims are **DENIED**:

**Claim: 1**      is denied because Petitioner failed to:
                  ☐ utilize or follow available state procedure
                  X establish the merits of the claim

JUDGMENT 17CV47262 Jorden Timothy Hollingsworth vs. Tim Causey Supt DRCI          Page 1 of 4

EXHIBIT 129, Page 26 of 36
Case No. 3:20-cv-01567-MC

The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in coercing Petitioner to waive jury trial. The declaration of attorney Arthur B. Knauss establishes that he had more than one discussion with petitioner whether to have a bench trial or a jury trial. They discussed that a judge might be more receptive than a jury to a defense theory that depended on expert testimony (Dr. Wendy Bourg) and the contention that the victim had problems sometimes being truthful. Trial counsel did not demand that Petitioner waive jury trial nor was Petitioner told that the jury was needed for another case. There was a jury available for Petitioner's trial. Petitioner made a voluntary and informed decision to waive his right to a jury trial. The Honorable Katherine Weber engaged in a colloquy with petitioner before the trial about what would be involved if he chose to have a jury trial. Judge Weber also discussed whether petitioner instead wanted to have her decide whether he was guilty or not guilty. Petitioner told Judge Weber that he wanted to have her make the decision in his case. At the end of this colloquy, the court concluded that petitioner was making a knowing, voluntary, and intelligent decision to waive jury. Notably, petitioner never told Judge Weber that counsel had pressured him into waiving a jury. Nor did he disclose that counsel had supposedly threatened him into waiving his right to a jury trial or told him that a jury was not available. Indeed, Judge Weber said a jury was ready and waiting across the hall. Accordingly, because petitioner gave answers which demonstrated that he knew what his choices were and was exercising his right to choose a bench trial, Judge Weber made the finding that his waiver of a jury was knowing, voluntary, and intelligent.

Petitioner has also not proven prejudice. Petitioner has not proven that he would not have waived his right to a jury trial if it were not for improper actions of his attorney.

**Claim: 2**    is denied because Petitioner failed to:
☐ utilize or follow available state procedure
X establish the merits of the claim
The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to call character witnesses in Petitioner's behalf at trial. According to the first amended petition, four persons could have testified that petitioner is "good with children, safe for children, and trustworthy for the care of children." Trial counsel had his investigator talk to the people identified and had them present at trial. As counsel points out in his declaration, he made a considered and informed strategic decision not to present evidence on petitioner's character because petitioner has impeachable convictions. Counsel's research into petitioner's past convictions and OEC 609 led him to conclude that calling the four character witnesses could backfire because this would allow the prosecutor to ask the witnesses if they were aware of petitioner's past criminal history. Trial counsel also had information that revealed that petitioner was investigated in 2013 and 2014 for having sexual relations with a 15-year-old, when he was 21. The victim in that instance reluctantly reported that she had had sexual intercourse with petitioner 10-15 times, in various parks in Clackamas County, and that petitioner knew she was only 15. Ultimately, petitioner was not prosecuted for Rape III, but only because the victim would not testify at grand jury and claimed that she had lied about the reported sexual intercourse. Nevertheless, if counsel had blundered into putting on witnesses about petitioner's supposed sexual propriety or safety around children, he may well have opened

the door to the prosecutor putting on evidence of the investigation into petitioner's sexual relationship with an underage female. The DDA testified that the victim in that old case was willing and available to testify in Petitioner's case.

Petitioner also did not prove prejudice. Petitioner did not offer the sworn testimony from any of the proposed character witnesses to demonstrate what their testimony would have been at trial regarding Petitioner's character. Petitioner thus did not prove that failure to call the character witnesses could have had a tendency to affect the outcome of the trial.

**Claim: 3**    is denied because Petitioner failed to:
               ☐ utilize or follow available state procedure
               X establish the merits of the claim
          The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to have Dr. Wendy Bourg testify about the supposed side effects of Dexedrine, if taken in too high a dose. As she testified at petitioner's trial, she has a doctorate in clinical psychology and her practice is interviewing children, and always has been. She is not a medical doctor. There is nothing to show that she would have had the expertise to opine that J may have been confabulating the reported sexual abuse in February 2015, supposedly due to having ingested too much Dexedrine. Indeed, there is no credible evidence that delusions or false reports of sexual abuse are even a documented potential side effect of Dexedrine. Dr. Skinner, who is a medical doctor, and has long worked at the Children's Center where J was interviewed, testified that she was unaware of a potential side effect of Dexedrine being delusions or hallucinations. In addition, as Dr. Skinner testified, J's dose of Dexedrine was "low normal." Thus, for at least two reasons – lack of expertise and no factual basis to support the notion – Dr. Bourg could not have testified that J's report of being sexually abused by petitioner, in February 2015, could possibly have been the product of a Dexedrine overdose. Counsel reasonably chose to not attempt to have Dr. Bourg offer an opinion that would have been well outside her area of expertise and unsupported by the facts in the case.

Petitioner has also failed to prove prejudice. There is no evidence that Dr. Bourg could have even given admissible testimony on the potential side effects of Dexedrine, let alone done so in such a persuasive fashion it could have had a tendency to affect the outcome of the case.

JUDGMENT 17CV47262 Jorden Timothy Hollingsworth vs. Tim Causey Supt DRCI    Page 3 of 4

EXHIBIT 129, Page 28 of 36
Case No. 3:20-cv-01567-MC

**Additional findings and orders:**

The court adopts all findings made on the record and incorporates them into this judgment.

All questions presented were decided. This judgment constitutes a final General Judgment for the purposes of appellate review and res judicata.

NOW, THEREFORE, The Petition for Post-Conviction Relief is denied in its entirety and is dismissed with prejudice.

*Judge Signature:*

Signed: 5/28/2019 03:15 PM

_____    _____
**Senior Judge J Burdette Pratt**

JUDGMENT 17CV47262 Jorden Timothy Hollingsworth vs. Tim Causey Supt DRCI    Page 4 of 4

EXHIBIT 129, Page 29 of 36
Case No. 3:20-cv-01567-MC

UMATILLA

# CASE SUMMARY
## CASE NO. 17CV47262

| | | | |
|---|---|---|---|
| **JORDEN TIMOTHY HOLLINGSWORTH** | § | Location: | **Umatilla** |
| vs | § | Filed on: | **10/27/2017** |
| **Tim Causey Supt DRCI** | § | Previous Court Case | **CR1501848** |
| | § | Number: | |
| | § | | |

---

### CASE INFORMATION

**File Date** 10/27/2017

**Filed By** HOLLINGSWORTH, JORDEN TIMOTHY

**Filed Against** Troy Bowser Supt TRCI

Case Type: **Post Conviction Relief**

Case Flags: **Appeal**

**Cause of Action**
- Original Action

**Description/Remedy**
Action

**Statistical Closures**
05/29/2019     Closed

---

| DATE | CASE ASSIGNMENT |
|---|---|

**Current Case Assignment**
Case Number          17CV47262
Court                Umatilla
Date Assigned        10/27/2017

---

### PARTY INFORMATION

*Lead Attorneys*

**Petitioner**     **HOLLINGSWORTH, JORDEN TIMOTHY**

**Defendant**     **Tim Causey Supt DRCI**

**MARSHALL, WARD DOUGLAS**
*Retained*
503 947-4706(W)

**Troy Bowser Supt TRCI**
Removed: 03/19/2019
Inactive

---

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 10/27/2017 | **Cause of Action**   - Original Action   ()<br>Filed By          HOLLINGSWORTH, JORDEN TIMOTHY<br>Filed Against     Troy Bowser Supt TRCI<br>Action Type       Action | |
| 10/27/2017 | Petition - Post Conviction Relief<br>Filed By:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY<br>Serving:  Defendant  Troy Bowser Supt TRCI<br>Created: 10/30/2017 10:59 AM | |
| 10/27/2017 | Motion - Appoint Counsel<br>*And proceed as indigent person*<br>Party:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 10/30/2017 11:01 AM | |
| 10/31/2017 | Order - Appointing Counsel (Judicial Officer: Temple, Eva J )<br>*Attorney: ORPCC*<br>Signed: 10/31/2017<br>Party:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY | |

*Printed on 09/03/2019 at 1:43 PM*

# CASE SUMMARY
## CASE No. 17CV47262

Created: 10/31/2017 4:07 PM

| | |
|---|---|
| 10/31/2017 | **Judgment - Limited Creates Lien** (Judicial Officer: Temple, Eva J)<br>- Original Action :<br>Monetary Award (Unsatisfied, 10/31/2017)<br> Signed Date: 10/31/2017<br> Expiration Date: 10/31/2027<br> Monetary Award:<br><br> Creditor: State of Oregon, Debtor: JORDEN TIMOTHY HOLLINGSWORTH,<br> Unsatisfied, Award Type: Judgment Fees, Amount: $265.00<br> Total: $265.00<br> Created: 10/31/2017 4:08 PM |
| 10/31/2017 | ▉ Digitized Judgment Document (Judicial Officer: Temple, Eva J )<br>*Filing fee; cc: PTF & DOC Financial*<br>Created: 10/31/2017 4:08 PM |
| 10/31/2017 | Notice - Judgment Entry<br>Party: Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 10/31/2017 4:09 PM |
| 11/07/2017 | ▉ Notice - Representation<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,<br>JORDEN TIMOTHY<br>Created: 11/08/2017 8:47 AM |
| 01/26/2018 | ▉ Motion - Time Extension<br>*PTF time to file Amended Petition*<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,<br>JORDEN TIMOTHY<br>Created: 01/26/2018 3:05 PM |
| 01/26/2018 | ▉ Declaration<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,<br>JORDEN TIMOTHY<br>Created: 01/26/2018 3:05 PM |
| 01/29/2018 | ▉ Order - Continue (Judicial Officer: Lieuallen, Jon )<br>*PTF time to file Amended Petition*<br>Signed: 01/29/2018<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,<br>JORDEN TIMOTHY<br>Created: 01/29/2018 12:09 AM |
| 05/21/2018 | ▉ Declaration<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,<br>JORDEN TIMOTHY<br>Created: 05/21/2018 11:11 AM |
| 05/21/2018 | ▉ Motion - Time Extension<br>*PET time to file Amended Petition*<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,<br>JORDEN TIMOTHY<br>Created: 05/21/2018 11:11 AM |
| 05/21/2018 | ▉ Order - Continue (Judicial Officer: Lieuallen, Jon )<br>*Insufficient grounds for 90 day extension; less time granted than requested* |

EXHIBIT 129, Page 31 of 36
Case No. 3:20-cv-01567-MC

# CASE SUMMARY
## CASE NO. 17CV47262

Signed: 05/21/2018
Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 05/21/2018 12:59 AM

06/28/2018       Motion - Time Extension
*PET time to file Amended Petition*
Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 06/29/2018 8:23 AM

06/28/2018       Declaration
Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 06/29/2018 8:23 AM

06/29/2018       Order - Continue (Judicial Officer: Hill, Daniel J )
*PET Time to file Amended Petition; Counsel needs to comply with SLRs or have motions
denied*
Signed: 06/29/2018
Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 06/29/2018 3:48 PM

08/27/2018       Petition - Amended
*with PET EXB 1 - 4 attached (EXB 3 to be filed separately)*
Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 08/29/2018 11:51 AM

09/07/2018       Exhibit
*PET EXB 3*
Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 09/07/2018 1:20 PM

10/01/2018       Answer
Party: Assistant Attorney General MARSHALL, WARD DOUGLAS; Defendant Troy
Bowser Supt TRCI
Created: 10/01/2018 1:03 PM

10/01/2018       Issue - At Issue
*Set Trial*
Created: 10/01/2018 2:52 PM

03/13/2019       Exhibit - List
*PET EXB 1 - 8*
Party: Petitioner HOLLINGSWORTH, JORDEN TIMOTHY
Created: 03/15/2019 8:04 AM

03/13/2019       Memorandum - Trial
*Petitioner's*
Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 03/15/2019 8:04 AM

03/19/2019       Order (Judicial Officer: Temple, Eva J )

EXHIBIT 129, Page 32 of 36
Case No. 3:20-cv-01567-MC

# CASE SUMMARY
## CASE NO. 17CV47262

|  |  |
|---|---|
|  | *Substitute Causey for Bowser as DEF*<br>Signed: 03/19/2019<br>Party:  Defendant  Tim Causey Supt DRCI<br>Created: 03/19/2019 3:23 PM |
| 03/20/2019 | ▌Memorandum - Trial<br>*Defendant's*<br>Party:  Assistant Attorney General  MARSHALL, WARD DOUGLAS;  Defendant  Troy Bowser Supt TRCI<br>Created: 03/20/2019 4:18 PM |
| 03/20/2019 | ▌Exhibit - List<br>*DEF EXB 101 - 107*<br>Party:  Assistant Attorney General  MARSHALL, WARD DOUGLAS;  Defendant  Troy Bowser Supt TRCI<br>Created: 03/20/2019 4:18 PM |
| 04/02/2019 | ▌Exhibit - List<br>*Amended; DEF EXB 101 - 108*<br>Party:  Assistant Attorney General  MARSHALL, WARD DOUGLAS;  Defendant  Tim Causey Supt DRCI<br>Created: 04/02/2019 2:52 PM |
| 04/09/2019 | ▌**Trial - Court** (9:00 AM)  (Judicial Officer: Pratt, J Burdette)<br>*PET vv DRCI Min SID# 19524416 Attys vv SCAO Duration: 30 Minutes*<br>Resource: Court Reporter  UMAFTRPCR  Recording PCR, FTR<br>Resource: Court Staff  UMARH  Recorder, RJH<br>Resource: Location  UMACTR6  Umatilla County Circuit Court, PCR and Hearing Room #6<br>Resource: Location  SCAPCR  SCA - Post Conviction Relief Courtroom<br>*Held*<br>Created: 10/02/2018 10:56 AM |
| 04/09/2019 | Pending - Under Advisement (Judicial Officer: Pratt, J Burdette )<br>Created: 04/09/2019 2:31 PM |
| 05/24/2019 | ▌Notice - Time for Filing Objection<br>*to proposed judgment*<br>Party:  Court Appointed  CLARK, JONATHAN A;  Assistant Attorney General  MARSHALL, WARD DOUGLAS<br>Created: 05/24/2019 8:57 AM |
| 05/29/2019 | **Judgment - General** (Judicial Officer: Pratt, J Burdette)<br>Party (HOLLINGSWORTH, JORDEN TIMOTHY)<br>     PCR denied - failure to establish the merits of the claims<br>Created: 05/29/2019 8:38 AM |
| 05/29/2019 | ▌Digitized Judgment Document (Judicial Officer: Pratt, J Burdette )<br>*PCR denied - failure to establish the merits of the claims*<br>Signed Date: 05/28/2019<br>Created: 05/29/2019 8:39 AM |
| 05/29/2019 | Notice - Judgment Entry<br>Party:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 05/29/2019 8:39 AM |
| 05/29/2019 | Closed<br>Created: 05/29/2019 8:40 AM |

EXHIBIT 129, Page 33 of 36
Case No. 3:20-cv-01567-MC

# CASE SUMMARY
## CASE NO. 17CV47262

| | |
|---|---|
| 06/03/2019 | Notice - Appeal |
| | *Ct of Appeals #A171177 by Jason Weber* |
| | Filed By:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY |
| | Created: 06/03/2019 1:42 PM |

| DATE | FINANCIAL INFORMATION |
|---|---|

**Petitioner**  HOLLINGSWORTH, JORDEN TIMOTHY

| | |
|---|---|
| Total Charges | 265.00 |
| Total Payments and Credits | 265.00 |
| **Balance Due as of  6/3/2019** | **0.00** |

*Printed on 06/03/2019 at 1:43 PM*

EXHIBIT 129, Page 34 of 36
Case No. 3:20-cv-01567-MC

## CERTIFICATE OF COMPLIANCE WITH ORAP 5.05(2)(d)

<u>Brief Length</u>

I certify that (1) this brief complies with the word-count limitation in ORAP

5.05(2)(b) and (2) that the word count of this brief (as described in ORAP

5.05(2)(a)) is 2,230 words.  Section B of the brief is 6 pages in length.

<u>Type Size</u>

I certify that the size of the type in this brief is not smaller than 14 point font

for both the text of the brief and footnotes as required by ORAP 5.05(4)(f).  As

section B was handwritten I am unable to certify the type size in Section B.

## NOTICE OF FILING AND PROOF OF SERVICE

I certify that I directed the original Appellant's Opening Brief to be filed with the Appellate Court Administrator, Appellate Courts Records section, 1163 State Street, Salem, OR 97301.

I further certify that, upon receipt of the confirmation email stating that the document has been accepted by the eFiling system, this original Appellant's Opening Brief will be eServed pursuant to ORAP 16.45 (regarding electronic service on registered eFilers) on Benjamin Gutman, #160599, Solicitor General, attorney for Defendant-Respondent.


DATED February 11, 2020

Respectfully Submitted,

/s/ Jason Weber

_____
Jason Weber, OSB No. 54109
O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201
(503) 226-0923
jason@oconnorweber.com
Attorney for Petitioner-Appellant
Jorden Timothy Hollingsworth

IN THE COURT OF APPEALS OF THE STATE OF OREGON

————————

| | |
|---|---|
| JORDEN TIMOTHY HOLLINGSWORTH, | Umatilla County Circuit Court No. 17CV47262 |
| Petitioner-Appellant, | |
| v. | |
| TIM CAUSEY, Superintendent, Deer Ridge Correctional Institution, | CA A171177 |
| Defendant-Respondent. | |

————————

RESPONDENT'S ANSWERING BRIEF

————————

Appeal from the Judgment of the Circuit Court
for Umatilla County
Honorable J. BURDETTE PRATT, Judge

JASON L. WEBER  #054109
O'Connor Weber
 1500 SW First Ave, Suite 1090
 Portland, OR 97201
 Telephone:  (503) 226-0923
 Email:  jason@oconnorweber.com

ELLEN F. ROSENBLUM  #753239
Attorney General
BENJAMIN GUTMAN #160599
Solicitor General
ADAM HOLBROOK  #145494
Assistant Attorney General
 1162 Court St. NE
 Salem, Oregon 97301-4096
 Telephone:  (503) 378-4402
 Email:
 adam.holbrook@doj.state.or.us

Attorney for Petitioner-Appellant

Attorneys for Defendant-Respondent

8/20

# TABLE OF CONTENTS

STATEMENT OF THE CASE ............................................................................. 1

    Summary of Argument ................................................................................1

ANSWER TO ASSIGNMENT OF ERROR NO. 1 ........................................... 3

        The post-conviction court correctly denied relief on
petitioner's claim that trial counsel coerced him into waiving a jury
trial. ...........................................................................................................3

    A.    Preservation .............................................................................3

    B.    Standard of Review ..................................................................3

ARGUMENT .................................................................................................... 4

ANSWER TO ASSIGNMENT OF ERROR NO. 2 ........................................... 6

    A.    Preservation .............................................................................6

    B.    Standard of Review ..................................................................6

ARGUMENT .................................................................................................... 6

ANSWER TO ASSIGNMENT OF ERROR NO. 3 ........................................... 8

    A.    Preservation .............................................................................8

    B.    Standard of Review ..................................................................8

ARGUMENT .................................................................................................... 8

CONCLUSION ............................................................................................... 10

# TABLE OF AUTHORITIES

## Cases Cited

*Aponte v. State*,
    257 Or App 421, 306 P3d 785,
    *rev den*, 354 Or 489 (2013) ........................................................................5

*Austin v. Premo*,
    280 Or App 481, 380 P3d 1253,
    *rev den*, 360 Or 697 (2016) ........................................................................5

*Carias v. State of Oregon*,
    148 Or App 540, 941 P2d 571 (1997) .......................................................8

*Hale v. Belleque*,
    255 Or App 653, 288 P3d 596,
    *rev den*, 354 Or 597 (2013) ......................................................................10

*Lotches v. Premo*,
    257 Or App 513, 306 P3d 768,
    *rev den*, 354 Or 597 (2013) ........................................................................5

*Montez v. Czerniak*,
    355 Or 1, 322 P3d 487 (2014).................................................................3, 5

*Sparks v. Premo*,
    289 Or App 159, 408 P3d 276 (2017),
    *rev den*, 363 Or 119 (2018) ........................................................................7

*Strickland v. Washington*,
    466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984) ................................7

## RESPONDENT'S ANSWERING BRIEF

_____

## STATEMENT OF THE CASE

Respondent (the superintendent) accepts petitioner's statement of the case, with the addition and clarification of facts referred to in the argument.

**Summary of Argument**

Petitioner's *Balfour* brief assigns error to the post-conviction court's denial of post-conviction relief.  In his criminal trial, petitioner was convicted of two counts of first-degree sexual abuse.  (ER 2).  In post-conviction, he alleged that trial counsel was constitutionally inadequate and ineffective by (1) placing petitioner into a state of duress in order to obtain a jury-trial waiver (2) not calling certain character witnesses at trial; and (3) not having the defense expert opine on the side effects of a drug, Dexedrine, that the victim had taken. (ER 4).  The post-conviction court denied relief, concluding for each claim that petitioner failed to prove both that trial counsel was deficient and that petitioner suffered prejudice.  (ER 7-8).

The post-conviction court did not err.  As to his first claim, petitioner attempts to relitigate the post-conviction court's finding that trial counsel adequately advised, and did not pressure, petitioner into waiving a jury trial. Those findings, which are supported by trial counsel's credible testimony, are binding.  Furthermore, petitioner does not challenge the post-conviction court's

///

2

alternative and independently sufficient ruling that petitioner failed to prove prejudice.

With respect to petitioner's second claim, the post-conviction court found that trial counsel made an informed strategic decision to not call the character witnesses at issue to avoid opening the door to cross-examination about petitioner's criminal history. Although petitioner questions trial counsel's strategic choice, informed strategic decisions by counsel are virtually unchallengeable. In any event, petitioner does not dispute that he failed to offer evidence of what the character witnesses would have said at trial, and thus failed to prove that he suffered prejudice.

Finally, as to petitioner's third claim, the post-conviction court concluded that trial counsel reasonably decided to not ask his expert witness to opine on the effects of Dexedrine, primarily because the expert lacked the expertise to render such an opinion. Petitioner does not dispute that conclusion. He takes issue only with how his *post-conviction* counsel alleged and litigated the claim. Petitioner asserts that his post-conviction counsel should have asserted that trial counsel was constitutionally deficient for not calling a *different* expert to render the opinion. That argument, however, is unpreserved and factually unsupported, and thus provides no basis for reversal.

///

///

## ANSWER TO ASSIGNMENT OF ERROR NO. 1

The post-conviction court correctly denied relief on petitioner's claim that trial counsel coerced him into waiving a jury trial.

### A.    Preservation

The superintendent agrees that petitioner preserved his argument for appellate review.

### B.    Standard of Review

Petitioner alleged claims of both inadequate assistance of counsel under the Oregon Constitution and ineffective assistance of counsel under the United States Constitution. The standards under the state and federal constitutions are "functionally equivalent." *Montez v. Czerniak*, 355 Or 1, 6, 322 P3d 487 (2014). To prevail on a claim of ineffective or inadequate assistance of counsel, a petitioner must show that counsel acted unreasonably and that the petitioner was prejudiced as a result. *Id*. at 7–8.

This court reviews post-conviction proceedings for errors of law. *Id*. at 8. It is bound by the factual findings of the post-conviction court, if evidence in the record supports the findings. *Id*. If the post-conviction court did not make express findings, this court will presume that the post-conviction court decided the facts in a way consistent with the ultimate conclusion that it reached. *Id*.

///

///

4

## ARGUMENT

In his first claim for post-conviction relief, petitioner alleged that trial counsel was constitutionally inadequate and ineffective because he "placed petitioner into a state of duress in order to obtain a waiver of jury." (ER 4). The post-conviction court denied that claim. It found that trial counsel spoke to petitioner multiple times about whether to have a bench or jury trial, and that petitioner "made a voluntary and informed decision to waive his right to a jury trial." (ER 7). The court also concluded, alternatively, that petitioner failed to prove prejudice, because he did not establish "that he would not have waived his right to a jury trial if it were not for improper actions of his attorney." (ER 7).

On appeal, petitioner attempts to relitigate whether trial counsel compelled him to waive a jury trial but fails to confront the post-conviction court's dispositive factual findings on that issue. (*Balfour* Part B at 2). Petitioner asserted below that trial counsel had "demanded" that he sign a jury waiver and that he "did not have time" to discuss the pros and cons with trial counsel. (Ex 1 at 1). On the other hand, trial counsel explained that he had discussed "at length" with petitioner whether to have a jury trial or a bench trial, "explained the pros and cons" of those options to petitioner, and never demanded or even suggested that petitioner should not proceed with a jury trial. (Ex 105 at 3).

The post-conviction court weighed that evidence and credited trial counsel's version of events, finding petitioner to be not credible. (ER 6-7). Not only does petitioner fail to address the post-conviction court's dispositive findings, those findings are supported by the record—specifically, by trial counsel's declaration and petitioner's colloquy with the trial court before waiving a jury trial. (ER 7); *Aponte v. State*, 257 Or App 421, 426, 306 P3d 785, *rev den*, 354 Or 489 (2013) (affirming denial of post-conviction relief where petitioner did not challenge the post-conviction court's dispositive factual findings); *Lotches v. Premo*, 257 Or App 513, 514, 306 P3d 768, *rev den*, 354 Or 597 (2013) ("We are bound by a post-conviction court's findings of fact if they are supported by evidence in the record.").

Furthermore, petitioner does not challenge the post-conviction court's alternative ruling on prejudice. To prevail on a claim of inadequate or ineffective assistance of counsel, a petitioner must prove both elements—that counsel performed deficiently and that the petitioner was prejudiced as a result. *Montez*, 355 Or at 7-8. When a post-conviction court has ruled against a petitioner on both elements, this court will affirm the post-conviction court's decision "unless the petitioner persuades this court that the post-conviction court committed reversible error with respect to its rulings *as to each element*." *Austin v. Premo*, 280 Or App 481, 486, 380 P3d 1253, *rev den*, 360 Or 697 (2016) (emphasis added). Here, petitioner does not challenge the post-

conviction court's ruling that he failed to prove that he would have proceeded with a jury trial in the absence of trial counsel's allegedly inadequate performance. (*See* ER 7). That unchallenged basis for denying petitioner's claim independently requires affirmance.

## ANSWER TO ASSIGNMENT OF ERROR NO. 2

The post-conviction court correctly denied relief on petitioner's claim that trial counsel should have called certain character witnesses.

### A.    Preservation

Petitioner preserved his argument for appellate review.

### B.    Standard of Review

*See* Standard of Review for Assignment of Error No. 1.

## ARGUMENT

In his second claim for post-conviction relief, petitioner alleged that trial counsel was constitutionally inadequate and ineffective for not "call[ing] witnesses who could, and were prepared to, provide positive character evidence." (ER 4). Denying that claim, the post-conviction court found that trial counsel had his investigator speak with the character witnesses that petitioner identified. (ER 7). Counsel then "made a considered and informed strategic decision not to present evidence on petitioner's character because petitioner had impeachable convictions." (ER 7). The court also concluded, alternatively, that petitioner failed to prove prejudice, because he "did not offer

the sworn testimony from any of the proposed character witnesses to demonstrate what their testimony would have been at trial[.]" (ER 8).

On appeal, petitioner first challenges trial counsel's strategic decision to not call the character witnesses. (*Balfour* Part B at 4). But "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland v. Washington*, 466 US 668, 690, 104 S Ct 2052, 80 L Ed 2d 674 (1984); *see also Sparks v. Premo*, 289 Or App 159, 181, 408 P3d 276 (2017), *rev den*, 363 Or 119 (2018) (same). Here, trial counsel's investigator spoke to the witnesses at issue, and had them in court ready to testify. (Ex 105 at 5). Trial counsel made a strategic decision not to call those witness because he was worried that doing so would "backfire," given that the prosecutor would be able to cross-examine the witnesses about petitioner's prior criminal history. (Ex 105 at 6). He instead reasonably decided to focus the defense on the victim's "history of lying, her admittedly dreaming and awakening, and the possibility that Dexedrine had made her 'dopey' as several witnesses confirmed." (Ex 105 at 6). Petitioner's mere disagreement with the soundness of that strategy provides no basis for reversal.

In any event, petitioner does not challenge the post-conviction court's alternative and independently sufficient ruling on prejudice. When a petitioner's claim for relief involves an argument about how a witness might have testified at trial, petitioner must provide "evidence by affidavit, testimony

8

or otherwise as to what [the] testimony would have been so as to allow an evaluation of the likely effect of that testimony at trial." *Carias v. State of Oregon*, 148 Or App 540, 547, 941 P2d 571 (1997). As petitioner acknowledges, and as the post-conviction court concluded, he did not offer such evidence. (*Balfour* Br Part 2 at 4; ER 8).

## ANSWER TO ASSIGNMENT OF ERROR NO. 3

The post-conviction court correctly denied relief on petitioner's claim that trial counsel should have offered testimony from his expert on drug side effects.

**A.    Preservation**

Petitioner's argument on appeal is not preserved.

**B.    Standard of Review**

*See* Standard of Review for Assignment of Error No. 1.

## ARGUMENT

In his third claim for post-conviction relief, petitioner alleged that trial counsel was constitutionally inadequate and ineffective for not questioning his expert, Dr. Bourg, about the effect that Dexedrine could have had on the victim's sleepiness and perception of reality. (ER 4; TCF at 771). The post-conviction court denied that claim. The court explained, first, that Dr. Bourg was not a medical doctor, but rather had a doctorate in clinical psychology, and there was no evidence that Dr. Bourg had the expertise to opine on Dexedrine's

9

side effects.  (ER 8).  The post-conviction court also concluded that petitioner

failed to offer any credible evidence "that delusions or false reports of sexual

abuse are even a documented potential side effect of Dexedrine."  (ER 8).  For

both reasons, trial counsel "reasonably chose not to attempt to have Dr. Bourg

offer an opinion that would have been well outside her area of expertise and

unsupported by the facts in the case."  (ER 8).  For similar reasons, petitioner

failed to prove prejudice because there was "no evidence that Dr. Bourg could

have even given admissible testimony on the potential side effects of

Dexedrine."  (ER 8).

On appeal, petitioner does not dispute any of the post-conviction court's

findings or conclusions.  He argues only that his "*post-conviction* attorney made

an error by limiting this claim to the expert Dr. Bourg."  (*Balfour* Part B at 6,

emphasis added).  In other words, petitioner appears to contend that his post-

conviction attorney should have alleged and argued that trial counsel was

inadequate or ineffective by not having a *different* expert testify about the side

effects of Dexedrine.  (*Balfour* Part B at 6).  As petitioner recognizes, however,

that is not the claim alleged or litigated below.  (*Balfour* Part B at 6; TCF at

771).[1]  His argument on appeal is thus provides no basis for reversal and, in any

---

[1]      Furthermore, the record below lacked evidence to support such a
claim.  The post-conviction court found that "there is no credible evidence that

*Footnote continued...*

10

event, would be unpreserved. *Hale v. Belleque*, 255 Or App 653, 660, 288 P3d

596, *rev den*, 354 Or 597 (2013) ("Preservation principles apply in the context

of post-conviction relief and, as a general rule, arguments not made to the post-

conviction court in support of a claim will not be considered on appeal.").

## CONCLUSION

This court should affirm the post-conviction court's judgment denying

post-conviction relief.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General
BENJAMIN GUTMAN
Solicitor General


/s/  Adam Holbrook
_____
ADAM HOLBROOK  #145494
Assistant Attorney General
adam.holbrook@doj.state.or.us

Attorneys for Defendant-Respondent
TIM CAUSEY, Superintendent, Deer
Ridge Correctional Institution

_____

*(…continued)*
delusions or false reports of sexual abuse are even a documented potential side
effect of Dexedrine."  (ER 8).

## NOTICE OF FILING AND PROOF OF SERVICE

I certify that on August 11, 2020, I directed the original Respondent's Answering Brief to be electronically filed with the Appellate Court Administrator, Appellate Records Section, and electronically served upon Jason L. Weber, attorney for appellant, by using the court's electronic filing system.

## CERTIFICATE OF COMPLIANCE WITH ORAP 5.05(1)(d)

I certify that (1) this brief complies with the word-count limitation in ORAP 5.05(1)(b) and (2) the word-count of this brief (as described in ORAP 5.05(1)(a)) is 2,030 words. I further certify that the size of the type in this brief is not smaller than 14 point for both the text of the brief and footnotes as required by ORAP 5.05(3)(b).

/s/ Adam Holbrook

ADAM HOLBROOK  #145494
Assistant Attorney General
adam.holbrook@doj.state.or.us

Attorney for Defendant-Respondent
TIM CAUSEY, Superintendent, Deer
Ridge Correctional Institution

AH:aw2/10378146

# IN THE SUPREME COURT OF THE STATE OF OREGON

| | |
|---|---|
| JORDEN TIMOTHY HOLLINGSWORTH,<br>　　　Petitioner-Appellant,<br>　　　Petitioner on Review, | Umatilla County Circuit Court<br>Case No. 17CV47262<br><br>CA A171177 |
| v. | N_____ |
| TIM CAUSEY, Superintendent, Deer Ridge Correctional Institution,<br>　　　Defendant-Respondent,<br>　　　Respondent on Review. | |

## PETITION FOR REVIEW OF PETITIONER-APPELLANT

Petition to review the decision of the Court of Appeals
on an appeal from a judgment of the Circuit Court
for Umatilla County
Honorable J. Burdette Pratt, Senior Judge

Affirmed Without Opinion: September 16, 2020
Before: Egan, Chief Judge, and DeHoog, Judge

If review is allowed, petitioner will rely on the brief filed in the
Court of Appeals.

JASON WEBER #054109
O'Connor Weber LLC
1500 SW First Avenue, Suite 1125
Portland, OR 97201
(503) 226-0923
jason@oconnorweber.com
Attorney for Petitioner on Review

ELLEN ROSENBLUM #753239
Attorney General
BENJAMIN GUTMAN #160599
Solicitor General
ADAM HOLBROOK #145494
400 Justice Building
1162 Court Street NE
Salem, OR 97301
(503) 378-4402
adam.holbrook@doj.state.or.us
Attorneys for Respondent on Review

10/20

# Table of Contents

STATEMENT OF THE CASE ........................................................ 1

    Nature of the Proceeding ........................................................ 1

    Nature of the Judgment ......................................................... 2

    Jurisdiction ............................................................................. 2

    Notice of Appeal .................................................................... 2

    Summary of Historical and Procedural Facts ......................... 2

    Significant Motions ............................................................... 8

    CONCLUSION ....................................................................... 8

# TABLE OF AUTHORITIES

## Cases

*State v. Balfour*,
  311 Or 434, 814 P2d 1069 (1991) ................................................... 1, 8

## Constitutional Provisions and Statutes

Or Const, Art I, § 11 ................................................................... 3

US Const, Amend VI ................................................................ 3

ORAP 5.90 ............................................................................. 1, 8

ORAP 9.05 .............................................................................. 1

ORS 138.650 ............................................................................ 2

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

## APPELLANT'S PETITION FOR REVIEW

_____

### STATEMENT OF THE CASE

This petition is filed pursuant to ORAP 5.90(5)[1], and *State v. Balfour*, 311 Or 434, 814 P2d 1069 (1991).  Counsel for petitioner filed a *Balfour* brief consisting of both Section A and Section B in the Court of Appeals, and that court affirmed without opinion.  ER-15.  Accordingly, counsel for petitioner sets out the Section A and Section B *Balfour* brief that was filed in the Court of Appeals consistently with ORAP 5.90(5) and ORAP 9.05(4)(c).

### Section A

### STATEMENT OF THE CASE

### Nature of the Proceeding

This brief is filed pursuant to ORAP 5.90 and *State v. Balfour*, 311 Or 434, 814 P2d 1069 (1991).  Appellant, petitioner below and hereafter, appeals from a trial court judgment denying him post-conviction relief.  Petitioner filed a *pro se*

_____

[1] That rule provides: "In any case in which the appellant is represented by court-appointed counsel on appeal and counsel filed a brief in the Court of Appeals under subsection (1) of this rule, counsel may submit a petition for review that contains a Section A that complies with ORAP 9.05(3)(a) and a Section B that complies with paragraph (1)(b) of this rule."

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

petition for post-conviction relief and, after counsel was appointed, a first amended

petition for post-conviction relief. ER-10-14 (case register). A copy of the first

amended petition for post-conviction relief is attached at ER-1-5.

## Nature of the Judgment

The post-conviction trial court denied petitioner relief after a trial. A copy

of the general judgment denying relief is attached at ER-6-9

## Jurisdiction

This court has jurisdiction under ORS 138.650.

## Notice of Appeal

Judgment was entered in the Umatilla County Circuit Court on May 29,

2019. ER-11. Petitioner timely filed Notice of Appeal on May 31, 2019.

## Summary of Historical and Procedural Facts

Petitioner was charged, by grand jury indictment, in Clackamas County

Circuit Court case no. CR1501848 with two counts of sexual abuse in the first

degree. Electronic Trial Court File (eTCF) at 55 (Indictment). Both charges were

alleged to have been committed against the same victim, J, who was under 14

years of age at the time of the alleged offense. *Id.* The incident dates were years

apart. *Id.*

Page 2 – APPELLANT'S PETITION FOR REVIEW

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

EXHIBIT 131, Page 5 of 37
Case No. 3:20-cv-01567-MC

In this post-conviction proceeding petitioner raised three claims for relief. All three claims alleged that petitioner's convictions were obtained in violation of his right to counsel in violation of Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution.  ER-3.

First, petitioner alleged that trial counsel "placed petitioner into a state of duress in order to obtain a waiver of jury" by demanding the waiver the "morning of trial."  Petitioner did not have enough time to consider the decision and even though petitioner wanted a jury trial he was "overcome" by the "influence of trial counsel."  ER-4.

Second, petitioner alleged that trial counsel failed to call available character witnesses, Cindy Knowles, Courtney Polk, David Mills, and Kipley Edwards.  If trial counsel had called them, they would have testified that petitioner had a reputation in the community for being "good with children, safe for children, and trustworthy for the care of children."  ER-4.

Third, petitioner alleged that trial counsel "failed to provide testimony at trial indicating the impact of [Dexedrine] on sleepiness and perception of reality."  ER-4.  An expert at petitioner's trial testified that there was a possibility the child victim had "overdosed on Dexedrine" and opined "Withdrawal and rebound effects

Page 3 – APPELLANT'S PETITION FOR REVIEW

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

EXHIBIT 131, Page 6 of 37
Case No. 3:20-cv-01567-MC

such as extreme sleepiness and impaired reality can occur during recovery from

Dexedrine overdoses." ER-4.

In response to these claims the state offered a declaration from petitioner's

criminal defense attorney. Ex 105. The declaration provided in part:

> "At no time did I 'demand' that he waive a jury trial, nor
> suggest that he should not proceed with a jury trial, nor demand that
> he sign a jury waiver. At least two times in the week before the trial,
> the subject of his options as to whether he should have a jury trial or
> court trial were discussed at length. I thoroughly explained to him the
> pros and cons of a court trial verses a jury trial. Because of his
> convictions for Assault IV and Harassment, he had impeachable
> offenses pursuant to ORS 40.355(Oregon Rule of Evidence 609(2),
> which I carefully explained to him. * * *

> "I also informed him that a judge might be more receptive of
> our theory of the case than a jury. Our theory was that the girl had
> admitted to being a liar when she was younger (Tr p .52), and could
> have been confused as to whether she had just dreamed versus what
> actually happened, as she awakened with client allegedly touching her
> sexually. My expert witness, Dr. Wendy Bourg, PhD, a Clinical
> Psychologist, testified about this sort of 'twilight' state and the
> possibility of her confusing a dream with reality. In my experience,
> expert testimony is typically, at least, considered by the judge,
> whereas jurors can be unduly affected by or have undue sympathy for
> the child victim.

> "* * * * *

> "I have never demanded of a client, nor even recommended that
> they waive jury. I have always explained to my clients, including
> petitioner, that it was their personal choice, not mine. I had always
> assumed this case would be tried to a jury. In my opinion, I believe he
> made an intelligent choice in waiving the jury, irrespective of the
> outcome.

Page 4 – APPELLANT'S PETITION FOR REVIEW

"At no time did I assert that 'the jury was needed for another trial.' That statement is categorically false.

Ex 105 at 3-4.

After a hearing on the claims raised in the petitioner, the post-conviction trial court made the following factual findings in its written judgment:

"On February 13, 2015, 11-year-old J reported to her father that the night before, petitioner had put his hands under her shirt, as she was sleeping on the couch. A few days later, J was interviewed at the Children's Center and described how petitioner had touched her "boob" and rubbed his hand across the nipple area of her breast. J reported that when she asked petitioner what he was doing, petitioner variously tried to pretend he had been asleep and was not aware of his actions, or had done nothing, but he also asked J if he could touch her. When she refused, petitioner asked J not to tell what he had done and offered to give her money, and promised to take her to the new Sponge Bob movie, if she would not disclose the touching. During the Children's Center interview, J also disclosed that a few years prior, when she lived at a different address, petitioner had pulled his 'crotch' out of his pants, that it was sticking up some, and he had put his hand down her pants, before she could pull it from her vagina and jump away from petitioner.

"I find the testimony of Arthur Knauss (Ex 105) and DDA Sarah Dumont (Ex 108) to be credible. I find the testimony of Heather Carver (Ex 8) to be credible but largely irrelevant. Hearsay testimony is not adequate to prove what a witness would have testified to if called as a witness at trial. I find the testimony of Petitioner (Ex 1) to be not credible. His testimony is contrary to that of both Knauss and Dumont and is contrary to the record."

ER-6.

With regard to petitioner's first claim, the court wrote:

Page 5 – APPELLANT'S PETITION FOR REVIEW

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

"Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in coercing Petitioner to waive jury trial. The declaration of attorney Arthur B. Knauss establishes that he had more than one discussion with petitioner whether to have a bench trial or a jury trial. They discussed that a judge might be more receptive than a jury to a defense theory that depended on expert testimony (Dr. Wendy Bourg) and the contention that the victim had problems sometimes being truthful. Trial counsel did not demand that Petitioner waive jury trial nor was Petitioner told that the jury was needed for another case. There was a jury available for Petitioner's trial. Petitioner made a voluntary and informed decision to waive his right to a jury trial. The Honorable Katherine Weber engaged in a colloquy with petitioner before the trial about what would be involved if he chose to have a jury trial. Judge Weber also discussed whether petitioner instead wanted to have her decide whether he was guilty or not guilty. Petitioner told Judge Weber that he wanted to have her make the decision in his case. At the end of this colloquy, the court concluded that petitioner was making a knowing, voluntary, and intelligent decision to waive jury. Notably, petitioner never told Judge Weber that counsel had pressured him into waiving a jury. Nor did he disclose that counsel had supposedly threatened him into waiving his right to a jury trial or told him that a jury was not available. Indeed, Judge Weber said a jury was ready and waiting across the hall. Accordingly, because petitioner gave answers which demonstrated that he knew what his choices were and was exercising his right to choose a bench trial, Judge Weber made the finding that his waiver of a jury was knowing, voluntary, and intelligent.

"Petitioner has also not proven prejudice. Petitioner has not proven that he would not have waived his right to a jury trial if it were not for improper actions of his attorney."

ER-7.

With regard to petitioner's second claim the court wrote:

"Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to call character witnesses in Petitioner's behalf at trial. According to the first amended

Page 6 – APPELLANT'S PETITION FOR REVIEW

petition, four persons could have testified that petitioner is 'good with children, safe for children, and trustworthy for the care of children." Trial counsel had his investigator talk to the people identified and had them present at trial. As counsel points out in his declaration, he made a considered and informed strategic decision not to present evidence on petitioner's character because petitioner has impeachable convictions. Counsel's research into petitioner's past convictions and OEC 609 led him to conclude that calling the four character witnesses could backfire because this would allow the prosecutor to ask the witnesses if they were aware of petitioner's past criminal history. Trial counsel also had information that revealed that petitioner was investigated in 2013 and 2014 for having sexual relations with a 15-year-old, when he was 21. The victim in that instance reluctantly reported that she had had sexual intercourse with petitioner 10-15 times, in various parks in Clackamas County, and that petitioner knew she was only 15. Ultimately, petitioner was not prosecuted for Rape III, but only because the victim would not testify at grand jury and claimed that she had lied about the reported sexual intercourse. Nevertheless, if counsel had blundered into putting on witnesses about petitioner's supposed sexual propriety or safety around children, he may well have opened the door to the prosecutor putting on evidence of the investigation into petitioner's sexual relationship with an underage female. The DDA testified that the victim in that old case was willing and available to testify in Petitioner's case.

"Petitioner also did not prove prejudice. Petitioner did not offer the sworn testimony from any of the proposed character witnesses to demonstrate what their testimony would have been at trial regarding Petitioner's character. Petitioner thus did not prove that failure to call the character witnesses could have had a tendency to affect the outcome of the trial."

ER-7-8.

With regard to petitioner's third claim the court wrote:

"Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to have Dr.

Page 7 – APPELLANT'S  PETITION FOR REVIEW

Wendy Bourg testify about the supposed side effects of Dexedrine, if taken in too high a dose. As she testified at petitioner's trial, she has a doctorate in clinical psychology and her practice is interviewing children, and always has been. She is not a medical doctor. There is nothing to show that she would have had the expertise to opine that J may have been confabulating the reported sexual abuse in February 2015, supposedly due to having ingested too much Dexedrine. Indeed, there is no credible evidence that delusions or false reports of sexual abuse are even a documented potential side effect of Dexedrine. Dr. Skinner, who is a medical doctor, and has long worked at the Children's Center where J was interviewed, testified that she was unaware of a potential side effect of Dexedrine being delusions or hallucinations. In addition, as Dr. Skinner testified, J's dose of Dexedrine was 'low normal.' Thus, for at least two reasons – lack of expertise and no factual basis to support the notion – Dr. Bourg could not have testified that J's report of being sexually abused by petitioner, in February 2015, could possibly have been the product of a Dexedrine overdose. Counsel reasonably chose to not attempt to have Dr. Bourg offer an opinion that would have been well outside her area of expertise and unsupported by the facts in the case.

"Petitioner has also failed to prove prejudice. There is no evidence that Dr. Bourg could have even given admissible testimony on the potential side effects of Dexedrine, let alone done so in such a persuasive fashion it could have had a tendency to affect the outcome of the case."

ER-8.

## Significant Motions

No significant motions have been filed in this PCR appeal.

## CONCLUSION

Counsel submits Section A in compliance with all the requirements

articulated in ORAP 5.90 and *State v. Balfour*, 311 Or at 451-52.  Counsel has

Page 8 – APPELLANT'S PETITION FOR REVIEW

thoroughly reviewed the record and "discussed the case with trial counsel and client." *See* ORAP 5.90(1)(a)(iii).  Counsel has not identified any arguably meritorious issues on appeal.

Counsel has supplied petitioner with copies of pertinent post-conviction trial court records including the transcript of the post-conviction proceedings and the trial court record.  In addition, counsel has provided petitioner with applicable appellate court rules and has provided petitioner a reasonable opportunity to "raise any issue" in a Section B portion of the brief.  311 Or at 452.  Petitioner has provided counsel with "Section B" brief, which is set out below.

DATED October 21, 2020

Respectfully Submitted,

/s/ Jason Weber

_____

Jason Weber
OSB No. 54109
O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201
(503) 226-0923
jason@oconnorweber.com
Attorney for Petitioner on Review
Jorden Timothy Hollingsworth

Page 9 – APPELLANT'S PETITION FOR REVIEW

O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201

EXHIBIT 131, Page 12 of 37
Case No. 3:20-cv-01567-MC

**Section B begins on the next page.**

Claim 1

## Statement of the case
## Questions presented

Did the court erred in denying the Claim 1 that petitioner did not prove he would not have waived his right to a jury trial if it were not for improper actions of his attorney?

## Summary of Argument

The court erred in denial of claim 1. There was evidence to prove petitioner signed the jury waiver minutes before the trial.

## Assignment of Error

The court erred by denying claim 1. that petitioner did not prove that he would not have waived his right to a jury trial if it were not for improper actions of his attorney.

## Preservation of Error

In the judgment denying Post-Conviction Relief, page 1, Claim 1. It is said that claim is denied because petitioner failed to establish the merits of the claim. The jury waiver should have been present. It was dated the morning of the trial. That is envidence that the decision was made minutes before the trial.

## Standard of Review

The court reviews the denial of Claim 1. It reviews the jury waiver that was signed before the trial. It determines if this is enough evidence to support this claim.

## Argument

It was said all case long that petitioner wanted a jury trial. The morning of the trial, the trial attorney influenced petitioner to sign the waiver. If this was truly the petitioners decision, why wasn't the the decision to have a judge trial made before the day of trial? The jury waiver was signed minutes before trial. The document should have been audible. If it wasn't, the post conviction Attorney erred in this defense.

For all this reasons, this court should reverse the courts denial of Claim 1 and remand to a new trial.

*Jordan Hollingsworth*

Claim 2

### Statement of the case
### Questions presented
Did the court erred in denying the Claim
2 that petitioner did not prove that
his character witnesses would have
influenced the outcome of the trial?

### Summary of Argument
The court erred in denying Claim 2.
Petitioner did prove his character
witnesses should have been presented
at trial and they would have changed
the impact of the trial.

### Assignment of Error
The court erred in denying claim 2,
that petitioner did not prove his
character witnesses would have
impacted the outcome of the trial.
The Trial attorney did not have a
good strategy in not presenting the
witnesses. He had all the witnesses
ready to testify.

### Preservation of Error
In the judgement denying Post conviction
relief, Page 2, Claim 2. It is said that
Claim 2 is denied because petitioner failed
to establish the merits of the Claim.
In a case like this, the character witnesses
should have been presented.

## Standard of Review

The court reviews the denial of claim 2. It reviews the testimony of these witnesses and determines if this is enough to support claim. It reviews the so called evidence the DA had to cross examine these witnesses.

## Argument

It is said that the strategy of not putting these character witnesses on the stand was a right strategy because it would allow previous allegations to be let in. There is no proof to these other allegations. The 14, 15 year old said at the Grand Jury that she lied about the reported sexual intercourse she had with petitioner. The court could not have brought this up. The previous convictions and allegations had nothing to do with the present case. The petitioner wanted every thing about him and his life brought up in court. The Post conviction attorney did not get sworn affidants from these witnesses. I believe gathering affidants would have impacted this claim. The Attorney erred in this defense.

For these reasons, this court should reverse the courts denial of claim 2, and remand for a new trial.

## Statement of the case
### Questions presented

Did the court erred in denying claim 3 that petitioner failed to prove prejudice?

### Summary of Argument

The court erred in the denial of claim 3. The effects on the medication in this case was big enough that presented in the right way would have affected the outcome of the case.

### Assignment of Error

The court erred in denying the claim 3 that petitioner failed to prove prejudice. That the evidence would have affected the outcome of the case if not for improper actions of his attorney.

### Preservation of Error

In the judgement denying post-conviction relief, page 3, claim 3. It is said that claim 3 was denied because petitioner failed to establish the merits of the claim. It is linked with the medication that a side effect is delusion. This should have been presented at trial.

## Standard of Review

The court reviews the denial of Claim 3. It reviews the side effects of these medication. It reviews the evidence and determines if this is enough evidence to support this claim.

## Argument

There is alot that goes into this case regarding the medication. The side effects of the medication and the impact it can have coming out of a dream state. should have been presented at trial. In petitioners claim before he was appointed a court appointed attorney, It is said that his trial attorney should have had a witness that was an expert on this specific medication and the side effects it can have. The post conviction attorney made an error by limiting these claim to the expert Dr. Boorg. I believe another expert should have presented this evidence.

For all of these reasons, this court should reverse the courts denial of Claim 3 and remand to a new trial.

*Jordan Phillips*

# EXCERPT OF RECORD INDEX

Amended Petition for Post-Conviction Relief.........................................ER 1-5

Judgment...................................................................................ER 6-9

OECI Case Register.........................................................................ER 10-14

Order Affirming Without Opinion..........................................................ER-15

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF UMATILLA

JORDEN HOLLINGSWORTH,

           Plaintiff,

    vs.

TROY BOWSER, Superintendent,

Two Rivers Correctional Institution,

         Defendant.

) No. 17CV47262
)
) **PETITIONER'S FIRST AMENDED**
) **PETITION**
)
)
)
)
)
)

COMES NOW the Petitioner, by and through his attorney, Jonathan Clark, and alleges:

1.

Troy Bowser was the duly appointed, acting superintendent of the Two Rivers Correctional Institution, City of Umatilla, Oregon, at the time of filing the original petition herein, and was thereby in custody and control of Petitioner. Defendant Troy Bowser continues to act in that capacity, and Petitioner continues to reside in that facility.

2.

Petitioner's imprisonment is by virtue of a judgment and sentence imposed on October 24, 2016, by Clackamas County Circuit Court Judge Katherine E. Weber in *State of Oregon v. Jorden Timothy Hollingsworth,* Clackamas County Circuit Court Case No. CR1501848.

3.

Petitioner was charged by Secret Indictment in *State of Oregon v. Jorden Timothy*

*Hollingsworth,* Clackamas County Circuit Court Case No. CR1501848. He entered pleas of Not

Guilty to all charges.  The charges, and the resolution of each, are as follows:

## CR1501848

| Charge | Disposition | Sentence |
|---|---|---|
| Count 1<br>Sexual Abuse in the First Degree<br>ORS 163.427<br>(Felony Class B)<br>Ballot Measure 11 | Convicted | 75 months in the Department of Corrections, and 36 months Post-Prison Supervision. |
| Count 2<br>Sexual Abuse in the First Degree<br>ORS 163.427<br>(Felony Class B)<br>Ballot Measure 11 | Convicted | 75 months in the Department of Corrections concurrent with Count 1, and 36 months Post-Prison Supervision. |

4.

Petitioner was appointed Arthur Knauss as counsel (OSB# 731700, 294 Warner Milne Rd, Oregon City, Oregon 97045).  Arthur Knauss represented Petitioner through trial in the original trial court proceedings.

5.

Petitioner pursued an appeal from his criminal convictions in Oregon Court of Appeals Case but his appeal was dismissed October 2, 2017.

6.

No prior post-conviction proceedings have been undertaken by Petitioner with respect to the above-referenced conviction. Petitioner's petition for post-conviction relief was filed within the two-year limitations period set forth at ORS 138.510.

/ / / /

## CLAIMS FOR RELIEF
(Ineffective Assistance of Counsel)
7.

Petitioner incorporates paragraphs 1 through 7 as if fully set forth herein. Petitioner's imprisonment and restraint, to the best of his knowledge and belief, are unlawful under ORS 138.530 because:

a. Petitioner's right to effective and adequate assistance of trial counsel under Article 1 § 11 of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution were violated as further alleged below.

b. On each of the following claims, Petitioner alleges that trial counsel's acts and omissions were not the product of an acceptable tactical decision and counsel's performance fell below an objective standard of reasonableness for defense counsel in similar felony criminal proceedings under the then-prevailing professional norms.

c. Whether considered cumulatively or individually, the numerous deficiencies in trial counsel's performance are sufficiently significant to undermine confidence in the outcome of Petitioner's trial and sentence. The unreasonable failures by trial counsel eviscerated Petitioner's constitutional rights to a jury trial, confrontation, effective assistance of counsel, and right against self-incrimination, all under Article 1 § 11 of the Oregon Constitution, Article 1 § 12 of the Oregon Constitution and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

d. There is a reasonable probability that, absent the errors of trial counsel, the result of conviction or sentence would have been different. Any confidence in petitioner's conviction and sentence has been undermined as a result of trial counsel's deficient performance.

/ / / /

/ / / /

e.  Trial counsel provided ineffective and inadequate assistance of counsel in the following particulars:

  I. Trial Counsel placed Petitioner into a state of duress in order to obtain a waiver of jury.  Trial Counsel demanded the jury waiver the morning of trial, close in time to the beginning of trial, asserting that the jury was needed for another trial and that he (petitioner) did not want a jury.  This contradicted Petitioner's desire and intention, but his will was overcome by the position and influence of Trial Counsel.  Furthermore, Petitioner did not have ample time to consider this tactical decision or discuss its implications with Trial Counsel.

  II. Trial Counsel failed to call witnesses who could, and were prepared to, provide positive character evidence.  Trial Counsel had in his file investigative reports indicating that four persons who knew Petitioner personally would testify that according to their opinion and according to Petitioner's reputation, Petitioner was good with children, safe for children, and trustworthy for the care of children.  These witnesses are Cyndi Knowles, Courtney Polk, David Mills, and Kipley Edwards.

  III. One expert informed Trial Counsel that the case file indicates some reports that the child victim had been overdosed with Dexedrine.  The expert then opined, "Withdrawal and rebound effects such as extreme sleepiness and impaired reality testing can occur during recovery from Dexedrine overdoses."   Trial Counsel failed to provide testimony at trial indicating the impact of medication on sleepiness and perception of reality.

/ / / /

8.

All assertions of ineffective and inadequate assistance of counsel are supported by Exhibit 1, the Trial Court File, Exhibit 2, the Trial Transcript, Exhibit 3, Petitioner's Declaration, Exhibit 4, Declaration of Counsel, as well as the foregoing paragraphs, and any evidence developed during the course of litigation of this matter.

All Exhibits will be filed separately on a CD and served contemporaneously on defense counsel.


DATED this 27th day of August, 2018.

/s/ Jonathan Clark
Jonathan Clark, OSB No. 022740
Attorney for Petitioner

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR THE COUNTY OF UMATILLA
216 SE 4th Street  Pendleton Oregon  97801

JORDEN TIMOTHY HOLLINGSWORTH          **Case No:** 17CV47262
        *SID#: OR-19524416*          Petitioner

        v.                                    **GENERAL JUDGMENT
                                            DENYING
                                            POST-CONVICTION RELIEF**

Tim Causey Supt DRCI
                                    Defendant

This matter came before the court on 04/09/2019 on an action for post-conviction relief.

☐ The Petitioner **withdrew** the following claims:

**Findings of fact** ☐ were made on the record  X included in the legal findings below and
        X as follows:

On February 13, 2015, 11-year-old J reported to her father that the night before, petitioner had
put his hands under her shirt, as she was sleeping on the couch.  A few days later, J was
interviewed at the Children's Center and described how petitioner had touched her "boob"
and rubbed his hand across the nipple area of her breast.  J reported that when she asked
petitioner what he was doing, petitioner variously tried to pretend he had been asleep and was
not aware of his actions, or had done nothing, but he also asked J if he could touch her.  When
she refused, petitioner asked J not to tell what he had done and offered to give her money, and
promised to take her to the new Sponge Bob movie, if she would not disclose the touching.
During the Children's Center interview, J also disclosed that a few years prior, when she
lived at a different address, petitioner had pulled his "crotch" out of his pants, that it was sticking
up some, and he had put his hand down her pants, before she could pull it from her vagina and
jump away from petitioner.


I find the testimony of Arthur Knauss (Ex 105) and DDA Sarah Dumont (Ex 108) to be credible.
I find the testimony of Heather Carver (Ex 8) to be credible but largely irrelevant.  Hearsay
testimony is not adequate to prove what a witness would have testified to if called as a witness at
trial. I find the testimony of Petitioner (Ex 1) to be not credible.  His testimony is contrary to
that of both Knauss and Dumont and is contrary to the record.

➤  **X** Federal X State Constitution questions were presented and decided

The following claims are **ALLOWED**: None
        For all allowed claims, the following relief is granted: None


The following claims are **DENIED**:

**Claim: 1**        is denied because Petitioner failed to:
                        ☐ utilize or follow available state procedure
                        X establish the merits of the claim

JUDGMENT 17CV47262 Jorden Timothy Hollingsworth vs. Tim Causey Supt DRCI        Page 1 of 4

EXHIBIT 131, Page 26 of 37
Case No. 3:20-cv-01567-MC

The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in coercing Petitioner to waive jury trial. The declaration of attorney Arthur B. Knauss establishes that he had more than one discussion with petitioner whether to have a bench trial or a jury trial. They discussed that a judge might be more receptive than a jury to a defense theory that depended on expert testimony (Dr. Wendy Bourg) and the contention that the victim had problems sometimes being truthful. Trial counsel did not demand that Petitioner waive jury trial nor was Petitioner told that the jury was needed for another case. There was a jury available for Petitioner's trial. Petitioner made a voluntary and informed decision to waive his right to a jury trial. The Honorable Katherine Weber engaged in a colloquy with petitioner before the trial about what would be involved if he chose to have a jury trial. Judge Weber also discussed whether petitioner instead wanted to have her decide whether he was guilty or not guilty. Petitioner told Judge Weber that he wanted to have her make the decision in his case. At the end of this colloquy, the court concluded that petitioner was making a knowing, voluntary, and intelligent decision to waive jury. Notably, petitioner never told Judge Weber that counsel had pressured him into waiving a jury. Nor did he disclose that counsel had supposedly threatened him into waiving his right to a jury trial or told him that a jury was not available. Indeed, Judge Weber said a jury was ready and waiting across the hall. Accordingly, because petitioner gave answers which demonstrated that he knew what his choices were and was exercising his right to choose a bench trial, Judge Weber made the finding that his waiver of a jury was knowing, voluntary, and intelligent.

Petitioner has also not proven prejudice. Petitioner has not proven that he would not have waived his right to a jury trial if it were not for improper actions of his attorney.

**Claim: 2**    is denied because Petitioner failed to:
          ☐ utilize or follow available state procedure
          X establish the merits of the claim
       The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to call character witnesses in Petitioner's behalf at trial. According to the first amended petition, four persons could have testified that petitioner is "good with children, safe for children, and trustworthy for the care of children." Trial counsel had his investigator talk to the people identified and had them present at trial. As counsel points out in his declaration, he made a considered and informed strategic decision not to present evidence on petitioner's character because petitioner has impeachable convictions. Counsel's research into petitioner's past convictions and OEC 609 led him to conclude that calling the four character witnesses could backfire because this would allow the prosecutor to ask the witnesses if they were aware of petitioner's past criminal history. Trial counsel also had information that revealed that petitioner was investigated in 2013 and 2014 for having sexual relations with a 15-year-old, when he was 21. The victim in that instance reluctantly reported that she had had sexual intercourse with petitioner 10-15 times, in various parks in Clackamas County, and that petitioner knew she was only 15. Ultimately, petitioner was not prosecuted for Rape III, but only because the victim would not testify at grand jury and claimed that she had lied about the reported sexual intercourse. Nevertheless, if counsel had blundered into putting on witnesses about petitioner's supposed sexual propriety or safety around children, he may well have opened

JUDGMENT 17CV47262 Jorden Timothy Hollingsworth vs. Tim Causey Supt DRCI    Page 2 of 4

EXHIBIT 131, Page 27 of 37
Case No. 3:20-cv-01567-MC

the door to the prosecutor putting on evidence of the investigation into petitioner's sexual relationship with an underage female.  The DDA testified that the victim in that old case was willing and available to testify in Petitioner's case.

Petitioner also did not prove prejudice.  Petitioner did not offer the sworn testimony from any of the proposed character witnesses to demonstrate what their testimony would have been at trial regarding Petitioner's character.  Petitioner thus did not prove that failure to call the character witnesses could have had a tendency to affect the outcome of the trial.


**Claim: 3**    is denied because Petitioner failed to:
           ☐ utilize or follow available state procedure
           X establish the merits of the claim
       The legal basis for denial of relief is:

Petitioner did not prove that his trial attorney failed to exercise reasonable professional skill and judgment in failing to have Dr. Wendy Bourg testify about the supposed side effects of Dexedrine, if taken in too high a dose.  As she testified at petitioner's trial, she has a doctorate in clinical psychology and her practice is interviewing children, and always has been. She is not a medical doctor.  There is nothing to show that she would have had the expertise to opine that J may have been confabulating the reported sexual abuse in February 2015, supposedly due to having ingested too much Dexedrine.  Indeed, there is no credible evidence that delusions or false reports of sexual abuse are even a documented potential side effect of Dexedrine.  Dr. Skinner, who is a medical doctor, and has long worked at the Children's Center where J was interviewed, testified that she was unaware of a potential side effect of Dexedrine being delusions or hallucinations.  In addition, as Dr. Skinner testified, J's dose of Dexedrine was "low normal."  Thus, for at least two reasons – lack of expertise and no factual basis to support the notion – Dr. Bourg could not have testified that J's report of being sexually abused by petitioner, in February 2015, could possibly have been the product of a Dexedrine overdose.  Counsel reasonably chose to not attempt to have Dr. Bourg offer an opinion that would have been well outside her area of expertise and unsupported by the facts in the case.

Petitioner has also failed to prove prejudice.  There is no evidence that Dr. Bourg could have even given admissible testimony on the potential side effects of Dexedrine, let alone done so in such a persuasive fashion it could have had a tendency to affect the outcome of the case.

JUDGMENT 17CV47262 Jorden Timothy Hollingsworth vs. Tim Causey Supt DRCI    Page 3 of 4

EXHIBIT 131, Page 28 of 37
Case No. 3:20-cv-01567-MC

**Additional findings and orders:**

The court adopts all findings made on the record and incorporates them into this judgment.

All questions presented were decided. This judgment constitutes a final General Judgment for the purposes of appellate review and res judicata.

NOW, THEREFORE, The Petition for Post-Conviction Relief is denied in its entirety and is dismissed with prejudice.

*Judge Signature:*

Signed: 5/28/2019 03:15 PM

_____

**Senior Judge J Burdette Pratt**

JUDGMENT 17CV47262 Jorden Timothy Hollingsworth vs. Tim Causey Supt DRCI

Page 4 of 4

EXHIBIT 131, Page 29 of 37
Case No. 3:20-cv-01567-MC

UMATILLA

# CASE SUMMARY
## CASE NO. 17CV47262

| | | | |
|---|---|---|---|
| JORDEN TIMOTHY HOLLINGSWORTH | § | Location: | **Umatilla** |
| vs | § | Filed on: | **10/27/2017** |
| Tim Causey Supt DRCI | § | Previous Court Case | **CR1501848** |
| | § | Number: | |
| | § | | |

---

### CASE INFORMATION

**File Date** 10/27/2017

**Filed By** HOLLINGSWORTH, JORDEN TIMOTHY    **Filed Against** Troy Bowser Supt TRCI

Case Type: **Post Conviction Relief**

Case Flags: **Appeal**

**Cause of Action**          **Description/Remedy**
- Original Action            Action

**Statistical Closures**
05/29/2019      Closed

---

| DATE | CASE ASSIGNMENT |
|---|---|
| | **Current Case Assignment** |
| | Case Number          17CV47262 |
| | Court                Umatilla |
| | Date Assigned        10/27/2017 |

---

### PARTY INFORMATION

*Lead Attorneys*

**Petitioner**      **HOLLINGSWORTH, JORDEN TIMOTHY**

**Defendant**       **Tim Causey Supt DRCI**                          **MARSHALL, WARD**
                                                                      **DOUGLAS**
                                                                      *Retained*
                                                                      503 947-4706(W)

            **Troy Bowser Supt TRCI**
                Removed: 03/19/2019
                Inactive

---

| DATE | EVENTS & ORDERS OF THE COURT | INDEX |
|---|---|---|
| 10/27/2017 | **Cause of Action**   - Original Action   () | |
| | Filed By                HOLLINGSWORTH, JORDEN TIMOTHY | |
| | Filed Against           Troy Bowser Supt TRCI | |
| | Action Type             Action | |
| 10/27/2017 | ▇ Petition - Post Conviction Relief | |
| | Filed By:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY | |
| | Serving:  Defendant  Troy Bowser Supt TRCI | |
| | Created: 10/30/2017 10:59 AM | |
| 10/27/2017 | ▇ Motion - Appoint Counsel | |
| | *And proceed as indigent person* | |
| | Party:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY | |
| | Created: 10/30/2017 11:01 AM | |
| 10/31/2017 | ▇ Order - Appointing Counsel (Judicial Officer: Temple, Eva J ) | |
| | *Attorney: ORPCC* | |
| | Signed: 10/31/2017 | |
| | Party:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY | |

*Printed on 09/03/2019 at 9:43 PM*

EXHIBIT 131, Page 30 of 37
Case No. 3:20-cv-01567-MC

# CASE SUMMARY
## CASE NO. 17CV47262

Created: 10/31/2017 4:07 PM

| | |
|---|---|
| 10/31/2017 | **Judgment - Limited Creates Lien** (Judicial Officer: Temple, Eva J)<br>- Original Action :<br>Monetary Award (Unsatisfied, 10/31/2017)<br>   Signed Date: 10/31/2017<br>   Expiration Date: 10/31/2027<br>   Monetary Award:<br>      Creditor: State of Oregon, Debtor: JORDEN TIMOTHY HOLLINGSWORTH,<br>      Unsatisfied, Award Type: Judgment Fees, Amount: $265.00<br>   Total: $265.00<br>Created: 10/31/2017 4:08 PM |
| 10/31/2017 | Digitized Judgment Document (Judicial Officer: Temple, Eva J )<br>*Filing fee; cc: PTF & DOC Financial*<br>Created: 10/31/2017 4:08 PM |
| 10/31/2017 | Notice - Judgment Entry<br>Party: Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 10/31/2017 4:09 PM |
| 11/07/2017 | Notice - Representation<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 11/08/2017 8:47 AM |
| 01/26/2018 | Motion - Time Extension<br>*PTF time to file Amended Petition*<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 01/26/2018 3:05 PM |
| 01/26/2018 | Declaration<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 01/26/2018 3:05 PM |
| 01/29/2018 | Order - Continue (Judicial Officer: Lieuallen, Jon )<br>*PTF time to file Amended Petition*<br>Signed: 01/29/2018<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 01/29/2018 12:09 AM |
| 05/21/2018 | Declaration<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 05/21/2018 11:11 AM |
| 05/21/2018 | Motion - Time Extension<br>*PET time to file Amended Petition*<br>Party: Court Appointed CLARK, JONATHAN A; Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 05/21/2018 11:11 AM |
| 05/21/2018 | Order - Continue (Judicial Officer: Lieuallen, Jon )<br>*Insufficient grounds for 90 day extension; less time granted than requested* |

EXHIBIT 131, Page 31 of 37<br>Case No. 3:20-cv-01567-MC

UMATILLA

# CASE SUMMARY
## CASE NO. 17CV47262

Signed: 05/21/2018
Party: Court Appointed  CLARK, JONATHAN A;  Petitioner  HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 05/21/2018 12:59 AM

06/28/2018    Motion - Time Extension
*PET time to file Amended Petition*
Party: Court Appointed  CLARK, JONATHAN A;  Petitioner  HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 06/29/2018 8:23 AM

06/28/2018    Declaration
Party: Court Appointed  CLARK, JONATHAN A;  Petitioner  HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 06/29/2018 8:23 AM

06/29/2018    Order - Continue (Judicial Officer: Hill, Daniel J )
*PET Time to file Amended Petition; Counsel needs to comply with SLRs or have motions
denied*
Signed: 06/29/2018
Party: Court Appointed  CLARK, JONATHAN A;  Petitioner  HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 06/29/2018 3:48 PM

08/27/2018    Petition - Amended
*with PET EXB 1 - 4 attached (EXB 3 to be filed separately)*
Party: Court Appointed  CLARK, JONATHAN A;  Petitioner  HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 08/29/2018 11:51 AM

09/07/2018    Exhibit
*PET EXB 3*
Party: Court Appointed  CLARK, JONATHAN A;  Petitioner  HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 09/07/2018 1:20 PM

10/01/2018    Answer
Party: Assistant Attorney General  MARSHALL, WARD DOUGLAS;  Defendant  Troy
Bowser Supt TRCI
Created: 10/01/2018 1:03 PM

10/01/2018    Issue - At Issue
*Set Trial*
Created: 10/01/2018 2:52 PM

03/13/2019    Exhibit - List
*PET EXB 1 - 8*
Party: Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY
Created: 03/15/2019 8:04 AM

03/13/2019    Memorandum - Trial
*Petitioner's*
Party: Court Appointed  CLARK, JONATHAN A;  Petitioner  HOLLINGSWORTH,
JORDEN TIMOTHY
Created: 03/15/2019 8:04 AM

03/19/2019    Order (Judicial Officer: Temple, Eva J )

*Printed on 06/03/2019 at 9:43 PM*

EXHIBIT 131, Page 32 of 37
Case No. 3:20-cv-01567-MC

# Case Summary
## Case No. 17CV47262

Substitute Causey for Bowser as DEF
Signed: 03/19/2019
Party:  Defendant  Tim Causey Supt DRCI
Created: 03/19/2019 3:23 PM

03/20/2019    Memorandum - Trial
*Defendant's*
Party:  Assistant Attorney General  MARSHALL, WARD DOUGLAS;  Defendant  Troy Bowser Supt TRCI
Created: 03/20/2019 4:18 PM

03/20/2019    Exhibit - List
*DEF EXB 101 - 107*
Party:  Assistant Attorney General  MARSHALL, WARD DOUGLAS;  Defendant  Troy Bowser Supt TRCI
Created: 03/20/2019 4:18 PM

04/02/2019    Exhibit - List
*Amended; DEF EXB 101 - 108*
Party:  Assistant Attorney General  MARSHALL, WARD DOUGLAS;  Defendant  Tim Causey Supt DRCI
Created: 04/02/2019 2:52 PM

04/09/2019    **Trial - Court** (9:00 AM)  (Judicial Officer: Pratt, J Burdette)
*PET vv DRCI Min SID# 19524416 Attys vv SCAO Duration: 30 Minutes*
Resource: Court Reporter  UMAFTRPCR  Recording PCR, FTR
Resource: Court Staff  UMARH  Recorder, RJH
Resource: Location  UMACTR6  Umatilla County Circuit Court, PCR and Hearing Room #6
Resource: Location  SCAPCR  SCA - Post Conviction Relief Courtroom
*Held*
Created: 10/02/2018 10:56 AM

04/09/2019    Pending - Under Advisement (Judicial Officer: Pratt, J Burdette )
Created: 04/09/2019 2:31 PM

05/24/2019    Notice - Time for Filing Objection
*to proposed judgment*
Party:  Court Appointed  CLARK, JONATHAN A;  Assistant Attorney General  MARSHALL, WARD DOUGLAS
Created: 05/24/2019 8:57 AM

05/29/2019    **Judgment - General** (Judicial Officer: Pratt, J Burdette)
Party (HOLLINGSWORTH, JORDEN TIMOTHY)
     PCR denied - failure to establish the merits of the claims
Created: 05/29/2019 8:38 AM

05/29/2019    Digitized Judgment Document (Judicial Officer: Pratt, J Burdette )
*PCR denied - failure to establish the merits of the claims*
Signed Date: 05/28/2019
Created: 05/29/2019 8:39 AM

05/29/2019    Notice - Judgment Entry
Party:  Petitioner  HOLLINGSWORTH, JORDEN TIMOTHY
Created: 05/29/2019 8:39 AM

05/29/2019    Closed
Created: 05/29/2019 8:40 AM

EXHIBIT 131, Page 33 of 37
Case No. 3:20-cv-01567-MC

UMATILLA
# CASE SUMMARY
## CASE NO. 17CV47262

| | |
|---|---|
| 06/03/2019 | Notice - Appeal<br>*Ct of Appeals #A171177 by Jason Weber*<br>Filed By: Petitioner HOLLINGSWORTH, JORDEN TIMOTHY<br>Created: 06/03/2019 1:42 PM |

| DATE | FINANCIAL INFORMATION |
|---|---|

**Petitioner** HOLLINGSWORTH, JORDEN TIMOTHY

| | |
|---|---:|
| Total Charges | 265.00 |
| Total Payments and Credits | 265.00 |
| **Balance Due as of 6/3/2019** | **0.00** |

**FILED: September 16, 2020**

IN THE COURT OF APPEALS OF THE STATE OF OREGON

JORDEN TIMOTHY HOLLINGSWORTH,
Petitioner-Appellant,

v.

TIM CAUSEY, Superintendent, Deer Ridge Correctional Institution,
Defendant-Respondent.

Umatilla County Circuit Court
17CV47262

A171177

J. Burdette Pratt, Senior Judge.

Submitted on August 14, 2020.

Before Egan, Chief Judge, and DeHoog, Judge.

Attorney for Appellant:  Jason Weber/Jorden Hollingsworth *pro se.*

Attorney for Respondent:  Adam Holbrook.

**AFFIRMED WITHOUT OPINION**

---

**DESIGNATION OF PREVAILING PARTY AND AWARD OF COSTS**

Prevailing party:    Respondent

[ ]    No costs allowed.
[X]    Costs allowed, payable by Appellant.

---

# CERTIFICATE OF COMPLIANCE WITH ORAP 5.05(2)(d)

Brief Length

I certify that (1) this petition complies with the word-count limitation in

ORAP 5.05(2)(b) and (2) that the word count of this brief (as described in ORAP

5.05(2)(a)) i  2,851 words.  Section B of the brief is 6 pages in length.

Type Size

I certify that the size of the type in this petition is not smaller than 14 point

font for both the text of the brief and footnotes as required by ORAP 5.05(4)(f).

As section B was handwritten/scanned I am unable to certify the type size

in Section B.

## NOTICE OF FILING AND PROOF OF SERVICE

I certify that I directed the original Petition for Review to be filed with the

Appellate Court Administrator, Appellate Courts Records section, 1163 State

Street, Salem, OR 97301.

I further certify that, upon receipt of the confirmation email stating that the

document has been accepted by the eFiling system, this original Petition for

Review will be served via U.S. mail delivery on Adam Holbrook, #145494,

attorney for Respondent on Review.


DATED October 21, 2020

Respectfully Submitted,

/s/ Jason Weber

_____

Jason Weber
OSB No. 054109
O'Connor Weber LLC
1500 SW First Avenue, Suite 1090
Portland, OR 97201
(503) 226-0923
jason@oconnorweber.com
Attorney for Petitioner on Review
Jorden Timothy Hollingsworth

IN THE SUPREME COURT OF THE STATE OF OREGON

JORDEN TIMOTHY HOLLINGSWORTH,
Petitioner-Appellant,
Petitioner on Review,

v.

TIM CAUSEY, Superintendent, Deer Ridge Correctional Institution,
Defendant-Respondent,
Respondent on Review.


Court of Appeals
A171177

S068068

**ORDER DENYING REVIEW**

Upon consideration by the court.

The court has considered the petition for review and orders that it be denied.

_____
MARTHA L. WALTERS
CHIEF JUSTICE, SUPREME COURT
12/24/2020   10:00 AM

c:  Adam W Holbrook
    Jason L Weber

tnb


**ORDER DENYING REVIEW**
REPLIES SHOULD BE DIRECTED TO:  State Court Administrator, Records Section,
Supreme Court Building, 1163 State Street, Salem, OR  97301-2563
Page 1 of 1

EXHIBIT 132, Page 1 of 1
Case No. 3:20-cv-01567-MC

IN THE COURT OF APPEALS OF THE STATE OF OREGON

JORDEN TIMOTHY HOLLINGSWORTH,
Petitioner-Appellant,

v.

TIM CAUSEY, Superintendent, Deer Ridge Correctional Institution,
Defendant-Respondent.

Umatilla County Circuit Court
17CV47262

A171177

**APPELLATE JUDGMENT AND SUPPLEMENTAL JUDGMENT**

J. Burdette Pratt, Senior Judge.

Submitted on August 14, 2020.

Before Egan, Chief Judge, and DeHoog, Judge.

Attorney for Appellant: Jason Weber.

Attorney for Respondent: Adam Holbrook.

**AFFIRMED WITHOUT OPINION**

---

**DESIGNATION OF PREVAILING PARTY AND AWARD OF COSTS**

Prevailing party:  Respondent                [X]  Costs allowed, payable by Appellant.

---

**MONEY AWARD**

Creditor:      Tim Causey, Superintendent, Deer Ridge Correctional Institution
Attorney:      Adam Holbrook, 1162 Court St NE, Salem OR 97301
Debtor:        Jorden Timothy Hollingsworth
Attorney:      Jason Weber
Costs:                  $100.00
Total Amount:           $100.00
Interest: Simple, 9% per annum, from the date of this appellate judgment.

---

Appellate Judgment                                        COURT OF APPEALS
Effective Date:  January 29, 2021                              (seal)

els

**APPELLATE JUDGMENT AND SUPPLEMENTAL JUDGMENT**

EXHIBIT 133, Page 1 of 1
Case No. 3:20-cv-01567-MC